IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90085-11 |
| | § | JOINTLY ADMINISTERED SORRENTO |
| SORRENTO THERAPEUTICS, INC., | § | HOUSTON, TEXAS |
| ET AL, | § | MONDAY, |
| | § | MAY 22, 2023 |
| DEBTORS. | § | 4:00 P.M. TO 5:19 P.M. |

**<u>MOTIONS HEARING</u>**

BEFORE THE HONORABLE DAVID R. JONES
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:


FOR THE DEBTOR, SORRENTO               LATHAM & WATKINS, LLP
THERAPEUTICS, INC.:                    Amy C. Quartarolo, Esq.
                                       355 S. Grand Avenue
                                       Los Angeles, CA 90071ericas
                                       213-485-1234

                                       LATHAM & WATKINS, LLP
                                       Robert J. Ellison, Esq.
                                       10250 Constellation Blvd.
                                       Suite 1100
                                       Century City, CA 90067
                                       424-653-5570


FOR GANG GARY CHEN AND                 FRANKLIN SOTO LEEDS, LLP
ZHENWEI DAVID MIAO:                    Dean T. Kirby, Jr., Esq.
                                       444 W. C Street, Suite 300
                                       San Diego, CA 92101
                                       619-525-1652

<u>INDEX</u>

| WITNESSES: | Direct | Cross | Redirect | Recross | VOIR DIRE |
|---|---|---|---|---|---|
| MICHAEL H. RINEY | | | | | |
| By Mr. Kirby | 10 | . | . | . | . |
| By Mr. Ellison | . | 32 | . | . | . |
| DR. CHEN | | | | | |
| By Mr. Kirby | 27 | . | 41 | . | . |
| By Mr. Ellison | . | 32 | . | . | . |
| MO MEGHJI | | | | | |
| By Ms. Quartarolo | 43 | . | . | . | . |
| By Mr. Kirby | . | 46 | . | . | . |

| EXHIBITS: | Admitted |
|---|---|
| Movant's Exhibit 2 | 26 |
| Movant's Exhibit 10 | 18 |

***

4

1        **HOUSTON, TEXAS; MONDAY, MAY 22, 2023; 4:00 P.M.**

2            THE COURT:  Good afternoon, everyone.  This is Judge

3    Jones, the time is 4:00 o'clock Central, today is May 22,

4    2023.  This is the docket for Houston, Texas.  On the 4:00

5    o'clock docket we have Case Number 23-90085, the jointly

6    administered cases under Sorrento Therapeutics, Inc.

7            Folks, please don't forget to record your electronic

8    appearance.  If this is the first time for you or it's been a

9    while, that's a quick trip to the website, a couple of mouse

10   clicks, you can do that at any time prior to the conclusion of

11   the hearing.  But that is how we note your appearance.

12           Again, I have activated the hand-raising feature.

13   If you know you're going to be speaking, if you would go ahead

14   and hit five star for me.  You only have to do that once but

15   it is -- it will let me know that you do intend to speak, and

16   you can change your mind at any time.  The first time that you

17   do speak if you would please state your name and who you

18   represent.  It really does serve as a good point of reference

19   in the event that a transcript request is made.

20           And finally we are recording this afternoon using

21   CourtSpeak.  We will have the audio up on the docket shortly

22   after the conclusion of the hearing this afternoon.

23           All right.  Mr. Kirby, where are we?

24           MR. KIRBY:  Well, Your Honor -- can Your Honor hear

25   me?

1            THE COURT:  Loud and clear, thank you.

2            MR. KIRBY:  All right.  Dean Kirby for Dr. Chen and

3  Dr. Miao, the moving parties.  Your Honor, these motions are

4  decided on the facts of each case and here we have a State

5  Court lawsuit which has been going on for almost five years,

6  was scheduled for trial on May 12, was derailed by the

7  automatic stay.  Trial date's then vacated and when they did

8  that they scheduled a status conference for August 7.

9            There's no trial date and although no one's stayed

10  from showing up at the next status conference, the Court can't

11  set a new trial date on August 7 at the status conference if

12  the stay remains in effect.  If our motion is granted and the

13  Superior Court can set a new trial date, and the way that

14  court calendars work that's going to be months down the road.

15            We presented evidence that discovery is

16  substantially completed meaning specifically that there's no

17  outstanding discovery that the Debtor has to respond to,

18  summary judgment motions have all been decided, and there are

19  no pending motions at all that the Debtor has to respond to.

20  The case is ready for trial.  The Debtor has not presented a

21  declaration and has not designated a witness that could

22  contradict that.

23            So basically the main effect of granting this motion

24  would be to allow my clients to get back in line in the

25  Superior Court to have their case set for trial next year.

1    Given the posture of the litigation there's no burden on

2    management of the Debtor during these next few months, and I

3    have not heard the Debtor admit that this Chapter 11 case

4    isn't well down the road to being resolved.

5        Now the Court knows that the Bankruptcy Code has

6    provisions designed to see that the stay motions are decided

7    relatively promptly.  There has to be a hearing within 30 days

8    after the motion's filed.  Unless the Court within that period

9    orders that the stay continue in effect, when the Court wanted

10   to reschedule this hearing, I emailed the case administrator

11   to let the Court know that my clients would and did waive the

12   30-day requirement so that this hearing could take place.

13       So at this hearing, Section 362(a)(1) says if the

14   Court shall order the stay continue in effect pending the

15   conclusion of the final hearing, if there is, and I'm quoting,

16   "a reasonable likelihood that the party opposing relief from

17   such stay will prevail at the conclusion of such final

18   hearing".  Now has the Debtor, which has the burden of proof

19   on all the issues here, made that showing?  If not, then the

20   Court ought to grant the motion now.

21       The Debtor hasn't made the showing that it has a

22   reasonable likelihood of prevailing.  As they said, there's

23   evidence only on one side that the burden of continuing this

24   litigation over the next few months is slight.  The Debtor's

25   not required to respond to further discovery, no motions.  The

1  Debtor could have offered the declaration of one of the

2  lawyers in the California lawsuit to refute, that but did not

3  do so.  The Debtors asserted that having this case reset for

4  trial now would blow up the Debtor's litigation budget which

5  totals $13.2 million in professional fees through the end of

6  June.

7          Well, nothing's going to happen through the end of

8  June in this case at all.  There's no declaration and there's

9  no competent witness designated who estimate the amount of the

10  fees that will be incurred in these next few months.  And the

11  only evidence that the Debtor has apparently prepared to

12  present, now or later, is that there's going to be very slight

13  fees.  And with no motions, no depositions or interrogatories

14  to answer, how's the Debtor's management going to be

15  distracted by this lawsuit during the next few months.  All

16  they have to do the Debtor doesn't say.

17          And finally, when you ask the Court to weigh

18  whatever clearly slight inconvenience and cost the Debtor

19  could possibly incur against the harm in my clients, Dr. Chen

20  and Dr. Miao.  Although they want to liquidate a general

21  unsecured claim in this case, something I assume the Debtor

22  wants to do, their lawsuit primarily concerns Concordance -- I

23  always want to say Concordance, but it's Concortis, a non-

24  bankrupt subsidiary of the Debtor.  Does Concortis really own

25  the intellectual property that my clients conveyed with?  What

1    about my clients' damages claim against Paul Hastings?

2            And the balance of harm here clearly weighs in favor

3    of my clients, and there's nothing that the Debtor has even

4    offered to prove to the contrary.  So this is a very

5    appropriate case to grant this motion now at this stage.

6            THE COURT:  So, Mr. Kirby, just a couple of

7    observations.  Number one, as we sit here today there's been

8    no evidence on either side.  And second of all, I take a

9    little issue with the fact that you say that the Debtors have

10   identified no witness, when I look at the docket and in

11   accordance with the rules of the Southern District of Texas,

12   there is a witness and exhibit list on file with a witness

13   identified.  So I'm sort of curious as to how you came to make

14   that statement to me.

15           MR. KIRBY:  Well, the only witness designated is the

16   Debtor's chief reorganization officer.

17           THE COURT:  But you told me --

18           MR. KIRBY:  How can the Debtor --

19           THE COURT:   -- you told me there was no witness.

20   That's what you told me.

21           MR. KIRBY:  I don't believe --

22           THE COURT:  All right.

23           MR. KIRBY:   -- that that's what I said, but there's

24   no witness --

25           THE COURT:  The Record is -- the Record is what the

1   Record is.  I'll take that as your opening statement.  I can't

2   really believe, but so that you're clear, I don't take

3   declarations as evidence attached to motions.  That's not

4   evidence.

