**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| SORRENTO THERAPEUTICS INC., *et al.*[1] | ) Case No. 23-90085 (DRJ) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL
ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN JUNIOR SECURED
SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH COLLATERAL,
(II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY
ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, AND (V) GRANTING RELATED RELIEF**

---

**Emergency relief has been requested. Relief is requested not later than 3:00 p.m. (prevailing Central Time) on July 5, 2023.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**A hearing will be conducted on this matter on July 5, 2023, at 3:00 p.m. (prevailing Central Time) in Courtroom 400, 4th floor, 515 Rusk Street, Houston, Texas 77002. You may participate in the hearing either in person or by an audio and video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. Once connected, you will be asked to enter the conference room number. Judge Jones's conference room number is 205691. Video communication will be by use of the GoToMeeting platform. Connect via the free GoToMeeting application or click the link on Judge Jones homepage. The meeting code is "JudgeJones". Click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of both electronic and in-person hearings. To make your appearance, click the "Electronic Appearance" link on Judge Jones's homepage. Select the case name, complete the required fields and click "Submit" to complete your appearance**

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956). The Debtors' service address is: 4955 Directors Place, San Diego, CA 92121.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state as follows in support of this motion (this "Motion"):

## Preliminary Statement

1.      The Debtors commenced these chapter 11 cases in February 2023 on an emergency basis to protect against impending enforcement actions by certain judgment creditors.[2]  Shortly after filing, the Debtors obtained a $75 million senior secured postpetition financing facility from JMB Capital Partners Lending (the "Senior DIP Facility" and the "Senior DIP Lender," respectively), which the Court approved by a final order on March 30, 2023 [Docket No. 324].

2.      The Senior DIP Facility matures on July 31, 2023, but the liquidity provided by the Senior DIP Facility was only intended to last until on or around June 30, 2023.  The Debtors have efficiently managed costs, allowing them to extend such liquidity for an extra week—but the Debtors' current liquidity is expected to last only until July 7, 2023.  As a result, the Debtors have been seeking additional liquidity (whether through financing and/or sale proceeds) to continue with their chapter 11 cases.

3.      Ultimately, the Debtors' Chief Restructuring Officer (Mr. Mo Meghji) has determined that the best source of liquidity under the current circumstances is the Junior DIP Facility proposed here—a $20 million junior term loan from Scilex Holding Company ("Scilex" or the "Junior DIP Lender"), a non-debtor subsidiary of Debtor Sorrento Therapeutics, Inc.  The Junior DIP Facility matures on September 30, 2023, and the liquidity provided by the Junior DIP Facility is expected to last through July 2023.  The Junior DIP Facility (which will be junior and subordinate to the Senior DIP Facility) was negotiated at arms' length and in good faith through

---

[2]     Additional facts and circumstances surrounding the filing of these chapter 11 cases are set forth in the *Declaration of Mohsin Meghji, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions* [Docket No. 5].

the Debtors' Chief Restructuring Officer and the Junior DIP Lender's Chief Accounting Officer (Mr. Stephen Ma, who has no relationship with the Debtors) and their respective independent advisors.

4.      The Junior DIP Facility will help the Debtors continue their efforts to obtain a value-maximizing result in these chapter 11 cases, including the potential attainment of exit financing, the potential consummation of asset sales, and the confirmation of a chapter 11 plan that provides significant recoveries to the Debtors' stakeholders.  In connection with the Debtors' sale and financing process, the Debtors' advisors are evaluating various bids and financing proposals, all of which require some runway to consummate.

5.      Absent access to the Junior DIP Facility, however, the Debtors will have no liquidity to continue operations and will be forced to shut down and liquidate.  Thus, the Debtors believe that entering into the Junior DIP Facility is the only viable path forward, is in the best interests of the Debtors' estates and all stakeholders, is fair and reasonable, and is a sound exercise of the Debtors' business judgment.

6.      The Debtors have previewed this Motion and the Interim Order with the Senior DIP Lender, the Unsecured Creditors' Committee, and the Equity Committee.  The Debtors believe that all such parties generally support the relief requested but understand they are continuing to review the DIP Term Sheet, the Interim Order, and the Approved Budget (as defined below).  The Debtors shared the DIP Term Sheet and Interim Order with the U.S. Trustee shortly before filing and will work with the U.S. Trustee (and all other parties) to address any issues before the hearing.

## Relief Requested

7.      The Debtors seek entry of an interim order, substantially in the form of the proposed interim order filed with this Motion (the "Interim Order") and a final order (the "Final Order," and, together with the Interim Order, the "DIP Orders"):[3]

a) authorizing the Debtors to obtain postpetition financing on a superpriority junior secured basis (the "Junior DIP Facility", and the loans made, advanced or deemed advanced thereunder, the "DIP Loans") in the form of a term loan facility in an aggregate principal amount not to exceed the sum of (i) $20,000,000, *plus* (ii) the amount of the Commitment Fee ($200,000) and the Funding Fee ($200,000) (each as defined in the DIP Term Sheet), *plus* (iii) the amount of the Junior DIP Lender Holdback (as defined in the Interim Order),[4] all of which shall be available to the Debtors in a single draw (the "Draw") upon entry of the Interim Order, in accordance with and subject to the terms and conditions (including, without limitation, any conditions precedent to each of the DIP Borrowings) set forth in (x) that certain *Debtor-In-Possession Term Loan Facility Summary of Terms and Conditions*, substantially in the form attached to the Interim Order as **Exhibit 1** (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Term Sheet"), (y) that Subordination Agreement (substantially in the form to be attached to the Interim Order as **Exhibit 2**)[5] (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "Subordination Agreement") (together with the DIP Term Sheet and all other agreements, guarantees, pledge, collateral and security agreements, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the Junior DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "Junior DIP Loan Documents"), by and among the Debtors as borrowers (the "DIP Borrowers"), the Guarantors (as defined in the DIP Term Sheet, together with the DIP Borrowers, the "DIP Loan Parties"), Scilex Holding Company, as the

