United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 27, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| *In re:* | ) | Chapter 11 |
|  | ) |  |
| SORRENTO THERAPEUTICS, INC., *et al.*,[1] | ) | Case No. 23-90085 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Re: Docket Nos. 978, 997** |

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN JUNIOR SECURED SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of Sorrento Therapeutics, Inc. and Scintilla Pharmaceuticals, Inc (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas and the Procedures for Complex Chapter 11 Bankruptcy Cases (together, the "Local Bankruptcy Rules") promulgated by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"),

---

[1]   The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956). The Debtors' service address is: 4955 Directors Place, San Diego, CA 92121.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the Junior DIP Credit Agreement (as defined below), as applicable.

seeking entry of an interim order [Docket No. 997] (the "Interim Order") and a final order (this "Final Order"), among other things:

(a)     authorizing the Debtors to obtain postpetition financing on a superpriority junior secured basis (the "Junior DIP Facility", and the loans made, advanced or deemed advanced thereunder, the "Junior DIP Loans") in the form of a term loan facility in an aggregate principal amount not to exceed the sum of (i) $20,000,000, *plus* (ii) the amount of the Commitment Fee and the Funding Fee (each as defined in the Junior DIP Credit Agreement), *plus* (iii) the amount of the Junior DIP Lender Holdback (as defined herein), all of which shall be available to the Debtors in a single draw (the "Draw") upon entry of the Interim Order, in accordance with and subject to the terms and conditions (including, without limitation, any conditions precedent to each of the Junior DIP Loans) set forth in (w) that certain *Debtor In Possession Term Loan Facility Summary of Terms and Conditions*, substantially in the form attached to the Interim Order as Exhibit 1 thereto (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms thereof, hereof and of the Interim Order, the "Junior DIP Term Sheet"), (x) that certain *Junior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement*, substantially in the form attached to this Final Order as **Exhibit 1** (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "Junior DIP Credit Agreement"), (y) that certain Intercreditor and Subordination Agreement (substantially in the form attached to this Final Order as **Exhibit 2**) (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "Subordination Agreement") (and, together with the Junior DIP Credit Agreement and all other agreements, guarantees, pledge, collateral and security agreements, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the Junior DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, together with the Junior DIP Credit Agreement, collectively, the "Junior DIP Loan Documents"), by and among the Debtors, as borrowers (the "DIP Borrowers"), each of the Guarantors (as defined in the Junior DIP Credit Agreement) (collectively, the "DIP Guarantors", and together with the DIP Borrowers, the "DIP Loan Parties"), Scilex Holding Company, as the lender (together with its successors and permitted assigns, the "Junior DIP Lender"), and (z) the Interim Order and this Final Order;

(b)     authorizing the DIP Loan Parties to (i) execute, deliver, and perform under the Junior DIP Credit Agreement and each of the Junior DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the Junior DIP Loan Documents, including without limitation, all

Obligations (as defined in the Junior DIP Credit Agreement, and referred to herein as the "<u>DIP Obligations</u>") in accordance with the terms of the Junior DIP Loan Documents, and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of the Interim Order, this Final Order, the Junior DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)    authorizing the DIP Borrowers to incur, and the DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with the Interim Order, this Final Order and the Junior DIP Loan Documents;

(d)    subject to the Subordination Agreement, granting to the Junior DIP Lender the Junior DIP Liens (as defined below) in all Collateral (as defined in the Junior DIP Credit Agreement, and referred to herein as the "<u>DIP Collateral</u>"), as set forth in the Interim Order and this Final Order, subject to the Carve Out, any transaction fee or the like owed to Moelis & Company or M3 Advisory Partners LP, and any Prior Permitted Liens (as defined below), subject to the relative priorities set forth in this Final Order;

(e)    granting to the Junior DIP Lender allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out and the Senior DIP Superpriority Claims, as set forth in the Interim Order, this Final Order and the Junior DIP Loan Documents;

(f)    authorizing the Debtors to use the proceeds of the Junior DIP Facility and the DIP Collateral, including cash collateral, as defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>"), solely in accordance with the terms and conditions set forth in the Interim Order, this Final Order and the Junior DIP Loan Documents, including the Approved Budget (as defined below) and the Subordination Agreement, subject to any variances expressly permitted herein and under the Junior DIP Credit Agreement;

(g)    approving the Debtors' waiver of the right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(h)    approving the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral; and

(i)    modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of the Interim Order, this Final Order and the Junior DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of the Interim Order and this Final Order, providing for the immediate effectiveness of this Final Order, and granting related relief.

The Court, having considered the Motion, the Junior DIP Loan Documents, the exhibits attached thereto, the Junior DIP Credit Agreement, and the evidence submitted and arguments proffered or adduced at the interim hearing held before this Court on July 5, 2023 (the "Interim Hearing"); and the Court having entered the Interim Order on July 5, 2023; and due and proper notice of the Motion having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and upon the record of the Chapter 11 Cases; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; the Court having determined that the legal and factual bases set forth in the Motion and at the Interim Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, represents a sound exercise of the Debtors' business judgment, is necessary for the continued operation of the Debtors' businesses and is necessary to preserve and maximize the value of the Debtors and their estates; and the Debtors having provided notice of the Motion as set forth in the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:[3]**

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

A.      *Petition Date.* On February 13, 2023 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these Chapter 11 Cases.

B.      *Debtors in Possession.* The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.      *Committee Formation.* On February 28, 2023, the Office of the United States Trustee (the "<u>U.S. Trustee</u>") appointed an official committee of unsecured creditors (the "<u>Unsecured Creditors' Committee</u>"), which was reconstituted on March 28, 2023 [Docket No. 313] and again on June 7, 2023 [Docket No. 813]. On April 10, 2023, the U.S. Trustee appointed an official committee of equity security holders (together with the Unsecured Creditors' Committee, the "<u>Official Committees</u>"), which was reconstituted on April 14, 2023 [Docket No. 448].

D.      *Jurisdiction and Venue.* This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Bankruptcy Rule 4001-2.

E.      *Findings Regarding Corporate Authority.* Each of the DIP Loan Parties has all requisite power and authority to execute and deliver the Junior DIP Loan Documents to which it is a party and to perform its obligations thereunder.

F.      *Senior DIP Facility*.  On March 30, 2023, this Court entered a final order [Docket No. 74] (the "Senior Final DIP Order") approving the Debtors' senior secured postpetition financing facility (the "Senior DIP Facility") with JMB Capital Partners Lending, LLC (the "Senior DIP Lender" and together with the Junior DIP Lender, the "DIP Lenders").  The "DIP Liens," the "DIP Superpriority Claims," and "DIP Obligations" in the Prior Final DIP Order are referred to herein as the Senior DIP Liens, Senior DIP Superpriority Claims, and Senior DIP Obligations, respectively.

G.      *Findings Regarding Junior DIP Facility and Use of Cash Collateral.*

(a)      *Good Cause*. Good and sufficient cause has been shown for the entry of this Final Order and for the Debtors to obtain postpetition financing pursuant to the terms hereof and the Junior DIP Loan Documents.

(b)      *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors have an immediate and critical need to obtain the Junior DIP Facility and use Cash Collateral in order to, among other things, (i) permit the orderly continuation and operation of their businesses, (ii) maintain business relationships with customers, vendors and suppliers, (iii) make payroll, (iv) make capital expenditures, (v) pay the expenses of the Chapter 11 Cases, including the costs needed to formulate and pursue a chapter 11 plan of reorganization, (vi) satisfy working capital and operational needs of the Debtors, and (v) for general corporate purposes, in each case, in accordance with and subject to the terms and conditions of the Interim Order, this Final Order and the Junior DIP Loan Documents, including the Approved Budget (subject to Permitted Variances, as defined in the Junior DIP Credit Agreement).  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the Junior DIP Facility in order to preserve, maintain and maximize the

Debtors' going concern value and to facilitate an orderly and successful reorganization of the Debtors.  Without access to the Junior DIP Facility and the authorized use of Cash Collateral upon the terms set forth herein, the Debtors and their estates will be immediately and irreparably harmed.

(c)    *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing or other financial accommodations on more favorable terms from sources other than the Junior DIP Lender. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors are also unable to obtain adequate secured credit allowable under section 364(c)(1) of the Bankruptcy Code in addition to the Senior DIP Facility without granting to the Junior DIP Lender the rights, benefits, remedies and protections set forth herein and the Junior DIP Loan Documents, including the Junior DIP Liens in all DIP Collateral and the Junior DIP Superpriority Claims upon the terms set forth herein.

(d)    *Use of Proceeds of Junior DIP Facility and Cash Collateral.* As a condition to the Senior DIP Lender consenting to the Junior DIP Facility and to the Junior DIP Lender providing the Junior DIP Facility (including Cash Collateral), the Senior DIP Lender and Junior DIP Lender each require, and the Debtors have agreed, that all proceeds of the Junior DIP Loans and all Cash Collateral shall be used and/or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget (subject to Permitted Variances) including (i) to pay the costs of administration of the Chapter 11 Cases, (ii) for general corporate and working capital purposes, (iii) to pay certain DIP Obligations, (iv) to pay certain obligations arising under the Senior DIP Facility, and (v) to pay professional fees and expenses in accordance with this Final Order, in each case, subject to the terms and conditions of this Final Order and the Junior DIP Loan Documents.

(e)     *Approved Budget and Variance*. The Debtors have prepared and delivered to the DIP Lenders the initial itemized cash flow forecast set forth on **Exhibit 3** attached hereto, which has been approved by the DIP Lenders (the "Initial Budget", as amended, supplemented or updated by the Debtors, and approved by the DIP Lenders, from time to time in accordance with the terms of this Final Order and the Junior DIP Credit Agreement, the "Approved Budget"), reflecting, on a line item, cumulative and aggregate basis, (i) the Debtors' projected cash receipts expected to be collected, and necessary disbursements and expenditures expected to be incurred or made, by the Debtors for each calendar week during the 5-week period from the calendar week beginning on June 25, 2023 and (ii) the sum of weekly unused availability under the Junior DIP Facility, plus cash on hand.  The Initial Budget is an integral part of this Final Order, and the DIP Lenders are relying, in part, upon the Debtors' agreement to comply with the Approved Budget (subject to Permitted Variances) in determining to enter into the Junior DIP Facility and to allow the Debtors' use of proceeds of the Junior DIP Facility and Cash Collateral in accordance with the terms of this Final Order and the Junior DIP Loan Documents.

(f)     *Section 506(c) and Marshalling Waivers*. As a material inducement to the Junior DIP Lender providing the Junior DIP Facility, and in consideration of (i) the Junior DIP Lender's agreement to subordinate their DIP Liens to the Carve Out and Senior DIP Liens, and (ii) the Junior DIP Lender's agreement to pay the expenses of the administration of these cases, subject to the Approved Budget (subject to Permitted Variances), and in accordance with the terms of this Final Order and the Junior DIP Loan Documents, (i) the DIP Loan Parties waive their right to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the Junior DIP Lender or the DIP Collateral, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise and (ii) the Junior DIP Lender shall not be

subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

(g)    *Good Faith*. The terms of the Junior DIP Facility and the Junior DIP Loan Documents, and the terms upon which the Debtors may use Cash Collateral pursuant to the terms of this Final Order and the Junior DIP Loan Documents, were negotiated in good faith and at arm's length among the DIP Loan Parties and the Junior DIP Lender, and their respective representatives, and all of the DIP Loan Parties' obligations and indebtedness arising under, in respect of, or in connection with, the Junior DIP Facility, the Junior DIP Loan Documents and this Final Order, including, without limitation, all loans, advances, extensions of credit and other financial accommodations made to and guarantees issued by the DIP Loan Parties pursuant to the Junior DIP Loan Documents, shall each be deemed to have been extended by the Junior DIP Lender and each of their respective affiliates, in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by sections 364(e) of the Bankruptcy Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections granted to the Junior DIP Lender (and its successors and assigns) pursuant to this Final Order and the Junior DIP Loan Documents (including, without limitation, the Junior DIP Liens, the Junior DIP Superpriority Claims, and the DIP Obligations) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

(h)    *Fairness; Business Judgment.* Based on the Motion, the record presented to the Court at the Interim Hearing and in the Chapter 11 Cases, the terms of the Junior DIP Facility and the Junior DIP Loan Documents, and the terms upon which the Debtors may use Cash Collateral pursuant to the terms of this Final Order and the Junior DIP Loan Documents (i) were

negotiated in good faith and at arm's length among the DIP Loan Parties and the Junior DIP Lender, (ii) are fair, reasonable, and the best available to the Debtors under the circumstances, (iii) reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration.

(i) *Notice*. Proper, timely, sufficient and appropriate notice of the Motion has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules, and no other or further notice of the Motion or the entry of this Final Order shall be required.

(j) *Immediate Entry; Relief Essential.* The Debtors have requested, and the Court hereby finds that sufficient cause exists for, the immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Unless the relief set forth in this Final Order is granted, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the Junior DIP Facility upon the terms set forth in this Final Order and the Junior DIP Loan Documents are necessary to preserve and maximize the value of the Debtors, are in the best interests of the Debtors and their estates, and are consistent with the Debtors' exercise of their fiduciary duties.

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the Motion, the evidence adduced at the Interim Hearing and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1. *Motion Granted.* The Junior DIP Facility and the use of Cash Collateral is hereby authorized and approved, in each case, on a final basis and upon the terms and conditions set forth in this Final Order and the Junior DIP Loan Documents. Any objections to any of the relief set

forth in this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights or other statements inconsistent with this Final Order, are hereby denied and overruled. This Final Order shall become effective and enforceable immediately upon its entry.

2. *Authorization of Junior DIP Facility and Junior DIP Loan Documents.*

(a) *Authorization of Junior DIP Loan Documents.* The DIP Loan Parties are hereby authorized to (i) execute, deliver, enter into and perform all of their obligations, and to pay all fees, costs, expenses, indemnities and other amounts contemplated, under the Junior DIP Loan Documents and this Final Order, and (ii) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates, notes, and other documents (including, without limitation, the execution and/or recordation of any collateral, pledge and security documents, deeds of trust, control agreements, financing statements, or other documents), and to perform all such other and further acts, that may be necessary, required or desirable for the DIP Loan Parties to perform their obligations under the Junior DIP Facility, the Junior DIP Loan Documents and this Final Order and to implement the transactions contemplated thereunder and hereunder. All provisions of the Junior DIP Loan Documents are incorporated herein and approved, whether explicitly referenced or not.

(b) *Authorization to Borrow.* The DIP Borrowers are hereby authorized to borrow, and the DIP Guarantors are hereby authorized to jointly and severally guarantee the payment in full in cash of such borrowing with respect to, the principal amount of $20 million (plus applicable interest (including interest and other amounts payable-in-kind), premiums, payments, fees (including professional fees and expenses), costs, expenses, charges and other amounts to the extent payable under this Final Order and the Junior DIP Loan Documents in connection with such borrowing), under the Junior DIP Facility, subject to the terms and conditions

(including any conditions precedent to such borrowing) set forth in the Junior DIP Loan Documents and this Final Order. The Debtors are hereby authorized to use the proceeds of the Junior DIP Facility and all Cash Collateral solely in the manner and for the purposes expressly permitted in the Approved Budget (subject to Permitted Variances), the Junior DIP Loan Documents and this Final Order.

(c)     *DIP Fees and Expenses; Indemnification.* Subject in all respects to the terms of the Junior DIP Loan Documents, including the Subordination Agreement, the DIP Loan Parties are authorized and directed to pay any and all (i) fees, premiums or other payments payable under the Junior DIP Loan Documents, (ii) amounts due (or that may become due) to the Junior DIP Lender (solely in its capacity as such) in respect of the indemnification obligations under this Final Order and the Junior DIP Loan Documents, and (iii) any other amounts payable in connection with the Junior DIP Facility, including without limitation, the payment of all reasonable, documented out of pocket costs, expenses and disbursements of the Junior DIP Lender (solely in its capacity as such), including, without limitation, the reasonable and documented fees and expenses of (A) Paul Hastings LLP (solely in its capacity as counsel to the Junior DIP Lender in its capacity as such) and (B) any other professionals that may be retained by the Junior DIP Lender (solely in their capacity as such), with the consent of the DIP Borrowers, such consent not to be unreasonably withheld or delayed, which consent of the DIP Borrowers shall not be required after the occurrence of a Junior DIP Termination Event (as defined herein) (collectively, the "Junior DIP Professional Fees and Expenses"), whether or not the transactions contemplated herein or in the Junior DIP Loan Documents are consummated.

(d)     *Indemnification*. Subject in all respects to the terms of the Junior DIP Loan Documents, including the Subordination Agreement, the Junior DIP Lender (and its affiliates

(excluding the Debtors) and respective officers, directors, employees, advisors and agents) (each such person, including the Junior DIP Lender, an "Indemnitee") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof; *provided, however*, that such indemnity shall not be available (a) to the extent arising from a material breach of any obligation of such Indemnitee under the Junior DIP Loan Documents, (b) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Debtor and that is brought by an Indemnitee against another Indemnitee, (c) to the extent determined by a final, non-appealable judgment of a court of competent jurisdiction to have arisen from the fraud, gross negligence, bad faith, willful misconduct, or breach of a fiduciary duty of the relevant Indemnitee (or any of its affiliates or any of its or its respective officers, directors, employees, advisors or agents), or (d) to the extent arising with respect to actions related to the Excluded Claims.

(e)     *Modification of Junior DIP Loan Documents.* The DIP Loan Parties are hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents, or other modifications to and under the Junior DIP Loan Documents, in each case, in accordance with the provisions of the Junior DIP Credit Agreement governing amendments thereto, each without further application to or order of the Court; *provided, however,* that any amendment to the Junior DIP Credit Agreement shall require, at a minimum, the prior written consent of each of the DIP Lenders; *provided, further, however*, that any amendment that (a) shortens the maturity of the extensions of credit thereunder, (b) increases the aggregate commitments thereunder, or (c) increases the rate of interest payable with respect thereto (each, a "Material DIP Amendment"), shall be provided (which may be by electronic mail) to the U.S.

Trustee and lead restructuring counsel to the Official Committees and filed with the Court no later than three (3) Business Days prior to the anticipated date of effectiveness of any such Material DIP Amendment, and if no objection to the Material DIP Amendment is made by the U.S. Trustee or the Official Committees within such three (3) Business Day period, then, without further application to or order of the Court, such Material DIP Amendment shall automatically be deemed approved and effective; *provided further, however,* if an objection is made by the U.S. Trustee or the Official Committees within such three (3) Business Day period, then such Material DIP Amendment shall be subject to a hearing and approval of the Court.

(f)     *Perfection in Cash*. Subject to the Carve Out, any transaction fee or the like owed to Moelis & Company LLC or M3 Advisory Partners, LP, and Prior Permitted Liens on the cash in the restricted lease collateral account ending in 9812 at Bank of America, N.A. (the "BOA Collateral Account"), and subject to the Remedies procedures outlined in paragraph 18 of this Final Order, all financial institutions with which the DIP Loan Parties maintain accounts containing any of the DIP Loan Parties' cash or Cash Collateral are authorized and directed to comply with any request of the Junior DIP Lender to turn over to the Junior DIP Lender all cash or Cash Collateral therein without offset or deduction of any kind; *provided, further*, that notwithstanding anything to the contrary in this Final Order or the Prior Final DIP Order, the lender(s) under the Senior DIP Facility shall have no recourse to such Designated Account (as defined in the Junior DIP Credit Agreement) or the cash or Cash Collateral therein and such financial institutions shall not comply with any request of such lender(s) to turn over such cash or Cash Collateral to such lender(s).  Subject to the terms of the Junior DIP Lender Documents, including the Subordination Agreement, the Junior DIP Lender shall be entitled to all of the rights and benefits of all deposit account control agreements, blocked account control agreements,

securities account control agreements, and similar agreements to which any of the DIP Loan Parties may be a party, without the need to enter into any such agreements, *provided*, that any rights and benefits in favor of the Junior DIP Lender on the BOA Collateral Account shall be subject to any Prior Permitted Liens.  Notwithstanding (and without limiting) the foregoing, the DIP Loan Parties are authorized to enter into, and cause the financial institutions servicing or maintaining the DIP Loan Parties' deposit accounts (or other accounts) to enter into, such deposit account control agreements and other collateral agreements with the Junior DIP Lender and such financial institutions as the Junior DIP Lender may reasonably request.

      3.    *DIP Obligations.*

      (a)    Upon execution and delivery of the Junior DIP Loan Documents, the Junior DIP Loan Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and shall be fully enforceable against each of the DIP Loan Parties, their estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "Successor Cases"), in each case, in accordance with the terms of the Junior DIP Loan Documents, including the Subordination Agreement, and this Final Order.

      (b)    Upon execution and delivery of the Junior DIP Loan Documents, the DIP Loan Parties shall be jointly and severally liable for all DIP Obligations, including, without limitation, all loans, advances, indebtedness, obligations, extensions of credit, financial accommodations, principal, interest, payments, premiums or similar amounts, fees, costs,

expenses, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, to the Junior DIP Lender under the Junior DIP Loan Documents or this Final Order.  Subject in all respects to the terms of the Junior DIP Loan Documents, including the Subordination Agreement, the DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease, on the DIP Termination Declaration Date (as defined below) (subject to the Remedies procedures outlined in paragraph 18 hereof).

(c)     All obligations incurred, payments made, and transfers or grants of liens and security interests set forth in this Final Order and the Junior DIP Loan Documents by the DIP Loan Parties are granted to or for the benefit of the DIP Loan Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby. No obligation, payment, transfer, or grant of liens or security interests under this Final Order or the Junior DIP Loan Documents to the Junior DIP Lender shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, solely in the

case of the Junior DIP Professional Fees and Expenses (as defined below), only to the Remedies procedures set forth in paragraph 18 of this Final Order).

(d)     Notwithstanding anything to the contrary herein, the DIP Obligations and Junior DIP Superpriority Claims shall not be paid with Excluded Claims (as defined below) (including proceeds thereof) (other than any such claims against the Junior DIP Lender or any of its subsidiaries, which may (and the proceeds thereof may) be used to repay the Junior DIP Lender, including through the exercise of rights of setoff by the Junior DIP Lender), subject to the Subordination Agreement.

4.     *No Obligation to Extend Credit/Loan Cap.* The Junior DIP Lender shall have no obligation to make any loan or advance available under the Junior DIP Loan Documents unless all of the conditions precedent to the making of such loan or advance by the Junior DIP Lender have been satisfied in full (or waived) in accordance with the terms of the Junior DIP Loan Documents and this Final Order. Notwithstanding anything contained in this Final Order or the Junior DIP Loan Documents to the contrary, in no event shall the aggregate principal amount of the Junior DIP Loans advanced under the Junior DIP Facility pursuant to the Junior DIP Credit Agreement at any time (after giving effect to all Junior DIP Loans previously made or requested) exceed the Commitments (as defined in the Junior DIP Credit Agreement).

5.     *No Duty to Monitor Compliance.* The Junior DIP Lender shall not have any obligation or responsibility to monitor the Debtors' use of DIP Collateral or Cash Collateral, and the Junior DIP Lender may rely upon the Debtors' representations that the use of DIP Collateral and Cash Collateral complies with and is in accordance with the requirements of this Final Order and the Junior DIP Loan Documents.

6.     *DIP Liens.*

(a)     As security for the prompt and complete payment and performance of all DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of the Interim Order, and without the necessity of the execution, recordation or filing by any of the DIP Loan Parties or the Junior DIP Lender of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including, without limitation, entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the Junior DIP Lender is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "Junior DIP Liens") in all DIP Collateral, in each case, subject and subordinate to the Carve Out and the Prior Permitted Liens (including the Senior DIP Liens), and subject to the relative priorities set forth in this Final Order and the Junior DIP Loan Documents, including the Subordination Agreement.

(b)     The term "DIP Collateral" means, subject to the Carve Out and except as otherwise provided in this Final Order, each DIP Loan Party's right, title and interest in, to and under all the Debtor Loan Parties' assets, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such DIP Loan Party and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort

claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, except as set forth in paragraph 6(d) of this Final Order, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), including, without limitation, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York) and proceeds of any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code, other than, in each case "Excluded Assets" (as defined in the Junior DIP Credit Agreement).  Excluded Assets shall include causes of action (and proceeds thereof) under chapter 5 of the Bankruptcy Code or otherwise related to (1) the distribution by Sorrento Therapeutics, Inc. of its common stock in the Junior DIP Lender to Sorrento Therapeutics, Inc.'s shareholders on or about January 19, 2023, (2) the current or former directors or officers of the Debtors or the Junior DIP Lender (other than in connection with the Junior DIP Facility), (3) the Junior DIP Lender (other than in connection with the Junior DIP Facility), (4) any transfer by the Debtors to any of their subsidiaries or affiliates occurring prior to the Petition Date, and (5) any insider or affiliate transaction, including investments by the Debtors in other companies (such causes of action related to the items referenced in the foregoing clauses (1)-(5), the "Excluded Claims"). Excluded Assets shall also include insurance policies and proceeds thereof related to the foregoing Excluded Claims.

(c)     Pursuant to section 364(c)(3) of the Bankruptcy Code, the Junior DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected liens and security interests in all DIP Collateral, which Junior DIP Liens shall be (1) subject to the

Carve Out and any transaction fee or the like owed to Moelis & Company LLC or M3 Advisory Partners, LP, first-priority liens on and continuing security interests in all proceeds of the Junior DIP Facility in the Designated Account, the Designated Account, and the Junior DIP Lender Holdback, and (2) with respect to all other DIP Collateral, subject only to (A) the Carve Out, (B) any transaction fee or the like owed to Moelis & Company LLC or M3 Advisory Partners, LP, and (C)(i) any liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or that were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) and (ii) the Senior DIP Liens (all such liens in this clause (C), the "Prior Permitted Liens").

(d)     For the avoidance of doubt, none of the liens granted pursuant to this Final Order shall attach to or encumber, and DIP Collateral shall not include, the Debtors' non-residential real property leases (or leasehold interest created thereby) that restrict or prohibit the grant of such liens or any security deposits held pursuant to such leases, but such liens shall attach solely to the proceeds of such leases, as applicable.

(e)     Notwithstanding paragraph 6(d) above, to the maximum extent permitted by the Bankruptcy Code, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to sell, assign, or otherwise transfer any interest therein (including any fee or leasehold interest), any proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the granting of the Junior DIP Liens in any such interest therein or other DIP

Collateral, or in the proceeds of any assignment and/or sale thereof by any Debtor in favor of the Junior DIP Lender in accordance with the Junior DIP Loan Documents and this Final Order.

7.      *Junior DIP Superpriority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors, with priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any and all other administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "Junior DIP Superpriority Claims"), subject only to the Carve Out, the Senior DIP Superpriority Claims, and the Prior Permitted Liens on the collateral in the BOA Collateral Account.  The Junior DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The Junior DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral, subject only to the Carve-Out, the Senior DIP Superpriority Claims, and the Prior Permitted Liens on the collateral in the BOA Collateral Account.  The Junior DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.      *Use of DIP Collateral and Cash Collateral.*

(a)      The Debtors are hereby authorized to use the proceeds of Junior DIP Loans and all Cash Collateral solely to the extent expressly permitted under the Approved Budget

(subject to Permitted Variances) and subject to the terms and conditions set forth in the Junior DIP Loan Documents and this Final Order.

(b)     Following the indefeasible Payment in Full[4] of the Senior DIP Obligations: (i) the DIP Loan Parties shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) without the prior written consent of the Junior DIP Lender except as may be expressly permitted by the Junior DIP Loan Documents (including the Subordination Agreement) and this Final Order, and (ii) the Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any non-Debtor affiliate of the Debtors without the prior written consent of the Junior DIP Lender, in its discretion, except to the extent provided for in the Approved Budget.  Except with respect to the Prior Permitted Liens on the collateral in the BOA Collateral Account, all collection and proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied as required by this Final Order and the Junior DIP Loan Documents (including the Subordination Agreement).

(c)     Following the indefeasible Payment in Full of the Senior DIP Obligations, the Debtors are authorized and directed, upon the closing of a sale of any of the DIP Collateral, to immediately pay all proceeds of any such sale to the Junior DIP Lender to satisfy the DIP Obligations in accordance with this Final Order and the Junior DIP Loan Documents until Paid in Full, and any order approving the sale of such DIP Collateral shall provide that the sale is conditioned upon the payment of such DIP Obligations (except to the extent otherwise agreed in

---

[4]   For purposes hereof, the term "Paid in Full" or "Payment in Full" means, with respect to the Senior DIP Obligations and the DIP Obligations, the irrevocable and indefeasible payment in full in cash of all Senior DIP Obligations or DIP Obligations (as applicable), other than contingent indemnification and expense reimbursement obligations for which no claim or demand has been asserted, and all commitments thereunder shall have irrevocably, permanently, and finally expired or shall have been terminated, cancelled, and discharged.

writing by the Junior DIP Lender).  For the avoidance of doubt, prior to the Payment in Full of the Senior DIP Obligations, all proceeds of any sale of any of the DIP Collateral must be paid in accordance with the terms of the Junior DIP Loan Documents, including the Subordination Agreement.

