**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SORRENTO THERAPEUTICS, INC., *et al.*,[1] | ) | Case No. 23-90085 (DRJ) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |
|  | ) | **Related Docket No. 1316** |

**NOTICE OF CLOSING OF SCILEX STOCK SALE**
**AND RELATED DEFINITIVE DOCUMENTATION**

**PLEASE TAKE NOTICE THAT:**

On February 13, 2023, Sorrento Therapeutics, Inc. ("Sorrento") and Scintilla Pharmaceuticals, Inc. (together, the "Debtors") each filed voluntary petitions for bankruptcy relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "Court").

On August 7, 2023, Sorrento and Oramed Pharmaceuticals Inc. ("Oramed") entered into a *Stock Purchase Agreement* (as amended, the "Oramed SPA") for the sale of substantially all of Sorrento's equity interests (consisting of common stock, preferred stock, and warrants for common stock) in Scilex Holding Company ("Scilex"), which the Court approved on August 30, 2023 [Docket No. 1267] (the "Oramed Sale Order"). The sale contemplated under the Oramed SPA did not close.

On September 12, 2023, the Court entered an order approving the sale by Sorrento to Scilex of all of Sorrento's equity interests (common stock, preferred stock, and warrants for common stock) in Scilex (the "Sale") [Docket No. 1316] (the "Scilex Sale Order"). The Scilex Sale Order conditionally vacated the Oramed Sale Order and conditionally terminated the Oramed SPA, each effective upon the closing of the Sale.

On September 21, 2023, Sorrento and Scilex closed the Sale, and Sorrento, Scilex, and Oramed entered into various transaction documents related thereto. This includes the *Stock Purchase Agreement* between Sorrento and Scilex, which is attached hereto as Exhibit A.

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956). The Debtors' service address is: 4955 Directors Place, San Diego, CA 92121.

In connection with the Sale:

- Sorrento and Oramed entered into a *Mutual Termination and Release Agreement* (attached hereto as <u>Exhibit B</u>), mutually terminating the Oramed SPA and releasing the parties' obligations thereunder;

- Sorrento, Scilex, and Oramed entered into an *Assignment, Assumption and Release Agreement* (attached hereto as <u>Exhibit C</u>), whereby Scilex assumed the Debtors' obligations under their senior postpetition financing facility with Oramed;

- Sorrento, Scilex, and Paul Hastings LLP entered into an *Assumption and Assignment of Legal Fees and Expenses* (attached hereto as <u>Exhibit D</u>), whereby Scilex assumed Sorrento's obligations to Paul Hastings LLP; and

- Scilex delivered a *Credit Bid Pay-Off Letter* to Sorrento (attached hereto as <u>Exhibit E</u>), confirming that Scilex's junior postpetition financing facility with Sorrento has been satisfied in full with no obligations remaining thereunder.

All documents filed in these chapter 11 cases are available free of charge by visiting https://cases.stretto.com/Sorrento or by calling (833) 278-6637 (toll-free) or (949) 471-0454 (international).  Copies of any pleadings or papers filed with the Court may be obtained by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: September 21, 2023

/s/  *Kristhy M. Peguero*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:  (713) 752-4200
Facsimile:  (713) 752-4221
Email: mcavenaugh@jw.com
          kpeguero@jw.com
          ggraham@jw.com

– and –

Caroline Reckler (S.D. Tex. Bar No. IL6275746)
Ebba Gebisa (admitted *pro hac vice*)
Jonathan Gordon (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile:  (312) 993-9667
Email:  caroline.reckler@lw.com
          ebba.gebisa@lw.com
          jonathan.gordon@lw.com

– and –

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile:  (213) 891-8763
Email:  jeff.bjork@lw.com
          kim.posin@lw.com

*Counsel to the Debtors*

## **Certificate of Service**

I certify that, on September 21, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Kristhy M. Peguero*
Kristhy M. Peguero

## EXHIBIT A

**Stock Purchase Agreement**

*Execution Version*
*CONFIDENTIAL*

---

**STOCK PURCHASE AGREEMENT**


**BY AND BETWEEN**


**SCILEX HOLDING COMPANY**


**AND**


**SORRENTO THERAPEUTICS, INC.**


**September 21, 2023**

---

## STOCK PURCHASE AGREEMENT

**THIS STOCK PURCHASE AGREEMENT** is made and entered into as of September 21, 2023 (this "Agreement"), by and between Scilex Holding Company, a Delaware corporation (the "Purchaser") and Sorrento Therapeutics, Inc., a Delaware corporation (the "Seller"). Purchaser and the Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."

### RECITALS:

**WHEREAS**, on February 13, 2023, the Seller and its wholly owned Subsidiary, Scintilla Pharmaceuticals, Inc. ("Scintilla"), commenced voluntary proceedings under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, which are being jointly administered under the caption *In re Sorrento Therapeutics, Inc., et al.*;

**WHEREAS**, on July 28, 2023, the Seller and Scintilla, as borrowers (in such capacity, the "Borrowers"), entered into that certain Junior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement (the "Junior DIP Loan Agreement") with the Purchaser, as lender (in such capacity, the "Junior DIP Lender"), pursuant to which the Borrowers obtained $20,000,000 of junior post-petition financing (the "Junior DIP Facility");

**WHEREAS**, the Seller desires to sell, convey, transfer, assign and deliver to the Purchaser, and the Purchaser desires to purchase and acquire from the Seller, those securities of the Purchaser listed on Schedule I attached hereto (the "Purchased Securities"), on the terms and subject to the conditions set forth in this Agreement; and

**WHEREAS,** the transactions contemplated by this Agreement (collectively, the "Transactions") will be consummated pursuant to and in accordance with the Bid Procedures Order and the Sale Order (each as defined below), pursuant to Sections 105 and 363 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*, as amended (the "Bankruptcy Code").

**NOW**, **THEREFORE**, in consideration of the foregoing and the mutual agreements, covenants, representations and warranties set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

## 1.    PURCHASE PRICE; DEPOSIT; TREATMENT OF JUNIOR DIP LOAN.

Pursuant to Section 363 of the Bankruptcy Code and on the terms and subject to the conditions of this Agreement, on the Closing Date (as defined below) and effective as of the Effective Time (as defined below), the Seller shall sell to the Purchaser, and the Purchaser shall purchase from the Seller the Purchased Securities listed on Schedule I attached hereto, free and clear of any Encumbrances or Liabilities. The aggregate consideration for the Purchased Securities shall be (i) $100,000,000 which such amount is satisfied by the Oramed DIP Assumption (the "DIP Amount") *plus* (ii) a credit bid, on a dollar-for-dollar basis, pursuant to Section 363(k) of the Bankruptcy Code, in respect of any and all amounts of principal and accrued but unpaid interest outstanding, and any other obligations of Sorrento or Scintilla, in each case, under the Junior DIP Facility as of the Closing Date (the "Credit Bid Amount") *plus* (iii) $5,000,000 which the Purchaser paid to the

Seller on September 13, 2023 as an advance payment of the Purchase Price (as defined below) (the "Advance Payment") *plus* (iv) $5,000,000 which the Purchaser shall pay to the Seller on the Closing Date (the "Closing Payment") *plus* (v) the assumption and assignment of all of the obligations of the Seller to Paul Hastings LLP for legal fees and expenses reflected in Paul Hastings LLP's proof of claim #238 filed with the Bankruptcy Court in the amount of $12,249,244.09 (the "Legal Fee Assumption" and, together with the DIP Amount, the Credit Bid Amount, the Advance Payment and the Closing Payment, the "Purchase Price").  Notwithstanding anything to the contrary in this Agreement, the amount of Purchased Securities and Purchase Price per share shall be appropriately adjusted in the event of any stock split, dividend, stock combination, reclassification or similar transaction occurring prior to the Closing Date. For the avoidance of doubt, Purchaser will not assume any Liabilities, accounts payable, notes payable, expenses or other obligations of Seller or its Affiliates.

2.      **CLOSING.**

(a)      The sale and purchase of the Purchased Securities shall be effected by the Seller delivering to SCLX Stock Acquisition on the Closing Date duly executed certificates or other instruments evidencing the Purchased Securities with instruments of transfer reasonably satisfactory to the Purchaser (duly endorsed or otherwise in such form sufficient for transfer), against delivery by the Purchaser to the Seller of the Purchase Price.  The Purchase Price shall be paid by Purchaser to the Seller on or prior to the Closing Date in accordance with Section 1, with the Closing Payment being paid by wire transfer of immediately available funds in U.S. dollars to an account designated by the Seller to the Purchaser in writing no later than two Business Days prior to the Closing Date.

(b)      The Purchaser will notify its transfer agent of the proposed Closing Date, and the Seller will deliver to the Purchaser or such transfer agent documentation reasonably requested by the Purchaser or such transfer agent to effect the book-entry transfer of the Purchased Securities by the Seller to the Purchaser.  The Purchaser and/or its transfer agent will transfer the Purchased Securities to the Purchaser in a restricted book-entry position on the books of the transfer agent and register the Purchaser as the registered owner of the Purchased Securities as of the Effective Time. The Seller will cooperate with the Purchaser and will use reasonable best efforts to transfer the Purchased Securities in the manner preferred by the Purchaser.

(c)      The closing of such sale and purchase of the Purchased Securities (the "Closing") shall take place immediately following the execution of this Agreement, remotely by conference call and electronic exchange of documentation, at 10:00 a.m. New York time, or by such other means or at such other date and time as the Parties shall mutually agree (the date of the Closing, the "Closing Date" and the time of the Closing, the "Effective Time").

3.      **REPRESENTATIONS AND WARRANTIES OF THE SELLER.**

The Seller represents and warrants to the Purchaser, subject to such exceptions as are disclosed in the disclosure schedule (the "Seller Disclosure Schedule") delivered by the Seller to Purchaser concurrently with the execution and delivery of this Agreement as follows:

(a)    <u>Organization</u>.  The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)    <u>Authority</u>.  The Seller has authorized the execution, delivery and performance of this Agreement and each of the transactions contemplated hereby, and, upon entry and effectiveness of the Sale Order (as defined below), no other action will be necessary to authorize such execution, delivery and performance.  Subject to and assuming the entry and effectiveness of the Sale Order, this Agreement constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.

(c)    <u>No Violation; Consents</u>.

(i)    No consent, approval, authorization or order (each a "<u>Consent</u>") of any federal, municipal, state, local or foreign governmental, administrative, taxing or regulatory authority, department, agency, commission or body (including any court, arbitrator, or similar tribunal) (each a "<u>Governmental Authority</u>") having jurisdiction over the Seller is required for the execution, delivery or performance by the Seller of its obligations hereunder, including without limitation the sale of the Purchased Securities, except for (A) the entry of the Sale Order by the Bankruptcy Court (as defined below) and (B) such consents, approvals, authorizations or orders as have already been obtained or granted.

(ii)    Except to the extent excused by or unenforceable as a result of the Bankruptcy Case (as defined below) and except for the entry and effectiveness of the Sale Order, neither the sale of the Purchased Securities nor the performance of the Seller's obligations hereunder will violate, conflict with, result in a breach or termination of, extinguish any material rights, or constitute a default (or an event that, with the giving of notice or the lapse of time, or both, would constitute a default) under (i) the certificate of incorporation, bylaws or other Organizational Documents of the Seller (ii) any decree, judgment, order, law, treaty, rule, regulation or determination of any Governmental Authority ("<u>Laws</u>") having jurisdiction over the Seller or any of its respective assets or properties, or (iii) the terms of any Material Contract, except in each case as would not reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with any of the transactions contemplated by this Agreement.

(d)    <u>Capitalization</u>.  Other than that certain Stockholder Agreement, dated as of September 12, 2022, between the Purchaser and the Seller and that certain Amended and Restated Registration Rights Agreement, dated as of November 10, 2022, among the Purchaser, the Seller and the other parties thereto, there are no stockholder agreements, voting trusts or other agreements or understandings to which the Seller is a party or by which it is bound relating to the voting or registration of any shares of capital stock of the Purchaser or any of its Subsidiaries or preemptive rights with respect thereto.

(e)    <u>Title to Purchased Securities</u>.  The Seller has good, valid and marketable title to the Purchased Securities, and, subject to receipt of the Sale Order, good, valid and marketable title will be transferred to the Purchaser free and clear of any charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, right of use, first offer or first refusal, voting trusts, proxies, easement, servitude, restrictive covenant, encroachment

4

or similar restriction, other than those imposed by the Securities Act (each, an "Encumbrance", and collectively, "Encumbrances").  The Purchased Securities, constitute all of the shares of capital stock of the Purchaser (or options, warrants or rights to purchase shares of capital stock of the Purchaser or securities convertible into or exchangeable for shares of capital stock of the Purchaser) owned by the Seller (other than those certain 1,917,210 shares of common stock of the Purchaser that the Seller is currently holding in abeyance on behalf of certain warrantholders of the Seller).

(f)     Legal Proceedings and Orders.  Other than in connection with the Bankruptcy Case, to the Knowledge of Seller, there is no action, suit, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) or investigation pending or being heard by or before, or otherwise involving, any Governmental Authority or any arbitrator or arbitration panel (each a "Proceeding") and no Person has threatened in writing to commence any Proceeding, in each case, that would reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with any of the Transactions contemplated by this Agreement.  To the Knowledge of Seller, and except as described in Section 3(f) of the Seller Disclosure Schedule, there is no governmental order, writ, injunction, judgment or decree to which the Purchased Securities are subject.

(g)     SEC Matters.  The sale of the Purchased Securities by the Seller is not part of a plan or scheme to evade the registration requirements of the Securities Act.  Neither the Seller nor any Person (as defined below) acting on behalf of the Seller has offered or sold any of the Purchased Securities by any form of general solicitation or general advertising.

(h)     Brokers.  Except as set forth in Section 3(h) of the Seller Disclosure Schedule, no Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Seller or any of its Affiliates in connection with the Transactions contemplated by this Agreement.

(i)     No Reliance.  In making its decision to sell the Purchased Securities, the Seller represents that it has not relied on, and expressly disclaims reliance on, any statements or other information provided by any Person (including, without limitation, the Purchaser) (other than the representations and warranties of the Purchaser set forth in Section 4).

(j)     Disclaimer of Additional Warranties.  Except as expressly set forth in this Section 3, neither the Seller nor any of its directors, members, officers, employees or representatives nor any other Person makes or has made any representation or warranty, express or implied, at law or in equity, in respect of the Seller, the Purchased Securities or the transactions contemplated by this Agreement, and the Seller disclaims any other representations or warranties, whether made by the Seller or any other Person, in each case notwithstanding the delivery or disclosure to the Purchaser or any other Person of any documentation or other information with respect to the foregoing.

