**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SORRENTO THERAPEUTICS, INC., *et al.*[1] | ) | Case No. 23-90085 (CML) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DEBTORS' MEMORANDUM OF LAW
IN SUPPORT OF AN ORDER (I) APPROVING THEIR DISCLOSURE
STATEMENT ON A FINAL BASIS AND (II) CONFIRMING THE MODIFIED JOINT
PLAN OF LIQUIDATION OF SORRENTO THERAPEUTICS, INC. AND SCINTILLA
PHARMACEUTICALS, INC. UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956). The Debtors' service address is: 4955 Directors Place, San Diego, CA 92121.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

RESPONSE TO EQUITY COMMITTEE....................................................................................2

RESPONSE TO SHAREHOLDER JOINDER ............................................................................8

SUMMARY OF RESPONSES ..................................................................................................10

BACKGROUND .......................................................................................................................10

ARGUMENT .............................................................................................................................12

I.       The Disclosure Statement Should Be Approved On A Final Basis....................................12

II.      The Plan Should Be Confirmed. ......................................................................................13

         A.       Undisputed Provisions ........................................................................................13

         B.       Disputed Provisions ............................................................................................25

CONCLUSION..........................................................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

*In re 11,111, Inc.*,
117 B.R. 471 (Bankr. D. Minn. 1990) ....................................................................23

*Matter of 47th & Belleview Partners*,
95 B.R. 117 (Bankr. W.D. Mo. 1988)....................................................................20

*In re Beyond.com Corp.*,
289 B.R. 138 (Bankr. N.D. Cal. 2003) ...................................................................28

*In re Buttonwood Partners, Ltd.*,
111 B.R. 57 (Bankr. S.D.N.Y. 1990) .....................................................................23

*In re Cajun Elec.*,
150 F.3d 503 (5th Cir. 1998) .................................................................................18

*In re Digerati Techs., Inc.*,
2014 WL 2203895 (Bankr. S.D. Tex. May 27, 2014) ......................................26, 27

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007)...................................................................21

*In re Highland Capital Mgmt., L.P.*,
48 F.4th 419 (5th Cir. 2022) ..................................................................................30

*In re Machne Menachem, Inc.*,
304 B.R. 140 (Bankr. M.D. Pa. 2003) ..............................................................26, 27

*In re Pero Bros. Farms, Inc.*,
90 B.R. 562 (Bankr. S.D. Fla. 1988).......................................................................21

*In re Prussia Assocs.*,
322 B.R. 572 (Bankr. E.D. Pa. 2005) .....................................................................21

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000).....................................................................................30

*In re Sentinel Mgmt. Grp., Inc.*,
398 B.R. 281 (Bankr. N.D. Ill. 2008) .....................................................................27

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011) ........................................................................21

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this memorandum of law in support of (i) final approval of the Debtors' disclosure statement [Docket No. 1443] (the "Disclosure Statement") and (ii) confirmation of the Debtors' modified chapter 11 plan [Docket No. 1562] (as modified, amended, or supplemented from time to time, the "Plan"), pursuant to sections 1125, 1126, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). In further support of confirmation of the Plan, the Debtors have filed (i) the *Declaration of Clarissa D. Cu Regarding the Solicitation and Tabulation of Votes on Joint Plan of Liquidation of Sorrento Therapeutics, Inc. and Scintilla Pharmaceuticals, Inc. Under Chapter 11 of the Bankruptcy Code* [Docket No. 1560] (the "Voting Report") and (ii) the *Declaration of Mohsin Y. Meghji, Chief Restructuring Officer of the Debtors, In Support of Confirmation of the Debtors' Chapter 11 Plan* [Docket No. 1597].

## PRELIMINARY STATEMENT

1. The Plan should be confirmed. It satisfies the Bankruptcy Code's requirements. It was proposed in good faith by the Debtors and negotiated by various stakeholders, including the Unsecured Creditors' Committee (which supports the Plan) and the U.S. Trustee. It contains no releases. It is a value-maximizing conclusion to these cases and provides for recoveries greater than the chapter 7 alternative. And it was overwhelmingly accepted by the sole voting class (Class 3, General Unsecured Claims)—with over 96% of voting creditors (in number) and over 94% of voted claims (in amount) accepting the Plan. The Debtors have resolved all objections to the Plan, other than the objection filed by the Equity Committee [Docket No. 1525] and the joinder filed by certain shareholders [Docket No. 1563]. And though the Debtors do not expect to consummate the Plan until spring 2024 for certain operational reasons, confirmation should not be delayed as the Debtors cannot afford the expense of continuing to entertain potential plan alternatives.

<u>**RESPONSE TO EQUITY COMMITTEE**</u>

2.      **Confirmation Issues**.  Despite its many misguided claims and allegations, the Equity Committee's objection raises just four specific issues with respect to the actual terms of the Plan—all of which should be overruled for the reasons herein, which are summarized in the following paragraphs.

3.      *First*, the Equity Committee argues that equity holders should be explicitly named as a beneficiary of the Liquidation Trust, such that the trust should owe them fiduciary duties. *Second*, and relatedly, the Equity Committee argues that once general unsecured claims are paid in full, then equity holders should be entitled to remove and replace the Liquidation Trustee and any members of the Liquidation Trust's advisory committee.  But based on the value of the Debtors' assets and the liquidation of the Debtors, the equity holders are unfortunately out of the money and entitled to nothing—including any fiduciary duties or related rights.  The Liquidation Trust provides that equity holders can receive distributions if and after general unsecured claims are paid in full in cash.  But equity holders are not entitled to anything more at present, particularly when the Debtors are liquidating and will cease to exist.

4.      *Third*, the Equity Committee argues that the general nature of the Plan and the transfer of assets to the Liquidation Trust is not a value-maximizing solution because it eliminates purportedly valuable tax attributes.  In the Debtors' professionals' experience, monetizing net operating losses and other favorable tax attributes can be challenging given, among other things, (i) other potential investments available in the market also involving favorable tax attributes, (ii) the complexities and risks of third parties being able to beneficially use such attributes after acquiring them, and (iii) IRS regulatory considerations and requirements.  Thus, to date, the Debtors have not identified a financially practicable path forward in which the unused tax attributes could be used and do not expect such a transaction to materialize.  But the Plan is not expected to

go effective until approximately spring 2024, which is the earliest when the unutilized tax attributes might be eliminated (consistent with the principles of Rev. Rul. 74-462, 1974-2 C.B. 82). Thus, the Debtors and the Equity Committee still have time to monetize the Debtors' unused tax attributes in a value-maximizing way if such a transaction somehow becomes actionable.

5. *And fourth*, the Equity Committee argues that the scope of "Exculpated Parties" (as defined in the Plan) should not include "Related Persons", i.e. the professionals of the Exculpated Parties. The Debtors have removed such professionals from the definition of Exculpated Parties. *See* Art.I.A.52 of the Plan (defining "Exculpated Parties" as "(a) the Debtors, (b) the Committees, and (c) the Committees' members, in their capacity as such"). As agreed to with the U.S. Trustee, estate professionals will now only be exculpated as a "Protected Party" to the limited extent provided by section 1125(e) of the Bankruptcy Code and will be covered by a "gatekeeping provision" that requires court approval before certain litigation is commenced against them. These provisions comply with the Bankruptcy Code, Fifth Circuit law, and precedent in this Court and should be approved.

