**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| SORRENTO THERAPEUTICS, INC., *et al.*[1] | ) | Case No. 23-90085 (CML) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) | (Emergency Hearing Requested) |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDERS
APPROVING (I) SENIOR SECURED SUPERPRIORITY FINANCING AND
(II)(A) SALE OF ASSETS AND (B) MODIFICATIONS TO CHAPTER 11 PLAN**

> **Emergency relief has been requested. Relief is requested not later than February 24, 2024.**
>
> **If you object to the relief requested or you believe that emergency consideration is not warranted, you must appear at the hearing if one is set, or file a written response prior to the date that relief is requested in the preceding paragraph.  Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") state the following in support of this motion (this "Motion"):

**RELIEF REQUESTED: DIP ORDER**

1.     The Debtors seek entry of an order (on an emergency basis), substantially in the form of the attached proposed order (the "DIP Order"), authorizing, among other things:

- the Debtors to obtain postpetition financing on a superpriority senior secured basis in the form of a term loan facility in an aggregate principal amount of up to  $5,000,000 (plus any and all amounts capitalized thereon) (the "DIP Facility," and the loans made, advanced or deemed advanced thereunder, the "DIP Loans"), comprised of (i) $3,000,000 of DIP Loans advanced within two business days of the entry of the DIP Order, and (ii) $2,000,000 to be made available to the Debtors on March 1, 2024, in accordance with and subject to the terms and conditions (including, without limitation, any conditions precedent to each of the DIP Loans) set forth in that certain *Debtor-in-Possession Term Loan Promissory Note and Security Agreement*, substantially

---

[1]     The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956).  The Debtors' service address is: 9380 Judicial Drive, San Diego, CA 92121.

in the form attached to the DIP Order as Exhibit 1 (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Note</u>", and, together with the Approved Budget (as defined in the DIP Order) and all other agreements, guarantees, pledge, collateral and security agreements, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof), collectively, the "<u>DIP Loan Documents</u>"), by and among the Debtors, as borrowers (the "<u>DIP Borrowers</u>"), each of the Guarantors (as defined in the DIP Note) (collectively, the "<u>DIP Guarantors</u>", and together with the DIP Borrowers, the "<u>DIP Loan Parties</u>"), BioVintage, Inc., a California corporation, as the lender (together with its successors and permitted assigns, the "<u>DIP Lender</u>"), and the DIP Order.

2.      Emergency relief with respect to the DIP Facility is required by February 24, 2024 because the Debtors' liquidity is extremely limited.  The Debtors have only approximately $3.6 million of unrestricted cash on hand, which is estimated to be depleted during the week of February 25, 2024 (following payment of necessary wage obligations and other operating expenses).  The DIP Facility will provide the Debtors with liquidity to continue with these chapter 11 cases, document and pursue the closing of the proposed Sale (as defined below), and proceed toward consummation of their confirmed plan (with modifications described herein). Without the DIP Facility, the Debtors will not have sufficient liquidity to proceed and will most likely have to consider converting these cases to chapter 7, to the detriment of all stakeholders. Thus, prompt consideration of this Motion with respect to the DIP Facility is in the best interests of the Debtors' estates.  Further, the Unsecured Creditors' Committee does not object to emergency consideration of the DIP Facility; the Debtors have twice asked the Equity Committee for their position on an emergency hearing but have not received an answer.

## RELIEF REQUESTED: SALE ORDER

3.        The Debtors also seek entry of an additional order (on an emergency basis,
subsequent to the hearing on the DIP Order), substantially in a form to be filed prior to such
subsequent hearing, authorizing, among other things:

- the sale to a limited liability company capitalized by a group of investor(s) led
  by Mr. Michael Vasinkevich and certain other person(s) or a shelf company
  designated by such limited liability company, in either case, overseen from an
  operations perspective by Dr. Henry Ji (the Debtors' CEO) (in each case, the
  "Buyer") of substantially all of the Debtors' remaining assets—as set forth in
  the Sorrento Assets Acquisition term sheet attached hereto as Exhibit A (the
  "Sale Term Sheet") as the "Purchased Assets" (collectively, the "Assets")—
  free and clear of all pledges, liens, security interests, encumbrances, claims,
  charges, options, and interests (collectively, the "Liens") except to the extent
  otherwise set forth in the asset purchase agreement executed by the Debtors and
  Buyer (the "Sale") and with the Liens attaching to the proceeds of the Sale with
  the same validity, extent, and priority as had attached to the Assets; and

- in connection with the Sale, the Debtors' modifications to their chapter 11 plan
  such that current equity interests in Sorrento are not canceled (with Sorrento
  remaining as a public company), with the modifications effective at closing of
  the Sale.[2]

4.        Emergency relief is appropriate with respect to the Sale (and the plan
modifications) because continued operations will cause the Debtors to burn additional liquidity,
thus an expedited Sale can help the Debtors' estates preserve liquidity so that (i) the Debtors can
pay all allowed administrative claims in full and (ii) funds are preserved and made available to the
liquidation trust to fund recovery efforts, for the benefit of creditors and, potentially, equity
holders.  Thus, prompt consideration of this Motion with respect to the Sale (and the plan
modifications) is in the best interests of the Debtors' estates.  Further, the Unsecured Creditors'
Committee does not object to emergency consideration of the Sale; the Debtors have twice asked
the Equity Committee for their position on an emergency hearing but have not received an answer.

---

[2]    The Debtors will file the asset purchase agreement and the modified plan prior to the hearing on the Sale.

**THE DIP LENDER / BUYER**

5.      The DIP Lender and Buyer are (or will be) entities fully capitalized by Mr. Michael Vasinkevich and certain other investors, and the Debtors' CEO (Dr. Henry Ji) will receive certain equity rights therein.  Mr. Michael Vasinkevich is an investment banker that runs Stockblock Securities LLC and previously ran and sold H.C. Wainwright & Co, where he often helped Sorrento raise capital.  Given the affiliated relationship with Dr. Ji, the Debtors' negotiations were overseen by their independent Chief Restructuring Officer, Mr. Meghji (as explained below).

**JURISDICTION & VENUE**

6.      The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b).  The Debtors confirm their consent to the entry of a final order by the Court.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7.      The bases for the relief requested are sections 105, 361, 362, 363, 364, 365, 503, 506, 507, and 1127 of title 11 of the Bankruptcy Code (the "Bankruptcy Code"), rules 2002, 3019(a), 4001, 6004, 9019, and 9024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 4002-1(e) and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

8.      The Court can and should still consider the emergency relief requested herein, notwithstanding the two pending motions to transfer venue [Docket Nos. 1851, 1879] because (i) as the Debtors will show in response to the motions, venue is appropriate because, among other things, Scintilla's only asset was a Houston, Texas bank account containing $60,000 of cash and (ii) regardless, venue is not jurisdictional.  *See, e.g., In re Houghton Mifflin Harcourt Pub. Co.*, 474 B.R. 122, 138 (Bankr. S.D.N.Y. 2012) ("Venue objections, even if valid, are not jurisdictional.") (summarizing Supreme Court jurisprudence).

4

## GENERAL BACKGROUND

9.      On February 13, 2023, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  A detailed description of the Debtors, their businesses, and the facts and circumstances supporting these chapter 11 cases are set forth in greater detail in the *Declaration of Mohsin Meghji, Chief Restructuring Officer of the Debtors, in Support of Chapter 11 Petitions* [Docket No. 5].  On February 28, 2023, the U.S. Trustee appointed the Unsecured Creditors' Committee, which was reconstituted on March 28, 2023 [Docket No. 313], June 7, 2023 [Docket No. 813], and July 28, 2023 [Docket No. 1123].  On April 10, 2023, the U.S. Trustee appointed the Equity Committee, which was reconstituted on April 14, 2023 [Docket No. 448].

