## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| SORRENTO THERAPEUTICS, INC., *et al.*[1] | Case No. 23-90085 (CML) |
| Debtors. | (Jointly Administered) |
|  | **Re: Docket Nos. 1851, 1879, 1887, 1892** |

### DEBTORS' AND DEBTORS' COUNSELS' OBJECTION TO (I) MOTIONS TO DISMISS OR TRANSFER VENUE AND (II) MOTION FOR SANCTIONS

The above-captioned debtors (the "Debtors") and their counsel at Jackson Walker LLP and Latham & Watkins LLP (together, the "Debtors' Counsel") object to (i) Mr. Culberson's motion to dismiss or transfer venue and for reconsideration of the order denying discovery against Latham [Docket No. 1851], (ii) the U.S. Trustee's motion to dismiss or transfer venue [Docket No. 1879] (collectively, the "Movants" and the "Venue Motions"), and (iii) Mr. Culberson's motion for sanctions and a stay of all asset sales [Docket Nos. 1887 and 1892] (the "Sanctions Motion").

### PRELIMINARY STATEMENT

1.      The Venue Motions and the Sanctions Motion should be denied in full.  To start, they are based on factual inaccuracies that could have been addressed had the Movants reached out to the Debtors before filing.  The factual record clearly shows that Scintilla's petition was not fraudulent and that there was no perjury; venue here was and is proper.  At the time of filing, Scintilla's primary (in fact, sole) asset was cash in a bank account that was located at a Signature Bank local office in Houston (at 9 Greenway Plaza, Suite 3120, Houston, Texas 77046)—and <u>not</u>

---

[1]      The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) and Scintilla Pharmaceuticals, Inc. (7956).  The Debtors' service address is: 9380 Judicial Drive, San Diego, CA 92121.

in New York, as the Venue Motions mistakenly claim.  *See* Exhibit A hereto.  Because of that, under Fifth Circuit precedent regarding the principal place of business for non-operating entities, Scintilla's assertion that Houston was its primary place of business was accurate.

2.     Second, the key facts related to Scintilla's venue were disclosed in its petition filed over a year ago, on February 13, 2023, as well as in its schedules and statements (filed in May 2023).  Indeed, one creditor even asked questions about Scintilla's venue, P.O. box, and bank account at the U.S. Trustee's "section 341" meeting in May 2023.  *See* Exhibit B hereto, 23:17–26:18.  The Debtors also understand that the Unsecured Creditors' Committee (with knowledge of all the relevant facts, based on the Debtors' various filings) evaluated the Debtors' venue and ultimately determined not to challenge it.  And presumably the Equity Committee (appointed in April 2023) was aware of the facts as well, particularly as their lead lawyer has been present in this case since March 2023 [see Docket No. 256].  Because the pertinent facts have been publicly disclosed since at least May 2023 (if not longer), the Venue Motions are untimely.

3.     Third, even if the Court considers the merits, venue is appropriate.  As noted above, Scintilla's principal place of business is in Houston.  But regardless of where Scintilla's principal place of business is, Scintilla's principal assets—$60,000 of cash at Signature Bank—were located in Houston, which alone is enough to establish venue.  Mr. Culberson ignores the "principal assets" prong of venue, and (as noted above) the U.S. Trustee mistakenly assumes that Scintilla's cash was located in New York (Signature Bank's headquarters), simply because of a third-party FDIC report that said Signature Bank did not have any "branches" in Texas (without making any distinction as to non-branch offices).

4.     Fourth, as for whether this case should nonetheless be transferred to another venue, transfer is discretionary and must either be in the interest of justice or the convenience of the

parties.  Neither is true here, and neither Movant has even argued otherwise (nor could they).  Transfer of venue would <u>not</u> be in the interest of justice given that these cases have been pending for over a year in this Court, which has already confirmed the Debtors' chapter 11 plan.  Indeed, as the plan is expected to go effective in the next month or so, transferring venue would only cause inefficiencies, delay, and expense.

5.      Nor would another venue be more convenient to the parties than Houston, as Houston is centrally located among the main parties:  the Debtors' Chief Restructuring Officer is based in New York, the Debtors' lead lawyer is based in Chicago, the Unsecured Creditors' Committee lead lawyer is based in Los Angeles, and the Equity Committee's lead lawyer is based in New York.  And Mr. Culberson himself is even based in Texas.  Moving venue to San Diego or Delaware (as requested by the U.S. Trustee) would not be more convenient.

6.      Finally, Mr. Culberson's baseless motion for reconsideration of discovery against Latham should also be denied.  The supposed "newly-discovered evidence" is <u>not</u> actually newly-discovered, and it is also entirely irrelevant to the basis for his discovery requests as it provides no evidence whatsoever that Latham was aware of the relationship between Ms. Freeman and then-Judge Jones.  The motion is based on reckless and false allegations of fraud and conspiracy, without any legal authority or factual support, and should be rejected.

7.      Mr. Culberson's motion for sanctions is similarly based on recklessly false allegations and conspiracy theories.  Because there was no fraud with Scintilla's petition and venue is appropriate (for the reasons described herein), the Sanctions Motion should also be denied in full.  The Debtors and their professionals reserve all rights with respect to Mr. Culberson's unending stream of false, reckless, and disparaging allegations.

## OBJECTION

### I.   Scintilla's petition was not fraudulent; venue is appropriate.

8.      The Movants argue that Scintilla's petition was incorrect (indeed Mr. Culberson, but not the U.S. Trustee, claims it was fraudulent) based on the allegation that Scintilla did not maintain a principal place of business nor have principal assets in Houston.  But that argument is both legally and factually wrong.  To the extent the Movants disagree with the language or practical implications of section 1408, that is simply a policy argument that should be raised with Congress.  This Court's only duty is to interpret the law as written.

9.      ***Principal Place of Business****.*  Scintilla is a non-operating entity—which means the standard for the location of its principal place of business is not as the Movants suggest.  As the Fifth Circuit has held (and which the U.S. Trustee has acknowledged), the principal place of business for an "inactive corporation" is based on the entity's "total activity," with the "last activity being relevant to" the determination.  *See Harris v. Black Clawson Co.*, 961 F.2d 547, 551 (5th Cir. 1992); U.S. Trustee Venue Motion, n. 3.

10.      Here, Scintilla is and was a dormant, non-operating entity.  Other than the opening of the P.O. box and the bank account, it has not had operations or assets since 2019 (as the U.S. Trustee acknowledged in ¶ 4 of its Motion).  Thus, Scintilla's "last activity" (the opening of the P.O. box and bank account in Houston, shortly before the Petition Date) and its "total activity" in the 180-day prepetition period (nothing else) show that its principal place of business is in Houston.

11.      The Movants appear to make three main arguments in support of their Venue Motions, but none of these arguments are persuasive.  First, the Movants rely on *Hertz Corp. v. Friend*, 559 U.S. 77, 93 (2010), for the argument that a P.O. box cannot satisfy a principal place of business.  But Hertz was an operating company:  it operated facilities in 44 states, and it had

more than 1,600 car rental locations, more than 11,000 full-time employees, and more than \$4 billion in revenue.  *Id.* at 81.  Scintilla has none of that—again, it is and has been a dormant, non-operating company.  And that requires a different analysis, as the Fifth Circuit explained.  *Harris v. Black Clawson*, 961 F.2d at 551.  Thus, *Hertz* is distinguishable.

12.     Second, the Movants argue that Scintilla's principal place of business must be in California because Scintilla is registered in California and has filed papers with California to that effect.  U.S. Trustee Venue Motion, ¶ 21.  But as the Fifth Circuit has explained, "where a corporation has been inactive in a state for a substantial period of time … that state is not the corporation's principal place of business, irrespective of any representations the corporation may have made to state officials."  *Harris v. Black Clawson*, 961 F.2d at 551.

13.     And third, the Movants argue that Scintilla cannot satisfy the 180-day rule of 28 U.S.C. § 1408 because the P.O. box and bank account (to the extent they justify a principal place of business) were opened days before the filing.  But the Movants misunderstand the rule: by its text, it does not require that the principal place of business or principal assets be in the district for 180 days, but rather only "for a longer portion of such one-hundred-and-eighty-day period" than another district.  28 U.S.C. § 1408(1); *see, e.g., In re Frame*, 120 B.R. 718, 722 (Bankr. S.D.N.Y. 1990) (court must determine where "the debtor was longer in order to determine whether venue is proper"); *In re Handel*, 253 B.R. 308, 311 (1st Cir. B.A.P. 2000) (summarizing same and explaining "longer than" requirement).  Here, again, Scintilla had no other business, operations, assets, or activities until the bank account was opened.  It was totally dormant and thus it arguably did not have a principal place of business anywhere until that account was opened.  So the principal place of business was located in Houston "for a longer portion" of the 180-day period than any other district, which satisfies section 1408.