5           So, Ms. Reckler, did you want to make any opening

6   comments?

7           MS. QUARTAROLO:  Actually, Your Honor, it's Amy

8   Quartarolo on behalf of the Debtors.

9           THE COURT:  My apologies.  Any opening statements?

10          MS. QUARTAROLO:  So, Your Honor, we are prepared to

11  move forward with an evidentiary hearing today.  I believe we

12  had attempted to discuss with Mr. Kirby in advance of the

13  hearing and he indicated that he viewed today as a preliminary

14  hearing.  We believe that today -- I mean we're prepared to

15  move forward on a final hearing basis and are happy to put on

16  evidence.

17          THE COURT:  Okay.  Mr. Kirby?

18          MR. KIRBY:  Well, Your Honor, I have my witness

19  here, Mr. Riney, and I also have Dr. Chen.

20          THE COURT:  Okay.  So you're prepared --

21          MR. KIRBY:  -- and I don't --

22          THE COURT:  -- you're prepared to go forward.

23          MR. KIRBY:  Yes.

24          THE COURT:  All right.  Who's your first witness?

25          MR. KIRBY:  I'd like to call Michael H. Riney, he's

1   here I believe on video.

2           THE COURT:  All right.  Mr. Riney, can you hear me?

3   Just confirm for me.

4           MR. RINEY:  (No audible response.)

5           THE COURT:  So to Mr. Riney and Mr. Chen, had you

6   hit five star on your telephone?  Because I can see you

7   talking, but I can't hear you.

8       (Pause in the proceedings.)

9           THE COURT:  You only need to do it once.  In fact,

10  if you do it twice it actually makes the circle.  I think --

11  there you are.  How about now, Mr. Riney?

12          MR. RINEY:  Hello, Your Honor.  Can you hear me now?

13          THE COURT:  Loud and clear.  Thank you.  If you

14  would please, sir, if you'd raise your right hand.

15      (Witness sworn.)

16          THE COURT:  All right.  Thank you.

17      Mr. Kirby?

18                      DIRECT EXAMINATION

19  BY MR. KIRBY:

20  Q   Mr. Riney, could you tell the Court what your involvement

21  is in the Sorrento lawsuit that's now pending in the Superior

22  Court of California?

23  A   I represent Dr. David Miao who is the primary financial

24  instant party in the litigation between Sorrento and Drs. Miao

25  and Chen.  Dr. Chen, sitting to my left, is represented by

1    Matt Mahoney who's also on the call.  Mr. Chen (glitch in the

2    audio) is closer to my offices, so that's why he's here.

3    Q    Mr. Riney, as of the date that the bankruptcy petition

4    was filed by Sorrento Therapeutics, that would have been I

5    believe February 11, were there -- was there any outstanding

6    discovery that the Debtor was required to respond to?

7    A    I don't believe there was anything pending from Sorrento

8    at all.  There was an issue with respect to some information

9    required from my clients to Sorrento or Concortis, but not the

10    other way around.

11    Q    And at the time that the bankruptcy petition was filed

12    was there -- were there any motions pending that the Debtor

13    was required to respond to?

14    A    Not the best of my recollection.

15    Q    And at the time the bankruptcy petition was filed was

16    there a trial date scheduled?

17    A    There had been a trial date scheduled in January of 2023,

18    that was essentially by agreement of the parties continued to

19    allow for mediation.  So the cutoff date was May 2022, the

20    trial date was in January 2022 (sic) but it was in December

21    that the judge continued the trial date I think till May to

22    allow for mediation.

23    Q    And after the bankruptcy petition was filed, Mr. Riney,

24    what occurred in the Superior Court litigation?

25    A    Well, nothing other than we went to a status conference

1    and advised Judge Sturgeon of the bankruptcy filing.

2    Q    And was that at a status conference?

3    A    It was.

4    Q    And did Judge Sturgess -- Sturgeon take any action as a

5    result?

6    A    Other than set another status conference for August 7 I

7    believe which followed Mr. Ellison's comments to the effect

8    that his client is just going be out of bankruptcy by July

9    2023.  I think June or July, if I remember correctly.  The

10   judge set a follow-up status conference for August 7.  So

11   we're expected in the courtroom, so.  I think August 7, 2023.

12   Q    Mr. Riney, you're familiar with how the calendar works in

13   the San Diego County Superior Court, are you not?

14   A    I've been practicing here for almost 40 years now.

15   Q    So what do you anticipate, based on your experience, a

16   new trial date might be?

17   A    Well, Judge Sturgeon, who is an excellent judge, and I

18   say that whether or not this being recorded, but he's a very

19   good judge with a -- a typical Superior Court judge in

20   San Diego has about 1,000 cases on their docket.  Obviously

21   they don't open a file, but when you have a case of this

22   nature with a lengthy file, it's hard to get, you know, an

23   open window of time.  I'm sure the Court can appreciate that.

24        I would not anticipate, if we went and saw the judge

25   on August 7, 2023, when an order allowing Judge Sturgeon to

1    reset the trial, that this (glitch in the audio) trial until,

2    at the very earliest, the end of this year or some time in

3    2024.  But right now though of course we get in line, and

4    that's kind of the problem.

5             MR. KIRBY:  I have nothing further for Mr. Riney.

6             THE COURT:  Thank you.  Mr. Riney, have you filed a

7    proof of claim in the bankruptcy case?

8             THE WITNESS:  Me personally?

9             THE COURT:  For your client.

10            THE WITNESS:  Or have -- I think Mr. Kirby can

11   answer that question better than I.

12            THE COURT:  But he's not under oath and you are.  Do

13   you know if a proof of claim has been filed on behalf of your

14   client?

15            THE WITNESS:  Your Honor, I apologize, I can't

16   answer that question with any certainty.  I assume that

17   something akin to that's been filed, but I don't -- I have

18   steered clear of Bankruptcy Court through all these almost

19   40 years, Your Honor.  I have twice stepped into Bankruptcy

20   Court and only then in connection with (indiscernible).

21            THE COURT:  I got it.  I wasn't trying to put you in

22   a box, I was just trying to figure out what you'd done.

23            THE WITNESS:  I apologize.

24            THE COURT:  All right.

25            THE WITNESS:  I know that that's (glitch in the

1     audio).

2            THE COURT:  Okay.  Fair enough.

3            Ms. Quartarolo, any Cross?

4            MS. QUARTAROLO:  Your Honor, I'm going to leave the

5     Cross to my colleague, Rob Ellison --

6            THE COURT:  Ah, my apologies.

7            MS. QUARTAROLO:   -- who I believe also --

8            THE COURT:  I got it wrong again.

9            Mr. Ellison, any Cross?

10           MR. ELLISON:  Yes, Your Honor.  Thank you.

11           Can you hear me?

12           THE COURT:  Loud and clear.  Thank you.

13                       CROSS-EXAMINATION

14    BY MR. ELLISON:

15    Q    Mr. Riney, good afternoon.

16    A    Hello, Mr. Ellison.  I'm sure you've dreamed of this day.

17    Q    For a long time.  Mr. Riney, you just testified about

18    the -- what you expect the trial date would be if we were to

19    go back before Judge Sturgeon in August.  Correct?

20    A    I said I didn't think it would be set before the end of

21    this year or early next year.  I don't know whether it would

22    be out some time after that, it could be quite a bit after

23    that I would guess.  And that's just based upon not talking to

24    the judge but just my experience with how things work.

25    Q    Okay.  So just to be clear, it wasn't based on any recent

1  discussions with the judge or the judge's clerk?

2  A    No, I would not do that, Rob.

3  Q    Okay.

4  A    (Glitch in the audio.)

5  Q    So, Mr. Riney, before the San Diego litigation was stayed

6  Judge Sturgeon ordered a forensic inspection of your client's

7  laptop.  Correct?

8  A    I think that's correct, Rob.  It's been a few months.

9  Q    Okay.  In the following --

10  A    I wasn't really personally doing much work on that piece

11  of the whole discovery puzzle, so forgive me if my timing is

12  not good.

13  Q    Understood, but you argued in opposition to Sorrento's

14  efforts to obtain a forensic inspection of Dr. Miao's laptop.