---

[3]      To the extent of any conflict between the descriptions and definitions in this Motion and the DIP Orders, Junior DIP Term Sheet, or Junior DIP Loan Documents, then the DIP Orders, Junior DIP Term Sheet, or Junior DIP Loan Documents, as applicable, will control.

[4]      For the avoidance of doubt, the DIP Loans will be funded net of items (ii) and (iii), which amounts will be retained by the Junior DIP Lender and applied in payment of such items in accordance with the DIP Term Sheet and the Interim Order, resulting in the cash proceeds of the DIP Loans to the Borrowers in the amount of $20,000,000.

[5]      The Subordination Agreement, which is still being documented, must be in form and substance acceptable to the Senior DIP Lender and the Junior DIP Lender, in their sole discretions.

lender (together with its successors and permitted assigns, the "<u>Junior DIP Lender</u>"), and (z) the Interim Order;

a) authorizing the DIP Loan Parties to (i) execute, deliver, and perform under the DIP Term Sheet and each of the Junior DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Junior DIP Loan Documents, including without limitation, all DIP Obligations (as defined in the DIP Term Sheet) in accordance with the terms of the Junior DIP Loan Documents, and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of the Interim Order, the Junior DIP Loan Documents and the transactions contemplated hereunder and thereunder;

b) authorizing the DIP Borrowers to incur, and the DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with the Interim Order and the Junior DIP Loan Documents;

c) granting to the Junior DIP Lender the DIP Liens (as defined below) on all DIP Collateral (as defined below), as set forth in the Interim Order, subject to the Carve Out, any transaction fee or the like owed to Moelis & Company LLC or M3 Advisory Partners, LP, and any Prior Permitted Liens (each as defined in the Interim Order), subject to the relative priorities set forth in the Interim Order;

d) granting to the Junior DIP Lender allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out and the Senior DIP Claims, as set forth in the Interim Order and the Junior DIP Loan Documents;

e) authorizing the Debtors to use the proceeds of the Junior DIP Facility and the DIP Collateral, including Cash Collateral (as defined in the Interim Order), solely in accordance with the terms and conditions set forth in the Interim Order and the Junior DIP Loan Documents, including the Approved Budget (as defined below) and Subordination Agreement, subject to any variances expressly permitted in the Interim Order and under the DIP Term Sheet;

f) approving the Debtors' waiver of the right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

g) approving the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral;

h) modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Interim Order and the Junior DIP Loan Documents, as set forth herein, waiving any

5

applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order, providing for the immediate effectiveness of the Interim Order, and granting related relief; and

i)   scheduling a final hearing (the "<u>Final Hearing</u>") on the Motion to consider entry of the Final Order authorizing the relief requested in the Motion on a final basis, which order shall be in form and substance and on terms and conditions acceptable in all respects to the Junior DIP Lender.

## **Jurisdiction and Venue**

8.     The United States Bankruptcy Court for the Southern District of Texas (the "<u>Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157 (b).  The Debtors confirm their consent to the entry of a final order by the Court.

9.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The bases for the relief requested herein are sections 102(1), 105, 361, 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code, rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and rules 4002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "<u>Local Rules</u>").

## **Emergency Consideration**

11.     The Debtors have an immediate and critical need to obtain the financing provided by the Junior DIP Facility to, among other things, (i) pay the ongoing fees, costs and expenses incurred in connection with these chapter 11 cases, (ii) continue the orderly operation of their businesses, (iii) maintain business relationships with customers, vendors and suppliers, (iv) make payroll, and (v) satisfy other working capital and operational needs.  The incurrence of new debt under the DIP Term Sheet is necessary and vital to the preservation and maintenance of the going concern value of the Debtors.  If immediate financing is not obtained by July 7, 2023, the Debtors

US-DOCS\143293968

will have no more liquidity and will be forced to shut down and liquidate, which would result in immediate and irreparable harm to the Debtors and their estates and stakeholders.