9.      [Reserved.]

10.      *Fees and Expenses; Payments.*

(a)      The payment of all Junior DIP Professional Fees and Expenses hereunder shall not be subject to further application to or approval of the Court, and shall not be subject to allowance or review by the Court or subject to the U.S. Trustee's fee guidelines, and no attorney or advisor to the Junior DIP Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court.

(b)      On the date of the Draw, pursuant to the Interim Order, the Junior DIP Lender held back $1,200,000 from the Junior DIP Facility to pay all or any portion of the fees described in paragraph 10(a) above (the "Junior DIP Lender Holdback"). The Junior DIP Lender Holdback will be deemed to have been fully drawn by the Debtors from the Junior DIP Facility, but it will remain in the Junior DIP Lender's custody and control in a separate segregated, interest bearing (to the extent possible) bank account in the name or for the benefit of the Junior DIP Lender (which account, for the avoidance of doubt, may be a Paul Hastings LLP client trust account) (the "Junior DIP Lender Holdback Account").  Funds deposited in the Junior DIP Lender Holdback Account shall be available and may be used solely for the payment of the Junior DIP Professional Fees and Expenses.  Neither the Debtors nor any creditor of any of the Debtors (except for the Junior DIP Lender) shall have a claim or interest in the funds in the Junior DIP Lender Holdback Account; *provided, however*, that any excess funds remaining in the Junior DIP Lender

Holdback Account following payment of all Junior DIP Professional Fees and Expenses shall be applied to any outstanding DIP Obligations (subject to the terms of the Subordination Agreement). For the avoidance of doubt, until the indefeasible Payment in Full of the Senior DIP Obligations, payment of Junior DIP Professional Fees and Expenses shall be in accordance with the terms of the Junior DIP Loan Documents, including the Subordination Agreement.

(c)     Any time professionals for the Junior DIP Lender seek payment of fees and expenses from the Debtors from and after entry of the this Final Order, but prior to the effective date of any confirmed chapter 11 plan, each such professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to lead restructuring counsel to the Debtors, the U.S. Trustee, the Senior DIP Lender, and lead restructuring counsel to the Official Committees (collectively, the "Review Parties"); *provided, however*, that the U.S. Trustee, the Senior DIP Lender, and the Official Committees reserve their rights to reasonably request additional detail regarding the services rendered and expenses incurred by such professionals. Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the affected professional within ten (10) calendar days after delivery of such invoices to the Review Parties (such ten (10) day calendar period, the "Review Period"). If no written objection is received prior to the expiration of the Review Period from the Review Parties, the Junior DIP Lender, on behalf of the Debtors (until the funds deposited in the Junior DIP Lender Holdback Account are exhausted), or the Debtors shall pay such invoices

within three (3) Business Days following the expiration of the Review Period.  If an objection is received within the Review Period from the Review Parties, the Junior DIP Lender or the Debtors, as the case may be, shall promptly pay the undisputed amount of the invoice within three (3) Business Days, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of this Court. Any hearing to consider such an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection.

(d)       Notwithstanding anything contained in this paragraph 10 to the contrary, the Junior DIP Lender, on behalf of the DIP Loan Parties, is authorized and directed to pay from the Junior DIP Lender Holdback (and upon exhaustion of the Junior DIP Lender Holdback, any such payments owed on account of Junior DIP Professional Fees and Expenses shall be made from other funds, in accordance with the terms of the Junior DIP Loan Documents) the following: (i) upon the Draw, the Junior DIP Lender, on behalf of the DIP Loan Parties, shall pay in full in cash all Junior DIP Professional Fees and Expenses arising through and including the date of the Draw, without the need for any professional engaged by or on behalf of the Junior DIP Lender to first deliver a copy of its invoice to any of the Review Parties (other than the DIP Loan Parties), and (ii) following the Draw, the Junior DIP Lender or the DIP Loan Parties, as the case may be, shall pay in full in cash all Junior DIP Professional Fees and Expenses incurred after the Draw in accordance with and subject to the procedures set forth above in this paragraph 10 of this Final Order and the terms of the Junior DIP Loan Documents (including the Subordination Agreement).

(e)       Notwithstanding anything contained in this Final Order to the contrary, any and all payments, premiums, fees, costs, expenses and other amounts paid at any time by any of

the DIP Loan Parties to the Junior DIP Lender pursuant to the requirements of this Final Order or the Junior DIP Loan Documents, including the Subordination Agreement, shall be non-refundable and irrevocable, are hereby approved, and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity (subject, solely in the case of the Junior DIP Professional Fees and Expenses, to paragraphs 10(c) and (d) of this Final Order).

11.     *Reservation of Rights.* Except as otherwise expressly provided herein or in the Junior DIP Loan Documents, including the Subordination Agreement, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the Junior DIP Lender to seek any other or supplemental relief in respect of the DIP Loan Parties, (b) the rights of the Junior DIP Lender, the Bankruptcy Code, or applicable non-bankruptcy law, including, without limitation, the right to request modification of the automatic stay of section 362 of the Bankruptcy Code, or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the Junior DIP Lender.

12.     *Modification of Automatic Stay.* The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the DIP Loan Parties to grant the Junior DIP Liens and the Junior DIP

-26-

Superpriority Claims, and to perform such acts as the Junior DIP Lender may request to assure the perfection and priority of the Junior DIP Liens, (b) the DIP Loan Parties to incur all liabilities and obligations to the Junior DIP Lender as contemplated under this Final Order and the Junior DIP Loan Documents, (c) the DIP Loan Parties to pay all amounts required hereunder and under the Junior DIP Loan Documents, (d) the Junior DIP Lender to retain and apply payments made in accordance with the terms of this Final Order and the Junior DIP Loan Documents, including the Subordination Agreement, (e)  subject to the Remedies procedures outlined in paragraph 18 of this Final Order, the Junior DIP Lender to exercise, upon the occurrence of any Junior DIP Termination Event, all rights and remedies provided for in this Final Order, the Junior DIP Loan Documents, or applicable law, (f) the DIP Loan Parties to perform under this Final Order and the Junior DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the DIP Loan Parties under this Final Order and the Junior DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (g) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Final Order and the Junior DIP Loan Documents.

13.   *Perfection of DIP Liens*.

(a)    This Final Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted hereunder and under the Junior DIP Loan Documents, including, without limitation, the Junior DIP Liens, without the necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control

agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the Junior DIP Lender to the priorities granted herein (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

(b)     Without in any way limiting the automatically effective perfection of the liens and security interests granted under this Final Order and the Junior DIP Loan Documents, the Junior DIP Lender is hereby authorized, but not required, as they in their sole discretion may determine for any reason, to execute, file and record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of submission, to the maximum extent permitted under applicable law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession or control over cash or securities, or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate, perfect, preserve and enforce the liens and security interests granted to them hereunder or under the Junior DIP Loan Documents or to otherwise evidence such liens and security interests in all DIP Collateral (each, a "Perfection Action"); *provided, however,* that, whether or not the Junior DIP Lender determines, in its sole discretion, to take any Perfection Action with respect to any liens or security interests granted hereunder, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable, non-avoidable as of the entry of the Interim Order. Upon the request of the Junior DIP Lender, the DIP Loan Parties, without any further consent of any party, are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the Junior DIP Lender to

further validate, perfect, preserve and enforce the Junior DIP Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(c)     A certified copy of this Final Order may, as the Junior DIP Lender may determine in its discretion, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Final Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the Junior DIP Lender to take all actions, as applicable, referenced in this paragraph 13.

14.     *Maintenance of DIP Collateral.*  Until such time as all DIP Obligations are Paid in Full (or as otherwise agreed in writing by each of the DIP Lenders), the DIP Loan Parties shall continue to maintain all property, operational, and other insurance as required and as specified in the Junior DIP Loan Documents. Upon the entry of this Final Order, the Junior DIP Lender shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy maintained by the DIP Loan Parties, subject only to the rights of the Senior DIP Lender (including all property damage and business interruption insurance policies of the DIP Loan Parties, whether expired, currently in place, or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in accordance with the terms of this Final Order and the Junior DIP Loan Documents.

15.     *Payments Held in Trust*. Subject to the terms of this Final Order or the Junior DIP Loan Documents (including the Subordination Agreement), including in respect of the Carve Out, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to Payment

in Full of all DIP Obligations under the Junior DIP Loan Documents, and termination of the Junior DIP Facility in accordance with the Junior DIP Credit Agreement, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral and shall immediately turn over such proceeds to the Junior DIP Lender, for application in accordance with the DIP Credit Agreement and this Final Order.

16.     *Cash Management.* Until such time as all DIP Obligations are Paid in Full, the DIP Loan Parties shall maintain the cash management system in accordance with the applicable "first day" order at Docket Number 312. The DIP Loan Parties shall not open any new deposit or securities account that is not subject to the liens and security interests of the Junior DIP Lender (in which case they shall be subject to the lien priorities and other provisions set forth in this Final Order and the Subordination Agreement).

17.     *Reporting.* Without limiting the requirements contained herein or in the Junior DIP Loan Documents, the DIP Loan Parties and their representatives shall (a) provide the Junior DIP Lender (and its advisors) with (i) all reports, documents, and information required to be delivered under the Junior DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder), and (ii)  reasonable access, upon reasonable notice and during regular business hours, to the DIP Loan Parties' books and records, assets and properties, for purposes of monitoring the DIP Loan Parties' businesses and operations and the value of the DIP Collateral, and (b) cooperate and consult with, and provide reasonable information reasonably requested by the Junior DIP Lender (and its advisors) concerning the DIP Loan Parties' businesses, financial condition, properties, business operations and assets, and the DIP Loan Parties hereby authorize their representatives to cooperate and consult with, and promptly provide to the such parties (in each case, together with their respective advisors) such information.  For any budget, variance

report, or other financial reporting that the Debtors deliver to the Junior DIP Lender, the Debtors shall deliver the same to the Official Committees concurrently with the Debtors' delivery to the Junior DIP Lender.

18.    *Junior DIP Termination Event; Exercise of Remedies.*

(a)    *Junior DIP Termination Events.* A "Junior DIP Termination Event" shall exist upon occurrence of any of the events listed in the definition of "Maturity Date" in the Junior DIP Credit Agreement.

(b)    *Exercise of Remedies*. The DIP Loan Parties shall immediately provide notice to counsel to the Senior DIP Lender, the Junior DIP Lender and the Official Committees of the occurrence of any Junior DIP Termination Event.  Subject to the terms of the Junior DIP Loan Documents, including the Subordination Agreement, upon the occurrence of a Junior DIP Termination Event, without further application to or order from the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the Junior DIP Lender to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee, the Senior DIP Lender and lead restructuring counsel for the Official Committees (the "Remedies Notice")[5] declaring the occurrence of a Junior DIP Termination Event (such date, the "DIP Termination Declaration Date") and/or deliver a Carve Out Notice (as defined in the Prior Final DIP Order), (ii) declare the termination, reduction or restriction of the commitments under the Junior DIP Facility (to the extent any such commitment remains), (iii) declare all DIP Obligations to be immediately due and payable, without presentment, demand or protest or other notice of any kind, all of which are expressly waived by

---

[5] For the avoidance of doubt, the Carve Out Notice and the Remedies Notice may be included in the same notice.

the DIP Loan Parties, (iv) declare the termination of the Junior DIP Facility and the Junior DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the Junior DIP Liens, the Junior DIP Superpriority Claims or the DIP Obligations, (v) declare the reduction or restriction on the Junior DIP Facility or the Junior DIP Loan Documents, and (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral (subject to the Debtors' rights under the Remedies Notice Period in paragraph 18(c)); *provided, however,* that following the occurrence of a Junior DIP Termination Event, (i) the Junior DIP Lender may not exercise or enforce any rights against DIP Collateral (other than the sweeping of all cash or other amounts contained in the Designated Account or the charging of interest as payment in kind at the default rate set forth in the Junior DIP Credit Agreement) unless the obligations under the Senior DIP Facility have been Paid in Full and (ii) subject thereto, prior to the exercise or enforcement of any rights against DIP Collateral (including the sweeping of all cash or other amounts contained in the Designated Account or the charging of interest as payment in kind at the default rate set forth in the Junior DIP Credit Agreement), the Junior DIP Lender shall be required to file a motion with the Court on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency hearing (the "Stay Relief Hearing"), and the DIP Loan Parties and the Official Committees shall not object to the shortened notice with respect to such Stay Relief Hearing.  The Court may fashion any appropriate remedy at a Stay Relief Hearing, which may include, *inter alia*, the exercise of any and all rights or remedies available to the Junior DIP Lender under this Final Order, the Junior DIP Loan Documents (including the Subordination Agreement) or applicable law against the DIP Collateral, *provided* that the rights of the Debtors to contest such relief are expressly preserved.

(c)     *Remedies Notice Period.* During the period from and after the Termination Declaration Date through the date of the Stay Relief Hearing (the "Remedies Notice Period"), the Debtors shall be permitted to use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that are critically necessary to keep the Debtors' businesses operating or that have been consented to by the Junior DIP Lender, (ii) payment on account of Prior Permitted Liens from the BOA Collateral Account, and (iii) the Carve Out Trigger Notice Reserve (as defined in the Prior Final DIP Order); *provided, however*, that any fees or expenses incurred by the DIP Loan Parties or the Official Committees during the Remedies Notice Period shall permanently reduce the Carve Out Amount (as defined in the Prior Final DIP Order); *provided, further,* that the Debtors may seek an emergency hearing with the Court during the Remedies Notice Period.  For the avoidance of doubt, during the Remedies Notice Period, the Junior DIP Lender shall not be obligated to provide any Junior DIP Loans or advance any credit at any time from and after the occurrence of a Junior DIP Termination Event.

(d)     *Leased Premises.*  Subject to the terms of the Junior DIP Loan Documents (including the Subordination Agreement), following a Junior DIP Termination Event (subject to the terms of paragraph 18 herein), the Junior DIP Lender shall be entitled to enter upon any leased premises in accordance with (i) a separate agreement with the landlord by and between the Junior DIP Lender and the applicable landlord, (ii) consent of the landlord, (iii) upon entry of an order of this Court, upon notice to the landlord and a hearing, or (iv) in accordance with the rights of the Junior DIP Lender under applicable non-bankruptcy law.

(e)     *Cooperation.* The DIP Loan Parties shall cooperate with the Junior DIP Lender in its efforts to enforce its liens and security interests in the DIP Collateral (without limiting in any way the Debtors' rights under the Remedies procedures set forth in this paragraph 18) the

-33-

DIP Loan Parties shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral, provided that all such actions and efforts shall be consistent with and in accordance with the terms of the Junior DIP Loan Documents, including the Subordination Agreement.

19.     *No Waiver by Failure to Seek Relief.* The rights and remedies of the Junior DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the Junior DIP Lender may have under this Final Order, the Junior DIP Loan Documents (including the Subordination Agreement), applicable law, or otherwise. The failure or delay on the part of any of the Junior DIP Lender to seek relief or otherwise exercise its rights and remedies under this Final Order, the Junior DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of its respective rights hereunder, thereunder or otherwise. Except as expressly set forth herein, none of the rights or remedies of the Junior DIP Lender under this Final Order or the Junior DIP Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the Junior DIP Lender. No consents required hereunder by the Junior DIP Lender shall be implied by any inaction or acquiescence by the Junior DIP Lender.

20.     *Carve Out.* "Carve Out" as used in this Final Order means the Carve Out defined in the Prior Final DIP Order, which (along with all related provisions, including but not limited to those in paragraph 20 of the Prior Final DIP Order) is hereby incorporated by reference (without duplication) and which shall continue in effect for the duration of these Chapter 11 Cases, including after the Senior DIP Obligations have been Paid in Full.  The Junior DIP Liens and the Junior DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out, any transaction fee or the like owed to Moelis & Company LLC or M3 Advisory Partners, LP, the

Senior DIP Liens, and the Senior DIP Superpriority Claims.  The Carve Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Final Order, other than the Prior Permitted Liens in the BOA Collateral Account.

21.     *Limitations on Use of DIP Collateral, Cash Collateral, Carve Out or Other Funds.* Notwithstanding anything contained in this Final Order or any other order of the Court to the contrary, no DIP Collateral, Junior DIP Loans, Cash Collateral, proceeds of any of the foregoing, or any portion of the Carve Out may be used (including to pay professional fees) by any of the DIP Loan Parties, the Official Committee, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party-in-interest (including without limitation any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

(a)     object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the Junior DIP Lender under this Final Order or the Junior DIP Loan Documents; *provided* that, for the avoidance of doubt, no such restrictions shall apply to (i) an objection filed in the Court to the relief sought at the hearing for final approval of the Junior DIP Facility or (ii) avoidance actions against the Junior DIP Lender that are not related to the Junior DIP Facility or the Junior DIP Loans;

(b)     object to or seek to prevent, hinder, interfere with or otherwise delay any of the Junior DIP Lender's assertion, enforcement, exercise of remedies or realization upon any DIP Collateral in accordance with this Final Order or the Junior DIP Loan Documents (other than to contest whether a Junior DIP Termination Event has occurred);

(c)     request authorization from the Court to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise, unless such financing is sufficient to cause the Payment in Full of all DIP Obligations contemporaneously with the consummation of such financing (or as otherwise agreed in writing by the Junior DIP Lender);

(d)     request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under this Final Order) in any portion of the DIP Collateral that are senior to or *pari passu* with the Junior DIP Liens or the Junior DIP Superpriority Claims unless all DIP Obligations have been Paid in Full (or as otherwise agreed in writing by the Junior DIP Lender); or

(e)     use, request authorization to use, Cash Collateral or sell or otherwise dispose of DIP Collateral (without the prior written consent of the Junior DIP Lender) other than as expressly permitted in this Final Order and in the Junior DIP Loan Documents.

22.     *Limitation on Charging Expenses.* No costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the Junior DIP Lender upon the DIP Collateral shall be charged against or recovered from the DIP Collateral, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the Junior DIP Lender with respect to the DIP Collateral, in its sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in this Final Order (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by the Junior DIP Lender to any charge, lien, assessment or claim against the Junior DIP Lender to the DIP Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise.

23.     *No Marshalling.* In no event shall the Junior DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds of DIP Collateral shall be received and applied in accordance with this Final Order and the Junior DIP Loan Documents (including the Subordination Agreement).

24.     *Right to Credit Bid.* Subject to the terms of the Junior DIP Loan Documents (including the Subordination Agreement), the Junior DIP Lender or its designee (in each case, acting at the instruction of the Junior DIP Lender), shall have the unqualified right to credit bid for all or any portion of DIP Collateral in accordance with the Junior DIP Loan Documents up to the full amount of any DIP Obligations with respect to the sale of any of the DIP Loan Parties' assets, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a Chapter 11 plan

subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy Code, a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise. The Junior DIP Lender shall have the absolute right to assign, transfer, sell, or otherwise dispose of its respective rights to credit bid (subject to this Final Order) to any acquisition vehicle formed in connection with such bid or other designee in accordance with the terms of the Junior DIP Loan Documents, including the Subordination Agreement.

25.     *Binding Effect; Successors and Assigns*. Immediately upon entry of this Final Order, the Junior DIP Loan Documents and this Final Order, including all findings and conclusions of law herein, shall be binding upon all parties-in-interest in the Chapter 11 Cases and any Successor Cases, including without limitation, the Junior DIP Lender, the Official Committees or any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors and the Junior DIP Lender, and their respective successors and assigns; *provided, however,* that, for the avoidance of doubt, the Junior DIP Lender shall have no obligation to make any loan, permit the use of DIP Collateral (including Cash Collateral) or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

26.   *No Modification of Final Order.*

(a)   The DIP Loan Parties irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly, without the prior written consent of the Junior DIP Lender (unless and until the DIP Obligations have been Paid in Full), (A) any modification, stay, vacatur or amendment to this Final Order, (B) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the Junior DIP Superpriority Claims (other than the Carve Out and the Senior DIP Superpriority Claims), (C) the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the Junior DIP Liens, except as expressly permitted hereunder or under the Junior DIP Loan Documents, or (D) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is inconsistent with this Final Order (except in connection with a request for approval of financing sufficient to cause the Payment in Full of all DIP Obligations contemporaneously with the consummation of such financing).

(b)   Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the Payment in Full of all DIP Obligations, either the DIP Loan Parties, the DIP Loan Parties' estates, any chapter 11 trustee, chapter 7 trustee or examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Final Order or the Junior DIP Loan Documents, then, unless otherwise agreed in writing by the Junior DIP Lender, all of the cash proceeds derived from such credit or debt shall immediately be turned over to the Senior DIP Lender until the indefeasible Payment in Full of the Senior DIP Obligations and then to the Junior DIP Lender.

27.     *Preservation of Rights Granted Under Final Order.*

(a)     *Senior to Other Liens.* Other than the Carve Out and Prior Permitted Liens (including the Senior DIP Liens), no claim (including any intercompany claim) or lien having a priority superior to or *pari passu* with those granted by the Final Order to the Junior DIP Lender shall be permitted while any of the DIP Obligations remain outstanding, and, except as otherwise expressly provided in this Final Order, (i) the Junior DIP Superpriority Claims shall not be subject or junior to any intercompany or affiliate claims of the Debtors; and (ii) the Junior DIP Liens shall not be: (A) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (B) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (C) unless the DIP Obligations have been Paid in Full, subordinated to or made *pari passu* with any liens arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (D) subject or junior to any intercompany or affiliate lies or security interests of the Debtors.

(b)     *Payment in Full.* Until Payment in Full of all DIP Obligations, none of the DIP Loan Parties shall propose or support any chapter 11 plan or sale of all or substantially all of the DIP Loan Parties' equity or assets, or any order confirming such plan or approving such sale, that is not conditioned upon the Payment in Full (unless otherwise agreed in writing by the Junior DIP Lender) of all DIP Obligations on or prior to the earlier to occur of the effective date of such chapter 11 plan or sale.

(c)     *Dismissal/Conversion.* Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting

any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code: (A) all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the Junior DIP Lender hereunder and under the Junior DIP Loan Documents (including, without limitation, the Junior DIP Superpriority Claims and the Junior DIP Liens), shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall have been Paid in Full, and all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections shall, notwithstanding such dismissal or conversion, remain unaffected and shall remain binding on all parties in interest (and any such order shall, in accordance with sections 105 and 349 of the Bankruptcy Code, so provide), and (B) this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes of enforcing all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the Junior DIP Lender hereunder and under the Junior DIP Loan Documents.

(d)     *Reversal/Modification.* Based on the findings set forth in this Final Order and the record presented during the Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, in the event that any or all of the provisions of this Final Order or the Junior DIP Loan Documents are hereafter reversed, modified, vacated or stayed by a subsequent judgment or order of this Court or any other court, any such reversal, stay, modification or vacatur shall not affect (i) the validity or enforceability of advances previously made hereunder or under the Junior DIP Loan Documents by the Junior DIP Lender to the Debtors, (ii) the validity or enforceability of any obligation, indebtedness or liability incurred under this Final Order or the Junior DIP Loan Documents (including, without limitation, the DIP Obligations) by the DIP Loan Parties to the Junior DIP Lender, (iii) the validity, enforceability, or perfection of any of the claims,

liens, security interests, rights, privileges or benefits granted hereunder or under the Junior DIP Loan Documents to the Junior DIP Lender, or (iv) the payment of any fees, costs, expenses or other amounts to the Junior DIP Lender under this Final Order and the Junior DIP Loan Documents, in each case, prior to the actual receipt of written notice by the Junior DIP Lender of the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification or vacatur, the claims, liens, security interests, rights, privileges, remedies and benefits set forth in the Final Order shall be governed in all respects by the original provisions of this Final Order and the Junior DIP Loan Documents.

(e)     *Survival*. Except as expressly provided in this Final Order, until all of the DIP Obligations have been Paid in Full (unless the Junior DIP Lender has otherwise agreed), all claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the Junior DIP Lender under this Final Order and the Junior DIP Loan Documents shall survive and shall not be modified, impaired, or discharged by: (i) the entry of an order confirming any chapter 11 plan in any of the Chapter 11 Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive any discharge as to any remaining DIP Obligations), (ii) the entry of an order converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, dismissing any or all of the Chapter 11 Cases or terminating the joint administration of the Chapter 11 Cases or by any other act or omission, or (iii) the entry of an order approving the sale or disposition of any DIP Collateral (except to the extent expressly permitted in the Junior DIP Loan Documents).

28.     *Proof of Claim.* The Junior DIP Lender shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment of the DIP Obligations.  The Debtors' acknowledgments and the provisions of this Final Order,

together with the evidence accompanying the Motion, are deemed sufficient to and do constitute timely filed proofs of claim in respect of such claims arising under the DIP Obligations against each of the applicable Debtors.  The bar date order at Docket Number 856 shall not apply to the Junior DIP Lender or the DIP Obligations.

29.     *Limitation of Liability.*

(a)     Nothing in this Final Order, the Junior DIP Loan Documents, or any documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the Junior DIP Lender of any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the DIP Loan Parties or their respective affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, their restructuring efforts or the administration of these Chapter 11 Cases.

(b)     In determining to make any loan or extension of credit under the Junior DIP Loan Documents, or permit the use of Cash Collateral, or in exercising any rights or remedies under this Final Order, the Junior DIP Loan Documents, the Junior DIP Lender shall not (i) have any liability to any third party or be deemed to be in control of the operations of any of the DIP Loan Parties, (ii) owe any fiduciary duty to any of the DIP Loan Parties, their respective creditors, shareholders or estates, or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of any of the DIP Loan Parties (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S. §§ 9601 *et seq*., as amended, or any other federal or state statute, including the Internal Revenue Code).

(c)     The Junior DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring

or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the DIP Loan Parties.

30.     *Exculpation*.  Neither the Debtors nor the Junior DIP Lender, nor their respective owners, directors, officers, employees, professionals and agents, shall have any liability (including any liability for any breach of fiduciary duty which may be owed by Sorrento Therapeutics, Inc. to shareholders or creditors of the Junior DIP Lender as a significant shareholder of the Junior DIP Lender) for making, receiving, or negotiating the Junior DIP Facility or the terms thereof.  For the avoidance of doubt, this paragraph is not exculpating or releasing any claim or liability for, or arising from or relating to, any prepetition acts or omissions.

31.     *No Objection by Committees to Refinancing and Payoff of Senior DIP Facility by Junior DIP Lender*.  In the event that the Junior DIP Lender offers to provide replacement financing sufficient for the Senior DIP Obligations to be indefeasibly Paid in Full in cash, the Debtors will seek Court approval of such financing on an expedited basis and the Official Committees will not object to shortened notice with respect to such hearing (provided there is no less than 24 hours prior notice) nor will the Official Committees oppose or object to such financing so long as (a) the replacement financing is on the same or better terms as the Senior DIP Facility, (b) the amount of the replacement financing does not exceed the amount of the DIP Loan Parties' obligations under the Senior DIP Facility, and (c) the Junior DIP Lender will not hold any liens on the Excluded Claims.  For the avoidance of doubt, the Official Committees reserve the right to object to any such financing offered by the Junior DIP Lender in excess of the amount required to pay off the Senior DIP Lender indefeasibly in full in cash.

32.     *Mediation Settlement.*  Notwithstanding any other provision in this Final Order, the Junior DIP Lender shall (i) consent to Bankruptcy Court approval of and support the proposed settlement between the Debtors and the Nant Parties (as defined and described in the Debtors' *Motion for Entry of an Order Approving and Implementing Mediation Settlement and Granting Related Relief* [Docket Number 810] (the "<u>Mediation Settlement Motion</u>")) and (ii) in connection therewith, in the event paragraph 4(B) of the proposed settlement order [Docket Number 917] (as may be approved by the Bankruptcy Court) approving the Mediation Settlement Motion is triggered (i.e., the "walkaway scenario"), release any and all of its liens encumbering the causes of actions and other assets that are required to be released and/or transferred by the Debtors to implement the settlement.