**4.     REPRESENTATIONS AND WARRANTIES OF THE PURCHASER**

The Purchaser represents and warrants to the Seller as follows:

(a)     Organization.  The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

(b)      Authority.  The Purchaser has authorized the execution, delivery and performance of this Agreement and each of the transactions contemplated hereby, and, upon entry and effectiveness of the Sale Order, no other action will be necessary to authorize such execution, delivery and performance.  Subject to and assuming the entry and effectiveness of the Sale Order, this Agreement shall constitute a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its terms.

(c)      No Violation; Consents.

(i)      No Consent of any Governmental Authority having jurisdiction over the Purchaser is required for the execution, delivery or performance by the Purchaser of its obligations hereunder, including without limitation the purchase of the Purchased Securities, except for the entry of the Sale Order by the Bankruptcy Court.

(ii)      Except to the extent excused by or unenforceable as a result of the filing of the Bankruptcy Case and except for the entry and effectiveness of the Sale Order, neither the acquisition of the Purchased Securities nor the performance of the Purchaser's obligations hereunder will violate, conflict with, result in a breach of or termination of, extinguish any rights, or constitute a default (or an event that, with the giving of notice or the lapse of time, or both, would constitute a default) under (i) the certificate of incorporation, bylaws or other Organizational Documents of the Purchaser, (ii) any Laws of any Governmental Authority having jurisdiction over the Purchaser or any of its assets or properties or (iii) the terms of any material agreement to which the Purchaser is a party or to which any of the Purchaser's properties is subject, except in each case as would not reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with any of the transactions contemplated by this Agreement.

(d)      Sufficient Funds.  The Purchaser has sufficient cash in immediately available funds to pay the Closing Payment and all of the fees, costs and expenses incurred in connection with the transactions contemplated hereby by the Purchaser (without giving effect to any unfunded financing, regardless of whether any such financing is committed).

(e)      Solvency.  Assuming the accuracy of the representations and warranties of Seller set forth in Section 3 (disregarding any materiality, knowledge or similar qualifications or exceptions contained therein), immediately after giving effect to the transactions contemplated hereby (including, without limitation, the Oramed DIP Assumption), the Purchaser shall (i) be able to pay its debts as they become due; (ii) own property which has a fair saleable value greater than the amounts required to pay its debts (including a reasonable estimate of the amount of all contingent liabilities); and (iii) have adequate capital to carry on its business.  No transfer of property is being made and no obligation is being incurred in connection with the transactions contemplated hereby with the intent to hinder, delay or defraud either present or future creditors of the Purchaser.

(f)      Acknowledgement.  The Purchaser acknowledges and understands that the Purchase Price represents a mutually agreed upon price for the Purchased Securities determined by the Purchaser and the Seller and does not necessarily represent the fair market value of the Purchased Securities as of the date hereof, as of the Closing or in the future.

    (g)    <u>Tax Classification</u>.  SCLX Stock Acquisition is a direct, wholly-owned subsidiary of the Purchaser that, for U.S. federal and applicable state and local income Tax purposes, is treated as a disregarded entity.

## 5.    COVENANTS OF THE PARTIES.

    (a)    <u>[Reserved]</u>.

    (b)    <u>[Reserved]</u>.

    (c)    <u>Further Assurances</u>.  At all times from and after the Closing, each of the Parties shall use its reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things reasonably necessary, proper or advisable consistent with applicable Laws or reasonably requested to consummate and make effective in the most expeditious manner practicable the Transactions contemplated by this Agreement and the other Transaction Documents.

    (d)    <u>No Encumbrances</u>.  At the Effective Time, Seller shall sell and transfer the Purchased Securities to the Purchaser, free and clear of any Encumbrances or Liabilities.

    (e)    <u>[Reserved]</u>.

    (f)    <u>[Reserved]</u>.

    (g)    <u>Tax Matters</u>.

    (i)    <u>Cooperation on Tax Matters</u>.  The Parties shall use commercially reasonable efforts to cooperate, as and to the extent reasonably requested by any other party, and at such requesting party's expense, in connection with the filing of Tax Returns and any audit, litigation or other proceeding with respect to Taxes relating to Tax periods (or portions thereof) ending on or before the Closing Date.  Such cooperation shall include the retention and (upon a reasonable request) the provision of records and information that are reasonably relevant to any filing of Tax Returns including the transactions contemplated hereby and any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  The Seller agrees (A) to retain all books and records in its possession with respect to Taxes of the Purchaser and its Subsidiaries relating to any taxable period beginning before the Closing Date for up to seven (7) years, and (B) to give the Purchaser reasonable written notice prior to transferring, destroying or discarding any such books and records and shall allow the Purchaser to take possession of such books and records.  For the avoidance of doubt, the Seller shall not be required to share tax information or books and records with the Purchaser with respect to the Seller or the Seller's consolidated, combined, unitary or affiliated tax group, except to the extent there is an audit, litigation or other proceeding with respect to the Seller's Income Taxes with respect to a taxable period for which the Purchaser was a member of the Seller's consolidated, combined, unitary or affiliated tax group and the Purchaser is reasonably expected to have liability for all or a portion of any resulting Tax liability.

    (ii)    The Parties agree, upon reasonable request and at such requesting party's expense, to use their commercially reasonable efforts to obtain any certificate or other document

from any governmental authority or any other Person as may be necessary to mitigate, reduce or eliminate any Tax that could be imposed with respect to the transactions contemplated hereby.

(iii)    <u>Transfer Taxes</u>.  All transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with consummation of the transactions contemplated by this Agreement and actually due and owing shall be borne and paid by the Purchaser when due, and Purchaser will file all necessary Tax Returns and other documentation with respect to all such Taxes, fees and charges, and, if required by applicable law, each Party will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

(iv)    <u>Tax Election</u>.  The Purchaser agrees not to file any entity classification election pursuant to Treasury Regulations Section 301.7701-3 to classify SCLX Stock Acquisition as a corporation for U.S. federal income tax purposes which election shall be effective on or before the day after the Closing Date.

(h)    <u>Submission for Bankruptcy Court Approval</u>.

(i)    The Seller has given notice under the Bankruptcy Code of the request for the relief in the Sale Order to all Persons entitled to such notice, including all Persons that have asserted Encumbrances in the Purchased Securities, and shall give such additional notice as the Bankruptcy Court shall direct or as the Purchaser may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby.  The Seller shall be responsible for making all appropriate filings relating thereto with the Bankruptcy Court, which filings shall be submitted, to the extent practicable, to the Purchaser prior to their filing with the Bankruptcy Court for the Purchaser's prior review and comments (which comments the Seller shall consider in good faith).

(ii)    The Parties shall consult with one another regarding pleadings which any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect, the Sale Order.  The Seller shall promptly provide the Purchaser and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that the Seller has in its possession (or receives) pertaining to the Sale Order or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the Bankruptcy Court's docket or otherwise made available to the Purchaser and its counsel.

(iii)    The Parties shall comply in all material respects with all of their obligations under the Sale Order.

(iv)    If the Bid Procedures Order, the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order, the Sale Order or other such order), subject to rights otherwise arising from this Agreement, the Parties shall use their commercially reasonable efforts to prosecute such

appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(i)     [Reserved].

(j)     [Reserved].

(k)     Receipt of Property Relating to Purchased Securities.  If, following the Closing, the Seller (or its respective Affiliates or Representatives) shall receive any money, check, note, draft, instrument, payment or other property as proceeds of the Purchased Securities or any part thereof, and to the extent arising from any fact, event or circumstance after the Closing, each such Person shall receive all such items in trust for, and as the sole and exclusive property of, Purchaser and, upon receipt thereof, shall notify Purchaser in writing of such receipt and shall remit the same (or cause the same to be remitted) to Purchaser in the manner reasonably specified by Purchaser.

(l)     Post-Closing Operation of the Seller; Name Changes.  After the Closing Date, none of the Seller and any of its Affiliates shall use the name or mark "Scilex" or any derivatives thereof for commercial purposes.  After the Closing, the Seller and its Affiliates shall promptly file with the applicable Governmental Authorities all documents reasonably necessary to delete from their names the words "Scilex" or any derivatives thereof and shall do or cause to be done all other acts, including the payment of any fees required in connection therewith, to cause such documents to become effective as promptly as reasonably practicable.  For clarity, nothing in this Section 5(l) shall restrict the Seller or any of its Affiliates from using or referencing the name or mark "Scilex" or any derivatives thereof (i) in a non-trademark manner to describe or provide information regarding the history of the Purchased Securities, or (ii) as required by applicable Law, including in any filing with the SEC, documents filed with the Bankruptcy Court or financial statements.

(m)     Transition Services.

(i)     Subject to the terms and conditions of this Section 5(m), the Seller will, for a period of up to 120 days following the Closing, provide to the Purchaser a continuation of those services that the Seller has provided to the Purchaser at any time since December 1, 2022 (the "Transition Services"), on the same terms and conditions (including cost) as previously provided between the Seller and the Purchaser; provided however, that:

(1)     the Seller shall have the right to make such changes to the Transition Services as are necessary in order to comply with applicable Laws or Permits to which the Seller or its Affiliates is a party or subject;

(2)     the Seller shall not be responsible for any act or omission of a third party provider and the Purchaser's sole and exclusive remedy in respect of such acts or omissions shall be the Seller's use of commercially reasonable efforts to cause such third party to perform or re-perform the Transition Services and/or to seek available remedies under the applicable Contract with such third party provider;

(3)     nothing contained in this Section 5(m) shall require the Seller to provide any services that would constitute the provision of any legal or tax advice or regulated activity, or

that would create deficiencies in the Seller's controls over financial information or adversely affect the maintenance of the Seller's financial books and records; and

(4)     in no event shall the Seller be obligated to hire replacements for employees providing Transition Services that resign, retire or are terminated; provided, however, that in such case, the Seller will use commercially reasonable efforts to provide the applicable Transition Services.

(ii)     The aggregate liability of Seller in connection with the performance of the Transition Services shall not exceed the total fees actually paid or payable by the Purchaser to Seller in respect of the Transition Services.  Notwithstanding anything else in this Agreement to the contrary, and solely with respect to the Transition Services, Seller shall not be liable for any special, indirect, punitive or consequential damages which substantially arise out of, relate to or are a consequence of the performance of the Transition Services, except in the event of the Seller's gross negligence, willful misconduct or fraud.  Seller acknowledges and agrees that irreparable damage would occur in the event that any of the provisions of this Section 5(m) were not performed by them in accordance with the terms hereof or were otherwise breached and that the Purchaser shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Section 5(l) and to enforce specifically the provisions of this Section 5(m) (without any requirement to post any bond or other security in connection with seeking such relief), in addition to any other remedy at law or equity, and Seller further agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Section 5(m) by the Seller, and to specifically enforce the terms and provisions of this Section 5(m).

(iii)     The Purchaser may terminate all or any portion of the Transition Services before the expiration of such 120-day period, by delivering written notice of such termination to the Seller.

(iv)     Nothing in this Section 5(m) shall grant or transfer any rights, title or interests in any Intellectual Property invented or created before, on or after the Closing by or on behalf of the Seller or its Affiliates or otherwise controlled by or licensed to the Seller or its Affiliates.

(v)     The Purchaser shall pay any applicable costs invoiced to the Purchaser by the Seller within 30 days after receipt thereof by wire transfer of immediately available funds to an account designated by the Seller in writing.

(n)     Acknowledgement.  Each of the Parties acknowledges and represents that: (i) sufficient consideration has been given by each Party to the other Parties as it relates hereto and the covenants, obligations and agreements hereunder were taken into account in determining the amount of such consideration; (ii) each of the Parties has consulted with independent legal counsel regarding its rights and obligations under this Section 5; (iii) each of the Parties fully understands the terms and conditions contained herein; (iv) the restrictions and agreements in this Section 5 are reasonable in all respects and, as applicable, necessary for the protection of the Business and that, without such protection, the customer and client relationships and competitive advantage relating to the Business would be materially adversely affected; and (v) the agreements in this Section 5 are an essential inducement to each Party to enter into this Agreement and they are in

10

addition to, rather than in lieu of, any similar or related covenants to which either Party is party or by which it is bound.

**6.      [RESERVED].**

**7.      [RESERVED].**

**8.      NO RECOURSE.**

This Agreement may only be enforced against, and any claim or cause of action pursuant to the terms of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to this Agreement) may only be brought against, the entities that are expressly named as Parties hereto and then only with respect to the specific obligations set forth herein with respect to such Party.  Except to the extent a named Party to this Agreement (and then only to the extent of the specific obligations undertaken by such named Party in this Agreement and not otherwise), no past, present or future manager, director, officer, employee, incorporator, member, partner, equityholder, Affiliate, agent, attorney, advisor or representative or Affiliate of any named Party to this Agreement shall have any liability (whether in contract, tort, equity or otherwise) for any one or more of the representations, warranties, covenants, agreements or other obligations or liabilities of any one or more of the named Parties to this Agreement.

**9.      SURVIVAL OF REPRESENTATIONS AND WARRANTIES.**

(a)      None of the representations and warranties of the Parties in this Agreement shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such representation or warranty from or after the Closing.

(b)      None of the covenants or agreements of the Parties in this Agreement shall survive the Closing, and no Party hereto shall, or shall be entitled to, make any claim or initiate any action against any other Party with respect to any such covenant or agreement from or after the Closing, other than (i) the covenants and agreements of the Parties contained in this <u>Section 9</u> and in <u>Sections</u> <u>1</u>, <u>2</u> and <u>10</u>, and (ii) those other covenants and agreements contained herein that by their terms apply, or that are to be performed in whole or in part, after the Closing, which shall survive the consummation of the transaction contemplated by this Agreement until fully performed.

**10.      DEFINITIONS; MISCELLANEOUS.**

(a)      <u>Terms Defined</u>.  As used in this Agreement, the following terms have the respective meanings set forth below:

"<u>Affiliate</u>" means any Person that directly or indirectly controls, is controlled by, or is under control with, such Person.  The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Bankruptcy Case" means the Seller's and Scintilla's voluntary proceedings under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court, which are being jointly administered under the caption *In re Sorrento Therapeutics, Inc., et al,* Case No. 23-90085 (Bankr.  S.D. Tex.)*.*

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas or such other court having competent jurisdiction over the Bankruptcy Case.

"Benefit Plan" means each "employee benefit plan" (as defined in Section 3(3) of ERISA or any similar plan subject to Laws of a jurisdiction outside of the United States, whether or not subject to ERISA), and any other plan, policy, program or agreement providing compensation or other benefits to any current or former director, officer, employee or other individual service provider of the Purchaser or any of its Subsidiaries (whether qualified or nonqualified or funded or unfunded or written or unwritten), in each case, (i) which is maintained, sponsored by, contributed to or required to be contributed to by the Purchaser or any of its Subsidiaries, or (ii) under which the Purchaser or any of its Subsidiaries has or would reasonably be expected to have any obligation or Liability.