6. **Case Complaints**. Beyond those limited confirmation issues, the Equity Committee complains about the general activities that have occurred (or not occurred) during the nine months of these cases—all of which are complete red herrings. While their complaints do not constitute an actual objection to confirmation (even by the terms of the Equity Committee's own objection; see pages 12–17 therein) and thus are irrelevant to confirmation, the Debtors wish to correct just some of the many wrong assertions and assumptions made by the Equity Committee.

7. (a) Chief Restructuring Officer. The Debtors' Chief Restructuring Officer is one of the most experienced and qualified restructuring professionals in the industry. He has overseen these chapter 11 cases from their filing and has thoughtfully and carefully exercised his sound

business judgment in pursuing (or not pursuing) various transactions, including several financings and sales that have been approved by this Court as valid exercises of business judgment—including transactions that the Equity Committee itself approved and to which they did not object.

8.      Among other things, the Equity Committee alleges that the Chief Restructuring Officer did not conduct an investigation on behalf of the Debtors (Equity Objection, ¶ 6)—which is simply wrong.  Section III.F of the Disclosure Statement explicitly describes the investigation conducted by the Debtors (at the Chief Restructuring Officer's direction), as well as the related investigation conducted by the Unsecured Creditors' Committee, which the Debtors helped facilitate.  After conducting these investigations, the Debtors proposed a plan that contains no releases for anyone—there are **no** releases being given by the Debtors (including for the benefit of any estate professionals) and **no** releases being given by any third parties.  Instead, the Debtors have preserved all potential claims and have put their insurance carriers on notice thereof.

9.      Additionally, while the Equity Committee claims that the Chief Restructuring Officer has operated without any board oversight or engagement, the Equity Committee fails to note that the Debtors' board delegated broad decision-making authority to the Chief Restructuring Officer in March 2023.  *See* Docket No. 1598-1 (delegation resolutions).  This delegation was also noted on the record by the Debtors at multiple hearings at which the Equity Committee's counsel was present.[2]  Mr. Meghji was in frequent contact with Dr. Ji, the Chairman of Sorrento, about the sale process until Dr. Ji became affiliated with certain bidders and financing sources.  To avoid even the appearance of impropriety, Mr. Meghji, on the advice of counsel, then treated Dr. Ji as a bidder so as to create a level and fair playing field for all potential bidders and financing sources.  To the Debtors' best knowledge, no director ever complained to the Debtors' professionals that

---

[2]      *See, e.g.,* July 5, 2023 transcript (page 21); October 18, 2023 transcript (page 8).

there was any lack of board meetings or communication, until a Sorrento director resigned in October 2023—eight months after these cases were filed.  And to be clear, neither Mr. Meghji nor any of the Debtors' other professionals ever discouraged any board meetings or communications.

10.     (b) Value of Scilex Stock.  The Equity Committee relies heavily and often on the trading prices of Scilex Holding Company as purported evidence that the Debtors (a) were solvent when they filed these cases and (b) did not sufficiently market or maximize the value of the Debtors' Scilex stock.  But the Equity Committee fails to recognize that the trading price of the Scilex stock (both before and during these cases) was not an accurate reflection of value given the extremely limited float of the stock (due to, among other things, the lockup of a significant amount of Scilex shares that could not be traded).  Not only did the market speak through the extensive Court-approved sale process and ultimate sale of Scilex stock to Scilex, the stock price of Scilex today is currently trading *lower* than what it was at the time of the sale.

11.     (c) Sale Process.  Relatedly, the Equity Committee generally complains about the Debtors' marketing efforts, because it is not satisfied with the value generated by the sales to date.  But notably, the Equity Committee did not object to any of the final, closed sales (*i.e.*, the Scilex stock sale and the ImmuneOncia Therapeutics joint venture sale).  And the Debtors' marketing efforts in these cases, which have been pending for more than nine months, have been very fulsome with outreach to over 250 parties, including parties potentially interested in the Debtors' Asia-Pacific assets (contrary to the Equity Committee's assertions).  That process included consultation with both the Unsecured Creditors' Committee and the Equity Committee and (to the Debtors' best knowledge) included outreach to all parties that each committee recommended.  Because the Debtors have a diverse group of assets, including many discrete assets of limited scale or value,

5

the Debtors' marketing process focused heavily on larger assets, but the Debtors have always been clear to the market that they would entertain interest in any of the Debtors' assets.

12.     Perhaps the best indicator of the Debtors' fulsome marketing efforts is the fact that they "received a variety of term sheets for sales of various assets"—as the Equity Committee acknowledges (Equity Objection, ¶ 7)— including for a number of smaller assets.  Unfortunately, many of those bidders chose not to proceed with a transaction for one reason or another, but not for a lack of effort by the Debtors' professionals.  The reality is that the Debtors' assets generally are complex, diverse biopharma assets that, in large part, do not currently generate revenue and would require significant investments of go-forward capital, which has affected the Debtors' ability to realize significant value from such assets in a distressed environment.  Put simply, equity holders are out-of-the-money because the Debtors' assets did not prove to be as valuable as holders may have expected.  The market has spoken.

13.     (d) Financing.  The Equity Committee also complains that the Debtors incurred too much DIP financing across three separate facilities, but then inexplicably complains that the Debtors did not go forward with a potential fourth DIP facility.  Putting aside the contradictory nature of those complaints, the Debtors did not proceed with additional financing for several reasons, including the following.  *First*, the proposed financings did not offer sufficient (or any) exit financing commitments and were contingent on additional exit financing from other sources. *Second*, the proposed financings would not have materially extended runway, if at all, as the proposals contained sale-proceed sweeps and other provisions that would have prevented the Debtors from otherwise using the proceeds from the sales—sales that the Debtors were nonetheless able to consummate without incurring extra DIP financing (and related DIP fees).  In other words, the additional financing proposals provided no clear path to a reorganization and were simply a

bridge to nowhere.  The Debtors clearly and repeatedly shared these concerns with the Equity Committee.  And while hypothetical financing beyond the amount of sale proceeds could have extended these cases, these cases have been pending for over nine months with the marketing process ongoing for a significant majority of that.  Extra money may have allowed for further drug development, but there is no certainty on whether that development would have realized more value for these estates.  One can understand why out-of-the-money equity holders would want to take that risk, but the Debtors (as estate fiduciaries) were not willing to take that gamble and risk further depletion of these estates.

14.     (e) Engagement.  The Equity Committee also generally complains that the Debtors' professionals did not sufficiently engage with the Equity Committee's advisors or potential third-party financiers or buyers.  Without getting into the details of each communication or each party, the Debtors' professionals (to their best understanding) fully and transparently engaged with all relevant parties throughout these chapter 11 cases, including the Equity Committee's advisors and third parties.  Those discussions included frequent consultations with the Equity Committee (including the sharing of relevant and requested information) both as part of the formal mediation process and otherwise, as well as negotiations with third parties (including diligence responses and markups of many proposed deal documents).