10.      On April 14, 2023, the Court entered an order approving bid procedures to allow the Debtors to pursue and consummate potential transactions (including potential sales of their assets) using a clear and open process for the solicitation, receipt, and evaluation of bids on an appropriate timeline [Docket No. 447] (the "Bid Procedures Order").  The Bid Procedures Order required that any objections to the potential free-and-clear sales of the Debtors' assets be filed by May 5, 2023.[3]  Pursuant to the Bid Procedures Order, the Debtors conducted a dual-track (i) financing process for the potential raising of debt, equity, or hybrid financing or consummation of a restructuring transaction through a chapter 11 plan of reorganization and (ii) marketing process for the sale or disposition of all or any portion of the Debtors' assets.  In connection with the Bid Procedures Order, the Debtors filed and served the *Notice of Bid Procedures and Potential Sales* [Docket No. 453] (the "Sale Notice") on April 14, 2023, and published such notice in the *New York Times* on April 18, 2023.  On April 28, 2023, the Debtors filed their *Notice of (I) Potential*

---

[3]   The Debtors only received one limited objection and reservation of rights from Fisher Scientific Company, LLC [Docket No. 575], which concerned the party's specific contractual rights and concerns and was not a wholesale objection to the broader sale process.

*Assumption and Assignment of Executory Contracts and Unexpired Leases and (II) Cure Amounts*
[Docket No. 548], which the Debtors supplemented on October 2, 2023 [Docket No. 1376] to add
or remove certain executory contracts and unexpired leases and to modify certain proposed cure
amounts.

11.     On November 30, 2023, the Court entered an order confirming the Debtors'
chapter 11 plan of liquidation (the "Plan") [Docket No. 1616] (with a corrected order entered on
December 13, 2023 at Docket No. 1652). The confirmed version of the Plan provides for the
cancelation of equity securities in Sorrento, with Sorrento eventually dissolving. As the Debtors
explained in connection with confirmation, the Plan did not immediately go effective because the
Debtors needed to complete certain regulatory and operational activities and obtain additional
liquidity to pay necessary emergence costs.

## THE DIP FACILITY

12.     After confirmation of the Plan, the Debtors continued to work on value-maximizing
solutions with respect to their remaining assets and received a purchase bid from the Buyer. The
Debtors (through their independent Chief Restructuring Officer), the Unsecured Creditors'
Committee, and the Buyer (and their respective advisors) then spent weeks negotiating that bid (in
the form of the Sale Term Sheet). However, as the Sale Term Sheet was being negotiated, it
became clear that the Debtors would need upfront liquidity to proceed with definitive
documentation and ultimately a closing. Thus, the parties negotiated the DIP Facility to bridge to
the closing of the Sale.

13.    The DIP Facility is summarized as follows:[4]

| Material Term | Summary of Material Terms |
|---|---|
| **Parties to the DIP Note** | ***Borrower***:  Sorrento Therapeutics, Inc.<br><br>***Guarantors***:   Scintilla Pharmaceuticals, Inc, and each of Scintilla's subsidiaries that becomes a guarantor of the Borrower's obligations under the Note from time to time.<br><br>***DIP Lender***:  BioVintage, Inc., a California corporation.<br><br>*See* DIP Note, Preamble, § 19. |
| **Term** | All Obligations (as defined in the DIP Note) shall be due and payable in full in cash on (i) March 31, 2024; (ii) the date on which the Sale is consummated; (iii) substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; (iv) the acceleration of the Term Loans; and (v) as otherwise ordered by the Bankruptcy Court.<br><br>*See* DIP Note, § 20. |
| **Commitment** | A super-priority senior secured term loan facility in an aggregate principal amount of up to $5,000,000.<br><br>*See* DIP Note, Preamble. |
| **Conditions of Borrowing** | The DIP Note includes standard and customary conditions of borrowing.<br><br>*See* DIP Note., § 2. |
| **Interest Rates** | The DIP Loans shall bear interest at the rate of 8.0% per annum, to be paid in-kind on the first business day of each month while any Term Loans are outstanding and the Maturity Date (the "Non-Default Interest").<br><br>Notwithstanding the foregoing, after the occurrence and during the continuance of an Event of Default, the Loans shall bear interest at an additional per annum rate of 5.0%, payable, plus the Non-Default Interest, on the first day of each month and on the Maturity Date.<br><br>*See* DIP Note, § 4. |

---

[4]   This summary provides the straightforward reference to the material terms of the proposed DIP Facility, as intended by Bankruptcy Rule 4001 and the Complex Case Procedures.  To the extent of any inconsistency between this summary and the DIP Loan Documents or the DIP Order, the DIP Loan Documents or the DIP Order (as applicable) shall control.

| Material Term | Summary of Material Terms |
|---|---|
| **Use of DIP Facility and Cash Collateral** | The proceeds of the DIP Facility shall be used to fund working capital requirements and costs and expenses of administration of the Chapter 11 Cases, in each case, in accordance with the Approved Budget.<br><br>*See* DIP Note, § 1(d). |
| **Entities with Interests in Cash Collateral** | Bank of America, with respect to the BOA Collateral Account (as defined in DIP Order). |
| **Fees** | None. |
| **Budget** | The use of cash and proceeds from the DIP Facility is subject to the Debtors' postpetition budget under the DIP Facility, attached to the DIP Note as <u>Exhibit A</u> and the DIP Order as <u>Exhibit 2</u>.<br><br>*See* DIP Note, <u>Exhibit A</u>; DIP Order, <u>Exhibit 2</u>. |
| **Reporting Information / Variance Covenants** | On or before Thursday of every week (or, to the extent such Thursday is not a Business Day, the next Business Day thereafter) commencing on the first full week after the date hereof, the Borrower hereby agrees to deliver to the Lender (i) a report of total receipts and total disbursements with respect to the immediately preceding week, and (ii) a statement setting forth in reasonable detail the cash balance for each deposit account of the Borrower and the Guarantors as of the previous Friday.<br><br>On Thursday of every week (or, to the extent such Thursday is not a Business Day, the next Business Day thereafter) commencing on the first full week after the date hereof, the Borrower shall deliver to the Lender a variance report, in a form satisfactory to the Lender, for the rolling cumulative four (4)-week period ending the immediately preceding Friday (each a "<u>Measuring Period</u>") calculating the Net Operating Disbursements Variance for such Measuring Period and explaining in reasonable detail all material Net Operating Disbursements Variance (each such report, a "<u>Variance Report</u>").<br><br>*See* DIP Note, § 14. |
| **Chapter 11 Milestones** | The DIP Note requires (i) entry of the DIP Order no later than February 23, 2024, (ii) entry of an order approving the Sale no later than March 1, 2024, and (iii) consummation of the Sale no later than March 31, 2024.<br><br>See DIP Note, § 17(e). |
| **DIP Collateral** | The Obligations are secured by liens on generally all assets of the Debtors, excluding causes of action (or proceeds thereof) arising under or relating to:<br><br>a. under chapter 5 of the Bankruptcy Code, including under section 502(d), |

| Material Term | Summary of Material Terms |
|---|---|
| | b.  the distribution by Sorrento Therapeutics, Inc. of its common stock in Scilex to Sorrento Therapeutics, Inc.'s shareholders on or about January 19, 2023, including any pending or resolved claims related thereto,<br><br>c.  the current or former directors or officers of the Debtors or Scilex (other than in connection with the DIP Facility),<br><br>d.  any transfer by the Debtors to any of their subsidiaries or affiliates occurring prior to the Petition Date,<br><br>e.  any insider or affiliate transaction, including investments by the Debtors in other companies, and<br><br>f.  any proceeds of, or insurance policies covering or related to, the foregoing (collectively, the "Excluded Claims").<br><br>DIP Note, § 20; DIP Order, § 6(b) |
| **Liens and Priorities** | The DIP Liens shall be subject to the following priorities:<br><br>*Senior First Priority Liens on DIP Collateral.*  Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority, senior priming liens and security interests in all DIP Collateral, which DIP Liens shall be subject only to (1) the Carve Out, and (2) the Prior Permitted Liens in the BOA Collateral Account.<br><br>*First Priority Liens on Unencumbered Property.*  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to any liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or that were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (such liens, "Prior Permitted Liens"; such DIP Collateral not subject to the Prior Permitted Liens, the "Unencumbered Assets"), which DIP Liens shall be junior and subordinated only to the Carve Out.<br><br>*Liens Junior to Certain Other Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected junior liens and security interests in all DIP Collateral (other than the DIP Collateral described in paragraph 6(c)(i) and 6(c)(ii) hereof), which DIP Liens shall be subject only to the (1) Carve Out and (2) the Prior Permitted Liens.<br><br>*See* DIP Order, ¶ 6(c). |
| **Carve Out** | The Order provides a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors.<br><br>*See* DIP Order, ¶ 20. |
| **Challenge Period** | Not applicable. |