14.     Because of those facts (which have been publicly disclosed since at least May 2023, if not longer) and law (including relevant Fifth Circuit law), the parties signing the petition were correct that Scintilla's principal place of business was in Houston.  And they certainly had more than a "reasonable belief" it was true (see Scintilla Petition, § 17) and certainly did not intend to defraud the Court—thus disproving the (reckless) allegations of fraud and perjury.  *See, e.g.,* 18 U.S.C. § 152 (for a false statement made under penalty of perjury in a bankruptcy case to be a crime, it must be made "knowingly and fraudulently"); *United States v. Key*, 859 F.2d 1257, 1260 (7th Cir. 1988) ("the essence of the offense under § 152 is the making of a materially false statement or oath with the intent to defraud the bankruptcy court"); 18 U.S.C. § 157 (governing bankruptcy schemes to defraud); *United States v. Milwitt*, 475 F.3d 1150, 1156 (9th Cir. 2007) ("conclud[ing] that the crime of bankruptcy fraud under 18 U.S.C. § 157 requires a specific intent to defraud an identifiable victim or class of victims of the identified fraudulent scheme").  Mr. Culberson provides no legal authority in support of any fraud or perjury claims.

15.     ***Principal Assets***.  Moreover, the Court need not even determine whether Scintilla's principal place of business was in Houston, because venue is appropriate anyway, as Scintilla's principal assets were located in Houston.  The law is clear on what can satisfy venue.  Venue is appropriate wherever the debtor's "domicile, residence, principal place of business in the United States, <u>or principal assets in the United States</u>" is located for either the 180 days preceding the petition or the longer period thereof.  28 U.S.C. § 1408 (emphasis added).

16.     Here, Scintilla's principal—in fact, only—assets consist of $60,000 of cash, which was in a bank account that was opened at, and thus located in, a Houston office at the time of filing.  *See In re Bavelis*, 453 B.R. 832, 869 (Bankr. S.D. Ohio 2011) ("The Brokerage Account is located where the account was opened."); *In re Iglesias*, 226 B.R. 721, 723 (Bankr. S.D. Fla. 1998)

(holding that the debtor's bank account was located in the district where the bank at which the account was opened was physically located).  And as the U.S. Trustee recognizes, that cash is the only asset that Scintilla's schedules show (see ¶ 25 of its Venue Motion).

17.     The U.S. Trustee acknowledges the "principal assets" basis for venue (see ¶ 15 of its Venue Motion), but mistakenly assumes that the bank account was located in New York, apparently because that is where Signature Bank is headquartered, and because a third-party article from the FDIC did not list any "branches" in Texas.  But as shown on Exhibit A hereto, Scintilla's cash was located at a Signature Bank "local office" in Houston (at 9 Greenway Plaza, Suite 3120, Houston, Texas 77046).  The account listed on Exhibit A (notwithstanding its generic references to Sorrento) is Scintilla's account—it has the same account number as the account on the U.S. Trustee's Exhibit A (x7311).

18.     Mr. Culberson, meanwhile, ignores the "principal assets" prong and misrepresents the law.  Despite quoting directly from 28 U.S.C. § 1408, he notably omits the language addressing "principal assets" and states that a "principal place of business" is "clearly and unambiguously" the "only" way to satisfy venue (see ¶ 5 of his Venue Motion).  That is wrong.

19.     And even though that bank account was opened and funded shortly before the Petition Date, it still satisfies the venue requirements because, again, Scintilla (a non-operating entity) did not have any other assets in the 180-day period prior to the Petition Date—thus, the principal assets were in Houston for a longer period of time than any other district, satisfying 28 U.S.C. § 1408(1).  Based on the law and facts, Scintilla's principal assets were located in Houston and thus venue is proper.  If either Movant had reached out to the Debtors before filing their motions, these facts and the result would have been explained.

II.    **The Movants have waived any challenge to venue.**

20.    Courts are overwhelmingly clear that venue can be waived if it is not timely challenged.  *See, e.g., In re Lebbos*, 2007 WL 7540977, at *4 (9th Cir. B.A.P. Nov. 14, 2007) (citing *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960)); *Block v. Citizens Bank of Tulsa (In re Moss)*, 267 B.R. 834, 838 (8th Cir. B.A.P. 2001) (same); *In re Bavelis*, 453 B.R. 832, 867 (Bankr. S.D. Ohio 2011) (same); *York v. Bank of Am. (In re York),* 291 B.R. 806, 810 (Bankr. E.D. Tenn. 2003) (same); *In re Smith Jones, Inc.*, 13 B.R. 804, 807 (Bankr. N.D. Tex. 1981) (same); *see also* Fed. R. Bankr. P. 1014, Advisory Committee Note (1987) ("If a timely motion to dismiss for improper venue is not filed, the right to object to venue is waived.").

21.    "What constitutes timely filing of such a motion is not governed by a statutory or rule definition; whether a motion to change venue has been timely filed depends on the facts and circumstances presented in the particular case."  *Blagg v. Miller (In re Blagg)*, 223 B.R. 795, 802 (10th Cir. B.A.P. 1998) (citations omitted).

22.    The facts and circumstances of this case prove that the Venue Motions are untimely. Movants may argue that the Venue Motions are based on new information, such that they could not have raised a timely challenge.  But consider the following:

- On February 13, 2023, Scintilla filed its petition, listing its P.O. box as its principal place business—the very fact that the Movants now take issue with.

- Scintilla also listed Sorrento's San Diego address (4955 Directors Place) as its mailing address on the petition, just as Debtors' counsel did in the UPS application. In an attempt to conjure conspiracies, Mr. Culberson claims that the San Diego address in the UPS application is new information that the Debtors "did not imagine would show up in this Court's records," (¶ 8) but the San Diego address is not new information—it's included in Scintilla's petition.

- On February 13, 2023, the Debtors' Chief Restructuring Officer filed the Debtors' first-day declaration, which states that Scintilla "is a Delaware corporation and a wholly-owned, non-operating subsidiary" of Sorrento, with Dr. Ji as its sole officer and director.  Docket No. 5, ¶ 10.

- The Debtors have record of Mr. Culberson being aware of, and monitoring, these cases since at least May 2023.  He has had ample opportunity since then to become familiar with the facts of this case.

- On May 25, 2023, Scintilla filed its schedules of assets and liabilities, showing that its only asset was $60,000 of cash in its bank account, as the U.S. Trustee acknowledges.  *See* U.S. Trustee Venue Motion, ¶ 5; Docket No. 712 (amended at Docket No. 722 on May 29, 2023).

- Confirming that these facts were apparent to anyone who reviewed the record, on May 30, 2023, the U.S. Trustee conducted a "section 341" meeting of creditors, at which counsel to a creditor asked various questions about Scintilla and its venue, including questions about Scintilla's P.O. box, bank account, books and records, and place of incorporation.  *See* Exhibit B hereto, 23:17–26:18.

- The Debtors are also aware of news coverage in June 2023 regarding the Debtors' choice of venue, again confirming that the facts were apparent to anyone who reviewed the record—even those outside this case.

- In August 2023, Mr. Culberson filed a motion to appear pro hac vice [Docket No. 1195], filed a notice of appearance [Docket No. 1204], signed the protective order in these cases, and observed the Debtors' auction of its Scilex stock.  And starting in August 2023 and continuing to the present day, Mr. Culberson has filed a number of motions, objections, subpoenas, discovery requests, and other pleadings—including an objection to confirmation of the Debtors' plan.  *See, e.g.*, Docket No. 1563 (confirmation objection).

- On November 16, 2023, the Debtors filed a proposed confirmation order, which contained (among other things) a proposed finding that venue was proper in this Court.  *See* Docket No. 1565, ¶ B.  The U.S. Trustee provided informal responses to the Debtors with respect to confirmation, which the Debtors resolved.  The U.S. Trustee never filed a formal objection and never objected to the venue finding in the proposed order.