15  Right?

16  A    I believe that was objected to, yes.

17  Q    Okay.  And following the Court's order granting that

18  motion the parties agreed to use an expert at Palo Alto

19  Networks to conduct the forensic work.  Right?

20  A    I think that's right, yeah.

21  Q    Okay.  And becuase the case was stayed first by agreement

22  of the parties and then the bankruptcy filing, the parties had

23  not yet agreed on the specific protocol to be applied by Palo

24  Alto Networks.  Correct?

25  A    I'll take your word on that, Rob.  I know there a

1    protocol being worked on.  I also know that computer was, you

2    know, reviewed long before I got involved in the case and

3    documents to do so.  I think it really mostly confirms that it

4    was done.

5    Q    Okay.  But you agree with me that the work of Palo Alto

6    Networks remained outstanding at the time the case was stayed.

7    A    Honestly, Rob, I don't recall whether they clicked that

8    button or not.  I just don't know.  I know it was underway, or

9    at least underway if not completed.

10          THE COURT:  And, Mr. Riney, I appreciate the

11    informality but we are in a court hearing.  It's Mr. Ellison,

12    it's Judge Jones, and you are Mr. Riney.

13          THE WITNESS:  Okay.  Thank you.  I apologize, Your

14    Honor.

15    BY MR. ELLISON:

16    Q    And do you recall, Mr. Riney, Judge Sturgeon referenced

17    16,000 files and meta data on the files contained on the

18    laptop that would be subject to Palo Alto Networks' forensic

19    imaging exercise.  Do you remember that?

20    A    I don't remember Judge Sturgeon using a number like that,

21    but I do remember someone from the office using that number.

22    Q    Okay.  Let's take a look --

23          MR. ELLISON:  Judge Jones, if you wouldn't mind

24    Chandler Howell in my office handling the -- putting exhibits

25    up, presenting exhibits.

1          THE COURT:  All right.  He has control.

2          MR. ELLISON:  Okay.  Great.  Mr. Howell could you

3     pull up Debtor's Exhibit 10 at the Docket 68 -- 658-10.

4          And scroll down for Mr. Riney's benefit, I'd just

5     like to ask him if this is a true and correct copy of the

6     judge's order granting Sorrento's motion to compel the

7     forensic image of Dr. Miao's laptop.

8          THE WITNESS:  I'll take your word for that, it sure

9     looks like it from what little I can see it.

10         MR. ELLISON:  Okay.  So, Mr. Howell, if you could

11    scroll down to the bottom of page 1 and the top of page 2.

12    And I'll just read into the Record, it says, Plaintiffs have

13    shown good cause as required by Section 2031.310 of Division B

14    to allow for the forensic inspection of the laptop in

15    accordance with forensic inspection protocol attached as

16    Exhibit A to Plaintiff's proposed order.  Therefore the motion

17    is granted.  Plaintiff shall be allowed to have an expert take

18    a mirror image of all post-2018 searches made by Mr. Miao

19    which shall be limited to 16,000 files and meta data RAM on

20    the files.

21         So, Mr. Riney, did I read that correctly?

22    A    It appears that you read it correctly, Counsel.  I'm

23    squinting, but sure.

24         MR. ELLISON:  And, Your Honor, I'd like to offer

25    this court order into evidence.

1          THE COURT:  Any objection?

2          MR. KIRBY:  No objection to the Court taking

3     judicial notice of the order.

4          THE COURT:  So I think he's offering it for the

5     substance.  I got it.  I can take judicial notice of the fact

6     that it exists.  But I think he's asking that I take -- that I

7     actually take the statement for the truth of the matter

8     asserted.  So is there an objection to the admission of the

9     exhibit?

10         MR. KIRBY:  Your Honor, I don't want to be

11    difficult, no objection.

12         THE COURT:  So, one, I don't think it's being

13    difficult.  I play by the rules of evidence.  They should be

14    what govern our conduct.  So there's either an objection or

15    not.

16         MR. KIRBY:  I said there was not.

17         THE COURT:  All right.  Then it's admitted without

18    objection.

19       (Debtor's Exhibit No. 10 received in evidence.)

20    BY MR. ELLISON:

21    Q    And, Mr. Riney, does this refresh your recollection that

22    Judge Sturgeon mentioned the 16,000 files and meta data read

23    on the files in his order granting Sorrento's motion to

24    compel?

25    A    It does, Mr. Ellison, refresh my recollection that the --

1  those were the numbers that came out of, I think if I remember

2  correctly, the work that had been done by prior counsel and

3  their electronic discovery experts to produce those 16,000

4  files and the remaining meta data.  It was effectively

5  confirming that Sorrento can have a second look at stuff

6  that's from some years ago to make sure I disclosed --

7  Q    But --

8  A     -- that it was -- excuse me.

9  Q    Okay.  Apologies.  I thought you were done.  I apologize

10  for interrupting.

11       You recall though having discussions with me and with

12  Palo Alto Networks about what the protocol would be for that

13  forensic inspection.  Do you remember that?

14  A    I remember we were in communication with the ESI expert

15  that was (indiscernible).

16  Q    Okay.  And there was a dispute --

17  A    (Indiscernible).

18  Q    Sorry, I thought you were done.

19  A    I was.

20  Q    There was --

21  A    I apologize.

22  Q    Okay.  And there was some dispute over the scope of Judge

23  Sturgeon's order at the time the case was stayed.  Correct?

24  A    I'm sorry, Mr. Ellison, I don't recall that.  I don't --

25  I just don't recall that one way or the other.

1    Q    Okay.  But following the stay, regardless of whether you

2    remember that there was a dispute or not, this is a topic that

3    will have to be taken up between the parties and if the

4    parties can't agree, we'll have to go back to Judge Sturgeon

5    following the lifting of the stay.  Right?

6    A    But, well, if I could, I would object to the question

7    being compound, but since I can't I will tell you that the --

8    I understand the engagement.  You're entitled to have Palo

9    Alto look at those 16,000 files that were previously

10   introduced and give them to you again.  I don't know what the

11   dispute is about that process, but we're just hoping to

12   (indiscernible).

13   Q    Okay.  But you don't remember having an agreement on

14   specifically what the protocol would be.  Correct?

15   A    One way or the other, I don't recall.

16   Q    Okay.

17        MR. ELLISON:  Mr. Howell, you can take that exhibit

18   down.

19   BY MR. ELLISON:

20   Q    Mr. Riney, before the San Diego litigation was stayed

21   Judge Sturgeon also ordered Dr. Miao to provide further

22   responses to three different sets of written discovery

23   requests from Sorrento by November 29, 2022.  Correct?

24   A    That's correct.

25   Q    And, in fact, after Judge Sturgeon issued that order you

1    on behalf of Dr. Miao applied ex parte to Judge Sturgeon to --

2    seeking to clarify the Court's order.  Correct?

3    A    Are you referring to the ex parte application about

4    whether or not -- related to the question of how the Chinese

5    data security rules impacted that order?

6    Q    Correct.  Yep.

7    A    So, yes, that issue was brought up before the judge by ex

8    parte.

9    Q    Okay.  And the judge denied the ex parte application?

10   A    He did.

11   Q    And the judge did not modify the substance of its order

12   compelling Dr. Miao to respond to Sorrento's discovery.

13   Right?

14   A    I think that's correct.

15   Q    Okay.  On December 6, 2022 after the Debtors agreed to a

16   short extension Dr. Miao served further responses to those

17   discovery requests in accordance with Judge Sturgeon's order.

18   Right?

19   A    I'll take your word for that, sir.

20   Q    Okay.

21   A    I don't recall, but on this date, we would have done our

22   best to meet it.

23   Q    So in a number of those RFP responses, the requests for

24   production of documents, Dr. Miao stated that he is amenable

25   to meet and confer discussions between counsel to determine if

1    relevant -- additional relevant information can be provided

2    without violating Chinese law.  Do you remember that?

3    A    I generally recall offering to discuss some things, sure.

4    Q    And you don't recall producing any additional documents

5    in response to those discovery requests.  Right?

6    A    We stayed -- by agreement stayed all the discovery

7    pending mediation.

8    Q    Okay.  Following mediation the discovery -- if the stay

9    on the case were to be lifted, you would agree with me that

10    Dr. Miao would have to produce additional documents or the

11    parties would have to meet and confer over those responses.

12    Correct?

13    A    I would anticipate that you and I would have a

14    conversation about whether anything more needed to be

15    produced.