**Summary of Junior DIP Facility[6]**

| Material Term | Summary of Material Terms |
|---|---|
| **Parties to the DIP Term Sheet** | ***Borrowers***:  Sorrento Therapeutics, Inc. and Scintilla Pharmaceuticals, Inc. (the Debtors).<br><br>***Guarantors***:  Each of Sorrento Therapeutics, Inc.'s existing and future, direct and indirect domestic or foreign subsidiaries that become debtors and debtors-in-possession in these chapter 11 cases.  No Guarantor shall be added as a Loan Party unless such Guarantor guarantees the Priming Obligations (as defined in the DIP Term Sheet).<br><br>***DIP Lender***: Scilex Holding Company and/or its designees or its assignees.<br><br>*See* DIP Term Sheet, §§ 1–3. |
| **Term** | Subject to the Subordination Agreement, all DIP Obligations (as defined in the DIP Term Sheet) shall be due and payable in full in cash (or such other form of consideration as the Junior DIP Lender and the Borrowers may mutually agree) on the earliest of:<br><br>i.    September 30, 2023;<br><br>ii.   the effective date of any chapter 11 plan of reorganization with respect to the Borrowers or any other Debtor;<br><br>iii.  the consummation of any sale or other disposition of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code;<br><br>iv.   the date of the acceleration of the DIP Loans and the termination of the DIP Commitments in accordance with the DIP Documents;<br><br>v.    dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code; and<br><br>vi.   July 31, 2023, unless the Final Order has been entered by the Bankruptcy Court on or prior to such date.<br><br>In no event shall the DIP Obligations mature before the maturity date of the Priming Obligations.<br><br>*See* DIP Term Sheet, § 6. |
| **Commitment** | A non-amortizing super-priority junior secured term loan facility in an aggregate principal amount not to exceed the sum of (i) $20,000,000, *plus* (ii) the amount of the |

---

[6]    This summary provides the straightforward reference to the material terms of the proposed Junior DIP Facility, as intended by Bankruptcy Rule 4001 and the Complex Case Procedures.  Capitalized terms used but not defined in this section have the meaning ascribed to them in the DIP Term Sheet or the Interim Order, as applicable.

US-DOCS\143293968

| Material Term | Summary of Material Terms |
|---|---|
| | Commitment Fee ($200,000) and the Funding Fee ($200,000), *plus* (iii) the amount of the Junior DIP Lender Holdback.<br><br>*See* DIP Term Sheet, § 4. |
| **Conditions of Borrowing** | The DIP Term Sheet includes standard and customary conditions of borrowing.<br><br>*See* DIP Term Sheet, § 14. |
| **Interest Rates** | The DIP Loans shall bear interest at a per annum rate equal to 12% payable in kind on the first day of each month in arrears and on the DIP Termination Date (the "<u>Non-Default Interest</u>").<br><br>Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the DIP Loans shall bear interest at an additional per annum rate of 2%, payable in kind, plus the Non-Default Interest, on the first day of each month and on the DIP Termination Date.<br><br>*See* DIP Term Sheet, § 7. |
| **Use of Junior DIP Facility and Cash Collateral** | The proceeds of the Junior DIP Facility shall be used only for the following purposes and, excluding payments pursuant to clause (ii) below, subject to the Budget and 20% permitted variances as set forth below:<br><br>i.    working capital and other general corporate purposes of the Borrowers and the Guarantors and certain subsidiaries;<br><br>ii.    professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Closing Date);<br><br>iii.    interest, fees and expenses payable under the Junior DIP Facility, including, without limitation, the Commitment Fee, the Funding Fee, the Exit Fee and the Junior DIP Lender Legal Expenses; and<br><br>iv.    interest and other amounts payable under the Priming Credit Agreement.<br><br>*See* DIP Term Sheet, § 9. |
| **Entities with Interests in Cash Collateral** | The Senior DIP Lender has an interest in the Cash Collateral. |
| **Fees** | ***Commitment Fee***. The Borrowers shall pay to the Junior DIP Lender a commitment fee equal to 1% of the total amount of the Base Amount. The Commitment Fee shall be fully earned and non-refundable upon entry of the Interim Order, and shall be payable on the date of the Draw by being added to the principal amount of the DIP Loans.<br><br>***Funding Fee***. The Borrowers shall pay to the Junior DIP Lender a funding fee equal to 1.0% of the amount of the Base Amount, which shall be fully earned and non-refundable |

US-DOCS\143293968

| Material Term | Summary of Material Terms |
|---|---|
| | upon entry of the Interim Order and shall be payable on the date of the Draw by being added to the principal amount of the DIP Loans.<br><br>***Exit Fee.*** Upon repayment or satisfaction of the DIP Loans in whole or in part the Borrowers shall pay to the Junior DIP Lender in cash an exit fee equal to 2% of the aggregate principal amount of the Junior DIP Facility on the date of the Draw, which shall be fully earned and non-refundable upon the Bankruptcy Court's entry of the Interim Order. If the DIP Termination Date has occurred solely as a result of the occurrence and continuation of an Event of Default under the DIP Documents, then the Exit Fee shall not be payable until the DIP Obligations have been accelerated by the Junior DIP Lender or the DIP Obligations have matured in accordance with their terms.<br><br>The Commitment Fee, the Exit Fee, and the Funding Fee shall be approved by the Bankruptcy Court as part of the Interim Order and the Final Order, respectively. If such premiums are not approved by the Bankruptcy Court, the Term Sheet shall automatically terminate and be of no further force and effect.<br><br>*See* DIP Term Sheet, § 8. |
| **Budget** | The use of cash and proceeds from the Junior DIP Facility is subject to the Debtors' postpetition budget under the Junior DIP Facility, attached to the Interim Order as <u>Exhibit 3</u>.<br><br>*See* Interim Order, <u>Exhibit 3</u>. |
| **Reporting Information / Variance Covenants** | The Budget shall be updated and provided to the Junior DIP Lender on the fourth Wednesday following the prior Budget's approval and every fourth Wednesday thereafter, or more frequently at the reasonable discretion of both the Borrowers and DIP Lender, with such updated Budget extending the term thereof and the Junior DIP Lender, in its reasonable discretion, shall have the right to approve any such updates (or any amendments) (other than any such updates or amendments that are approved by the Senior DIP Lender under the terms of the Priming Credit Agreement and that do not result, in the aggregate when taken together with any other updates or amendments made since the most recent Budget was approved by the Junior DIP Lender, in more than a 15% variance from the most recent Budget approved by the Junior DIP Lender) by providing the Borrowers specific notice thereof within five business days after the delivery by the Borrowers of any such update or amendment ("<u>Updated Budget</u>") and, (ii) to the extent the Junior DIP Lender provides written notice rejecting the updates (or any amendments), the then existing Budget shall continue to constitute the applicable Budget until such time as an update or amendment is approved by the Junior DIP Lender. In the event the Junior DIP Lender does not provide written notice of its rejection of the proposed updates within such five day period, the Updated Budget shall become effective as the Budget.<br><br>On a weekly basis thereafter, the Borrowers shall deliver to the Junior DIP Lender a variance report for the four-week period ending the prior Friday comparing the difference/variance, expressed as a percentage (each, a "<u>Budget Variance</u>"), between: (x) total receipts for such period to total receipts for such period as set forth in the Budget on a cumulative 4-week rolling basis; (y) total disbursements (excluding professional fees) for such period to total disbursements (excluding professional fees) for such period as set forth in the Budget on a cumulative 4-week rolling basis (each a "<u>Measuring Period</u>") and explaining in reasonable detail all material variances, it being understood that any variance solely with respect to net operating disbursements that exceeds 20% shall be |