33.     *Fisher Scientific Matters*.  This Final Order does not affect or impair any rights or remedies that Fisher Scientific and its divisions and subsidiaries (collectively, "<u>FS</u>") may have (a) in relation to any goods supplied to the Debtors in the ordinary course of business within forty-five days prior to the Petition Date, (b) to assert an administrative expense claim against the Debtors under any applicable provision of the Bankruptcy Code, subject to the priorities set forth herein; or (c) in respect of any executory contracts between FS and the Debtors, if any.  Any such rights and remedies, if any, are preserved and reserved; *provided, however*, that the rights of the Debtors and all other parties in interest to oppose and object to FS's assertion of any such rights or remedies, if any, and to seek any related relief, are preserved and reserved.

34.     *Payments Free and Clear.* Any and all payments or proceeds required to be remitted to the Junior DIP Lender pursuant to the Junior DIP Loan Documents, the Interim Order, this Final Order or any subsequent order of this Court shall be irrevocable (subject, solely in the case of the Junior DIP Professional Fees, only to the procedures set forth in paragraph 10 of this

Final Order), and shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the DIP Loan Parties) or otherwise.  Notwithstanding the foregoing, until the indefeasible Payment in Full of the Senior DIP Obligations, all payments and proceeds remitted shall be consistent with and subject to the terms of the Subordination Agreement.

35.    *Joint and Several Liability.* Nothing in this Final Order shall be construed to constitute or authorize a substantive consolidation of any of the DIP Loan Parties' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for all obligations (including all DIP Obligations) under this Final Order and the Junior DIP Loan Documents.

36.    *Third-Party Beneficiary.* Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor, equity holders, or any direct, indirect or incidental beneficiary.

37.    *Final Order Controls.* In the event of any conflict or inconsistency between or among the terms or provisions of this Final Order and any of the Junior DIP Loan Documents, unless such term or provision in this Final Order is phrased in terms of "defined in" or "as set forth in" the Junior DIP Credit Agreement or the Junior DIP Loan Documents, or in the event of any conflict or inconsistency between the terms of this Final Order and any other order of the Court, the terms and provisions of this Final Order shall govern and control.

38.    *Effectiveness.* This Final Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon entry hereof. Notwithstanding Bankruptcy Rules

4001(a)(3), 6004(h), 6006(d), 7062, or 9014, any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

39.     *Bankruptcy Rules.* The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

40.     *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order. When used in this Final Order, the word "including" shall not imply limitation.

41.     *Necessary Action.* The DIP Loan Parties and the Junior DIP Lender are authorized to take any and all such actions as are necessary, required or appropriate to implement and effectuate the terms of this Final Order, the Junior DIP Loan Documents, and the transactions contemplated hereunder and thereunder.

42.     *Retention of Jurisdiction.* The Court retains jurisdiction to hear, determine and enforce the terms of any and all matters arising from or related to the Junior DIP Facility, the Junior DIP Loan Documents and this Final Order, and the Court's jurisdiction shall survive confirmation and consummation of any Chapter 11 plan for any of the Debtors notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.

**Signed:  July 27, 2023.**

_____

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

## **Exhibit 1**

**Junior DIP Credit Agreement**

The obligations evidenced hereby and the liens and security interests securing such obligations are subordinate, in the manner and to the extent set forth in that certain Subordination Agreement (as defined below), to the "Senior Obligations," as defined therein; and the Lender (as defined below), by its acceptance hereof, irrevocably agrees to be bound by the provisions of the Subordination Agreement. In the event of any conflict between the terms of the Subordination Agreement and this Agreement, the terms of the Subordination Agreement shall govern and control.

**JUNIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

**by and among**

**SORRENTO THERAPEUTICS, INC.
SCINTILLA PHARMACEUTICALS, INC.
as Borrowers,**

**and**

**SCILEX HOLDING COMPANY,
as Lender**

**Dated as of July [ ● ], 2023**

## TABLE OF CONTENTS

**Page**

1.   DEFINITIONS AND CONSTRUCTION ................................................................ 2

    1.1   Definitions .................................................................................................. 2
    1.2   Accounting Terms .................................................................................... 14
    1.3   UCC .......................................................................................................... 14
    1.4   Construction ............................................................................................. 15
    1.5   Schedules and Exhibits ........................................................................... 15

2.   LOAN AND TERMS OF PAYMENT ................................................................ 15

    2.1   Agreement to Lend; Security Documents and Loan Documents ............. 15
    2.2   [Reserved] ................................................................................................ 15
    2.3   Payments; Reductions of the Commitment; Prepayments ...................... 16
    2.4   Interest Rates and Rates, Payments and Calculations ............................. 17
    2.5   Crediting Payments; Clearance Charge ................................................... 18
    2.6   [Reserved] ................................................................................................ 18
    2.7   Statements of Obligations ........................................................................ 18
    2.8   Fees .......................................................................................................... 18

3.   TERM OF AGREEMENT ................................................................................... 19

    3.1   [Reserved] ................................................................................................ 19
    3.2   Conditions Precedent to the Effective Date ............................................ 19
    3.3   [Reserved] ................................................................................................ 19
    3.4   Maturity ................................................................................................... 19
    3.5   Effect of Maturity .................................................................................... 19

4.   REPRESENTATIONS AND WARRANTIES ..................................................... 20

    4.1   Due Organization and Qualification ........................................................ 20
    4.2   Due Authorization .................................................................................... 20
    4.3   Binding Obligations ................................................................................. 20
    4.4   Title to Properties .................................................................................... 20
    4.5   Jurisdiction of Formation; Location of Chief Executive Office; Organizational;
            Identification Number .............................................................................. 20
    4.6   Litigation ................................................................................................. 21
    4.7   Fraudulent Transfer ................................................................................. 21
    4.8   Indebtedness ............................................................................................ 21
    4.9   Payment of Taxes .................................................................................... 21
    4.10  Approved Budget ..................................................................................... 21
    4.11  Pledged Securities .................................................................................... 21
    4.12  Permits ..................................................................................................... 21
    4.13  No Other Representations ......................................................................... 22

5.     AFFIRMATIVE COVENANTS ................................................................................. 22

       5.1    Reports; Certificates ................................................................................. 22
       5.2    Reporting; Approved Budget; Conference Calls ....................................... 22
       5.3    Material Contracts; Sale Offers ................................................................ 23
       5.4    Existence ................................................................................................... 23
       5.5    Maintenance of Properties; Permits .......................................................... 23
       5.6    Taxes ......................................................................................................... 23
       5.7    Insurance ................................................................................................... 23
       5.8    Inspection ................................................................................................. 24
       5.9    Environmental ........................................................................................... 24
       5.10   Compliance with Laws .............................................................................. 25
       5.11   Disclosure Updates ................................................................................... 25
       5.12   Further Assurances .................................................................................... 25
       5.13   Designated Account .................................................................................. 25
       5.14   Approved Budget ...................................................................................... 25
       5.15   Carve Out Trigger Notice Reserve ........................................................... 25
       5.16   Pledged Securities ..................................................................................... 25
       5.17   Joinder of Existing Subsidiaries ............................................................... 25

6.     NEGATIVE COVENANTS ..................................................................................... 26

       6.1    Indebtedness .............................................................................................. 26
       6.2    Liens .......................................................................................................... 27
       6.3    Restrictions on Fundamental Changes ...................................................... 27
       6.4    Disposal of Assets ..................................................................................... 27
       6.5    Change Name ............................................................................................ 28
       6.6    Nature of Business .................................................................................... 28
       6.7    Material Leases or Contracts; Amendments .............................................. 28
       6.8    Change of Control ..................................................................................... 28
       6.9    Accounting Methods ................................................................................. 28
       6.10   Transactions with Affiliates ...................................................................... 28
       6.11   Use of Proceeds ........................................................................................ 28
       6.12   Limitation on Capital Expenditures .......................................................... 29
       6.13   Chapter 11 Cases ...................................................................................... 29
       6.14   Plan ........................................................................................................... 29
       6.15   Acquisitions, Loans or Investments .......................................................... 29
       6.16   Payments on Indebtedness ........................................................................ 29
       6.17   Distributions or Redemptions ................................................................... 30
       6.18   Transfer of Pledged Securities .................................................................. 30
       6.19   Formation of Subsidiaries ......................................................................... 30

7.     GUARANTY ........................................................................................................... 30

       7.1    Guaranty .................................................................................................... 30
       7.2    Separate Obligation .................................................................................. 30
       7.3    Limitation of Guaranty ............................................................................. 30
       7.4    Liability of Guarantors .............................................................................. 30
       7.5    Consents of Guarantors ............................................................................. 31
       7.6    Guarantor's Waivers ................................................................................. 32
       7.7    Continuing Guaranty ................................................................................. 32

|  | 7.8 | Reinstatement | 32 |

8. EVENTS OF DEFAULT .................................................................................................. 33

|  | 8.1 | Event of Default | 33 |
|  | 8.2 | Rights and Remedies | 35 |
|  | 8.3 | Application of Proceeds upon Event of Default | 36 |
|  | 8.4 | Remedies Cumulative | 36 |
|  | 8.5 | Acknowledgments | 36 |

9. PRIORITY AND COLLATERAL SECURITY ............................................................. 37

|  | 9.1 | Super-priority Claims; Subordination in favor of the Lender Liens | 37 |
|  | 9.2 | Grant of Security Interest in the Collateral | 38 |
|  | 9.3 | Representations and Warranties in Connection with Security Interest | 38 |
|  | 9.4 | Lender's Ability to Perform Obligations on Behalf of Borrowers with Respect to the Collateral | 38 |
|  | 9.5 | Filing of Financing Statements | 38 |
|  | 9.6 | No Discharge; Survival of Claims | 39 |

10. WAIVERS; INDEMNIFICATION .............................................................................. 39

|  | 10.1 | Demand; Protest; etc. | 39 |
|  | 10.2 | Lender's Liability for Collateral | 39 |
|  | 10.3 | Indemnification | 39 |

11. NOTICES ..................................................................................................................... 39

12. CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER ................................... 41

13. AMENDMENTS; WAIVERS; SUCCESSORS ......................................................... 42

|  | 13.1 | Amendments and Waivers | 42 |
|  | 13.2 | No Waivers; Cumulative Remedies | 42 |
|  | 13.3 | Successors | 42 |

14. GENERAL PROVISIONS ............................................................................................ 42

|  | 14.1 | Effectiveness | 42 |
|  | 14.2 | Section Headings | 42 |
|  | 14.3 | Interpretation | 43 |
|  | 14.4 | Severability of Provisions | 43 |
|  | 14.5 | Debtor-Creditor Relationship | 43 |
|  | 14.6 | Counterparts; Electronic Execution | 43 |
|  | 14.7 | Revival and Reinstatement of Obligations | 43 |
|  | 14.8 | Lender Expenses | 43 |
|  | 14.9 | Integration | 44 |

15. JOINT AND SEVERAL OBLIGATIONS ...................................................................... 44

16. ADDITIONAL LOAN PARTIES .................................................................................. 44

17. TREATMENT OF CERTAIN INFORMATION ........................................................... 44

Exhibits

Exhibit A – RESERVED
Exhibit B – Approved Budget
Exhibit C – Reporting Requirements
Exhibit D – RESERVED
Exhibit E – Form of Guarantor Joinder Agreement

Schedules

Schedule A – Authorized Persons
Schedule D – Designated Account and Designated Account Bank
Schedule 4.1 – Organizational Chart
Schedule 4.5 – Uniform Commercial Code Filing Information
Schedule 4.6 – Litigation and Commercial Tort Claims
Schedule 4.8 – Existing Indebtedness
Schedule 4.9 – Taxes
Schedule 4.11 – Pledged Securities
Schedule 4.12 – Maintenance of Properties; Permits
Schedule 6.2 – Existing Liens

**JUNIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION
LOAN AND SECURITY AGREEMENT**

**THIS JUNIOR SECURED, SUPER PRIORITY DEBTOR-IN-POSSESSION LOAN AND SECURITY AGREEMENT** (this "Agreement"), is entered into as of July [ ● ], 2023 (the "Effective Date"), by and among SORRENTO THERAPEUTICS, INC. ("Sorrento"), a Delaware corporation, SCINTILLA PHARMACEUTICALS, INC., a Delaware corporation (together with Sorrento, each a "Borrower" and collectively, the "Borrowers"), as borrowers, the guarantors from time to time a party hereto (each a "Guarantor" and collectively, the "Guarantors" and together with the Borrowers, each a "Loan Party" and collectively, the "Loan Parties"), and SCILEX HOLDING COMPANY, a Delaware corporation, as lender ("Lender").

**WHEREAS**, on February 13, 2022 (the "Petition Date"), the Borrowers commenced a voluntary bankruptcy proceeding (together with any other chapter 11 case by any Loan Party, collectively, the "Chapter 11 Cases") under Chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (together with any other court having jurisdiction over the Chapter 11 Cases or any proceeding therein from time to time, the "Bankruptcy Court"), which are being jointly administered under the lead case filed by Sorrento, Case No. 23-90085 (DRJ);

**WHEREAS**, on March 30, 2023, the Borrowers entered into that certain Senior Secured, Superior-Priority Debtor-in-Possession Loan and Security Agreement (the "Priming Credit Agreement") by means of which JMB CAPITAL PARTNERS LENDING, LLC (the "Priming Lender") provided financing to the Borrowers in the form of a multiple draw term loan in an aggregate principal amount of Seventy-Five Million Dollars ($75,000,000);

**WHEREAS**, each Borrower remains in possession of its business and manages its properties as debtor and debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, the Borrowers have requested that Lender provide financing to the Borrowers consisting of a junior secured super-priority single draw term loan in a principal amount of (i) Twenty Million Dollars ($20,000,000), plus (ii) the amount of the Commitment Fee and the Funding Fee, plus (iii) the amount of the DIP Lender Holdback (the "Facility") pursuant to Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code;

**WHEREAS**, Lender has indicated its willingness to agree to extend the Facility to the Borrowers upon the terms and conditions set forth in this Agreement, the DIP Orders, and in the other Loan Documents, and in accordance with Sections 105, 363, 364(c) and 364(d) of the Bankruptcy Code, so long as the Obligations are (i) subject to the Subordination Agreement, secured by Liens on the Collateral granted by the Borrowers as hereinafter provided and (ii) given superpriority status as provided in the DIP Orders;

**WHEREAS**, the Borrowers have agreed to grant to the Lender a security interest in all their assets as Collateral (subject to the Subordination Agreement as hereinafter provided), and the Borrowers have further agreed that the Lender shall have Super-priority Claims in the Chapter 11 Cases for the repayment of the Obligations pursuant to the DIP Orders, subject to the approval of the Bankruptcy Court;

**WHEREAS**, on July 5, 2023, the Bankruptcy Court entered an order approving the Facility on an interim basis (the "Interim Order"), and authorizing the Borrowers to borrow and enter into this Agreement and the other Loan Documents; and

**WHEREAS**, on July 7, 2023, the Borrowers drew the entire principal of the Facility, pursuant to the Interim Order (the amounts advanced by Lender hereunder and under the DIP Orders, the "Loans").

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1.     **DEFINITIONS AND CONSTRUCTION**.

       1.1     **Definitions**. As used in this Agreement, the following terms shall have the meanings specified below:

       "Acceptable 363 Sale" means a sale of all or substantially all of the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code, subject to the following conditions: the Lender shall have reviewed and approved in writing (with email being sufficient) in its reasonable discretion any "stalking horse" asset purchase agreement (the "Stalking Horse Purchase Agreement"), the bidding procedures governing a sale of any portion of the DIP Collateral pursuant to Section 363 of the Bankruptcy Code (the "Bidding Procedures"), any order or proposed order approving the Bidding Procedures (the "Bidding Procedures Order"), any order or proposed order approving a sale of all or any portion of the DIP Collateral pursuant to Section 363 of the Bankruptcy Code (a "Sale Order"), and any motions seeking entry of a Sale Order or approval of the Bidding Procedures.

       "Acceptable Plan" means a plan of reorganization or liquidation for the Chapter 11 Cases that (i) provides for the indefeasible payment in full in cash of the Obligations, in exchange for full discharge thereof, on or prior to the effective date of the plan as a condition to the effectiveness thereof or (ii) is otherwise approved in writing (with email being sufficient) by the Lender.

       "Additional Documents" has the meaning set forth in Section 5.11.

       "Administrative Borrower" means Sorrento Therapeutics, Inc.

       "Advisor Transaction Fees" means any transaction fee or the like owed to Moelis & Company LLC or M3 Advisory Partners, LP.

       "Affiliate" means, as to any Person, any other Person (a) that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person, (b) who is a director or officer (i) of such Person, (ii) of any Subsidiary of such Person, or (iii) of any Person described in clause (a) above with respect to such Person, or (c) which, directly or indirectly through one or more intermediaries, is the beneficial or record owner (as defined in Rule 13d-3 of the Securities Exchange Act of 1934, as amended, as the same is in effect on the date hereof) of ten percent (10%) or more of any class of the outstanding voting equity interests, securities or other equity or ownership interests of such Person. For purposes of this definition, the term "control" (and the correlative terms, "controlled by" and "under common control with") shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, whether through ownership of securities or other interests, by contract or otherwise.

       "Agreement" has the meaning set forth in the preamble to this Agreement.

       "Allowed Professional Fees" means professional fees and expenses of administering the Chapter 11 Cases, to the extent the Bankruptcy Court authorizes payment (including fees incurred prior to the Effective Date).

"Approved Budget" has the meaning specified in Section 5.2(b).

"Authorized Person" means any one of the individuals identified on Schedule A, as such schedule is updated from time to time by written notice from the Administrative Borrower to the Lender.

"Avoidance Actions" means any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code.

"Bankruptcy Code" has the meaning set forth in the recitals hereto.

"Bankruptcy Committees" means the statutory committee of unsecured creditors appointed by the United States Trustee in relation to the Chapter 11 Cases, the statutory committee of equity securities holders appointed by the United States Trustee in relation to the Chapter 11 cases, and any other official committees appointed in the Chapter 11 Cases.

"Bankruptcy Court" has the meaning set forth in the recitals hereto.

"Base Amount" means $20,000,000.

"Borrower(s)" has the meaning set forth in the preamble to this Agreement.

"Business Day" means any day that is not a Saturday, Sunday, or other day on which banks are authorized or required to close in the State of New York.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed.

"Capital Lease" means a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP as in effect prior to the adoption and/or effectiveness of Accounting Standards Codification No. 842 or any successor or replacement accounting provisions.

"Carve Out" has the meaning set forth in the DIP Orders.

"Carve Out Trigger Notice Reserve" has the meaning set forth in the DIP Orders.

"Cash Collateral" has the meaning set forth in the DIP Orders.

"Cash Operating Disbursements" means disbursements of the type listed under the "Cash Operating Disbursements" category in the Approved Budget; provided that, for the avoidance of doubt, Cash Operating Disbursements shall include contingency disbursements but exclude Other Disbursements.

"Cash Operating Receipts" means receipts of the type listed under the "Cash Operating Receipts" line item in the Approved Budget.

"CCC" has the meaning specified in Section 7.6(c).

"Change of Control" means, except with respect to the consummation of a Sale (whether under a plan of reorganization or under Section 363 of the Bankruptcy Code), the acquisition, through purchase or otherwise (including the agreement to act in concert without anything more), by any Person or group (as such term is used in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), after the date of this Agreement, of (i) the beneficial ownership, directly or indirectly, of 50% or more of the voting equity

-3-

interests of Sorrento or (ii) all or substantially all of the assets of the Loan Parties, taken as a whole, except as permitted in this Agreement.

"Chapter 11 Cases" has the meaning set forth in the recitals hereto.

"Collateral" means, collectively, (a) all prepetition and post-petition real property and all prepetition and post-petition tangible and intangible personal property of the Borrowers, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, intellectual property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, arbitration awards, commercial tort claims (as more fully described on Schedule 4.6 and any judgments related thereto), money, insurance, receivables, receivables records, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications or "amendments to alleged use" filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all equity interests (including, without limitation, the Pledged Securities), all books and records relating to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)), and (b) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of the Collateral and Avoidance Actions and proceeds of Avoidance Actions; provided that the Collateral shall not include (i) the Excluded Assets, (ii) property subject to a purchase money lien, capital lease or similar arrangement to the extent the creation of a security interest therein is prohibited thereby or creates a right of termination in favor of any other party thereto or otherwise requires third party consent thereunder or (iii) the Carve Out Trigger Notice Reserve or any contents or proceeds thereof; provided that the exclusions set forth in the foregoing clauses shall not apply to any equity or residual value of such property or the proceeds, products, substitutions or replacements of the foregoing property unless such proceeds, products, substitutions or replacements would themselves constitute property excluded pursuant to foregoing clauses.

"Commitment" means the commitment of the Lender to make Loans hereunder. The aggregate amount of the Lender's Commitment is Twenty Million Dollars ($20,000,000), *plus* the amount of the Commitment Fee and the Funding Fee, *plus* the amount of the DIP Lender Holdback, in each case subject to the terms of this Agreement and the DIP Orders.

"Commitment Fee" means the fee equal to one percent (1.00%) of Base Amount, which fee was fully earned and non-refundable upon the entry of the Interim Order and paid in full upon the funding of the Loans by being added to the principal amount of the Loans.

"Control Agreement" means a deposit account control agreement, in form and substance reasonably acceptable to Lender, executed and delivered by the Borrowers, the Lender, the Priming Lender and the applicable bank institution, with respect to each Deposit Account (other than the Excluded Accounts), which agreement is sufficient to give the Lender "control" (within the meaning of Article 8 and 9 of the UCC) over such Deposit Account and provide that such bank institution shall agree to follow Lender's instructions with respect to all funds in such Deposit Account.

"Cynviloq Award" means the final award issued on December 19, 2022 in *Sorrento Therapeutics, Inc. v. NantPharma, LLC*, AAA Case No. 01-19-0001-0303 (filed April 3, 2019).

"<u>Daily Balance</u>" means, as of any date of determination and with respect to any fixed monetary Obligations, the amount of such Obligations owed at the end of such day.

"<u>Debtor</u>" means each Borrower in such Borrower's capacity as a bankruptcy debtor.

"<u>Default</u>" means an event, condition, or default that, with the giving of notice, the passage of time, or both, would be an Event of Default or a default under the terms of this Agreement.

"<u>Default Rate</u>" has the meaning specified in <u>Section 2.4(b)</u>.

"<u>Deposit Account</u>" means any deposit account, as that term is defined in the UCC.

"<u>Designated Account</u>" means the Deposit Account of the Administrative Borrower identified in <u>Schedule D</u>.

"<u>Designated Account Bank</u>" means the financial institution identified in <u>Schedule D</u>.

"<u>DIP Orders</u>" means the Interim Order, the Final Order and/or the Priming DIP Orders, as applicable.

"<u>DIP Lender Holdback</u>" has the meaning set forth for the term "Junior DIP Lender Holdback" in the DIP Orders.

"<u>Disbursement and Capital Expenditure Variance</u>" has the meaning specified in <u>Section 5.2(d)</u>.

"<u>Dollars</u>" or "<u>$</u>" means United States dollars.

"<u>Effective Date</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Environmental Action</u>" means any written complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter, or other written communication from any Governmental Authority, or any third party relating to or arising out of violations of Environmental Laws or releases of Hazardous Materials (a) from any Collateral; (b) from adjoining properties or businesses of any real property that constitutes Collateral, or (c) from or onto any facilities, with respect to the Collateral, which received Hazardous Materials generated by the Borrowers.

"<u>Environmental Law</u>" means any applicable federal, state, provincial, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy, or rule of common law now or hereafter in effect and in each case as amended, or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent decree or judgment, in each case, to the extent binding on the Borrowers, relating to the environment, the effect of the environment on employee health, or Hazardous Materials, in each case as amended from time to time.

"<u>Environmental Liabilities</u>" means all liabilities, monetary obligations, losses, damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts, or consultants, and costs of investigation and feasibility studies), fines, penalties, sanctions, and interest incurred as a result of any claim or demand, or Remedial Action required, by any Governmental Authority or any third party, and which relate to any Environmental Action.

"<u>Event of Default</u>" has the meaning specified in <u>Section 8.1</u>.

"Excluded Assets" means, with respect to any Loan Party (a) Excluded Accounts, (b) the capital stock held by such in (i) any subsidiary that is not a direct subsidiary of a Loan Party and (ii) any direct subsidiary of such Loan Party that is a foreign subsidiary, except for (A) sixty-five percent (65.0%) of the issued and outstanding capital stock in any such direct subsidiary entitled to vote (within the meaning of Treasury Regulations Section 1.956- 2(c)(2)) and (B) one hundred percent (100.0%) of the issued and outstanding capital stock in any such direct subsidiary not entitled to vote (within the meaning of Treasury Regulations Section 1.956-2(c)(2)), (c) any property or asset to the extent that the grant of a security interest is prohibited or effectively restricted by any contractual restriction or applicable law (only so long as such prohibition exists and subject to any limitation on such prohibitions under the Bankruptcy Code) or requires a consent not obtained of any Governmental Authority pursuant to such applicable laws or a consent not obtained from an unaffiliated third party, (d) such Loan Party's non-residential real property leases (or leasehold interest created thereby) that restrict or prohibit the grant of such liens or any security deposits held pursuant to such leases; (e) the Excluded Claims; and (f) any insurance policies and proceeds thereof relating to any of the Excluded Claims; provided, however, that such assets shall be included (and such security interest shall attach) immediately at such time as the contractual or legal prohibition shall no longer be applicable and to the extent severable, shall attach immediately to any portion of such property not subject to the prohibitions set forth above.

"Excluded Accounts" means: (a) deposit and/or securities accounts, the balance of which consists exclusively of (i) withheld income taxes and federal, state or local employment taxes, in such amounts as are required, in the reasonable judgment of the Borrowers, to be paid to the Internal Revenue Service or state or local government agencies, with respect to employees of any of the Loan Parties, or (ii) amounts required to be paid over to an employee benefit plan pursuant to DOL Reg. §–2510.3–102 on behalf of, or for the benefit of, employees of one (1) or more Loan Parties; and (b) all tax accounts (including, without limitation, sales tax accounts), accounts used solely for payroll, accounts maintained solely in trust for the benefit of third parties and fiduciary purposes, escrow accounts, zero balance or swept accounts, and employee benefit accounts (including 401(k) accounts and pension fund accounts), in each case of this clause (b), so long as such account is used solely for such purpose.

"Excluded Claims" means causes of action (or proceeds thereof) under Chapter 5 of the Bankruptcy Code or otherwise related to (i) the distribution by Sorrento of its common stock in the Lender to Sorrento's shareholders on or about January 19, 2023, (ii) the current or former directors or officers of the Borrowers or the Lender (other than in connection with the Facility), (iii) the Lender (other than in connection with the Facility), (iv) any transfer by the Borrowers to any of their subsidiaries or affiliates occurring prior to the Petition Date, and (v) any insider or affiliate transaction, including investments by Sorrento in other companies.

"Exit Fee" means the fee equal to two percent (2.00%) of the principal amount of the Facility funded on July 7, 2023 (including the principal amount of the Loans, plus, without duplication, the amount of the Commitment Fee and the Funding Fee, and the amount of the DIP Lender Holdback (which such amount, for the avoidance of doubt, is equal to $21,600,000)), which was fully earned and non-refundable upon entry of the Interim Order.

"Equity Interests" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person, and any warrants, options or other rights entitling the holder thereof to purchase or acquire any such equity interest.

"Facility" has the meaning specified in the recitals to this Agreement.

"<u>Fees</u>" means all fees due to the Lender under this Agreement, any Loan Document or the DIP Orders, including the Commitment Fee, the Exit Fee and the Funding Fee.

"<u>Final Order</u>" means a final order of the Bankruptcy Court, substantially in the form of the Interim Order, authorizing and approving the Borrowers' entry into this Agreement and the other Loan Documents, in a form and substance satisfactory to the Lender, in its reasonable discretion, on a final basis.

"<u>Funding Fee</u>" means the fee equal to one percent (1.00%) of Base Amount, which fee was fully earned and non-refundable upon the entry of the Interim Order and paid in full upon the funding of the Loans by being added to the principal amount of the Loans.

"<u>Governmental Authority</u>" means any federal, state, local, or other governmental or administrative body, instrumentality, board, department, or agency or any court, tribunal, administrative hearing body, arbitration panel, commission, or other similar dispute-resolving panel or body.

"<u>Guaranteed Obligations</u>" has the meaning specified in <u>Section 7.1</u>.

"<u>Guaranty</u>" means the terms and provisions of <u>Article 7</u>.

"<u>Hazardous Materials</u>" means (a) substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances," or any other formulation intended to define, list, or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity, or "EP toxicity", (b) oil, petroleum, or petroleum derived substances, natural gas, natural gas liquids, synthetic gas, drilling fluids, produced waters, and other wastes associated with the exploration, development, or production of crude oil, natural gas, or geothermal resources, (c) any flammable substances or explosives or any radioactive materials, and (d) asbestos in any form or electrical equipment that contains any oil or dielectric fluid containing levels of polychlorinated biphenyls in excess of 50 parts per million.