"Bid Procedures Order"  means the *Order (I) Approving Bid Procedures, (II) Approving Assumption and Assignment Procedures, and (III) Granting Related Relief* [ECF No. 447] entered by the Bankruptcy Court on April 14, 2023.

"Business" means the business and operations of the Purchaser and its Subsidiaries, taken as a whole.

"Business Day" shall mean any day that is not a Saturday, Sunday or other day on which banks are permitted or required to be closed in New York City.

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Stock" means the shares of Common Stock of the Company set forth on Schedule I.

"Contract" means any contract, sub-contract, agreement, lease or sub-lease, license or sub-license, occupancy agreement, purchase order, supply agreement, commitment, note, bond, franchise, guarantee, indemnity, indenture, instrument, lease, license or other legally binding arrangement, understanding, or obligation, whether written or oral (including all amendments, side letters, supplements and modifications of any of the foregoing and all rights and interests arising thereunder or in connection therewith, but excluding any Benefit Plan).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"Exchange Act" means the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Income Tax" means any federal, state, local, or non-U.S. income tax measured by or imposed on net income, including any interest, penalty, or addition thereto.

"Intellectual Property" shall mean all rights, title and interest (whether statutory, common law or otherwise) in or relating to any intellectual property, including all: (i) patents and patent applications, and all related national or international counterparts thereto, including any divisionals, continuations, continuations-in-part, reissues, reexaminations, substitutions provisionals, renewals, extensions, patents of addition, supplementary protection certificates, utility models, inventors' certificates, or the like, and any foreign equivalents of any of the foregoing (including certificates of invention and any applications therefor) and all rights to claim priority from any of the foregoing; (ii) trademarks, trade dress, service marks, certification marks, logos, slogans, design rights, names, corporate names, trade names, brand names and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, and all applications, registrations, renewals and extensions of any of the foregoing; (iii) copyrights and copyrightable subject matter, whether or not registered or published, and all applications, registrations, reversions, extensions and renewals of any of the foregoing, and all moral rights, however denominated; (iv) trade secrets, and all other confidential or proprietary information, ideas, technology, software, compositions, discoveries, improvements, know-how, inventions, designs, processes, techniques, formulae, models, and methodologies, in each case, whether or not patentable or copyrightable; (v) Internet domain names and social media accounts and addresses, and all registrations for any of the foregoing; and (vi) rights and remedies with respect to any past, present, or future infringement, misappropriation, or other violation of any of the foregoing in clauses (i) through (v), in each case (i) through (vi), anywhere in the world.

"Knowledge" means, as to a particular matter, the actual knowledge of (i) with respect to Purchaser, its chief executive officer or its chief financial officer, and (ii) with respect to the Seller, Mohsin Meghji.

"Liability" means any liability (including any unknown, undisclosed, unmatured, unaccrued, unasserted, contingent, direct, indirect, conditional, implied, vicarious, derivative, joint, several or secondary liability), debt, obligation, deficiency, interest, tax, penalty, fine, penalty, claim, demand, judgment, cause of action or other loss (including loss of benefit or relief), cost or expense of any kind or nature whatsoever, whether asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, and whether due or to become due and regardless of when asserted.

"Material Contract" means any contract to which the Seller is a party that was filed by the Seller pursuant to Exhibit 10, as specified in Regulation S-K Item 601(b)(10), with its annual report on Form 10-K for the fiscal year ended December 31, 2022, or any subsequent current report on Form 8-K or any quarterly report on Form 10-Q.

"Oramed DIP Assumption" means the assignment to Purchaser by Sorrento and Scintilla of their respective rights and obligations under that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, by and among Oramed Pharmaceuticals, Inc., a Delaware corporation ("Oramed"), on the one hand, and Sorrento and Scintilla, on the other, dated as of August 8, 2023 (the "Senior DIP"), the assumption by the Purchaser of such rights, title and interests, duties, liabilities and obligations and the irrevocable and unconditional release by the Purchaser and Oramed of Sorrento and Scintilla from any and all claims, liabilities and obligations under the Senior DIP, in each case, pursuant to documentation entered into between Oramed, Sorrento and the Purchaser on the date hereof.

13

"Organizational Documents" means the articles of incorporation, certificate of incorporation, charter, by-laws, articles of formation, articles of organization, certificate of formation, regulations, operating agreement, certificate of limited partnership, limited liability company agreement or partnership agreement, stockholders agreement and all other similar documents, instruments or certificates executed, adopted or filed in connection with the creation, formation, organization or governance of a Person, including any amendments thereof and any supplements thereto.

"Permit" shall mean franchises, grants, authorizations, registrations, licenses, permits, easements, variances, exceptions, certificates, and approvals of any Governmental Authority.

"Person" means an individual, partnership, joint-stock company, corporation, limited liability company, trust or unincorporated organization, and a government or agency or political subdivision thereof.

"Preferred Stock" means the shares of Series A Preferred Stock of the Company set forth on Schedule I.

"Representative" of any Person shall mean such Person's directors, managers, officers, employees, agents, attorneys, consultants, advisors or other representatives.

"Sale Order" means the *Order (I) Approving Sale of Scilex Stock to Scilex Holding Company Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Conditionally Vacating the Oramed Sale Order, and (III) Granting Related Relief* [ECF No. 1316].

"SCLX Stock Acquisition" means SCLX Stock Acquisition JV LLC, a Texas limited liability company that is a wholly-owned subsidiary of the Purchaser.

"Securities Act" means the Securities Act of 1933, as amended.

"Subsidiary" of any Person means any other Person, of which such first Person (either alone or with any other Subsidiary) owns or controls, directly or indirectly, stock, other securities or other equity interests (i) having the ordinary voting power to elect a majority of the board of directors or other governing body of such Person, or (ii) representing at least fifty percent (50%) of the outstanding stock, other securities or other equity interests of such Person.

"Tax" means any U.S. federal, state, local or non-U.S. tax (including any income tax, franchise tax, service tax, capital gains tax, gross receipts tax, value-added tax, surtax, excise tax, ad valorem tax, transfer tax, stamp tax, sales tax, use tax, property tax, business tax, withholding tax or payroll tax), levy, assessment, tariff, duty (including any customs duty), deficiency or fee (including any fine, addition, penalty or interest), imposed by any Governmental Authority (to the extent the foregoing are taxes or in the nature of a tax).

"Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof, required to be filed by the Purchaser or any of its Subsidiaries to a tax authority.

"Transaction Documents" means collectively, this Agreement, the schedules and exhibits attached hereto (including the Seller Disclosure Schedule), and any and all agreements, certificates, instruments and other documents of the Parties required thereby or executed in connection therewith.

"Warrants" means the Warrants of the Company set forth on Schedule I.

(b)     Public Announcements; Reporting Obligations.

(i)     Each of the Parties may make any filings or public announcement it reasonably deems necessary in order to comply with the requirements of any applicable Law, including without limitation the filing by the Parties of any Form 8-K, Schedule 13G or Schedule 13G/A, Schedule 13D or Schedule 13D/A, Form 3, Form 4 or other appropriate filings with the SEC.  Except as a Party reasonably deems necessary in order to comply with the requirements of any applicable Law, no Party may issue any press release or make any other public announcement relating to the subject matter of this Agreement or the Transactions contemplated hereby without the prior written consent of the other Party, which shall not be unreasonably withheld, conditioned or delayed.

(ii)     The Purchaser acknowledges and agrees that it shall be solely responsible for the filing, as and if applicable, of (1) any Forms 3, 4 and 5 in accordance with Section 16(a) of the Exchange Act and the rules promulgated thereunder, and (2) any Schedule 13D or 13G, as applicable, under the Exchange Act and the rules promulgated thereunder, in each case, in respect of its ownership of a registered class of securities of the Purchaser.

(c)     Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and to be performed entirely within such State.  All actions and proceedings arising out of or relating to this Agreement and the transactions contemplated hereby shall be heard and determined exclusively in the United States Bankruptcy Court for the Southern District of Texas, and the Parties hereby irrevocably submit to the exclusive jurisdiction of such court in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding; *provided, however*, that, if the Bankruptcy Case is closed, any action, claim, suit or proceeding arising out of, based upon, or relating to this Agreement or the transactions contemplated herby shall be heard and determined exclusively in any state or federal court located in New York County, New York. Each Party agrees that a final, non-appealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  **EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

(d)     Section Headings.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not be deemed to constitute a part thereof.

(e)      <u>Notices</u>.

(i)      All communications under this Agreement shall be in writing and shall be delivered by hand, mailed by overnight courier or by registered or certified mail, postage prepaid or by e-mail:

(1)      if to the Purchaser, at Scilex Holding Company, Attention: Stephen Ma and Henry Ji (e-mail: SMa@scilexholding.com; HJi@sorrentotherapeutics.com), or at such other address or e-mail address as the Purchaser may have furnished the Seller in writing, with a copy (which shall not constitute notice) to: Paul Hastings LLP, 600 Travis Street, Fifty-Eighth Floor, Houston, TX 77002, Attention: Luis F. Gomar, James Grogan, Justin Rawlins (e-mail: luisgomar@paulhastings.com;                           jamesgrogan@paulhastings.com; justinrawlins@paulhastings.com).

(2)      if to the Seller, to 4955 Directors Place, San Diego, California 92121, Attention: Mohsin Y. Meghji, Chief Restructuring Officer (e-mail: mmeghji@m3-partners.com), or at such other address or e-mail address as it may have furnished in writing to the Purchaser, with a copy (which shall not constitute notice) to: Latham & Watkins LLP, 10250 Constellation Blvd. Suite 1100, Los Angeles, CA 90067, Attention: Andrew Clark; Caroline Reckler; Steven Feldman (e-mail: andrew.clark@lw.com; caroline.reckler@lw.com; steve.feldman@lw.com).

(ii)      Any notice so addressed shall be deemed to be given: if delivered by hand, on the date of such delivery; if mailed by courier, on the first Business Day following the date of such mailing; if mailed by registered or certified mail, on the third Business Day after the date of such mailing; and if delivered by e-mail (with no error message received), on the date of such delivery.

(f)      <u>Expenses and Taxes</u>.  Each Party shall bear its own expenses incurred in connection with this Agreement and the consummation of the transactions contemplated hereby; *provided*, that the Purchaser shall bear any transfer taxes payable in connection with the transfer of the Purchased Securities to the Purchaser.

(g)      <u>Successors and Assigns</u>.  Neither this Agreement nor any of the rights, interests or obligations hereunder may be assigned or delegated by the Purchaser or the Seller.   This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of each of the parties, including the trustee in the Bankruptcy Case.   Notwithstanding the foregoing or anything in this Agreement to the contrary, the Purchaser may assign this Agreement and/or any of its rights, interests, or obligations hereunder (in whole or in part) to an Affiliate of the Purchaser; *provided*, *however*, that such assignment shall not relieve the Purchaser of its obligations hereunder.  Purchaser may, without the consent of Seller, designate, effective as of the Closing, one or more Persons to acquire all, or any portion of, the Purchased Securities or pay all or any portion of the Purchase Price; *provided*, *however*, that such designation shall not relieve the Purchaser of its obligations hereunder.  The above designation may be made by Purchaser by written notice to Seller at least three (3) Business Days prior to the Closing Date.  The Parties agree to modify any Closing deliverables in accordance with the foregoing designation.

(h)    Remedies.  The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with its specific terms or was otherwise breached and that monetary damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement.  It is accordingly agreed that the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, and any such injunction shall be in addition to any other remedy to which any Party is entitled, at law or in equity.

(i)    Entire Agreement; Amendment and Waiver.  This Agreement constitutes the entire understanding of the Parties and supersedes all prior understandings among such Parties, including the non-binding term sheet, dated September 11, 2023, among the Parties and Oramed.  This Agreement may be amended with (and only with) the written consent of the Seller and the Purchaser, and the observance of any term of this Agreement may be waived in a writing signed by the party making such waiver.

(j)    Counterparts.  This Agreement may be executed with counterpart signature pages or in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterpart signature pages or counterparts of this Agreement may be executed and delivered by electronic means (including in .pdf format sent by electronic mail) and other electronic signatures, and the receiving party may rely on the receipt of such document so executed and delivered by electronic means as if the original had been received.

(k)    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

(l)    Mutual Drafting.  The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent.  If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(m)    Rules of Construction.  The words "hereby," "herein," "hereof," "hereunder" and words of similar import refer to this Agreement as a whole (including any Exhibits and Schedules hereto) and not merely to the specific section, paragraph or clause in which such word appears.  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  When calculating periods of time under this Agreement, reference to a "day" or "days" shall refer to a calendar day unless otherwise expressly

provided herein.  The definitions given for terms in this Agreement shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  Except as otherwise expressly provided herein, all references to "dollars" or "$" shall be deemed references to the lawful money of the United States of America.  The use of "or" is not intended to be exclusive unless expressly indicated otherwise.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

<u>SELLER</u>:

SORRENTO THERAPEUTICS, INC.

By: _____
    Name: Mohsin Y. Meghji
    Title: Chief Restructuring Officer

[*Signature Page to Stock Purchase Agreement*]

PURCHASER:

SCILEX HOLDING COMPANY, a Delaware corporation

By: _____
Name: Jaisim Shah
Title: Chief Executive Officer and President

## Schedule I

**Purchased Securities**

| Class or Type of Securities | Number of Securities |
|---|---|
| Common Stock | 60,068,585 |
| Series A Preferred Stock | 29,057,097 |
| Warrants | Warrants exercisable for 1,386,617 shares of common stock of the Purchaser in respect of Public Warrants, and warrants exercisable for 3,104,000 shares of common stock of the Purchaser in respect of Private Placement Warrants (each as defined in the latest publicly filed Annual Report on Form 10-K of the Purchaser) |

*Final Form*

# SELLER DISCLOSURE LETTER

# TO

# STOCK PURCHASE AGREEMENT

between

**SCILEX HOLDING COMPANY**

and

**SORRENTO THERAPEUTICS, INC.**

**Dated as of September 21, 2023**

Table of Contents

Section 3(a) Organization ..................................................................................................3

Section 3(b) Authority ......................................................................................................4

Section 3(c) No Violation; Consents ................................................................................5

Section 3(d) Capitalization ...............................................................................................7

Section 3(e)  Title to Purchased Securities ......................................................................8

Section 3(f) Legal Proceedings and Orders .....................................................................9

Section 3(g) SEC Matters ...............................................................................................10

Section 3(h) Brokers .......................................................................................................11

## SELLER DISCLOSURE LETTER

Reference is made to that certain Stock Purchase Agreement (the "Agreement") entered into as of the date hereof, by and between Scilex Holding Company, a Delaware corporation (the "Purchaser") and Sorrento Therapeutics, Inc., a Delaware corporation (the "Seller"). Capitalized terms used but not defined in this Disclosure Schedule shall have the meanings ascribed to them in the Agreement.