15.     (f) Business Plan.  Further, the Equity Committee complains that the Debtors never developed an "industry attuned" business plan for a reorganization.  The Equity Committee's accusation is misguided.  Given the breadth of the Debtors' assets and their go-forward capital requirements, different plan sponsors could have different views on which asset programs they would be interested in funding.  So the Debtors created a business plan and provided supporting information to help the Equity Committee and potential plan sponsors understand and analyze

different business scenarios that a plan sponsor might be interested in underwriting, which would in turn allow a chapter 11 plan to be developed around such financing.

16.     (g) Equity Plan Proposal.  Last, the Equity Committee takes issue with the fact that the Debtors did not pursue or facilitate the Equity Committee's plan proposal—which would have required, among other things, $30 million in senior secured financing (which no one has committed to provide) and a $35 million *non-backstopped* rights offering to thousands of retail shareholders (with no evidence that it would be successful).  The Debtors estimate that the rights offering alone could have cost hundreds of thousands of dollars and months to implement (plus additional administrative expenses caused by this delay), given the significantly retail shareholder base.

17.     For those reasons, along with the uncommitted nature of the Equity Committee's proposal and the general uncertainty that comes with a non-backstopped rights offering (much less one to thousands of retail shareholders), the Debtors and the Unsecured Creditors' Committee rejected that proposal as they did not (and still do not) believe, under the circumstances, that such proposal was (or is) feasible, actionable, or superior to the Plan.  *See* Disclosure Statement, Section I.A.  The Debtors have made clear, both directly to the Equity Committee's advisors and on the record in these cases, that they remained open to any actionable, value-maximizing alternative proposals by the Equity Committee or any other party.  *See* Disclosure Statement, Section I.A (the Debtors "will pivot to an alternative plan if one materializes that is both actionable and superior to the Plan").  The Debtors and the Unsecured Creditors' Committee had hoped that the Equity Committee would pull together a comprehensive, committed alternative to the Plan, but the Equity Committee has proved unable to do so to date.

## RESPONSE TO SHAREHOLDER JOINDER

18.     The joinder filed by certain shareholders supporting the Equity Committee's objection [Docket No. 1563] is also significantly flawed.  Much like the Equity Committee, the

shareholders generally air their complaints about the case at large.  These complaints are factually unsupported by the record and generally irrelevant to confirmation.  More specifically:

- *First*, the shareholders' joinder was untimely, as it was filed six days after the November 10th objection deadline.

- *Second,* the shareholders do not provide a single reason why the requirements of section 1129 of the Bankruptcy Code are not satisfied.

- *Third*, the joinder contains several arguments related to discovery requests made by (i) Scilex to brokerage firms with respect to alleged short-selling and (ii) the Equity Committee to the Debtors' counsel with respect to Ms. Freeman—neither of which are confirmation issues.

- *Fourth*, the shareholders allege that these cases were mismanaged by the Debtors' professionals—which allegations are false for all the reasons discussed above.

- *Fifth*, the shareholders' purported concerns with the professional fees incurred in the nine months of these cases are not confirmation issues.

- *Sixth,* the Debtors are not "ramrodding" the Plan, as the joinder claims.  These cases have been pending for more than nine months, and no actionable reorganization solution is available.  The solicitation version of the Plan was filed on October 19, 2023 and promptly solicited.  Parties had three weeks to object to the Plan, in accordance with the timeline that this Court approved in the solicitation order [Docket No. 1436] (the "<u>Solicitation Order</u>").

- *Seventh*, as explained above, the Debtors did robustly market their assets, contrary to the assertion otherwise.

- *Eighth*, the Debtors have cooperated with the Equity Committee's many diligence requests, despite the allegations otherwise.  The shareholders complain about the motion for a protective order filed by Latham & Watkins with respect to the Equity Committee's request for certain discovery related to Ms. Freeman.  The shareholders contend that this discovery is "vital information to help market the assets"—but, of course, information related to Ms. Freeman has nothing to do with the marketing of the Debtors' assets.

- *And last*, the shareholders argue that the Plan "flies in the face of justice" because it leaves shareholders "at the back of the line"—but that is exactly what the shareholders signed up for when they invested equity in the Debtors and exactly what the Bankruptcy Code requires.

## SUMMARY OF RESPONSES

19.     The Equity Committee's objection (interestingly signed by only one of the committee's two law firms) and the joinder thereto filed by certain shareholders are irrelevant distractions to confirmation, are overflowing with inaccurate statements and assumptions, and were filed by out-of-the-money constituents that now want to second-guess the Debtors' business judgment over the last nine months—even when such constituents did not object to many of the transactions about which they now complain.   While the Debtors or other parties may have believed that the Debtors were solvent when they filed these cases more than nine months ago, the market has spoken.   So while the Debtors' advisors and stakeholders may have hoped for a better solution, the reality is that the Debtors are insolvent with limited liquidity remaining.   The Debtors and their professionals reserve all rights with respect to the claims made in the Equity Committee's objection and the shareholders' joinder thereto, whether specifically responded to herein or not.

## BACKGROUND[3]

20.     The Debtors filed these chapter 11 cases on February 13, 2023—more than nine months ago.   Since then, the Debtors and their professionals have spent significant time, resources, and efforts working to maximize the value of these estates, for the benefit of the Debtors' stakeholders.   These efforts included a lengthy, extensive marketing process where the Debtors solicited financing and sale proposals.   As a result of that process, the Debtors consummated three postpetition financing facilities (all of which have been paid or otherwise satisfied in full) and two major asset sales (the ~$145 million Scilex stock sale and the $20 million ImmuneOncia Therapeutics joint venture sale).

---

[3]     Additional detail regarding the activities during these chapter 11 cases is set forth in the Disclosure Statement.

21.     To date, however, no legitimate, actionable reorganization solution has been proposed to the Debtors.  Thus, under these circumstances, the Debtors and the Unsecured Creditors' Committee have determined that the best value-maximizing solution to conclude these cases is a chapter 11 plan of liquidation (i.e., the Plan).  Accordingly, the Debtors sought and obtained approval from the Court to solicit the Plan under the Solicitation Order, which the Debtors commenced on October 20, 2023 in accordance therewith.[4]  The Solicitation Order established November 10, 2023 at 4:00 p.m. (Central Time) as the deadline for Class 3 (General Unsecured Claims) to vote on the Plan and for all parties to object to the Disclosure Statement and Plan.

22.     Holders of Claims and Equity Interests in Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), Class 4 (Intercompany Claims), Class 5 (Scintilla Equity Interests), and Class 6 (Sorrento Equity Interests) (the parties in such classes, the "Non-Voting Parties") were not solicited because they were either presumed to accept or deemed to reject the Plan and thus not entitled to vote.  Instead, on October 20, 2023, the Debtors delivered to all such Non-Voting Parties notices that informed them of their non-voting status and the various methods by which they could obtain copies of the Disclosure Statement, the Plan, the Solicitation Order, and other documents and materials included in the Solicitation Package.  *Id.*  In addition, the Debtors caused notice of the Combined Hearing to be published in the *New York Times* (national edition) on October 23, 2023 and the *San Diego Union-Tribune* on October 25, 2023.[5]

---

[4]    *See Certificate of Service* dated October 23, 2023 [Docket No. 1459], *Supplemental Certificate of Service* dated November 9, 2023 [Docket No. 1526], and *Supplemental Certificate of Service* dated November 22, 2023 [Docket No. 1584].