| Material Term | Summary of Material Terms |
|---|---|
| **Adequate Protection** | Not applicable. |
| **Events of Default** | The DIP Note contains events of default that are usual and customary for debtor-in-possession financings, including the failure to comply with the Milestones.<br><br>*See* DIP Note, § 17. |
| **Waiver/Modification of the Automatic Stay** | The DIP Order provides for a customary waiver / modification of the automatic stay with respect to the exercise of remedies (as well as certain strict foreclosure rights), all as described in greater detail in paragraphs 33-36 of this Motion.<br><br>*See* DIP Order, ¶¶ 12, 18. |
| **Indemnification** | Subject in all respects to the terms of the DIP Loan Documents, the DIP Lender (and its affiliates) and respective officers, directors, employees, advisors and agents) (each such person, including the DIP Lender, an "<u>Indemnitee</u>") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof; *provided, however*, that such indemnity shall not be available to the extent (i) arising from a material breach of any obligation of such Indemnitee under the DIP Loan Documents or (ii) that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnitee's (or any Affiliate of such Indemnitee's) fraud, gross negligence, bad faith, or willful misconduct as finally determined by a court of competent jurisdiction.<br><br>*See* DIP Order, ¶ 2(d); DIP Note, ¶ 9. |

14.     The DIP Note and DIP Order contain certain provisions identified in section C, paragraph 8 of the *Procedures for Complex Cases in the Southern District of Texas* (the "<u>Complex Case Procedures</u>") as "Significant Provisions"[5] as summarized below:[6]

(a)     ***Milestones.*** The DIP Note requires (i) entry of the DIP Order no later than February 23, 2024, (ii) entry of an order approving the Sale no later than March 1, 2024, and (iii) consummation of the Sale no later than March 31,

---

[5]   Significant Provisions refer to those provisions that contain:  (a) sale or plan confirmation milestones; (b) cross-collateralization; (c) roll ups; (d) liens on avoidance actions or proceeds of avoidance actions; (e) default provisions and remedies; (f) releases of claims against lenders or others; (g) limitations on fees for advisors to official committees; (h) non-consensual priming liens; or (i) any other provision that limits the ability of estate fiduciaries to fulfill their duties under the Bankruptcy Code and applicable law.

[6]   To the extent of any conflict between the descriptions and definitions in this Motion and the DIP Loan Documents or the DIP Order, the DIP Loan Documents or the DIP Order (as applicable) shall control.

2024.  *See* DIP Note, § 17(e).  The DIP Note and DIP Order do not impose any other milestones.

(b) ***No Cross-Collateralization.***  The DIP Note and DIP Order do not authorize, and the DIP Facility does not provide for, any cross-collateralization.

(c) ***No Roll-Up Loans.***  The DIP Note and DIP Order do not authorize, and the DIP Facility does not provide for, any "roll-up" of prepetition debt (the DIP Lender does not have any prepetition claims).

(d) ***Liens on Proceeds of Avoidance Actions***.  The DIP Order would grant the DIP Lender liens on proceeds of actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code, subject to those actions excluded as an "Excluded Claim."  DIP Order, ¶ 6(b); DIP Note, § 20.

(e) ***Default Provisions and Remedies.***  The DIP Note provides for the customary events of default and remedies available to DIP lenders as set forth in the DIP Note section titled "Events of Default; Rights and Remedies." DIP Note, § 17.

(f) ***Releases of Claims.***  The DIP Order provide for a limited release in favor of the DIP Lender, solely with respect to claims in connection with, arising under, or related to the DIP Order, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Collateral, the transactions contemplated by the DIP Note or DIP Order, or the negotiation thereof.  DIP Order, ¶ 30.

(g) ***Limitations on the Use of DIP Proceeds Other than General "Carve Outs" To Pay Approved Fees and Expenses of Advisors to Official Committees or Future Trustees***.  The DIP Order provides for customary restrictions on use of the DIP Facility and Cash Collateral.  DIP Order, ¶ 21.

(h) ***Priming Liens***.  The DIP Note and DIP Order do not grant, and the DIP Facility does not provide, the DIP Lender with any priming liens and security interests in DIP Collateral.

(i) ***Limitation on the Ability of Estate Fiduciaries to Fulfill Their Duties***.  The DIP Order provides for a waiver of a section 506(c) surcharge and marshalling and impose certain customary limitations on the use of the DIP Facility and Cash Collateral.  DIP Order, ¶¶ 21, 22, 23.

## THE SALE

15.   The Debtors (through their independent Chief Restructuring Officer), the Unsecured Creditors' Committee, and the Buyer negotiated the terms of the Sale Term Sheet at arm's length and in good faith over approximately three weeks.  The parties also frequently

solicited feedback from the Equity Committee and incorporated their comments to the extent they were acceptable.  The Sale Term Sheet (attached as Exhibit A) summarizes the terms of the Sale.

## THE PLAN MODIFICATIONS

16.     As indicated in the Sale Term Sheet, the Sale requires that the Plan "be modified as may be necessary to clarify that outstanding shares of Sorrento shall not be cancelled, with shareholders of Sorrento retaining their equity interests against Sorrento and Sorrento retaining a reversionary interest in the liquidation trust (to allow Sorrento to make distributions to shareholders)."  In other words, instead of excess liquidation trust recoveries being distributed to Sorrento shareholders directly once creditors are paid in full, those excess funds (if any) will revert to Sorrento for the benefit of its equity holders.  Substantively, the treatment of equity holders is the same as that under the confirmed Plan, except that equity holders will now be able to hold (and/or trade) their equity securities.  Thus, the Debtors do not intend to re-solicit the plan.

## BASIS FOR RELIEF

**A.    The DIP Facility Should Be Approved.**

***A1.   The Debtors Should Be Authorized to Obtain Postpetition Financing Under Bankruptcy Code Section 364 on a Senior Secured and Superpriority Basis.***

17.     It is essential that the Debtors obtain access to sufficient postpetition financing to avoid immediate and irreparable harm to the estate.  The preservation of estate assets and the Debtors' continuing viability and ability to maximize value for stakeholders depends heavily upon the expeditious approval of the relief requested.

18.     Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit out of the ordinary course of business, and (c) obtaining credit with specialized priority or with security.  If a debtor in possession cannot obtain postpetition credit on an unsecured or junior basis under the Bankruptcy

Code, a court may authorize a debtor to obtain credit or to incur debt, the repayment of which is entitled to superpriority administrative expense status, or is secured by a senior lien on unencumbered property, or a senior or junior lien on encumbered property, or a combination of the foregoing.

19.     The Debtors propose to obtain financing under the DIP Facility, in part, by providing superpriority claims and senior liens on substantially all of the Debtors' assets, all as set forth in greater detail in paragraph 6 of the DIP Order (summarized above) and subject to the priorities set forth therein (such collateral, the "DIP Collateral," and such liens, the "DIP Liens").

### A2.  The Debtors Are Unable to Obtain Unsecured or Junior Financing.

20.     To show that the credit required is not obtainable on an unsecured or junior basis, a debtor need only demonstrate "by a good faith effort that credit was not available."  *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986).   These cases have been pending since February 2023 and despite an extensive marketing process for potential financings (and three prior DIP facilities), the Debtors have not been able to obtain postpetition financing on better terms than those reflected in the DIP Note, and there are no better offers available to the Debtors or before the Court at this time.

### A3.  The DIP Facility is Necessary to Preserve and Protect the Debtors' Assets.

21.     The DIP Facility will provide the Debtors with necessary and immediate access to liquidity needed to avoid an immediate conversion to chapter 7.  The DIP Facility will enable the Debtors to preserve more value as they pursue, document, and close the going-concern Sale (avoiding a chapter 7 liquidation), for the benefit of their estates.   Thus, the DIP Facility is necessary to preserve and protect the assets of the Debtors' estates.