- On November 30, 2023, the Court conducted a confirmation hearing, which both Movants attended.  The Court overruled Mr. Culberson's objection and entered an order confirming the Debtors' chapter 11 plan.  *See* Docket No. 1616 (corrected at Docket No. 1652).  That confirmation order contains a finding that "venue is proper before this Court."  Docket No. 1652, ¶ B.

- Not until February 2024—a year after the petition was filed, more than eight months after the "section 341" meeting where Scintilla's venue was questioned by a creditor, and more than two months after the Debtors' plan was confirmed—did the Movants challenge venue.

23.     Many courts have found waiver based on similar facts.  *See e.g.*, *Bryan v. Land (In re Land)*, 215 B.R. 398, 402–03 (8th Cir. B.A.P. 1997) (creditor's motion to change venue after plan confirmation untimely when creditor had actual notice of bankruptcy case, even though venue was improper); *In re Pickett*, 330 B.R. 866, 871 (Bankr. M.D. Ga. 2005) (United States Trustee's motions to transfer or dismiss bankruptcy cases for improper venue were untimely where there were sufficiently substantial developments in the cases); *In re Deabel, Inc.*, 193 B.R. 739, 743 (Bankr. E.D. Pa. 1996) (finding that if "a party has submitted itself to the jurisdiction of the court by litigating a matter of substance, or if substantial developments have transpired in the case in general, ... waiver of an objection to venue could be found"); *Jones v. U.S. (In re Jones)*, 134 B.R. 274, 278–79 (N.D. Ill. 1991) (motion to dismiss filed nineteen months after confirmation and ten months after discharge untimely); *In re Smith Jones, Inc.*, 13 B.R. 804, 807 (Bankr. N.D. Tex. 1981) ("Where, as here, defendant proceeds first to challenge the merits of the case and thereafter objects to improper venue it comes too late.").  This Court should similarly hold that the Movants have waived their rights to challenge venue.

## III.     Regardless, these cases should not be dismissed and venue should not be transferred.

24.     But even if the Court considers the Venue Motions as timely, the Court should not dismiss or transfer these cases.  The Movants' only argument in support of dismissal is that the Debtors lack venue in Houston.  But as explained above, the Debtors do have venue in Houston, and thus dismissal is not warranted.

25.     Whether these cases should nonetheless be transferred to another venue is up to the Court's discretion.  *In re Commonwealth Oil Ref. Co., Inc.*, 596 F.2d 1239, 1247 (5th Cir. 1979). And whether the Court should exercise that discretion depends on "the convenience of the parties and the interest of justice."  *Id.*  The Court "should exercise its power to transfer cautiously," and

the Movants bear the burden of proof as they "must show by a preponderance of the evidence that the case should be transferred." *Id.* at 1241. Here, transfer would <u>not</u> be in the interest of justice or the convenience of parties. And despite bearing the high burden, neither Movant has even argued otherwise, much less offered evidence sufficient to satisfy their burden.

26. ***Interest of Justice***. This factor "contemplates a consideration of whether transferring venue would promote the efficient administration of the bankruptcy estate, judicial economy, timeliness, and fairness." *In re Manville Forest Prod. Corp.*, 896 F.2d 1384, 1391 (2d Cir. 1990); *see also In re Enron Corp.*, 274 B.R. 327, 349 (Bankr. S.D.N.Y. 2002) (quoting same); *In re Restaurants Acquisition I, LLC*, 2016 WL 855089, at *5 (Bankr. D. Del. Mar. 4, 2016) (quoting same).

27. Unsurprisingly, courts have held that when a case has progressed with significant developments, the interest of justice favors against transferring venue "because any venue transfer inherently requires a new court to start over and familiarize itself with a debtor's business operations and capital structure." *In re Restaurants Acquisition I, LLC*, 2016 WL 855089, at *5 (Bankr. D. Del. Mar. 4, 2016); *see also In re AnthymTV Co.,* 650 B.R. 261, 283 (Bankr. D.S.C. 2023) (even though a "relatively short period of time" had passed since the bankruptcy filing, "a considerable amount of information has been provided to this court during this time regarding debtor and its operations" and thus "allowing the bankruptcy cases to proceed in this court would be more efficient and would promote judicial economy").

28. The Debtors' cases have been pending before this Court since February 13, 2023 (over a year ago) and pending before the Honorable Christopher Lopez since October 13, 2023 (over four months ago). This Court is intimately familiar with the Debtors' cases and confirmed a chapter 11 plan of liquidation on November 30, 2023 [Docket No. 1616, corrected at Docket

11

No. 1652].  Transferring venue at this time—after over a year of developments, in which this Court has developed a deep understanding of the facts and parties, and while the Debtors' chapter 11 plan and other critical transactions (such as the DIP/sale proposed at Docket No. 1884) are still pending—would be inefficient, against judicial economy, and a burden on judicial resources.

29.     As this Court knows and experienced itself, any new judge assigned to this case would have to spend countless hours getting up to speed, reviewing the docket, learning the parties and issues, etc.—all of which is already familiar to this Court.  Indeed, Mr. Culberson even acknowledged that point to this Court last week when he complained that transferring his Rule 60(b) proceeding to Chief Judge Rodriguez would purportedly be inefficient and cause delays.

30.     Transfer would also deplete the scarce resources of this estate:  even assuming the Debtors obtain their proposed DIP financing (see Docket No. 1884), that liquidity will likely run out by the end of March 2024.  In other words, a transfer of venue, and all the burdens and costs that would come with it, is functionally equivalent to a chapter 7 conversion at this stage, which would be to the detriment of the Debtors' stakeholders.  The Movants, despite bearing the burden, give no reason why a venue transfer would benefit the estate.  Nor, again, are their motions even timely (as noted above).  Transfer is thus not in the interest of justice.

31.     ***Convenience of Parties***.  Nor would transfer be more convenient to the parties than Houston.  Houston is centrally located among the main parties:  the Debtors' Chief Restructuring Officer is based in New York, the Debtors' lead lawyer is based in Chicago, the Unsecured Creditors' Committee lead lawyer is based in Los Angeles, the Equity Committee's lead lawyer is based in New York, and the Debtors, Creditors' Committee, and Equity Committee have all retained local counsel in Houston.  Mr. Culberson himself is even located in Texas.  And when his Rule 60(b) proceeding was transferred to Chief Judge Rodriguez, Mr. Culberson complained that

it would be an inconvenient burden to him.  All of this just emphasizes how his motion is not based on any convenience to him but rather unfounded conspiracy theories.  Additionally, the Southern District of Texas has leading capabilities for remote participation for those unable to attend in person, proven by the hundreds of shareholders and other parties that dial in to the Debtors' hearings.  Moving venue to San Diego or Delaware (as requested by the U.S. Trustee) would certainly not be more convenient to the parties.

**IV.** **Reconsideration of the order denying discovery against Latham is not appropriate.**

32.    Mr. Culberson makes recklessly false and utterly unsupported allegations of fraud and conspiracy while arguing that this purportedly "new evidence" means the Court should reconsider its discovery ruling as to Latham & Watkins LLP.  Culberson Venue Motion, ¶ 13.  He presumably seeks relief under Federal Rule of Civil Procedure 60(b)(2) (which governs reconsideration based on new evidence), but Mr. Culberson does not cite to any legal authority.

33.    A motion to reconsider "is not the vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before entry of [the order]."  *Templet v. HydroChem Inc.*, 367 F.3d 473, 478–79 (5th Cir. 2004) (affirming denial of motion to alter, amend, or reconsider).  Rather, "to obtain Rule 60(b)(2) relief, a movant must demonstrate: '(1) that it exercised due diligence in obtaining the information; and (2) that the evidence is material and controlling and clearly would have produced a different result if present before the original judgment.'" *Thermacor Process, L.P. v. BASF Corp.*, 567 F.3d 736, 744 (5th Cir. 2009) (*quoting Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 639 (5th Cir. 2005)).

34.    Indeed, at the hearing on January 24, 2024, when the Court denied Mr. Culberson's discovery requests as to Latham because the evidence showed that Latham was not aware of the

Freeman/Jones relationship, the Court made clear that parties can renew a discovery request but they have to "find something … there's got to be something there."  Exhibit C hereto, 103:23–24.