16    Q    Okay.

17    A    (Glitch in the audio.)

18    Q    (Glitch in the audio.)

19    A    --  here is whether or not additional production is

20    required (indiscernible).  But, yeah, Dr. Miao -- you and I

21    have a couple of open issues with Dr. Miao and that we needed

22    to do additional things.

23    Q    Okay.  And the last one is there was an outstanding

24    motion to compel correspondence from Dr. Miao and Dr. Chen's

25    expert, Dr. Woodnut (phonetic) that was pending subject to

1     parties' discuss to try to resolve it at the time the

2     bankruptcy case was stayed.  Correct?

3     A     Was there a motion pending or was that the meet and

4     confer discussion between you and counsel, or I think it was

5     co-counsel probably.

6     Q     Well, Mr. Riney, I'll just offer to you there was a

7     third motion pending and we were still trying to resolve that

8     issue at the time the stay was imposed.  Any reason to

9     disagree with that?

10              MS. KIRBY:  Objection --

11              THE WITNESS:  I recall that -- I recall that --

12              MS. KIRBY:   -- Mr. Ellison is not -- Mr. Ellison is

13    not testifying here and he wasn't designated as a witness.

14              THE COURT:  And so what's the objection?

15              MR. KIRBY:  He's testifying as part of his question.

16              THE COURT:  Mr. Ellison, so I'll make is easy for

17    you, he's raising a form objection, do you have any response?

18              MR. ELLISON:  Yeah, I can just re-ask the question

19    to --

20              THE COURT:  The objection --

21              MR. ELLISON:   -- get the same information.

22    Mr. --

23              THE COURT:  The objection --

24              MR. ELLISON:  Oh, I'm sorry.

25              THE COURT:  Hold on.  The objection is sustained.

1    Now go ahead and re-ask your question.

2         MR. ELLISON:  Okay.

3    BY MR. ELLISON:

4    Q    Mr. Riney, do you have any reason to dispute the fact

5    that Sorrento had a motion pending regarding Dr. Woodnut at

6    the time the bankruptcy stay was imposed?

7    A    Rob, I don't have any recollection about a motion that

8    could be pending.  I mean if you were testifying and you said

9    that, I wouldn't, you know, refute it.  But what I do recall

10   is that there was an issue as to whether the expert needed to

11   produce some additional documents.  I don't think it

12   (indiscernible).

13   Q    Okay.  And when the stay would be -- when the stay is

14   lifted that issue will be -- need to be addressed by the

15   parties.  Correct?

16   A    No doubt.

17   Q    Okay.  So on page 4 of movant's reply, which is at Docket

18   Number 614, there's a statement that says, There is no pending

19   discovery.  That statement's not accurate.  Correct?

20   A    Do you have the document?  I think -- my recollection of

21   the proceeding was is there's no pending discovery due from

22   the Debtor.

23   Q    So it wouldn't be accurate if it just said, there's no

24   pending discovery period.  Is that correct?

25   A    I'd ask you to contact counsel, that you contact -- I

1    think what Mr. Kirby has argued in his papers is that there is

2    no outstanding discovery due from the Debtor.  So that's the

3    context as I understood it from what Mr. Kirby filed.

4    Q    Mr. Riney, when all these discovery issues are ironed out

5    the parties will have to prepare for trial.  Correct?

6    A    I mean if we ever get a trial date, yes.

7    Q    Okay.  And the litigation has been pending for about five

8    years.  Is that right?

9    A    Approximately.

10   Q    There's roughly 35 claims between the parties?

11   A    In that ballpark.  You mean -- by that you mean counts?

12   Yes.

13   Q    Yep.  Okay.  And there's a voluminous record in the

14   litigation.  Correct?

15   A    There's a voluminous record in the litigation, yes.

16   Q    And you'd agree that the trial will be north of three

17   weeks, likely around four weeks when it eventually happens?

18   A    That was, yes, I mean I think we were giving four before

19   the court severed out the claims against the lawyer.  But I do

20   think probably it's in that ballpark.

21   Q    Thank you, Mr. Riney.

22          MR. ELLISON:  I have no further questions.

23          THE COURT:  All right.  Thank you.

24          Mr. Kirby, any redirect?

25          MR. KIRBY:  No, Your Honor.

1          THE COURT:  All right.  Thank you.  Mr. Riney's your

2     excused as a witness.

3          (Witness excused.)

4          THE COURT:  Mr. Kirby, who's your next witness?

5          MR. KIRBY:  Your Honor, before calling Dr. Chen I'd

6     like to offer Exhibit 2 on our list which is the cross-

7     complaint of Dr. Chen and Dr. Miao filed in the Superior Court

8     lawsuit.

9          And I ask that the Court take judicial notice of

10     that just for the purpose of seeing what claims are being made

11     in the lawsuit and not for the truth of any sort of a finding

12     as to the merits of those claims.

13          THE COURT:  So, Mr. Ellison, I'm going to modify

14     that a little bit.  Do you have any objection to my admitting

15     Exhibit 2, Movant's Exhibit 2 for the limited purpose of

16     showing what claims have been asserted in the litigation?

17          MR. ELLISON:  No, Your Honor.

18          THE COURT:  All right.  Then I'll admit it for that

19     limited purpose.

20          (Movant's Exhibit No. 2 received in evidence.)

21          MR. KIRBY:  All right.  Dr. Chen --

22          THE COURT:  So, Mr. Kirby, are you intending on

23     calling Dr. Chen?

24          MR. KIRBY:  Oh, my apologies, Your Honor.  I do want

25     to address the Court, or ask a question about this.  This is a

DR. CHEN - DIRECT BY MR. KIRBY                    27

1      complicated lawsuit with a lot of complicated claims.  It will

2      take a very long time to examine even on direct Dr. Chen about

3      the merits of those claims.  And perhaps the Court can give me

4      some guidance as to whether it intends to evaluate the merits

5      of the claims or make decisions on that before I offer his

6      testimony.

7              THE COURT:  I do not intend on evaluating the merits

8      of any claim asserted in the California litigation.

9              MR. KIRBY:  All right.  Thank you, Your Honor.

10     Well, I would like to call Dr. Chen.

11             THE COURT:  All right.  Dr. Chen, if you would,

12     please, sir, if you'd raise your right hand.

13         (Witness sworn.)

14             THE COURT:  All right.  Thank you, sir.

15             Mr. Kirby, go ahead, please, sir.

16                          DIRECT EXAMINATION

17     BY MR. KIRBY:

18     Q    Dr. Chen, prior to the merger transactions which are the

19     subject of the Sorrento litigation in the Superior Court, you

20     were the -- were you the principal, or one of the principals

21     of a company called Concortis?

22     A    Yes.

23     Q    And when Concortis ultimately merged with and became a

24     wholly owned subsidiary of the Debtor, in connection with that

25     transaction did you transfer certain intellectual property

1    Concortis?

2    A    So actually there was two transactions, 2013 and 2016.

3    So on the 2013 we transferred certain IP and technology, but

4    we retained the target and also the rights to use those

5    (indiscernible) targets on the technology part, and plus

6    there's a (indiscernible) retained (indiscernible).  Then in

7    2016 we transferred all the IP, all the ownership to

8    Sorrento -- to Concortis.

9    Q    Dr. Chen, let's focus on the 2016 merger.  First of all

10   the intellectual property that was transferred, were you

11   developing that intellectual property and deriving income from

12   it at the time that it was transferred to Concortis?

13   A    Yes, me and my partner, Dr. David Miao, we are the co-

14   inventors of some of the technology and Dr. Miao is the major

15   inventor of this technology.

16   Q    And were you developing that technology and did it have

17   at least the potential of making a great deal of money?

18            MR. ELLISON:  Objection, it lacks foundation, it's

19   compound.

20            THE COURT:  I'll sustain the form objection, it was

21   a compound question.  I'd have no idea what answer he was

22   giving.  So, Mr. Kirby, you can break it down.

23   BY MR. KIRBY:

24   Q    Were you in the process of continuing to develop that

25   intellectual property at the time of the 2016 merger?

1    A    Yes.  Yes.

2    Q    And did that development cost money?

3    A    Yes.

4    Q    And did that intellectual property that you were

5    developing at your expense have the potential to generate

6    large amounts of income down the line?