| Material Term | Summary of Material Terms |
|---|---|
| | material and shall constitute an Event of Default under the DIP Documents (each such report, a "Variance Report," which shall be in a form satisfactory to the Junior DIP Lender). <br><br> For purposes of each Measuring Period, the Borrowers shall calculate: the numerical difference between "net operating disbursements" plus "net capital expenditures" (such terms reflecting those line items illustrated in the Budget) for such period to "net operating disbursements" plus "net capital expenditures" for such period as set forth in the Budget on a cumulative 4 week rolling basis, and to the extent the difference is a positive number, the percentage such difference is of the cumulative budgeted amount for disbursements for such period (the "Disbursements and Capital Expenditure Variance"). For purposes herein, a "Permitted Variance" shall be limited to not greater than 20% for budget variances with respect to the Disbursements and Capital Expenditure Variance, each as set forth in the applicable Variance Report. <br><br> *See* DIP Term Sheet, § 20. |
| **Chapter 11 Milestones** | The only milestones are the entry of the Interim Order on or before July 7, 2023 and the entry of the Final Order on or before July 31, 2023. <br><br> *See* DIP Term Sheet, §§ 6, 14. |
| **Liens and Priorities** | Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral, which DIP Liens shall be, subject to the Carve Out and any transaction fee or the like owed to Moelis & Company LLC or M3 Advisory Partners, LP: <br><br> (1) first-priority liens on and continuing security interests in all proceeds of the Junior DIP Facility and the DIP Accounts, and <br><br> (2) with respect to all other DIP Collateral, subject only to (A) the Carve Out, (B) any transaction fee or the like owed to Moelis & Company LLC or M3 Advisory Partners, LP and (C)(i) any liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or that were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) and (ii) the Senior DIP Liens (all such liens in this clause (C), the "Prior Permitted Liens"). <br><br> *See* Interim Order, ¶ 6. |
| **Carve Out** | The Interim Order provides a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors. <br><br> *See* Interim Order, ¶ 20. |
| **Challenge Period** | Not applicable. |
| **Adequate Protection** | Not applicable. |

US-DOCS\143293968

| Material Term | Summary of Material Terms |
|---|---|
| **Events of Default** | The DIP Term Sheet contains events of default that are usual and customary for debtor-in-possession financings, including the failure to obtain entry of the Final Order by July 31, 2023.<br><br>*See* DIP Term Sheet, § 24. |
| **Waiver/Modification of the Automatic Stay** | ***Exercise of Remedies***. The DIP Loan Parties shall immediately provide notice to counsel to the Junior DIP Lender and the Official Committees of the occurrence of any DIP Termination Event. Upon the occurrence of a DIP Termination Event, without further application to or order from the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Junior DIP Lender to take any of the following actions, at the same or different time:<br><br>   i.   deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the Senior DIP Lender, the U.S. Trustee and lead restructuring counsel for the Official Committee (the "<u>Remedies Notice</u>") declaring the occurrence of a DIP Termination Event (such date, the "<u>DIP Termination Declaration Date</u>") and/or deliver a Carve Out Notice (as defined in the Senior Final DIP Order),<br><br>   ii.   declare the termination, reduction or restriction of the commitments under the Junior DIP Facility (to the extent any such commitment remains),<br><br>   iii.   declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties,<br><br>   iv.   declare the termination of the Junior DIP Facility and the Junior DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the DIP Obligations,<br><br>   v.   declare the reduction or restriction on the Junior DIP Facility or the Junior DIP Loan Documents, and<br><br>   vi.   declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral (subject to the Debtors' rights under the Remedies Notice Period in paragraph 18(c) of the Interim Order);<br><br>*provided, however,* that following the occurrence of a DIP Termination Event, (i) the Junior DIP Lender may not exercise or enforce any rights against DIP Collateral (other than the sweeping of all cash or other amounts contained in any accounts controlled by the Junior DIP Lender or the charging of interest at the default rate set forth in the DIP Term Sheet) unless the obligations under the Senior DIP Facility have been Paid in Full and (ii) subject thereto, prior to the exercise or enforcement of any rights against DIP Collateral (including the sweeping of all cash or other amounts contained in any accounts controlled by the Junior DIP Lender or the charging of interest at the default rate set forth in the DIP Term Sheet), the Junior DIP Lender shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency hearing (the "<u>Stay Relief Hearing</u>"), and the DIP Loan Parties and the Official Committees shall not object to the shortened notice with respect to such Stay Relief Hearing. The Court may fashion any appropriate remedy at a Stay Relief Hearing, which may include, *inter alia*, the exercise of any and all rights or remedies available to the |