"<u>Indebtedness</u>" means (a) all obligations for borrowed money, including, without limitation, the Obligations, (b) all obligations evidenced by bonds, debentures, notes, or other similar instruments and all reimbursement or other similar obligations then owing in respect of letters of credit, bankers acceptances, or other financial products, (c) all obligations as a lessee under Capital Leases, (d) all obligations or liabilities of others secured by a Lien on any asset of such Person, irrespective of whether such obligation or liability is assumed, (e) all payment obligations to pay the deferred purchase price of assets (other than trade payables incurred in the ordinary course of business and repayable in accordance with customary trade practices), (f) all indebtedness created or arising under any conditional sale or other title retention agreement, or incurred as financing, in either case with respect to property acquired by such Person, (g) the principal balance outstanding under any synthetic lease, off-balance sheet loan or similar off balance sheet financing products, or (h) any obligation guaranteeing or intended to guarantee (whether directly or indirectly guaranteed, endorsed, co-made, discounted, or sold with recourse) any obligation of any other Person that constitutes Indebtedness under any of clauses (a) through (h) above. For purposes of this definition, (i) the amount of any Indebtedness represented by a guaranty or other similar instrument shall be the lesser of the principal amount of the obligations guaranteed and still outstanding and the maximum amount for which the guaranteeing Person may be liable pursuant to the terms of the instrument embodying such Indebtedness, and (ii) the amount of any Indebtedness described in <u>clause (d)</u> above shall be the lower of the amount of the obligation and the fair market value of the assets of such Person securing such obligation.

"<u>Indemnified Liabilities</u>" has the meaning specified in <u>Section 10.3</u>.

"Indemnified Person" has the meaning specified in Section 10.3.

"Information" has the meaning specified in Article 17.

"Initial Approved Budget" has the meaning specified in Section 5.2(b).

"Interim Hearing" has the meaning set forth in the Interim Order.

"Interim Order" has the meaning specified in the recitals to this Agreement.

"Lender" has the meaning set forth in the preamble to this Agreement.

"Lender Expenses" means all reasonable and documented (a) costs or expenses (including taxes and insurance premiums) required to be paid by the Loan Parties under any of the Loan Documents that are paid, advanced, or incurred by the Lender, (b) out-of-pocket fees or charges paid or incurred by the Lender in connection with its transactions with the Borrowers under any of the Loan Documents, including, but not limited to, fees or charges for photocopying, notarization, couriers and messengers, telecommunication, public record searches (including tax lien, litigation, and UCC searches and including searches with the patent and trademark office, the copyright office, or the department of motor vehicles), filing, recording or publication, (c) out-of-pocket costs and expenses incurred by the Lender in the disbursement of funds to the Borrowers (by wire transfer or otherwise), (d) out-of-pocket charges paid or incurred by the Lender resulting from the dishonor of checks payable by or to the Borrowers, (e) out-of-pocket costs, fees (including reasonable and documented attorneys' fees) and expenses paid or incurred by the Lender to correct any default or enforce any provision of the Loan Documents, or during the continuance of an Event of Default, in gaining possession of, maintaining, handling, preserving, storing, shipping, selling, preparing for sale, or advertising to sell the Collateral, or any portion thereof, irrespective of whether a sale is consummated, (f) [reserved], (g) out-of-pocket costs and expenses of third party claims or any other suit paid or incurred by the Lender in enforcing or defending the Loan Documents or in connection with the transactions contemplated by the Loan Documents or the Lender relationship with the Loan Parties, (h) out-of-pocket costs and expenses (including reasonable and documented attorneys' fees) incurred by the Lender incurred in advising, structuring, drafting, reviewing, administering, or amending the Loan Documents, (i) out-of-pocket fees and expenses of the Lender related to any due diligence in connection with the Facility or meetings with the Loan Parties in connection with the Facility, (j) costs and expenses of the Lender (including reasonable and documented attorneys, accountants, consultants, and other advisors fees and expenses) incurred in terminating, enforcing (including reasonable attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a "workout," a "restructuring," or an insolvency proceeding concerning the Loan Parties or in exercising rights or remedies under the Loan Documents), or defending the Loan Documents, irrespective of whether suit is brought, or in taking any Remedial Action concerning the Collateral and (k) all other reasonable and documented fees and expenses of other professionals retained by Lender, with the consent of the Administrative Borrower (which consent shall not be unreasonably withheld or delayed and shall not be required following an Event of Default).

"Lender Related Person" means the Lender, together with its officers, directors, employees, attorneys, representatives and agents.

"Lien" means any pledge, hypothecation, assignment (which is intended as security), charge, deposit arrangement (which is intended as security), encumbrance, easement, lien (statutory or other), mortgage, security interest, or other security arrangement and any other preference, priority, or preferential arrangement of any kind or nature whatsoever (which is intended as security), including any title retention agreement, the interest of a lessor under a Capital Lease, and any synthetic or other financing lease having substantially the same economic effect as any of the foregoing.

"Loan Documents" means this Agreement, DIP Orders, the Additional Documents, the Security Documents, and any other notes or security agreements executed by Loan Parties in connection with the Agreement in favor of the Lender, any other agreement entered into, now or in the future, by any Loan Party and the Lender in connection with this Agreement and designated as a Loan Document, and all amendments, modifications, renewals, substitutions and replacements of any of the foregoing.

"Loans" has the meaning set forth in the recitals hereto.

"Material Adverse Change" means, other than with respect to the Chapter 11 Cases, any event, condition, circumstance or contingency that, individually or in the aggregate, (a) has had or could reasonably be expected to have, a material adverse effect on the business, operations, performance, prospects or financial condition of the Loan Parties, taken as a whole, (b) has resulted in, or could reasonably be expected to result in, a material adverse effect on the validity or enforceability of, or the rights, remedies or benefits available to the Lender under this Agreement or the DIP Orders (other than as permitted hereunder or as a result of an action or failure to take action by the Lender) or of Lender's ability to enforce the Obligations or realize upon the Collateral, (c) has had or could reasonably be expected to have, a material adverse effect on the ability of any Loan Party, taken as a whole, to perform its payment obligations under this Agreement or the DIP Orders, or (d) a material impairment of the enforceability or priority of the Lender's Liens with respect to the Collateral, taken as a whole, or the priority of such Liens, as provided in the DIP Orders.

"Material Contract" means each contract or agreement as to which the breach, nonperformance, cancellation, termination, loss, expiration or failure to renew by any party thereto would reasonably be expected to result in a Material Adverse Change.

"Maturity Date" means the earliest of: (i) September 30, 2023; (ii) the effective date of a plan of reorganization of the Chapter 11 Cases; (iii) the consummation of any sale or other disposition of all or substantially all of the assets of the Borrowers pursuant to Section 363 of the Bankruptcy Code; (iv) the date of acceleration of the Obligations and the termination of the Commitment pursuant to this Agreement; (v) the dismissal of the Chapter 11 Cases or its conversion to a case under Chapter 7 of the Bankruptcy Code; and (vi) July 31, 2023 (or such later date agreed to by Lender in its sole discretion), unless the Final Order has been entered by the Bankruptcy Court on or prior to such date.

"Measuring Period" has the meaning specified in Section 5.2(d).

"Net Cash Proceeds" means with respect to any sale or disposition of Collateral by any Person, the amount of cash proceeds received (directly or indirectly) from time to time (whether as initial consideration or through the payment of deferred consideration) by or on behalf of such Person, in connection therewith, after deducting therefrom only (i) attorneys' fees, accountants' fees, investment banking fees, consulting fees, other fees, commissions, and expenses related thereto and required to be paid in connection with such sale or disposition, (ii) amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset which is the subject of such sale or disposition, (iii) taxes paid or payable to any taxing authorities in connection with such sale or disposition, (iv) the amount of any reasonable reserve established in accordance with GAAP against any liabilities (other than any taxes deducted pursuant to clause (ii) above), and (v) the pro rata portion of the Net Cash Proceeds thereof (calculated without regard to this clause (v)) attributable to minority interests and not available for distribution to or for the account of any Loan Party as a result thereof.

"Net Operating Disbursements" means Cash Operating Receipts *less* Cash Operating Disbursements.

"<u>Net Operating Disbursements Variance</u>" means, for each Measuring Period, the difference, expressed as a percentage, between (a) actual Net Operating Disbursements for such Measuring Period *and* (b) projected Net Operating Disbursements for such Measuring Period, as set forth in the relevant Approved Budget.

"<u>Obligations</u>" means (a) all loans, including, without limitation, the Loans, debts, principal, interest, contingent reimbursement or indemnification obligations, liabilities (including all amounts paid by being added to the principal amount of the Loans pursuant to this agreement), obligations (including indemnification obligations), Fees, Lender Expenses, premiums, costs, expenses and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, guaranties, covenants, and duties of any kind and description owing by the Loan Parties, to the Lender pursuant to or evidenced by the Loan Documents and/or pursuant to or in connection with any one or more documents, instruments or agreements described in <u>clause (i)</u> of the definition of Lender Expenses and, in each case, irrespective of whether for the payment of money, of the Loan Parties to the Lender under the Loan Documents and the DIP Orders, and including all interest not paid when due and all other expenses or other amounts that Loan Parties are required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents including, without limitation, including in connection with the collection or enforcement of or preservation of rights of the Lender under the Loan Documents.

"<u>Ordinary Course</u>" and "<u>Ordinary Course of Business</u>" shall mean, in respect of any Person, the ordinary course and reasonable requirements of such Person's business and undertaken in good faith.

"<u>Organizational Documents</u>" means (a) for any corporation, the certificate or articles of incorporation, the bylaws, any certificate of designation or other instrument relating to the rights of preferred shareholders or stockholders of such corporation, any shareholder rights agreement and all applicable resolutions of the board of directors (or any committee thereof) of such corporation, (b) for any partnership, the partnership agreement and, if applicable, the certificate of limited partnership, and (c) for any limited liability company, the operating agreement and articles or certificate of formation or organization and all applicable resolutions of any managing member of such limited liability company.

"<u>Other Disbursements</u>" means disbursements of the type listed under the "Other Disbursements" category in the Approved Budget; <u>provided</u> that, for the avoidance of doubt, Other Disbursements shall include Professional Fees, interest payments in respect of the Loans and other expenses paid pursuant to the DIP Orders.

"<u>Payment Account</u>" means the Deposit Account of the Lender notified in writing to the Borrowers.

"<u>Permits</u>" means any license, lease, power, permit, franchise, certificate, authorization or approval issued by a Governmental Authority.

"<u>Permitted Indebtedness</u>" has the meaning set forth in <u>Section 6.1</u>.

"<u>Permitted Liens</u>" means:

(a)       all Liens created by the Priming Loan Documents and the Priming DIP Orders (including the Carve Out, Adequate Protection Liens and Adequate Protection Super-priority Claims, as defined therein);

(b)       all Liens created by the Loan Documents and the DIP Orders (including the Carve Out, Adequate Protection Liens and Adequate Protection Super-priority Claims, as defined therein);

-10-

(c)     Liens existing on the Effective Date and listed on Schedule 6.2 and any renewals, substitutions or extensions thereof; provided that (i) the property or asset covered thereby has not changed, (ii) the outstanding principal amount thereof secured by such property or asset does not increase (unless otherwise permitted pursuant to the terms of the documentation (as in effect as of the Effective Date) in respect of such Liens), and (iii) the Loan Party liable with respect there to has not changed;

(d)     Liens for Taxes that are not delinquent or thereafter payable and that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)     Statutory or common law Liens of landlords and Liens of carriers, warehousemen, mechanics, materialmen, repairmen, construction contractors and suppliers and other Liens imposed by law or pursuant to customary reservations or retentions of title arising in the Ordinary Course of Business for amounts not overdue or subject to Permitted Protest;

(f)     (i) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA, and (ii) pledges and deposits of cash securing liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Loan Party;

(g)     deposits to secure the performance of bids, trade contracts, governmental contracts and leases (other than Indebtedness for borrowed money), statutory obligations, surety, stay, customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the Ordinary Course of Business;

(h)     easements, rights-of-way, restrictions, encroachments, protrusions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not in any case materially detract from the value or use of the property subject thereto, impair the use or operation of the Collateral for the use currently being made thereof or impair Borrower's ability to pay the Obligations in a timely manner or materially interfere with the ordinary conduct of the business of the applicable Person;

(i)     Liens on equipment arising from precautionary UCC financing statements regarding operating leases of equipment;

(j)     Liens in favor of customs and revenue authorities arising as a matter of law to secure the payment of customs duties in connection with the importation of goods in the Ordinary Course of Business, and consistent with past practice;

(k)     receipts of progress payments and advances from customers in the Ordinary Course of Business, and consistent with past practice, to the extent same creates a Lien on the related inventory and proceeds thereof;

(l)     Liens on the Equity Interests of subsidiaries to the extent constituting Excluded Assets;

(m)     Liens securing judgments for the payment of money (or appeal or other surety bonds relating to such judgments) in existence for less than thirty (30) days after the entry thereof or with respect to which execution has been stayed and which do not constitute an Event of Default;

(n)     non-exclusive licenses and sublicenses of intellectual property entered into in the Ordinary Course of Business;

(o)     normal and customary rights of setoff upon deposits of cash in favor of banks or other depository institutions incurred in connection with the maintenance of such deposits in the Ordinary Course and not arising in connection with the issuance or repayment of Indebtedness;

(p)     Liens that are contractual rights of setoff relating to pooled deposit or sweep accounts of the Borrowers or their Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the Ordinary Course of Business of the Loan Parties;

(q)     Liens on insurance policies and the proceeds thereof solely securing the financing of the premiums with respect thereto; and

(r)     any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrowers, individually, or taken as a whole.

"Permitted Protest" means the right of any Borrower or other Loan Party to protest any Lien (other than any Lien that secures the Obligations), taxes, or rental payment; provided that (a) a reserve with respect to such obligation is established on such Borrower's or other Loan Party's books and records in such amount as is required under GAAP, (b) any such protest is instituted promptly and prosecuted diligently by such Borrower or such other Loan Party in good faith and (c) the Lender is satisfied in its reasonable discretion that, while any such protest is pending, there will be no impairment of the enforceability, validity, or priority of any of the Lender's Liens.

"Permitted Transfers" means a sale of Collateral not to exceed gross proceeds of $20,000,000 subject to the following conditions: (a) no Default or Event of Default has occurred and is continuing or would occur after giving effect to any proposed Permitted Transfer, (b) the Borrowers have filed an Acceptable Plan (or otherwise provides for the payment in full in cash of the Obligations in a manner satisfactory to the Lender in its sole discretion) and (c) the proceeds thereof are used solely to fund working capital of Borrowers in accordance with the Approved Budget.

"Permitted Variance" means a positive 20% or less Net Operating Disbursements Variance.

"Person" means natural persons, corporations, limited liability companies, limited partnerships, general partnerships, limited liability partnerships, joint ventures, trusts, land trusts, business trusts, or other organizations, irrespective of whether they are legal entities, and governments and agencies and political subdivisions thereof.

"Petition Date" has the meaning set forth in the recitals hereto.

"Pledged Securities" any Equity Interests now owned or obtained in the future by any Borrower, as more fully described on Schedule 14.11 with respect to Pledged Securities as of the Effective Date.

"Post Carve Out Notice Trigger Cap" has the meaning set forth in the DIP Orders.

"Pre-Trigger Date Fees" has the meaning set forth in the DIP Orders.

"Priming Credit Agreement" has the meaning specified in the recitals to this Agreement.

-12-

"Priming Designated Account" means the "Designated Account" as defined in the Priming Credit Agreement, as in effect on the date of the Interim Order.

"Priming DIP Orders" means the "DIP Orders" as defined in the Priming Credit Agreement, as in effect on the date hereof.

"Priming Lender" has the meaning specified in the recitals to this Agreement.

"Priming Loan Documents" means the Priming Credit Agreement and the other "Loan Documents" as defined in the Priming Credit Agreement, as in effect on the date hereof.

"Priming Obligations" means "Obligations" as defined in the Priming Credit Agreement, as in effect on the date hereof.

"Professional Fees" means all unpaid fees and expenses incurred by persons or firms retained by the Loan Parties pursuant to Sections 327, 328, 329, 330, 331, 363, or 503(b)(4) of the Bankruptcy Code; provided that to the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

"Record" means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"Remedial Action" means all actions taken to (a) clean up, remove, remediate, contain, treat, monitor, assess, evaluate, or in any way address Hazardous Materials in the indoor or outdoor environment, (b) prevent or minimize a release or threatened release of Hazardous Materials so they do not migrate or endanger or threaten to endanger public health or welfare or the indoor or outdoor environment, (c) restore or reclaim natural resources or the environment, (d) perform any pre-remedial studies, investigations, or post-remedial operation and maintenance activities, or (e) conduct any other actions with respect to Hazardous Materials required by Environmental Laws.

"Remedies Notice" has the meaning set forth in the applicable DIP Order.

"Remedies Notice Period" has the meaning set forth in the applicable DIP Order.

"Required Lien Priority" has the meaning set forth in Section 9.1(a)(iii).

"Sale" means the sale of all or substantially all of the assets of Borrowers or any other Loan Party to any party, including the Lender, or any of its Affiliates, pursuant to an Acceptable 363 Sale or pursuant to an Acceptable Plan.

"Schedules" means those certain schedules annexed hereto and made a part hereof.

"Security Documents" means (i) all UCC financing statements, or amendments or continuations thereof, and (ii) any other security agreements, the Control Agreements, documents or filings in connection with the perfection of the Liens hereunder.

"Sorrento" has the meaning set forth in the preamble to this Agreement.

"Stay Relief Hearing" has the meaning set forth in the applicable DIP Order.

"Subordination Agreement" means that certain Intercreditor and Subordination Agreement, dated as of July 5, 2023, between the Lender and the Priming Lender.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock (or equivalent ownership or controlling interest) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, governors or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Super-priority Claim" has the meaning set forth in Section 9.1(a)(i).

"Term Sheet" means that certain Term Sheet dated July 5, 2023, by and between the Borrowers and Lender.

"Trigger Date" has the meaning set forth in the DIP Orders.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" means the United States of America.

"Updated Approved Budget" has the meaning specified in Section 5.2(c).

"Variance Report" has the meaning specified in Section 5.2(d).

"Voidable Transfer" has the meaning set forth in Section 14.7.

1.2 **Accounting Terms**. All accounting terms not specifically defined herein shall be construed in accordance with GAAP; provided that, if the Administrative Borrower notifies the Lender that the Borrowers request an amendment to any provision hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Lender notifies the Administrative Borrower that the Lender requests an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then the Lender and the Administrative Borrower agree that they will negotiate in good faith amendments to the provisions of this Agreement that are directly affected by such change in GAAP with the intent of having the respective positions of the Lender and the Administrative Borrower after such change in GAAP conform as nearly as possible to their respective positions as of the date of this Agreement and, until any such amendments have been agreed upon, the provisions in this Agreement shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective. When used herein, the term "financial statements" shall include the notes and schedules thereto. Whenever the term "Borrower" or "Borrowers" is used in respect of a financial covenant or a related definition, it shall be understood to mean the Borrowers on a consolidated basis, unless the context clearly requires otherwise.

1.3 **UCC**. Any terms used in this Agreement that are defined in the UCC shall be construed and defined as set forth in the UCC unless otherwise defined herein; provided that, to the extent that the

UCC is used to define any term herein and such term is defined differently in different Articles of the UCC, the definition of such term contained in Article 9 of the UCC shall govern.

1.4     **Construction**. Unless the context of this Agreement or any other Loan Document clearly requires otherwise, references to the plural include the singular, references to the singular include the plural, the terms "includes" and "including" are not limiting, and the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or." The words "hereof," "herein," "hereby," "hereunder," and similar terms in this Agreement or any other Loan Document refer to this Agreement or such other Loan Document, as the case may be, as a whole and not to any particular provision of this Agreement or such other Loan Document, as the case may be. Section, subsection, clause, schedule, and exhibit references herein are to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any agreement, instrument, or document shall include all alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements, thereto and thereof, as applicable (subject to any restrictions on such alterations, amendments, changes, extensions, modifications, renewals, replacements, substitutions, joinders, and supplements set forth herein). The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts, and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations shall mean the repayment in full in cash of all Obligations other than unasserted contingent indemnification Obligations (with all such Obligations consisting of monetary or payment Obligations having been paid in full in cash) and the irrevocable termination of all Commitments under this Agreement. Any reference herein to any Person shall be construed to include such Person's successors and assigns. Any requirement of a writing contained herein or in any other Loan Document shall be satisfied by the transmission of a Record.

1.5     **Schedules and Exhibits**. All schedules and exhibits attached to this Agreement shall be deemed incorporated herein by reference.

**2.     LOAN AND TERMS OF PAYMENT**.

2.1     **Agreement to Lend; Security Documents and Loan Documents**.

(a)     Subject to the terms and conditions of the DIP Orders and this Agreement, Lender has agreed to make the Loans to the Borrower, in the amount of its Commitment, on July 7, 2023 (for the avoidance of doubt, the amount of the Loans funded on such date was $21,600,000 (such amount inclusive of Twenty Million Dollars ($20,000,000), *plus* the amount of the Commitment Fee and the Funding Fee, *plus* the amount of the DIP Lender Holdback)). The Loans have been advanced to the Borrowers in accordance with the Term Sheet and as set forth in the Interim Order. Any Loans, or portion thereof, that are repaid or prepaid (whether as an optional prepayment or a mandatory prepayment) cannot be reborrowed.

(b)     The Loans shall be secured by the Collateral as set forth in this Agreement, the DIP Orders, and the other Loan Documents.

(c)     The Borrowers agree that they are jointly and severally liable for the prompt payment and performance of all Obligations under the Loan Documents. Each Borrower promises to pay the Obligations (including principal, interest, fees, costs, and expenses) in Dollars in full (including the Exit Fee) on the Maturity Date.

2.2     **[Reserved]**.

2.3      **Payments; Reductions of the Commitment; Prepayments**.

(a)      **Payments by the Borrowers**. Except as otherwise expressly provided herein, all payments by the Borrowers shall be made to the Payment Account for the account of the Lender and shall be made in immediately available funds, no later than 4:00 p.m. (Eastern time) on the date specified herein. Any payment received by the Lender later than 4:00 p.m. (Eastern time) shall be deemed to have been received on the following Business Day and any applicable interest or fee shall continue to accrue until such following Business Day.

(b)      **Application of Payments and Proceeds**. Subject to the Subordination Agreement, all payments remitted to the Lender and all proceeds of Collateral received by the Lender shall be applied as follows (unless otherwise directed by the Lender):

(i)      <u>first</u>, to pay any Lender Expenses then owed to the Lender or Lender Related Persons in accordance with the DIP Orders, or indemnities then due to the Lender under the Loan Documents, until paid in full;

(ii)      <u>second</u>, to pay any Fees then due to the Lender under the Loan Documents until paid in full;

(iii)      <u>third</u>, to pay interest due in respect of the Loans until paid in full;

(iv)      <u>fourth</u>, to pay the principal of all Loans until paid in full;

(v)      <u>fifth</u>, to pay any other Obligations until paid in full; and

(vi)      <u>sixth</u>, to Borrowers (to be wired to the Designated Account or any other Deposit Account of the Borrowers notified in writing to the Lender from time to time) or as otherwise required by applicable law.

In the event of a direct conflict between the priority provisions of this <u>Section 2.3(b)</u> and any other provision contained in any other Loan Document (except for the DIP Orders), it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other. In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this <u>Section 2.3(b)</u> shall control and govern. Notwithstanding the foregoing, to the extent there is a conflict between the DIP Orders and any other Loan Document, the DIP Orders shall control and govern.

(c)      **Optional Prepayments**. Subject to the Subordination Agreement, upon five (5) Business Days' prior notice to Lender, Borrowers may prepay any Loan, in whole or in part, at any time, <u>provided</u> that (i) the principal amount being prepaid shall be an amount not less than $1,000,000, and (ii) any such prepayments under this <u>clause (c)</u> shall be applied in the order set forth in <u>Section 2.3(b)</u>.

**Pursuant to California Civil Code Section 2954.10, Borrowers expressly waive their right to prepay the Loans except as expressly permitted herein**.

(d)      **Mandatory Prepayments**. Subject to the Subordination Agreement:

(i)      **Dispositions**. Within one (1) Business Day of the date of receipt by the Borrowers or any other Loan Party of the Net Cash Proceeds of any disposition (whether through a voluntary or involuntary sale, the loss, destruction or damage thereof or any actual condemnation,

confiscation, requisition, seizure or taking thereof or otherwise) of Collateral described in <u>Section 6.4</u>, the Borrowers shall prepay such portion of the outstanding amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of the Net Cash Proceeds (including insurance proceeds, condemnation awards, and payments in lieu thereof) received in connection with such sales or dispositions, *less* any amounts applied to the prepayment of the Priming Obligations pursuant to the mandatory prepayment required by Section 2.3(d)(i) of the Priming Credit Agreement, *plus* the accrued interest and Exit Fee as applied to the amount of such prepayment. Nothing contained in this <u>Section 2.3(d)(i)</u> shall permit the Borrowers to sell any Collateral other than in accordance with <u>Section 6.4</u>. In no event shall any amount paid to Lender under this <u>Section 2.3(d)(i)</u> exceed the outstanding amount of the Obligations.

(ii)    **Indebtedness**. Within one (1) Business Day of the date of incurrence by any Borrower or any other Loan Party of any Indebtedness (other than Permitted Indebtedness), the Borrowers shall prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.3(b)</u> in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with the incurrence of such Indebtedness, *less* any amounts applied to the prepayment of the Priming Obligations pursuant to the mandatory prepayment required by Section 2.3(d)(ii) of the Priming Credit Agreement, *plus* the accrued interest and Exit Fee as applied to the principal amount of such prepayment. The provisions of this <u>Section 2.3(d)(ii)</u> shall not be deemed to be implied consent to any such incurrence otherwise prohibited by the terms and conditions of this Agreement.

2.4    <u>**Interest Rates and Rates, Payments and Calculations**</u>.

(a)    **Interest Rate**. Except as provided in <u>Section 2.4(b)</u>, all Loans shall bear interest on the Daily Balance thereof at a rate equal to fourteen percent (12.00%) per annum. For the purpose of calculating interest under this <u>Section 2.4(a)</u>, the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder (but, for the avoidance of doubt, the "Daily Balance" shall include all interest and fees that have been paid in kind by being capitalized and added to the principal amount of the Loans).

(b)    **Default Rate**. Upon the occurrence and during the continuation of an Event of Default, all Obligations shall bear interest on the Daily Balance thereof at a per annum rate equal to two percent (2.00%) plus the then applicable interest rate (the "<u>Default Rate</u>"), and the Default Rate may be applied retroactively to the date of the occurrences of the related Event of Default. For the purpose of calculating interest under this <u>Section 2.4(b)</u>, the Daily Balance shall exclude accrued but unpaid interest due or owing hereunder (but, for the avoidance of doubt, the "Daily Balance" shall include all interest and fees that have been paid in kind by being capitalized and added to the principal amount of the Loans).

(c)    **Payment**. Except to the extent provided to the contrary herein, and subject to the Subordination Agreement, (i) interest shall be due and payable, in arrears, on the first (1st) day of each month at any time that Obligations or the Loans are outstanding and on the Termination Date, and shall be paid in kind by being capitalized and added to the principal amount of the Loans owed hereunder, (ii) the Commitment Fee, Funding Fee, and Exit Fee shall be due and payable in accordance with <u>Section 2.8</u> and (iii) all other Fees payable hereunder or under any of the other Loan Documents, and all costs, expenses and Lender Expenses payable hereunder or under any of the other Loan Documents, shall be due and payable, in arrears, on the first (1st) day of each month at any time that Obligations or the Loans are outstanding and shall be paid to the Payment Account; in each case of <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> hereof, subject to the procedures set forth in the DIP Orders (to the extent applicable). Each Borrower agrees that the Lender have all rights of setoff and bankers' lien provided by applicable law on account of any accounts maintained at the Lender, and in addition thereto, each Borrower agrees that at any time any Event of Default exists, upon prior notice to the Administrative Borrower, the Lender may apply all balances, credits,

deposits, accounts or moneys of such Borrower then or thereafter with the Lender to the payment of any Obligations of the Borrowers hereunder, whether or not then due.

(d)     **Computation**. All interest and fees chargeable under the Loan Documents shall be computed based on a 360-day year, in each case, for the actual number of days elapsed in the period during which the interest or fees accrue.