This Disclosure Schedule is qualified in its entirety by reference to specific provisions of the Agreement, and is not intended to constitute, and shall not be construed as constituting representations or warranties of the Seller, except to the extent expressly provided in the Agreement.

Any information disclosed in any section of this Disclosure Schedule, representation or warranty in a manner that makes its relevance to one or more other sections of the Disclosure Schedule, representations or warranties reasonably apparent will be deemed to have been appropriately included in each such other section of the Disclosure Schedule, representation or warranty (notwithstanding the presence or absence of any reference in or to any section of the Disclosure Schedule, representation or warranty).

Inclusion of information in this Disclosure Schedule shall not be construed as an admission that such information is material to the business, assets, liabilities, financial position, operations or results of operations of the Seller, as applicable.

The Seller assumes no responsibility to any Person that is not a party to the Agreement for the accuracy of any information herein. The information was not prepared or disclosed with a view to its potential disclosure to others.

## SECTION 3(A)
## ORGANIZATION

(a) *Organization. The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.*

None.

<u>**SECTION 3(B)**</u>
<u>**AUTHORITY**</u>

(b) *Authority. The Seller has authorized the execution, delivery and performance of this Agreement and each of the transactions contemplated hereby, and, upon entry and effectiveness of the Sale Order (as defined below), no other action will be necessary to authorize such execution, delivery and performance.  Subject to and assuming the entry and effectiveness of the Sale Order, this Agreement constitutes a legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.*

None.

**SECTION 3(C)**
**NO VIOLATION; CONSENTS**

(c) *No Violations; Consents.*

(i) *No consent, approval, authorization or order (each a "Consent") of any federal, municipal, state, local or foreign governmental, administrative, taxing or regulatory authority, department, agency, commission or body (including any court, arbitrator, or similar tribunal) (each a "Governmental Authority") having jurisdiction over the Seller is required for the execution, delivery or performance by the Seller of its obligations hereunder, including without limitation the sale of the Purchased Securities[1], except for (A) the entry of the Sale Order by the Bankruptcy Court (as defined below) and (B) such consents, approvals, authorizations or orders as have already been obtained or granted.*

None.

(ii) *Except to the extent excused by or unenforceable as a result of the Bankruptcy Case (as defined below) and except for the entry and effectiveness of the Sale Order, neither the sale of the Purchased Securities nor the performance of the Seller's obligations hereunder will violate, conflict with, result in a breach or termination of, extinguish any material rights, or constitute a default (or an event that, with the giving of notice or the lapse of time, or both, would constitute a default) under (i) the certificate of incorporation, bylaws or other Organizational Documents of the Seller (ii) any decree, judgment, order, law, treaty, rule, regulation or determination of any Governmental Authority ("Laws") having jurisdiction over the Seller or any of its respective assets or properties, or (iii) the terms of any Material Contract, except in each case as would not reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with any of the transactions contemplated by this Agreement.*

(A)

Restated Certificate of the Purchaser, filed with the Secretary of State of the State of Delaware on November 10, 2022.

Bylaws of the Purchaser.

Stockholder Agreement, dated as of September 12, 2022 (the "Stockholder Agreement"), between Vickers Vantage Corp. I and Seller.

Certificate of Designations of Scilex Holding Company, dated as of November 10, 2022.

(C)

---

[1] Seller desires to sell, convey, transfer, assign and deliver to Purchaser, and Purchaser desires to purchase and acquire from the Seller, those securities of the Purchaser, listed on Schedule I attached hereto (the "Purchased Securities").

5

Convertible Debenture (Debenture Number SCLX-1), dated as of March 21, 2023 ("Debenture 1"), issued by the Purchaser to YA II PN, Ltd.

Convertible Debenture (Debenture Number SCLX-2), dated as of April 11, 2023 ("Debenture 2"), issued by the Purchaser to YA II PN, Ltd.

Convertible Debenture (Debenture Number SCLX-3), dated as of April 20, 2023 ("Debenture 3" and together with Debenture 1 and Debenture 2, the "Debentures"), issued by the Purchaser to YA II PN, Ltd.

Office Lease, dated as of August 8, 2019, between Scilex Pharmaceuticals, Inc. and 960 San Antonio LLC.

First Amendment to Office Lease, dated as of September 15, 2019, between Scilex Pharmaceuticals, Inc. and 960 San Antonio LLC.

Amended and Restated Industrial Lease, dated April 12, 2023, between Scilex Pharmaceuticals, Inc. and 960 San Antonio LLC.

SECTION 3(D)
CAPITALIZATION

(d) *Capitalization. Other than that certain Stockholder Agreement, dated as of September 12, 2022, between the Purchaser and the Seller and that certain Amended and Restated Registration Rights Agreement, dated as of November 10, 2022, among the Purchaser, the Seller and the other parties thereto, there are no stockholder agreements, voting trusts or other agreements or understandings to which the Seller is a party or by which it is bound relating to the voting or registration of any shares of capital stock of the Purchaser or any of its Subsidiaries or preemptive rights with respect thereto.*

(A)

Agreement to which the Purchaser is a party in connection with voting or registration of any shares of capital stock of the Purchaser:

The Stockholder Agreement.

YA II PN, LTD. has registration rights in respect of the YA ELOC (as set forth in the Standby Equity Purchase Agreement, dated as of November 17, 2022, between the Purchaser and YA II PN, LTD., as amended by the Amended and Restated Standby Equity Purchase Agreement dated as of February 8, 2023).

B. Riley Principal Capital II, LLC has registration rights in respect of that certain B. Riley Equity Line of Credit (as set forth in the Standby Equity Purchase Agreement, dated as of January 8, 2023, between the Purchaser and B. Riley Principal Capital II, LLC).

Registration Rights Agreement, dated as of March 21, 2023, by and between the Purchaser and YA II PN, Ltd.

Amended and Restated Registration Rights Agreement, dated as of November 10, 2022, by and among the Purchaser, Vickers Venture Fund VI Pte Ltd, Vickers Venture Fund VI (Plan) Pte Ltd, Seller and certain security holders set forth on the signature pages thereto.

## SECTION 3(E)
## TITLE TO PURCHASED SECURITIES

(e) *Title to Purchased Securities. The Seller has good, valid and marketable title to the Purchased Securities, and, subject to receipt of the Sale Order, good, valid and marketable title will be transferred to the Purchaser free and clear of any charge, lien (statutory or otherwise), mortgage, lease, hypothecation, encumbrance, pledge, security interest, option, right of use, first offer or first refusal, voting trusts, proxies, easement, servitude, restrictive covenant, encroachment or similar restriction, other than those imposed by the Securities Act (each, an "Encumbrance", and collectively, "Encumbrances"). The Purchased Securities, constitute all of the shares of capital stock of the Purchaser (or options, warrants or rights to purchase shares of capital stock of the Purchaser or securities convertible into or exchangeable for shares of capital stock of the Purchaser) owned by the Seller (other than those certain 1,917,210 shares of common stock of the Purchaser that the Seller is currently holding in abeyance on behalf of certain warrantholders of the Seller).*

None.

### SECTION 3(F)
### LEGAL PROCEEDINGS AND ORDERS

(f) *Legal Proceedings and Orders.  Other than in connection with the Bankruptcy Case, to the Knowledge of Seller, there is no action, suit, arbitration, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding or any informal proceeding) or investigation pending or being heard by or before, or otherwise involving, any Governmental Authority or any arbitrator or arbitration panel (each a "Proceeding") and no Person has threatened in writing to commence any Proceeding, in each case, that would reasonably be expected to have the effect of preventing, materially delaying, making illegal or otherwise materially interfering with any of the Transactions contemplated by this Agreement.  To the Knowledge of Seller, and except as described in Section 3(f) of the Seller Disclosure Schedule, there is no governmental order, writ, injunction, judgment or decree to which the Purchased Securities are subject.*

There are ongoing legal proceedings as set out in details in Form S-1 Registration Statement (see page 203-204 (under "*Business – Legal Proceedings*")). As an update to the section "*Former Employee Litigation*" in such Form S-1 Registration Statement, on September 1, 2023, the Delaware Court of Chancery (the "Court") issued a memorandum opinion addressing liability in this case, finding in favor of Sorrento Therapeutics, Inc. and Scilex Pharmaceuticals Inc. (on all but three counts deemed to have been waived). The Court has requested additional briefing by the parties before making its ruling on remedies.

**SECTION 3(G)**
**SEC MATTERS**

(g) *SEC Matters. The sale of the Purchased Securities by the Seller is not part of a plan or scheme to evade the registration requirements of the Securities Act.  Neither the Seller nor any Person (as defined below) acting on behalf of the Seller has offered or sold any of the Purchased Securities by any form of general solicitation or general advertising.*

None.

10

## SECTION 3(H)
## BROKERS

(o) *Brokers. Except as set forth in* <u>Section 3(h)</u> *of the Seller Disclosure Schedule, no Person is entitled to any brokerage, financial advisory, finder's or similar fee or commission payable by the Seller or any of its Affiliates in connection with the Transactions contemplated by this Agreement.*

1.   Moelis & Company LLC.

# **EXHIBIT B**

**Mutual Termination and Release Agreement**

EXECUTION VERSION

## MUTUAL TERMINATION AND RELEASE AGREEMENT

This Mutual Termination and Release Agreement (this "<u>Agreement</u>") is entered into as of September 21, 2023, by and between Sorrento Therapeutics, Inc., a Delaware corporation, ("<u>Sorrento</u>"), and Oramed Pharmaceuticals, Inc., a Delaware corporation ("<u>Oramed</u>", and together with Sorrento, the "<u>Parties</u>").

**WHEREAS**, on February 13, 2023, Sorrento, together with its wholly-owned subsidiary, Scintilla Pharmaceuticals, Inc., commenced voluntary proceedings under Chapter 11 of the United States Bankruptcy in the United States Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>"), which case has been administered under Case No. 23-90085 (DRJ) (the "<u>Chapter 11 Case</u>");

**WHEREAS**, on August 7, 2023, Sorrento and Oramed entered into that certain Stock Purchase Agreement (as amended, the "<u>Oramed Stock Purchase Agreement</u>");

**WHEREAS**, on September 11, 2023, in connection with the Chapter 11 Case and upon further negotiation between Sorrento, Scilex Holding Company, a Delaware corporation ("<u>Scilex</u>") and Oramed in connection with the proposed sale by Sorrento and acquisition by Scilex of the Purchased Securities (as defined in Scilex Stock Purchase Agreement (as defined below)), entered into that certain Non-Binding Term Sheet (the "<u>Term Sheet</u>"), which includes as Exhibit A thereto that certain Term Sheet for Senior Secured Note and Warrants and Related Matters (the "<u>Senior Debt Term Sheet</u>" and, together with the Short Form Term Sheet, the "<u>Term Sheets</u>", and the transactions contemplated thereby, collectively, the "<u>Transactions</u>");

**WHEREAS**, the Bankruptcy Court has, by order dated September 12, 2023 [Docket No. 1316] (the "<u>Approval Order</u>"), approved the Term Sheets, and in connection therewith, (i) conditionally vacated the Oramed Stock Purchase Agreement and the order dated August 30, 2023 [Docket No. 1267], effective upon closing of the Transactions, and (ii) extended the restrictions on certain transfers of Scilex common stock set forth in the *Court's Order Extending the Application of the Automatic Stay to Continue the Restricted Trading Period for Shares of Scilex Stock Distributed to the Debtors' Shareholders* from September 1, 2023 to March 31, 2024;

**WHEREAS**, on September [21], 2023, Sorrento and Scilex entered into that certain Stock Purchase Agreement (the "<u>Scilex Stock Purchase Agreement</u>"), pursuant to which Sorrento agreed to sell and transfer to Scilex and Scilex agreed to purchase and acquire the Purchased Securities (as defined therein); and

**WHEREAS**, in connection with the closing of the Scilex Stock Purchase Agreement and in furtherance of the Transactions, Sorrento and Oramed desire to terminate in all respects the Oramed Stock Purchase Agreement effective upon the closing of the Transactions, and to deliver mutual full, irrevocable and unconditional releases of any and all claims and causes of action, including, without limitation, claims and causes of action relating to or arising from or in connection with the Stock Purchase Agreement (and related documents) effective upon the closing of the Transactions.

**NOW, THEREFORE**, in consideration of the mutual agreements contained herein, and good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

Section 1.        <u>Termination of the Oramed Stock Purchase Agreement</u>. Pursuant to Section 7(a) of the Oramed Stock Purchase Agreement, effective upon the closing of the Transactions, each of Sorrento

and Oramed hereby consents to the termination of the Oramed Stock Purchase Agreement, all of the other Transaction Documents (as defined in the Oramed Stock Purchase Agreement) and the transactions contemplated by the Oramed Stock Purchase Agreement and such other Transactions Documents, and acknowledges and agrees that the Oramed Stock Purchase Agreement and all of the other Transaction Documents are of no further force and effect and each of the Oramed Stock Purchase Agreement, the other Transaction Documents and the transactions contemplated by the Oramed Stock Purchase Agreement and such other Transactions Documents are hereby terminated in all respects.

Section 2.    <u>Mutual Releases</u>.