[5]    *See Affidavit of Publication for the Notice of (I) Combined Hearing on the Disclosure Statement, Confirmation of the Chapter 11 Plan, and Related Matters and (II) Objection and Voting Deadlines in the New York Times (National Edition)* [Docket No. 1467] and *Affidavit of Publication for the Notice of (I) Combined Hearing on the Disclosure Statement, Confirmation of the Chapter 11 Plan, and Related Matters and (II) Objection and Voting Deadlines in the San Diego Union-Tribune* [Docket No. 1468].

23.     The Debtors filed their initial Plan Supplement on November 1, 2023 [Docket No. 1491], their Second Plan Supplement on November 16, 2023 [Docket No. 1564], and their Third Plan Supplement on November 27, 2023 [Docket No. 1596] (collectively, the "Plan Supplements"). The Plan Supplements contain, among other things, the form of agreement needed to form and facilitate the Liquidation Trust.

24.     Based on the Voting Report, and as shown below, Class 3 overwhelmingly voted in favor of the Plan, with over 96% of voting creditors (in number) and over 94% of voted claims (in amount) accepting the Plan.

| Class 3 Ballots -  General Unsecured Claims | | | | | |
|---|---|---|---|---|---|
| | Count | % | Dollars | % | |
| Accept: | 112 | 96.55% | $46,756,777.36 | 94.29% | |
| Reject: | 4 | 3.45% | $2,829,336.88 | 5.71% | |
| Tabulated Ballot Totals: | 116 | | $49,586,114.24 | | |
| | | | | | |
| Abstain: | 0 | | $0.00 | | |
| Unacceptable: | 3 | | $278,853.75 | | |

## ARGUMENT

25.     This memorandum contains two sections. In the first section, the Debtors request final approval of the Disclosure Statement—which no party has objected to. In the second section, the Debtors set forth how the Plan satisfies Bankruptcy Code section 1129 and should be confirmed. The Debtors will adduce evidence in support of the Plan at the Combined Hearing.

## I.      THE DISCLOSURE STATEMENT SHOULD BE APPROVED ON A FINAL BASIS.

26.     To grant final approval of the Disclosure Statement, the Court must determine, among other things, whether the solicitation complied with Bankruptcy Code sections 1125(b) and 1125(a) and Bankruptcy Rules 3017(d), 3017(e), and 3018(c). Under section 1125(b), solicited holders must receive either "the plan or a summary of the plan," along with "a written disclosure

statement approved, after notice and a hearing, by the court as containing adequate information," as defined in section 1125(a).  11 U.S.C. § 1125(b); *see* 11 U.S.C. § 1125(a).

27.     On October 11, 2023, the Debtors filed their motion seeking entry of the Solicitation Order, which motion described in detail the legal and factual basis supporting a conditional finding that the Disclosure Statement contains "adequate information" as defined in Bankruptcy Code section 1125(a)(1).  *See* Docket No. 1406 (the "Conditional Disclosure Statement Motion"), ¶¶ 18–21.  Among other things, the Disclosure Statement includes descriptions of: (i) the Debtors' history and business; (ii) events leading to the commencement of these chapter 11 cases; (iii) events occurring during these chapter 11 cases; (iv) the Plan; (v) financial information that would be relevant to creditors' determinations of whether to accept or reject the Plan; (vi) a liquidation analysis comparing the recoveries that Holders of Claims and Equity Interests would receive in a hypothetical chapter 7 liquidation to those that they will receive under the Plan; (vii) risk factors related to the Plan; and (viii) certain U.S. federal tax law consequences of the Plan.  The Debtors hereby incorporate the arguments contained in the Conditional Disclosure Statement Motion by reference as if fully set forth herein.

28.     No party has objected to the adequacy of the Disclosure Statement.  The Disclosure Statement contains adequate information within the meaning of Bankruptcy Code section 1125(a) in satisfaction of Bankruptcy Code section 1125(b) and should be approved on a final basis.

## II.    THE PLAN SHOULD BE CONFIRMED.

### A.    Undisputed Provisions

#### 1.    The Plan Complies with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(1)).

29.     Bankruptcy Code section 1129(a)(1) requires that a plan "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).  The principal aim of

this provision is to ensure compliance with the sections of the Bankruptcy Code governing classification of claims and interests and the contents of a chapter 11 plan. Accordingly, the determination of whether the Plan complies with Bankruptcy Code section 1129(a)(1) requires an analysis of Bankruptcy Code sections 1122 and 1123, as well as other applicable provisions.

### a. *The Plan Satisfies the Classification Requirements of Bankruptcy Code Section 1122.*

30.     Bankruptcy Code section 1122(a) provides that, with the exception of "convenience classes" of unsecured claims, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a).

31.     The Plan's classification of Claims and Equity Interests satisfies the requirements of Bankruptcy Code section 1122 because the Plan places Claims and Equity Interests into six separate Classes, with each Class differing from the Claims and Equity Interests in each other Class in a legal or factual nature or based on other relevant criteria. *See* Plan, Art. III.

32.     Valid business, legal and factual reasons justify the separate classification of the particular Claims or Equity Interests into the Classes created under the Plan, and no unfair discrimination exists between or among Holders of Claims and Equity Interests. Namely, the Plan separately classifies the Claims or Equity Interests because each Holder of such Claims or Equity Interests may hold (or may have held) rights in or against the Debtors' estates legally dissimilar to the Claims or Equity Interests in other Classes or because substantial administrative convenience resulted from such classification.

      **b.**    ***The Plan Satisfies the Mandatory Requirements of Bankruptcy Code Section 1123(a).[6]***

33.    Bankruptcy Code section 1123(a) contains eight mandatory requirements to confirm a chapter 11 plan, generally related to the specification of claims treatment and classification, the equal treatment of claims within classes and the mechanics of implementing the plan. 11 U.S.C. § 1123(a). The Plan satisfies each of the applicable requirements by way of the provisions set out in various Articles, as detailed below:

| Bankruptcy Code Subsection | Confirmation Requirement | Plan Article |
|---|---|---|
| 1123(a)(1) | The plan must designate "classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of [the Bankruptcy Code], and classes of interests." | Article III |
| 1123(a)(2) | The plan must "specify any class of claims or interests that is not impaired under the plan." | Article III |
| 1123(a)(3) | The plan must "specify the treatment of any class of claims or interests that is impaired under the plan." | Article III |
| 1123(a)(4) | The plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." | Article III |
| 1123(a)(5) | The plan must provide "adequate means" for its implementation. | Article V |
| 1123(a)(6) | The debtor's corporate constituent documents must prohibit the issuance of nonvoting equity securities. | Not Applicable |
| 1123(a)(7) | The plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, must be "consistent with the | See Section II.B of Memorandum (Disputed Provisions) |

---

[6]    The Plan's compliance with section 1123(a)(7) is disputed by the Equity Committee and thus addressed in Section II.B of this memorandum.

| | interests of creditors and equity security holders and with public policy." | |
|---|---|---|
| 1123(a)(8) | In a case in which the debtor is an individual, the plan must provide for the payment to creditors under the plan of certain earnings from personal services performed by the debtor. | Not Applicable |

Accordingly, the Plan complies with Bankruptcy Code section 1123(a).