### A4.   The DIP Facility Satisfies the Entire Fairness Standard.

22.     To the extent the DIP Lender is an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code, then the DIP Facility may be subject to the heightened "entire fairness" standard.  But even if the Court were to apply the "entire fairness" standard, the DIP Facility satisfies this standard and should be approved.

23.     The entire fairness standard consists of "two aspects, fair dealing and fair price, both of which must be examined together in resolving the ultimate question of entire fairness." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985).  Fair dealing "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction.  These concerns include how the purchase was initiated, negotiated, structured and the manner in which director approval was obtained." *Kahn v. Tremont Corp.*, 694 A.2d 422, 430-31 (Del. 1997).  Fair price "relates to the economic and financial considerations relied upon when valuing" the proposed transaction. *Id.*

24.     *Fair Dealing*.  The DIP Note was negotiated through an iterative process with various proposals and counterproposals, at arm's length, in good faith, and among sophisticated parties.  The negotiations regarding the DIP Note were largely conducted between the DIP Lender, the  Unsecured  Creditors'  Committee,  and  the  Debtors  (led  by  their  independent  Chief Restructuring Officer) and their respective advisors.  The parties also solicited feedback from the Equity Committee.  Last, the DIP Note is subject to approval by the Court.  Thus, the process was fair.

25.     *Fair Price*.  As a result of that fair dealing and the circumstances, the DIP Facility has fair and reasonable terms.  In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003).  Here, the DIP Facility contains fair terms:  interest is only 8% per annum, there are no fees associated with the DIP Facility, and the

14

DIP Liens are not priming any other liens.  The DIP Facility is the best available financing at this time for the Debtors under the circumstances and reflects fair terms.  That fairness is further confirmed by the support of the Unsecured Creditors' Committee.

### A5.  Entry into the DIP Facility Is In the Debtors' Sound Business Judgment.

26.     Entry into the DIP Facility is an exercise of the Debtors' sound business judgment. To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

27.     The Debtors' decision to move forward with the DIP Facility is a sound exercise of their business judgment.  The Debtors require immediate postpetition financing given their immediate liquidity constraints, which likely would cause the Debtors to liquidate if financing were not obtained, which the Debtors believe would materially decrease recoveries to constituents. The DIP Facility will provide the Debtors with liquidity to continue with these chapter 11 cases, document and pursue the closing of the proposed Sale, and proceed toward plan consummation.

28.     As discussed above, the Debtors negotiated the DIP Note with the DIP Lender and the Unsecured Creditors' Committee in good faith and at arm's length.  The Debtors believe that they have obtained the best financing available at this time under the circumstances.  The Debtors believe the terms of the DIP Facility are fair and reasonable under the circumstances.  The Court should thus authorize the Debtors' entry into the DIP Note as a reasonable exercise of the Debtors' business judgment.

### A6.  The Debtors Should Be Authorized to Use Cash Collateral.

29.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral (as defined in section 363 of the Bankruptcy Code) unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes

such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). Here, the DIP Lender has consented to the use of cash collateral, subject to the terms of the DIP Note and DIP Order.  In addition, the Debtors' use of cash collateral is fair, in the best interests of the Debtors' estates, and a sound exercise of their business judgment for the reasons explained throughout this Motion.  Accordingly, the Debtors' use of cash collateral should be approved, subject to the terms of the DIP Note and DIP Order.

### A7.  The Scope of the Carve Out is Appropriate.

30.     The DIP Lender's DIP Liens and the DIP Superpriority Claims will be subject and subordinate to payment of the Carve Out, as defined in and provided under the DIP Order.   The Carve Out will be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in the Order.  Without the Carve Out, the Debtors and other parties in interest may be deprived of certain rights and powers because the services for which professionals may be paid in these chapter 11 cases would be restricted.  *See In re Ames Dep't Stores*, 115 B.R. at 40 (observing that courts insist on carve outs for professionals representing parties in interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  The Carve Out does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers.  Additionally, the Carve Out protects against administrative insolvency during the course of the chapter 11 cases by ensuring that assets remain for the payment of the Clerk of the Court, U.S. Trustee fees, and professional fees of the Debtors and any statutory committee appointed under section 1102 of the Bankruptcy Code in these cases.

### A8.  The DIP Lender Should Be Afforded Good-Faith Protection Under Section 364(e) of the Bankruptcy Code.

31.     Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

32.    The DIP Facility is the result of (i) the Debtors' reasonable and informed determination that the DIP Lender offered the most favorable terms on which to obtain vital postpetition financing, (ii) arm's-length, good-faith negotiations between the Debtors (led by their independent Chief Restructuring Officer), the DIP Lender, and the Unsecured Creditors' Committee and their respective advisors, and (iii) an iterative process reflecting multiple rounds of negotiations.   The terms and conditions of the DIP Facility are appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code in accordance with the DIP Note.  The Court should find that the obligations arising under the DIP Facility and other financial accommodations made to the Debtors have been extended by the DIP Lender in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, and therefore the DIP Lender is entitled to all of the protections afforded thereby.

### *A9.  The Automatic Stay Should Be Modified on a Limited Basis.*

33.    The DIP Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the Debtors and the DIP Lender to commit all acts and take all actions necessary to implement the DIP Facility and all acts, actions, and transfers

contemplated therein.  The DIP Order provides that the DIP Lender may seek an emergency hearing with respect to the DIP Lender's right to exercise its rights and remedies under the DIP Note during the five business days immediately following the date the DIP Lender delivers the Termination Notice (as defined in the DIP Order).

34.     Additionally, the DIP Order and the DIP Note set forth mechanics for, upon an event of default, a strict foreclosure of the Debtors' assets (pursuant to the form foreclosure agreement attached to the DIP Note), *provided* that such foreclosure provides for payment on the terms set forth in the Sale Term Sheet, *provided however*, the purchase price will be reduced on a dollar-for-dollar basis by the amount of any fees, expenses, and costs incurred by the DIP Lender in exercising remedies.

35.     If the DIP Lender provides a notice of its election to proceed with the strict foreclosure (the "Foreclosure Notice"), such notice will qualify as a motion for relief from stay. Upon the DIP Lender's issuance of the such notice, the Debtors and the Official Committees shall have three business days to seek to enjoin (or otherwise object to) consummation of the strict foreclosure (a "Foreclosure Objection") only by proving that an "Event of Default" under the DIP Note has not occurred.  The DIP Loan Parties and the Official Committees shall not object to the shortened notice with respect to such hearing.  The DIP Lender agrees that an adversary proceeding is not required for any Foreclosure Objection.

36.     Stay modifications such as those requested in the DIP Order are typical and customary features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances.

B.      **The Sale Should Be Approved.**

  *B1. The Sale Satisfies the Entire Fairness Standard.*

  37. To the extent the Buyer is an "insider" of the Debtors within the meaning of section 101(31) of the Bankruptcy Code, then the Sale may be subject to the heightened "entire fairness" standard.  But even if the Court were to apply the "entire fairness" standard, the Sale satisfies this standard and should be approved.

  38. As discussed above with respect to the DIP Facility, the entire fairness standard consists of "two aspects, fair dealing and fair price, both of which must be examined together in resolving the ultimate question of entire fairness." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 937 (Del. 1985).  Fair dealing "focuses upon the conduct of the corporate fiduciaries in effectuating the transaction.  These concerns include how the purchase was initiated, negotiated, structured and the manner in which director approval was obtained."  *Kahn v. Tremont Corp.*, 694 A.2d 422, 430-31 (Del. 1997).  Fair price "relates to the economic and financial considerations relied upon when valuing" the proposed transaction.  *Id.*

  39. *Fair Dealing*.  The Sale Term Sheet was negotiated through an iterative process that spanned weeks of various proposals and counterproposals, at arm's length, in good faith, and among sophisticated parties.  The negotiations regarding the Sale Term Sheet were largely conducted between the Debtors (led by their independent Chief Restructuring Officer), the Unsecured Creditors' Committee, and the Buyer and their respective professionals.  The parties also solicited feedback from the Equity Committee, who finally provided certain comments after the other parties had reached an otherwise final deal.  The most material comment is the request that additional equity holders be permitted to invest in the "NewCo" business, following the Sale. The parties are working to accommodate the Equity Committee's comments, to the extent appropriate.  Last, the Sale is subject to approval by the Court.  Thus, the process was fair.