35.     And here, there is no evidence of fraud, let alone any *new* evidence (as discussed above).  There is nothing *there*.  The fact that steps were taken to facilitate venue in this district is not evidence that Latham was aware of the Freeman/Jones relationship, or that anyone knew this case would even be assigned to then-Judge Jones.  Rather, it only shows that the Debtors—like many other debtors—wanted to file in this district.  And there is nothing fraudulent about that desire because as the Court has held (and explained repeatedly), the assignment of the case was random.  Moreover, none of the purportedly "new evidence" is even new information.  As discussed in greater detail above, the fact that Scintilla opened a P.O. box and listed it as its principal place of business on its petition, while having no other operations or assets (other than the Houston bank account), has all been disclosed in these cases, since at least May 2023 if not longer.  Thus, reconsideration is not appropriate and should be denied.

## V.     The Sanctions Motion should be denied.

36.     Yet again, in another motion, Mr. Culberson recklessly attacks Debtors' Counsel and argues that they should be sanctioned for allegedly signing a fraudulent petition on behalf of Scintilla.  But as explained at length herein, the petition was not fraudulent and thus sanctions are not appropriate.  And because venue is appropriate, there is no reason to stay the Debtors' proposed sale (which has not even been scheduled for a hearing yet).

## VI.     The Court should issue a show-cause order with respect to Mr. Culberson.

37.     Mr. Culberson's tactics have gone past zealous advocacy into the area of reckless, unsupported allegations of fraud, directed publicly at individuals.  Mr. Culberson has personally attacked associates and partners at Jackson Walker and Latham & Watkins by name, as well as

other professionals in these cases, accusing them of fraud and conspiracy in his pleadings to this Court.  *See, e.g.*, Docket No. 1851, at ¶ 1 ("Latham & Watkins, LLP and Jackson Walker, LLP conspired to fraudulently file this Sorrento Chapter 11 case in the Southern District of Texas representing venue facts that were knowingly false."), at n. 2 ("Interestingly, on February 16, 2023, 4 days later, Ms. Polnick is promoted to partner at Jackson Walker, LLP according to the Houston Business Journal"); Docket No. 1887 at 3 ("the attorneys lied to this Court in their pleadings"), 3 ("Jonathan Gordon of Latham & Watkins, LLP authored the fraudulent Scintilla voluntary petition"), 6 ("Latham & Watkins, LLP through Josh [sic] Gordon at the direction of his supervising partner, Caroline Reckler, directly created the false petition …"); Docket No. 1892 (alleging the professionals engaged in a "conspiracy to commit bankruptcy fraud on this Court, the creditors, and the shareholders").  He has also repeatedly disclosed personally identifiable information in his public filings (as described in Docket Numbers 1890 and 1891).  And he has publicized and advertised those filings on public message boards devoted to Sorrento.[2]

38.    Mr. Culberson's actions are beyond reckless and are throwing wood onto an already overheated environment.  For example, one shareholder posted on the message board that the Debtors' professionals were "dishonest crooks" and that it would be "time to storm Capitol Hill if we get screwed again."  Another posted that they hoped to see Debtors' counsel and their Chief Restructuring Officer "dressed in orange one day," with another commenting that it would be better "to see them next to each other on gurneys."  Another shareholder emailed Ms. Reckler after

---

[2]   He has also repeated those false accusations and more on those public message boards: (i) "[Ms. Reckler] wrecked everything … in this case."; (ii) "BK lawyers ... get loans to pay themselves and feast on dying companies.  They are worse than ambulance chasers."; and (iii) "Just trying to do a little something to make these money sucking vultures aware that we shareholders are watching them closely."

the confirmation hearing, saying:  "You are a horrible person but Karma will get you.  Breast cancer, car wreck, toxic shock, etc. whatever it is it's coming to you, and you deserve it.  Enjoy!!!"[3]

39.     Mr. Culberson's inappropriate actions have continued as recently as February 20, 2024, when he filed his supplemental motion for sanctions and added a declaration from the Debtors' former chief financial offer that contains patently privileged communications [Docket No. 1892].  To be clear, (i) Mr. Culberson should <u>not</u> be soliciting privileged information from people who are likely to have such information (such as former officers) without contacting Sorrento's counsel and giving them an opportunity to be present in any discussions, (ii) Mr. Culberson should <u>not</u> be publicly disclosing any such privileged information, (iii) the Debtors are <u>not</u> waiving any rights with respect to privileged communications or attorney work product, and (iv) the Debtors reserve all rights with respect thereto.

40.     In sum, given (i) the Court's clear explanation of what would be needed to justify reconsideration of its discovery ruling, (ii) Mr. Culberson's blatant disregard of that explanation, (iii) his baseless Sanctions Motion, (iv) his recklessly false and disparaging behavior in these cases, and (v) his inappropriate solicitation and disclosure of privileged communications, the Debtors respectfully request that the Court issue an order to show cause why Mr. Culberson should not be sanctioned under Bankruptcy Rule 9011 or otherwise.  The Debtors do not make that request lightly.  But these repeated conspiracy theories and serial motions are not harmless; they burn limited estate and Court resources and recklessly attack the personal integrity of the Debtors and their professionals with no justification.

---

[3]    The Debtors will provide documentation of such statements to the extent requested or desired by the Court.

41.     The Debtors and their professionals strongly reserve all rights with respect to the recklessly false and disparaging allegations that Mr. Culberson continues to make in these cases and elsewhere in the public domain.

## **CONCLUSION**

42.     The Venue Motions and the Sanction Motion should be denied in full.

Dated:   February 21, 2024

*/s/ Caroline Reckler*
**LATHAM & WATKINS LLP**
Caroline Reckler (S.D. Tex. Bar No. IL6275746)
Ebba Gebisa (admitted *pro hac vice*)
Jonathan Gordon (admitted *pro hac vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
Facsimile:  (312) 993-9667
Email:  caroline.reckler@lw.com
          ebba.gebisa@lw.com
          jonathan.gordon@lw.com

– and –

Jeffrey E. Bjork (admitted *pro hac vice*)
Kimberly A. Posin (admitted *pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile:  (213) 891-8763
Email:   jeff.bjork@lw.com
          kim.posin@lw.com

– and –

**JACKSON WALKER LLP.**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Kristhy M. Peguero (TX Bar No. 24102776)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: mcavenaugh@jw.com
          kpeguero@jw.com
          ggraham@jw.com

*Counsel to the Debtors*

## **Certificate of Service**

I certify that, on February 21, 2024, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

/s/ *Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## **Exhibit A**

**Wiring Instructions**



## FUNDING INSTRUCTIONS FOR:

### *Sorrento Therapeutics, Inc.*

---

**Bank Headquarters:**    **SIGNATURE BANK**
**565 5th Ave, 12th Fl**
**New York, NY 10017**

**ABA Routing#:**    ███████

**SWIFT Code:**    ███████

**Account Name:**    **Sorrento Therapeutics, Inc. DIP**

**Account #:**    ██████**7311**

*NOTE: These instructions are for transfers of US Dollars only*

**Bank Local Office:**    **SIGNATURE BANK**
**9 Greenway Plaza, Suite 3120**
**Houston, TX 77046**

## Exhibit B

**Section 341 Meeting Transcript**

```
 1                IN THE UNITED STATES BANKRUPTCY COURT

 2              FOR THE SOUTHERN DISTRICT OF TEXAS

 3                        HOUSTON DIVISION

 4   IN RE:                    §     CASE NO. 23-90085-11
                               §     HOUSTON, TEXAS
 5   SORRENTO THERAPEUTICS, INC., §   (JOINTLY ADMINISTERED)
     ET AL,                     §     TUESDAY,
 6                 DEBTOR.      §     MAY 30, 2023
```

## 7     <u>**341 MEETING OF CREDITORS (VIA TELEPHONE)**</u>

```
 8                  CONDUCTED BY HECTOR DURAN
                          TRIAL ATTORNEY
 9

10               APPEARANCES (VIA TELEPHONE):

11   FOR THE DEBTOR:              CAROLINE RECKLER, ESQ.

12   FOR CHARLES RIVER LABORATORY: JOSEPH ORBACH, ESQ.

13   FOR DIMENSION ONE GRAPHICS:  SCOTT SUTTON

14   FOR CYTORPH, INC.:           FRANK LEE

15   FOR ALFA CHEMISTRY:          NANA

16   FOR NANTCELL &
     IMMUNOTHERAPY &
17   ANTIBODY:                    CAMERON KELLY, ESQ.

18   FOR GPS LIGHT, INC.:         WILLIAM SUNTERBY

19

20               TRANSCRIPTION SERVICE BY:

21          JUDICIAL TRANSCRIBERS OF TEXAS, LLC
                 935 Eldridge Road, #144
22                Sugar Land, TX 77478
                     281-277-5325
23            www.judicialtranscribers.com

24

       Proceedings recorded by electronic sound recording;
25        transcript produced by transcription service.
              No ERO present; no log notes.
```

1      **HOUSTON, TEXAS; TUESDAY, MAY 30, 2023**

2          MR. DURAN:  Today is Tuesday, May 30th, the year

3  2023.  This is the First Meeting of Creditors in Case

4  No. 23-90085 involving the Corporate Debtor Sorrento

5  Therapeutics, Incorporated.  These are two Debtors who are

6  jointly administered under this case number.  These are

7  complex Chapter 11 cases.