7    A    Yes.  It's actually one of the collaborations with a

8    Chinese company called the Column (phonetic) they continued.

9    They're actually going to file on the -- actually they filed

10   for marketing this year, and merged.  Actually through the

11   partnership with them acquired all the rights, the global

12   rights of the up-front payments of 175 million and milestones

13   totals of 9.5 billion.  So that's one of our projects.  We

14   started them in 2013 through the collaboration of them, and

15   then, you know, 2016 we transferred the rights to Sorrento in

16   the one -- the merger.

17           So then also there's another one, at the same time

18   we have a roll-up partnership.  We have a similar 1380(c)

19   project and because of Sorrento, well, actually the full

20   partnership swap.  So that project actually right now is just

21   on hold even without stoppage.  They probably got a similar

22   kind of -- generally a similar partnership like the one

23   (indiscernible).

24   Q    All right.  Now in the process of negotiating the 2016

25   merger did the parties put any value on the amount of stock

DR. CHEN - DIRECT BY MR. KIRBY

1     that you were supposed to receive in Concortis?

2     A    We actually have more than value on the -- that's good

3     faith because that's the promise so we can actually merger

4     with IPL and become a second company.

5              So we kind of (indiscernible) little bit of a value.

6     So total finally agreed value is 40 million.  That includes

7     the bitcoin units and the partnership and also the '16

8     included the targets of the IP (indiscernible).

9     Q    So just to be -- make that clear, $40 million was the

10    valuation?

11    A    That's right.

12    Q    Now at the time of the 2016 merger did you believe that

13    you were represented in that merger by Paul Hastings?

14    A    Yes.

15    Q    And that merger hadn't turned out very well so far, has

16    it, sir?

17    A    Unfortunately, yes.

18    Q    And as the Court will see in the cross-complaint, you

19    sued Paul Hastings for malpractice, have you not?

20    A    That's right.

21    Q    And are you presently prevented from pursuing that

22    lawsuit because of the automatic stay?

23              MR. ELLISON:  Objection, leading.

24              THE COURT:  Yeah, sustained.  I also don't

25    understand how that is given what was represented in the

1    pleadings, but keep going.

2    BY MR. KIRBY:

3    Q    All right.  Dr. Chen, is it your understanding that you

4    are unable to pursue your lawsuit against Paul Hastings due to

5    a ruling by Judge Sturgeon that the Concortis litigation has

6    to go first?

7    A    That's what I heard, yes, from my lawyers.

8    Q    Dr. Chen, have you -- do you know the amount of damages

9    that you're claiming in the Sorrento Therapeutics case in the

10   Superior Court?

11   A    What are -- Mr. Kirby, can you repeat the question?

12   Q    What is the amount of damages that you're claiming

13   against Paul Hastings?

14         THE COURT:  Well, that wasn't the question that

15   you --

16         MR. KIRBY:  Oh.

17         THE COURT:   -- that wasn't the question that you

18   asked the first time.  He asked you to repeat the question

19   that you asked, let's not change the question.

20         MR. KIRBY:  I'm not sure I'm going to be able to

21   read it back verbatim.

22   BY MR. KIRBY:

23   Q    Are you familiar with the amount of damages that you are

24   claiming in the Sorrento litigation in Superior Court?

25   A    Sort of, not all the final --

1     Q    Is it in excess of $40 million?

2     A    I think that the value is more than $40 million, probably

3     much more.

4     Q    All right.

5              MR. KIRBY:  I have nothing further for Dr. Chen.

6              THE COURT:  All right.  Thank you.

7              Dr. Chen, have you signed a proof of claim in the

8     Sorrento bankruptcy case?

9              THE WITNESS:  Yes.

10             THE COURT:  Okay.  All right.  Mr. Ellison, you have

11    Cross for Dr. Chen?

12             MR. ELLISON:  Yes, Your Honor.

13                           CROSS-EXAMINATION

14    BY MR. ELLISON:

15    Q    Dr. Chen, sitting here today you have no idea how much,

16    if any, profits would be generated from the IP that was

17    transferred to Sorrento as part of the 2016 merger.  Is that

18    correct?

19    A    I have a general idea based on the news release, I have

20    some idea, but not exact numbers.  But definitely more than 40

21    million.

22    Q    More than 40 million based on the news?

23    A    Yes, based on the news and based on the value, certainly

24    the value of the business part and all the current -- the

25    entities that's included in the merger.

1    Q    Did you just say based on the court value of Concortis?

2    A    Yes.

3    Q    Okay.  There hasn't been a valuation done of Concortis

4    recently as far as you're aware.  Correct?

5    A    That's my estimation.

6    Q    Okay.  So the valuation that you're talking about is a

7    valuation that you estimated?

8    A    Yes.

9    Q    Before the 2016 merger with Sorrento, Concortis never

10   generated a profit.  Correct?

11   A    Sorry, can you repeat it back?

12   Q    Yeah, before the 2016 merger Concortis never generated a

13   profit.  Correct?

14   A    That's not true.

15   Q    Okay.  Why don't you tell the Court the profit that

16   Concortis, Inc. generated after it was formed in 2013.

17   A    No, no, so Concortis, Inc. includes the bits and the

18   unit, the service unit, that one always generated a revenue,

19   and always (indiscernible).  Even our understanding of rights

20   based on the financial report provided by Sorrento, the

21   margins that, the profit margins (indiscernible) at 50

22   percent.  And you -- the net margin profit model

23   (indiscernible) 30 percent.  So that definitely in itself

24   generated revenue and also made a profit.

25   Q    Before the 2016 merger with Sorrento when you were in

1     charge of Concortis, it was a holding company.  Correct?

2     A     Yes.

3     Q     Okay.  And did any -- did any of the -- strike that.

4     Other than CBC -- strike that.

5           In 2013 Sorrento acquired CBC.  Correct?

6     A     Sorrento acquired a part of asset of CBC.  So only the IT

7     part, the technology part, but not others.  So there's three

8     units, service units, partnership and also the IT part.

9     Sorrento only acquired the IT part, only the two technologies.

10    Q     And it's your testimony here today that the service part

11    of CBC was never part -- was not part of the 2013 merger?

12    A     No.  So it's a delayed merger, it's a delayed.  So never

13    stayed a part of this units.

14    Q     Dr. Chen, under the 2016 merger the parties agreed that

15    there were two forms of consideration.  Right?

16    A     What do you mean two forms, I don't understand what the

17    two forms are.

18    Q     Okay.  So the closing consideration in the 2016 merger

19    was a $100 payment at closing and a percentage of CBC stock

20    upon a qualified financing of $10 million more.  Is that

21    right?

22    A     I don't understand.  At that time I don't understand what

23    this $100 means.  Okay.  All we understand is that 40 million

24    and that's a bill and they're going to issue the stock --

25    value of stock to us up to $40 million.

1    Q    But, Dr. Chen, my question was, not -- my question was

2    set this $100 aside, the other form of consideration under the

3    2016 merger was that the CI shareholders would obtain certain

4    stock in CBC upon a qualified financing.  Is that right?

5    A    That's right.

6    Q    And under these -- under the -- under all of the deal

7    documents for the 2016 merger there is never a time when

8    Sorrento was going to make a cash payment to the CI

9    shareholders in the amount of $40 million.  Correct?

10   A    No.  But the problem is Henry promised when we send out

11   the -- send off the Concortis from (indiscernible) and it goes

12   to IPL.  So we don't send off the company, they cannot go

13   because of (indiscernible).

14   Q    Okay.  Sir, just listen to my question.  My question was

15   simply whether under the 2016 merger the CI shareholders were

16   entitled to a $40 million cash payment.  And I think you said

17   no, but I'm wondering whether you meant that is correct.

18   A    (No audible response.)

19   Q    So under --

20        MR. KIRBY:  I'm sorry, Mr. Ellison, can you repeat

21   the question?  I'm just confused as to the question.

22        MR. ELLISON:  Yes.

23   BY MR. ELLISON:

24   Q    Under the 2016 merger the CI shareholders were never

25   entitled to a $40 million cash payment.  Correct?

1    A    That's correct.

2         (Pause in the proceedings.)

3              MR. ELLISON:  Mr. Howell, would you mind bringing up

4    the 2016 merger agreement, which is Debtor's Exhibit 12 at

5    Docket 658-12?

6    BY MR. ELLISON:

7    Q    And, Dr. Chen, I'm just going to ask you -- first let me

8    ask you, are you familiar with the 2016 merger agreement

9    between Sorrento and you and Dr. Chen and others?