US-DOCS\143293968

| Material Term | Summary of Material Terms |
|---|---|
| | Junior DIP Lender under the Interim Order, the Junior DIP Loan Documents or applicable law against the DIP Collateral, *provided* that the rights of the Debtors to contest such relief are expressly preserved. <br><br> ***Remedies Notice Period***. During the period from and after the Termination Declaration Date through the date of the Stay Relief Hearing (the "<u>Remedies Notice Period</u>"), the Debtors shall be permitted to use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that are critically necessary to keep the Debtors' businesses operating or that have been consented to by the Junior DIP Lender, (ii) payment on account of Prior Permitted Liens in the BOA Collateral Account, and (iii) the Carve Out Trigger Notice Reserve (as defined in the Senior Final DIP Order); *provided, however*, that any fees or expenses incurred by the DIP Loan Parties or the Official Committee during the Remedies Notice Period shall permanently reduce the Carve Out Amount (as defined below); *provided, further,* that the Debtors may seek an emergency hearing with the Court during the Remedies Notice Period. For the avoidance of doubt, during the Remedies Notice Period, the Junior DIP Lender shall not be obligated to provide any DIP Loans or advance any credit at any time from and after the occurrence of a DIP Termination Event. <br><br> *See* Interim Order, ¶ 18. |
| **Indemnification** | The Junior DIP Lender (and its affiliates (excluding the Debtors) and respective officers, directors, employees, advisors and agents) (each such person, including the Junior DIP Lender, an "<u>Indemnitee</u>") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the fraud, gross negligence, bad faith, willful misconduct, or breach of fiduciary duty of the relevant indemnified person (or any of its affiliates (excluding the Debtors) or any of its or its respective officers, directors, employees, advisors or agents). Such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of such Indemnitee under the Junior DIP Loan Documents, (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtor and that is brought by an Indemnitee against another Indemnitee, or (c) to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have arisen from the fraud, gross negligence, bad faith, willful misconduct, or breach of fiduciary duty of the relevant Indemnitee. <br><br> *See* Interim Order, ¶ 2(d), DIP Term Sheet ¶ 25. |

**Statement of Significant Provisions**

12.     The DIP Term Sheet and Interim Order contain provisions identified in section C,

paragraph 8 of the *Procedures for Complex Cases in the Southern District of Texas* (the "Complex

Case Procedures") as "Significant Provisions"[7] as summarized below:[8]

    (a)    ***Milestones.***  The DIP Term Sheet imposes certain milestones to obtain entry of the Interim Order (no later than July 7, 2023) and entry of the Final Order (no later than July 31, 2023).  *See* DIP Term Sheet, §§ 6, 24. The DIP Term Sheet and Interim Order do not impose any other milestones.

    (b)    ***No Cross-Collateralization.***  The DIP Term Sheet and Interim Order do not authorize, and the Junior DIP Facility does not provide for, any cross-collateralization.

    (c)    ***No Roll-Up Loans.***  The DIP Term Sheet and Interim Order do not authorize, and the Junior DIP Facility does not provide for, any "roll-up" of prepetition debt.

    (d)    ***Liens on Proceeds of Avoidance Actions***.  The Interim Order would grant the Junior DIP Lender liens on proceeds of any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code, other than causes of action (and proceeds thereof) under chapter 5 of the Bankruptcy Code or otherwise related to (i) the distribution by Sorrento of its common stock in the Junior DIP Lender to Sorrento's shareholders on or about January 19, 2023, (ii) the current or former directors or officers of the Debtors or the Junior DIP Lender (other than in connection with the Junior DIP Facility), (iii) the Junior DIP Lender (other than in connection with the Junior DIP Facility), and (iv) any insider or affiliate transactions, including investments by the Debtors in other companies.  Interim Order, ¶ 6(b); DIP Term Sheet, § 11.

    (e)    ***Default Provisions and Remedies.***  The DIP Term Sheet provides for the customary events of default and remedies available to DIP lenders as set

---

[7]     Significant Provisions refer to those provisions that contain:  (a) sale or plan confirmation milestones; (b) cross-collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies; (f) releases of claims against lenders or others; (g) limitations on fees for advisors to official committees; (h) non-consensual priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

[8]     To the extent of any conflict between the descriptions and definitions in this Motion and the DIP Orders, Junior DIP Term Sheet, or Junior DIP Loan Documents, then the DIP Orders, Junior DIP Term Sheet, or Junior DIP Loan Documents, as applicable, will control.

US-DOCS\143293968

forth in the DIP Term Sheet sections titled "Remedies" and "Events of Default." DIP Term Sheet, §§ 13, 24.

(f)     ***Releases of Claims.***  The DIP Term Sheet (§ 26) and Interim Order (¶ 30) provide for a limited release and exculpation in favor of the Debtors, the Junior DIP Lender, and their respective officers, directors, employees, and professionals, in each case solely in connection with the Junior DIP Facility.