(e)     **Intent to Limit Charges to Maximum Lawful Rate**. In no event shall the interest rate or rates payable under this Agreement, plus any other amounts paid in connection herewith, exceed the highest rate permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable. The Borrowers and the Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and manner of payment stated within it; provided that, anything contained herein to the contrary notwithstanding, if said rate or rates of interest or manner of payment exceeds the maximum allowable under applicable law, then, *ipso facto*, as of the date of this Agreement, Borrowers are and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Borrowers in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Obligations to the extent of such excess.

2.5     **Crediting Payments; Clearance Charge**. Except as provided in Section 2.4(c)(i) above, the receipt of any payment item by the Lender shall not be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to the Payment Account or unless and until such payment item is honored when presented for payment. Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment and interest shall be calculated accordingly.

2.6     **[Reserved]**.

2.7     **Statements of Obligations**. The Lender shall maintain true, correct and complete electronic or written records evidencing the Indebtedness and other Obligations owed by the Borrowers to the Lender, in which the Lender will record (i) the amount of all Loans made under this Agreement, (ii) the amount of any principal and/or interest due and payable and/or to become due and payable from the Borrowers to the Lender under this Agreement and (iii) all amounts received by the Lender under this Agreement from the Borrowers.

2.8     **Fees**.

(a)     **Commitment Fee; Funding Fee**. Upon the funding of the Loans, (i) Borrowers paid the Commitment Fee and the Funding Fee by adding the amount of such fees to the principal amount of the Loans; and (ii) the DIP Lender Holdback was funded in the amount of $1,200,000 and such amount was added to the principal amount of the Loans.

(b)     **Exit Fee**. Upon any voluntary or mandatory repayment or satisfaction of the Obligations in whole or in part, the Borrowers shall pay (i) the Exit Fee and (ii) the applicable Lender Expenses, including reasonable attorney's fees to the Lender. For the avoidance of doubt, the full amount of the Exit Fee shall be due and payable upon the Maturity Date; provided, however, if the Maturity Date has occurred solely as a result of the occurrence or continuation of an Event of Default under this Agreement or any other Loan Document, then the Exit Fee shall not be payable until the earlier of the date on which (i) Obligations have been accelerated by the Lender or (ii) the Obligations have matured pursuant to clauses (i) or (vi) of the definition of "Maturity Date".

-18-

(c)     The Fees payable to the Lender under this Agreement, the DIP Orders or any of the other Loan Documents shall not be subject to proration and shall be non-refundable and non-avoidable obligations of the Borrowers.

**3.     TERM OF AGREEMENT**.

3.1     **[Reserved]**.

3.2     **Conditions Precedent to the Effective Date**. Not later than July 31, 2023:

(i)     the Final Order shall have been entered by the Bankruptcy Court, which Final Order shall be in the form of the Interim Order with such changes as are customary for a final order or otherwise are acceptable to the Lender, and such Final Order shall be in full force and effect and shall not have been reversed, modified, stayed vacated, appealed or subject to a stay pending appeal. The Borrowers and the Lender be entitled to rely in good faith upon the Final Order and shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objections thereto, unless the relevant offer has been stayed by a court of competent jurisdiction;

(ii)     the Lender shall have received all necessary UCC financing statements and other documentation necessary to provide the Lender with a valid, perfected priming security interest in the Collateral pledged by the Borrowers;

(iii)     the Lender shall have received copies of UCC, tax, and judgment lien searches and title reports, in each case satisfactory to the Lender in its sole discretion; and

(iv)     the parties shall have executed and delivered this Agreement and the other Loan Documents in form and substance reasonably satisfactory to the Lender.

3.3     **[Reserved]**.

3.4     **Maturity**. This Agreement shall continue in full force and effect until the payment in full of the Obligations. All Obligations including, without limitation, the outstanding unpaid principal balance and all accrued and unpaid interest and all Fees (including, without limitation, the Exit Fee) on the Loans shall be due and payable on the Maturity Date. For the avoidance of doubt, if the Maturity Date occurs pursuant to clause (vi) of the definition thereof, then any funds remaining in the Designated Account as of such date may be applied by the Lender to the outstanding amount of the Obligations, *provided*, that such application shall not be deemed to satisfy any of the outstanding Obligations that are in excess of such amount, and the Borrowers shall remain jointly and severally obligated to the Lender in respect of such excess amounts pursuant to the terms hereof.

3.5     **Effect of Maturity**. On the Maturity Date, the Commitment of the Lender to provide any additional credit hereunder shall automatically be terminated and all Obligations immediately shall become due and payable without notice or demand. No termination of the obligations of Lender (other than payment in full of the Obligations and termination of the Commitment) shall relieve or discharge the Borrowers of their respective duties, obligations, or covenants hereunder or under any other Loan Document and the Lender's Liens in the Collateral shall continue to secure the Obligations and shall remain in effect until all Obligations have been paid in full and the Commitment has been terminated. When all of the Obligations have been indefeasibly paid in full in immediately available funds and Lender have no further obligation hereunder to fund further Loans, the Lender will, at the Borrowers' expense, execute and deliver any termination statements, lien releases, discharges of security interests, and other similar discharge or release

-19-

documents (and, if applicable, in recordable form) as are reasonably necessary to release, as of record, the Lender's Liens and all notices of security interests and Liens previously filed by the Lender with respect to the Obligations.

**4.    REPRESENTATIONS AND WARRANTIES.**

In order to induce the Lender to enter into this Agreement, each Borrower makes the following representations and warranties to the Lender. Each Borrower further represents that such representations and warranties shall be true, correct, and complete, in all material respects, as of the Effective Date, and shall be true, correct, and complete, in all material respects, as of the date of the making of each Loan (or other extension of credit) made thereafter, as though made on and as of the date of such Loan (or other extension of credit) (except to the extent that such representations and warranties relate solely to an earlier date) and such representations and warranties shall survive the execution and delivery of this Agreement until all Obligations have been indefeasibly paid in full:

4.1    **Due Organization and Qualification**. Each Borrower (i) is duly formed and existing and in good standing under the laws of the jurisdiction of its formation, (ii) where the ownership of Collateral requires such qualification, is qualified to do business in any state where the failure to be so qualified would reasonably be expected to result in a Material Adverse Change, and (iii) subject to the Bankruptcy Court's entry of the applicable DIP Order and any limitation under the Bankruptcy Code or other debtor relief law, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby. Schedule 4.1 is an organizational chart showing the complete and accurate ownership structure of the Borrowers.

4.2    **Due Authorization**. The execution, delivery, and performance by each Borrower of the Loan Documents to which it is a party have been duly authorized by all necessary corporate or limited liability company action on the part of such Borrower and, with respect to such Borrower, is only subject to the Bankruptcy Court's entry of the applicable DIP Order.

4.3    **Binding Obligations**. Each Loan Document has been duly executed and delivered by each Borrower that is a party thereto and, subject to the entry of the Interim Order or Final Order, as applicable, is the legally valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its respective terms, except as enforcement may be limited by equitable principles or by bankruptcy, insolvency, reorganization, moratorium, or similar laws relating to or limiting creditors' rights generally (regardless of whether such enforceability is considered in a proceeding at law or in equity).

4.4    **Title to Properties**. Except for Permitted Liens, each Borrower has (i) good, sufficient and legal title to, and (ii) good and marketable title to (in the case of personal property), all of such Borrower's right, interest and title in the Collateral.

4.5    **Jurisdiction of Formation; Location of Chief Executive Office; Organizational; Identification Number**.

(a)    The name (within the meaning of Section 9-503 of the UCC), jurisdiction of formation, tax identification numbers and organizational identification number (if any) of each Borrower are as set forth on Schedule 4.5 (as such Schedule may be updated from time to time by notice from Administrative Borrower to Lender).

(b)      The chief executive office of each Borrower is located at the address indicated on Schedule 4.5 (as such Schedule may be updated from time to time by notice from the Administrative Borrower to Lender).

4.6      **Litigation**. Other than the Chapter 11 Cases and as set forth on Schedule 4.6, there are no actions, suits, proceedings, claims or disputes pending or, to the actual knowledge of any Borrower, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Borrower or against any of its properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby (other than objections or pleadings that may have been filed in the Chapter 11 Cases with respect to the Borrowers seeking authorization to enter into the Loan Documents and incur the Obligations under this Agreement), or (b) except as set forth on Schedule 4.6, either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Change. Schedule 4.6 contains all of the commercial tort claims against any Borrower, pending or threatened, known to any Borrower as of the Effective Date.

4.7      **Fraudulent Transfer**. No transfer of property is being made by any Borrower and no obligation is being incurred by any Borrower in connection with the transactions contemplated by this Agreement or the Loan Documents with the intent to hinder, delay or defraud either present or future creditors of any Borrower.

4.8      **Indebtedness**. Together with the Priming Obligations, the Indebtedness set forth on Schedule 4.8 is a true and complete list of all Indebtedness of the Borrowers outstanding as of the Effective Date.

4.9      **Payment of Taxes**. Except as provided on Schedule 4.9, all United States federal, state and other material tax returns and reports of the Borrowers required to be filed by the Borrowers with respect to the Collateral have been timely filed, and all taxes due with respect to the period covered by such tax returns and all material assessments, fees and other governmental charges upon any Collateral that are due and payable have been paid when due and payable, other than taxes that are the subject of a Permitted Protest. With respect to the Collateral, no Borrower is aware of any proposed material tax assessment against any Borrower with respect to United States federal, state or municipal taxes.

4.10     **Approved Budget**. Attached to this Agreement as Exhibit B is a true and complete copy of the Approved Budget. The Approved Budget may be amended or otherwise modified from time to time with the written consent of the Lender in its reasonable discretion so long as such amendments or modifications are in accordance with the DIP Orders and this Agreement; provided the total amount of Loans provided pursuant to the Approved Budget shall not exceed the total amount of the initial Commitment authorized by the DIP Orders.

4.11     **Pledged Securities**. The only equity interests of any Person owned by any Borrower or other Loan Party as of the Effective Date are listed on Schedule 4.11.

4.12     **Permits**. Except as set forth on Schedule 4.12, as of the Effective Date, each Loan Party is in compliance with, and has, all Permits that, as of the Effective Date, are required for the operation of its business and for the execution, delivery and performance by, and enforcement against, such Borrower of each Loan Document. Except as set forth in Schedule 4.12, as of the Effective Date, no Loan Party is in breach of or default under the provisions of any such Permit, nor is there any event, fact, condition or circumstance which, with notice or passage of time or both, would constitute or result in any of the foregoing, which in each case could reasonably be expected to have a Material Adverse Change.

4.13    **No Other Representations**. Except for the representations and warranties contained in this Article 4 (including the related portions of the Schedules), no Loan Party nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of the Borrowers or any other Loan Party including, without limitation, any representation or warranty as to the accuracy or completeness of any information, documents or material delivered to the Lender or made available to the Lender. Lender hereby acknowledges and agrees that: (a) in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Lender has relied solely upon its own investigation and the express representations and warranties of the Borrowers set forth in this Article 4 (including the related portions of the Schedules) and (b) no Loan Party nor any other Person has made any representation or warranty except as expressly set forth in this Article 4 (including the related portions of the Schedules).

5.    **AFFIRMATIVE COVENANTS**.

Each Borrower covenants and agrees that, until termination of the Commitment and the indefeasible payment in full in cash of the Obligations (other than contingent or indemnification obligations not then due), it shall comply with each of the following, as applicable:

5.1    **Reports; Certificates**. Borrowers shall deliver to the Lender (a) promptly upon becoming aware of any Default, notice of such Default; and (b) promptly upon becoming aware of any litigation threatened in writing against any Borrower or filed (other than any adversary proceeding filed in the Chapter 11 Cases), or any event (other than events of public knowledge in the Chapter 11 Cases), in each case which could reasonably be expected to have a Material Adverse Change, notice of such litigation or event. In addition, the Borrowers agree to maintain a system of accounting that enables the Borrowers to produce unaudited financial statements in accordance with GAAP.

5.2    **Reporting; Approved Budget; Conference Calls**.

(a)    The Borrowers shall comply with the agreements, requirements, covenants and undertakings applicable to it set forth in Exhibit C, in accordance with the terms thereof.

(b)    The Borrowers have delivered to the Lender an extended weekly Approved Budget for the period commencing on June 25, 2023 through July 29, 2023 that sets forth in reasonable detail and separated into line items for each category of receipts or disbursements, all of the Borrowers' projected (i) Cash Operating Receipts, (ii) Cash Operating Disbursements, and (iii) Other Disbursements, each on a weekly basis and in form and substance reasonably acceptable to the Lender (the "Initial Approved Budget", as modified from time to time in accordance herewith, the "Approved Budget"), which is attached hereto as Exhibit B.

(c)    Starting August 2, 2023 and every fourth Wednesday thereafter (or, to the extent such Wednesday is not a Business Day, the next Business Day thereafter), the Borrowers shall deliver an updated Approved Budget extending the term thereof (each an "Updated Approved Budget"). Lender, in its reasonable discretion, shall have the right to approve or reject any Updated Approved Budget or any amendments by providing the Borrowers specific notice thereof within five (5) Business Days after the delivery by the Borrowers of an Updated Approved Budget (other than any such updates or amendments that are approved by the Priming Lender under the terms of the Priming Credit Agreement and that do no result, in the aggregate when taken together with any other updates or amendments made since the most recent Budget was approved by the Lender, in more than a 15% variance from the most recent Budget approved by the Lender). To the extent the Lender provides written notice rejecting the Updated Approved Budget, the then existing Approved Budget shall continue to constitute the Approved Budget until such time as an update or amendment is approved by the Lender. In the event the Lender does not provide written

notice of its rejection of the proposed updates within such five (5)-day period, the Lender shall be deemed to have approved the Updated Approved Budget. Upon approval, the Updated Approved Budget shall become the Approved Budget.

(d)     On Thursday of every week (or, to the extent such Thursday is not a Business Day, the next Business Day thereafter), the Borrowers shall deliver to the Lender a variance report, in a form satisfactory to the Lender, for the rolling cumulative four (4)-week period ending the prior Friday (each a "Measuring Period") calculating the Net Operating Disbursements Variance for such Measuring Period; and explaining in reasonable detail all material Net Operating Disbursements Variance (each such report, a "Variance Report").

(e)     [Reserved].

(f)     The Borrowers (or their financial advisor) shall use commercially reasonable efforts to participate in a weekly conference call at such time to be agreed between the Borrowers and the Lender, if requested by the Lender regarding the Approved Budget, management issues, sale process, and other matters. If reasonably requested by the Lender, the chief restructuring officer or the chief financial officer of the Borrowers shall participate in such conference calls.

5.3   **Material Contracts; Sale Offers**. Other than defaults existing as of the date hereof, the Borrowers shall deliver to the Lender (i) promptly upon the Borrowers becoming aware of any default (other than the filing of the Chapter 11 Cases) or other material breach under any Material Contract to which any Borrower is a party, notice of such defaults or breaches, and (ii) promptly notify the Lender upon any written offer by a third party to purchase all or substantially all of the assets of any Borrower, or to purchase all or substantially all of the equity of the Borrowers, in a binding bid related to a potential Sale.

5.4   **Existence**. At all times, the Borrowers shall (a) maintain and preserve in full force and effect its existence (including being in good standing in its jurisdiction of incorporation or formation) and (b) maintain all its rights and franchises, licenses and permits, except where the failure to maintain any such rights and franchises, or licenses and permits would not reasonably be expected to result in a Material Adverse Change.

5.5   **Maintenance of Properties; Permits**. The Borrowers shall (a) maintain and preserve the Collateral that is necessary to the proper conduct of its business in good working order and condition, ordinary wear, tear, and casualty excepted to the extent permitted by the Approved Budget and the Permitted Variance, (b) comply with the material provisions of all material leases related to the Collateral pledged by it, so as to prevent the loss or forfeiture thereof, unless such provisions are the subject of a Permitted Protest and (c) maintain, comply with and keep in full force and effect its Permits with respect to the Collateral pledged by it, unless failure to do so would not result in a Material Adverse Change. The Borrowers shall comply with, and obtain and maintain, all Permits required for the operation of its business, unless failure to do so would not result in a Material Adverse Change.

5.6   **Taxes**. The Borrowers shall cause all assessments and taxes imposed, levied, or assessed after the Petition Date against any Collateral to be paid in full, before delinquency or before the expiration of any extension period, except to the extent that any such assessments and taxes shall be paid as part of a Sale or pursuant to the Approved Budget or that is subject to a Permitted Protest.

5.7   **Insurance**. At the relevant Borrowers' expense, the Borrowers shall maintain insurance with respect to the Collateral in which the Borrowers have any right, interest or title, covering loss or damage by fire, theft, explosion, and all other hazards and risks as ordinarily are insured against by other Persons engaged in the same or similar businesses and consistent with the Borrowers' insurance policies in

effect on the Petition Date. The Borrowers shall maintain general liability, director's and officer's liability insurance, fiduciary liability insurance, employment practices liability insurance, title insurance as well as insurance against larceny, embezzlement, and criminal misappropriation, consistent with the Borrowers' insurance policies in effect on the Petition Date. All such policies of insurance shall be with responsible and reputable insurance companies and in such amounts as is carried generally in accordance with sound business practice by companies in similar businesses similarly situated and located and in any event in amount, adequacy and scope reasonably satisfactory to the Lender. All property insurance policies covering the Collateral are, reasonably promptly after the Effective Date (but not more than fifteen (15) Business Days thereafter), to be made payable to the Lender, in case of loss, pursuant to a standard loss payable endorsement with a standard non-contributory "lender" or "secured party" clause and are to contain such other provisions as the Lender may reasonably require to fully protect the Lender's interest in the Collateral and any payments to be made under such policies. All certificates of property and general liability insurance are to be delivered to the Lender, reasonably promptly after the Effective Date (but not more than fifteen (15) Business Days thereafter), with the loss payable (but only in respect of Collateral) and additional insured endorsements in favor of the Lender and shall provide for not less than thirty (30) days (fifteen (15) in the case of non-payment) prior written notice to Lender of the exercise of any right of cancellation. If the Borrowers fail to maintain the insurance required by this <u>Section 5.6</u>, the Lender may arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Lender's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims. The Administrative Borrower shall give the Lender prompt notice of any loss covered by the casualty or business interruption insurance of any Borrower. Upon the occurrence and during the continuance of an Event of Default, the Lender shall have the sole right to file claims under any property and general liability insurance policies in respect of the Collateral, to receive, receipt and give acquittance for any payments that may be payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

5.8     <u>**Inspection**</u>. The Borrowers shall permit the Lender and each of its duly authorized representatives or agent to visit any of its properties and inspect any of its Collateral or books and records, to conduct appraisals and valuations, to examine and make copies of its books and records, and to discuss its affairs, finances, and accounts with, and to be advised as to the same by, its officers and employees at such reasonable times and intervals as the Lender may reasonably require and, so long as no Default or Event of Default exists, with reasonable prior notice to the applicable Loan Party.

5.9     <u>**Environmental**</u>. The Loan Parties shall:

(a)     Comply with all applicable Environmental Laws, except where the failure to so comply would not reasonably be expected result in a Material Adverse Change.

(b)     Promptly notify the Lender of any release of which any Loan Party has knowledge of a Hazardous Material in any reportable quantity from or onto property owned or operated by any Loan Party that would reasonably be expected to result in a Material Adverse Change.

(c)     Promptly, but in any event within five (5) Business Days of its receipt thereof, provide the Lender with written notice of (i) commencement of any Environmental Action or written notice that an Environmental Action will be filed against any Loan Party, which Environmental Action may would reasonably be expected to result in a Material Adverse Change, and (ii) written notice of a violation, citation, or other administrative order from a Governmental Authority, which would reasonably be expected to result in a Material Adverse Change.

5.10    **Compliance with Laws**. The Loan Parties shall comply with the requirements of all applicable laws, rules, regulations, and orders of any Governmental Authority, other than laws, rules, regulations, and orders the non-compliance with which, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Change.

5.11    **Disclosure Updates**. The Loan Parties shall promptly, and in no event later than five (5) Business Days after obtaining actual knowledge thereof, notify the Lender of any written information, exhibit, or report (other than materials marked as drafts and forward-looking information and projections and information of a general economic nature and general information about Loan Parties' industry) furnished to the Lender contained, at the time it was furnished, any untrue statement of a material fact or omitted to state any material fact necessary to make the statements contained therein (taken as a whole) not misleading in light of the circumstances in which made. Any notification pursuant to the foregoing provision will not cure or remedy the effect of the prior untrue statement of a material fact or omission of any material fact nor shall any such notification have the effect of amending or modifying this Agreement or any of the Schedules or reports hereto, except as expressly provided hereunder.

5.12    **Further Assurances**. Upon reasonable written notice from the Lender, the Loan Parties shall use commercially reasonable efforts to execute and deliver to the Lender any and all Security Documents, fixture filings, endorsements of certificates of title, and all other documents (collectively, the "Additional Documents") that the Lender may reasonably request in form and substance reasonably satisfactory to the Lender, to create, perfect, and continue perfected or to better perfect the Lender's Liens in all the Collateral (whether now owned or hereafter arising or acquired, tangible or intangible, real or personal).

5.13    **Designated Account**. Borrowers agree to (i) maintain the Designated Account with the Designated Account Bank, which shall be subject to the Control Agreement and (ii) maintain the proceeds of the Loans in the Designated Account unless and until applied in accordance with Section 6.11 hereof.

5.14    **Approved Budget**. Borrowers shall comply with the Approved Budget (as updated and supplemented in accordance with this Agreement), subject to the Permitted Variance.

5.15    **Carve Out Trigger Notice Reserve**. The Borrowers shall deposit and hold in a segregated account the Carve Out Trigger Notice Reserve to pay such then unpaid Allowed Professional Fees prior to any and all other claims. The Carve Out Trigger Notice Reserve shall be funded by the Borrowers on a weekly basis and shall contain an amount equal to the amount of Pre-Trigger Date Fees reflected in the Approved Budget from the Petition Date through the weekly date of funding.

5.16    **Pledged Securities**. The Pledged Securities (other than the Equity Interests of any Borrower pledged hereunder) in the securities accounts noted on Schedule 4.11 shall at all times remain in such securities accounts noted on such Schedule 4.11 and on a monthly basis, the Borrower shall provide to Lender a copy of the statement from the securities intermediary which sets forth the balance of such Pledged Securities and confirms that no transfers have been made other than a Permitted Transfer in accordance with the terms of this Agreement.

5.17    **Joinder of Existing Subsidiaries**. The Borrowers shall cause any of their Subsidiaries that join the Chapter 11 Cases or otherwise commence a chapter 11 case under the Bankruptcy Code to be joined as a Guarantor under this Agreement by executing a Guarantor Joinder Agreement in substantially the form attached hereto as Exhibit F.

5.18    **Right of First Refusal**. Notwithstanding anything to the contrary set forth herein or in the DIP Orders, the Borrowers shall provide to Lender a right of first refusal to provide any debtor-in-

-25-

possession financing during the course of the Chapter 11 Cases to the Loan Parties occurring after the date of the Interim Order, until the Chapter 11 Cases are concluded. Prior to the incurrence of any such debtor-in-possession financing, the Borrowers shall provide to Lender a description of the material terms of such financing and a bona fide offer to provide financing on the same or better (as determined by the Borrowers in their reasonable judgement) terms as such offered financing, subject to the right of Lender to accept or reject such offer in its sole discretion within three (3) Business Days of delivery of such offer from the Borrowers to Lender.

## 6.     NEGATIVE COVENANTS.

The Loan Parties covenant and agree that, until termination of the Commitment and payment in full of the Obligations, the Loan Parties will not do any of the following without the prior consent of the Lender in its sole discretion:

6.1     **Indebtedness**. Create, incur, assume, suffer to exist, guarantee, or otherwise become or remain, directly or indirectly, liable with respect to any Indebtedness with respect to the Collateral, except for the following ("Permitted Indebtedness"):

(a)     Priming Obligations in an amount not to exceed (i) the sum of the principal amount outstanding under the Priming Loan Documents as of the date of the Interim Hearing *plus* all interest, fees and expenses (including, without limiting the generality of the foregoing, the Exit Fee (as defined in the Priming Credit Agreement)) payable under the Priming Credit Agreement as in effect on the date of the Interim Order (other than contingent indemnification obligations as to which no claim has been asserted), *less* (ii) any principal amount of the Priming Obligations repaid or prepaid after the date of the Interim Hearing;

(b)     Indebtedness evidenced by this Agreement and the other Loan Documents (including, for the avoidance of doubt, the Carve Out);

(c)     Indebtedness outstanding as of the Petition Date and listed on Schedule 4.8 and any refinancing Indebtedness in respect thereof in an amount not to exceed the principal amount of such original indebtedness except by an amount no greater than accrued and unpaid interest with respect to such original indebtedness and any reasonable fees, premium and expenses relating to such renewal or refinancing;

(d)     unsecured obligations (contingent or otherwise) of any Borrower existing or arising under any swap contract; provided that (i) such obligations are (or were) entered into by such Person in the Ordinary Course of Business for the purpose of directly mitigating risks associated with liabilities, commitments, investments, assets, or property held or reasonably anticipated by such Person, or changes in the value of securities issued by such Person, and not for purposes of speculation or taking a "market view", and (ii) such swap contract is not for speculative purposes;

(e)     obligations under any cash management agreement and other Indebtedness in respect of netting services, automatic clearinghouse arrangements, overdraft protections, employee credit card programs and other cash management and similar arrangements incurred in the Ordinary Course of Business;

(f)     unsecured Indebtedness consisting of (i) the financing of insurance premiums or (ii) take-or-pay obligations contained in supply arrangements, in each case, incurred in the Ordinary Course of Business;

(g)      unsecured Indebtedness incurred by any Borrower in respect of letters of credit, bank guarantees, bankers' acceptances, warehouse receipts or similar instruments issued or created in the Ordinary Course of Business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; provided that upon the drawing of such letter of credit, the reimbursement of obligations in respect of bankers' acceptances and the incurrence of such Indebtedness, and such obligations are reimbursed promptly (but no more than thirty (30) days) following such drawing, reimbursement obligation or incurrence;

(h)      all premiums (if any), interest (including post-petition interest), fees, expenses, charges and additional or contingent interest on obligations described in clauses (a) through (g) above below;

(i)      guarantees with respect to Indebtedness permitted under this <u>Section 6.1</u>;

(j)      intercompany Indebtedness of a Loan Party incurred in the Ordinary Course of Business, and consistent with past practice in an aggregate amount not exceeding $10,000,000; and

(k)      any other Indebtedness in an aggregate outstanding amount not to exceed $25,000,000 at any one time.

6.2      **Liens**. Create, incur, assume, or suffer to exist on or after the date of this Agreement, directly or indirectly, any Lien on or with respect to any of the Collateral, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, except for Permitted Liens.

6.3      **Restrictions on Fundamental Changes**. Except in connection with an Acceptable Plan or Acceptable 363 Sale approved by the Bankruptcy Court or otherwise with the prior written consent of the Lender:

(a)      no Loan Party shall enter into any merger, consolidation, reorganization, or recapitalization, or reclassify its equity interests;

(b)      no Loan Party shall liquidate, wind up, or dissolve itself (or suffer any liquidation or dissolution); and

(c)      no Loan Party shall suspend or close a substantial portion of its business.

6.4      **Disposal of Assets**. Except in connection with an Acceptable Plan or Acceptable 363 Sale, convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any Collateral pledged by the Borrowers, other than:

(a)      dispositions of inventory of any goods or assets made in the Ordinary Course of Business and consistent with past practice;

(b)      dispositions of surplus, obsolete or worn-out assets or assets no longer used or useful in the conduct of business of the Borrower and consistent with past practice;

(c)      Permitted Transfers; and

(d)      additional dispositions of inventory, goods or assets with an aggregate fair market value not to exceed $100,000,000 over the term of this Agreement.

6.5      **Change Name**. Change any Loan Party's name, state of organization or organizational identity, except upon ten (10) Business Days prior written notice to the Lender.

6.6      **Nature of Business**. Make any change in the nature of any Loan Party's business or acquire any properties or assets that are not reasonably related to the conduct of such business activities; provided that the foregoing shall not prevent any Loan Party from (i) engaging in any business that is reasonably related or ancillary to its or their business, or (ii) complying with any requirement of the Bankruptcy Code.

6.7      **Material Leases or Contracts; Amendments**. Change or modify (i) the material terms of any of its Material Contracts in connection with Collateral except in a manner that could not reasonably be expected to result in a Material Adverse Change, or (ii) any of its Organizational Documents in a manner that is adverse to the Lender.