(a)    Effective upon the closing of the Transactions, each of Sorrento and Oramed, on behalf of itself and its predecessors, successors, affiliates, heirs, administrators, executors, assigns and each of their respective officers, directors, partners, managers, members, financial advisors, accountants, actuaries, shareholders, agents, attorneys, representatives, employees, direct and indirect parent entities, subsidiaries, heirs, administrators, and executors and with respect to Sorrento, its estate and any trustee or other estate representative appointed in the Chapter 11 Case or any successor case (collectively, and whether current or former, in each case in his, her, or its capacity as such, the "<u>Releasing Parties</u>"), do hereby irrevocably and unconditionally release and discharge the other Party hereto and such other Party's predecessors, successors, affiliates, heirs, administrators, executors, assigns and each of their respective officers, directors, partners, managers, members, financial advisors, accountants, actuaries, shareholders, agents, attorneys, representatives, employees, direct and indirect parent entities, subsidiaries, heirs, administrators, and executors (collectively, and whether current or former, in each case in his, her, or its capacity as such, the "<u>Released Parties</u>"), and each of them, of and from any and all actions, suits, causes of action, contracts, debts, sums of money, controversies, claims, demands, liabilities, losses, judgments, costs, attorney's fees, damages and expenses, in each case of any kind whatsoever, whether in law, equity or otherwise, known or unknown, actual or contingent, mature or unmatured, disputed or undisputed, accrued or not accrued, foreseen or unforeseen, then existing or thereafter arising, in law, at equity or otherwise, whether individual, class, direct or derivative in nature, whether for tort, contract, negligence, gross negligence, strict liability, contribution, subrogation, *respondiat superior*, breach of fiduciary duty, recharacterization, subordination, violations of federal or state securities laws, rules or regulations, or otherwise, based, in whole or in part, on any act, omission, transaction, event or other occurrence or circumstances (each, a "<u>Claim</u>" and collectively, "<u>Claims</u>") taking place on or before the date hereof which any of the Releasing Parties may now have or ever has had, prior to and including the date hereof through, including, without limitation, any Claims relating to or arising in connection with the Oramed Stock Purchase Agreement and the other Transaction Documents (as defined in the Oramed Stock Purchase Agreement), and the Breakup Fee and Expense Reimbursement (each as defined in the Oramed Stock Purchase Agreement).

(b)    Each Party, on its own behalf and on behalf of its respective Releasing Parties, covenants not to directly or indirectly sue, participate in any suit (unless lawfully compelled to do so by service with a subpoena or other legal process, demand, or order), or threaten to sue, or otherwise assert any Claim or initiate any other action, arbitration, or proceeding, or in any other way assist others in any action, arbitration, or proceeding (unless lawfully compelled to do so by service with a subpoena or other legal process, demand, or order), of any kind (including, without limitation, lawsuits, arbitrations, administrative proceedings, proceedings before any government body, complaints, or appeals), against any Released Party concerning, relating to, or arising from any of the Claims.

(c)    Each Party (on behalf of itself and its respective Releasing Parties) hereby: (i) acknowledges a familiarity with Section 1542 of the Civil Code of the State of California, which provides as set forth below this <u>Section 2(c)</u>; (ii) recognizes that it may have some claim, demand, or cause of action against the other Party or any of such other Party's respective Released Parties of which it (or its respective

Releasing Parties) is unaware and unsuspecting, and which it is (or its respective Releasing Parties are) giving up by signing this Agreement; and (iii) hereby expressly waives and relinquishes every right or benefit which he, she, or it has under Section 1542 of the Civil Code of the State of California, and any similar statute under any other state or federal law, principle of common law, or international or foreign law, to the fullest extent that such right or benefit may lawfully be waived, regardless of whether such Party (or any its respective Releasing Parties) is aware of or suspects such Claims at the time such Party executes this Agreement or whether it later discovers Claims that may be different than, or in addition to, those that such Party (or any of its respective Releasing Parties) now knows or believes to exist regarding the subject matter of the release provided in <u>Section 2(a)</u>.

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

(d)     Notwithstanding anything in this Agreement to the contrary, (i) Sorrento's obligations under that certain Senior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, by and among Oramed on the one hand, and Sorrento and Scilex on the other hand, dated as of August 8, 2023 (the "<u>Senior DIP</u>"), any other definitive agreements entered into in connection therewith and ancillary thereto and the *Order (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Granting Stalking Horse Protections and (V) Granting Related Relief* [Docket No. 1184] shall not be released or discharged pursuant to this Agreement, and (ii) the terms of this Agreement shall not, and shall not be construed to, limit (I) the terms and scope of the releases provided in Paragraphs 14, 17, and 20 of the Approval Order or (II) the terms of the that certain Assignment, Assumption and Release Agreement entered into on the date hereof by Scilex, Oramed and Sorrento, including any release by either of the Parties provided therein.

Section 3.     <u>Miscellaneous</u>.

(a)     <u>Representations of the Parties</u>.  Each Party represents and warrants to the other that: (i) it has duly executed and delivered this Agreement and it has all requisite corporate power and authority to execute this Agreement; (ii) its entrance into this Agreement has been duly authorized by all necessary corporate action on the part of such Party; and (iii) this Agreement constitutes the legal, valid, and binding obligation of such Party, enforceable against it in accordance with its terms.

(i)     <u>Public Announcements</u>. Each of the Parties may make any filings or public announcement it reasonably deems necessary in order to comply with the requirements of any applicable Law, including, without limitation, the filing by any of the Parties of any Form 8-K, Schedule 13G or Schedule 13G/A, Schedule 13D or Schedule 13D/A, Form 3, Form 4 or other appropriate filings with the SEC.  Except as a Party reasonably deems necessary to comply with the requirements of any applicable Law, no Party may issue any press release or make any other public announcement relating to the subject matter of this Agreement or the Transactions contemplated hereby without the prior written consent of the other Party, which shall not be unreasonably withheld, conditioned or delayed.

(b)     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the law of the State of New York applicable to contracts made and to be performed entirely within such State.  All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in the United States Bankruptcy Court for the Southern District of Texas, and

3

140480627v4

the Parties hereby irrevocably submit to the exclusive jurisdiction of such court in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding; *provided, however*, that, if the Bankruptcy Case is closed, any action, claim, suit or proceeding arising out of, based upon, or relating to this Agreement or the transactions contemplated herby shall be heard and determined exclusively in any state or federal court located in New York County, New York. Each Party agrees that a final, non-appealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Each Party hereto irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum *non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or any other document related hereto. **EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

(c)     <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, all other terms, conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon a determination that any term or other provision of this Agreement is invalid, illegal or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible.

(d)     <u>Mutual Drafting</u>.  The Parties participated jointly in the negotiation and drafting of this Agreement and the language used in this Agreement shall be deemed to be the language chosen by the Parties to express their mutual intent.  If an ambiguity or question of intent or interpretation arises, then this Agreement will accordingly be construed as drafted jointly by the Parties, and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

(e)     <u>Headings.</u>  The headings of this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

(f)     <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the Parties including, without limitation, with respect to Sorrento, any trustee or other estate representative appointed in the Chapter 11 Case or any successor case.

(g)     <u>Counterparts</u>.  This Agreement may be executed with counterpart signature pages or in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterpart signature pages or counterparts of this Agreement may be executed and delivered by electronic means (including in .pdf format sent by electronic mail) and other electronic signatures, and the receiving party may rely on the receipt of such document so executed and delivered by electronic means as if the original had been received.

*[Signature Pages Follow]*

140480627v4

**IN WITNESS WHEREOF**, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

**SORRENTO THERAPEUTICS, INC.**

By: _____
    Name:  Mohsin Y. Meghji
    Title:   Chief Restructuring Officer

**ORAMED PHARMACEUTICALS, INC.**

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

**SORRENTO THERAPEUTICS, INC.**

By: _____
    Name:
    Title:

**ORAMED PHARMACEUTICALS, INC.**

By: _____
    Name: Nadav Kidron
    Title: Chief Executive Officer

By: _____
    Name: Josh Hexter
    Title: Chief Business and Operating Officer

## **EXHIBIT C**

**Assignment, Assumption and Release Agreement**

## ASSIGNMENT, ASSUMPTION AND RELEASE AGREEMENT

THIS ASSIGNMENT, ASSUMPTION AND RELEASE AGREEMENT (this "***Agreement***") is executed on September 21, 2023 (the "***Effective Date***"), by and among Scilex Holding Company ("***Scilex***"), Oramed Pharmaceuticals Inc. ("***Oramed***"), Sorrento Therapeutics, Inc. ("***Sorrento***"), and Scintilla Pharmaceuticals, Inc. (together with Sorrento, the "***Debtors***").

## W I T N E S S E T H:

**WHEREAS**, on February 13, 2023, the Debtors commenced voluntary proceedings under Chapter 11 of the United States Bankruptcy Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***"). The Debtors' Chapter 11 proceedings are jointly administered under the caption *In re Sorrento Therapeutics, Inc., et al.*, Case Number 23-90085 (DRJ) (the "***Chapter 11 Cases***");

**WHEREAS**, the Debtors have been conducting a marketing process for the sale or disposition of all or any portion of the Debtors' assets under section 363 of the Bankruptcy Code, including (x) the Debtors' equity interests in its non-debtor subsidiaries, including, but not limited to, Scilex and (y) the Debtors' other assets;

**WHEREAS**, Oramed agreed, and after a hearing before the Bankruptcy Court on August 7, 2023, the Bankruptcy Court approved, pursuant to that certain Senior Secured, Super-Priority Debtor-In-Possession Loan and Security Agreement (the "***DIP Loan Agreement***") entered into on August 9, 2023, to provide a non-amortizing super-priority senior secured debtor-in-possession term loan facility (the "***Senior DIP Facility***") in an aggregate principal amount of $100,000,000, which amount was subsequently drawn in full by the Debtors.  As of the Effective Date, the aggregate outstanding Obligations under the Senior DIP Facility is $101,875,000, comprised of $100,000,000 principal, $875,000 accrued and unpaid interest and $1,000,000 fees and expenses payable under the Senior DIP Facility (the "***DIP Facility Obligations***"); capitalized terms used herein but otherwise defined shall have the meanings so defined in the DIP Loan Agreement;

**WHEREAS**, on September 11, 2023, Scilex, Oramed and Sorrento executed non-binding term sheets relating to, among other things, the Securities Transfer (as defined below) (the "***Securities Transfer Term Sheet***") (which the official committee of unsecured creditors and the official committee of equity security holders in the Chapter 11 Cases have each signed as "Consenting Parties" thereto) and the Note Documents (as defined below) (the "***Note Term Sheet***" and together with the Securities Transfer Term Sheet, the "***Scilex Term Sheets***").  The Scilex Term Sheets are subject to entry into definitive documentation relating thereto. The transactions contemplated by the Scilex Term Sheets are expected to close on or about September 19, 2023;

**WHEREAS**, after a hearing before the Bankruptcy Court on September 12, 2023, the Bankruptcy Court approved, among other things, the Scilex Term Sheets and entered the *Order (I) Approving Sale of Scilex Stock to Scilex Holdings Company Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Conditionally Vacating the Oramed Sale Order, and (III) Granting Related Relief* [Docket No. 1316] (the "***Scilex Sale Order***");

**WHEREAS**, pursuant to the Securities Transfer Term Sheet, the parties to the Securities Transfer Term Sheet agreed that Scilex would acquire all of the Scilex Common Shares owned by Sorrento (other than Scilex Common Shares held in abeyance by Sorrento on behalf of certain warrantholders of Sorrento) (the "***Common Transfer Shares***"), (ii) all of the Scilex Preferred Shares owned by Sorrento (the "***Preferred Transfer Shares***") and (iii) all of the warrants for the purchase of shares of Scilex common stock owned

by Sorrento (the "***Transfer Warrants***", and together with the Common Transfer Shares and the Preferred Transfer Shares, the "***Transfer Securities***") (collectively, the "***Securities Transfer***") for an aggregate consideration of $110 million, payable (i) by means of Scilex's assumption of the Debtors' DIP Facility Obligations (the "***Senior DIP Assumption***"), and (ii) by such other consideration as set forth in the Securities Transfer Term Sheet;

**WHEREAS**, in connection with the Senior DIP Assumption, Scilex and Oramed will enter into certain note documents, including, without limitation, a securities purchase agreement (the "***Securities Purchase Agreement***"), senior secured promissory note and certain security documents (together with the Securities Purchase Agreement, the "***Note Documents***"), which will amend and restate in their entirety the Loan Documents; and

**WHEREAS**, in connection with this Agreement and the Note Documents, contemporaneously with this Agreement, Sorrento and Oramed have entered into that certain Mutual Termination and Release Agreement in respect of that certain Stock Purchase Agreement, dated as of August 7, 2023 (the "SPA Termination"), by and between Sorrento and Oramed.

**NOW, THEREFORE**, in consideration of the mutual agreements contained herein, and good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Representations by the Debtors and Oramed**.  The Debtors and Oramed each hereby represents and warrants that (i) as of the Effective Date, the aggregate outstanding amount of all Obligations under DIP Loan Agreement and all other Loan Documents is $101,875,000, comprised of $100,000,000 principal, $875,000 accrued and unpaid interest and $1,000,000 fees and expenses payable under the DIP Loan Agreement and all other Loan Documents, and (ii) there are no offsets, counterclaims or defenses against the repayment of the DIP Facility Obligations as of the Effective Date.

2.     **Senior DIP Assumption**.  Effective upon execution and delivery of the Note Documents and the SPA Termination by the parties thereto:

    (a)     the Debtors hereby irrevocably assign and transfer to Scilex all of their rights, title and interests and duties, liabilities and obligations under the DIP Loan Agreement and the other Loan Documents;

    (b)     Scilex hereby irrevocably and unconditionally accepts such assignment and assumes such rights, title and interests and assumes such duties, liabilities and obligations from the Debtors, including without limitation, any claims, liabilities or obligations arising from any failure of the Debtors to perform any of their covenants, agreements, commitments and/or obligations to be performed prior to the date hereof under the DIP Loan Agreement and the other Loan Documents; provided, however, that such indebtedness shall be governed by the Note Documents, which amend, restate and replace in their entirety the DIP Loan Agreement and the other Loan Documents;

    (c)     Oramed consents to the assignment and assumption described in Sections 2(a) and 2(b);

    (d)     the parties hereto hereby agree that the Note Documents shall amend, restate and replace in their entirety the DIP Loan Agreement and the other Loan Documents; and

    (e)     the facility evidenced by the Note Documents shall not constitute a debtor-in-possession credit facility in the Chapter 11 Cases.

2

3. **Releases**.  Effective upon execution and delivery of the Note Documents and the SPA Termination by the parties thereto, but without further action on the part of any party:

(a) **Release of Debtors**.  Oramed hereby releases and discharges the Debtors from any and all obligations and liabilities arising with respect to or relating to the DIP Loan Agreement and the other Loan Documents and agrees that the Obligations of the Debtors thereunder shall be automatically terminated and the Debtors shall be forever released and discharged and (b) any and all security interests, pledges, liens and other interests in favor of Oramed in the Debtor's assets shall be forever released and discharged.  Oramed hereby agrees that it shall promptly execute and deliver such additional documents and shall provide additional information as the Debtors may deem necessary or reasonably appropriate in order to evidence or otherwise give public notice of this release.

(b) **Mutual Release**.  Without limiting the foregoing, Oramed, Scilex, and the Debtors agree to the mutual releases in accordance with, and to the fullest extent set forth in the Scilex Sale Order.