**c.**      ***The Plan Complies with the Discretionary Provisions of Bankruptcy Code Section 1123(b).***

34.      Bankruptcy Code section 1123(b) sets forth various discretionary provisions that may be incorporated into a chapter 11 plan, including that a plan may: (a) impair or leave unimpaired any class of claims or interests; (b) provide for the assumption, assumption and assignment, or rejection of executory contracts and unexpired leases; and (c) include any other appropriate provision not inconsistent with the applicable provisions of chapter 11. 11 U.S.C. § 1123(b)(1)–(2), (6). Section 1123(b)(1) is satisfied by <u>Article III</u> of the Plan, and section 1123(b)(2) is satisfied by <u>Article VI</u> of the Plan. The Plan does not contain any releases but does contain exculpation and injunction provisions, which are consistent with section 1123(b)(6) for the reasons set forth later below.

**d.**      ***The Plan Complies with Bankruptcy Code Section 1123(d).***

35.      Bankruptcy Code section 1123(d) provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d). Section 1123(d) is satisfied by <u>Article VI</u> of the Plan. Further, the Debtors, in accordance with the Solicitation Order, distributed a notice of the Assumption and Assignment Procedures (defined in the Conditional Disclosure Statement Motion as a "<u>Contract/Lease Notice</u>") to each applicable

16

counterparty.[7]   The Contract/Lease Notice included procedures for objecting to the proposed assumptions of Executory Contracts and Unexpired Leases.   The Plan thus complies with Bankruptcy Code section 1123(d).

### 2. The Debtors Complied with the Applicable Provisions of the Bankruptcy Code (Section 1129(a)(2)).

36.   Bankruptcy Code section 1129(a)(2) requires the plan proponent to comply with applicable provisions of the Bankruptcy Code.   11 U.S.C. § 1129(a)(2).   As discussed throughout this memorandum, as well as in the Solicitation Affidavit, the Debtors complied with the applicable provisions of the Bankruptcy Code, including the notice and solicitation requirements of Bankruptcy Code section 1125, thereby satisfying Bankruptcy Code section 1129(a)(2).

### 3. The Debtors Proposed the Plan in Good Faith (Section 1129(a)(3)).

37.   Bankruptcy Code section 1129(a)(3) requires a plan proponent to propose the plan "in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3).   The Plan satisfies section 1129(a)(3), and the Debtors have met their good faith obligation.   Throughout these cases, the Debtors have focused on maximizing value for their stakeholders.   The Plan has been proposed in good faith and for the legitimate purpose of winding down the Debtors and liquidating the Debtors' estates by distributing the Debtors' assets on a fair and equitable basis while maximizing the returns available to various stakeholders.   The Plan, the Plan Supplement and the transactions contemplated by the Plan, including the Liquidation Trust Agreement, were developed after substantial analysis and arm's-length negotiations between the Debtors and other key constituents, particularly the Unsecured Creditors' Committee.   Accordingly, the Plan has been proposed in

---

[7]   *See Certificate of Service* dated October 23, 2023 [Docket No. 1459], *Supplemental Certificate of Service* dated November 9, 2023 [Docket No. 1526], and *Supplemental Certificate of Service* dated November 22, 2023 [Docket No. 1584].

good faith as interpreted under the Bankruptcy Code and will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.  Finally, as set forth herein, the Plan complies with bankruptcy and applicable nonbankruptcy law.

**4.      The Plan Provides That the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4)).**

38.      Bankruptcy Code section 1129(a)(4) requires that certain fees and expenses paid by the plan proponent, by the debtor or by a person issuing securities or acquiring property under the plan for services or for costs and expenses incurred in connection with the case or plan, be approved by the Court as reasonable.  11 U.S.C. § 1129(a)(4).  All such Professional Fee Claims and corresponding payments are subject to prior Court approval and the reasonableness requirements under Bankruptcy Code sections 328 or 330.  *See* Plan, <u>Art. II.A.2</u> (providing that professionals must file final requests for payment of Professional Fee Claims); *see also* 11 U.S.C. §§ 328(a), 330(a)(1)(A); *In re Cajun Elec.*, 150 F.3d 503, 517 (5th Cir. 1998) ("What constitutes a reasonable payment will clearly vary from case to case and, among other things, will hinge to some degree upon who makes the payments at issue, who receives those payments, and whether the payments are made from assets of the estate.").

**5.      The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6)).**

39.      Bankruptcy Code section 1129(a)(6) permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  11 U.S.C. § 1129(a)(6).  This requirement is inapplicable to these chapter 11 cases.

6.     **The Plan Is in the Best Interests of the Debtors' Estates (Section 1129(a)(7)).**

40.     Bankruptcy Code section 1129(a)(7), commonly known as the "best interests test," requires that, "with respect to each impaired class of claims or interests," members of such class that have not accepted the plan will receive at least as much as they would in a hypothetical chapter 7 liquidation." 11 U.S.C. § 1129(a)(7).

41.     The best interests test applies to each dissenting holder of an impaired claim or interest, and is generally satisfied through a comparison of the estimated recoveries for a debtor's stakeholders in a hypothetical chapter 7 liquidation of that debtor's estate against the estimated recoveries under that debtor's chapter 11 plan.  The Debtors prepared a liquidation analysis (the "Liquidation Analysis"), attached to the Disclosure Statement as Exhibit C, which estimates the recoveries for members of each Class under the Plan and describes in detail how the Debtors satisfy the best interests test.  As demonstrated by the Liquidation Analysis, all Holders of Claims and Equity Interests will receive estimated recoveries under the Plan that is no less than what they would receive in a hypothetical chapter 7 liquidation.  *See* Disclosure Statement, Exhibit C.

7.     **The Plan Satisfies the Voting Requirements of Bankruptcy Code (Section 1129(a)(8)).**

42.     Bankruptcy Code section 1129(a)(8) requires that each class of claims or interests must either accept a plan or be unimpaired under a plan.  11 U.S.C. 1129(a)(8).  Classes 1 (Other Priority Claims), 2 (Other Secured Claims), 3 (General Unsecured Claims), and 5 (Scintilla Equity Interests) have voted to accept the Plan or are deemed to have accepted the Plan.  Class 4 is potentially composed of Unimpaired Claims and presumed to accept the Plan on behalf thereof.

43.     Where certain impaired classes of claims or interests do not accept the plan and the requirements of section 1129(a)(8) are therefore not satisfied, the plan may nevertheless be confirmed over such non-acceptance pursuant to the "cramdown" provisions of section 1129(b).

19

*Id.* So although Class 6 (Sorrento Equity Interests) and, to the extent applicable, Class 4 (Intercompany Claims) (which may potentially be Impaired with no recovery) are deemed to have rejected the Plan, the Plan may still be confirmed because, as set forth further below, the Debtors have satisfied the requirements for cramdown under section 1129(b).