40.     *Fair Price.*  As a result of that fair dealing and the overall marketing process the Debtors have ran during these cases in connection with the Bid Procedures Order, the Sale reflects a fair and reasonable price.  Despite the extensive marketing and the duration of these cases (which have been pending since February 2023), no party has made a better offer for the purchase of the Assets.  The Sale is the best available transaction at this time for the Debtors.  Given the circumstances, the terms of the Sale are fair and reasonable.

### B2.   The Sale Is an Exercise of the Debtors' Sound Business Judgment.

41.     In addition to the Sale being fair, it is an exercise of the Debtors' sound business judgment.  To determine whether a debtor has met the business judgment standard, a court need only "examine whether a reasonable business person would make a similar decision under similar circumstances."  *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).  Here, the Sale to is an exercise of the Debtors' sound business judgment because (i) it represents the best offer available to the Debtors with respect to the Assets, (ii) it provides the Debtors with liquidity needed to consummate their chapter 11 plan, and (iii) it allows the Assets to be sold on a value-maximizing going-concern basis, rather than a liquidation by the plan's liquidation trustee or a chapter 7 trustee (if the Debtors were forced to convert to chapter 7).

### B3.   The Assets May Be Sold Free and Clear of Liens, Claims, Interests, and Encumbrances under Bankruptcy Code Section 363(f).

42.     Bankruptcy Code section 363(f) authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances provided that one of the following conditions is met:

1.     applicable non-bankruptcy law permits sale of such property free and clear of such interests;

2.     such entity consents;

3.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

4.      such interest is in bona fide dispute; or

5.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

This provision is supplemented by Bankruptcy Code section 105(a), which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  Because Bankruptcy Code section 363(f) is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Assets free and clear of the interests.

43.      Here, the Debtors are selling the Assets in a commercially reasonable manner where the value of the proceeds fairly reflect the value of the Assets.  Additionally, any party with a lien on the Assets shall have a corresponding security interest in the proceeds of such sale or transfer, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.  Moreover, the Debtors propose that no objection to the Bid Procedures Order, the Sale Notice, and the entry of the Order approving this Motion be deemed "consent" to any sales or transfers pursuant to the Order within the meaning of section 363(f)(2) of the Bankruptcy Code.

44.      To the extent that the Court finds that any Sale satisfies section 363(f), the Debtors request that the Court also hold that the Sale is free and clear of successor liability relating to the Debtors' businesses.  The purpose of a free and clear sale under section 363(f) would be frustrated if claimants could then assert claims against the Buyer arising from the Debtors' pre-sale conduct.

### B4.  *The Buyer Is Entitled to the Protections of Bankruptcy Code Section 363(m).*

45.      Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 521 (5th Cir. 2014).  An appropriate characterization of good faith in a bankruptcy sale is a lack of

"fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *In re Beaufontaine, Inc.*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).  For the same reasons the Sale satisfies the "entire fairness" standard (see above), the Buyer is a "good faith" purchaser within the meaning of section 363(m) and should be entitled to its protections.

### B5.  *The Assumption and Assignment of the Assumed Contracts Should Be Approved.*

46.      Under section 365(a) of the Bankruptcy Code, a debtor "may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports such assumption or rejection.  *See, e.g.*, *In re Stable Mews Assoc.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y. 1984).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract or lease, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default and there must be "adequate assurance of future performance" by the assignee of such contract.  11 U.S.C. §§ 365(b)(1), (f)(2).

47.      Here, assumption and assignment of the Assumed Contracts (in a schedule to be filed) is in the Debtors' business judgment, is appropriate, and should be approved because:  (i) the Assumed Contracts are integral to the Sale and thus will increase the value of the Sale for the benefit of the Debtors' estates, (ii)  cure amounts for such contracts will be paid by the Buyer, and (iii) the Buyer will demonstrate adequate assurance of future performance under such contracts.

### C.      The Plan Modifications Should Be Approved.

48.      The Debtors will file a revised plan prior to the hearing on the requested modifications, which will reflect the modifications required by the Sale.  At a high level, and as explained above, the Sale Term Sheet requires that the Plan "be modified as may be necessary to

clarify that outstanding shares of Sorrento shall not be cancelled, with shareholders of Sorrento retaining their equity interests against Sorrento and Sorrento retaining a reversionary interest in the liquidation trust (to allow Sorrento to make distributions to shareholders)."  In other words, instead of excess liquidation trust recoveries being distributed to Sorrento shareholders directly once creditors are fully paid, those excess funds (if any) will revert to Sorrento for the benefit of its equity holders.  Substantively, the treatment of equity holders is the same as that under the confirmed Plan, except that equity holders will be able to hold (and/or trade) their equity securities.

49.     Thus, none of the modifications materially adversely affect the treatment of Holders of Claims and Equity Interests that voted to accept the Plan, and thus none of modifications require the Debtors to re-solicit acceptances for the Plan.  *See* 11 U.S.C. § 1127(a) ("The proponent of a plan may modify such plan at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of this title.  After the proponent of a plan files a modification of such plan with the court, the plan as modified becomes the plan."); Fed. R. Bankr. P. 3019(a); *see also In re Am. Solar King Corp.*, 90 B.R. 808, 826 (Bankr. W.D. Tex. 1988) ("[I]f a modification does not materially impact a claimant's treatment, the change is not adverse and the court may deem that prior acceptances apply to the amended plan as well.") (internal citation omitted).

## WAIVER OF BANKRUPTCY RULES 6004(A) AND 6004(H)

50.     For the reasons described herein regarding the Debtors' lack of liquidity and exigent circumstances, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## **<u>NOTICE</u>**

51.     The Debtors will provide notice of this Motion to the following parties or their respective counsel: (a) the U.S. Trustee for the Southern District of Texas; (b) the DIP Lender and the Buyer; (c) the Creditors' Committee; (d) the Equity Committee; (e) Bank of America; (f) Mr. Tim Culberson; and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, no other or further notice need be given.

The Debtors request that the Court enter orders granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: February 19, 2024

/s/ *Kristhy M. Peguero*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone:  (713) 752-4200
Facsimile:   (713) 752-4221
Email: mcavenaugh@jw.com
   kpeguero@jw.com
   ggraham@jw.com

– and –

Caroline Reckler (S.D. Tex. Bar No. IL6275746)
Ebba Gebisa (admitted *pro hac vice*)
Jonathan Gordon (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile:  (312) 993-9667
Email:  caroline.reckler@lw.com
   ebba.gebisa@lw.com
   jonathan.gordon@lw.com

– and –

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile:  (213) 891-8763
Email:  jeff.bjork@lw.com
   kim.posin@lw.com

*Counsel to the Debtors*

25

**<u>Certificate of Accuracy</u>**

I certify that the foregoing statements are true and accurate to the best of my knowledge. This statement is being made pursuant to Bankruptcy Local Rule 9013-1(i).