8          My name is Hector Duran.  I represent the United

9  States Trustee who supervises the administration of

10 bankruptcy cases.  The meeting is being recorded, and all

11 parties are appearing by telephone.

12         I'll ask Debtor's counsel to please state her

13 appearance for the Record, please.

14         Ms. Reckler?

15         MS. RECKLER:  This is Caroline Reckler.

16         MR. DURAN:  All right.

17         MS. KORYCKI:  Sorry.  I tried to get -- go ahead,

18 Caroline.

19         MS. RECKLER:  It's Caroline Reckler from Latham.

20         MR. DURAN:  Okay.  Excellent.

21         And Mr. Meghji, are you in attendance?

22         MR. MEGHJI:  I am.

23         MR. DURAN:  All right.  All right.  I'll swear you

24 in first.  If you'll raise your right hand?

25         Do you solemnly swear that the testimony you're

1  about to give will be the truth, the whole truth, and

2  nothing but the truth?

3          THE WITNESS:  I do.

4      (The witness was sworn.)

5          MR. DURAN:  All right.  And the other person

6  testifying on behalf of the Debtor?

7          MR. MEGHJI:  Mary Korycki.

8          MS. KORYCKI:  Mary Korycki.

9          MR. DURAN:  All right.  And I'll swear you in at

10  this point in time.

11          Do you swear or affirm that the testimony you're

12  about to give will be the truth, the whole truth, and

13  nothing but the truth?

14          THE WITNESS:  Yes.

15      (The witness was sworn.)

16          MR. DURAN:  All right.  Let's see.  Mr. Meghji,

17  you've been the Chief Restructuring Officer since February

18  9th; is that correct?

19          MR. MEGHJI:  Yes.

20          MR. DURAN:  All right.  And in your capacity as

21  CRO, are you familiar with the assets, liabilities, and

22  financial condition of the Debtor?

23          MR. MEGHJI:  I am.

24          MR. DURAN:  All right.  And Ms. Korycki -- I think

25  I got that right; I'm not sure -- what is your

1   representative capacity?

2          MS. KORYCKI:  Sure.  I'm a Director with M3

3   Partners, and advisor working with loan, advising the

4   Company on reporting --

5          MR. DURAN:  All right.

6          MS. KORYCKI:  -- and other matters related to the

7   case.

8          MR. DURAN:  And in your connection with these two

9   cases, are you familiar with the assets, liabilities, and

10  financial condition of the Debtor?

11         MS. KORYCKI:  Yes.

12         MR. DURAN:  Okay.  All right.  My understanding is

13  that this case, the Debtors started out in 2006 as San Diego

14  Antibody Company and in 2009 reincorporated and renamed to

15  Sorrento Therapeutics, Incorporated.  Is all that correct?

16         MR. MEGHJI:  Yes.

17         MR. DURAN:  And Sorrento Therapeutics,

18  Incorporated has been publicly traded since 2013?

19         MR. MEGHJI:  Correct.

20         MR. DURAN:  And Scintilla Pharmaceuticals,

21  Incorporated is a wholly-owned, nonoperating subsidiary of

22  Sorrento Therapeutics, Incorporated?

23         MR. MEGHJI:  Yes.

24         MR. DURAN:  Where are the headquarters located?

25         MR. MEGHJI:  In San Diego, 4955 Directors Place in

1   San Diego.

2          MR. DURAN:  Got it.  Okay.  Is that where all the

3   books and records are kept?

4          MR. MEGHJI:  Yes.  There, and I think there's

5   another location, 4921 Directors Place.  It's between those

6   two offices.

7          MR. DURAN:  Got it.  And the Debtors are currently

8   operating a business, correct?

9          MR. MEGHJI:  Correct.  Operating a business that's

10  primarily focused on research and development in the

11  biopharma pharmaceutical place -- sorry, space.

12          MR. DURAN:  And as I understood it, the Debtors

13  develop and acquire drugs and treatments for cancer,

14  infectious, and infectious diseases, correct?

15          MR. MEGHJI:  Yes.

16          MR. DURAN:  How many employees do the Debtors

17  have?

18          MR. MEGHJI:  So I'll just walk you through -- are

19  you talking about now --

20          MR. DURAN:  Yes, currently.

21          MR. MEGHJI:  -- or as of the petition date?

22          MR. DURAN:  Currently.

23          MR. MEGHJI:  Currently, as of May 4th, which is

24  the latest head count we have, we had 253 full-time

25  employees and one part time, so 254 in total.

6

1              MR. DURAN:  Got it.  Okay.  And the Debtors

2  started with about 540 employees?  And by started, I mean --

3              MR. MEGHJI:  Yes.

4              MR. DURAN:  -- at the petition date.

5              MR. MEGHJI:  We had 533 full -- yeah, at the

6  petition date, we had 533 full time, and 5 part time, so

7  that's 538, which is close to the 540 number.

8              MR. DURAN:  Got it.  Okay.  I'll ask you for the

9  Record to tell us what the reasons for the bankruptcy filing

10  were.

11              MR. MEGHJI:  The reasons for the bankruptcy

12  filing --

13              MR. DURAN:  Yes.

14              MR. MEGHJI:  -- were Sorrento had an arbitration

15  award judgment against it from -- for $175 million, and at

16  that time, we didn't have the liquid assets to deal with

17  that judgment, and as a result, was forced to seek

18  protection under Chapter 11.

19              MR. DURAN:  All right.  Let's see.  Is the trial

20  against Dr. Soon-Shiong and NantCell and the derivative

21  action still set for July 17th?

22              MR. MEGHJI:  I believe so.

23              Caroline, can you confirm?  I think that's still

24  the case.

25              MS. RECKLER:  That is correct.

1          MR. MEGHJI:  Caroline, can you confirm?

2          MS. RECKLER:  Yes.  The derivative action is still

3   on the calendar with no changes.

4          MR. DURAN:  And has there been a trial setting for

5   the fraud action?

6          MS. RECKLER:  I don't believe that an actual trial

7   date has been set.  I believe it's -- I can't give you an

8   exact date other than early 2024.

9          MR. DURAN:  Got it.  Okay.

10          Mr. Meghji, can you give us a status update

11   regarding the sale process the Debtors are undergoing?

12          MR. MEGHJI:  Sure.  So we retained Moelis as our

13   investment banker, and they have been hard at work for the

14   past couple of months, initially with getting all of the

15   sales material prepared, the data rooms, financial

16   projection models, et cetera, and in the past month have

17   begun significant outreach efforts with a variety of

18   parties, both for Sorrento assets, as well as Scilex assets.

19          Because one of our -- one of Sorrento's primary

20   assets is a sort of circa 52 percent ownership interest in

21   Scilex.

22          MR. DURAN:  Okay.  Have the Debtors identified a

23   stalking horse bidder at this point?

24          MR. MEGHJI:  I'm sorry.  Can you repeat the

25   question?

8

1          MR. DURAN:  Have the Debtors identified a stalking

2    horse bidder?  Or maybe I should just back --

3          MR. MEGHJI:  No.

4          MR. DURAN:  No?  Okay.  Have the Debtors received

5    any bids?  I think the initial bid deadlines were May 16th

6    for the stock sale and capital transaction and May 25th for

7    the asset sale.

8          MR. MEGHJI:  Yeah.  Mr. Duran, we deferred those

9    to early June, so it sort of -- we have not -- those dates

10   for a variety of reasons were pushed out a little bit.  So

11   we're expecting that in the first half of June.

12         MR. DURAN:  Okay.  All right.  When do you

13   anticipate that a Plan and Disclosure Statement will be

14   filed?

15         MR. MEGHJI:  Caroline, do you want to take that?

16         MS. RECKLER:  I would expect one will be filed in

17   mid-June, mid to the end of June.