10   A    Dr. Miao you mean.

11   Q    I'm sorry, Dr. Miao and others?

12   A    Yes.

13   Q    Take a look at Section 3.1-1 of the 2016 merger on

14   page 32.

15   A    (Perusing document.)

16   Q    And before I -- we look at that provision, Dr. Chen, the

17   $40 million in value that you were talking about earlier

18   relates to the CI shareholders' entitlement to certain stock

19   in CBC upon a qualified financing.  Is that right?

20   A    Yes.

21   Q    Okay.  So isn't it right, Dr. Chen, that you and Dr. Miao

22   agreed that the qualified financing may take an indefinite

23   period of time to happen following the closure of the 2016

24   merger?

25              MR. RINEY:  Your Honor, excuse me, I apologize, but

1      this question is a -- it's calling for a legal conclusion, and

2      is an issue in the State Court litigation and (indiscernible).

3              THE COURT:  I would agree with you except for one

4      factor.  You are a witness in this proceeding, you can't also

5      be the lawyer.  But you could --

6              MR. RINEY:  Your Honor, I --

7              THE COURT:   -- you coached your lawyer on what

8      objection to make.

9              MR. RINEY:  I was nudging Mr. Kirby as gently and

10     professionally as I could, Your Honor, but I do think it's --

11             THE COURT:  I got it.  So you've had your time on

12     the stand.  Your job now is to fight the urge and sit very

13     quietly.

14             MR. KIRBY:  Your Honor, Dean Kirby, I do wish to

15     interpose that objection, it calls for a legal conclusion.

16             THE COURT:  Any response?

17             MR. ELLISON:  Yeah, Your Honor, I'll re-frame the

18     question.

19             THE COURT:  All right.  Then the objection is --

20     BY MR. ELLISON:

21     Q    Dr. Chen --

22             THE COURT:  I'll find that the objection is moot

23     based upon the question being withdrawn.

24     BY MR. ELLISON:

25     Q    Dr. Chen, in Section 3.1-1 do you see where it says such

1    key stockholder, and then it goes on, and in the middle of

2    that section it says, Acknowledges that such key stockholder

3    can bear the economic risk of its investment for an indefinite

4    period of time.  Do you see that?

5    A    Which line?  Oh, indefinite period of time, yes.

6    Q    And is it your understanding, Dr. Chen, that that

7    provision relates to when to when the qualified financing may

8    occur?

9    A    So, Mr. Ellison, so I think I said it before, I'm not a

10   lawyer so at that time I really relied on the lawyers to read,

11   go through the file (indiscernible) information to help me to

12   understand that, and then my uncle to my understanding he

13   promised, you know, making the deal (indiscernible) after

14   merger and until now I never heard of the -- otherwise I would

15   not agree to do the merger.

16        So even though there's no writing, but that's just based

17   on the good faith that we believed at that time

18   (indiscernible) that time.  And also this document is written

19   by lawyer, my lawyer supposedly, so I -- that's my

20   understanding is just they do that immediately.

21   Q    Okay.

22        MR. ELLISON:  And, Mr. Howell, we can take this

23   down.

24   BY MR. ELLISON:

25   Q    When you say do it immediately, are you talking about the

1    qualified financing, raising financing?

2    A    Yes.  After (indiscernible) --

3    Q    Okay.

4    A     -- after merger.

5    Q    Okay.  So, Dr. Chen, between December 2016 and the time

6    you left Sorrento in September 2017 one of your job was to

7    obtain a qualified financing, wasn't it?

8    A    No, that's not my job.  My job is to manage Concortis,

9    the day-to-day management.  So other (glitch in the audio) and

10   also I'm not the -- I have no rights to go outside to do the

11   financing.

12   Q    Okay.  So it's your testimony here today that it was not

13   one of your job responsibilities to attempt to obtain a

14   qualified financing between December 2016 and September 2017?

15   A    Yes.

16   Q    And in September 2018 you and Dr. Miao filed

17   counterclaims against Sorrento.  Correct?

18   A    Yes.

19   Q    And one of the things that you and Dr. Miao asked the

20   Court to do was rescind the 2016 merger.  Right?

21   A    That's right.

22   Q    Okay.  And those counterclaims are still pending?

23   A    I think that's becuase of this case.  Right?

24   Q    Yes?

25   A    Yes.

1    Q     Dr. Chen, the -- I want to go back to something we
2    covered earlier and then I'll be done here, the services
3    business that you testified about earlier was part of CBC.
4    Correct?
5    A     Was a part of CBC after 2016.
6    Q     But from the -- isn't it true, Dr. Chen, that CI merely
7    retained an option to take back the services business from CBC
8    following the 2013 merger?
9    A     So that's the issue of our lawyers.  The way they wrote
10   it is like we have acquired that.  But if you read the
11   document, we had it before, it never acquired, it's ours, our
12   business, our asset, just delayed payment of.
13   Q     So it's your testimony that the documents actually say
14   that the services business was part of the 2013 merger, but
15   that was not your intent.  Is that your testimony?
16   A     That's my lawyer to draft that one.  So he explained to
17   me that's the legal language, but if we -- if you look at our
18   other documents, it says that it's (indiscernible), it's
19   delayed for three years, but he wrote the way (indiscernible).
20   We acquired -- haven't acquired the rights.
21   Q     Okay.  You never exercised an option to buy back the
22   services business.  Correct?
23   A     We plan to, had offered to acquire the rest of us, that's
24   the one in 2016.  So to supposed end of 2016 we have a right
25   to acquire back.  Then Henry in 2015 in May he offered to

1    acquire the rest of the rights back.

2            MR. ELLISON:  I have nothing further.

3            THE COURT:  All right.  Thank you.

4            Mr. Kirby, any Redirect?

5            MR. KIRBY:  Yes.

6                    REDIRECT EXAMINATION

7    BY MR. KIRBY:

8    Q    Dr. Chen, did you believe that substantial money was

9    going to be invested in Concortis in order to position it to

10   make an IPO?

11   A    To Concortis itself?  Yes, yes.  So, you know, in 2016

12   when David and I started Concortis not many people doing ADC

13   so we actually the pioneer (glitch in the audio).  So you can

14   look at the -- right now you can look at the news for the

15   pharmaceutical position.  Right now every deal is related to

16   ADC.  So Pfizer just acquired (indiscernible).  So we have a

17   separate project in the market almost in market

18   (indiscernible) clinical and I'm very confident that we're

19   going to get IPO even before this year.

20   Q    Dr. Chen -- Dr. Chen, let's focus on the specific

21   question that's being asked, just in --

22           MR. ELLISON:  Yeah, I apologize --

23           MR. KIRBY:   -- the interest of time.

24           MR. ELLISON:   -- Mr. Kirby, just for interrupting.

25   I'm just going to move to strike, that that entire answer

1    lacks foundation and it's very speculative.

2         THE COURT:  Wrong objection, so I'm going to deny

3    the motion to strike.  Let's move on and actually try to get

4    something relevant.

5         Could I ask you folks to do that?

6    BY MR. KIRBY:

7    Q    Dr. Chen, did Dr. Gee (phonetic) represent to you that

8    Concortis is in a position to invest money necessary to

9    develop that technology?

10   A    Yes, he went -- in 2016 when he approached David prior to

11   the business, and they agreed to Sorrento to invest 65 million

12   to further -- to that Concortis entity to further -- to

13   enhance the chance of IPO.

14   Q    Did that happen after the merger?

15   A    No.

16        MR. KIRBY:  Your Honor, I have nothing further for

17   Dr. Chen.

18        THE WITNESS:  Oh, there's one --

19        THE COURT:  Dr. Chen --

20        THE WITNESS:   -- more thing.

21        THE COURT:   -- Dr. Chen, there's no question.

22   Indulged everyone long enough.  You're excused as a witness.

23        (Witness excused.)

24        THE COURT:  Mr. Kirby, any additional witnesses?

25        MR. KIRBY:  No, Your Honor.

1          THE COURT:  Mr. Ellison, do you intend on calling

2     any witnesses?

3              MS. QUARTAROLO:  Your Honor, it's Amy Quartarolo.

4              THE COURT:  I got it wrong again.

5              MS. QUARTAROLO:  Sorry to jump back.

6              THE COURT:  Yes, ma'am.

7              MS. QUARTAROLO:  If you guess, we'll go with someone

8     else.  The Debtors would like to call Mr. Mo Meghji.