(g)     ***Limitations on the Use of DIP Proceeds Other than General "Carve Outs" To Pay Approved Fees and Expenses of Advisors to Official Committees or Future Trustees***.  The DIP Term Sheet sets forth the allowed uses for Cash Collateral and the Junior DIP Facility.  The Debtors shall be entitled to use Cash Collateral and the Junior DIP Facility in accordance with the Approved Budget (subject to the Permitted Variances) and DIP Term Sheet.  The DIP Term Sheet provides for customary restrictions on use of the Junior DIP Facility and Cash Collateral, as set forth in the DIP Term Sheet (§ 9) and Interim Order (¶ 21).

(h)     ***Priming Liens***.  The DIP Term Sheet and Interim Order do not grant, and the Junior DIP Facility does not provide, the Junior DIP Lender with any priming liens and security interests in DIP Collateral *except* (subject to the Carve Out) the first-priority liens on all proceeds of the Junior DIP Facility and the DIP Accounts (as defined in the Interim Order).

(i)     ***Limitation on the Ability of Estate Fiduciaries to Fulfill Their Duties***.  The Interim Order provides for a waiver of a section 506(c) surcharge and marshalling. The DIP Term Sheet and DIP Orders impose certain limitations on the use of the Junior DIP Facility and the Cash Collateral. DIP Term Sheet, § 9; Interim Order, ¶¶ 21, 22, 23.

13.     The Significant Provisions in the DIP Term Sheet and DIP Orders are appropriate and necessary to permit the Debtors' access to the Junior DIP Facility.  Notably, and in contrast to a financing facility at the beginning of a chapter 11 case, here the Unsecured Creditors' Committee and the Equity Committee have already been appointed—and both generally support the Junior DIP Facility (but are continuing to review the precise terms).  The Junior DIP Facility also has the full support and approval of the Debtors Chief Restructuring Officer, who is independent of both the Debtors' management and the Junior DIP Lender.  In addition, the terms and conditions of these Significant Provisions are the result of good-faith, arm's-length negotiations between the

Debtors and the Junior DIP Lender.  The Junior DIP Lender is unwilling to provide the Junior DIP Facility absent the inclusion of these provisions, and the Debtors have no other liquidity solutions at this time.  Granting the relief requested pursuant to the Interim Order is critical to the continued operations of the Debtors' businesses (including the continued employment of the Debtors' workforce) and maintaining their going concern value.  The Significant Provisions are appropriate and necessary under the facts and circumstances of these chapter 11 cases and should be approved.

## Budget

14.      The Debtors and Junior DIP Lender have agreed on a 5-week budget (the "Approved Budget"), which is attached to the Interim Order as **Exhibit 3**.  The budget will be updated at least once every four weeks (each, a "Proposed Budget").  If a Proposed Budget is in form and substance satisfactory to the Junior DIP Lender, it shall become the "Approved Budget" for purposes of the Interim Order once approved by the Junior DIP Lender, until which time the prior Approved Budget shall remain the Approved Budget.  Compliance with the Approved Budget will be measured every week, as further described in section 20 of the DIP Term Sheet.

## Basis for Relief

**A.     The Debtors Should Be Authorized to Obtain Postpetition Financing Under Section 364(c) of the Bankruptcy Code on a Senior and Junior Secured and Superpriority Basis.**

15.      It is essential that the Debtors obtain access to sufficient postpetition financing to avoid immediate and irreparable harm to their businesses.  The preservation of estate assets and the Debtors' continuing viability and ability to maximize value for stakeholders depends heavily upon the expeditious approval of the relief requested.

16.      Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor in

15

possession cannot obtain postpetition credit on an unsecured basis pursuant to section 364(b) of the Bankruptcy Code, a court may authorize a debtor under section 364(c) to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a junior lien on encumbered property, or a combination of the foregoing.

17.     The Debtors propose to obtain financing under the Junior DIP Facility, in part, by providing superpriority claims and liens pursuant to section 364(c) of the Bankruptcy Code, subject only to the Carve Out and the Prior Permitted Liens (which include the Senior DIP Liens), each as defined in the Interim Order.  The Debtors propose to provide the Junior DIP Lender with (a) first-priority liens on all proceeds of the Junior DIP Facility and the DIP Accounts (as defined in the Interim Order) and (b) with respect to substantially all of the Debtors' others assets (excluding the "Excluded Assets," as defined in the DIP Term Sheet), junior liens subject to the Carve Out and the Prior Permitted Liens, all as set forth in greater detail in paragraph 6 of the Interim Order (such collateral, the "DIP Collateral," and such liens, the "DIP Liens").

18.     In the event that a debtor demonstrates that it is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court:

> may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

19.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing pursuant to section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

> (2)     the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code (*i.e.*, by allowing a lender only an administrative claim);

16

(3)     the credit transaction is necessary to preserve the assets of the estate; and

(4)     the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990).

### 1.     The Debtors Are Unable to Obtain Unsecured Financing.

20.     To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Despite an extensive marketing process at the beginning of these chapter 11 cases and an ongoing capital-raise process, at this time the Debtors have not been able to obtain postpetition financing on better terms than those reflected in the DIP Term Sheet, and there are no better offers available to the Debtors or before the Court at this time.