6.8      **Change of Control**. Cause, permit, or suffer, directly or indirectly, any Change of Control.

6.9      **Accounting Methods**. Modify or change its fiscal year or its method of accounting (other than as may be required to conform to GAAP).

6.10      **Transactions with Affiliates**. Directly or indirectly enter into or permit to exist any transaction with any Affiliate of any Loan Party, except for (a) transactions that are in the Ordinary Course of Business of such Loan Party and are consistent with such Loan Party's past practice, or (b) are otherwise in connection with the permitted transactions described in Sections 6.1, 6.2, 6.3, 6.4, 6.15 and 6.19, including, for the avoidance of doubt, such as various employee incentive and retention programs (in compliance with the Bankruptcy Code) among Loan Parties and their respective Affiliates.

6.11      **Use of Proceeds**. Use the proceeds of the Loans for any purpose other than to fund payments related to the: (a) working capital and other general corporate purposes of the Borrowers and their Subsidiaries, subject to the Approved Budget and the Permitted Variance; (b) the payment of Allowed Professional Fees and bankruptcy-related expenses, subject to the Carve Out, and in each case, consistent with, subject to, and within the categories and limitations contained in the DIP Orders and the Approved Budget; (c) Fees and Lender Expenses payable under this Agreement; (d) interest and other amounts payable under this Agreement; and (e) interest and other amounts payable under the Priming Credit Agreement (as in effect on the date of the Interim Order). Notwithstanding anything to the contrary in this Agreement, or any other Loan Document, the proceeds of the Loans or Collateral, or any portion of the Carve-Out, shall not be used directly or indirectly by any Borrower, any other Loan Party, the Bankruptcy Committees, or any trustee appointed in the Chapter 11 Cases or any successor cases, including any case under Chapter 7 of the Bankruptcy Code, or any other Person:

(a)      [reserved]

(b)      to prevent, hinder, or otherwise delay the Lender's enforcement or realization on the Obligations, Collateral, and the liens, claims and rights granted to such parties under the applicable DIP Order, each in accordance with the Loan Documents and the applicable DIP Order; provided, however, that no such restrictions shall apply to (a) objections to the Final Order or (b) avoidance actions against the Lender that are not related to this Facility or the Loans;

(c)       to seek to modify, stay, vacate or amend any of the rights and remedies granted to the Lender under the DIP Orders (other than with the consents contemplated thereunder), or the Loan Documents, as applicable; or

(d)       to apply to the Bankruptcy Court for authority to approve Super-priority Claims or grant liens (other than the liens permitted pursuant to the DIP Documents) or security interests in the Collateral or any portion thereof that are senior to, or on parity with, the Lender's Liens on the Collateral or the Lender's claims in the Chapter 11 Cases, unless permitted under the Loan Documents or unless all Obligations, and claims granted to the Lender under the applicable DIP Order have been refinanced or paid in full in cash or otherwise agreed to in writing by the Lender.

6.12    **Limitation on Capital Expenditures**. Except as set forth in the Approved Budget, make or incur any Capital Expenditure.

6.13    **Chapter 11 Cases**. Seek approval from the Bankruptcy Court for approval of, consent or suffer to exist (i) any modification, stay, vacation or amendment to the DIP Orders; (ii) in connection with the Collateral, a priority claim for any administrative expense or unsecured claim against any Loan Party (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expense of any kind specified in Section 503(b), 506(b) or (c) or 507(b) of the Bankruptcy Code) equal to or superior to the priority claim of the Lender in respect to the Collateral; and (iii) any Lien on Collateral having a priority equal or superior to the Liens in favor of the Lender in respect of the Obligations, other than as required under a purchase agreement with respect to the good faith deposit thereunder.

6.14    **Plan**. Propose and/or support any plan that is not an Acceptable Plan.

6.15    **Acquisitions, Loans or Investments**. Make any acquisition, advance, loan or any other investment of any kind or nature other than:

(a)       investments held by any Loan Party in the form of cash or cash equivalents;

(b)       investments existing as of the Effective Date;

(c)       investments in any Person that is a Loan Party;

(d)       intercompany investments consisting of Indebtedness granted by a Loan Party to a non-Loan Party incurred in the Ordinary Course of Business, and consistent with past practice intercompany, in an aggregate amount not exceeding $10,000,000;

(e)       guarantees permitted by Section 6.1;

(f)       investments consisting of Indebtedness, Liens, fundamental changes and dispositions permitted under Sections 6.1, 6.2, 6.3 and 6.4, respectively; and

(g)       additional investments in an aggregate amount not to exceed $15,000,000 at any time.

6.16    **Payments on Indebtedness**. Other than with respect to the Obligations or pursuant to the Approved Budget, make any payment when due with respect to any Indebtedness.

6.17    **Distributions or Redemptions**. Pay any dividends or distributions on, or make any redemptions of, any equity interest of any Loan Party other than to another Borrower.

6.18    **Transfer of Pledged Securities**. Except as otherwise set forth in <u>Section 6.4</u>, transfer, move, withdraw or otherwise exchange the Pledged Securities from the securities intermediary currently in place as of the Effective Date.

6.19    **Formation of Subsidiaries**. Form any direct or indirect Subsidiary or acquire any direct or indirect Subsidiary after the Effective Date, if such Subsidiary is to be added as a debtor in possession under the Chapter 11 Cases or otherwise commences a chapter 11 case under the Bankruptcy Code unless such Subsidiary (i) is a "Guarantor" under the Priming Credit Agreement, and (ii) is joined as a Guarantor under this Agreement by executing a Guarantor Joinder Agreement in substantially the form attached hereto as Exhibit E, or otherwise with the written consent of Lender in its sole discretion.

7.    **GUARANTY**.

7.1    **Guaranty**. Each Guarantor unconditionally and irrevocably guarantees to the Lender the full and prompt payment when due (whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise) and performance of the Obligations (the "<u>Guaranteed Obligations</u>").

7.2    **Separate Obligation**. Each Guarantor acknowledges and agrees that, in providing benefits to the Borrowers, the Lender is relying upon the enforceability of this <u>Article 7</u> and the Guaranteed Obligations. The fact that the guaranty is set forth in this Agreement rather than in a separate guaranty document is for the convenience of Borrowers and Guarantors and shall in no way impair or adversely affect the rights or benefits of the Lender under this <u>Article 7</u>.

7.3    **Limitation of Guaranty**. To the extent that any court of competent jurisdiction shall impose by final judgment under applicable Laws (including Sections 544 and 548 of the Bankruptcy Code) any limitations on the amount of any Guarantor's liability with respect to the Guaranteed Obligations that the Lender can enforce under this <u>Article 7</u>, the Lender accepts such limitation on the amount of such Guarantor's liability hereunder only to the extent needed to make this <u>Article 7</u> fully enforceable and non-avoidable.

7.4    **Liability of Guarantors**. The liability of each Guarantor under this <u>Article 7</u> shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance that might constitute a discharge of a surety or Guarantor other than the indefeasible payment and performance in full of all Guaranteed Obligations. In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

(a)    such Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of such Guarantor and shall not be contingent upon the Lender's exercise or enforcement of any remedy it may have against the Borrowers or any other Person, or against any Collateral or any security for any Guaranteed Obligations;

(b)    this guarantee is a guaranty of payment when due and not merely of collectability;

(c)    such Guarantor's payment of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge such Guarantor's liability for any portion of the Guaranteed Obligations remaining unsatisfied; and

(d)      such Guarantor's liability with respect to the Guaranteed Obligations shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall such Guarantor be exonerated or discharged by, any of the following events:

(i)      any proceeding under the Bankruptcy Code (except to the extent set forth in Section 7.3);

(ii)     any limitation, discharge, or cessation of the liability of any Borrower or any other Person for any Guaranteed Obligations due to any applicable law, or any invalidity or unenforceability in whole or in part of any of the Guaranteed Obligations or the Loan Documents;

(iii)    any merger, acquisition, consolidation or change in structure of any Borrower, any Subsidiary thereof or any other Guarantor or Person, or any sale, lease, transfer or other disposition of any or all of the assets of any Borrower or any other Person;

(iv)     any assignment or other transfer, in whole or in part, of the Lender's interests in and rights under this Agreement (including this Section 7) or the other Loan Documents;

(v)      any claim, defense, counterclaim or setoff, other than that of prior performance, that Borrowers, such Guarantor, any other Guarantor or any other Person may have or assert, including any defense of incapacity or lack of corporate or other authority to execute any of the Loan Documents;

(vi)     the amendment, modification, renewal, extension, cancellation or surrender of any Loan Document or any Guaranteed Obligations; or

(vii)    the Lender's exercise or non-exercise of any power, right or remedy with respect to any Guaranteed Obligations.

7.5      **Consents of Guarantors**. Each Guarantor hereby unconditionally consents and agrees that, without notice to or further assent from such Guarantor:

(a)      the principal amount of the Guaranteed Obligations may be increased or decreased and additional indebtedness or obligations of Borrowers under the Loan Documents may be incurred and the time, manner, place or terms of any payment under any Loan Document may be extended or changed, by one or more amendments, modifications, renewals or extensions of any Loan Document or otherwise;

(b)      the time for Borrowers' (or any other Person's) performance of or compliance with any term, covenant or agreement on its part to be performed or observed under any Loan Document may be extended, or such performance or compliance waived, or failure in or departure from such performance or compliance consented to, all in such manner and upon such terms as the Lender may deem proper;

(c)      the Lender may request and accept other guaranties and may take and hold security as collateral for the Guaranteed Obligations, and may, from time to time, in whole or in part, exchange, sell, surrender, release, subordinate, modify, waive, rescind, compromise or extend such other guaranties or security and may permit or consent to any such action or the result of any such action, and may apply such security and direct the order or manner of sale thereof; and

(d)      the Lender may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege even if the exercise thereof affects or eliminates any right of subrogation or any other right of such Guarantor against any Borrower.

-31-

7.6    **Guarantor's Waivers**. Each Guarantor waives and agrees not to assert:

(a)    any defense arising by reason of any lack of corporate or other authority or any other defense of any Borrower, such Guarantor or any other Person;

(b)    any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the Guaranteed Obligations. The Guaranteed Obligations shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty. Each Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices to or upon any Borrower, each Guarantor or any other Person with respect to the Guaranteed Obligations;

(c)    any right, including but not limited to under Sections 2845 or 2850 of the California Civil Code (the "CCC"), to require Lender to institute suit against, or to exhaust any rights and remedies which Lender has or may have against, any Borrower or any other Loan Party or any third party or against any Collateral for the Obligations;

(d)    (i) any right to assert against Lender any defense (legal or equitable), set-off, counterclaim or claim which such Guarantor may now or at any time hereafter have against any Borrower or any other party liable to Lender, including, without limitation under Sections 2787 through 2855, 2899, and 3433; (ii) any defense, set-off, counterclaim or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Obligations or any security therefor; (iii) any defense such Guarantor has to performance under this Guaranty, and any right Guarantor has to be exonerated, under Sections 2819, 2822, or 2825 of the CCC, or otherwise, arising by reason of the impairment or suspension of Lender's rights or remedies against any Borrower, the alteration or modification by Lender of any of the Obligations of any Borrower, any discharge or release of any of the Obligations to Lender by operation of law as a result of Lender's intervention or omission, or the acceptance by Lender of anything in partial satisfaction of any of the Obligations; (iv) the benefit of any statute of limitations affecting such Guarantor's liability under this Guaranty or the enforcement thereof, and any act which shall defer or delay the operation of any statute of limitations applicable to the Obligations shall similarly operate to defer or delay the operation of such statute of limitations applicable to such Guarantor's liability under this Guaranty; and

(e)    any defense arising by reason of or deriving from (i) any claim or defense based upon an election of remedies by Lender, including but not limited to any defense based upon an election of remedies by Lender under Section 580a, 580b, 580d or 726 of the California Code of Civil Procedure or any similar law of California, New York or any other jurisdiction; or (ii) any election by Lender under the Bankruptcy Code Section 1111(b) to limit the amount of, or any Collateral securing, its claim against the Borrowers.

As provided in Article 12 of this Agreement, this Agreement shall be governed by, and shall be construed and enforced in accordance with the laws of the State of New York. This Section 7.6 is included solely out of an abundance of caution, and shall not be construed to mean that any of the above-referenced provisions of California law are in any way applicable to this Agreement or to any of the Obligations.

7.7    **Continuing Guaranty**. This Guaranty is a continuing guaranty and agreement of subordination and shall continue in effect and be binding upon each Guarantor until termination of the Commitment and payment and performance in full of the Guaranteed Obligations.

7.8    **Reinstatement**. This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Guaranteed Obligations by or on behalf

of the Borrowers (or receipt of any proceeds of Collateral) shall be rescinded, invalidated, declared to be fraudulent or preferential, set aside, voided or otherwise required to be repaid to the Borrowers, its estate, trustee, receiver or any other Person (including under the Bankruptcy Code), or must otherwise be restored by the Lender in the Chapter 11 Cases of the Borrowers.

## 8.    EVENTS OF DEFAULT.

8.1    **Event of Default**. Any one or more of the following events shall constitute an event of default following giving of any applicable notice (if required) and the expiration of the applicable cure period (if any) (each, an "Event of Default") under this Agreement:

(a)    The Borrowers shall fail to pay when due, any principal (including without limitation pursuant to Section 2.3(d) hereof);

(b)    The Borrowers shall fail to pay any interest or any Fees, costs due to Lender or any other amount (other than an amount referred to in subsection (a) above) under this Agreement or any Loan Document when and as the same shall become due and payable;

(c)    Any Loan Party shall fail to comply with its obligations under Sections 5.1(a), 5.3 (solely with respect to maintaining the Borrowers' existence), 5.8, 5.18, Article 6 and/or Article 9;

(d)    Other than as set forth in any other sub-section of this Section 8.1, any Loan Party shall fail to perform, or otherwise breach, any of its respective covenants or obligations contained in this Agreement, which failure or breach shall continue unremedied (i) for a period of three (3) Business Days if such breach relates to the terms or provisions of Sections 5.2(a), (b), (c) and/or (d), or (ii) for a period of ten (10) Business Days (or seven (7) Business Days if such breach relates to the terms or provisions of Section 5.4) after the earlier to occur of (x) the date on which such failure to comply is known or reasonably should have become known to any officer of the relevant Loan Party, or (y) the date on which the Lender shall have notified the relevant Loan Party of such failure; provided, however, that the period set forth in this clause (ii) shall not apply in the case of any failure which is not capable of being cured at all or within such ten period;

(e)    Any representation or warranty made by any Loan Party in this Agreement or in any agreement, certificate, instrument or financial statement or other statement delivered to the Lender pursuant to or in connection with this Agreement shall prove to have been incorrect in any material respect when made or deemed made, which failure or breach shall continue for ten (10) Business Days after the date upon which such default is known or reasonably should have become known to any officer of the relevant Loan Party or it has received a written notice of such failure or breach from the Lender;

(f)    [Reserved];

(g)    Any Borrower shall file or obtain Bankruptcy Court approval of a disclosure statement for a plan of reorganization that is not an Acceptable Plan;

(h)    The entry of the Final Order shall have not occurred on or before July 31, 2023;

(i)    Except with respect to the Carve Out, the Borrowers shall file any motion or application, or the Bankruptcy Court grants the motion or application of any other Person, which seeks approval for or allowance of any claim, lien, security interest ranking equal or senior in priority to the claims, liens and security interests granted to the Lender under the DIP Orders, or with respect to the

Collateral or any such equal or prior claim, lien, or security interest shall be established in any manner, except, in any case, as expressly permitted under the DIP Orders;

(j)        The DIP Orders shall cease to be in full force and effect from and after the date of entry thereof by the Bankruptcy Court without the prior written consent of Lender;

(k)        Non-compliance by any Loan Party with the terms of the DIP Orders, subject to any grace or cure period provided in such order or granted by order of a court in the Bankruptcy Case;

(l)        The entry of an order which provides relief from any stay or proceeding (including, without limitation, the automatic stay imposed pursuant to Section 362 of the Bankruptcy Code), which order permits any creditor, other than the Lender, to realize upon, or to exercise any right or remedy with respect to, any material asset of the Loan Parties to which a fair market value exceeds $30,000,000;

(m)        The entry of an order (i) surcharging any of the Collateral under Sections 105, 506(c), or any other section of the Bankruptcy Code, (ii) allowing any administrative expense claim having priority over or ranking in parity with the Lender's claims or the rights, or (iii) resulting in the marshaling of any Collateral;

(n)        Conversion of any Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or dismissal of a Chapter 11 Case or any subsequent case under Chapter 7 of the Bankruptcy Code, either voluntarily or involuntarily and the Obligations are not simultaneously indefeasibly paid in full;

(o)        Any DIP Order or any Loan Document is modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of the Lender (and no such consent shall be implied from any other authorization or acquiescence by the Lender);

(p)        The entry of an order appointing an examiner having expanded powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Bankruptcy Code section 1104 (other than a fee examiner) in the Chapter 11 Cases, or the Bankruptcy Court shall have entered an order providing for such appointment, in each case without the prior written consent of the Lender in its sole discretion;

(q)        Any action by any Borrower to (i) challenge the rights and remedies of the Lender under this Agreement in the Chapter 11 Cases or acting in a manner inconsistent with the Loan Documents or (ii) avoid or require disgorgement by the Lender of any amounts received in respect of the Obligations;

(r)        The making of any material payments in respect of prepetition obligations other than (i) as permitted by the DIP Orders, (ii) as permitted by any other order of the Bankruptcy Court reasonably satisfactory to the Lender, (iii) as permitted under this Agreement or any other Loan Documents, or (iv) as otherwise agreed to by the Lender in writing;

(s)        The entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Borrower to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Lender;

(t)        The Borrowers shall seek to, or support any other person's motion to, (a) disallow in whole or in part the Obligations, (b) challenge the validity and enforceability of the Lender's Liens, (c) contest any material provision of this Agreement or any Loan Document;

-34-

(u)     entry of an order without the express written consent of the Lender obtaining additional financing from a party other than the Lender under Section 364(d) of the Bankruptcy Code except if such financing contemplates payment in full of the Facility;

(v)     The resignation or termination of the Borrowers' chief restructuring officer in place as of the Effective Date, unless a replacement reasonably acceptable to the Lender is appointed within seven (7) days thereof;

(w)     Entry of a final non-appealable order vacating the Cynviloq Award; provided that, for the avoidance of doubt, the settlement of any litigation or disputes (whether in connection with the Cynviloq Award or otherwise) shall not constitute an Event of Default;

(x)     The entry of an order by the Bankruptcy Court confirming a chapter 11 plan that is not an Acceptable Plan approving a Sale that is not an Acceptable 363 Sale;

(y)     A Variance Report showing a Net Operating Disbursement Variance greater than a Permitted Variance;

(z)     The occurrence of a Change of Control;

(aa)    Any Borrower shall fail to execute and deliver to the Lender any agreement, financing statement, trademark filing, copyright filing, notices of lien or similar instruments or other documents that the Lender may reasonably request from time to time to more fully evidence, confirm, validate, perfect, preserve and enforce the Liens created in favor of the Lender (provided that mortgages shall not be required), subject to the time periods set forth herein and in the Term Sheet; and/or

(bb)    The (i) Borrowers shall fail to pay the Priming Obligations at their stated maturity or (ii) Priming Lender shall declare, in accordance with the Priming Credit Agreement, the Priming Obligations due prior to their stated maturity (as in effect on the date of the Interim Order).

For the avoidance of doubt, the following shall not constitute an Event of Default: (a) any investigations or other discovery with respect to any party hereto, and (b) any actions relating to the Excluded Claims.

8.2    **Rights and Remedies**

(a)     Subject to the Subordination Agreement, upon the occurrence and during the continuance of an Event of Default, and notwithstanding Section 362 of the Bankruptcy Code and without further order of the Bankruptcy Court or any other court or the initiation of any further proceeding with the Borrowers except as provided in this Section 8.2, in addition to any other rights or remedies provided for hereunder or under any other Loan Document (including the DIP Orders) or by the UCC or any other applicable law, the Lender may do any one or more of the following, in each case subject, as set forth in the DIP Orders, to the requirement for a Remedies Notice, Stay Relief Hearing and the expiration of the Remedies Notice Period:

(i)     declare the Obligations, whether evidenced by this Agreement or by any of the other Loan Documents, due and payable, and the Commitment terminated, in each case upon the expiration of the Remedies Notice Period, whereupon the Obligations shall become and be immediately due and payable, without presentment, demand, protest, or further notice or other requirements of any kind, all of which are hereby expressly waived by the Borrowers;

(ii)    terminate, restrict or reduce any Borrower's ability to use Cash Collateral other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate

and irreparable harm to the Borrowers' estates; provided, however, that the Professional Fees and expenses of the Borrowers' and the Bankruptcy Committees' professionals shall be governed by the DIP Orders;

(iii)     charge interest at the Default Rate;

(iv)     upon five (5) days' prior written notice (which period shall be deemed to be reasonable notice) to the Administrative Borrower, in accordance with the terms hereof, and the United States Trustee and lead counsel for any creditors' committee, obtain and liquidate the Collateral. If notice of disposition of Collateral is required by law, ten (10) days prior notice by the Lender to the Administrative Borrower designating the time and place of any public sale or the time after which any private sale or other intended disposition of Collateral is to be made, shall be deemed to be reasonable notice thereof and shall constitute "authenticated notice of disposition" within the meaning of Section 9-611 of the UCC, and the Borrowers waive any other notice. The Lender may bid for and purchase the Collateral at any public sale. The Lender may bid and purchase any Collateral at a private sale if the Collateral in question has a readily ascertainable market value;

(v)     require the Borrowers to assemble all of the Collateral constituting personal property without judicial process pursuant to Section 9-609 of the UCC; and

(vi)     exercise any of its other rights under the Loan Documents, any rights granted under the Final Order and applicable law.

(b)     Subject to the terms of the Final Order, to the extent an Event of Default occurs as a result of the Borrowers failure to indefeasibly satisfy the Obligations in full by the Maturity Date, the Borrowers waive any right (i) to any notice period set forth in this Section 8.2 (except to the extent a notice period is required by operation of law) and (i) to challenge (x) whether or not the Maturity Date or an Event of Default has occurred, (y) the Lender's exercise of its rights and remedies against the Collateral, including without limitation, any foreclosure through a state court proceeding, and (z) the applicability of the Default Rate.

8.3     **Application of Proceeds upon Event of Default**. The Lender shall apply the cash proceeds actually received from any foreclosure sale, other disposition of the Collateral upon an Event of Default as follows: (i) *first*, to fund the Carve Out (to the extent not fully funded by the Borrowers at such time), (ii) thereafter, as set forth in Section 2.3(b) hereof.

8.4     **Remedies Cumulative**. The rights and remedies of the Lender under this Agreement, the other Loan Documents, and all other agreements shall be cumulative. The Lender shall have all other rights and remedies not inconsistent herewith or with the DIP Orders, as provided under the UCC, by law, or in equity. No exercise by the Lender of one right or remedy shall be deemed an election, and no waiver by the Lender of any Event of Default shall be deemed a continuing waiver. No delay by the Lender shall constitute a waiver, election, or acquiescence by it.

8.5     **Acknowledgments**. Notwithstanding anything herein to the contrary, the Lender acknowledges and agrees that in no event shall an "event of default" or "default" under any Indebtedness of any Borrower (other than the Indebtedness evidenced by this Agreement and the other Loan Documents), cause a Default or Event of Default hereunder, or cause a breach of any covenant described in Article 5 or Article 6 of this Agreement.

9.      **PRIORITY AND COLLATERAL SECURITY**.

9.1      <u>**Super-priority Claims; Subordination in favor of the Lender Liens**</u>.

(a)      Subject to the terms and conditions of the DIP Orders and <u>the Subordination Agreement</u>, Borrowers and each other Loan Party warrants and covenants that, except as otherwise expressly provided in this paragraph, the Obligations of Borrowers under the Loan Documents:

(i)      shall, in accordance with section 364(c)(1) of the Bankruptcy Code, constitute allowed senior administrative expense claims against each Borrower and their estates (the "<u>Super-priority Claims</u>") with priority in payment over any and all administrative expenses at any time existing or arising, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 and 1114 of the Bankruptcy Code or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to Section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; <u>provided</u>, <u>however</u>, that the Super-priority Claims shall only be subject to and subordinate to (w) the Advisor Transaction Fees, (x) the Priming Obligations, (y) the Carve Out and (z) other Permitted Liens so long as such liens were validly perfected as to the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code); and

(ii)      shall be, pursuant to Section 364(c)(2) of the Bankruptcy Code, secured by valid, enforceable, non-avoidable and perfected and automatic liens on and security interests in favor of the Lender in all Collateral, which liens shall be (A) subject and subordinate only to the Carve Out and the Advisor Transaction Fees, first priority liens on all proceeds of the Facility in the Designated Account, the Designated Account, and the DIP Lender Holdback and (B) with respect to all other Collateral, subject and subordinate only to (w) the Advisor Transaction Fees, (x) the Priming Obligations, (y) the Carve Out and (z) other Permitted Liens so long as such liens were validly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code);

(iii)      shall be, pursuant to section 364(c)(3) of the Bankruptcy Code, secured by valid, enforceable, non-avoidable and perfected and automatic liens on and security interests in favor of the Lender in all Collateral (other than the Collateral described in <u>Section 9.1(a)(ii)</u> hereof, as to which Liens are described in such Section) (the forgoing lien priorities set forth in clauses (ii) - (iii) shall be referred to herein as the "<u>Required Lien Priority</u>").

(b)      In the event any assets or property is transferred to any Borrower, such asset or property shall be subject in all respects to the Lender's Liens (other than assets or property constituting Excluded Assets).

(c)      Notwithstanding anything to the contrary set forth above with respect to the Carve Out, nothing herein shall be construed to impair the ability of the Lender to object to the fees, expenses, reimbursement or compensation described in clauses (iii) or (iv) of the defined term "Carve Out" on any grounds.

(d)      The Super-priority Claims referred to in this <u>Section 9.1</u> shall have the priority afforded to such Super-priority Claims in the DIP Orders.

9.2 **Grant of Security Interest in the Collateral**. Subject to the terms and conditions of the DIP Orders and the Subordination Agreement, to secure the payment and performance of the Obligations, each Loan Party hereby grants, pledges and assigns to the Lender the following:

(a) **Liens on Unencumbered Property**. Pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected first priority senior liens and security interests in all proceeds of the Facility in the Designated Account, the Designated Account, and the DIP Lender Holdback, and second priority senior liens and security interests in all other Collateral, regardless of where located and subject in each case only to (w) the Advisor Transaction Fees, (x) the Priming Obligations, (y) the Carve Out and (z) other Permitted Liens so long as such liens were validly perfected as of the Petition Date (or were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code).

(b) **Liens Junior to Other Liens**. Pursuant to Section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected junior liens on and security interests in all Collateral (other than as set forth in clause (a) above).

9.3 **Representations and Warranties in Connection with Security Interest**. Each Borrower represents and warrants to the Lender as follows:

(a) Subject to the approval of the Bankruptcy Court, each Borrower has full right and power to grant to the Lender a perfected, security interest and Lien, in accordance with the Required Lien Priority, on such Borrower's respective interests in the Collateral pursuant to this Agreement and the other Loan Documents.

(b) Subject to the approval of the Bankruptcy Court, upon (i) the execution and delivery of this Agreement, and (ii) the filing of the necessary financing statements and other appropriate filings or recordations and/or delivery of any necessary certificates, as applicable, the Lender will have a good, valid and perfected Lien and security interest in the Collateral granted by the applicable Borrower, in accordance with the Required Lien Priority, subject to no transfer or other restrictions or Liens of any kind in favor of any other Person, except the Permitted Liens and other restrictions previously disclosed to the Lender by the Borrowers prior to the Effective Date.

(c) As of the Effective Date, no financing statement, mortgage or any other evidence of lien relating to any of the Collateral granted by any Borrower is on file in any public office except those on behalf of the Lender, those on behalf of the Priming Lender and those listed on Schedule 6.2.

9.4 **Lender's Ability to Perform Obligations on Behalf of Borrowers with Respect to the Collateral**. The Lender shall have the right, but not the obligation, upon five (5) days' written notice to the Borrowers, to perform on the Borrowers' behalf any or all of the Borrowers' obligations under this Agreement with respect to the Collateral, when such obligations are due, at the expense, for the account and at the sole risk of the applicable Borrower.