(c) **Waiver of Section 1542**.  All parties providing releases pursuant to this Agreement expressly and voluntarily waive Section 1542 of the California Civil Code, or any similar, comparable or equivalent provision of the statutory or non-statutory law of California or any other jurisdiction, and expressly consents that this Agreement shall be given full force and effect according to each and all of its express terms and provisions, including those relating to unknown and unsuspected claims, if any. Section 1542 provides:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

4. **Authority; Valid Existence**.  Each of the parties hereto represents and warrants to each other party hereto that: (i) it has duly executed and delivered this Agreement and it has all requisite corporate power and authority to execute, and deliver and perform its obligations under, this Agreement; (ii) its entrance into this Agreement has been duly authorized by all necessary corporate action on the part of such party, and; (iii) this Agreement constitutes the legal, valid, and binding obligation of such party, enforceable against it such party accordance with its terms; and (iv) it is duly organized and validly existing under the laws of Delaware.

5. **Binding Effect**.  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns, including, without limitation, with respect to the Debtors, any trustee or other estate representative appointed in the Chapter 11 Cases or any successor case (including any cases under Chapter 7 of the Bankruptcy Code).

6. **Severability**.  In the event that any one or more of the provisions contained in this Agreement shall be held to be invalid, illegal, or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions contained herein shall not, in any way, be affected or impaired.

7. **Amendments**.  This Agreement may be modified with (and only with) the written consent of the each of the parties hereto.

8. **Governing Law; Waiver of Jury Trial**.  This Agreement shall be construed, interpreted and enforced under and pursuant to the laws of the State of New York, without regard to

principles of conflict of laws. All actions and proceedings arising out of or relating to this Agreement shall be heard and determined exclusively in the United States Bankruptcy Court for the Southern District of Texas, and the parties hereto hereby irrevocably submit to the exclusive jurisdiction of such court in any such action or proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such action or proceeding; *provided, however*, that, if the Bankruptcy Case is closed, any action, claim, suit or proceeding arising out of, based upon, or relating to this Agreement or the transactions contemplated herby shall be heard and determined exclusively in any state or federal court located in New York County, New York. Each party agrees that a final, non-appealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Each party hereto irrevocably waives any objection, including any objection to the laying of venue or based on the grounds of forum *non conveniens*, which it may now or hereafter have to the bringing of any action or proceeding in such jurisdiction in respect of this Agreement or any other document related hereto.  **EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

    9. **Counterparts; Electronic Transmission**.  This Agreement may be executed with counterpart signature pages or in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Counterpart signature pages or counterparts of this Agreement may be executed and delivered by electronic means (including in .pdf format sent by electronic mail) and other electronic signatures, and the receiving party may rely on the receipt of such document so executed and delivered by electronic means as if the original had been received.

    10. **Valuation**.

    (a) For purposes of this Agreement, "***Warrants***" means, collectively: (i) the warrant to purchase common stock (and any other class of securities into which such securities may hereafter be reclassified or changed) of Scilex, par value $0.0001 per share ("***Common Stock***"), delivered to Oramed on the Effective Date, which warrant shall have an exercise price of $0.01 per share of Common Stock issuable upon exercise thereof, and be exercisable for 4,500,000 shares of Common Stock; (ii) the warrants to purchase Common Stock delivered to Oramed on the Effective Date, which warrants shall have an exercise price of $0.01 per share of Common Stock issuable upon exercise thereof, and be exercisable for an aggregate number of up to 8,500,000 shares of Common Stock; and (iii) the warrant to purchase Common Stock transferred to Oramed on the Effective Date, which warrant has an exercise price of $11.50 per share of Common Stock issuable upon exercise thereof, and is exercisable for 4,000,000 shares of Common Stock.

    (b) Within twenty (20) Business Days (as that term is defined in the Securities Purchase Agreement) after the Effective Date, Oramed will prepare and deliver to the Debtors and Scilex a preliminary valuation statement (the "***Proposed Valuation Statement***") setting forth its calculation of the valuation of the Warrants. Each of the Debtors and Scilex shall have ten (10) Business Days thereafter to dispute such Proposed Valuation Statement, with any failure to dispute during this time deemed an acceptance of such Proposed Valuation Statement as a "***Final Valuation Statement***." In the event of any dispute regarding the Proposed Valuation Statement, Oramed, the Debtors and Scilex shall negotiate in good faith to resolve such dispute; *provided, however*, that if such parties are unable to resolve any such dispute within fifteen (15) Business Days after a notification of dispute to Oramed, the parties shall use reasonable discretion to select a nationally-recognized expert in valuing assets of this type (with each of Oramed, the Debtors and Scilex bearing one-third of the associated fees and expenses). The selected expert

4

resolution will be the Final Valuation Statement and shall be deemed final and binding as to each of Oramed, the Debtors and Scilex. Except as specifically required pursuant to a final "determination" within the meaning of Section 1313(a) of the Code, the parties shall report and file Tax Returns in all respects and for all purposes in a manner consistent with the Final Valuation Statement, and shall not take any position before any Governmental Authority that is in any way inconsistent with the Final Valuation Statement.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK;
SIGNATURE PAGES FOLLOWS**

5

**IN WITNESS WHEREOF**, Scilex, Oramed and the Debtors, by their respective duly authorized representatives, have executed and delivered this Agreement as of the day and year first above written.

**SCILEX HOLDING COMPANY**,
a Delaware corporation

By: _____
Name: Jaisim Shah
Title: Chief Executive Officer and President

**ORAMED PHARMACEUTICALS INC.**,
a Delaware corporation

By: _____
Name:  Nadav Kiron
Title:   Chief Executive Officer

By: _____
Name:  Josh Hexter
Title:   Chief Business and Operating Officer

[*Signature pages continue*]

[*Signature Page to Senior DIP Assignment, Assumption and Release Agreement*]

**SORRENTO THERAPEUTICS, INC.**,
a Delaware corporation

By: _Mohsin Y. Meghji_____
Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer


**SCINTILLA PHARMACEUTICALS, INC.**,
a Delaware corporation

By: _Mohsin Y. Meghji_____
Name: Mohsin Y. Meghji
Title: Chief Restructuring Officer

# **EXHIBIT D**

**Assumption and Assignment of Legal Fees and Expenses**

September 21, 2023

Sorrento Therapeutics, Inc.
4955 Directors Place
San Diego, CA 92121
Attention: Mohsin Y. Meghji

Re:      Assumption and Assignment of Legal Fees and Expenses

Ladies and Gentlemen:

      Reference is hereby made to that certain Stock Purchase Agreement, dated as of September 19, 2023, by and between Scilex Holding Company, a Delaware corporation ("**Scilex**"), and Sorrento Therapeutics, Inc., a Delaware corporation ("**Sorrento**") (as may be amended or restated from time to time, the "**Purchase Agreement**"). Each capitalized term used in this letter (the "**Letter Agreement**") but not otherwise defined herein shall have the meaning ascribed to it in the Purchase Agreement.

      Pursuant to and in accordance with Section 1 of the Purchase Agreement, Sorrento hereby assigns, and Scilex hereby irrevocably and unconditionally assumes, all of the obligations of Sorrento to Paul Hastings LLP for those legal fees and expenses reflected in Paul Hasting LLP's proof of claim #238 filed with the Bankruptcy Court (attached hereto as **Exhibit A**) in the amount of $12,249,244.09 (the "**Obligations**"). Scilex and Paul Hastings LLP each hereby agree and acknowledge that the Obligations shall be the sole responsibility of Scilex.

      Except as expressly set forth herein, this Letter Agreement will not amend, modify or otherwise affect the terms and conditions of the Purchase Agreement, which will remain in full force and effect in accordance with the terms thereof.

      This Letter Agreement may be executed electronically and in one or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.

*[Signature page follows]*

Sincerely,

**SCILEX HOLDING COMPANY**

By: _____

DocuSigned by:

*Jaisim Shah*

─────────B0054A3EB94C412...

    Name: Jaisim Shah

    Title:   Chief Executive Officer and President

*[Signature Page to Scilex Assumption of Fees Letter Agreement]*

ACKNOWLEDGED AND AGREED:

**SORRENTO THERAPEUTICS, INC.**

By: _____
      Name: Mohsin Y. Meghji
      Title:   Chief Restructuring Officer

**The undersigned hereby consents to the assignment and assumption of the Obligations as set forth above.**

Paul Hastings LLP

_____

*[Signature Page to Scilex Assumption of Fees Letter Agreement]*

ACKNOWLEDGED AND AGREED:

**SORRENTO THERAPEUTICS, INC.**


By: _____
     Name: Mohsin Y. Meghji
     Title:   Chief Restructuring Officer



**The undersigned hereby consents to the assignment and assumption of the Obligations as set forth above.**


Paul Hastings LLP

*Paul Hastings LLP*

**<u>EXHIBIT A</u>**

**(See attached)**

**Fill in this information to identify the case:**

Debtor _____ Sorrento Therapeutics, Inc. _____

United States Bankruptcy Court for the District of _____ Southern District of Texas _____

Case number _____ 23-90085 _____

Official Form 410

# Proof of Claim

04/22

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Paul Hastings LLP |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.   From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? / Where should payments to the creditor be sent? (if different)<br><br>See Additional/Expanded Creditor Address(es) page:<br><br>Paul Hastings LLP<br>Jennifer Mulligan<br>515 South Flower Street, Suit...<br>Los Angeles, CA 90071<br>USA<br>**P:** 213-683-5649<br>**E:** jennifermulligan@paulhastings.com<br><br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>_____ |
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____   Filed on _____<br>MM/DD/YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

Official Form 410

1208606212333235530000001

**Part 2:**  Give Information About the Claim as of the Date the Case Was Filed

| | | | |
|---|---|---|---|
| 6. | **Do you have any number you use to identify the debtor?** | ☐ No ☑ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: | 1966 |

---

| | | | |
|---|---|---|---|
| 7. | **How much is a claim?** | 12249244.09 | Does this amount include interest or other charges? ☑ No ☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

---

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

Legal Services - See attached Exhibits A & B

---

9. **Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property

**Nature of property**

☐ Real estate.      If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A)with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed
☐ Variable

---

| | | | |
|---|---|---|---|
| 10. | **Is this claim based on a lease?** | ☑ No ☐ Yes. Amount necessary to cure any default as of the date of the petition. | $ _____ |

---

| | | | |
|---|---|---|---|
| 11. | **Is this claim subject to a right of setoff?** | ☑ No ☐ Yes. Identify the property: | _____ |

---

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A Claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. Check one:        Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). _____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). _____

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4) _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)() that applies. _____

*Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C § 503(b)(9)?**

☑ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time     06/21/2023 at 07:43 am PT
                           MM / DD / YYYY HH : MM

/s/Jennifer E. Mulligan
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Jennifer | E. | Mulligan |
|------|----------|-----|----------|
| | First Name | Middle Name | Last Name |

Title       Senior Manager, Client Finance

Company    Paul Hastings LLP
               Identify the corporate servicer as the company if the authorized agent is a servicer

Address     515 South Flower Street, Suite 2500

| Number | Street | |
|--------|--------|---|
| Los Angeles | CA | 90071 |
| City | State | ZIP Code |

Contact phone _____

Email       jennifermulligan@paulhastings.com



**Additional/Expanded Creditor Address(es):**

**Primary Address (Expanded)**
Paul Hastings LLP
Jennifer Mulligan
515 South Flower Street, Suite 2500
Los Angeles, CA 90071
USA
Phone: 213-683-5649
jennifermulligan@paulhastings.com

Stretto Corporate Restructuring
855.812.6112 inquiries@stretto.com
cases.stretto.com
Proof Of Claim                                                   Page 4

United States Bankruptcy Court, Southern District of Texas, Houston Division

| Fill in this information to identify the case (Select only one Debtor per claim form) | |
|---|---|
| ☒ Sorrento Therapeutics, Inc. (Case No. 23-90085) | ☐ Scintilla Pharmaceuticals, Inc. (Case No. 23-90084) |

## Modified Official Form 410

# Proof of Claim                                                    04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed (February 13, 2023).

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Paul Hastings LLP

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☒ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Paul Hastings LLP
Name
515 South Flower Street, Suite 2500
Number    Street
Los Angeles, CA 90071
City              State          ZIP Code

Contact phone    213-683-5649

Contact email   jennifermulligan@paulhastings.com

Where should payments to the creditor be sent? (if different)

Name
Number    Street
City              State          ZIP Code

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**

☒ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes. Who made the earlier filing? _____

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☐ No

☒ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: __91966__

---

**7. How much is the claim?**   $ 12,249,244.09 _____   . **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Legal Services  -  See attached Exhibits A & B

---

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**          $_____

**Amount of the claim that is secured:**     $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

---

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

---

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☒ No | | |
|---|---|---|---|
| | ☐ Yes. *Check all that apply:* | | |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

|  | | **Amount entitled to priority** |
|---|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| ☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| ☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)? | ☒ No | |
|---|---|---|
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | $_____ |

---

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.
☒ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date:   06/15/2023
                    MM / DD / YYYY

Signature _____

Name of the person who is completing and signing this claim:

| Name | Jennifer | E. | Mulligan |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Senior Manager, Client Finance

Company    Paul Hastings LLP
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    515 South Flower Street, Suite 2500
           Number        Street

           Los Angeles,                         CA        90071
           City                                 State     ZIP Code

Contact phone    213-683-5649          Email    jennifermulligan@paulhastings.com

**Proof of Claim**                                                    page 3

PAUL HASTINGS LLP – PROOF OF CLAIM – Exhibit A

## EXHIBIT A

Claim Analysis

Paul Hastings LLP ("Paul Hastings" or "Claimant") provided legal services to Sorrento Therapeutics, Inc. ("Debtor") for which Paul Hastings has not been paid.  The fees and expenses owing to Paul Hastings as of February 13, 2023 are as follows:

| | |
|---|---|
| Fees | $11,930,153.66 |
| Expenses | $    319,090.43 |
| **Total** | **$12,249,244.09** |

PAUL HASTINGS LLP – PROOF OF CLAIM – Exhibit B

## **EXHIBIT B**

Supporting Documentation

The documents supporting Paul Hastings' claim include, without limitation, certain unpaid invoices (the "Invoices") that are summarized on the following chart.   Paul Hastings previously delivered the Invoices to the Debtor.   To avoid disclosing any confidential or privileged information, Paul Hastings has not attached the Invoices hereto.