### 8.    The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9)).

44.    Bankruptcy Code section 1129(a)(9) requires that certain priority claims be paid in full on the effective date of a plan and that the holders of certain other priority claims receive deferred cash payments.  11 U.S.C. § 1129(a)(9).  Bankruptcy Code section 1129(a)(9) is satisfied by <u>Articles II.A</u> and <u>II.C</u> of the Plan.

### 9.    At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (Section 1129(a)(10)).

45.    Bankruptcy Code section 1129(a)(10) provides that, to the extent there is an impaired class of claims, at least one impaired class of claims must accept the plan, "without including any acceptance of the plan by any insider."  11 U.S.C. § 1129(a)(10).  As detailed in the Voting Report, Class 3 has voted overwhelmingly to accept the Plan (without including the votes of any insiders), so the Plan satisfies the requirements of section 1129(a)(10).

### 10.    The Plan Is Feasible, To The Extent Applicable (Section 1129(a)(11)).

46.    Bankruptcy Code section 1129(a)(11) permits confirmation of a plan if "confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, *unless such liquidation or reorganization is proposed in the plan*."  11 U.S.C. § 1129(a)(11) (emphasis added).

47.    Because the Plan itself proposes a liquidation, the feasibility requirement is not applicable.  *See, e.g., Matter of 47th & Belleview Partners*, 95 B.R. 117, 120 (Bankr. W.D. Mo. 1988) ("feasibility, under the literal wording of § 1129(a)(11) of the Bankruptcy Code, is

unnecessary to be shown when 'liquidation … is proposed in the plan'"); *In re Pero Bros. Farms, Inc.*, 90 B.R. 562, 563 (Bankr. S.D. Fla. 1988) ("The feasibility test has no application to a liquidation plan."); *see also* In re Heritage Org., L.L.C., 375 B.R. 230, 311 (Bankr. N.D. Tex. 2007) ("Several courts take a narrow approach and interpret the plain language of § 1129(a)(11) to say that feasibility need not be established when liquidation is proposed in the plan."); *but see id.* (explaining that other courts have nonetheless applied the feasibility test to liquidating plans).

48.     But even if the feasibility test applies to the Plan, the test is satisfied.   To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.  Rather, a debtor must provide only a reasonable assurance of success.  There is a relatively low threshold of proof necessary to satisfy the feasibility requirement.  *E.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 584 (Bankr. E.D. Pa. 2005) (quoting approvingly that "the Code does not require the debtor to prove that success is inevitable, and a relatively low threshold of proof will satisfy § 1129(a)(11) so long as adequate evidence supports a finding of feasibility") (internal citations omitted); *In re Tribune Co.*, 464 B.R. 126, 185 (Bankr. D. Del. 2011), on reconsideration, 464 B.R. 208 (Bankr. D. Del. 2011).  Here, as the Debtors will demonstrate through their evidentiary presentation, the Plan is feasible because there is a "reasonable" likelihood of success as the Debtors' current cash on hand and anticipated cash receipts are expected to be sufficient for the Debtors to consummate the liquidation set forth in the Plan.

### 11.     The Plan Provides for the Payment of All Statutory Fees (Section 1129(a)(12)).

49.     Bankruptcy Code section 1129(a)(12) requires the payment of "all fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on the confirmation of the plan."  11 U.S.C. § 1129(a)(12).  Bankruptcy Code section 507(a)(2) provides that "any fees and charges assessed against the estate under [section 1930 of] chapter 123

of title 28" are afforded priority status.   11 U.S.C. § 507(a)(2).   Bankruptcy Code section

1129(a)(12) is satisfied by Article II.D of the Plan.

> **12.      Bankruptcy Code Sections 1129(a)(13) through 1129(a)(16) Do Not Apply to the Plan.**

50.      Bankruptcy Code sections 1129(a)(13), 1129(a)(14), 1129(a)(15), and 1129(a)(16)

do not apply to the Plan as the Debtors do not owe any retiree obligations, do not owe any domestic

support obligations, are not individuals, and are not nonprofit corporations.   *See* 11 U.S.C.

§ 1129(a)(13)–(16).

> **13.      The Plan Satisfies the "Cramdown" Requirements of Bankruptcy Code Section 1129(b).**

51.      Because Class 6 (and Class 4, to the extent applicable) are impaired non-voting

classes that are deemed to have rejected the Plan, the requirements of Bankruptcy Code

section 1129(a)(8) are not satisfied.   The Debtors therefore request Confirmation of the Plan under

Bankruptcy Code section 1129(b) (the "cramdown" provision) with respect to such Classes.

52.      Bankruptcy Code section 1129(b) provides that, if all applicable requirements of

Bankruptcy Code section 1129(a) are met other than Bankruptcy Code section 1129(a)(8), a plan

may be confirmed so long as the requirements set forth in section 1129(b) are satisfied.   *See* 11

U.S.C. § 1129(b).   Under section 1129(b), the bankruptcy court may "cram down" a plan over the

rejection or deemed rejection of a plan by an impaired class or classes of claims or interests as

long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the

non-accepting impaired class(es).   *Id.*

53.      *No Unfair Discrimination.*   The requirement in Bankruptcy Code section

1129(b)(1) that a plan not discriminate unfairly against impaired, dissenting classes focuses on the

treatment of the dissenting class relative to other classes that have similar legal rights.   *See* H.R.

Rep. No. 95-595, at 416-417 (1977) ("The plan may be confirmed if the class is not unfairly

discriminated against with respect to equal classes if junior classes will receive nothing under the plan."); *see also In re Buttonwood Partners, Ltd*., 111 B.R. 57, 62 (Bankr. S.D.N.Y. 1990) (same). Section 1129(b)(1) does not prohibit all discrimination among classes; it prohibits only discrimination that is "unfair" with respect to the class or classes that do not accept the plan.  *See, e.g.*, *In re 11,111, Inc.*, 117 B.R. 471, 478 (Bankr. D. Minn. 1990).  Thus, a plan unfairly discriminates in violation of Bankruptcy Code section 1129(b) only if, under all the facts and circumstances, classes comprising similarly situated claims or interests receive treatment under the plan that is not equivalent, and there is no reasonable basis for the disparate treatment.

54.    The Plan does not discriminate unfairly with respect to the treatment of Classes 6 and Class 4 (to the extent applicable).  The Plan's treatment of Class 6 is proper because it is the only class of Equity Interests held by non-Debtors and is not similarly situated to any other Classes given its distinctly different legal character.  To the extent applicable, the Plan's treatment of Class 4 is proper because it is the only class of Intercompany Claims and is not similarly situated to any other Classes given its distinctly different legal character.

55.    *Fair and Equitable.*  The Plan is "fair and equitable" with respect to Classes 4 (to the extent applicable) and 6 because the Plan complies with the "absolute priority" rule. Bankruptcy Code section 1129(b)(2) requires that any class junior to the impaired class not receive any distribution under a plan on account of its junior interest.  11 U.S.C. § 1129(b)(2).