*/s/ Kristhy M. Peguero*
Kristhy M. Peguero

**<u>Certificate of Service</u>**

I certify that, on February 19, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Kristhy M. Peguero*
Kristhy M. Peguero

## Exhibit A

**Sale Term Sheet**

EXECUTION VERSION

## SORRENTO ASSETS ACQUISITION

SUMMARY OF KEY TERMS

February 16, 2024

*The following is a summary of principal terms for the proposed transaction (the "Transaction") and is not intended to be a complete description of a transaction, an agreement or terms capable of binding any party, or a legal offer of any kind. This term sheet is provided for discussion purposes only. Unless and until a definitive written agreement with respect to the Transaction has been executed, no party will be under any legal obligation of any kind whatsoever with respect to such a transaction (other than any obligations of confidentiality and non-disclosure pursuant to any separate confidentiality agreement entered into by a party).*

| | |
|---|---|
| **Acquired Assets:** | A limited liability company owned by Henry Ji and certain other investor(s) or a shelf company designated by such limited liability company (in each case, "NewCo"), funded entirely by said other investor(s), will acquire from the bankruptcy estate of Sorrento Therapeutics, Inc. ("Sorrento")[1] the following assets (the "Acquired Assets"), subject to statutory requirements for assumption and assignment, to the extent applicable: |

- All equity interests held directly or indirectly by Sorrento in the entities set forth on Exhibit A hereto, including all affiliates and subsidiaries of such entities (collectively, the "Acquired Equities"). For the avoidance of doubt, the Acquired Equities include all Sorrento's subsidiaries on Exhibit A hereto (collectively, the "Acquired Subsidiaries"). For further avoidance of doubt, the Acquired Equities shall include: (i) ACEA Therapeutics, Inc., (ii) Concortis Biosystems, Corp. ("Concortis"), (iii) Aardwolf Therapeutics, Inc., and (iv) each of Sorrento's subsidiaries incorporated in the People's Republic of China, including, without limitation: Levena Suzhou Biopharma Co., Ltd.; Sorrento Therapeutics (Shanghai) Co., Ltd.; and Nanjing Levena Biopharma Co. Ltd.

- Certain assets of Sorrento, including: any drugs under development held directly by Sorrento and its Acquired Subsidiaries (the "Acquired Drugs"); any and all equipment, instruments and laboratory supplies, office furniture and supplies; any and all intellectual property, including patents, patent applications, and rights in know-how; any and all regulatory filings, documentation for all drugs and drug

---

[1] Following the effective date of the plan, the Liquidating Trust shall be the successor to Sorrento, subject to the Sorrento estate's reversionary interest as provided herein.

candidates under development; any and all business licenses; any and all laboratory notebooks, recordings and results thereof; and any and all license agreements and contracts not otherwise excluded hereunder.

- All rights and liabilities under that certain Asset Purchase Agreement, dated as of July 2, 2018, among Kimberly-Clark Corporation, Kimberly-Clark Global Sales, LLC, and Sorrento Therapeutics, Inc. (the "Kimberly Clark Contract"), provided that the estimated cure payment shall be $0; provided further that upon assumption NewCo shall assume any contingent consideration due under said contract and other liabilities and obligations thereunder.

- The ACEA Earn-Out Agreement, including the assumption of any contingent consideration due under said contract and other liabilities and obligations thereunder.

- All claims, counterclaims and causes of action, other than the Identified Causes of Action (as defined below) (collectively, the "Acquired Causes of Actions").  For the avoidance of doubt, (i) the matters set forth on Exhibit B hereto are all Acquired Causes of Action and (ii) the claims against Nant Parties under the Nant Settlement (each as defined by the Plan) have been settled, and the Nant Settlement has been approved by the Bankruptcy Court [Docket No. 1205].

- All rights, interests and obligations in leases with respect to: (i) building located at 9380 Judicial Drive, San Diego, California 92121, (ii) Sorrento's Camino Sante Fe facilities at 8395 Camino Santa Fe, Suite A-C and 8340 Camino Santa Fe, Suite D-E in San Diego, California 92121, and (iii) Sorrento's Sofusa facilities at 8601 Dunwoody Pl. Unit 570, 580, and 620, Sandy Springs, GA (collectively, "Assumed Leases").

- All rights and obligations under contracts with ImmuneOncia and Yuhan (other than as described below in the section of this term sheet entitled "Excluded Assets").

- An option to acquire all rights and interests in the Virex Diagnostic Technology (including, for the avoidance of doubt, equity interests of Virex Health Inc), exercisable by NewCo for $500,000 and assumption of milestone liabilities if Sorrento has failed to enter into a purchase agreement for the sale of such technology to a third party within sixty (60)

2

days following the consummation of the Transaction (such option, the "<u>Virex Option</u>").

**Total Consideration:**   In consideration for the Acquired Assets, NewCo will:

- Pay $20.9 million to Sorrento, subject to customary working capital adjustment, consisting of $15.5 million in cash, plus Henry Ji's agreement to waive in excess of $400,000 in compensation and benefits (including accrued PTO), plus a $5 million promissory note with a 2-year term. The promissory note shall accrue simple interest at a rate of 4% per year and shall be prepayable by NewCo without penalty.

- Issue a 7% equity interest as of the date of the Initial Capitalization of NewCo to Sorrento in each of certain subsidiaries of NewCo as set forth on <u>Exhibit C</u> hereto (further described below in the section of this term sheet entitled "***Acquired Drugs***").

- Prior to unsecured claims being paid in full, that 7% cannot be diluted by an additional equity infusion from a party other than NewCo[2] unless

  - NewCo has raised $50mm (excluding the $15.5 million cash consideration for this transaction); and

  - NewCo has invested at least $10 million cash in the subsidiary where additional new money would be contributed; and

  - NewCo determines in good faith that such equity is needed for that subsidiary's continued operation and growth; and

  - NewCo determines in good faith that debt funding is either not readily and commercially available or, to the extent readily and commercially available, is not superior to an equity raise for that subsidiary.

- Dilution would work as follows:

  - For purposes of the equity investment, the subsidiary is valued at no less than $50mm; and

---

[2] An additional equity infusion by NewCo would not dilute the 7% given to the estate.

- That value is increased by the new cash (not NewCo cash).[3]

- Assume all debts and other liabilities of the Acquired Subsidiaries.

- Assume from Sorrento certain debt and other liabilities, including (i) the obligations under the Kimberly Clark Contract which, if not assumed, could lead to large claim against the Sorrento bankruptcy estate and (ii) the obligations under the Assumed Leases other than the excluded leases described in the Excluded Assets, subject to NewCo and the claimants reaching mutually acceptable terms with respect to the assumption of such obligation.

In addition:

- If Sorrento undertakes any financing after the consummation of the Transaction, proceeds shall be used to pay any fees and expenses in association with the financing and thereafter 80% of the remaining net proceeds shall be allocated to the liquidating trust for the benefit of Sorrento's unsecured creditors until Sorrento's unsecured creditors are paid in full.

- Upon NewCo's receipt of aggregate payouts through asset sales by, mergers and acquisitions involving, or otherwise from the operation of, the subsidiaries of NewCo equaling or exceeding $500 million in cash, and exclusive of value available to distribute to Sorrento through the initial 7% equity interest granted, NewCo shall distribute to Sorrento $35 million in cash.

---

[3] How this dilution provision is intended to work in practice:

- Assume all conditions are satisfied here are two examples of how this is intended to work:
  - Example #1: NewCo raises $10mm of new investor money for sub-1
    - Sub 1 then has an implied value of $60mm ($50mm assumed plus $10m cash)
    - For that new $10, the new investor would own 1/6th ($10mm/$60mm)
    - The existing equity of that subsidiary would be diluted by 1/6th
  - Example #2: Newco raises $50 mm of new investor money for sub-1
    - Sub 1 then has an implied value of $100mm ($50mm assumed plus the $50mm of new cash)
    - For that new $50mm, the new investor obtains 50% of sub 1 ($50mm/$100mm)
    - Existing equity would be diluted by 50%

4

- Sorrento shall receive 20% of any net proceeds received by NewCo in connection with settlement or resolution of any Acquired Causes of Action, with such proceeds to be allocated to the Liquidating Trust provided, that Sorrento's entitlement to such proceeds shall cease once all of Sorrento's unsecured creditors holding allowed claims have been paid in full.

- NewCo will provide to Sorrento a senior secured debtor-in-possession ("DIP") loan due March 31, 2024 with an aggregate principal amount of $5 million pursuant to which Sorrento and the creditors' committee shall agree that, if there has been a material default or event of default or if the Transaction has not been consummated on or before March 31, 2024, NewCo and Sorrento may proceed with a partial strict foreclosure on substantially all of the assets of Sorrento (including, without limitation, the assets contemplated to be purchased pursuant to the Transaction), provided that such partial strict foreclosure provides for payment on the terms set forth herein, provided however, the Purchase Price shall be reduced on a dollar for dollar basis by the amount of any fees, expenses, and costs incurred by NewCo in exercising remedies.