18         MR. DURAN:  Got it.  Okay.

19         All right.  I noticed that the Schedules were

20   amended, and those amendments came in late last night and

21   early this morning.  And so, I haven't had a chance to

22   review them.

23         What are the nature of the changes, if you can

24   tell me?

25         MR. MEGHJI:  Ms. Korycki?

1              MS. KORYCKI:  Sure.  On Schedule F, we request

2   about 87,000 from unsecured to priority claims which would

3   be for the independent contractors, employee wages, and San

4   Diego tax payments.

5              MR. DURAN:  All right.  Is that --

6              MS. KORYCKI:  And then on AB --

7              MR. DURAN:  Go ahead.

8              MS. KORYCKI:  I'm sorry.  Did you have a follow-up

9   question on that?

10             MR. DURAN:  Yeah.  Just continue on.  Tell me.

11             MS. KORYCKI:  So then on A/B 25, I mean, the goods

12  purchased 20 days before the filing, the company expenses

13  there, materials and supplies to research and development.

14  So we originally had a 1.5 million in the net book value

15  column, but it's not, the way the company does their

16  accounting, we disclosed it in the global notes that we made

17  that as the company expenses, the material and supplies to

18  R&D, so we changed that as well.

19             MR. DURAN:  Okay.  Anything else?

20             MS. KORYCKI:  On the A/B 15, the insurance did

21  other businesses.  We had undetermined on the current value,

22  but we were able to get the current value amounts, so we

23  added to the list of 27 entities, we added in the current

24  value which totals approximately $81 million, and that was

25  on A/B 15.

1          MR. DURAN:  Got it.

2          MS. KORYCKI:  And --

3          MR. MEGHJI:  And Mr. Duran, if you have questions

4   after you review the changes, we're obviously very happy to

5   facilitate a follow-up call.

6          MR. DURAN:  All right.  I will most likely

7   continue the meeting so that I'll have a chance to review

8   the changes.  And I'll also ask any of the participants in

9   today's meeting whether or not they would prefer to have

10  time to review those changes and continue the meeting for --

11  in respect of those changes.

12         MR. MEGHJI:  Yeah, we would have absolutely no

13  objection to that.  We appreciate that.

14         MR. DURAN:  Okay.  All right.

15         Mr. Meghji, did you provide the information that

16  was used by the Debtors' attorneys to produce the Bankruptcy

17  Schedule, Statements and Petition?

18         MR. MEGHJI:  Yes.  My team and I did.

19         MR. DURAN:  All right.  And did you review the

20  information that's contained in those documents before they

21  were filed?

22         MR. MEGHJI:  Yes.

23         MR. DURAN:  Okay.  Is all the information --

24         MR. MEGHJI:  Correct.  I did.

25         MR. DURAN:  -- reported in the Bankruptcy

1    Schedules, Statements and Petitions true and correct?

2            MR. MEGHJI:  To the best of my knowledge, yes.

3            MR. DURAN:  Okay.  And with this latest set of

4    amendments to the Schedules, do you believe that there are

5    any other changes or amendments that need to be made at this

6    point in time?

7            MR. MEGHJI:  We do not as of this time.  So we

8    believe the Schedules are correct as filed as of last night.

9            MR. DURAN:  And is it your testimony here today

10   that the source of the information in those Bankruptcy

11   Schedules, Statements -- and Statements comes from the books

12   and records of the Debtors?

13           MR. MEGHJI:  Yes.

14           MR. DURAN:  All right.  Have the Debtors disclosed

15   all their cash on hand and in bank accounts?

16           MR. MEGHJI:  I believe so.

17           Mr. Korycki, can you confirm?

18           MS. KORYCKI:  To my knowledge, yes.  They have.

19           MR. DURAN:  Okay.  How many accounts do the

20   Debtors currently have?

21           MR. MEGHJI:  Mary, I'll let you take this.

22           MS. KORYCKI:  Nine.  Sorry about that.  Nine

23   accounts.

24           MR. DURAN:  Nine accounts.  And are all of them

25   DIP accounts?

1          MS. KORYCKI:  They're DIP accounts.  We still have

2    one at Signature Bank, which was the Scintilla account that

3    we are looking -- we are in the process of transferring it

4    over to Bank of America.

5          MR. DURAN:  Okay.

6          MS. KORYCKI:  And then there is still the letter

7    of credit with Silicone Valley Bank, and with that letter of

8    credit, there's $2,580 in a bank account that needs to stay

9    open there for the letter of credit.

10          MR. DURAN:  Okay.  And are all the other -- where

11    are all the other DIP accounts located?

12          MS. KORYCKI:  So the DIP account is at Wells

13    Fargo.

14          MR. DURAN:  Right.

15          MS. KORYCKI:  And then the remainder of the

16    accounts are with Bank of America.

17          MR. DURAN:  Got it.  Okay.

18          All right.  What is the current balance in the DIP

19    accounts, both at Bank of America and Wells Fargo, if you

20    know?

21          MS. KORYCKI:  Yes.  It's twelve -- 12 million.

22    Approximately $12 million as of end of day Friday.

23          MR. DURAN:  Okay.  Are all revenues generated from

24    the operation of the Debtors' businesses deposited into the

25    DIP accounts?

1          MS. KORYCKI:  To my knowledge, yes.

2          MR. DURAN:  All right.  Is the only outstanding

3    receivable about 71,000 as of the petition date?

4          MS. KORYCKI:  To my knowledge, yes.

5          MR. DURAN:  All right.  And has any portion of

6    that receivable, that prepetition receivable, been collected

7    to date?

8          MS. KORYCKI:  Not to my knowledge, no.  And the

9    company is not sure if it would be collectable.

10          MR. DURAN:  Okay.  Now I think you mentioned that

11    in the First Day Declaration, Mr. Meghji, that the Debtors'

12    most significant asset is the Debtors' 52 percent equity

13    interest in Scilex, correct?

14          MR. MEGHJI:  Yes.

15          MR. DURAN:  Is it true the Debtors have about

16    59 million shares of Scilex common stock and 29 million in

17    preferred shares?

18          MR. MEGHJI:  Correct.

19          MR. DURAN:  And that 180-day lockup agreement, it

20    expired on May 11th?

21          MR. MEGHJI:  Yes.

22          MR. DURAN:  All right.

23          MR. MEGHJI:  With respect to the shares that we

24    own, yes.

25          MR. DURAN:  All right.  Is it true the Debtors

1  also have an interest in Celularity, Incorporated?

2         MR. MEGHJI:  Yes.

3         MR. DURAN:  What is the Debtors' percentage

4  ownership interest in Celularity?

5         MR. MEGHJI:  I don't know the exact percentage --

6         MS. KORYCKI:  Can you give me --

7         MR. MEGHJI:  -- ownership.

8         MS. KORYCKI:  -- one minute?

9         MR. MEGHJI:  Mary, do you have -- yeah.

10        MS. KORYCKI:  Yes.  But just give me one minute.

11        MR. DURAN:  While Ms. Korycki is getting that

12  information, can you tell us for the Record what the

13  business is of Celularity?

14        MR. MEGHJI:  It's another biopharma company.

15        MR. DURAN:  Okay.

16        MS. KORYCKI:  And just one more minute.  I'll pull

17  it up.

18        MR. DURAN:  Have the Debtors disclosed all their

19  furniture and fixtures?

20        MS. KORYCKI:  Yes.

21        MR. DURAN:  Have they disclosed all the --

22        MS. KORYCKI:  To my knowledge, yes.

23        MR. DURAN:  -- lab equipment and leasehold

24  improvements?

25        MS. KORYCKI:  To my knowledge, yes.

1          MR. DURAN:  Is it true the Debtors have nine

2   pieces of real property they have leased?

3          MS. KORYCKI:  The listing in what was filed is --

4   and just, I apologize, I just don't know -- right here.

5   Nine, correct, yes.

6          MR. DURAN:  Okay.  Have the Debtors disclosed all

7   their claims and causes of action against any third parties

8   as of the day of bankruptcy?

9          MS. KORYCKI:  To my knowledge, yes.

10          MR. MEGHJI:  Claims, yes, we have.  And the

11   primarily, the big ones primarily relate to the named set of

12   issues.  So we believe we have done those, yes.

13          MR. DURAN:  All right.  Would it be your testimony

14   that given the most-recent amendments to the Schedules, that

15   the Debtors have disclosed all their assets as of the day of

16   bankruptcy?