9              THE COURT:  All right.  Mr. Meghji, if you would,

10    please, sir, if you'd raise your right hand?

11         (Witness sworn.)

12             THE COURT:  All right.  Thank you, sir.

13             Ms. Quartarolo, go ahead, please, ma'am.

14             MS. QUARTAROLO:  Thank you.

15                              DIRECT EXAMINATION

16    BY MS. QUARTAROLO:

17    Q    Mr. Meghji, I know we've covered some of the background

18    in prior hearings, but just briefly for the Record where are

19    you currently employed?

20    A    M3 Partners.

21    Q    And what is your title?

22    A    I'm managing partner of the firm.

23    Q    And how long have you worked with M3?

24    A    About 7 years.

25    Q    And what is your role with respect to the Debtors in this

1    case?

2    A    I'm the Chief Restructuring Officer of the Debtor.

3    Q    And in connection with that role what is the scope of

4    your authority?

5    A    Oversight of the entire restructuring process.

6    Q    Mr. Meghji, why did the Debtors file for Chapter 11

7    protection?

8    A    The Debtors had received an arbitration award and

9    judgment against them and were not in a position financially

10   to satisfy the award and the judgment, so they filed for

11   Chapter 11 to restructure and to maximize the value to the

12   Debtors' stakeholders.

13   Q    And in connection with the Chapter 11 filing did the

14   Debtors consider what pre-petition litigation matters it would

15   made sense to actively litigate versus those which they

16   believe should remain stayed?

17   A    Yes.

18   Q    And are you generally familiar with the motion that's

19   been filed by Messrs. Chen and Miao and that's before the

20   Court today?

21   A    I am, I'm generally familiar at a high level.

22   Q    And are you generally familiar with the underlying

23   litigation that's pending in San Diego Superior Court?

24   A    Again, at a high level, yes.

25   Q    Have the Debtors estimated how much in legal fees would

1    be required to adjudicate the case through trial?

2          MR. KIRBY:  Objection --

3          THE WITNESS:  Yes, my under --

4          MR. KIRBY:   -- calls for his recollection of a

5    hearsay statement.

6          MR. KIRBY:  Overruled.  Go ahead, Mr. Meghji.

7          THE WITNESS:  My understanding is that it would be

8    over $5 million to see this litigation to conclusion.

9    BY MS. QUARTAROLO:

10   Q    Mr. Meghji, are you familiar with the Debtors' DIP

11   budget?

12   A    Very familiar.

13   Q    Do the Debtors have room for an expense in that range in

14   their DIP budget?

15   A    No.

16   Q    We heard from Mr. Kirby earlier that the DIP budget has

17   amounts for professional fees or legal fees.  Why couldn't

18   legal fees for the Chen/Miao litigation matter fall within

19   those line items?

20   A    All of those legal and restructuring fees have been

21   spoken for in terms of the cost of the restructuring and

22   issues related to the restructuring.  So there really just is

23   not any available budget.  In fact, the DIP budget is so tight

24   that even managing the restructuring budget is a challenge at

25   this point.

1    Q    Mr. Meghji, as the Debtors' CRO how do you believe that

2    modifying the automatic stay such that the Chen/Miao

3    litigation would proceed through trial could impact the

4    Debtors and their reorganization efforts?

5    A    Very negatively.  We're running a sales process right

6    now.  We've also -- the Debtors have significantly reduced its

7    work force as part of its restructuring efforts.  So all of

8    the management by this time is focused on the restructuring

9    process, the sale process and the financing process which is

10   critical to a Chapter 11 plan for the Debtors.

11            MS. QUARTAROLO:  Thank you, Your Honor.  Nothing

12   further at this time.

13            THE COURT:  All right.  Thank you.

14            Mr. Kirby, any cross for Mr. Meghji?

15            MR. KIRBY:  Yes.

16                         CROSS-EXAMINATION

17   BY MR. KIRBY:

18   Q    Mr. Meghji, the DIP budget, litigation budget that you're

19   referring to is -- does that extend beyond the end of June of

20   this year?

21   A    So the DIP is currently -- the DIP budget is done through

22   June, with a provision to extend it to July 31 under a couple

23   of conditions.  One, we would need the consent of our DIP

24   lender and the second thing would be if we could raise another

25   $20 million to do that, which would require a plan having been

1  filed -- a plan of reorganization having been filed that was

2  acceptable to our DIP lenders by June 15.

3  Q    Now in your planning did you determine what amount of

4  attorneys fees would be necessary to participate in this

5  litigation to the end of June?

6  A    To participate in the litigation with your clients?

7  Q    Yes, sir.

8  A    No, we did not, there was an automatic stay in place so

9  we did not expect to spend money on litigation with your

10  clients.

11  Q    And so did you take into account then -- well, excuse me,

12  I'll withdraw that.  The $5 million estimate that you referred

13  to, you said that was what might be necessary as far as you

14  knew to bring the case to a conclusion?

15  A    Correct.

16  Q    And to our understanding that would be a trial?

17  A    It would be everything from here going forward that it's

18  a minimum of $5 million.

19  Q    All right.  So do you have any idea, sir, what it would

20  take -- what it would cost for this litigation to get back on

21  track and get scheduled for trial some time next year, between

22  now and the end of the year let's say.

23  A    No.

24  Q    Did you -- when you say that it would be a terrible

25  distraction, a distraction to whom, sir?  And again, I'm

1    speaking of just from now to the end of the year, let's not

2    talk about a trial.

3    A    There is a huge amount of work to get this company out of

4    bankruptcy, to get the exit financing, to get the sales

5    process with a limited management team that is overwhelmed in

6    terms of the amount of work that's required, both in terms of

7    managing its clinical programs, as well as the work that's

8    required to get the company out of bankruptcy.  It's a

9    monumental task, even with the help from my team and

10   restructuring counsel distracting -- we also have a very tight

11   time line under our DIP to get the company -- get a plan of

12   reorganization filed and hopefully get the company out of

13   bankruptcy, because that's my -- that's what I'm referring to.

14   Q    And how is management going to be distracted by this case

15   being set for trial some time next year?

16   A    I'm sorry, I don't know what this trial means for next

17   year, I'm just talking about management has an absolutely full

18   plate right now.  Any other distractions relating to anything

19   else in the next two or three months are problematic.

20              MR. KIRBY:  Your Honor, I have nothing further for

21   Mr. Meghji.

22              THE COURT:  All right.  Thank you.

23              Any Redirect?

24              MS. QUARTAROLO:  No, Your Honor.

25              THE COURT:  All right.  Thank you, Mr. Meghji.  You

1     are excused as a witness.

2          (Witness excused.)

3               THE COURT:  Any additional witnesses from the

4     Debtor?

5               MS. QUARTAROLO:  No, Your Honor.

6               THE COURT:  All right.  Thank you.

7               Everybody agree that the evidence is now closed?

8               MR. KIRBY:  Yes, Your Honor.

9               THE COURT:  All right.  Thank you.

10              MS. QUARTAROLO:  Yes, Your Honor.

11              THE COURT:  Mr. Kirby, any closing argument?

12              MR. KIRBY:  Yes, Your Honor, very -- first let me

13    say, I don't think I'm digressing here really, I'm a

14    professional and I was very disturbed when Your Honor stated

15    his perception that I had misrepresented the Record, and I'm

16    not proud of this fact, but I was reading when I was making

17    that argument, and I was so disturbed by that statement that I

18    went back and looked at the word -- to see if I could find the

19    word Evidence and what I said.  And I found it, and it says

20    there is evidence only on one side but the burden of

21    continuing this litigation over the next few months is slight.

22              Now what I meant, Your Honor, was that I believe in

23    their papers that they had the duty to demonstrate that they

24    could establish a reasonable likelihood of prevailing.  And if

25    they couldn't, then there wasn't any reason to have an

1    evidentiary hearing and that's the law, and perhaps a little

2    different than how things are proceeding in this court.  And I

3    do appreciate that and understand it.  But I want to make

4    clear that I don't believe I did, and certainly did not intend

5    to misrepresent anything to the Court.

6         To get to the motion, I don't think -- the Debtor

7    has the burden of proof on all these issues.  I don't think

8    that all of the cross-examination about the merits of this

9    case amount to anything.  The Court sees and has taken

10   judicial notice of one of the pleadings, this is a very

11   complicated case, it's gone on for five years, it has been

12   disposed out on summary judgment.  A great deal of time and

13   energy has been spent making those claims clearly.  They're

14   legitimate claims.  And I don't think that the Court could

15   find otherwise.