### 2.     The Junior DIP Facility is Necessary to Preserve and Protect the Debtors' Assets.

21.     The Junior DIP Facility will provide the Debtors with necessary and immediate access to the liquidity needed to avoid an immediate liquidation.  The Junior DIP Facility (including immediate access on an interim basis) will enable the Debtors to preserve more value as a going concern for the benefit of their estates, compared to a piecemeal liquidation—which the Debtors believe would generate substantially less value for stakeholders than an orderly sale process or a restructuring.  Additionally, the Junior DIP Facility will signal to the Debtors' employees and vendors that operations can and will continue in the ordinary course, which will help mitigate the uncertainty and disruptions that might otherwise arise.  Thus, the Junior DIP Facility is necessary to preserve and protect the assets of the Debtors' estates.

### *3.*      *The Terms are Fair, Reasonable, and Appropriate under the Circumstances.*

22.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances.  *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003).  As described further below, the terms of the DIP Term Sheet (including the fees thereunder) and the proposed Interim Order were negotiated in good faith and at arm's-length between the Debtors (through their independent Chief Restructuring Officer) and the Junior DIP Lender (through its independent Chief Accounting Officer) and their respective independent advisors.  Thus, the Junior DIP Facility is fair, reasonable, and appropriate under the circumstances.

**B.**     **Entry into the Junior DIP Facility Satisfies the Entire Fairness Standard.**

23.     To the extent the Junior DIP Lender is an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code, then the Junior DIP Facility may be subject to the heightened "entire fairness" standard.  But even if the Court were to apply the "entire fairness" standard, the Junior DIP Facility satisfies this standard and should be approved.

24.     The entire fairness standard consists of "two aspects, fair dealing and fair price, both of which must be examined together in resolving the ultimate question of entire fairness." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985).  Fair dealing "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction.  These concerns include how the purchase was initiated, negotiated, structured and the manner in which director approval was obtained." *Kahn v. Tremont Corp.*, 694 A.2d 422, 430-31 (Del. 1997).  Fair price "relates to the economic and financial considerations relied upon when valuing" the proposed transaction.  *Id.*

25.     *Fair Dealing*.  The Debtors' and the Junior DIP Lender's conduct, and the overall process in negotiating the Junior DIP Facility, was fair and reasonable.  The Debtors and the Junior DIP Lender, both sophisticated parties, were represented by separate counsel (Latham & Watkins

18

LLP and Paul Hastings LLP, respectively), who engaged in good-faith, hard-fought negotiations. The Debtors' independent Chief Restructuring Officer and the Junior DIP Lender's Chief Accounting Officer (who has no affiliation with the Debtors) also separately engaged in good-faith negotiations with each other on the economics of the deal.  These collective negotiations involved an iterative process comprising several proposals and counterproposals with respect to the terms of both the DIP Term Sheet and the Interim Order.  And the DIP Facility has been approved by the Debtors' Chief Restructuring Officer (who has full authority on behalf of the Debtors), the Junior DIP Lender's Chief Accounting Officer, and the Junior DIP Lender's full board of directors.

26.    *Fair Price*.  As a result of that fair dealing, the Junior DIP Facility reflects a fair and reasonable price.  The terms of the Junior DIP Facility are generally comparable to other postpetition financings, including the Senior DIP Facility.  The Junior DIP Facility provides benefits to both the Debtors and the Junior DIP Lender and reflects hard-fought negotiations by sophisticated parties with sophisticated counsels.  Ultimately, the Junior DIP Facility is the best available financing at this time for the Debtors and reflects fair terms.  That fairness is confirmed by the general support of both the Unsecured Creditors' Committee and the Equity Committee.

## C.    Entry into the Junior DIP Facility Is an Exercise of the Debtors' Sound Business Judgment.

27.    In addition to the Junior DIP Facility being fair, entry into the Junior DIP Facility is an exercise of the Debtors' sound business judgment.  To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  Further, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003).

28. The Debtors' decision to move forward with the Junior DIP Facility is a sound exercise of their business judgment. The Debtors require immediate postpetition financing, given their immediate liquidity constraints, which likely would cause the Debtors to liquidate if financing were not obtained, which the Debtors believe would materially decrease recoveries to constituents. As discussed above, the Debtors negotiated the DIP Term Sheet with the Junior DIP Lender in good faith, at arm's length, and with the assistance of their advisors, and the Debtors believe that they have obtained the best financing available at this time under the circumstances. The Debtors believe the terms of the Junior DIP Facility are fair and reasonable under the circumstances. The Court should thus authorize the Debtors' entry into the DIP Term Sheet as a reasonable exercise of the Debtors' business judgment.

**D.      The Debtors Should Be Authorized to Use Cash Collateral.**

29. Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral (as defined in section 363 of the Bankruptcy Code) unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the Junior DIP Lender has consented to the use of cash collateral, subject to the terms of the Junior DIP Loan Documents and Interim Order. In addition, the Debtors' use of cash collateral is fair, in the best interests of the Debtors' estates, and a sound exercise of their business judgment for the reasons explained throughout this Motion. Accordingly, the Debtors' use of cash collateral should be approved, subject to the terms of the Junior DIP Loan Documents and Interim Order.

**E.      The Scope of the Carve Out is Appropriate.**

30. The Junior DIP Lender's DIP Liens and the DIP Superpriority Claims will be subject and subordinate to payment of the Carve Out, as defined in and provided under the Senior DIP Facility. The Carve Out will be senior to all claims and liens over all assets of the Debtors,

including any DIP Collateral, as set forth in the Interim Order. Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted. *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced."). The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers. Additionally, the Carve Out protects against administrative insolvency during the course of the chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee appointed under section 1102 of the Bankruptcy Code in these chapter 11 cases.