9.5 **Filing of Financing Statements**. The Borrowers irrevocably authorizes the Lender to prepare and file financing statements provided for by the UCC, including, without limitation, describing such property as "all assets, whether now owned or hereafter acquired, developed or created" or words of similar effect, to perfect the Lender's security interest in the Collateral, in all jurisdictions in which the Lender believes in its sole opinion that such filing is appropriate. The Borrowers also irrevocably authorizes the Lender to file such continuation statements and amendments and to take such other action as may be required or appropriate, in either case in the Lender's sole judgment, in order to perfect and to continue the perfection of the Lender's security interests in the Collateral, unless prohibited by law.

-38-

9.6    **No Discharge; Survival of Claims**. Pursuant to Section 1141(d)(4) of the Bankruptcy Code, the Borrowers hereby waive any discharge of the Obligations with respect to any plan of reorganization that shall not provide for the indefeasible payment in full in cash of the Obligations under this Agreement, unless the Lender, in its sole discretion, has otherwise agreed in writing to such treatment.

10.    **WAIVERS; INDEMNIFICATION**.

10.1    **Demand; Protest; etc.** To the extent permitted by applicable law or as expressly required pursuant to the terms of this Agreement, the Borrowers and the other Loan Parties waive demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guarantees at any time held by the Lender on which the Borrowers may in any way be liable.

10.2    **Lender's Liability for Collateral**. As long as the Lender complies with its obligations, if any, under the UCC and applicable law, the Lender shall not in any way or manner be liable or responsible for: (i) the safekeeping of the Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, warehouseman, bailee, forwarding agency, or other Person. All risk of loss, damage, or destruction of the Collateral shall be borne by the Borrowers, except any thereof resulting from the gross negligence, bad faith or willful misconduct of the Lender as finally determined by a court of competent jurisdiction.

10.3    **Indemnification**. The Loan Parties shall pay, indemnify, defend, and hold the Lender Related Persons (each, an "Indemnified Person") harmless (to the fullest extent permitted by law) for any losses, claims, damages, liabilities, expenses, penalties, fined, actions, judgment, and disbursements of any kind or nature whatsoever (including reasonable and documented out of pocket fees and disbursements of experts, consultants and counsel) incurred by any of them (a) in connection with or as a result of or related to the execution and delivery, enforcement, performance, or administration (including any restructuring or workout with respect hereto) of this Agreement, any of the other Loan Documents, or the transactions contemplated hereby or thereby or the monitoring of the Borrowers' compliance with the terms of the Loan Documents, (b) with respect to any investigation, litigation, or proceeding related to this Agreement, any other Loan Document, or the use of the proceeds of the credit provided hereunder (irrespective of whether any Indemnified Person is a party thereto), or any act, omission, event, or circumstance in any manner related thereto, and (c) in connection with or arising out of any presence or release of Hazardous Materials at, on, under, to or from any Collateral or any Environmental Actions, Environmental Liabilities or Remedial Actions related in any way to any Collateral (each and all of the foregoing, the "Indemnified Liabilities"). For the avoidance of doubt, the Indemnified Liabilities shall not include any losses, claims, damages, liabilities, expenses, penalties, fined, actions, judgment, or disbursements arising out of Excluded Claims. The foregoing to the contrary notwithstanding, the Loan Parties shall have no obligation to any Indemnified Person under this Section 10.3 (i) with respect to any Indemnified Liability that a court of competent jurisdiction finally determines to have resulted from the gross negligence, bad faith, fraud or willful misconduct of such Indemnified Person, or (ii) to the extent arising out of any loss, claim, damage, liability or expense that does not involve an act or omission of the Loan Parties and that is brought by an Indemnified Person against another Indemnified Person (other than claims against an Indemnified Person in its capacity or in fulfilling its role as the Lender under the Loan Documents). This provision shall survive the termination of this Agreement and the repayment of the Obligations.

11.    **NOTICES**.

All notices or demands relating to this Agreement or any other Loan Document shall be in writing and shall be personally delivered or sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or electronic mail (at such email addresses as a party may designate in

accordance herewith). In the case of notices or demands to any party hereunder or any service of process to any party hereunder, they shall be sent to the respective addresses set forth below:

If to the Borrowers:

Sorrento Therapeutics, Inc.
c/o Scintilla Pharmaceuticals, Inc.
4955 Directors Place
San Diego, CA 92121
Attn:          Mohsin Y. Meghji, Chief Restructuring Officer
Telephone:    212-202-2300
Email:        mmeghji@m3-partners.com

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Attn:          Caroline Reckler
               Melissa Alwang
Telephone:    +1.312.876.7663
Email:        Caroline.Reckler@lw.com
               Melissa.Alwang@lw.com

If to the Lender:

SCILEX HOLDING COMPANY
960 San Antonio Rd.
Palo Alto, CA 94303
Attn:          Stephen Ma
Telephone:    (650) 516-4310
Email:        sma@scilexholding.com

with a copy to (which shall not constitute notice):

Paul Hastings LLP
695 Town Center Drive, Seventeenth Floor
Costa Mesa, CA 92626
Attention: Katherine Bell
Email: katherinebell@paulhastings.com

Any party hereto may change the address at which they are to receive notices hereunder, by notice in writing in the foregoing manner given to the other party. All notices or demands sent in accordance with this Article 11, shall be deemed received on the earlier of the date of actual receipt or five (5) Business Days after the deposit thereof certified, return receipt requested in the mail; provided that (a) notices sent by overnight courier service shall be deemed to have been given when received, and (b) notices by electronic mail shall be deemed received when sent upon confirmation of transmission as evidenced by a delivery receipt or similar electronic mail function. If any notice, disclosure, or report is required to be delivered pursuant to the terms of this Agreement on a day that is not a Business Day, such notice, disclosure, or report shall be deemed to have been required to be delivered on the immediately following Business Day.

12.      **CHOICE OF LAW AND VENUE; JURY TRIAL WAIVER**.

(a)      THE VALIDITY OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT), THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF AND THEREOF, AND THE RIGHTS OF THE PARTIES HERETO AND THERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

(b)      THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE TRIED AND LITIGATED ONLY IN THE BANKRUPTCY COURT AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN NEW YORK; PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE THE LENDER OR SUCH LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. THE BORROWERS AND THE LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF _FORUM NON CONVENIENS_ OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 12(b); PROVIDED, FURTHER, HOWEVER, THAT ALL PARTIES HEREBY AGREE THAT THEY HAVE CONSENTED TO THE JURISDICTION OF THE BANKRUPTCY COURT AND THAT THE BANKRUPTCY COURT WILL RETAIN EXCLUSIVE JURISDICTION WITH RESPECT TO ALL DISPUTES SO LONG AS THE CHAPTER 11 CASES REMAIN PENDING.

(c)      **THE LOAN PARTIES AND THE LENDER HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. THE BORROWERS AND THE LENDER ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN THEIR RELATED FUTURE DEALINGS. EACH OF THE LOAN PARTIES AND THE LENDER EACH WARRANTS AND REPRESENTS THAT IT HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.**

(d)      **JUDICIAL REFERENCE IN THE EVENT OF JURY TRIAL WAIVER UNENFORCEABILITY. IN THE EVENT THAT THE JURY TRIAL WAIVER CONTAINED HEREIN SHALL BE HELD OR DEEMED TO BE UNENFORCEABLE, EACH LOAN PARTY HEREBY EXPRESSLY AGREES TO SUBMIT TO JUDICIAL REFERENCE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE §§ 638, ET SEQ., ANY CLAIM, DEMAND, ACTION, OR CAUSE OF ACTION ARISING HEREUNDER FOR WHICH A JURY TRIAL WOULD OTHERWISE BE APPLICABLE OR AVAILABLE. PURSUANT TO SUCH JUDICIAL REFERENCE, EACH LOAN PARTY AGREES TO THE APPOINTMENT OF A SINGLE REFEREE AND SHALL USE ITS BEST EFFORTS TO AGREE ON THE SELECTION OF A REFEREE. IF THE PARTIES TO THE DISPUTE ARE UNABLE TO AGREE ON A SINGLE**

-41-

**REFEREE, A REFEREE SHALL BE APPOINTED BY THE COURT TO HEAR ANY DISPUTES HEREUNDER IN LIEU OF ANY SUCH JURY TRIAL. EACH LOAN PARTY ACKNOWLEDGES AND AGREES THAT THE APPOINTED REFEREE SHALL HAVE THE POWER TO DECIDE ALL ISSUES IN THE APPLICABLE ACTION OR PROCEEDING, WHETHER OF FACT OR LAW, AND SHALL REPORT A STATEMENT OF DECISION THEREON. EACH BORROWER AGREES THAT THE PROVISIONS CONTAINED HEREIN HAVE BEEN FAIRLY NEGOTIATED ON AN ARM'S-LENGTH BASIS, WITH EACH LOAN PARTY AGREEING TO THE SAME KNOWINGLY, AND BEING AFFORDED THE OPPORTUNITY TO HAVE LOAN PARTIES' LEGAL COUNSEL CONSENT TO THE MATTERS CONTAINED HEREIN. ANY PARTY MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THE RIGHT TO TRIAL BY JURY AND THE AGREEMENTS CONTAINED HEREIN REGARDING THE APPLICATION OF JUDICIAL REFERENCE IN THE EVENT OF THE INVALIDITY OF SUCH JURY TRIAL WAIVER.**

**13.     AMENDMENTS; WAIVERS; SUCCESSORS**.

13.1     **Amendments and Waivers**. No amendment, waiver or other modification of any provision of this Agreement or any other Loan Document, and no consent with respect to any departure by the Borrowers or any other Loan Parties therefrom, shall be effective unless the same shall be in writing and signed by the Lender and Borrowers that are party thereto and then any such waiver or consent shall be effective, but only in the specific instance and for the specific purpose for which given.

13.2     **No Waivers; Cumulative Remedies**. No failure by the Lender to exercise any right, remedy, or option under this Agreement or any other Loan Document, or delay by the Lender or such Lender in exercising the same, will operate as a waiver thereof. No waiver by Lender will be effective unless it is in writing, and then only to the extent specifically stated. No waiver by the Lender on any occasion shall affect or diminish the Lender's rights thereafter to require strict performance by the Loan Parties of any provision of this Agreement. The Lender's rights under this Agreement and the other Loan Documents will be cumulative and not exclusive of any other right or remedy that the Lender may have.

13.3     **Successors**. This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided that no Borrower or other Loan Party may assign this Agreement or any rights or duties hereunder without the Lender's prior written consent and such consent shall not, unless otherwise provided in such consent, release the Borrowers or any Loan Party from its Obligations. Any assignment by a Borrower or other Loan Party which is not explicitly permitted hereunder shall be absolutely void *ab initio*. The Lender (with the consent of Borrowers which shall not be unreasonably withheld or delayed (and shall not be required if an Event of Default has occurred and is continuing), and which consent shall be deemed given if the Borrowers do not respond to such request within five (5) Business Days), may freely assign all or part of its rights and duties hereunder to any Person.

**14.     GENERAL PROVISIONS**.

14.1     **Effectiveness**. This Agreement shall be binding and deemed effective when executed by the Borrowers, the other Loan Parties (if any) and the Lender.

14.2     **Section Headings**. Headings and numbers have been set forth herein for convenience only. Unless the contrary is compelled by the context, everything contained in each Section applies equally to this entire Agreement.

14.3     **Interpretation**. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed against Lender or the Loan Parties, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to accomplish fairly the purposes and intentions of all parties hereto.

14.4     **Severability of Provisions**. Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

14.5     **Debtor-Creditor Relationship**. The relationship between the Lender, on the one hand, and Borrowers and other Loan Parties (if any), on the other hand, is solely that of creditor and debtor, as applicable. Lender has not (and shall not be deemed to have) any fiduciary relationship or duty to the Borrowers or the Loan Parties arising out of or in connection with the Loan Documents or the transactions contemplated thereby, and there is no agency or joint venture relationship between the Lender, on the one hand, and Borrowers and the other Loan Parties, on the other hand, by virtue of any Loan Document or any transaction contemplated therein.

14.6     **Counterparts; Electronic Execution**. This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis*.

14.7     **Revival and Reinstatement of Obligations**. If the incurrence or payment of the Obligations by Borrowers or the transfer to the Lender of any property should for any reason subsequently be asserted, or declared, to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (each, a "Voidable Transfer"), and if the Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Lender is required or elects to repay or restore, and as to all reasonable and actual out-of-pocket costs, expenses, and attorneys' fees of the Lender related thereto, the liability of Borrowers automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made.

14.8     **Lender Expenses**. Subject to the Subordination Agreement, the Loan Parties agree to pay any and all Lender Expenses promptly after written demand therefor by the Lender if funds in the DIP Lender Holdback are insufficient to cover the entire amount of Lender Expenses (subject to the procedures set forth in the DIP Orders) and such Obligations shall survive payment or satisfaction in full of all other Obligations. Any Lender Expenses that are paid directly by the Lender (other than through the DIP Lender Holdback and after the exhaustion of the funds deposited therein) at any time before the Priming Obligations have been repaid in full shall be added to the principal amount of the Loans but at all times shall remain subject to the Subordination Agreement. Any Lender Expenses (other than the Lender Expenses paid through the DIP Lender Holdback and after the exhaustion of the funds deposited therein) that are due and payable at any time after the Priming Obligations have been repaid in full shall be paid in cash by the Borrowers.

14.9     **Integration**. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

## 15.     JOINT AND SEVERAL OBLIGATIONS.

**IN ADDITION TO, AND WITHOUT LIMITING ANY TERM OR PROVISION OF, THIS AGREEMENT, ALL OBLIGATIONS HEREUNDER AND UNDER THE LOAN DOCUMENTS OF EACH BORROWER ARE JOINT AND SEVERAL. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE OBLIGATIONS OF EACH BORROWER SHALL NOT BE AFFECTED BY (I) THE FAILURE OF THE LENDER TO ASSERT ANY CLAIM OR DEMAND OR TO ENFORCE OR EXERCISE ANY RIGHT OR REMEDY AGAINST ANY OTHER BORROWER UNDER THE PROVISIONS OF THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR OTHERWISE, (II) ANY RESCISSION, WAIVER, AMENDMENT OR MODIFICATION OF, OR ANY RELEASE FROM ANY OF THE TERMS OR PROVISIONS OF, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR (III) THE FAILURE TO PERFECT ANY SECURITY INTEREST IN, OR THE RELEASE OF, ANY OF THE COLLATERAL OR OTHER SECURITY HELD BY THE LENDER.**

## 16.     ADDITIONAL LOAN PARTIES.

In the event a Loan Party is added to this Agreement as required hereunder, all references herein to Borrowers (other than Loans made to Borrowers) shall also apply to any such additional Loan Party, including, without limitation, the granting of a security interest in the Collateral and all representations, warranties, covenants and other obligations of Borrowers hereunder.

## 17.     TREATMENT OF CERTAIN INFORMATION.

The Lender agrees to treat as confidential all non-public information supplied by the Borrowers or any of other Loan Parties pursuant to the Loan Documents or otherwise in connection herewith ("Information") and to use reasonable precautions to maintain such confidentiality, in accordance with its customary procedures for handling confidential information of the same nature; provided, however that nothing herein shall limit the disclosure of any such Information (i) to any Lender Related Person as need to know such Information, (ii) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, or requested by any bank regulatory authority provided, the Lender agrees, to the extent practicable, to notify the Borrowers prior to such disclosure and cooperate with the Borrowers in obtaining an appropriate protective order, (iii) to auditors or accountants, and any analogous counterpart thereof, (iv) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to the Loan Document or the enforcement of rights thereunder, (v) to the extent such Information (A) becomes publicly available other than as a result of a breach of this Agreement, (B) becomes available to the Lender or such Lender on a confidential basis from a source other than the Borrowers or the other Loan Parties, or (C) was available to the Lender on a non-confidential basis prior its disclosure to it by the Borrowers, any other Loan Party, or any of their advisors, and (vi) to the extent the Borrowers shall have consented to such disclosure in writing.

*[Signature pages follow.]*

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed and delivered as of the date first above written.

<u>**BORROWERS**</u>:

**SORRENTO THERAPEUTICS, INC**.
**SCINTILLA PHARMACEUTICALS, INC**

By: _____

Name: _____

Title: _____

**<u>LENDER</u>**

**SCILEX HOLDING COMPANY**


By: _____
Name:
Title:

**EXHIBIT A**

**RESERVED**

## **EXHIBIT B**

### **Approved Budget**

See attached.

**EXHIBIT C**

**Reporting Requirements**

       (a)     **Financial Reports**. Borrowers shall furnish to the Lender, which, subject to the following sentence, shall be in a form reasonably satisfactory to the Lender, as soon as available and in any event within thirty (30) days after the end of each calendar month (or within such longer period as the Lender may agree to in its reasonable discretion), unaudited cash receipts and disbursements, asset and liability status and income statement for such calendar month and/or quarter, as applicable, for each of the Borrowers, all of which shall be certified on behalf of the Borrowers by an Authorized Person.

The information required under this clause (a) above may be satisfied by delivery of the monthly operating reports as filed in the Chapter 11 Cases.

       (b)     **Other Materials**. The Borrowers shall furnish to the Lender, in form and substance satisfactory to Lender, as soon as available and in any event within three (3) Business Days after (A) the receipt by the Borrowers of copies of any reports and management control letters provided by the Borrowers' independent accountants and (B) the request therefor by the Lender of such additional information, documents, statements, and other materials as the Lender may reasonably request from time to time in its sole discretion and which is reasonably capable of being obtained, produced or generated by the Borrowers within such three (3) Business Days period; provided that in no event shall the Borrowers be required to provide any information, documents, statements, and other materials that is subject to attorney-client or other privilege or that consists of attorney work product.

       (c)     **Updates**. The Borrowers shall furnish to the Lender revisions to the schedules to any Loan Document to the extent necessary or appropriate (as determined by the Borrowers in the good faith exercise of their business judgment); provided, that delivery or receipt thereof by the Lender shall not constitute a waiver by the Lender or a cure of any Default or Event of Default resulting therefrom.

Exhibit C-2

**<u>EXHIBIT D</u>**

**RESERVED**

## EXHIBIT E

## GUARANTOR JOINDER AGREEMENT

THIS GUARANTOR JOINDER AGREEMENT (this "Agreement"), dated as of [ ], 2023, is entered into between [ ], a [ ] (the "New Subsidiary") and SCILEX HOLDING COMPANY, as Lender (in such capacity, together with its successors and assigns in such capacity, "Lender") under that certain Junior Secured Debtor-In-Possession Loan and Security Agreement, dated as of July [ ● ], 2023 (as amended, restated, supplemented, replaced, renewed or otherwise modified from time to time, the "Loan Agreement") by and among Sorrento Therapeutics, Inc. and Scintilla Pharmaceuticals, Inc. (each, a "Borrower" and collectively, the "Borrowers"), the guarantors party thereto and SCILEX HOLDING COMPANY (the "Lender"). Capitalized terms used in this Agreement without definition shall have the same meanings herein as they have in the Loan Agreement. This Agreement constitutes a Loan Document.

The New Subsidiary and the Lender, hereby agree as follows:

1.      The New Subsidiary hereby acknowledges, agrees and confirms that, by its execution of this Agreement, the New Subsidiary will be deemed to be a Loan Party under the Loan Agreement and a "Guarantor" for all purposes of the Loan Agreement and shall have all of the obligations of a Loan Party and a Guarantor thereunder as if it had executed the Loan Agreement. The New Subsidiary hereby ratifies, as of the date hereof, and agrees to be bound by, all of the terms, provisions and conditions contained in the Loan Agreement, including without limitation (a) all of the representations and warranties of the Borrowers set forth in Article 4 of the Loan Agreement, (b) all of the covenants set forth in Articles 5 and 6 of the Loan Agreement and (c) all of the guaranty obligations set forth in Article 7 of the Loan Agreement. Without limiting the generality of the foregoing terms of this paragraph 1, the New Subsidiary, subject to the limitations set forth in Article 7 of the Loan Agreement, hereby guarantees, jointly and severally with the other Guarantors, to the Lender, as provided in Article 7 of the Loan Agreement, the prompt payment and performance of the Obligations in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise) strictly in accordance with the terms thereof and agrees that if any of the Obligations are not paid or performed in full when due (whether at stated maturity, as a mandatory prepayment, by acceleration or otherwise), the New Subsidiary will, jointly and severally together with the other Loan Guarantors, promptly pay and perform the same, without any demand or notice whatsoever, and that in the case of any extension of time of payment or renewal of any of the Obligations, the same will be promptly paid in full when due (whether at extended maturity, as a mandatory prepayment, by acceleration or otherwise) in accordance with the terms of such extension or renewal.

2.      The New Subsidiary hereby waives acceptance by the Lender of the guaranty by the New Subsidiary upon the execution of this Agreement by the New Subsidiary.

3.      This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be an original, but all of which shall constitute one and the same Agreement. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

4.      THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

IN WITNESS WHEREOF, the New Subsidiary has caused this Agreement to be duly executed by its authorized officer, and the Lender, has caused the same to be accepted by its authorized officer, as of the day and year first above written.

[NEW SUBSIDIARY]

By: _____

Name: _____

Title: _____

Acknowledged and accepted:

SCILEX HOLDING COMPANY, as Lender

By: _____

Name: _____

Title: _____

[Signature Page to Guarantor Joinder Agreement]

**Exhibit 2**

**Subordination Agreement**

*Execution Version*

## INTERCREDITOR AND SUBORDINATION AGREEMENT

This Agreement (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") is entered into as of July 5, 2023 by and among JMB CAPITAL PARTNERS LENDING, LLC, a California limited liability company (in its capacity as the lender under the Senior DIP Agreement referred to below, the "Senior Lender") and SCILEX HOLDING COMPANY, a Delaware corporation (in its capacity as the lender under the Junior DIP Loan Documents referred to below, the "Subordinated Lender", and together with the Senior Lender, each a "Lender" and collectively, the "Lenders").

## RECITALS

A.      Sorrento Therapeutics, Inc., a Delaware corporation ("Sorrento") and Scintilla Pharmaceuticals, Inc., a Delaware corporation ("Scintilla", and together with Sorrento, each a "Borrower" and collectively, the "Borrowers"), the guarantors from time to time party thereto (each a "Guarantor" and collectively, the "Guarantors", and together with the Borrowers, each a "Loan Party" and collectively, the "Loan Parties"), and the Senior Lender are parties to that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement, dated as of March 30, 2023 (as amended, supplemented, amended and restated or otherwise modified from time to time, the "Senior DIP Agreement"), pursuant to which the Senior Lender has agreed to provide a new money multiple draw term loan in the aggregate principal amount of up to $75,000,000.

B.      On July 5, 2023, the Bankruptcy Court entered that certain Interim Order (I) Authorizing the Debtors to (A) Obtain Junior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Super Priority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief (the "Junior Interim Order"), authorizing the Borrowers to borrow the Junior DIP Loans (as defined below) under the Junior DIP Facility (as defined below), on the terms and conditions set forth in that certain Debtor-in-Possession Term Loan Facility Summary of Terms and Conditions, dated July 5, 2023 (the "Junior DIP Term Sheet") and the other Junior DIP Loan Documents (as defined below).

C.      Pursuant to terms of the Senior DIP Agreement, the Senior Lender's consent is required for the Loan Parties to enter into the Junior DIP Loan Documents.

D.      As a condition precedent to the Senior Lender's consent to the consummation of the transactions contemplated by the Junior DIP Loan Documents, the Senior Lender has required execution and delivery of this Agreement by the Subordinated Lender and the Loan Parties to specify the relative rights and priorities of the Senior Lender under the Senior DIP Agreement and the Subordinated Lender under the Junior DIP Loan Documents.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Lenders agree as follows:

## 1.      Definitions.

All capitalized terms used but not otherwise defined herein shall have the meanings given them in the Senior DIP Agreement.  In addition, as used herein, the following terms have the meanings set forth below:

"Acceptable 363 Sale" means a sale of all or substantially all of the Borrowers' assets pursuant to Section 363 of the Bankruptcy Code, subject to the following conditions: (i) the Senior Lender shall have reviewed and approved in writing (with email being sufficient) in its reasonable discretion any "stalking horse" asset purchase agreement (the "Stalking Horse Purchase Agreement"), the bidding procedures governing a sale of any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code (the "Bidding Procedures"), any order or proposed order approving the Bidding Procedures (the "Bidding Procedures Order"), any order or proposed order approving a sale of all or any portion of the Collateral pursuant to Section 363 of the Bankruptcy Code (a "Sale Order"), any motions seeking entry of a Sale Order or approval of the Bidding Procedures, or (ii) the Senior Obligations will be paid in full at the closing of such sale.

"Acceptable Plan" means a plan of reorganization or liquidation for the Chapter 11 Cases that (x) provides for the indefeasible payment in full in cash of the Senior Obligations on or prior to the Maturity Date, in exchange for full discharge thereof, on or prior to the effective date of the plan as a condition to the effectiveness thereof or (y) is otherwise approved in writing (with email being sufficient) by the Senior Lender.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas or any other court having jurisdiction over the Chapter 11 Cases or any proceeding therein from time to time.

"Chapter 11 Cases" means the bankruptcy cases filed under Chapter 11 of Title 11 of the United States Bankruptcy Code by the Loan Parties with the Bankruptcy Court, which are being jointly administered under the lead case filed by Sorrento, Case No. 23-90085, and any successor cases thereto.

"Collateral" means any real or personal property in which each of the Lenders have a Lien to secure performance under the Senior DIP Agreement or Junior DIP Loan Documents, as applicable, and payment of the Senior Obligations or Junior Obligations, as applicable.

"Distribution" means, with respect to any indebtedness or other obligation, (a) any payment or distribution by any Person of cash, securities, property, or other assets, by set-off or otherwise, on account of such indebtedness or obligation, (b) any redemption, purchase, or other acquisition of such indebtedness or obligation by any Loan Party or any affiliate thereof.

"Junior DIP Account" means the DIP Account (as defined in the Junior DIP Term Sheet).

"Junior DIP Account Collateral" means all loan proceeds from the Junior DIP Loans held in the Junior DIP Account.

"Junior DIP Facility" has the meaning specified in the Junior Interim Order.

"Junior DIP Lender Holdback" has the meaning specified in the Junior Interim Order.

"Junior DIP Loan Documents" has the meaning specified in the Junior Interim Order.

"Junior DIP Loans" has the meaning specified in the Junior Interim Order.

"Lien" means any mortgage, deed of trust, pledge, hypothecation, assignment, deposit arrangement, security interest, encumbrance, lien (statutory or otherwise), charge, preference, priority or other preferential arrangement in the nature of a security interest of any kind (including,

-2-

without limitation, any agreement to give any of the foregoing), any conditional sale or other title retention agreement, any lease in the nature of any of the foregoing, and any filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction.

"Permitted Junior Payment" means (i) payments for the reimbursement of all reasonable and documented out-of-pocket fees, costs, disbursements and expenses owing by the Borrowers to the Subordinated Lender under the Junior DIP Loan Documents, including, without limitation, the reasonable and documented fees and expenses of (A) Paul Hastings LLP (solely in its capacity as counsel to the Subordinated Lender in its capacity as such) and (B) any other professionals that may be retained by the Subordinated Lender (solely in their capacity as such), in each case, which payments may be made solely from the Junior DIP Lender Holdback until such amount is exhausted, and thereafter, solely by the payment-in-kind of such amounts by adding such amounts to the principal balance of the Junior DIP Loans, (ii) repayment of the Junior DIP Loans solely from any unused proceeds of the Junior DIP Loans remaining in the Junior DIP Account if the Final Order (as defined in the Junior Interim Order), on terms reasonably acceptable to the Subordinated Lender, is not entered by the Bankruptcy Court on or before July 31, 2023, (iii) without duplication of clause (i) above, payments in-kind, original issue discount or net funding of accrued interest and fees due on the Subordinated Obligations at the rates set forth in the Junior DIP Loan Documents, and (iv) payments in the form of Reorganization Subordinated Securities. For the avoidance of doubt, at any time prior to the Senior Indebtedness Termination Date, in the case of (a) clause (i), no such Permitted Junior Payment may be made out of the proceeds of any Collateral other than the Junior DIP Lender Holdback, or amounts added to the principal balance of the Junior DIP Loan in accordance with the terms hereof and (b) clause (ii), no such Permitted Junior Payment may be made out of the proceeds of any Collateral other than the Junior DIP Account Collateral, the Junior DIP Lender Holdback, or amounts added to the principal balance of the Junior DIP Loan in accordance with the terms hereof, in each case absent the Senior Lender's written consent otherwise.

"Reorganization Subordinated Securities" means any equity securities issued by any Loan Party or any other Person, provided that if such equity securities provide for mandatory redemption or mandatory dividend payments, the payment thereof shall be subordinated in right of payment, at least to the same extent provided in this Agreement with respect to the Subordinated Obligations, to the payment in full of the Senior Obligations and to the payment in full of all debt or equity securities having such features issued in exchange for the Senior Obligations to the holders of Senior Obligations.