| Invoice Number | Invoice Date | Fees | Expenses | Total Invoice Amount |
|---|---|---|---|---|
| 2322900 | 7/18/2022 | $189,786.50 | $14,781.88 | $204,568.38 |
| 2322901 | 7/18/2022 | $92,106.25 | $1,426.09 | $93,532.34 |
| 2325136 | 8/9/2022 | $0.00 | $125.00 | $125.00 |
| 2326038 | 8/15/2022 | $135,186.84 | $1,039.76 | $136,226.60 |
| 2326149 | 8/15/2022 | $0.00 | $1,873.65 | $1,873.65 |
| 2326150 | 8/15/2022 | $64,601.00 | $6,631.36 | $71,232.36 |
| 2326151 | 8/15/2022 | $170,970.00 | $2,749.43 | $173,719.43 |
| 2326066 | 8/15/2022 | $783.00 | $0.00 | $783.00 |
| 2326065 | 8/15/2022 | $2,821.50 | $0.00 | $2,821.50 |
| 2326069 | 8/15/2022 | $1,726.88 | $0.00 | $1,726.88 |
| 2326037 | 8/15/2022 | $367.88 | $0.00 | $367.88 |
| 2326064 | 8/15/2022 | $4,362.76 | $0.00 | $4,362.76 |
| 2326063 | 8/15/2022 | $14,792.50 | $0.00 | $14,792.50 |
| 2326036 | 8/15/2022 | $31,268.26 | $0.00 | $31,268.26 |
| 2326035 | 8/15/2022 | $161,392.58 | $1,628.00 | $163,020.58 |
| 2326039 | 8/15/2022 | $38,604.41 | $58.16 | $38,662.57 |
| 2326344 | 8/16/2022 | $261.00 | $0.00 | $261.00 |
| 2328552 | 9/6/2022 | $0.00 | $1,948.65 | $1,948.65 |
| 2328562 | 9/9/2022 | $80,982.00 | $639.75 | $81,621.75 |
| 2328553 | 9/15/2022 | $24,909.00 | $7,842.87 | $32,751.87 |
| 2328554 | 9/15/2022 | $12,262.50 | $719.89 | $12,982.39 |
| 2329904 | 9/16/2022 | $109,752.85 | $313.50 | $110,066.35 |
| 2329903 | 9/16/2022 | $23,796.01 | $0.00 | $23,796.01 |
| 2329876 | 9/16/2022 | $0.00 | $125.00 | $125.00 |
| 2329902 | 9/16/2022 | $261.00 | $0.00 | $261.00 |
| 2329881 | 9/16/2022 | $3,393.00 | $30.00 | $3,423.00 |
| 2329900 | 9/16/2022 | $193,125.42 | $157.27 | $193,282.69 |
| 2329899 | 9/16/2022 | $87,939.03 | $138.56 | $88,077.59 |
| 2330642 | 9/21/2022 | $15,515.00 | $0.00 | $15,515.00 |
| 2329901 | 9/22/2022 | $15,668.75 | $19,986.10 | $35,654.85 |
| 2333040 | 10/13/2022 | $0.00 | $1,798.65 | $1,798.65 |
| 2333041 | 10/13/2022 | $247,286.50 | $8,979.01 | $256,265.51 |

PAUL HASTINGS LLP – PROOF OF CLAIM – Exhibit B

| 2333042 | 10/13/2022 | $17,487.50 | $719.89 | $18,207.39 |
| 2332883 | 10/14/2022 | $60,612.84 | $953.80 | $61,566.64 |
| 2332882 | 10/14/2022 | $1,726.88 | $0.00 | $1,726.88 |
| 2332890 | 10/14/2022 | $18,078.77 | $947.56 | $19,026.33 |
| 2332889 | 10/14/2022 | $0.00 | $125.00 | $125.00 |
| 2332881 | 10/14/2022 | $14,748.75 | $0.00 | $14,748.75 |
| 2332888 | 10/14/2022 | $261.00 | $0.00 | $261.00 |
| 2332887 | 10/14/2022 | $3,908.75 | $7,673.31 | $11,582.06 |
| 2332880 | 10/14/2022 | $17,312.65 | $0.00 | $17,312.65 |
| 2332886 | 10/14/2022 | $805.00 | $0.00 | $805.00 |
| 2333794 | 10/19/2022 | $22,482.00 | $778.33 | $23,260.33 |
| 2332879 | 10/20/2022 | $255,299.73 | $0.00 | $255,299.73 |
| 2336396 | 11/11/2022 | $2,137.50 | $0.00 | $2,137.50 |
| 2336786 | 11/14/2022 | $0.00 | $1,868.65 | $1,868.65 |
| 2336787 | 11/14/2022 | $281,236.00 | $13,715.82 | $294,951.82 |
| 2336788 | 11/14/2022 | $1,230.00 | $620.89 | $1,850.89 |
| 2337108 | 11/17/2022 | $15,405.75 | $0.00 | $15,405.75 |
| 2337457 | 11/18/2022 | $47,041.91 | $1,358.21 | $48,400.12 |
| 2337461 | 11/18/2022 | $1,381.51 | $0.00 | $1,381.51 |
| 2337460 | 11/18/2022 | $3,453.75 | $0.00 | $3,453.75 |
| 2337464 | 11/18/2022 | $0.00 | $125.00 | $125.00 |
| 2337463 | 11/18/2022 | $256.50 | $0.00 | $256.50 |
| 2337462 | 11/18/2022 | $0.00 | $230.16 | $230.16 |
| 2337456 | 11/18/2022 | $3,889.14 | $0.00 | $3,889.14 |
| 2337455 | 11/18/2022 | $42,471.25 | $0.00 | $42,471.25 |
| 2337459 | 11/18/2022 | $21,447.01 | $0.00 | $21,447.01 |
| 2337454 | 11/18/2022 | $35,044.88 | $0.00 | $35,044.88 |
| 2337458 | 11/18/2022 | $7,647.50 | $0.00 | $7,647.50 |
| 2340336 | 12/14/2022 | $5,755.51 | $526.86 | $6,282.37 |
| 2340970 | 12/14/2022 | $0.00 | $1,873.65 | $1,873.65 |
| 2340314 | 12/14/2022 | $0.00 | $125.00 | $125.00 |
| 2340972 | 12/14/2022 | $0.00 | $719.89 | $719.89 |
| 2340342 | 12/14/2022 | $1,827.00 | $0.00 | $1,827.00 |
| 2340313 | 12/14/2022 | $2,308.50 | $0.00 | $2,308.50 |
| 2340328 | 12/14/2022 | $735.75 | $0.00 | $735.75 |
| 2340312 | 12/14/2022 | $1,381.50 | $0.00 | $1,381.50 |
| 2340326 | 12/14/2022 | $6,278.64 | $0.00 | $6,278.64 |
| 2340335 | 12/14/2022 | $70,628.63 | $0.00 | $70,628.63 |
| 2340332 | 12/14/2022 | $15,603.77 | $0.00 | $15,603.77 |
| 2340338 | 12/15/2022 | $71,744.71 | $478.63 | $72,223.34 |
| 2340329 | 12/15/2022 | $19,456.89 | $0.00 | $19,456.89 |
| 2340971 | 12/15/2022 | $390,035.50 | $12,713.23 | $402,748.73 |
| 2340327 | 12/15/2022 | $11,222.50 | $4,533.20 | $15,755.70 |
| 2340588 | 12/15/2022 | $17,020.13 | $282.00 | $17,302.13 |

PAUL HASTINGS LLP – PROOF OF CLAIM – Exhibit B

| | | | | |
|---|---|---|---|---|
| 2340587 | 12/15/2022 | $4,157.00 | $0.00 | $4,157.00 |
| 2340333 | 12/15/2022 | $142,200.06 | $0.00 | $142,200.06 |
| 2344097 | 1/12/2023 | $0.00 | $1,873.65 | $1,873.65 |
| 2344098 | 1/12/2023 | $117,766.50 | $6,741.14 | $124,507.64 |
| 2344099 | 1/12/2023 | $0.00 | $719.89 | $719.89 |
| 2344042 | 1/13/2023 | $21,906.01 | $0.00 | $21,906.01 |
| 2344041 | 1/13/2023 | $1,946.26 | $0.00 | $1,946.26 |
| 2344047 | 1/13/2023 | $261.00 | $0.00 | $261.00 |
| 2344046 | 1/13/2023 | $4,360.50 | $0.00 | $4,360.50 |
| 2344036 | 1/13/2023 | $14,467.50 | $3,897.00 | $18,364.50 |
| 2344035 | 1/13/2023 | $26,910.00 | $0.00 | $26,910.00 |
| 2344045 | 1/13/2023 | $867.38 | $668.40 | $1,535.78 |
| 2344040 | 1/13/2023 | $10,053.00 | $0.00 | $10,053.00 |
| 2344039 | 1/13/2023 | $2,137.50 | $0.00 | $2,137.50 |
| 2344034 | 1/13/2023 | $338,705.09 | $0.00 | $338,705.09 |
| 2344044 | 1/13/2023 | $3,108.38 | $0.00 | $3,108.38 |
| 2344037 | 1/20/2023 | $71,056.18 | $195.34 | $71,251.52 |
| 2347126 | 2/10/2023 | $0.00 | $1,873.65 | $1,873.65 |
| 2347197 | 2/10/2023 | $214,095.00 | $8,270.53 | $222,365.53 |
| 2347127 | 2/10/2023 | $7,156.25 | $720.54 | $7,876.79 |
| 2348399 | 2/24/2023 | $31,691.28 | $7,748.03 | $39,439.31 |
| 2348126 | 2/21/2023 | $513.00 | $0.00 | $513.00 |
| 2348127 | 2/21/2023 | $0.00 | $250.00 | $250.00 |
| 2348128 | 2/21/2023 | $13,213.13 | $0.00 | $13,213.13 |
| 2348129 | 2/21/2023 | $77,766.81 | $265.42 | $78,032.23 |
| 2348130 | 2/21/2023 | $34,892.50 | $57,911.30 | $92,803.80 |
| 2348131 | 2/21/2023 | $3,037.50 | ($230.16) | $2,807.34 |
| 2348132 | 2/21/2023 | $2,227.50 | $0.00 | $2,227.50 |
| 2347501 | 2/17/2023 | $2,156.25 | $0.00 | $2,156.25 |
| 2347502 | 2/17/2023 | $29,621.29 | $17.27 | $29,638.56 |
| 2350618 | 3/30/2023 | $0.00 | $3,525.51 | $3,525.51 |
| 2350835 | 3/16/2023 | $0.00 | $450.00 | $450.00 |
| 2351366 | 3/20/2023 | $55,760.65 | $0.00 | $55,760.65 |
| 2350841 | 3/16/2023 | $4,083.75 | $0.00 | $4,083.75 |
| 2350840 | 3/16/2023 | $39,510.01 | $0.00 | $39,510.01 |
| 2350839 | 3/16/2023 | $371.25 | $26.50 | $397.75 |
| 2350617 | 3/30/2023 | $120,682.50 | $9,247.69 | $129,930.19 |
| 2350837 | 3/16/2023 | $1,361.25 | $0.00 | $1,361.25 |
| 2350836 | 3/16/2023 | $7,893.01 | $0.00 | $7,893.01 |
| 2352101 | 3/27/2023 | $32,968.15 | $17.05 | $32,985.20 |
| 2350833 | 3/16/2023 | $1,143.00 | $0.00 | $1,143.00 |
| 2350499 | 3/15/2023 | $11,993.75 | $0.00 | $11,993.75 |
| | Credit On Account | ($675.00) | $0.00 | ($675.00) |
| 2201004 | 7/10/2019 | $187,860.37 | $1,749.44 | $189,609.81 |

PAUL HASTINGS LLP – PROOF OF CLAIM – Exhibit B

| 2204230 | 8/12/2019 | $261,565.87 | $560.70 | $262,126.57 |
|---------|-----------|-------------|---------|-------------|
| 2207897 | 9/16/2019 | $218,331.00 | $1,237.86 | $219,568.86 |
| 2210579 | 10/11/2019 | $288,426.37 | $1,896.53 | $290,322.90 |
| 2213578 | 11/11/2019 | $56,460.37 | $635.40 | $57,095.77 |
| 2217482 | 12/11/2019 | $40,945.50 | $128.70 | $41,074.20 |
| 2220634 | 1/8/2020 | $9,590.62 | $130.80 | $9,721.42 |
| 2223617 | 1/31/2020 | $11,765.25 | $365.40 | $12,130.65 |
| 2227116 | 3/16/2020 | $1,170.00 | $0.00 | $1,170.00 |
| 2230481 | 4/9/2020 | $31,298.62 | $0.50 | $31,299.12 |
| 2230482 | 4/9/2020 | $18,253.12 | $0.00 | $18,253.12 |
| 2230483 | 4/9/2020 | $70,329.37 | $0.00 | $70,329.37 |
| 2233828 | 5/8/2020 | $3,144.39 | $0.00 | $3,144.39 |
| 2233829 | 5/8/2020 | $4,042.13 | $0.00 | $4,042.13 |
| 2233830 | 5/8/2020 | $16,437.39 | $411.60 | $16,848.99 |
| 2237541 | 6/12/2020 | $877.50 | $0.00 | $877.50 |
| 2237542 | 6/12/2020 | $877.50 | $0.00 | $877.50 |
| 2237543 | 6/12/2020 | $0.00 | $34.20 | $34.20 |
| 2239563 | 7/7/2020 | $4,758.75 | $0.00 | $4,758.75 |
| 2239564 | 7/7/2020 | $14,044.50 | $0.00 | $14,044.50 |
| 2239565 | 7/7/2020 | $6,069.37 | $0.00 | $6,069.37 |
| 2243115 | 8/12/2020 | $14,898.38 | $0.00 | $14,898.38 |
| 2243116 | 8/12/2020 | $97,237.13 | $592.40 | $97,829.53 |
| 2243117 | 8/12/2020 | $0.00 | $135.60 | $135.60 |
| 2246051 | 9/10/2020 | $192.38 | $3,136.95 | $3,329.33 |
| 2246052 | 9/10/2020 | $59,956.89 | $0.00 | $59,956.89 |
| 2249594 | 10/12/2020 | $1,669.50 | $0.00 | $1,669.50 |
| 2249595 | 10/12/2020 | $40,065.75 | $220.00 | $40,285.75 |
| 2252863 | 11/13/2020 | $9,966.38 | $0.00 | $9,966.38 |
| 2252864 | 11/13/2020 | $27,254.27 | $0.00 | $27,254.27 |
| 2257207 | 12/18/2020 | $18,263.25 | $0.00 | $18,263.25 |
| 2257208 | 12/18/2020 | $35,544.38 | $446.00 | $35,990.38 |
| 2259892 | 1/14/2021 | $6,883.88 | $2,518.76 | $9,402.64 |
| 2259893 | 1/14/2021 | $30,813.75 | $55.00 | $30,868.75 |
| 2263681 | 2/28/2021 | $2,125.13 | $0.00 | $2,125.13 |
| 2263682 | 2/28/2021 | $506.25 | $55.00 | $561.25 |
| 2263683 | 2/28/2021 | $4,340.25 | $0.00 | $4,340.25 |
| 2265515 | 3/12/2021 | $1,591.88 | $0.00 | $1,591.88 |
| 2265516 | 3/12/2021 | $1,828.13 | $0.00 | $1,828.13 |
| 2268966 | 4/13/2021 | $5,259.38 | $0.00 | $5,259.38 |
| 2268967 | 4/13/2021 | $6,019.88 | $221.00 | $6,240.88 |
| 2272408 | 5/13/2021 | $3,271.50 | $0.00 | $3,271.50 |
| 2272409 | 5/13/2021 | $506.25 | $0.00 | $506.25 |
| 2275760 | 6/15/2021 | $1,282.50 | $5.00 | $1,287.50 |
| 2275761 | 6/15/2021 | $1,991.25 | $0.00 | $1,991.25 |