56.    The Plan satisfies Bankruptcy Code section 1129(b)(2)(C) for Classes 4 (to the extent applicable) and 6 because  (i) there are no Classes junior to Class 6 (or Class 4, to the extent applicable) that will receive or retain any property under the Plan and (ii) no Holders of Claims in any Classes senior to Class 6 (or Class 4, to the extent applicable) will be paid more than 100% of their Allowed Claims.  Accordingly, the Plan does not discriminate unfairly with respect to Classes

4 (to the extent applicable) and 6 and is fair and equitable with respect to those Classes, thus satisfying the requirements of Bankruptcy Code section 1129(b).

### 14. The Debtors Complied with Bankruptcy Code Sections 1129(c) and 1129(d).

57. The Plan satisfies the remaining provisions of Bankruptcy Code section 1129. Bankruptcy Code section 1129(c), which prohibits confirmation of multiple plans, is not implicated because there is only one proposed plan. 11 U.S.C. § 1129(c).

58. The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act of 1933. Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of Bankruptcy Code section 1129(d). 11 U.S.C. § 1129(d).

### 15. The Plan's Injunction Provisions Are Appropriate and Comply with the Bankruptcy Code.

59. The Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any additional provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Notably, the Plan does <u>not</u> contain any debtor or third-party releases. Plan, <u>Art. X</u>. But among other discretionary provisions, the Plan includes injunction and gatekeeping provisions, which are set forth in <u>Article X.C</u> of the Plan (collectively, the "<u>Injunction Provisions</u>"). The Injunction Provisions were the product of extensive good-faith, arm's-length negotiations with the U.S. Trustee, comply with the Bankruptcy Code and prevailing Fifth Circuit law, and should be approved. They are necessary because they enforce the Plan's exculpation provisions (discussed below) and also provide a fair and controlled process by which litigation against the Protected Parties can otherwise proceed. Accordingly, the Court should approve the Injunction Provisions.

B.     **Disputed Provisions**

     1.    **The Plan Satisfies Bankruptcy Code Sections 1123(a)(7) and 1129(a)(5) With Respect to the Liquidation Trust and the Liquidation Trustee.**

60.    Bankruptcy Code section 1123(a)(7) (a sub-requirement within section 1129(a)(1)) provides that a plan's provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto must be "consistent with the interests of creditors and equity security holders and with public policy."  11 U.S.C. § 1123(a)(7).

61.    Similarly, Bankruptcy Code section 1129(a)(5)(A)(i) requires that the proponent of a plan disclose the identity and affiliations of any individual proposed to serve as a director or officer of the debtor under the plan, while Bankruptcy Code section 1129(a)(5)(A)(ii) requires that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.  11 U.S.C. § 1129(a)(5)(A)(i)-(ii). Additionally, Bankruptcy Code section 1129(a)(5)(B) requires a plan proponent to disclose the identity of any "insider" (as defined by Bankruptcy Code section 101(31)) to be employed or retained by the debtor under the plan and the nature of any compensation for such insider.

62.    The Plan satisfies these requirements through Article V.J of the Plan, as well as the Liquidation Trust Agreement filed in the Plan Supplements.  The Debtors are selling or winding down their assets, and all remaining officers, managers, or managing members of the Debtors will be deemed to have resigned on the Effective Date.  *See* Plan, Art.V.J.  On and after the Effective Date, the Liquidation Trustee—whose initial identity (Mr. David Weinhoffer) is disclosed in the Plan Supplements and is not an insider of the Debtors—will serve as the Liquidating Debtors' sole director, manager, officer, and member, as applicable, and will have the sole authority to act on behalf of the Liquidating Debtors with respect to the Wind-Down and the Plan Administration Process.  *Id.*  To the extent applicable, these activities are consistent with the interests of the

Debtors' stakeholders and public policy.  Accordingly, the Plan satisfies Bankruptcy Code sections 1129(a)(5) and 1123(a)(7).

63.     The Equity Committee does not dispute the adequacy of the disclosures.  Instead, it argues that the Plan does not satisfy these two requirements for other reasons—which should be overruled (to the extent not resolved).

### a.     *Equity Holders Are Not Entitled To Any Fiduciary Duties Or Related Protections.*

64.     The Equity Committee argues that equity holders should be named as a beneficiary of the Liquidation Trust and that the trust should owe them fiduciary duties and related rights—such as the right to remove and replace the Liquidation Trustee or the Trust's advisory committee members if general unsecured claims are paid in full.  But based on the current and expected value of the Debtors' assets, the equity holders are unfortunately out of the money and entitled to nothing—including any fiduciary duties or related rights.  The Liquidation Trust provides that equity holders can receive distributions if general unsecured claims are paid in full in cash.  But equity holders are not entitled to anything more.

65.     There is little caselaw on sections 1123(a)(7) and 1129(a)(5).  *See In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014) (Bohm, J.) (noting there is "little case law" on section 1129(a)(5)(A)(ii)); *In re Machne Menachem, Inc.*, 304 B.R. 140, 142–43 (Bankr. M.D. Pa. 2003) ("Little has been written on § 1123(a)(7).").  Because of that limited caselaw, courts have turned to the legislative history of the provisions and have tried to craft legal frameworks based on the limited rulings available.

66.     And that limited caselaw and legislative history suggests that it is intended to protect the equity holders of the reorganized debtors, not out-of-the-money prepetition equity holders.  For example, in *Machne*, the bankruptcy court noted that the language of section

1123(a)(7) originated in the Bankruptcy Act and that the accompanying Senate Report explained how the provision "directs the scrutiny of the court to the methods by which the management of the *reorganized corporation* is to be chosen, so as to ensure, for example, adequate representation of *those whose investments are involved in the reorganization*" (emphasis added). *In re Machne Menachem, Inc.*, 304 B.R. 140, 142 (Bankr. M.D. Pa. 2003).

67.     And in *Digerati*, which the Equity Committee relies on in its objection, then-Chief Judge Bohm of this Court surveyed the limited applicable caselaw of section 1129(a)(5) and concluded that a number of factors should be considered when analyzing whether the post-confirmation governance was consistent with public policy. *See In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014). The first factor was whether the plan would "keep the debtor in existence as an ongoing company or is the debtor extinguished," as Judge Bohm recognized the difference between a reorganizing debtor and a liquidating debtor. *Id; see also In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 308–09 (Bankr. N.D. Ill. 2008) (holding that section 1129(a)(5)(A) did not apply because the debtor "will cease to exist post-confirmation").