- After consummation of the Transaction, NewCo shall provide the following co-invest opportunities to certain Sorrento equity holders:

  - Accredited investors (and to the extent not burdensome to NewCo, in NewCo's judgment, and in compliance with applicable securities laws, non-accredited investors) may invest in common equity of NewCo on a pro rata basis for up to $5 million in aggregate value, to be funded within seven (7) calendar days of closing of the Transaction.

  - Accredited investors (and to the extent not burdensome to NewCo, in NewCo's judgment, and in compliance with applicable securities laws, non-accredited investors) will also have the opportunity to participate for up to 10% of the aggregate amount of the first registered public equity offering undertaken by NewCo or any of its subsidiaries.

**Clawback Claims**     Sorrento may, in its discretion, elect to (i) settle and dispose of the pending claims with respect to any shares of Scilex clawed back by Sorrento pertaining to the Scilex Distribution (defined

5

below) (including, for the avoidance of doubt, any Scilex shares contemplated to be distributed in connection therewith but which are currently held in abeyance by Sorrento) (collectively, such claims, the "Clawback Claims") or (ii) sell all rights with respect to the Clawback Claims to NewCo for $1 million in cash. Notwithstanding the foregoing, prior to the closing of the Transaction, Sorrento shall file a motion with the bankruptcy court to extend the automatic stay prohibiting trading and other restrictions applicable to the transfer of the Scilex shares through a date for two (2) months after the date on which the Transaction is consummated (such period, the "Restricted Period") and Sorrento shall use commercially reasonable efforts to obtain approval of such motion. For the avoidance of doubt, during the Restricted Period, Sorrento may not transfer, pledge, encumber or otherwise dispose of any Scilex shares.

**Bidding Procedures:**      This term sheet is subject to the bidding procedures previously approved by the Court including reimbursement of expenses (and associated interest, if applicable) incurred by NewCo in connection with the Transaction in the event Sorrento enters into an alternative transaction.

**Excluded Assets:**      The following assets will be excluded from the Transaction (the "Excluded Assets"):

- cash or cash equivalents (including any deposits or prepayments) held by Sorrento

- any accounts receivable held by Sorrento

- all monies payable to Sorrento under Article 6 of that certain Exclusive License and Development Agreement between Sorrento and China Oncology Focus Limited (Lee's Pharma), deducting all legal expenses/fees associated with the enforcement of the milestone payment under Article 6.

- publicly traded securities held by Sorrento (including, for the avoidance of doubt, any securities that are issued by Scilex Holding Company ("Scilex") (including, without limitation, any shares of common stock of Scilex which Sorrento currently holds in abeyance for certain warrant holders of Sorrento, regardless of whether or not such shares of common stock subsequently become an unencumbered asset of Sorrento))

- (A) all causes of action (or proceeds thereof) and defenses under Chapter 5 of the Bankruptcy Code, including under

section 502(d) and (B) other causes of action related to (i) the distribution by Sorrento of its common stock in Scilex to Sorrento's shareholders on or about January 19, 2023 (the "Scilex Distribution"), including the Clawback Claims, (ii) the current or former directors or officers of Sorrento, Scintilla Pharmaceuticals, Inc. ("Scintilla") or Scilex (other than in connection with the Facility), (iii) any transfer by Scintilla or Sorrento to any of their subsidiaries or affiliates occurring prior to the petition date, and (iv) any insider or affiliate transaction, including investments by Sorrento in other companies (the "Identified Causes of Action").

- NewCo shall use commercially reasonable efforts to preserve defenses the Debtor may have against parties with claims against the Debtor.

- While NewCo will acquire all causes of action [4] (other than the Identified Causes of Action), Sorrento may prosecute counterclaims and assert a right of set-off with respect to objections to proofs of claim.

- To the extent Sorrento asserts counterclaims and set-off rights in seeking to settle proof of claim filed against it, Sorrento may not enter into a settlement or other resolution with respect to such claim without prior consultation with NewCo. Further, Sorrento shall not settle or resolve such claim without NewCo's consent to the extent NewCo provides Sorrento with an acceptable backstop with respect to such claim up to the amount of such claim.

- NewCo and Sorrento shall agree to cooperate with the primary goal of minimizing claims against Sorrento and maximizing affirmative recoveries for NewCo, if any. NewCo does not currently intend to pursue the Acquired Causes of Action unless it determines in its reasonable judgment that doing so would be in the best interests of NewCo's consolidated post-closing businesses.

- all rights, interests and obligations in leases with respect to properties located at: (i) 4930 Directors Place, San Diego, California 92121, (ii) 4921 Directors Place, San Diego,

---

[4] While Newco is acquiring all causes of action other than the Identified Causes of Action, as a matter of disclosure Newco will not pursue causes of action other than acquired causes of actions that are materially beneficial to NewCo's operations, intellectual property, or drug development and not adverse to the Liquidating Trust.

California 92121, (iii) 4955 Directors Place, San Diego, California 92121, (iv) 4939 Directors Place, San Diego, California 92121, (v) 4690 Executive Drive, San Diego, California 92121, and (vi) the lease described under Docket 436.

- any insurance policies or proceeds thereof relating to any Excluded Claims

- any tax assets/attributes of Sorrento

- The certain Manufacturing Know-How, Supply Chain, Material and Consulting Agreement, by and between Sorrento, Ark Animal Health, Inc., and EDRR, LLC, as amended from time to time.

- The remaining outstanding payments under the contracts with Yuhan, provided that Sorrento may only retain an amount equal to the lesser of (i) $900,000 and (ii) $900,000 minus any fees and expenses expended in pursuing the recovery of payment from Yuhan.

- All rights, interests and obligations in leases with respect to: all buildings, offices, facilities and other properties of Bioserv Corp and its subsidiaries in San Diego, California.

"Facility" has the meaning ascribed to such term in the Junior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of July 28, 2023, by and among Sorrento, Scintilla, and Scilex.

In addition, the Excluded Assets also include any assets (including intellectual property or inventory) relating to the following business units/entities: (a) Cytimm Therapeutics, Inc. and (b) ImmuneOncia.

**Structure:**  In connection with the Transaction, Sorrento shares will not be cancelled and any reversionary interest retained by Sorrento's shareholders in the liquidating trust will be run through Sorrento.

**Acquired Drugs:**  Following the closing of the Transaction, separate subsidiaries of NewCo will own each of the Acquired Drugs (each such subsidiary, a "NewCo Subsidiary"), with initially 93% of the equity interests of each such NewCo Subsidiary to be owned by NewCo and 7% of the equity interests of each such NewCo Subsidiary to be owned by Sorrento (and then the Liquidating

Trust).  Such equity interests will initially take the form of preferred equity (to the extent legally permissible), convertible to common equity on a 1-to-1 ratio at the Liquidating Trustee or equity holder's election, provided that such preferred equity shall automatically convert into common equity upon the earlier to occur of the following:  (i) payment to the Liquidating Trust of an amount sufficient to satisfy all allowed general unsecured claims in full, (ii) effectiveness of any settlement between Sorrento and the creditors or Liquidating Trustee (on behalf of the Liquidating Trust and its beneficiaries) of similar effect, and (iii) in the event such NewCo Subsidiary's common equity becomes publicly listed and traded on a national securities exchange or other trading market (including, for the avoidance of doubt, the over-the-counter market) (any such exchange or market, a "<u>Securities Market</u>") or such NewCo Subsidiary consummates a merger or acquisition.  The organizational documents of each NewCo Subsidiary will include customary tag and drag provisions.

Sorrento will remain a publicly listed entity following the closing of the Transaction, provided that NewCo shall provide all services and bear all costs associated with maintaining Sorrento's public company status (including, if NewCo so elects, any termination of Sorrento's public company status).

Sorrento shall distribute the equity interests of each NewCo Subsidiary to the Liquidating Trust for the benefit of Sorrento's creditors and/or then-current shareholders and the Liquidating Trustee shall have the option to distribute the equity interests of each NewCo Subsidiary to Sorrento's creditors and/or then-current shareholders (i) in the event such NewCo Subsidiary's common equity becomes publicly listed and traded on a Securities Market or such NewCo Subsidiary consummates a merger or acquisition and (ii) <u>if and only if</u>, at such time, Sorrento's common equity remains publicly listed and traded on a Securities Market (or Sorrento merges with a company whose equity securities are publicly listed and traded on a Securities Market) following Sorrento's emergence from bankruptcy.