17          MR. MEGHJI:  Yes.

18          MS. KORYCKI:  To my knowledge, yes.

19          MR. MEGHJI:  That is my testimony.

20          MR. DURAN:  Okay.  Are the Debtors current on any

21   taxes that became due after the day of bankruptcy?

22          MS. KORYCKI:  Yes.  Except for the San Diego, the

23   two San -- yes, except for the two San Diego ones.  We're

24   working with the companies that were disclosed on the

25   priority tax claim.  Those are pre-petition, but to my

1   knowledge, yes, they are current on any post-petition taxes.

2              MR. DURAN:  Okay.  Current.  All right.

3              Are the Debtors current on all other post-petition

4   obligations?

5              MS. KORYCKI:  The company is currently --

6              MR. MEGHJI:  Yes, we are to the best of our

7   knowledge, yes.

8              MR. DURAN:  Okay.  And is it your testimony that

9   the Debtors have disclosed all their debts as of the day of

10  bankruptcy?

11             MR. MEGHJI:  Yes.

12             MR. DURAN:  Have the Debtors disclosed all their

13  contracts and unexpired leases?

14             MR. MEGHJI:  Mary?

15             MS. KORYCKI:  Yes, they have.

16             MR. DURAN:  All right.  And have the Debtors

17  disclosed all co-obligors or guarantors, if any, on any of

18  the Debtors' debts as of the day of bankruptcy?

19             MS. KORYCKI:  Our understanding is that there were

20  none.  So the answer to that is yes, as there were none.

21             MR. DURAN:  Got it.  All right.

22             Have the Debtors disclosed all their payments to

23  Creditors within 90 days of bankruptcy unless the aggregate

24  amount of the payment was less than $7,575?

25             MS. KORYCKI:  Yes.

1          MR. DURAN:  And have Debtors disclosed all their

2   payments or transfers made within one year of bankruptcy to

3   any insiders?

4          MS. KORYCKI:  Yes.

5          MR. MEGHJI:  I'm sorry.  Can you repeat that

6   question?  Sorry.

7          MR. DURAN:  Have the Debtors disclosed all their

8   payments or transfers made within one year of bankruptcy to

9   any insiders?

10          MR. MEGHJI:  Yes.

11          MR. DURAN:  Have the Debtors conducted any

12   investigation into the existence of any avoidance actions?

13          MR. MEGHJI:  We are in the process of conducting

14   an investigation.

15          MR. DURAN:  And what is your timeline for

16   completing that investigation?

17          MR. MEGHJI:  We don't have -- we haven't sort of

18   nailed that down exactly, but it will be, I would say,

19   sometime in the next 60 to 90 days.

20          MR. DURAN:  Okay.  All right.  Do you believe that

21   the Debtors have all the insurance that would be customary

22   in the industry in which they operate?

23          MR. MEGHJI:  Yes, we do.

24          MR. DURAN:  Are there any licenses or permits that

25   are required to operate the business of the Debtors?

1          MR. MEGHJI:  There are and we have them.

2          MR. DURAN:  They're all current and in good

3    standing?

4          MR. MEGHJI:  Yes, to the best of our knowledge,

5    they are.

6          MR. DURAN:  Are the Debtors current in the filing

7    of their federal income tax returns?

8          MR. MEGHJI:  I believe so.

9          MR. DURAN:  All right.  I don't have any

10   additional questions at this point in time.

11         Is there anyone in attendance who would like to

12   ask questions of Mr. Meghji or Ms. Korycki?

13         MR. ORBACH:  Good morning.  Just two quick

14   questions.  For the Record, this is Joseph Orbach, Thompson

15   Coburn on behalf of Creditor Charles River Laboratories.

16         MR. DURAN:  Go ahead.

17         MR. ORBACH:  Thank you.  And thank you, Mr. Duran.

18   You asked two of the questions I wanted to ask.  I just had

19   two follow-up questions.

20         In the order of course of business and operating

21   the business post-petition, are the Debtors executing any

22   contracts?

23         MR. MEGHJI:  Executing any contracts in what

24   sense?

25         MR. ORBACH:  Just in the ordinary course of

1  operating the business.

2          MR. MEGHJI:  Yeah, I think in the ordinary course,

3  we are buying and selling -- really buying what we need to

4  buy to keep the business going.  But we're not entering into

5  long-term contracts at this point.

6          MR. ORBACH:  Understood.  And then just one follow

7  up.

8          Do the Debtors intend to honor any contracts that

9  they execute post-petition?

10          MR. MEGHJI:  Of course.

11          MR. ORBACH:  Okay.  Thank you for your time.

12          MR. DURAN:  All right.  Anyone else?

13          MR. MEGHJI:  Thank you.

14          MR. DURAN:  Anyone else?

15          MS. KORYCKI:  Mr. Duran, this is Mary Korycki.  I

16  just wanted to let you know the Celularity, the ownership

17  was 12.71 percent as of 2/1 of 2023.  And that's why it did

18  not make it on the 2015.3 report.

19          MR. DURAN:  Thank you very much for that.

20          All right.  Anyone else have questions for

21  Mr. Meghji or Ms. Korycki?

22          MR. SUTTON:  Yeah.  This is Scott Sutton from

23  Dimension One Graphics, and I was invited into this meeting.

24  And I'm a small business.  I'm only a debt for $882, but for

25  a small business, am I ever going to get paid?  We go back

1  to 2021.  Can anybody answer that or --

2          MR. MEGHJI:  We will be dealing with all of the

3  unsecured debt as part of our Plan, and we are working hard

4  to find a path to get you paid.  I cannot sort of tell you

5  the exact structure of the Plan as we sit here today, but

6  it's our hope and expectation that we will be able to do

7  that over time.

8          MR. SUTTON:  Okay.  Well, that's being honest.

9          So what are you looking at, within a year, two

10 years, or -- because I've been waiting a couple years so,

11 you know, just a general kind of time frame?

12         MR. MEGHJI:  Yeah.  It will, you know, the current

13 structure we're thinking about is it'll be a portion exit

14 and a portion paid over time.  But nothing is decided, and

15 this is also subject to raising the required financing.

16         So I'm just trying to be, you know, transparent or

17 as transparent as I can be.  But we will -- we expect to be

18 filing a Plan within the next 30 days which will lay some of

19 these terms out.

20         MR. SUTTON:  Okay.  Great.  Appreciate.  Thank

21 you.

22         MR. MEGHJI:  Thank you.

23         MR. DURAN:  Anyone else have questions?

24         MR. LEE:  Yes.  Hello?

25         MR. DURAN:  Yes.  If you'll identify yourself and

1  who you represent?

2         MR. LEE:  Yes.  This is Frank Lee from Cytorph

3  Incorporation.  We are a vendor of Sorrento in the past two

4  to three years.  We just have a small debt as well.  It's

5  $6,000 around.  I'm just wanting the (glitch in the audio)

6  -- I just wonder is there any paperwork we need to file to

7  be in the line of the payment queue or we just wait?

8         MS. RECKLER:  This is Caroline Reckler.  I can

9  answer that.

10        You will be receiving a notice of the bar date.

11 That paperwork has not yet been mailed.  It should be mailed

12 in the next week or two.  And then you will be well-advised

13 if you believe you are owed money by Sorrento to return that

14 paperwork in accordance with the procedures and the detail

15 that's going to be very clearly set forth in that paperwork.

16        MR. LEE:  Okay.  So before that, how do you know

17 who I -- where to send the notice?  I mean, do I need to

18 register online somewhere to let you guys know the facts or

19 you guys already know the facts already?

20        MS. RECKLER:  No, it'll be based on the

21 information that the company has for every single creditor,

22 and they will receive -- if the company believes that they

23 owe somebody money, they will send them a proof of claim

24 form.  That form will also be available on the Debtors'

25 claim page website.

1          If you want to look online, you can access that in

2     case you're concerned that you won't receive the form.

3          MR. LEE:  Oh, okay.  Great.  Thank you.

4          MR. DURAN:  Anyone else in attendance who would

5     like to ask questions?

6          NANA:  Hi.  This is Nana from Alfa Chemistry.

7     Just one more question.  I think we already filed some

8     documents.  I don't remember the names of the documents.  So

9     do we have another document coming besides the one we

10    already signed?