16        And the Court didn't ask me but, no, there hasn't

17   been a proof of claim filed.  And there -- unless it happened

18   in the last couple of days a claims bar date hasn't bee set.

19   So, no, there's no proof of claim.  But there is ample

20   evidence before the Court that this is a real dispute

21   involving real money.

22        But the main thing -- point that I want to make is

23   that there has been no showing by the Debtor to carry its

24   burden of proof that there is almost any burden on this Debtor

25   for this case to go back to its August 7 statu conference for

1      a trial date to be set, most probably months later, and

2      therefore no reason to continue the stay in effect.  So --

3              THE COURT:  So, Mr. Kirby, is it your belief that

4      once a trial date gets set that there's absolutely nothing for

5      the Debtor to do?

6              MR. KIRBY:  Now --

7              THE COURT:  That wasn't the testimony.

8              MR. KIRBY:  No, I didn't say absolutely nothing for

9      the Debtor to do.  The Debtor's lawyers apparently may follow

10     through on some -- a discovery order, I believe there may be

11     only one that was referred to.  But that doesn't distract

12     management of the Debtor and it can't cost anything touching

13     the amounts of money that are going to professional fees.

14             I would go so far as to say that, what are there,

15     four or five Latham & Watkins lawyers attending this hearing.

16     The amount of time that is going to be spent on something like

17     that just simply is de minimis compared to the amounts of

18     money that are going forth in attorneys fees in this case.

19     And certainly within the next few months.

20             We hear on the one hand how this has to be done,

21     this has to be done at the end of the summer.  We must have

22     our plan of reorganization, we must do this.  All right.  But

23     that being the case, why is it a problem for Dr. Chen and Dr.

24     Miao to get back in line to have their lawsuit eventually

25     heard?  The burden to them, they gave up substantial assets in

1    order to be in this transaction that they're challenging.

2    They have a colorable claim against their lawyers.  So they're

3    prevented from doing this.

4         And to address something that the Court mentioned

5    they're prevented from doing it because the judge found that

6    those two claims -- Judge Sturgeon I'm talking about -- were

7    intertwined and that in his judgment the case against Sorrento

8    had to go first.  So my clients are prevented from pursuing

9    their just claims against Paul Hastings becuase of that.

10        So there's hardship on their side.  And I think that

11   the evidence has not established that there's much of any

12   hardship on the other side.  So if we're weighing harm, I

13   think that that clearly goes to my client.  Thank you.

14            THE COURT:  All right.  Thank you.

15            Who is making closing argument on behalf of the

16   Debtor?

17            MS. QUARTAROLO:  You didn't want to guess this time,

18   Your Honor?

19            THE COURT:  I was -- I didn't want to go 0 for 3.

20            MS. QUARTAROLO:  It will be me.  Amy Quartarolo on

21   behalf of the Debtors.  Thank you for hearing us today, Your

22   Honor.

23            We would submit that the movants here have not met

24   what is their initial burden of establishing cause for

25   modifying the stay, which is made clear in both the *Sonics*

1    case and in the Southern District of Texas in the *In Re*

2    *Gramercy Court* case both of which are cited in our objection.

3         The balance of the equities we believe weighs

4    sharply in favor of denying the relief sought.  The *Sonics*

5    factors as they're referred to do not support a finding of

6    cause to modify the automatic stay.  I'm not going to

7    reiterate the summary of the litigation which has been briefed

8    and put on before Your Honor today, but I think it is

9    important to note that resuming the litigation would take

10   substantial resources from the Debtors and the Debtors don't

11   have those resources to devote, either monetary or labor

12   hours.

13        As you heard in the cross of Mr. Riney, he

14   acknowledged that there's several items that remain open in

15   the litigation and those items will need to be addressed if

16   and when the stay is lifted.  So we don't believe that the

17   stay should be lifted, and we believe that that would be

18   burdensome on the Debtors.  And even after the pretrial work

19   that remains, this litigation is estimated to be a trial of

20   upwards of four weeks and that certainly will require great

21   time and attention from the Debtors and their professionals.

22        Movants here -- I didn't hear any evidence of

23   demonstrable harm that they will suffer if the relief is not

24   granted at this time.  There's simply no need to liquidate

25   this particular claim at this time.  And as Mr. Meghji

1    testified, there will be harm to the Debtors if the stay is to

2    be lifted now.  The Debtors must remain focused on the

3    restructuring efforts and there's simply no room in the

4    Debtors' limited DIP budget to fund this additional

5    litigation.

6           I just want to briefly respond to four additional

7    arguments that have been raised by movants then to be offered

8    into Court of the relief that they seek.  First, they argue

9    that because resuming the litigation would eventually lead to

10   a resolution of the issues as between the movants and the

11   Debtors, that that counsel's in favor of modifying the stay.

12   I believe that misses the point.  The relevant inquiry is

13   whether proceeding with the litigation might help solve

14   significant open issues in the bankruptcy case.   And I heard

15   no evidence or argument that that is the case here.

16          Second, while it's true that the Debtors are

17   marketing their assets through a sale process, there's no

18   indication at present that the particular assets in dispute

19   are being sold, and to the extent they ever were proposed to

20   be sold, certainly there will be notice and an opportunity to

21   be heard and movants can raise any issue at that.

22          Third, movants argue that modifying the stay will

23   not burden the Debtors or their impact on -- have any impact

24   on their restructuring efforts.  I don't think that there's

25   any evidence in support of that and I think we've presented

1     ample evidence in the Record today to suggest to the contrary.

2               Fourth and finally, the movants point to the line

3     item in the DIP for the professional fees, and we heard from

4     Mr. Kirby that he thinks that there should be room to

5     accommodate that.  Respectfully it is not Mr. Kirby's business

6     judgment that the Court should consider in terms of the

7     allocation of the DIP budget and those dollars have already

8     been allocated as Mr. Meghji testified.

9               In conclusion the balance of the harm I think weighs

10    sharply in favor of denying the relief sought and we would ask

11    that the Court deny the motion that's before you.

12              THE COURT:  All right.

13              MS. QUARTAROLO:  Thank you, Your Honor.

14              THE COURT:  I've got before me a motion for relief

15    filed by the movants, it's at Docket Number 490.  I do find

16    that I have jurisdiction over the matter pursuant to 28 USC

17    Section 1334.  I do find the matter constitutes a core

18    proceedings under Section 157.  I further find, to the extent

19    it is an issue, that I have the requisite constitutional

20    authority to enter an order with respect to the motion.

21              I really didn't understand the approach.  It started

22    from what was initially filed to the declarations, and I sat

23    with Mr. Riney's declaration and listened to him testify, and

24    you just reinforced why I don't take declarations.  It's just

25    a little disappointing.  As I listened to the testimony that

1    was offered by the movants, the testimony had little, if

2    anything, to do with whether or not there should be relief

3    granted from the automatic stay.  I will find that there's

4    been no cause established.

5         To the contrary Mr. Meghji is presented with a

6    difficult problem that he is required to address.  It has

7    taken all of their resources, and I'm not convinced he's going

8    to be successful, I hope that he is, but I understand -- I

9    understand exactly the situation that he is facing.  And as I

10   look at the case, if it is to have any chance of success, it

11   is going to require 100 percent of his team's efforts and

12   those remaining at the company during the pendency of the

13   case.

14        Dr. Chen, with all due respect, he has the ability

15   to protect himself.  And again, making an argument to lift the

16   stay so that I can get a trial date at an unknown point in the

17   future is not a compelling argument.

18        Those are my findings and conclusions on the Record

19   pursuant to Bankruptcy Rule 7052.  The motion's denied, I'll

20   enter an order.

21        Thank you everybody. Have a good day.

22        MR. KIRBY:  Your Honor, may I inquire?  Is it the

23   Court's intention to deny the motion without -- well --

24        (Hearing adjourned 5:19 p.m.)

25                     * * * * *

1           *I certify that the foregoing is a correct transcript*

2      *to the best of my ability due to the condition of the*

3      *electronic sound recording of the ZOOM/video/telephonic*

4      *proceedings in the above-entitled matter.*

5        */S./   MARY D. HENRY*

6      *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

7      *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

8      *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

9      *JTT TRANSCRIPT 67246*

10     *DATE FILED:  MAY 25, 2023*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25