**F.    The Junior DIP Lender Should Be Afforded Good-Faith Protection Under Section 364(e) of the Bankruptcy Code.**

31.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

32.    The Junior DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the Junior DIP Lender offered the most favorable terms on which to obtain vital

postpetition financing, (ii) arm's-length, good-faith negotiations between the Debtors and the Junior DIP Lender, and (iii) an iterative process comprising multiple proposals and counterproposals.  The terms and conditions of the Junior DIP Facility are appropriate under the circumstances, and the proceeds of the Junior DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code in accordance with the DIP Term Sheet.  The Court should find that the obligations arising under the Junior DIP Facility and other financial accommodations made to the Debtors have been extended by the Junior DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and therefore the Junior DIP Lender is entitled to all of the protections afforded thereby.

**G.     The Automatic Stay Should Be Modified on a Limited Basis.**

33.     The Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Debtors and the Junior DIP Lender to commit all acts and take all actions necessary to implement the Junior DIP Facility and all acts, actions, and transfers contemplated therein.  The DIP Term Sheet provides that the Junior DIP Lender may seek an emergency hearing with respect to the Junior DIP Lender's right to exercise its rights and remedies under the DIP Term Sheet during the five business days immediately following the date the Junior DIP Lender delivers the Termination Notice (as defined in the DIP Term Sheet).  Stay modifications of this kind are typical and customary features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances.

**H.     The Limited Exculpation/Release is Appropriate.**

34.     The Interim Order releases and exculpates the Debtors, the Junior DIP Lender, and their respective officers, directors, employees, and professionals from any claim, obligation, cause of action, or liability for any act or omission taken in connection with the Junior DIP Facility,

including but not limited to any claim for breach of fiduciary duty owed to the Debtors, the Junior DIP Lender, and/or their respective shareholders and creditors (including, without limitation, any fiduciary duty which may be owed by the Debtors to shareholders or creditors of the Junior DIP Lender as a significant shareholder of the Junior DIP Lender); *provided, however,* that the released and exculpated claims shall not include: (i) any act or omission that is determined in a final order of this Court to have constituted willful misconduct, gross negligence, criminal conduct, or fraud, and/or (ii) the rights of any entity to enforce this Interim Order and the Junior DIP Loan Documents.

35.     The Debtors do not believe any colorable exculpated/released claims exist; however, as noted above this, is an interested party transaction.  It would not be in the Debtors' business judgment to obtain the Junior DIP Facility if doing so created liability for the Debtors (including liability for breach of any fiduciary duties which may be owed by the Debtors, including to the Junior DIP Lender or its shareholders and creditors)—which is why the Debtors are requesting this limited exculpation/release, to provide certainty and protection on the issue.  At all times in connection with negotiating and drafting the DIP Term Sheet and Interim Order, the Debtors, the Junior DIP Lender, and their respective officers, directors, employees and professionals have acted in good faith.  And notably, the release in the Interim Order is limited to the Junior DIP Facility.  It does <u>not</u> provide for a general release of the Junior DIP Lender, which is otherwise often customary for postpetition facilities.  Though the Junior DIP Lender requested such a release, the Debtors declined to provide it.  Last, the scope of the exculpation/release is generally the same as the exculpation/release that would generally be provided in a confirmation order; the effect of including it in the Interim Order is only to accelerate the timing of its grant to enable the Debtors to exercise their business judgment properly at this critical time.  Thus, for all

23

these reasons, the limited and appropriately tailored exculpation/release set forth in the Interim Order is appropriate under the circumstances and should be approved.

## Request for Final Hearing

36.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the final hearing on this Motion no later than July 28, 2023, and fix the time and date for parties to file objections to this Motion seven days prior.

## Waiver of Bankruptcy Rules 6004(a) and 6004(h)

37.    For the reasons described herein regarding the Debtors' lack of liquidity and exigent circumstances, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## Notice

38.    The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the Southern District of Texas; (b)  the Senior DIP Lender; (c) the Creditors' Committee; (d) the Equity Committee; (e) the creditor matrix (which includes the Debtors' master service list, creditors, and shareholders); (f) the Junior DIP Lender; (g) the Junior DIP Lender's shareholders to the extent feasible; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

The Debtors request the Court enter the Interim Order and Final Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: June 30, 2023

/s/  *Kristhy M. Peguero*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:  (713) 752-4200
Facsimile:   (713) 752-4221
Email: mcavenaugh@jw.com
      kpeguero@jw.com
      ggraham@jw.com

– and –

Caroline Reckler (S.D. Tex. Bar No. IL6275746)
Ebba Gebisa (admitted *pro hac vice*)
Jonathan Gordon (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile:  (312) 993-9667
Email:  caroline.reckler@lw.com
      ebba.gebisa@lw.com
      jonathan.gordon@lw.com

– and –

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile:  (213) 891-8763
Email:  jeff.bjork@lw.com
      kim.posin@lw.com

*Counsel to the Debtors*

**Certificate of Accuracy**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Kristhy M. Peguero*
Kristhy M. Peguero

**Certificate of Service**

I certify that, on June 30, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Kristhy M. Peguero*
Kristhy M. Peguero