"Secured Lender Remedies" means any action which results in the sale, foreclosure, realization upon, or a liquidation of any of the Collateral including, without limitation, the exercise or any of the rights or remedies of a "secured party" under Article 9 of the Uniform Commercial Code, such as, without limitation, the notification of account debtors and shall also include any legal proceeding or action to have any stay applicable to the Collateral lifted in any of the Chapter 11 Cases and any action or proceeding against any Loan Party to recover all or any part of the Subordinated Obligations, or take possession of, sell or dispose of any Collateral; provided that the following shall not constitute "Secured Lender Remedies":  (i) the acceleration of the Senior Obligations or the Subordinated Obligations, provided, however, that the mere acceleration of the Subordinated Obligations shall not allow the Junior Lender to exercise any other rights or remedies to collect any payment on account of the Subordinated Obligations except as otherwise permitted by clause (ii) hereof or to foreclose on the Collateral (other than the Junior DIP Account Collateral); (ii) the exercise by the Subordinated Lender of rights to set-off against the Junior DIP Holdback Amount or the Junior DIP Account Collateral solely to make the Permitted Junior Payments under

-3-

clauses (i) and (ii) of the definition thereof; (iii) the acceptance by the Subordinated Lender of Permitted Junior Payments in accordance with the terms of this Agreement and application of such Permitted Junior Payments to the Subordinated Obligations in accordance with the Junior DIP Loan Documents; (iv) the taking of any action to protect or preserve the perfection, priority or enforceability of any security interest or lien securing the Subordinated Obligations consistent with the terms of this Agreement and so long as such actions do not affect the Senior Lender's lien on the Collateral; (v) the execution and delivery of definitive financing documentation with respect to the Junior DIP Facility and the Junior DIP Loans in a form consistent with and substantially similar to the Senior DIP Agreement as in effect on the date hereof, as modified to reflect the nature of the Junior DIP Facility as a second lien financing and the terms of the Junior DIP Term Sheet as in effect on the date hereof; (vi) file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding, or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Subordinated Lender, including any claims secured by the Collateral, if any; and (vii) vote on any plan of reorganization and make any filings and motions that are, in each case, not in contravention of the provisions of this Agreement, with respect to the Subordinated Obligations and the Collateral.

"Senior Indebtedness Termination Date" means the date when the Senior Obligations shall have been indefeasibly paid in full in cash and the Senior DIP Agreement shall be irrevocably terminated pursuant to its terms.

"Senior Loan Documents" means the Loan Documents as defined in the Senior DIP Agreement (as in effect on the date hereof).

"Senior Obligations" means all Obligations (as defined in the Senior DIP Agreement) and other obligations owing by any Loan Party to the Senior Lender, whether such debt, liability or obligation now exists or is hereafter created or incurred, and whether it is or may be direct or indirect, due or to become due, absolute or contingent, primary or secondary, liquidated or unliquidated, or joint, several or joint and several, including but not limited to the indebtedness evidenced by any Senior DIP Agreement, in each case, issued or incurred in connection with, under or pursuant to, the Senior DIP Agreement and the other Loan Documents (as defined in the Senior DIP Agreement), including all interest, fees, costs and expenses of collection, including attorneys fee; and legal expenses, and all renewals, extensions and modifications thereof and any notes issued in whole or partial substitution therefor.

"Subordinated Obligations" means all of the obligations of the Loan Parties to the Subordinated Lender as evidenced by or incurred pursuant to the Junior DIP Loan Documents, including without limitation principal, interest, fees thereon, and costs and expenses of collection including attorneys' fees and legal expenses.

## 2. Subordination.

The payment of the Subordinated Obligations is expressly subordinated to the Senior Obligations in right to payment in all respects. At all times from and after the date of this Agreement and until the Senior Indebtedness Termination Date, the Subordinated Lender shall not, without the prior written consent of the Senior Lender, demand, receive or accept any direct or indirect payment or distribution of any kind or character whatsoever (whether in cash, securities, other property, by set-off, or otherwise) on account of the Subordinated Obligations, other than Permitted Junior Payments. Under no circumstance shall any Secured Lender Remedy be taken by the Subordinated Lender against any Loan Party or the Collateral until the Senior Indebtedness Termination Date has occurred, in each case with respect to any of the Subordinated

-4-

Obligations (including to assert, enforce or collect any of the Subordinated Obligations), in each case, except with the prior written consent of the Senior Lender.

3.      **Security Interest Subordination.**

a)      <u>Acknowledgment of Lien</u>.  Each Lender agrees and acknowledges that the other Lender has been granted a Lien upon the Collateral.

b)      <u>Priority</u>.  Notwithstanding the order or time of attachment, or the order, time or manner of perfection, or the order or time of filing or recordation of any document or instrument, or other method of perfecting a Lien in favor of each Lender in any Collateral and notwithstanding any conflicting terms or conditions which may be contained in any other agreement, until the Senior Indebtedness Termination Date, the Liens upon the Collateral securing the Senior Obligations shall have priority over the Liens upon the Collateral securing the Subordinated Obligations and such Liens securing the Subordinated Obligations are and shall be, in all respects, subject and subordinate to the Liens securing the Senior Obligations to the full extent of the Senior Obligations outstanding from time to time; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary contained in the foregoing, the Liens upon the Junior DIP Account Collateral and the Junior DIP Lender Holdback securing the Subordinated Obligations shall have priority over the Liens upon the Junior DIP Account Collateral and the Junior DIP Lender Holdback securing the Senior Obligations, and the Liens upon the Junior DIP Account Collateral and the Junior DIP Lender Holdback securing the Senior Obligations are and shall be, in all respects, subject and subordinate to the Liens upon the Junior DIP Account Collateral and the Junior DIP Lender Holdback securing the Subordinated Obligations to the full extent of the Subordinated Obligations outstanding from time to time.

c)      <u>No Alteration of Priority</u>.  The Lien priorities provided in Section 3(b) of this Agreement shall not be altered or otherwise affected by any amendment, modification, supplement, extension, renewal, restatement or refinancing of the Senior Obligations or the Subordinated Obligations, nor by any action or inaction which Senior Lender or the Subordinated Lender may take or fail to take in respect of the Collateral nor by any order of the Bankruptcy Court.

d)      <u>Perfection</u>.  Each Lender shall be solely responsible for perfecting and maintaining the perfection of its respective security interest in the Collateral.  The foregoing provisions of this Agreement are intended solely to govern the respective Lien priorities between the Lenders and shall not impose on the Senior Lender any obligations in respect of the disposition of proceeds of foreclosure on any Collateral which would conflict with prior perfected claims therein in favor of any other Person.  Subordinated Lender agrees that it will not contest the validity, perfection, priority or enforceability of the Liens of the Senior Lender in the Collateral and that as between the Lenders, the terms of this Agreement shall govern even if part or all of the Senior Obligations or the Liens of Senior Lender securing payment and performance thereof are avoided, disallowed, set aside or otherwise invalidated in any judicial proceeding or otherwise.

e)      <u>Management of Collateral</u>.  Senior Lender shall have the exclusive right to manage, perform and enforce the terms of the Senior DIP Agreement with respect to the Collateral (other than the Junior DIP Account) and to exercise and enforce all privileges and rights thereunder according to its discretion and exercise of its business judgment including, without limitation, the exclusive right to take or retake control or possession of the Collateral (other than the Junior DIP Account) and to hold, prepare for sale, process, sell, lease, dispose of, or liquidate the Collateral (other than the Junior DIP Account). The Senior Lender shall not have any duty to preserve, protect, care for, insure, take possession of, collect, dispose of, or otherwise realize upon any of the Collateral, and in no event shall the Senior Lender be deemed the agent for the Subordinated Lender with respect to the Collateral.   In connection therewith,

Subordinated Lender hereby waives and all rights to affect the method or challenge the appropriateness of any action by Senior Lender.

        f)     <u>Sale of Collateral</u>. Only the Senior Lender shall have the right to restrict or permit, or approve or disapprove, the sale, transfer or other disposition of Collateral (other than the Junior DIP Account). Subordinated Lender will, promptly upon the reasonable written request of Senior Lender (but no later than two (2) Business Days thereafter), release or otherwise terminate its Liens upon the Collateral (other than the Junior DIP Account), to the extent such Collateral is sold or otherwise disposed of either by Senior Lender, its agents, or any Loan Party with the consent of Senior Lender, in each case, to the extent that Senior Lender also concurrently releases its Liens on such Collateral, in each case, other than in connection with the Senior Indebtedness Termination Date provided, that any such release by Subordinated Lender shall not extend to or otherwise affect any of the rights, if any, of Subordinated Lender to the proceeds from any such sale, transfer or other disposition of any Collateral. To the extent the Subordinated Lender's consent is required to sell, transfer or dispose of the Collateral (other than the Junior DIP Account), the Subordinated Lender shall promptly, upon the request of the Senior Lender (but no later than two (2) Business Days thereafter), provide its consent to such sale to the same extent as the Senior Lender shall have provided its consent. The Senior Lender agrees that it shall provide prior notice of any sale, transfer or other disposition of Collateral pursuant to this clause (f) in the manner required by the Uniform Commercial Code. In accordance with the provisions of applicable law, the Liens of Subordinated Lender shall automatically attach to any proceeds of any Collateral subject to any such sale, transfer or other disposition to the extent not used to repay Senior Obligations.

        g)     <u>Secured Lender Remedies</u>. In no event shall Subordinated Lender exercise any Secured Lender Remedies (other than with respect to the Junior DIP Account or the Junior DIP Lender Holdback) until the Senior Indebtedness Termination Date.

        h)     <u>Notice and Waiver of Marshaling</u>. Subordinated Lender and Senior Lender acknowledge that this Agreement shall constitute notice of their respective interests in the Collateral and each hereby waive any right to compel any marshaling of any of the Collateral.

        i)     <u>Prohibition on Contesting Liens</u>. In respect of any Collateral, the Subordinated Lender agrees that it shall not, and hereby waives any right to, directly or indirectly:

              1)     contest, or support any other Person in contesting, in any proceeding (including the Chapter 11 Cases), the priority, validity, extent, attachment, perfection or enforceability of any Lien of the Senior Lender on such Collateral; or

              2)     demand, request, plead or otherwise assert or claim the benefit of any marshalling, appraisal, valuation or similar right which it may have in respect of such Collateral or the Liens of the Senior Lender on such Collateral, except to the extent that such rights are expressly granted in this Agreement.

        j)     <u>No New Liens or Guaranties</u>. Until the Senior Indebtedness Termination Date, the Subordinated Lender shall not (i) acquire or hold any Lien on any assets of any Loan Party securing any Subordinated Obligations which assets are not also subject to the Lien of the Senior Lender under the Senior Loan Documents, subject to the Lien priority set forth herein or (ii) accept any guarantee, indemnity or any other assurance or form of recourse (collectively, the "<u>Guarantee</u>") against loss by any Person in respect of any or all of the Subordinated Obligations if such Person does not also provide a Guarantee to the Senior

-6-

Lender in respect of the Senior Obligations on substantially similar terms. If the Subordinated Lender shall (nonetheless and in breach hereof) acquire or hold any Lien on any assets of any Loan Party securing any Subordinated Obligation or accept any Guarantee which assets are not also subject to the Lien of the Senior Lender under the Senior Loan Documents and/or Senior Lender does not receive a Guarantee on substantially similar terms, then the Subordinated Lender shall, without the need for any further consent and notwithstanding anything to the contrary in any other Junior DIP Loan Document, be deemed to also hold and have held such Lien or Guarantee for the benefit of the Senior Lender as security for the Senior Obligations (subject to the Lien priority and other terms hereof) and shall promptly notify the Senior Lender in writing of the existence of such Lien or Guarantee.

    k)    Separate Liens. Subordinated Lender and the Senior Lender hereby agree, and the Loan Parties hereby acknowledge, that (a) the grants of Liens pursuant to the Senior Loan Documents and the Junior DIP Loan Documents constitute separate and distinct grants of Liens and (b) because of, among other things, their differing rights in the Collateral, the Subordinated Obligations in respect of any Collateral is fundamentally different from the Senior Obligations in respect of such Collateral, and the Subordinated Obligations and the Senior Obligations in respect of any Collateral must be separately classified in the Chapter 11 Cases. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that, in respect of any Collateral, the Subordinated Obligations and the Senior Obligations in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Subordinated Lender hereby acknowledges and agrees that all Distributions in respect of such Collateral shall be made as if there were separate classes of senior and junior secured claims in respect of such Collateral (with the effect that, to the extent that the aggregate value of such Collateral is sufficient (for this purpose ignoring all claims held by the Subordinated Lender), until the Senior Indebtedness Termination Date, the Senior Lender shall be entitled to receive, in addition to all Distributions received by it in respect of the Senior Obligations, all amounts owing on the Senior Obligations before any Distribution is made in respect of the claims held by the Subordinated Lender). The Subordinated Lender hereby agrees to turn over to the Senior Lender any Distributions otherwise received or receivable by them to the extent necessary to effectuate the intent of this Section 3, even if such turnover has the effect of reducing the claim or recovery of the Subordinated Lender.

    4.   **Receipt of Prohibited Payments.**

    If the Subordinated Lender receives any payment on account of the Subordinated Obligations (other than any Permitted Junior Payments) prior to the Senior Indebtedness Termination Date, the Subordinated Lender will hold the amount so received in trust for the Senior Lender, and will forthwith turn over such payment to the Senior Lender in the form received (along with the endorsement of the Subordinated Lender where necessary) for application to then-existing Senior Obligations (whether or not due), in accordance with the Senior Loan Documents then remaining unpaid until the Senior Indebtedness Termination Date.

    5.   **Modification of Subordinated Debt.**

    The Subordinated Lender shall not, without the consent of the Senior Lender, (i) amend, restate, supplement, or otherwise modify in any manner the Junior DIP Term Sheet or (ii) enter into the definitive financing documentation referenced in clause (v) of the defined term "Secured Lender Remedies" inconsistent with the requirements thereof.

6.      **Action on Subordinated Debt.**

The Subordinated Lender will not exercise, enforce or take any Secured Lender Remedy available to the Subordinated Lender with respect to any Collateral (including, for the avoidance of doubt, any right to credit bid in any sale pursuant to section 363 of the Bankruptcy Code in the Chapter 11 Cases), unless and until the Senior Indebtedness Termination Date has occurred.

**7.      Application of Proceeds**

All proceeds received with respect to any Collateral (other than Collateral consisting of the Junior DIP Account or the Junior DIP Lender Holdback) shall be applied to the Senior Obligation until the Senior Indebtedness Termination Date, and thereafter shall be applied to the Subordinated Obligations.  All Junior DIP Account Collateral and the Junior DIP Lender Holdback shall be applied to the Subordinated Obligations until the Subordinated Obligations have been indefeasibly paid in full in immediately available funds, and thereafter shall be applied to the Senior Obligations.

**8.      Waivers**

The Subordinated Lender agrees that it will not at any time prior to the Senior Indebtedness Termination Date:

a)   support a plan of reorganization that is not an Acceptable Plan or object or withhold any required consent to (i) the confirmation of an Acceptable Plan or (ii) the approval of an Updated Budget (as defined in the Junior DIP Term Sheet) which Senior Lender has approved in its discretion (provided that such Updated Budget does not result, in the aggregate when taken together with any other updates or amendments made since the most recent Updated Budget was approved by Subordinated Lender, in more than a 15% variance from the most recent Updated Budget approved by the Subordinated Lender) (for the avoidance of doubt, the Subordinated Lender approves the most recent Updated Budget provided by the Borrowers, a copy of which is attached hereto as Exhibit A, and acknowledges that this Updated Budget shall remain in effect until a new Updated Budget is approved by Senior Lender and Subordinated Lender to the extent required under the Junior DIP Term Sheet);

b)   support a sale that is not an Acceptable 363 Sale or object or withhold any consent to the sale of the Collateral supported by the Senior Lender to the extent such consent is required pursuant to Section 3(f) of this Agreement;

c)   object to or otherwise oppose the treatment of the Senior Obligations as senior in priority to the Subordinated Obligations (other than with respect to the Junior DIP Account Collateral and the Junior DIP Lender Holdback, as to which the Subordinated Obligations shall be senior in priority to the Senior Obligations in accordance with the terms hereof);

d)   contest the validity, perfection, priority (as set forth in this Agreement) or enforceability of the Senior Obligations or the Liens and security interests of the Senior Lender in the Collateral;

e)   contest, object to or otherwise oppose, in any manner whatsoever, the sale of any Collateral (other than the Junior DIP Account Collateral) without the prior written consent of the Senior Lender (with email being sufficient); or

-8-

f) exercise any right to credit bid for all or any portion of the Collateral, whether in a sale under or pursuant to Section 363 of the Bankruptcy Code, a Chapter 11 plan subject to confirmation under section 1129 of the Bankruptcy Code, a sale or disposition by a Chapter 7 trustee, or otherwise.

**9.    Transfer of Subordinated Obligations.**

Prior to the Senior Indebtedness Termination Date, the Subordinated Lender will not, without the prior written consent of the Senior Lender, assign, transfer or pledge to any other person, any of the Subordinated Obligations, and any such transfer in violation of this <u>Section 9</u> shall be null and void.

**10.    Continuing Effect.**

This Agreement shall constitute a continuing and irrevocable subordination agreement until the Senior Indebtedness Termination Date, and the Senior Lender may, without notice to or consent by the Subordinated Lender, subject to the terms and conditions of the Senior DIP Agreement and this Agreement, modify any term of the Senior Indebtedness in reliance upon this Agreement. Without limiting the generality of the foregoing, the Senior Lender may, at any time and from time to time, without the consent of or notice to the Subordinated Lender and without incurring responsibility to the Subordinated Lender or impairing or releasing any of the rights of the Senior Lender or of the Subordinated Obligations hereunder:

(i)    change the interest rate or change the amount of payment or extend the time for payment or renew or otherwise alter the terms of any Senior Indebtedness or any instrument evidencing the same in any manner;

(ii)    sell, exchange, release or otherwise deal with any property at any time securing payment of the Senior Obligations (other than the Junior DIP Account or the Junior DIP Lender Holdback) or any part thereof;

(iii)    release anyone liable in any manner for the payment or collection of the Senior Obligations or any part thereof;

(iv)    exercise or refrain from exercising any right against the Loan Parties or any other person (including the Subordinated Lender); and

(v)    apply any sums received by the Senior Lender, by whomsoever paid and however realized, to the Senior Obligations in such manner as the Senior Lender shall deem appropriate.

**11.    No Commitment.**

None of the provisions of this Agreement shall be deemed or construed to constitute or imply any commitment or obligation on the part of the Senior Lender to make any future loans or other extensions of credit or financial accommodations to the Borrowers.  None of the provisions of this Agreement shall be deemed or construed to constitute or imply any commitment or obligation on the part of the Subordinated Lender to make any future loans or other extensions of credit or financial accommodations to the Borrowers.

12.     **Notice.**

All notices and other communications hereunder shall be in writing and shall be (i) personally delivered, (ii) transmitted by certified mail, return receipt requested, postage prepaid or (iii) sent by Federal Express or similar expedited delivery service, in each case addressed to the party to whom notice is being given at its address as set forth below:

If to the Senior Lender:

JMB Capital Partners Lending, LLC
205 South Martel Avenue
Los Angeles, CA 90036
Attn: Vikas Tandon
Telephone: 310-286-2929
Email: vikas@jmbcapital.com

with a copy to (which shall not be deemed to be notice):

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
Attention: Rob Hirsh, Jordana Renert and Fran Skoller
Email: rhirsh@lowenstein.com, jrenert@lowenstein.com and fskoller@lowenstein.com

If to the Subordinated Lender:

Scilex Holding Company
960 San Antonio Road
Palo Alto, CA 94303
(650) 516-4310
Attn: Stephen Ma
Email: sma@scilexholding.com

with a copy to (which shall not be deemed to be notice):

Paul Hastings LLP
695 Town Center Drive, Seventeenth Floor
Costa Mesa, CA 92626
Attention:  Katherine Bell
Email:  katherinebell@paulhastings.com

or at such other address as may hereafter be designated in writing by that party.  All such notices or other communications shall be deemed to have been given on (i) the date received if delivered personally, (ii) three business days after the date of posting if delivered by mail, or (iii) the date of receipt, if delivered by Federal Express or similar expedited delivery service.

13.     **Conflict in Agreements.**

If the subordination provisions of any instrument evidencing the Subordinated Obligations (including, without limitation, the Junior DIP Loan Documents or any final order of the Bankruptcy Court

-10-

approving the Junior DIP Loan Documents) conflict with the terms of this Agreement, the terms of this Agreement shall govern the relationship between the Senior Lender and the Subordinated Lender and the subordination of the Subordinated Obligations and Junior Lender's liens in the Collateral.

14.    **No Amendment or Waiver.**

No waiver shall be deemed to be made by either Lender of any of its rights hereunder unless the same shall be in writing signed by such Lender, and each such waiver, if any, shall be a waiver only with respect to the specific matter or matters to which the waiver relates and shall in no way impair the rights of either Lender or the obligations of either Lender to the other Lender in any other respect at any time.  Any modification or waiver of any provision of this Agreement, or any consent to any departure by any party from the terms hereof, shall not be effective in any event unless the same is in writing and signed by Senior Lender and Subordinated Lender, and then such modification, waiver or consent shall be effective only in the specific instance and for the specific purpose given. Any notice to or demand on any party hereto in any event not specifically required hereunder shall not entitle the party receiving such notice or demand to any other or further notice or demand in the same, similar or other circumstances unless specifically required hereunder.

15.    **Miscellaneous.**

This Agreement shall be binding upon each Lender and its successors and assigns and shall inure to the benefit of the each Lender and its successors and assigns irrespective of whether this or any similar agreement is executed by any other creditor of the Borrowers.

16.    **Jury Trial Waiver.**

THE PARTIES HERETO ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVE ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS AGREEMENT OR THE RELATIONSHIP ESTABLISHED HEREUNDER.

17.    **Choice of Law.**

This Agreement shall be governed by and construed and enforced in accordance with the laws of the State of New York (without regard to its conflict of law provisions). Whenever possible each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

18.    **Consent to Jurisdiction.**

EACH PERSON PARTY HERETO HEREBY CONSENTS TO THE JURISDICTION OF THE BANKRUPTCY COURT AND IRREVOCABLY AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE LITIGATED IN THE BANKRUPTCY COURT. EACH PARTY HERETO EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE BANKRUPTCY COURT AND WAIVES ANY DEFENSE OF FORUM

NON CONVENIENS. EACH PARTY HERETO HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON IT BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO SUCH PARTY AT THEIR RESPECTIVE ADDRESSES SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

**19.    Execution; Counterparts.**

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Agreement, taken together, shall constitute but one and the same instrument.  Each of the undersigned by execution of this Agreement and any related acknowledgments and consents agrees that any copy of this document signed by it and transmitted by facsimile or email, or any other method for delivery shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence.

**20.    Severability.**

If any provision of this Agreement is deemed to be invalid, illegal or unenforceable by reason of the operation of any law or by reason of the interpretation placed thereon by any court or governmental authority, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby, and the affected provision shall be modified to the minimum extent permitted by law so as most fully to achieve the intention of this Agreement.

*[Signature pages follow]*

-12-

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

SCILEX HOLDING COMPANY,
as Subordinated Lender

By: _____
Name: Stephen Ma
Title:  Chief Accounting Officer

[Signature Page to Intercreditor and Subordination Agreement]

**JMB CAPITAL PARTNERS LENDING, LLC**,
as Senior Lender

By: _____
Name: Vikas Tandon
Title:   Chief Investment Officer

[Signature Page to Intercreditor and Subordination Agreement]

**Acknowledgment**

  Each of the undersigned hereby acknowledges receipt of a copy of the Intercreditor and Subordination Agreement. Each of the undersigned understands that the foregoing Agreement is for the benefit of the Senior Lender and the Subordinated Lender and their successors and assigns, that neither of the undersigned is an intended beneficiary or third party beneficiary thereof, and that the consent or approval by each of the undersigned of any changes to such Agreement shall not be required.

       **SORRENTO THERAPEUTICS, INC.**
       **SCINTILLA PHARMACEUTICALS, INC.**

       By: _____
       Name: Mohsin Y. Meghji
       Title: Chief Restructuring Officer

**<u>Exhibit 3</u>**

**Initial Budget**

US-DOCS\143664564

*Sorrento Therapeutics*
Cash Flow Forecast

| Week # | 20 | 21 | 22 | 23 | 24 | Total |
|---|---|---|---|---|---|---|
| Week Beginning | 6/25 | 7/2 | 7/9 | 7/16 | 7/23 | |
| Week Ending | 7/1 | 7/8 | 7/15 | 7/22 | 7/29 | 24Wks |
| | Fcst. | Fcst. | Fcst. | Fcst. | Fcst. | |
| *($ in millions)* | | | | | | |
| **Cash Receipts** | | | | | | |
| Cash Operating Receipts | – | – | – | – | – | $1.71 |
| Non-Operating Receipts | – | – | – | – | – | 0.77 |
| Senior DIP Funding | 5.00 | – | – | – | – | 75.00 |
| Junior DIP Funding | – | 21.20 | – | – | – | 21.20 |
| **Total Cash Receipts** | **$5.00** | **$21.20** | **–** | **–** | **–** | **$98.68** |
| **Cash Disbursements** | | | | | | |
| **Operating Disbursements** | | | | | | |
| Payroll, Taxes, and Medical | (0.39) | (1.51) | (0.55) | (2.21) | (0.05) | (27.73) |
| Rent / Operating Leases | (1.28) | (0.22) | – | – | (1.28) | (8.43) |
| Licensing, Taxes, and Insurance | (0.53) | (0.03) | (0.03) | (0.03) | (0.63) | (4.23) |
| SG&A Other | (2.51) | (1.32) | (1.15) | (1.03) | (0.23) | (9.40) |
| ACEA China Funding | (1.00) | – | (1.00) | (1.00) | – | (7.00) |
| Critical Vendor Payments | (0.10) | (0.10) | (0.10) | – | – | (0.30) |
| Contingency | – | – | – | – | – | – |
| Capital Expenditures | – | – | – | – | – | – |
| **Total Cash Operating Disbursements** | **($5.81)** | **($3.18)** | **($2.83)** | **($4.27)** | **($2.19)** | **($57.08)** |
| **Other Disbursements** | | | | | | |
| Professional Fees - Estate Advisors | (1.29) | (1.51) | (1.41) | (1.30) | (1.30) | (32.97) |
| Professional Fees - UCC Advisors | (0.05) | (0.05) | (0.05) | (0.05) | (0.05) | (1.80) |
| Professional Fees - Equity Committee Advisors | – | – | – | – | – | (0.40) |
| **Total Retained Professionals** | **(1.34)** | **(1.56)** | **(1.46)** | **(1.35)** | **(1.35)** | **(35.17)** |
| Professional Fees - Ordinary Course Professionals | (1.87) | (0.15) | (0.25) | (0.10) | (0.10) | (4.33) |
| Senior DIP Interest and Fees[1] | (0.97) | (0.50) | (0.09) | – | – | (7.01) |
| Junior DIP Interest and Fees[1] | – | (1.20) | – | – | – | (1.20) |
| **Total Other Disbursements** | **($4.18)** | **($3.41)** | **($1.80)** | **($1.45)** | **($1.45)** | **($47.70)** |
| **Total Disbursements** | **($9.99)** | **($6.60)** | **($4.63)** | **($5.72)** | **($3.65)** | **($104.79)** |
| **Cash Roll-Forward** | | | | | | |
| **Net Cash Flow** | **($4.99)** | **$14.60** | **($4.63)** | **($5.72)** | **($3.65)** | **($6.11)** |
| Beginning Cash | $5.55 | $0.56 | $15.16 | $10.53 | $4.81 | $7.28 |
| Net Cash Flow | (4.99) | 14.60 | (4.63) | (5.72) | (3.65) | (6.11) |
| **Ending Cash** | **$0.56** | **$15.16** | **$10.53** | **$4.81** | **$1.16** | **$1.16** |
| *Senior DIP Loan Balance* | *$75.00* | *$75.00* | *$75.00* | *$75.00* | *$75.00* | |
| *Junior DIP Loan Balance [2]* | *–* | *$21.62* | *$21.62* | *$21.62* | *$21.62* | |

Notes:
*(1) Fees for Sr. and Jr. DIP Lender counsels represent initial estimates and remain subject to further negotiations.*
*(2) Includes 1.0% commitment fee (PIK), 1.0% funding fee (PIK), and $1.2MM lender counsel fees*