PAUL HASTINGS LLP – PROOF OF CLAIM – Exhibit B

| | | | | |
|---|---|---|---|---|
| 2279440 | 7/15/2021 | $2,992.50 | $276.51 | $3,269.01 |
| 2282966 | 8/13/2021 | $315.00 | $0.00 | $315.00 |
| 2282967 | 8/13/2021 | $1,147.50 | $0.00 | $1,147.50 |
| 2286854 | 9/20/2021 | $5,715.00 | $140.20 | $5,855.20 |
| 2290631 | 10/21/2021 | $675.00 | $0.00 | $675.00 |
| 2298188 | 12/21/2021 | $630.00 | $0.00 | $630.00 |
| 2302451 | 1/24/2022 | $385,644.45 | $520.60 | $386,165.05 |
| 2302452 | 1/24/2022 | $630.00 | $0.00 | $630.00 |
| 2304405 | 2/16/2022 | $945.00 | $31.20 | $976.20 |
| 2304406 | 2/16/2022 | $1,687.50 | $0.00 | $1,687.50 |
| 2304407 | 2/16/2022 | $558,991.13 | $1,079.50 | $560,070.63 |
| 2308224 | 3/18/2022 | $54,531.02 | $390.00 | $54,921.02 |
| 2308225 | 3/18/2022 | $315,382.53 | $15,714.74 | $331,097.27 |
| 2311062 | 4/14/2022 | $77,698.13 | $0.00 | $77,698.13 |
| 2311063 | 4/14/2022 | $267,759.03 | $601.80 | $268,360.83 |
| 2311064 | 4/14/2022 | $65,982.40 | $187.00 | $66,169.40 |
| 2311065 | 4/14/2022 | $17,876.26 | $45.00 | $17,921.26 |
| 2314175 | 5/11/2022 | $7,070.63 | $0.00 | $7,070.63 |
| 2314176 | 5/11/2022 | $475,585.89 | $0.00 | $475,585.89 |
| 2314182 | 5/11/2022 | $17,272.15 | $677.70 | $17,949.85 |
| 2314183 | 5/11/2022 | $39,171.43 | $0.00 | $39,171.43 |
| 2314184 | 5/11/2022 | $21,532.50 | $447.30 | $21,979.80 |
| 2319235 | 6/17/2022 | $6,190.91 | $196.20 | $6,387.11 |
| 2319236 | 6/17/2022 | $33,867.00 | $69.30 | $33,936.30 |
| 2319238 | 6/17/2022 | $15,769.13 | $0.00 | $15,769.13 |
| 2320455 | 6/27/2022 | $31,034.26 | $96.00 | $31,130.26 |
| 2319234 | 6/28/2022 | $505,363.52 | $685.41 | $506,048.93 |
| 2321805 | 7/13/2022 | $4,647.39 | $0.00 | $4,647.39 |
| 2321806 | 7/13/2022 | $29,099.25 | $276.30 | $29,375.55 |
| 2321824 | 7/13/2022 | $14,108.64 | $0.00 | $14,108.64 |
| 2321823 | 7/14/2022 | $5,913.00 | $0.00 | $5,913.00 |
| 2321943 | 7/14/2022 | $455,974.97 | $635.73 | $456,610.70 |
| 2322104 | 7/15/2022 | $33,054.80 | $132.14 | $33,186.94 |
| 2326034 | 8/15/2022 | $13,531.51 | $0.00 | $13,531.51 |
| 2326061 | 8/15/2022 | $334,246.56 | $961.29 | $335,207.85 |
| 2326062 | 8/15/2022 | $120,838.51 | $116.40 | $120,954.91 |
| 2326067 | 8/15/2022 | $34,709.67 | $0.00 | $34,709.67 |
| 2326068 | 8/15/2022 | $9,849.39 | $0.00 | $9,849.39 |
| 2329885 | 9/16/2022 | $8,766.00 | $0.00 | $8,766.00 |
| 2329887 | 9/16/2022 | $4,279.50 | $0.00 | $4,279.50 |
| 2329888 | 9/16/2022 | $12,010.52 | $0.00 | $12,010.52 |
| 2329861 | 9/22/2022 | $49,305.42 | $973.40 | $50,278.82 |
| 2329870 | 9/22/2022 | $327,366.08 | $546.46 | $327,912.54 |
| 2329886 | 9/22/2022 | $120,256.90 | $115.80 | $120,372.70 |

PAUL HASTINGS LLP – PROOF OF CLAIM – Exhibit B

| | | | | |
|---|---|---|---|---|
| 2333469 | 10/13/2022 | $35,980.87 | $0.00 | $35,980.87 |
| 2333470 | 10/13/2022 | $64,688.63 | $28,420.50 | $93,109.13 |
| 2333471 | 10/13/2022 | $280,116.00 | $461.40 | $280,577.40 |
| 2333472 | 10/13/2022 | $56,109.38 | $23,205.30 | $79,314.68 |
| 2333473 | 10/13/2022 | $49,495.50 | $0.00 | $49,495.50 |
| Not invoiced at this time | October 2022 Services | $2,515.42 | $0.00 | $2,515.42 |
| Not invoiced at this time | October 2022 Services | $912.38 | $0.00 | $912.38 |
| Not invoiced at this time | October 2022 Services | $77,836.39 | $0.00 | $77,836.39 |
| Not invoiced at this time | October 2022 Services | $460,168.28 | $0.00 | $460,168.28 |
| Not invoiced at this time | October 2022 Services | $16,602.15 | $0.00 | $16,602.15 |
| Not invoiced at this time | October 2022 Services | $113,941.14 | $0.00 | $113,941.14 |
| | | **$11,930,153.66** | **$319,090.43** | **$12,249,244.09** |

NOTES:  Claimant expressly reserves the right to amend or supplement this Claim at any time and in any respect, including, without limitation, for the purpose of   (i) setting forth or changing the basis or the amount of the Claim, (ii) further describing the Claim, (iii) providing further evidence relating to the Claim, and (iv) amending this Claim to the extent necessary to preserve and assert any other rights belonging to Claimant.

This Claim is filed under the compulsion of the bar date and is filed to protect Claimant from forfeiture of claims by reason of the bar date.  Filing this Claim is not and shall not be deemed or construed as (a) an election of remedies, (b) a consent by Claimant to the jurisdiction of any court with respect to proceedings, if any, commenced against or otherwise involving Claimant, (c) a consent by Claimant to a jury trial in any court in any proceeding as to any and all matters so triable herein or in any case, controversy or proceeding related hereto, pursuant to 28 U.S.C. § 157(e) or otherwise, (d) a waiver of the right of Claimant to a trial by jury in any proceeding so triable herein or in any case, controversy or proceeding related hereto, notwithstanding the designation or not of such matters as "core proceedings" pursuant to 28 U.S.C. § 157(b)(2), and whether such jury trial is pursuant to statute or the United States Constitution, (e) a waiver of the right of Claimant to have final orders in non-core matters entered only after de novo review by a District Court judgment, (f) a waiver of the right of Claimant to have the reference withdrawn by the District Court in any matter subject to mandatory or discretionary withdrawal, (g) a waiver of any past, present or future event of default, (h) a waiver or limitation of any rights of Claimant, including, without limitation, a waiver of rights, claims, actions, defenses, set-offs or recoupments to which Claimant is or may be entitled under agreements, in law or in equity, all of which rights, claims, actions, defenses, set-offs and recoupments are expressly reserved by Claimant, or (i) an admission by Claimant that any property held by the Debtor (or any debtor affiliate) is property of the estate.  In addition, Claimant reserves its right to

PAUL HASTINGS LLP – PROOF OF CLAIM – Exhibit B

an administrative expense priority claim for all amounts set forth or owing which are due and owing as administrative expenses pursuant to, *inter alia*, Sections 503, 507, or other applicable provisions of the Bankruptcy Code.

In executing and submitting this Claim, Claimant does not waive any obligation owing to it, any right to any security held by it or for its benefit, any right to claim specific assets, or any other right or rights of action that it has or may have against the Debtor or any other person, including without limitation, rights against guarantors, officers or directors.

## **EXHIBIT E**

**Credit Bid Pay-Off Letter**

*Execution Version*

September 21, 2023

Sorrento Therapeutics, Inc.
c/o Scintilla Pharmaceuticals, Inc.
4955 Directors Place
San Diego, CA 92121
Attn:   Mohsin Y. Meghji, Chief Restructuring Officer
Email:  mmeghji@m3-partners.com

       Re: Credit Bid Pay-Off Letter

Dear Mr. Meghji:

       Reference is made to that certain (i) Junior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of July 28, 2023 (as may have been amended, extended, supplemented, modified or restated from time to time and as may be further amended, supplemented or otherwise modified from time to time, the "**Loan Agreement**") by and among Sorrento Therapeutics, Inc., a Delaware corporation ("**Sorrento**"), Scintilla Pharmaceuticals, Inc., a Delaware corporation (together with Sorrento, each a "**Borrower**" and collectively, the "**Borrowers**") and Scilex Holding Company, a Delaware corporation ("**Lender**"), (ii) Intellectual Property Security Agreement, dated as of July 28, 2023, by Borrowers in favor of Lender (the "**Security Agreement**"; the Loan Agreement together with the Security Agreement, any other Loan Document (as defined in the Loan Agreement) and any other notes, security agreements, mortgages, pledge agreements, guarantees or other agreements, documents, certificates or instruments related thereto, in each case, as amended, restated, supplemented or otherwise modified from time to time, the "**Transaction Documents**"), (iii) the *Order (I) Approving Sale of Scilex Stock to Scilex Holdings Company Free and Clear of All Liens, Claims, Interests, and Encumbrances, (II) Conditionally Vacating the Oramed Sale Order, and (III) Granting Related Relief [*Docket No. 1316] (the "**Scilex Sale Order**"), entered by the Bankruptcy Court after the hearing held on September 12, 2023 in the Chapter 11 Cases, and (iv) the Stock Purchase Agreement, dated as of the date hereof, by and among the Lender, as purchaser, and Sorrento, as seller (the "**Stock Purchase Agreement**"), which documents the sale of certain Purchased Securities (as defined in the Stock Purchase Agreement) (the "**Stock Purchase**"). Capitalized terms used herein but not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

       Pursuant to the Scilex Sale Order and the Stock Purchase Agreement, the Lender has made a credit bid, on a dollar-for-dollar basis, pursuant to Section 363(k) of the Bankruptcy Code, in respect of the Obligations (including, but not limited to, any contingent indemnity and reimbursement obligations) of the Borrowers under the Loan Agreement, accrued and outstanding as of the September 21, 2023 (the "**Pay-Off Amount**"). The Pay-Off Amount is part of the Purchase Price (as defined in the Stock Purchase Agreement) and will be fully satisfied at Closing (as defined in the Stock Purchase Agreement). Anything to the contrary contained herein notwithstanding, the Borrowers agree that the on the date hereof the DIP Holdback Amount is permitted to, and shall be applied to, Legal Expenses of Lender incurred in connection with the Transaction Documents, which Legal Expenses shall fully utilize the DIP Holdback Amount and which DIP Holdback Amount shall not be available for any other purpose.

       Subject to, and effective immediately upon, Closing, without further action on the part of the parties hereto, the Loan Agreement and the Transaction Documents (other than this letter agreement) shall be automatically terminated, and all obligations thereunder shall be paid and discharged in full and shall be deemed terminated all without any further action being required to effectuate the foregoing.

Subject to and effective as of the occurrence of the Closing, Lender hereby authorizes Borrowers or their designees to give notice of, record or file, as applicable, the termination of the UCC Financing Statements and the Intellectual Property Security Agreement listed on Schedule I attached hereto and to file such other lien release documents as the Borrowers may deem necessary or reasonably appropriate, and which is in form approved by Lender in its reasonable discretion, in order to evidence or otherwise give public notice of such collateral terminations and releases. Promptly after Closing, Lender shall execute and deliver to the applicable Borrower such terminations, releases and satisfactions necessary or reasonably requested by such Borrower or its designees to evidence the release of all other liens, security interests, pledges and other interests granted to Lender as security for the Transaction Documents; provided, however, that all costs and expenses of Lender with respect to the preparation, execution or recording of any terminations or releases in connection with this letter shall be borne solely by the Borrowers, whether incurred prior to or after Closing.

This letter may be executed by any of the parties hereto on separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this letter by facsimile or other electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

This letter shall be governed by the laws of the State of New York and shall be effective only when signed by the Lender and accepted by the Borrowers by its due execution in the space provided below. This letter sets forth the entire agreement among the parties relating to the subject matter pertaining hereto, and no term or provision hereof may be amended, changed, waived, discharged or terminated orally or otherwise, except in writing signed by each such party and shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

It is acknowledged and agreed that this document constitutes a "Loan Document" under the Loan Agreement.

[SIGNATURE PAGE FOLLOWS]

Very truly yours,

**SCILEX HOLDING COMPANY**

By: _____

    Name:  Jaisim Shah

    Title:   Chief Executive Officer and President

ACKNOWLEDGED AND ACCEPTED:

**SORRENTO THERAPEUTICS, INC.**
**SCINTILLA PHARMACEUTICALS, INC.**

By: _____
      Name: Mohsin Y. Meghji
      Title: Chief Restructuring Officer

**Schedule I**

**UCC Financing Statements, Control Agreements, and IP Security Agreements**

1. UCC-1 Financing Statement no. 2023 52333977 filed with the Secretary of State of the State of Delaware on July 31, 2023, against Sorrento Therapeutics, Inc. in favor of Scilex Holding Company.

2. UCC-1 Financing Statement no. 2023 5234116 filed with the Secretary of State of the State of Delaware on July 31, 2023, against Scintilla Pharmaceuticals, Inc. in favor of Scilex Holding Company.

3. Intellectual Property Security Agreement, dated July 28, 2023, among Scilex Holding Company, Sorrento Therapeutics, Inc., and Scintilla Pharmaceuticals, Inc.