68.     The analysis in *Machne* and *Digerati* thus suggests is that the focus on "equity holders" in sections 1123(a)(7) and 1129(a)(5) is on the equity holders of not the prepetition debtor but the *reorganized* debtor—i.e., "those whose investments are involved in the reorganization." *In re Machne Menachem, Inc.*, 304 B.R. 140, 142 (Bankr. M.D. Pa. 2003). If the debtors are liquidating and ceasing to exist, like here, then the focus on public policy and out-of-the-money equity holders is much more limited, if not completely so. *See In re Digerati Techs., Inc.*, 2014 WL 2203895, at *5 (Bankr. S.D. Tex. May 27, 2014) (asking whether debtor was reorganizing or liquidating); *In re Sentinel Mgmt. Grp., Inc.*, 398 B.R. 281, 308–09 (Bankr. N.D. Ill. 2008) (section 1129(a)(5)(A) does not apply when debtor "will cease to exist"). Here, the Liquidation

27

Trust is being created for and is in the interests of the Debtors' creditors.  The Equity Committee's objection should be overruled.[8]

> **b.**     ***The Equity Committee's Tax Concerns Are Misguided.***

69.     Last, the Equity Committee argues that the general nature of the Plan and the transfer of assets to the Liquidation Trust is not a value-maximizing solution because it eliminates purportedly valuable tax attributes.  In the Debtors' professionals' experience, monetizing net operating losses and other favorable tax attributes can be challenging given, among other things, (i) other potential investments available in the market also involving favorable tax attributes, (ii) the complexities and risks of third parties being able to beneficially use such attributes after acquiring them, and (iii) IRS regulatory considerations and requirements.  Thus, to date, the Debtors have not identified a financially practicable path forward in which the unused tax attributes could be used and do not expect such a transaction to materialize.   But the Plan is not expected to go effective until approximately spring 2024, which is the earliest when the unutilized tax attributes might be eliminated, consistent with the principles of Rev. Rul. 74-462, 1974-2 C.B. 82. Thus, the Debtors and the Equity Committee still have additional time to monetize the Debtors' unused tax attributes in a value-maximizing way if such a transaction somehow becomes actionable.

> **2.**     **The Plan's Exculpation Provisions Are Appropriate and Comply with the Bankruptcy Code.**

70.     As explained above, the Bankruptcy Code identifies various additional provisions that may be incorporated into a chapter 11 plan, including "any additional provision not

---

[8]     The Equity Committee's reliance on *In re Beyond.com Corp.*, 289 B.R. 138, 144–45 (Bankr. N.D. Cal. 2003) is distinguishable, inapplicable, and unpersuasive.  There, the debtors failed to disclose the executive's conflicts as a result of his "golden parachute."  *Id.*  Those facts do not exist here; the Liquidation Trustee has no such conflicts.

inconsistent with the applicable provisions of this title."  11 U.S.C. § 1123(b)(6).  Again, notably, the Plan does <u>not</u> contain any debtor or third-party releases.  Plan, <u>Art. X</u>.  But among other discretionary provisions, the Plan includes exculpation provisions.

71.     <u>Article X.B</u> of the Plan provides for two exculpation provisions.  First, it generally exculpates the Exculpated Parties (i.e., the Debtors, the Committees, and the Committees' members, in their capacity as such—but *not* any estate professionals) from any Cause of Action for any Claim arising out of any act or omission on or after the Petition Date and prior to the Effective Date in connection with, relating to, or arising out of the chapter 11 cases and related transactions, except for any acts or omissions that are determined to have constituted willful misconduct, gross negligence, criminal conduct or fraud (the "<u>Broad Exculpation</u>").

72.     Second, it more narrowly exculpates the Protected Parties (i.e., the Exculpated Parties, the Debtors' Chief Restructuring Officer, and their respective Related Persons[9]) from any Claim, obligation, Cause of Action, or liability related to any act or omission in connection with, relating to, or arising out of (a) the solicitation of acceptance or rejection of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code (with which no party has raised an issue) or (b) the participation, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan (which is not applicable here given the liquidation) (the "<u>1125(e)</u> <u>Exculpation</u>," and together with the Broad Exculpation, the Exculpation Provisions).

---

[9]     Under the Plan, "Related Persons" means, with respect to a Person, each of such Person's financial advisors, attorneys, accountants, investment bankers, consultants, representatives, other professionals, and employees (other than current and former directors, officers (other than the Debtors' Chief Restructuring Officer), managers, managing members, principals, partners, members, and observers), each in their capacity as such.

73.     A bankruptcy court may approve an exculpation provision in a chapter 11 plan if it has been proposed in good faith, is the product of arms'-length negotiation between key stakeholders, and is appropriately tailored.  See 11 U.S.C. §§ 1123(b)(6), 1129(a)(3); *see also In re Highland Capital Mgmt., L.P.*, 48 F.4th 419, 437 (5th Cir. 2022).  An exculpation provision "does not affect the liability of [the exculpated] parties, but rather states the standard of liability under the [Bankruptcy] Code," thereby preventing future collateral attacks against the debtors and estate fiduciaries, where appropriate.  *In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000).

74.     Here, the Exculpation Provisions in the Plan are integral pieces of the overall settlement embodied by the Plan.  They are the product of good-faith, arm's-length negotiations and are narrowly tailored.  For example, the Broad Exculpation is limited to the Debtors, the Committees, and the Committees' members in accordance with the Fifth Circuit's ruling in *Highland* and excludes acts of willful misconduct, gross negligence, criminal conduct or fraud.  And the 1125(e) Exculpation is limited to actions protected by Bankruptcy Code section 1125(e).

75.     The Equity Committee objected to the Exculpation Provisions, arguing that the Related Parties (i.e., the professionals) of the Exculpated Parties should not be exculpated.  Such parties have been removed from the definition of Exculpated Parties and the Broad Exculpation; they will be exculpated only to the extent set forth in the 1125(e) Exculpation, in accordance with section 1125(e) of the Bankruptcy Code.  Additionally, the professionals (as Protected Parties) will be covered by a "gatekeeping provision" that requires court approval before certain litigation is commenced against them.

76.     In a footnote in a filing related to its discovery requests [Docket No. 1594, n. 72], the Equity Committee contends that these exculpation changes do not resolve their objection but are "pure semantics."  They are not semantics.  They are substantive, meaningful changes that are

consistent with Fifth Circuit precedent (and were the subject of hard-fought, good-faith, arm's-length negotiations with the U.S. Trustee). *First*, estate professionals will no longer be broadly exculpated for activities during the case; instead they will be exculpated solely to the extent set forth in section 1125(e)—which the Bankruptcy Code *already* provides. The Plan is not adding any exculpation that the Bankruptcy Code does not already provide. *And second*, the gatekeeping provision does not unfairly prejudice the Equity Committee (or other parties) as the Court would nonetheless have jurisdiction over litigation related to the activities of these cases. The provision is simply meant to protect the Protected Parties from frivolous litigation that could follow a bankruptcy case. But if the Equity Committee has a meritorious, non-frivolous claim against a Protected Party, then it should have no problem seeking the Court's approval to commence the litigation.

## CONCLUSION

77.     The Court should approve the Disclosure Statement on a final basis and confirm the Plan as satisfying all of the applicable requirements of the Bankruptcy Code.

Dated:   November 28, 2023

*/s/ Kristhy M. Peguero*
**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
            kpeguero@jw.com
            ggraham@jw.com

– and –

Caroline Reckler (S.D. Tex. Bar No. IL6275746)
Ebba Gebisa (admitted *pro hac vice*)
Jonathan Gordon (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile:  (312) 993-9667
Email:  caroline.reckler@lw.com
            ebba.gebisa@lw.com
            jonathan.gordon@lw.com

– and –

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile:  (213) 891-8763
Email:  jeff.bjork@lw.com
            kim.posin@lw.com

*Counsel to the Debtors*

**<u>Certificate of Service</u>**

I certify that on November 28, 2023, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*<u>/s/ Kristhy M. Peguero</u>*
Kristhy M. Peguero