NewCo will use commercially reasonable efforts to develop and commercialize the Acquired Drugs.

| | |
|---|---|
| **Conditions to Signing:** | • Non-Material Modification of Chapter 11 plan:  The Company's Chapter 11 plan shall be modified as may be necessary to clarify that outstanding shares of Sorrento shall not be cancelled, with shareholders of Sorrento retaining their equity interests against Sorrento and Sorrento retaining |

a reversionary interest in the liquidation trust (to allow Sorrento to make distributions to shareholders). Liquidating Trust/Trustee does not owe any duty to Sorrento.

- Negotiation and execution of definitive agreements

- CRO approval

**Conditions to Closing:**

- Entry of order by bankruptcy court approving the Transaction

**Governance of Reorganized Sorrento**

Directors:

- Henry Ji (Chairman)

- [*To come.*]

Officers:

- Henry Ji (President & CEO)

- [*To come.*]

**Purchase Agreement:**

The Purchase Agreement will provide for the acquisition of the Acquired Assets on an "as is, where is" basis and contain customary representations and warranties (*i.e.*, with respect to fundamental matters relating to Sorrento's power and ability to consummate the Transaction, such as title to interests) and covenants for a transaction of this type.

Sorrento will use its commercially reasonable best efforts to assign and assume contracts and leases to NewCo, including taking into account any requirements thereunder with respect to assurances of financial status, creditworthiness or future performance, such assumption and assignment shall be in accordance with the Bankruptcy Code, including, without limitation, Sections 363 and 365 of the Bankruptcy Code.

NewCo to provide certain representations with respect to Mr. Ji's activities with respect to process leading up to entry into the Transaction.

Closing to occur as promptly as reasonably practicable after execution of this term sheet (and in any event within two (2) weeks of entry of court order approving the Transaction).

**Public Announcements:**

Sorrento will not issue any press release or public statement with respect to the Transaction without the prior written consent of

NewCo, subject to customary exceptions for applicable law (including disclosures to bankruptcy court).

**Expenses:**       Except as otherwise provided herein, Sorrento and NewCo will each bear its own expenses, provided, however, Sorrento shall pay NewCo's expenses in the event of a successful overbid, subject to a mutually acceptable cap.

**Governing Law**    Delaware

**Venue:**          Texas Bankruptcy Court

\*       \*       \*

IN WITNESS WHEREOF, the undersigned have agreed to sign and deliver this non-binding summary of key terms as of the date first written above

HENRY JI

By: _____

*[Signature Page to Summary of Key Terms]*

SORRENTO THERAPEUTICS, INC.

By:

Name:  Mohsin Meghji
Title:   Chief Restructuring Officer

UCC.

Mark Shusterman,
Counsel

## <u>EXHIBIT A</u>

- Concortis Biosystems Corp
  - Levena Biopharma US Inc
  - Concortis Inc
  - Levena (Suzhou) Biopharma CO Ltd
    - Levena (Nanjing) Biopharma Co Ltd
    - Jiangsu Levena
- Ark Animal Health Inc
- Vavotar Life Sciences LLC
- Bioserv Corporation
- SmartPharm Therapeutics Inc
- Scintilla Health Inc
- TNK Therapeutics Inc
  - CARgenix Holdings LLC
  - BDL Products Inc
  - Virtu Biologics Limited
  - Sorrento Therapeutics (Shanghai) Co Ltd
  - Siniwest Holding Corp
    - Shanghai 3 Biotechnology Co Ltd
- Sorrento Holding Company
- Sorrento Capital Acquisition Corp I
- Sorrento Biologics Inc
- SNAN HoldCo LLC
- ACEA Therapeutics Inc
  - ACEA Therapeutics Ltd (HK)

- - Zhejiang ACEA Pharmaceutical Co LTD
  - Hangzhou ACEA Pharmaceutical Research Co Ltd
- Sorrento Therapeutics Inc Hong Kong Ltd
- Sorrento Mexico
- Virex Health Inc (pursuant to the Virex Option)
- Brink Biologics Inc
- Coneksis Inc
- SNAN HoldCo LLC
- Pulsar Therapeutics Inc
- Globavir Biosciences Inc
- Deverra Therapeutics Inc
- TNK Therapeutics Inc
  - Sorrento Therapeutics (Shanghai) Co Ltd
  - Ningbo Ziyuan Medical Device Co Ltd
  - Sorrento Shangai Medical Technology Co Ltd
    - Shenzhen Sorrento Medical Technology Co Ltd
  - Shenzhen Yunma Biotechnology Co Ltd
    - Yunnan Masheng
- Aardvark Therapeutics, Inc
- Aardwolf Therapeutics, Inc.

# EXHIBIT B

1. Sorrento Therapeutics, Inc. v. NantPhama, LLC, Case No. 23STCP00295 (LA Superior Court filed Feb 2, 2023).

2. Sorrento Therapeutics, Inc. v. NantCell, Inc., et. al, Case No. 19STCV11328 (filed April 3, 2019).

3. Immunotherapy NANTibody, LLC, et al. v. Sorrento Therapeutics, Inc., et. al, Case No. 19STCV18304 (filed May 24, 2019).

4. Sorrento Therapeutics, Inc. v. Patrick Soon-Shiong, Case No. 20STCV08789 (filed March 3, 2020).

5. Sorrento Therapeutics, Inc. v. NantPharma, LLC, Case No. 23STCP00295 (LA Superior Court filed Feb 2, 2023).

6. Sorrento Therapeutics, Inc., et al. v. Miao, et al., Case No. 37-2018-00032934 (filed July 2, 2018 S.D. Superior Court).

7. Sorrento Therapeutics, Inc., et al. v. Li, et al., Case No. 37-2021-00026791 (filed June 21, 2021 S.D. Superior Court).

8. Sorrento Therapeutics, Inc., et al. v. Li, et al., CAUSE NO: FSD 183 OF 2022 (CRJ) (Grand Court of the Cayman Islands).

9. Sorrento Therapeutics, Inc. v. CBC Group Investment Mgm't, HKIAC/A21102 (Hong Kong International Arbitration Centre).

10. Sorrento Therapeutics, Inc. v. Deverra Therapeutics, Inc. et al., Case No. 37-2022-00034031-CU-BC-CTL (San Diego Superior Court).

11. PROSPECT MEDICAL HOLDINGS, INC., a Delaware Corporation; and PROSPECT CHARTERCARE RWMC, LLC d/b/a  ROGER WILLIAMS MEDICAL CENTER, a Rhode Island Limited Liability Company vs. SORRENTO THERAPEUTICS, INC., and TNK THERAPEUTICS, INC. and TNK THERAPEUTICS, INC. vs. PROSPECT CHARTERCARE RWMC, LLC, et al., JAMS Ref. No. 1100110590.

12. Other than settled claims and Identified Causes of Action, all claims, of any kind, arising out of or relating to, the facts and claims at issue in Sorrento's prior litigations against any of the above parties.

<u>**EXHIBIT C**</u>

1. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the Ovydso drug candidate (SubCo 1).

2. A subsidiary company of the NewCo ("ACEA Therapeutics Inc") consists of the Abivertinib drug candidate (SubCo 2).

3. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the CD38 ADC and CD38 DAR-T drug candidates (SubCo 3).

4. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the Sofusa Technology (SubCo 4).

5. A subsidiary company of the NewCo ("Virex Health Inc") consists of the Virex Diagnostic Technology (SubCo 5), if the Virex Option is exercised.

6. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the TROP2 ADC (SubCo 5).

7. A subsidiary company of the NewCo ("Levena (Suzhou) Biopharma CO Ltd") consists of the Levena's ADC CDMO Business in China (SubCo 6).

8. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the RTX Drug candidate (SubCo 7).

9. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of Mayo Clinic's Adnic Technology (SubCo 8).