11         MS. RECKLER:  It's a little bit hard for me to

12    know.  I don't know what you already filed, so it's hard for

13    me to --

14         NANA:  Oh, okay.

15         MS. RECKLER:  -- say whether that is sufficient or

16    not.

17         NANA:  Oh, okay.  So but I'm going to receive the

18    same documents, right, because we are all on the line?

19         MS. RECKLER:  I would be surprised if you received

20    a notice of the bar date and a form to fill out a proof of

21    claim so --

22         NANA:  Oh.  Okay.

23         MS. RECKLER:  -- I would just encourage all

24    creditors who believe they're owed money by Sorrento, if you

25    disagree with the amounts as set forth in the Schedules to

1 | file a proof of claim.

2 |        NANA:  Okay.  I don't remember we submit a -- the

3 | invoice, everything, proof of the order I think months ago,

4 | but I don't know if any document come like that because that

5 | -- I did not fill it out.  But as I remembered, we submit

6 | some invoice related paperwork.

7 |        MS. RECKLER:  All right.

8 |        MR. DURAN:  Ma'am, --

9 |        NANA:  So we will receive -- yes.  Please.

10 |        MR. DURAN:  I just wanted you to identify yourself

11 | for the Record, okay?  I don't believe I got your name.

12 |        NANA:  Okay.  Okay.  My name is Nana from Alpha

13 | Chemistry, A-L-F-A Chemistry.

14 |        MR. DURAN:  Got it.  Okay.  Thank you.

15 |        NANA:  Uh-huh.  Yeah, bye.  Okay.  Thank you.

16 |        MR. DURAN:  Anyone else have questions?

17 |        MR. KELLY:  Yes.  This is Cameron Kelly from Quinn

18 | Emanuel Urquhart and Sullivan on behalf of Joint Creditors

19 | NantCell and Immunotherapy and Antibody.

20 |        Mr. Meghji or Ms. Korycki, where is Scintilla's

21 | principal place of business?

22 |        MS. RECKLER:  I can answer that question.  This is

23 | Caroline Reckler.  Scintilla --

24 |        MR. KELLY:  Okay, great.

25 |        MS. RECKLER:  -- has a post office box in Houston,

1  and it has a bank account in Houston as well, and its

2  principal place of business is in Houston.

3          MR. KELLY:  What is the address of its principal

4  place of business in Houston?

5          MS. RECKLER:  I don't have that handy.  If you

6  want, I can look it up.

7          MR. KELLY:  Yeah, that would be great if you

8  wouldn't mind.

9          In the meantime, where are the bank accounts in

10  Houston located?

11          MS. RECKLER:  The Scintilla bank account is with

12  Signature Bank account.

13          MR. KELLY:  And you mentioned that's being

14  transferred to Bank of America?

15          MS. RECKLER:  Correct.  It's in the process of,

16  yeah.

17          MR. KELLY:  And once it's transferred, will that

18  bank account be located in Texas?

19          MR. MEGHJI:  That's our understanding, but we can

20  confirm that.

21          MR. KELLY:  Okay.  Where are Scintilla's books and

22  records located?

23      (Pause.)

24          MR. MEGHJI:  Let us confirm and come back to you

25  on that one.

1          MR. KELLY:  Okay.  Where is Scintilla

2    incorporated?

3          MS. RECKLER:  I believe it's incorporated in

4    Delaware.

5          MR. KELLY:  What is located at 7 Switchbud Place,

6    The Woodlands, Texas?

7          MR. MEGHJI:  I will have to check and get back to

8    you on that.

9          MR. KELLY:  Okay.  Are you aware --

10          MR. MEGHJI:  I'm sorry.  What's your name?

11          MR. KELLY:  Oh, yeah, sorry.  This is Cameron

12    Kelly from Quinn Emanuel.

13          MR. MEGHJI:  Perfect.  Okay.

14          MR. KELLY:  Are you aware of whether Scintilla has

15    any assets located at 7 Switchbud Place, The Woodlands,

16    Texas?

17          MR. MEGHJI:  I am not at this moment, but I will

18    check and come back to you.

19          MR. KELLY:  Okay.  And just two other brief follow

20    ups.  You mentioned that currently, Scintilla has a bank

21    account at Signature Bank.  At what branch is that bank

22    account located?

23          MS. KORYCKI:  I have to get you the exact branch.

24    I can come back to you on that.

25          MR. KELLY:  Okay.  And then just following up on

1   my first question, what is the address of Scintilla's

2   principal place of business?  Were you able to come up with

3   that, Caroline?

4           MS. RECKLER:  Yes.  It's on the face of the

5   petition, so I would just direct you to item number 4 on the

6   Scintilla petition.

7           MR. KELLY:  And that's 7 Switchbud Place, Suite

8   192513?

9           MS. RECKLER:  P.O. Box 513, The Woodlands, Texas,

10  77380.  Correct.

11          MR. KELLY:  Does Scintilla have an executory

12  contract that it's party to for that P.O. Box?

13          MS. RECKLER:  Kristhy, do you know the answer to

14  that?  I don't know.

15          MS. PEGUERO:  Hi, it's Kristhy.  No, I would have

16  to look into that and get back to you, Cameron.

17          MR. KELLY:  Okay.  That's all my questions.  Thank

18  you very much.

19          MR. MEGHJI:  Well done, Cameron.  Thank you.

20          MR. DURAN:  Anyone else have any questions?

21          MR. SUNTERBY:  Yes.  Good morning.  My name is

22  William Sunterby (phonetic) on behalf of (inaudible) on

23  behalf of Creditor GPS Light, Incorporated.  I just have one

24  clarifying question as to the petition debt, did you state

25  that you are current on all post-petition debts?

1          MR. MEGHJI:  To the best of my knowledge, we

2   should be current on all post-petition obligations.  I'm not

3   aware that we're behind on anything.

4          MR. SUNTERBY:  That was all I had.  Thank you.

5          MR. DURAN:  Anyone else have questions?

6      (No audible response.)

7          MR. DURAN:  All right then.  My thought was to

8   continue the meeting until June 12th at 11:00 a.m.

9          Does that work for you, Mr. Meghji?

10         MR. MEGHJI:  Let me just check.  One second.

11         June 12th at 11:00 Central?

12         MR. DURAN:  Yes.

13         MR. MEGHJI:  Could we do it at 10:30 Central?

14         MR. DURAN:  Sure, that would work.

15         MR. MEGHJI:  Perfect.

16         MR. DURAN:  All right then.  With that in mind,

17  then this first meeting of Creditors is continued to June

18  12th, 2023, at 10:30 a.m. Central time.  Appreciate your

19  attendance today.  Thank you.

20         MR. MEGHJI:  Thank you.  Appreciate it.

21      (Meeting adjourned.)

22

23

24

25                          *  *  *  *  *

1              I certify that the foregoing is a correct

2    transcript to the best of my ability from the electronic

3    sound recording of the telephonic proceedings in the above-

4    entitled matter.

5    /S/ MARY D. HENRY

6    CERTIFIED BY THE AMERICAN ASSOCIATION OF

7    ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

8    JUDICIAL TRANSCRIBERS OF TEXAS, LLC

9    JTT TRANSCRIPT #68197

10   DATE:  FEBRUARY 14, 2024

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**<u>Exhibit C</u>**

**January 24, 2024 Hearing Transcript**

1   I don't know.

2          I do know that people know now, and it sounds like

3   Mr. Culberson is doing some deep digging.  And if you find

4   something, I'll be here.  I'm just a -- I'll be here.  I do

5   know, for the record, all -- there have been no final fee

6   applications approved.  And all of that remains to a final

7   -- everybody's rights -- Mr. Culberson, all of your rights

8   are preserved.

9          If you show up at a final hearing and say, "Judge,

10  don't give them a buck, not a dollar for any of them."

11  That's your right.  You're a party-in-interest and you have

12  the right to be here, to appear and be heard on that matter.

13  I don't see anything right now.

14          I think Declarations being filed on the record

15  have weight, and they'll stand out there.  And so I know

16  that they're taking those matters seriously, and I know that

17  Latham and M-3 know what it is to file Declarations on the

18  docket.  Those are very serious matters.  They're signed

19  under penalty of perjury.  So they're incredibly seriously,

20  and they're not to be given light weight.

21          So I'm going to deny all relief requested with

22  respect to M-3 and Latham, and it's without prejudice.

23  Folks can come back if you find something, but you've got to

24  -- there's got to be something there.  And right now, you

25  know, I think we went through, and there was a lot of