**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| _____ | ) | |
| *In re:* | ) | Chapter 11 |
| | ) | |
| SORRENTO THERAPEUTICS, INC., *et al.*,[1] | ) | Case No. 23-90085 (CML) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| _____ | ) | **Re: Docket No. 1884** |

**ORDER (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED
SUPERPRIORITY POSTPETITION FINANCING AND (B) USE CASH
COLLATERAL, (II) GRANTING LIENS AND PROVIDING CLAIMS WITH
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (III) MODIFYING
THE AUTOMATIC STAY, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of Sorrento Therapeutics, Inc. and Scintilla Pharmaceuticals, Inc. (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105, 361, 362, 363, 364, 503, 506, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1(b), 4002-1 and 9013-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Southern District of Texas and the Procedures for Complex Chapter 11 Bankruptcy Cases (together, the "Local Bankruptcy Rules") promulgated by the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court"), seeking entry of this final order (this "Final Order"), among other things:

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) ("Sorrento") and Scintilla Pharmaceuticals, Inc. (7956) ("Scintilla"). The Debtors' service address is: 9380 Judicial Drive, San Diego, CA 92121.

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion or the DIP Note (as defined below), as applicable.

(a)     authorizing the Debtors to obtain postpetition financing on a superpriority senior secured basis (the "DIP Facility", and the loans made, advanced or deemed advanced thereunder, the "DIP Loans") in the form of a term loan facility in an aggregate principal amount of up to $5,000,000 (plus any and all amounts capitalized thereon) (the "DIP Facility"), comprised of (i) $3,000,000 of DIP Loans (the "First Draw") advanced within two Business Days of the entry of this Final Order, and (ii) $2,000,000 (the "Second Draw") to be made available to the Debtors on March 1, 2024, in accordance with and subject to the terms and conditions (including, without limitation, any conditions precedent to each of the DIP Loans) set forth in that certain *Debtor-in-Possession Term Loan Promissory Note and Security Agreement*, substantially in the form attached to this Final Order as **Exhibit 1** (as may be amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Note", and, together with the Approved Budget (as defined herein) and all other agreements, guarantees, pledge, collateral and security agreements, deeds, charges, control agreements, instruments, certificates, notes, any separate fee letter agreements between any of the Debtors, on the one hand, and the DIP Lender, on the other hand, and other documents executed, filed and/or delivered in connection therewith, (each as amended, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof and thereof), collectively, the "DIP Loan Documents"), by and among the Debtors, as borrowers (the "DIP Borrowers"), each of the Guarantors (as defined in the DIP Note) (collectively, the "DIP Guarantors", and together with the DIP Borrowers, the "DIP Loan Parties"), Vivasor, Inc., a Delaware corporation, as the lender (together with its successors and permitted assigns, the "DIP Lender"), and this Final Order;

(b)     authorizing the DIP Loan Parties to (i) execute, deliver, and perform under the DIP Note and each of the DIP Loan Documents, (ii) incur all loans, advances, extensions of credit, financial accommodations, indemnification and reimbursement obligations and other obligations, and pay all principal, interest, premiums, fees, costs, expenses, charges and all other amounts payable under the DIP Loan Documents, including without limitation, all Obligations (as defined in the DIP Note, and referred to herein as the "DIP Obligations") in accordance with the terms of the DIP Loan Documents, and (iii) perform such other and further acts as may be necessary, required or desirable to implement and effectuate the terms of this Final Order, the DIP Loan Documents and the transactions contemplated hereunder and thereunder;

(c)     authorizing the DIP Borrowers to incur, and the DIP Guarantors to jointly and severally guarantee, all DIP Obligations, in accordance with this Final Order and the DIP Loan Documents;

(d)     granting to the DIP Lender the DIP Liens (as defined below) in all Collateral (as defined in the DIP Note, and referred to herein as the "DIP Collateral"), as set forth in this Final Order, subject only to the Carve Out, any Prior Permitted Liens (as defined below), subject to the relative priorities set forth in this Final Order and the DIP Loan Documents;

(e)      granting to the DIP Lender allowed super-priority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, subject in each case to the Carve Out, as set forth in this Final Order and the DIP Loan Documents;

(f)      authorizing the Debtors to use the proceeds of the DIP Facility and the DIP Collateral, including cash collateral, as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), solely in accordance with the terms and conditions set forth in this Final Order and the DIP Loan Documents, including the Approved Budget (as defined below), subject to any variances expressly permitted herein and under the DIP Note;

(g)      approving the Debtors' waiver of the right to surcharge the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise;

(h)      approving the Debtors' waiver of the equitable doctrine of "marshaling" and other similar doctrines with respect to the DIP Collateral; and

(i)      modifying or vacating the automatic stay imposed by sections 105(a) and 362 of the Bankruptcy Code or otherwise, to the extent necessary, required or desirable to implement and effectuate the terms and provisions of this Final Order and the DIP Loan Documents, as set forth herein, waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Final Order, providing for the immediate effectiveness of this Final Order, and granting related relief.

The Court, having considered the Motion, the DIP Loan Documents, the exhibits attached thereto, the DIP Note, and the evidence submitted and arguments proffered or adduced at the hearing on the Motion on February 26, 2024 (the "Hearing"); and due and proper notice of the Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; and it appearing that no other or further notice need be provided; and upon the record of the Chapter 11 Cases; and all objections, if any, to the relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing established just cause for the relief granted herein; and it appearing to the Court that granting the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates, and otherwise is fair and reasonable and in the best interests of the Debtors, their estates, their creditors,

and all other parties in interest, represents a sound exercise of the Debtors' business judgment, is necessary for the continued operation of the Debtors' businesses and is necessary to preserve and maximize the value of the Debtors and their estates; and the Debtors having provided notice of the Motion as set forth in the Motion; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.      *Petition Date.* On February 13, 2023 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court commencing these Chapter 11 Cases.

B.      *Debtors in Possession.* The Debtors continue to manage and operate their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.      *Committee Formation.* On February 28, 2023, the Office of the United States Trustee (the "U.S. Trustee") appointed an official committee of unsecured creditors (the "Unsecured Creditors' Committee"), which was reconstituted on March 28, 2023 [Docket No. 313], June 7, 2023 [Docket No. 813], and July 28, 2023 [Docket No. 1123].  On April 10, 2023, the U.S. Trustee appointed an official committee of equity security holders [Docket No. 391] (together with the Unsecured Creditors' Committee, the "Official Committees"), which was reconstituted on April 14, 2023 [Docket No. 448].

---

[3]      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

D.     *Jurisdiction and Venue*. This Court has jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. This Court's consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for these Chapter 11 Cases and the proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. The predicates for the relief set forth herein are sections 105, 361, 362, 363, 364, 503, 506, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, and 9014, and Local Bankruptcy Rule 4001-2.

E.     *Findings Regarding Corporate Authority.* Each of the DIP Loan Parties has all requisite power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

F.     *Findings Regarding DIP Facility and Use of Cash Collateral.*

(a)     *Good Cause*. Good and sufficient cause has been shown for the entry of this Final Order and for the Debtors to obtain postpetition financing pursuant to the terms hereof and the DIP Loan Documents.

(b)     *Need for Postpetition Financing and Use of Cash Collateral*. The Debtors have an immediate and critical need to obtain the DIP Facility and use Cash Collateral in order to, among other things, (i) permit the orderly continuation and operation of their businesses, (ii) maintain business relationships with customers, vendors and suppliers, (iii) make payroll, (iv) make capital expenditures, (v) pay the expenses of the Chapter 11 Cases, including the costs needed to (x) document and pursue the closing of the proposed sale set forth in the *Sorrento Assets Acquisition Summary of Key Terms*, attached hereto as Exhibit 3 (the "Sale Term Sheet," and such sale, the "Sale") and (y) in connection therewith, formulate and pursue an amended chapter 11 plan, (vi) satisfy working capital and operational needs of the Debtors, and (v) for general

corporate purposes, in each case, in accordance with and subject to the terms and conditions of this Final Order and the DIP Loan Documents, including the Approved Budget. The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of loans and other financial accommodations under the DIP Facility in order to pursue the Sale and to preserve, maintain and maximize the Debtors' going concern value. Without access to the DIP Facility and the authorized use of Cash Collateral upon the terms set forth herein, the Debtors and their estates will be immediately and irreparably harmed.

(c)     *No Credit Available on More Favorable Terms.* The Debtors are unable to obtain financing or other financial accommodations on more favorable terms from sources other than the DIP Lender. The Debtors are unable to obtain adequate unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors are also unable to obtain adequate secured credit allowable under section 364(c)(1) of the Bankruptcy Code without granting to the DIP Lender the rights, benefits, remedies and protections set forth herein and the DIP Loan Documents, including the DIP Liens in all DIP Collateral and the DIP Superpriority Claims upon the terms set forth herein.

(d)     *Use of Proceeds of DIP Facility and Cash Collateral.* As a condition to providing the DIP Facility (including Cash Collateral), the DIP Lender requires, and the Debtors have agreed, that all proceeds of the DIP Loans and all Cash Collateral shall be used and/or applied solely for the purposes expressly permitted in, and in a manner consistent with, the Approved Budget including (i) to pay the costs of administration of the Chapter 11 Cases, (ii) for general corporate and working capital purposes, (iii) to pay the DIP Obligations, and (iv) to pay estate professional fees and expenses in accordance with this Final Order, in each case, subject to the terms and conditions of this Final Order and the DIP Loan Documents.

(e)     *Approved Budget and Variance*. The Debtors prepared and delivered to the DIP Lender the initial itemized cash flow forecast set forth on **Exhibit 2** attached hereto, which was approved by the DIP Lender (the "Initial Budget", as amended, supplemented or updated by the Debtors, subject to the prior written approval of the DIP Lender, and subject to Permitted Variances, the "Approved Budget").  The Initial Budget is an integral part of this Final Order, and the DIP Lender is relying, in part, upon the Debtors' agreement to comply with the Approved Budget in determining to enter into the DIP Facility and to allow the Debtors' use of proceeds of the DIP Facility and Cash Collateral in accordance with the terms of this Final Order and the DIP Loan Documents.

(f)     *Section 506(c) and Marshaling Waivers*. As a material inducement to the DIP Lender providing the DIP Facility, and in consideration of (i) the DIP Lender's agreement to subordinate its DIP Liens to the Carve Out, and (ii) the DIP Lender's agreement to pay the expenses of the administration of these Chapter 11 Cases, subject to the Approved Budget, and in accordance with the terms of this Final Order and the DIP Loan Documents, (i) the DIP Loan Parties waive their right to surcharge any costs or expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Lender or the DIP Collateral, whether pursuant to section 506(c) of the Bankruptcy Code or otherwise and (ii) the DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

(g)     *Good Faith*. The terms of the DIP Facility and the DIP Loan Documents, and the terms upon which the Debtors may use Cash Collateral pursuant to the terms of this Final Order and the DIP Loan Documents, were negotiated in good faith and at arm's length among the DIP Loan Parties and the DIP Lender, and their respective representatives, and all of the DIP Loan

Parties' obligations and indebtedness arising under, in respect of, or in connection with, the DIP

Facility, the DIP Loan Documents and this Final Order, including, without limitation, all loans,

advances, extensions of credit and other financial accommodations made to and guarantees issued

by the DIP Loan Parties pursuant to the DIP Loan Documents, shall each be deemed to have been

extended by the DIP Lender in good faith, as that term is used in section 364(e) of the Bankruptcy

Code, and in express reliance upon the protections offered by sections 364(e) of the Bankruptcy

Code, and each of the claims, liens and security interests, rights, remedies, benefits and protections

granted to the DIP Lender (and its successors and assigns) pursuant to this Final Order and the DIP

Loan Documents (including, without limitation, the DIP Liens, the DIP Superpriority Claims, and

the DIP Obligations) shall be entitled to the full protection of section 364(e) of the Bankruptcy

Code in the event that this Final Order or any provision hereof is vacated, reversed, or modified,

on appeal or otherwise.

(h)     *Fairness; Business Judgment.* Based on the Motion, the record presented to

the Court at the Hearing and in the Chapter 11 Cases, the terms of the DIP Facility and the DIP

Loan Documents, and the terms upon which the Debtors may use Cash Collateral pursuant to the

terms of this Final Order and the DIP Loan Documents (i) were negotiated in good faith and at

arm's length among the DIP Loan Parties and the DIP Lender, (ii) are fair, reasonable, and the best

available to the Debtors under the circumstances and satisfy the "entire fairness" standard to the

extent applicable, (iii) reflect the Debtors' exercise of prudent business judgment consistent with

their fiduciary duties, and (iv) are supported by reasonably equivalent value and fair consideration.

(i)     *Notice.* Proper, timely, sufficient and appropriate notice of the Motion and

the Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules

and the Local Bankruptcy Rules, and no other or further notice of the Motion, the Hearing or the entry of this Final Order shall be required.

(j)     *Immediate Entry; Relief Essential.* The Debtors have requested, and the Court hereby finds that sufficient cause exists for, the immediate entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the Local Bankruptcy Rules. Unless the relief set forth in this Final Order is granted, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the DIP Facility upon the terms set forth in this Final Order and the DIP Loan Documents is necessary to preserve and maximize the value of the Debtors, is in the best interests of the Debtors and their estates, and is consistent with the Debtors' exercise of their fiduciary duties.

**NOW THEREFORE**, based upon the foregoing findings and conclusions, the Motion, the evidence adduced at the Hearing, and the record before the Court, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     *Motion Granted.* The DIP Facility and the use of Cash Collateral is hereby authorized and approved, in each case, on a final basis and upon the terms and conditions set forth in this Final Order and the DIP Loan Documents. Any objections to any of the relief set forth in this Final Order that have not been withdrawn, waived, or settled, and all reservations of rights or other statements inconsistent with this Final Order, are hereby denied and overruled. This Final Order shall become effective and enforceable immediately upon its entry.

2.     *Authorization of DIP Facility and DIP Loan Documents.*

(a)     *Authorization of DIP Loan Documents.* The DIP Loan Parties are hereby authorized on a final basis to (i) execute, deliver, enter into and perform all of their obligations,

and to pay all fees, costs, expenses, indemnities and other amounts contemplated, under the DIP Loan Documents and this Final Order, and (ii) perform all acts, to make, execute, deliver, enter into and perform under any and all other agreements, instruments, certificates, notes, and other documents (including, without limitation, the execution and/or recordation of any collateral, pledge and security documents, deeds of trust, control agreements,  financing statements, or other documents), and to perform all such other and further acts, that may be necessary, required or desirable for the DIP Loan Parties to perform their obligations under the DIP Facility, the DIP Loan Documents and this Final Order and to implement the transactions contemplated thereunder and hereunder. All provisions of the DIP Loan Documents are incorporated herein and approved, whether explicitly referenced or not.

(b)  *Authorization to Borrow.* The DIP Borrowers are hereby authorized on a final basis to borrow under the DIP Facility, and the DIP Borrowers and DIP Guarantors are hereby authorized on a final basis to jointly and severally guarantee the payment in full in cash of such borrowing with respect to the principal amount of up to $5,000,000 plus applicable interest, fees (including professional fees and expenses), costs, expenses,  and other amounts to the extent payable under this Final Order and the DIP Loan Documents in connection with such borrowing, subject to the terms and conditions (including any conditions precedent to such borrowing) set forth in the DIP Loan Documents and this Final Order. The Debtors are hereby authorized to use the proceeds of the DIP Facility and all Cash Collateral solely in the manner and for the purposes expressly permitted in the Approved Budget, the DIP Loan Documents and this Final Order.

(c)  *DIP Fees and Expenses; Indemnification.* Subject in all respects to the terms of the DIP Loan Documents, the DIP Loan Parties are authorized and directed, on a final basis, to pay any and all (i) fees, premiums or other payments payable under the DIP Loan Documents,

(ii) amounts due (or that may become due) to the DIP Lender in respect of the indemnification obligations under this Final Order and the DIP Loan Documents, and (iii) any other amounts payable in connection with the DIP Facility, the enforcement of the terms of the DIP Loan Documents or any credit bid of the DIP Obligations, whether or not the transactions contemplated herein or in the DIP Loan Documents are consummated; provided, however, to the extent that the (i) the Sale is consummated, the DIP Lender agrees that the DIP Loan Parties shall not be required to reimburse the DIP Lender for any costs, expenses and disbursements incurred or made by the DIP Lender in connection with the DIP Facility, or (ii) the Strict Foreclosure Transaction is consummated, the DIP Lender agrees that the DIP Loan Parties are authorized and directed, on a final basis, to pay to the DIP Lender all costs, expenses and disbursements incurred or made by the DIP Lender in connection with the enforcement of the DIP Lender's rights under the DIP Note, including any fees, costs and expense incurred in connection with the consummation of the Strict Foreclosure Transaction and including, without limitation, the reasonable and documented fees and expenses of (A) Paul Hastings LLP (solely in its capacity as counsel to the DIP Lender in its capacity as such) and (B) any other professionals that may be retained by the DIP Lender (solely in its capacity as such, collectively, the "DIP Professional Fees and Expenses"); *provided* that, to the extent the Strict Foreclosure Transaction is consummated, at the option of the DIP Lender, the aggregate amount of such costs, expenses and disbursements may either be (x) included in the Satisfied Obligations (as defined in the Strict Foreclosure Agreement) or (y) deducted from the original issuance amount of the Seller Note (as defined in the Strict Foreclosure Agreement) on a dollar-for-dollar basis.

(d)      *Indemnification*. Subject in all respects to the terms of the DIP Loan Documents, the DIP Lender (and its affiliates) and respective officers, directors, employees,

advisors and agents) (each such person, including the DIP Lender, an "Indemnitee") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof; *provided, however*, that such indemnity shall not be available to the extent (i) arising from a material breach of any obligation of such Indemnitee under the DIP Loan Documents or (ii) that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnitee's (or any Affiliate of such Indemnitee's) fraud, gross negligence, bad faith, or willful misconduct as finally determined by a court of competent jurisdiction.

(e)     *Modification of DIP Loan Documents.* The DIP Loan Parties are hereby authorized to execute, deliver and perform under one or more amendments, waivers, consents, or other modifications to and under the DIP Loan Documents, in each case, in accordance with the provisions of the DIP Note governing amendments thereto, each without further application to or order of the Court; *provided, however,* that any amendment to the DIP Note shall require, at a minimum, the prior written consent of the DIP Lender; *provided, further, however*, that any amendment that (a) shortens the maturity of the extensions of credit thereunder, (b) increases the aggregate commitments thereunder, or (c) increases the rate of interest payable with respect thereto (each, a "Material DIP Amendment"), shall be provided (which may be by electronic mail) to the U.S. Trustee and lead restructuring counsel to the Official Committees and filed with the Court no later than three (3) Business Days prior to the anticipated date of effectiveness of any such Material DIP Amendment, and if no objection to the Material DIP Amendment is made by the U.S. Trustee or the Official Committees within such three (3) Business Day period, then, without further application to or order of the Court, such Material DIP Amendment shall automatically be deemed

approved and effective; *provided further, however,* if an objection is made by the U.S. Trustee or the Official Committees within such three (3) Business Day period, then such Material DIP Amendment shall be subject to a hearing and approval of the Court.

(f)     *Perfection in Cash*. Subject only to the Carve Out and Prior Permitted Liens on the cash in the restricted lease collateral account ending in 9812 at Bank of America, N.A. (the "BOA Collateral Account"), and subject to the Remedies procedures outlined in paragraph 18 of this Final Order, all financial institutions with which the DIP Loan Parties maintain accounts containing any of the DIP Loan Parties' cash or Cash Collateral are authorized and directed to comply with any request of the DIP Lender to turn over to the DIP Lender all cash or Cash Collateral therein without offset or deduction of any kind.  Subject to the terms of the DIP Lender Documents, the DIP Lender shall be entitled to all of the rights and benefits of all deposit account control agreements, blocked account control agreements, securities account control agreements, and similar agreements to which any of the DIP Loan Parties may be a party, without the need to enter into any such agreements, *provided*, that any rights and benefits in favor of the DIP Lender on the BOA Collateral Account shall be subject to any Prior Permitted Liens.  Notwithstanding (and without limiting) the foregoing, the DIP Loan Parties are authorized to enter into, and cause the financial institutions servicing or maintaining the DIP Loan Parties' deposit accounts (or other accounts) to enter into, such deposit account control agreements and other collateral agreements with the DIP Lender and such financial institutions as the DIP Lender may reasonably request.

3.     *DIP Obligations.*

(a)     Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute valid, binding, enforceable, and non-avoidable obligations of each of the DIP Loan Parties, and shall be fully enforceable against each of the DIP Loan Parties, their

estates, and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases or in any case under Chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or relating to any of the foregoing, and/or upon the dismissal of any of the Chapter 11 Cases or any such successor cases (collectively, the "Successor Cases"), in each case, in accordance with the terms of the DIP Loan Documents and this Final Order.

(b)        Upon execution and delivery of the DIP Loan Documents, the DIP Loan Parties shall be jointly and severally liable for all DIP Obligations, including, without limitation, all loans, advances, indebtedness, obligations, extensions of credit, financial accommodations, principal, interest, payments, premiums or similar amounts, charges, indemnification and reimbursement obligations (whether contingent or absolute), and all other amounts, whenever the same shall become due and payable, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise, to the DIP Lender under the DIP Loan Documents or this Final Order.  Subject in all respects to the terms of the DIP Loan Documents, the DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease, on the DIP Termination Declaration Date (as defined below) (subject to the Remedies procedures outlined in paragraph 18 hereof).

(c)        All obligations incurred, payments made, and transfers or grants of liens and security interests set forth in this Final Order and the DIP Loan Documents by the DIP Loan Parties are granted to or for the benefit of the DIP Loan Parties for fair consideration and reasonably equivalent value and are granted contemporaneously with the making of the loans and commitments and other financial accommodations secured thereby. No obligation, payment, transfer, or grant of liens or security interests under this Final Order or the DIP Loan Documents

-14-

to the DIP Lender shall be limited, stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any challenge, objection, defense or claim, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge, recovery or other cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise (subject, solely in the case of the DIP Professional Fees and Expenses, only to the Remedies procedures set forth in paragraph 18 of this Final Order).

(d)     Notwithstanding anything to the contrary herein, the DIP Obligations and the DIP Superpriority Claims shall not be paid with Excluded Assets (as defined below) (including proceeds thereof) (other than any such claims against the DIP Lender or any of its subsidiaries, which may (and the proceeds thereof may) be used to repay the DIP Lender, including through the exercise of rights of setoff by the DIP Lender).

4.     *No Obligation to Extend Credit/Loan Cap.* The DIP Lender shall have no obligation to make any loan or advance available under the DIP Loan Documents unless all of the conditions precedent to the making of such loan or advance by the DIP Lender have been satisfied in full (or waived) in accordance with the terms of the DIP Loan Documents and this Final Order. Notwithstanding anything contained in this Final Order or the DIP Loan Documents to the contrary, in no event shall the aggregate principal amount of the DIP Loans advanced under the DIP Facility pursuant to the DIP Note at any time (after giving effect to all DIP Loans previously

made or requested) exceed the Commitments (as defined in the DIP Note), which, in no event, shall exceed $5,000,000 in principal amount (plus any amounts capitalized thereon).

5.      *No Duty to Monitor Compliance*. The DIP Lender shall not have any obligation or responsibility to monitor the Debtors' use of DIP Collateral or Cash Collateral, and the DIP Lender may rely upon the Debtors' representations that the use of DIP Collateral and Cash Collateral complies with and is in accordance with the requirements of this Final Order and the DIP Loan Documents.

6.      *DIP Liens.*

(a)      As security for the prompt and complete payment and performance of all DIP Obligations when due (whether upon stated maturity, prepayment, acceleration, declaration or otherwise), effective and perfected as of the entry of this Final Order, and without the necessity of the execution, recordation or filing by any of the DIP Loan Parties or the DIP Lender of any pledge, collateral or security documents, mortgages, deeds of trust, financing statements, notations of certificates of title, or any similar document or instrument, or the taking of any other action (including, without limitation, entering into any control agreements or taking any other action to take possession or control of any DIP Collateral), the DIP Lender is hereby granted valid, binding, enforceable, non-avoidable, and automatically and properly perfected liens and security interests (collectively, the "DIP Liens") in all DIP Collateral, in each case, subject and subordinate to the Carve Out and the Prior Permitted Liens, and subject to the relative priorities set forth in this Final Order and the DIP Loan Documents.

(b)      The term "DIP Collateral" means, subject to the Carve Out and except as otherwise provided in this Final Order, each DIP Loan Party's right, title and interest in, to and under all the DIP Loan Parties' assets, including, but not limited to the following, in each case,

-16-

whether now owned or existing or hereafter acquired, created or arising and wherever located: all assets and property of such DIP Loan Party and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, contract rights, licenses, general intangibles, instruments, equipment, accounts, documents, goods, inventory, fixtures, documents, cash, cash equivalents, chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, arbitration awards, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations and instruments, fixtures, except as set forth in paragraph 6(d) of this Final Order, all interests in leaseholds and real properties, all patents, copyrights, trademarks, all trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), including, without limitation, all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (as such terms are defined in the Uniform Commercial Code as in effect from time to time in the State of New York) and proceeds of any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code; provided that the DIP Collateral shall not include Excluded Claims (as defined below). "Excluded Assets" means all and/or any:

>   (i)    cash or cash equivalents (including any deposits or prepayments) held by the Debtors,

>   (ii)    accounts receivable held by the Debtors,

>   (iii)    monies payable to the Debtors under Article 6 of that certain Exclusive License and Development Agreement between Sorrento and China Oncology Focus Limited (Lee's Pharma), deducting all legal expenses/fees associated with the enforcement of the milestone payment under Article 6,

>   (iv)    publicly traded securities held by the Debtors (including, for the avoidance of doubt, any securities that are issued by Scilex Holding Company ("Scilex") (including, without limitation, any shares of common stock of Scilex which Sorrento currently holds in abeyance for certain warrant holders of Sorrento,

regardless of whether or not such shares of common stock subsequently become an unencumbered asset of Sorrento)),

(v)   insurance policies,

(vi) of the following causes of action (or proceeds thereof) arising under or relating to:

1)      under chapter 5 of the Bankruptcy Code, including under section 502(d),

2)      the distribution by Sorrento Therapeutics, Inc. of its common stock in Scilex to Sorrento Therapeutics, Inc.'s shareholders on or about January 19, 2023, including any pending or resolved claims related thereto,

3)      the current or former directors or officers of the Debtors or Scilex (other than in connection with the DIP Facility),

4)      any transfer by the Debtors to any of their subsidiaries or affiliates occurring prior to the Petition Date,

5)      any insider or affiliate transaction, including investments by the Debtors in other companies, and

6)      any proceeds of, or insurance policies covering or related to, the foregoing (collectively, the "Excluded Claims").

(c)      The DIP Liens shall be subject to the following priorities (subject in each case to the Carve Out):

(i) *Senior First Priority Liens on DIP Collateral.*  Pursuant to section 364(d) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority, senior priming liens and security interests in all DIP Collateral, which DIP Liens shall be subject only to (1) the Carve Out, and (2) the Prior Permitted Liens in the BOA Collateral Account.

(ii) *First Priority Liens on Unencumbered Property*.  Pursuant to section 364(c)(2) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected first priority liens and security interests in all DIP Collateral that is not subject to any liens and security interests that were valid, non-avoidable and properly perfected as of the Petition Date (or that were properly perfected subsequent to the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) (such liens, "Prior Permitted Liens"; such DIP Collateral not subject to the Prior Permitted

Liens, the "Unencumbered Assets"), which DIP Liens shall be junior and subordinated only to the Carve Out.

(iii) *Liens Junior to Certain Other Liens*. Pursuant to section 364(c)(3) of the Bankruptcy Code, the DIP Liens shall be valid, binding, continuing, enforceable, non-avoidable, fully and automatically perfected junior liens and security interests in all DIP Collateral (other than the DIP Collateral described in paragraph 6(c)(i) and 6(c)(ii) hereof), which DIP Liens shall be subject only to the (1) Carve Out and (2) the Prior Permitted Liens.

(d)     For the avoidance of doubt, none of the liens granted pursuant to this Final Order shall attach to or encumber, and DIP Collateral shall not include, the Debtors' non-residential real property leases (or leasehold interests created thereby) that restrict or prohibit the grant of such liens or any security deposits held pursuant to such leases, but such liens shall attach solely to the proceeds of such leases, as applicable.

(e)     Notwithstanding paragraph 6(d) above, to the maximum extent permitted by the Bankruptcy Code, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document or other agreement that requires the consent or approval of one or more landlords, licensors or other parties, or requires the payment of any fees or obligations to any governmental entity, non-governmental entity or any other person or entity, in order for any Debtor to sell, assign, or otherwise transfer any interest therein (including any fee or leasehold interest), any proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the granting of the DIP Liens in any such interest therein or other DIP Collateral, or in the proceeds of any assignment and/or sale thereof by any Debtor in favor of the DIP Lender in accordance with the DIP Loan Documents and this Final Order.

(f)     Other than as set forth herein or in the DIP Loan Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases, and shall be valid and enforceable against any trustee appointed

-19-

in the Chapter 11 Cases or any Successor Case, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Case. The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any Debtor's estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

7.      *DIP Superpriority Claims.* Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed superpriority administrative expense claims against each of the Debtors, with priority over any and all other claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any and all other administrative expense claims of the kind specified in or ordered pursuant to sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, or any other provision of the Bankruptcy Code whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (the "DIP Superpriority Claims"), subject only to the Carve Out  and the Prior Permitted Lien on the collateral in the BOA Collateral Account.  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code.  The DIP Superpriority Claims shall be payable by each of the Debtors, on a joint and several basis, and shall have recourse to all DIP Collateral, subject only to the Carve-Out, and the Prior Permitted Liens on the collateral in the BOA Collateral Account.  The DIP Superpriority Claims shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

8.      *Use of DIP Collateral and Cash Collateral.*

(a)     The Debtors are hereby authorized to use the proceeds of the DIP Loans and all Cash Collateral solely to the extent expressly permitted under the Approved Budget and subject to the terms and conditions set forth in the DIP Loan Documents and this Final Order.

(b)     Without the prior written consent of the DIP Lender at its sole discretion, the DIP Loan Parties shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) except as may be expressly permitted by the DIP Loan Documents and this Final Order.  Except with respect to the Prior Permitted Lien on the collateral in the BOA Collateral Account, all collection and proceeds of DIP Collateral, whether from ordinary course collections, asset sales, debt or equity issuances, insurance recoveries, condemnation, or otherwise, will be deposited and applied as required by this Final Order and the DIP Loan Documents.  The Debtors shall not transfer any cash, assets, properties or other DIP Collateral to any non-Debtor affiliate of the Debtors without the prior written consent of the DIP Lender, in its discretion, except to the extent provided for in the Approved Budget or further order of the Court.

(c)     Except as may be provided in the DIP Loan Documents, the Debtors are authorized and directed, upon the closing of a sale of any of the DIP Collateral, to immediately pay all proceeds of any such sale to the DIP Lender to satisfy the DIP Obligations in accordance with this Final Order and the DIP Loan Documents until Paid in Full,[4] and any order approving the sale of such DIP Collateral shall provide that the sale is conditioned upon the payment of such DIP Obligations (except to the extent otherwise agreed in writing by the DIP Lender).

---

[4]     For purposes hereof, the terms "Pay in Full", "Paid in Full" or "Payment in Full" means either (a) the indefeasible repayment in full in cash of all Obligations and the termination of all Commitments or (b) at the election of the DIP Lender following the occurrence of an Event of Default, consummation of the Strict Foreclosure Transaction (each as defined in the DIP Note).

9.      [Reserved.]

10.     *Fees and Expenses; Payments.*

(a)      The payment of all DIP Professional Fees and Expenses hereunder shall not be subject to further application to or approval of the Court, and shall not be subject to allowance or review by the Court or subject to the U.S. Trustee's fee guidelines, and no attorney or advisor to the DIP Lender shall be required to file an application seeking compensation for services or reimbursement of expenses with the Court; *provided, however*, that any time professionals for the DIP Lender seek payment of fees and expenses from the Debtors from and after entry of this Final Order,  each such professional shall provide summary copies of its invoices (which shall not be required to contain time entries and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of their invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine) to lead restructuring counsel to the Debtors, the U.S. Trustee, and lead restructuring counsel to the Official Committees (collectively, the "Review Parties"); *provided, however*, that the U.S. Trustee and the Official Committees reserve their rights to reasonably request additional detail regarding the services rendered and expenses incurred by such professionals. Any objections raised by any Review Party with respect to such invoices must be in writing and state with particularity the grounds therefor and must be submitted to the affected professional within five (5) calendar days after delivery of such invoices to the Review Parties (such five (5) day calendar period, the "Review Period"). If no written objection is received prior to the expiration of the Review Period from the Review Parties, the Debtors shall pay such invoices within three (3) Business Days following the expiration of the Review Period (or, if applicable

following a DIP Termination Event, the DIP Lender shall subtract such amount from the cash payment due under the Strict Foreclosure Agreement, as defined in the DIP Note).  If an objection is received within the Review Period from the Review Parties, the Debtors shall promptly pay the undisputed amount of the invoice within three (3) Business Days, and the disputed portion of such invoice shall not be paid until such dispute is resolved by agreement between the affected professional and the objecting party or by order of this Court. Any hearing to consider such an objection to the payment of any fees, costs or expenses set forth in a professional fee invoice hereunder shall be limited to the reasonableness of the fees, costs and expenses that are the subject of such objection. To the extent the Strict Foreclosure Transaction is consummated prior to the conclusion of the Review Period, the Buyer[5] shall deposit cash in an amount equal to the professional fee invoice in escrow pending resolution of the invoice, with the escrow released to the DIP Professional or the Bankruptcy Estate upon a determination of the reasonableness of the fees, costs and expenses that are the subject of such objection.  To the extent an objection is received within the Review Period and the Strict Foreclosure Transaction is consummated prior to resolution of such objection, the Buyer shall deposit cash in an amount equal to the disputed portion of such invoice pending resolution of such objection and the DIP Professional shall be paid any undisputed portion.

(b)      Notwithstanding anything contained in this paragraph 10 to the contrary, the DIP Loan Parties are authorized and directed upon a DIP Termination Event to pay the DIP Loan Parties in full in cash all DIP Professional Fees and Expenses arising through the date of such DIP Termination Event or such DIP Professional Fees shall be subtracted from the cash-payment due under the Strict Foreclosure Agreement, without the need for any professional

---

[5]      For purposes hereof, the term "Buyer" means BioVintage, Inc. as the proposed purchaser pursuant to the Sale Term Sheet.

engaged by or on behalf of the DIP Lender to first deliver a copy of its invoice to any of the Review Parties (other than the DIP Loan Parties).  The DIP Professional Fees and Expenses shall be waived solely to the extent the parties have reached terms on an asset purchase agreement in form and substance acceptable to the DIP Lender, the Asset Purchase and Sale has been approved by final order of the Bankruptcy Court and has closed.

(c)      Notwithstanding anything contained in this Final Order to the contrary, any and all payments,  fees, costs, expenses and other amounts paid at any time by any of the DIP Loan Parties to the DIP Lender pursuant to the requirements of this Final Order or the DIP Loan Documents shall be non-refundable and irrevocable, are hereby approved, and shall not be subject to any challenge, objection, defense, claim or cause of action of any kind or nature whatsoever, including, without limitation, avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual, or otherwise), reclassification, disgorgement, disallowance, impairment, marshaling, surcharge or recovery or any other cause of action, whether arising under the Bankruptcy Code, applicable non-bankruptcy law or otherwise, by any person or entity (subject, solely in the case of the DIP Professional Fees and Expenses, to paragraphs 10(a) and (b) of this Final Order).

11.     *Reservation of Rights.* Except as otherwise expressly provided herein or in the DIP Loan Documents, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Lender to seek any other or supplemental relief in respect of the DIP Loan Parties, (b) the rights of the DIP Lender, the Bankruptcy Code, or applicable non-bankruptcy law, including, without limitation, the right to

request modification of the automatic stay of section 362 of the Bankruptcy Code, or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Lender.

12.     *Modification of Automatic Stay.* The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby vacated and modified, without application to or further order of this Court, to permit: (a) the DIP Loan Parties to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Lender may request to assure the perfection and priority of the DIP Liens, (b) the DIP Loan Parties to incur all liabilities and obligations to the DIP Lender as contemplated under this Final Order and the DIP Loan Documents, (c) the DIP Loan Parties to pay all amounts required hereunder and under the DIP Loan Documents, (d) the DIP Lender to retain and apply payments made in accordance with the terms of this Final Order and the DIP Loan Documents, (e)  subject to the Remedies procedures outlined in paragraph 18 of this Final Order, the DIP Lender to exercise, upon the occurrence of any DIP Termination Event (as defined in the DIP Note), all rights and remedies provided for in this Final Order, the DIP Loan Documents, or applicable law, (f) the DIP Loan Parties to perform under this Final Order and the DIP Loan Documents, and to take any and all other actions that may be necessary, required or desirable for the performance by the DIP Loan Parties under this Final Order and the DIP Loan Documents and the implementation of the transactions contemplated hereunder and thereunder, and (g) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Final Order and the DIP Loan Documents.

13.     *Perfection of DIP Liens*.

        (a)     This Final Order shall be sufficient and conclusive evidence of the attachment, validity, perfection, and priority of all liens and security interests granted hereunder and under the DIP Loan Documents, including, without limitation, the DIP Liens, without the

necessity of the execution, recordation or filing of any pledge, collateral or security agreements, mortgages, deeds of trust, lockbox or control agreements, financing statements, notations of certificates of title for titled goods, or any other document or instrument, or the taking of any other action (including, without limitation, entering into any deposit account control agreement or other act to take possession or control of any DIP Collateral), to attach, validate, perfect or prioritize such liens and security interests, or to entitle the DIP Lender to the priorities granted herein (other than, to the extent applicable, any such filings required under applicable non-U.S. law to attach, validate, perfect or prioritize such liens).

(b)       Without in any way limiting the automatically effective perfection of the liens and security interests granted under this Final Order and the DIP Loan Documents, the DIP Lender is hereby authorized, but not required, as it in its sole discretion may determine for any reason, to execute, file and record (and to execute in the name of the DIP Loan Parties, as their true and lawful attorneys, with full power of submission, to the maximum extent permitted under applicable law) financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction, or take possession or control over cash or securities, or to amend or modify security documents, or to subordinate existing liens and any other similar action or action in connection therewith or take any other action in order to validate, perfect, preserve and enforce the liens and security interests granted to them hereunder or under the DIP Loan Documents or to otherwise evidence such liens and security interests in all DIP Collateral (each, a "Perfection Action"); *provided, however,* that, whether or not the DIP Lender determines, in its sole discretion, to take any Perfection Action with respect to any liens or security interests granted hereunder, such liens and security interests shall nonetheless be deemed valid, perfected, allowed, enforceable, non-avoidable as of the entry of this Final Order. Upon the request of the

DIP Lender, the DIP Loan Parties, without any further consent of any party, are authorized and directed to take, execute, deliver and file such instruments (in each case, without representation or warranty of any kind) to enable the DIP Lender to further validate, perfect, preserve and enforce the DIP Liens. All such documents will be deemed to have been recorded and filed as of the Petition Date.

(c)     A certified copy of this Final Order may, as the DIP Lender may determine in its discretion, be filed with or recorded in filing or recording offices in addition to or in lieu of any financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized and directed to accept such certified copy of this Final Order for filing and/or recording, as applicable. The automatic stay of section 362(a) of the Bankruptcy Code shall be modified to the extent necessary to permit the DIP Lender to take all actions, as applicable, referenced in this paragraph 13.

14.     *Maintenance of DIP Collateral.*  Until such time as all DIP Obligations are Paid in Full (or as otherwise agreed in writing by the DIP Lender), the DIP Loan Parties shall continue to maintain all property, operational, and other insurance as required and as specified in the DIP Loan Documents. Upon the entry of this Final Order, the DIP Lender shall automatically be deemed to be named as additional insured and lender loss payee under each insurance policy maintained by the DIP Loan Parties (including all property damage and business interruption insurance policies of the DIP Loan Parties, whether expired, currently in place, or to be put in place in the future), and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies in accordance with the terms of this Final Order and the DIP Loan Documents.

15.     *Payments Held in Trust*. Except as expressly permitted in this Final Order or the DIP Loan Documents, including in respect of the Carve Out, and Prior Permitted Lien on the BOA Collateral Account, in the event that any person or entity receives any payment on account of a security interest in the DIP Collateral or receives any DIP Collateral or any proceeds of DIP Collateral prior to Payment in Full of all DIP Obligations under the DIP Loan Documents, and termination of the DIP Facility in accordance with the DIP Note, such person or entity shall be deemed to have received, and shall hold, any such payment or proceeds of DIP Collateral and shall immediately turn over such proceeds to the DIP Lender, for application in accordance with the DIP Note and this Final Order.

16.     *Cash Management.* Until such time as all DIP Obligations are Paid in Full, the DIP Loan Parties shall maintain the cash management system in accordance with the *Final Order (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Continue to Perform Intercompany Transactions, (C) Maintain Existing Business Forms and Books and Records, and (II) Granting Related Relief* [Docket No. 312]. The DIP Loan Parties shall not open any new deposit or securities account that is not subject to the liens and security interests of the DIP Lender (in which case they shall be subject to the lien priorities and other provisions set forth in this Final Order).

17.     *Reporting.* Without limiting the requirements contained herein or in the DIP Loan Documents, the DIP Loan Parties and their representatives shall (a) provide the DIP Lender (and its advisors) with (i) all reports, documents, and information required to be delivered under the DIP Loan Documents (contemporaneously when the same is required to be delivered thereunder), and (ii)  reasonable access, upon reasonable notice and during regular business hours, to the DIP Loan Parties' books and records, assets and properties, for purposes of monitoring the DIP Loan

Parties' businesses and operations and the value of the DIP Collateral, and (b) cooperate and consult with, and provide reasonable information reasonably requested by the DIP Lender (and its advisors) concerning the DIP Loan Parties' businesses, financial condition, properties, business operations and assets, and the DIP Loan Parties hereby authorize their representatives to cooperate and consult with, and promptly provide to the such parties (in each case, together with their respective advisors) such information.  For any budget, variance report, or other financial reporting that the Debtors deliver to the DIP Lender, the Debtors shall deliver the same to the Official Committees concurrently with the Debtors' delivery to the DIP Lender.

18.     *DIP Termination Event; Exercise of Remedies.*

(a)     *DIP Termination Events.* A "DIP Termination Event" shall exist upon occurrence of any of the events listed in the definition of "Event of Default" in the DIP Note.

(b)     *Exercise of Remedies*. The DIP Loan Parties shall immediately provide notice to counsel to the DIP Lender and the Official Committees, and Bank of America, N.A. of the occurrence of any DIP Termination Event.  Subject to the terms of the DIP Loan Documents, upon the occurrence of a DIP Termination Event, without further application to or order from the Court, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be vacated and modified to the extent necessary to permit the DIP Lender to take any of the following actions, at the same or different time: (i) deliver a written notice (which may be via electronic mail) to lead restructuring counsel for the Debtors, the U.S. Trustee, and lead restructuring counsel for the Official Committees (the "Remedies Notice") declaring the occurrence of a DIP Termination Event (such date, the "DIP Termination Declaration Date"), (ii) declare the termination, reduction or restriction of the commitments under the DIP Facility (to the extent any such commitment remains), (iii) declare all DIP Obligations to be immediately due and payable, without

presentment, demand or protest or other notice of any kind, all of which are expressly waived by the DIP Loan Parties, (iv) declare the termination of the DIP Facility and the DIP Loan Documents as to any further liability or obligation thereunder, but without affecting the DIP Liens, the DIP Superpriority Claims or the DIP Obligations, (v) declare the reduction or restriction on the DIP Facility or the DIP Loan Documents, (vi) declare the termination, restriction or revocation of the ability of the Debtors to use Cash Collateral (subject to the Debtors' rights under the Remedies Notice Period in paragraph 18(c)), and, to the extent the DIP Lender provides a notice of its election to proceed with the Strict Foreclosure Transaction, (vii) consummate the Strict Foreclosure Transaction through the entry and release of signatures to the Strict Foreclosure Agreement (as defined in the DIP Note); *provided* that the DIP Lender has (A) made all payments due under any asset purchase agreement related to the Sale Term Sheet, (B) complied with the terms of this Final Order, and (C) performed under the Sale Term Sheet; *provided, however,* that following the occurrence of a DIP Termination Event, prior to the exercise or enforcement of any rights against DIP Collateral (including the sweeping of all cash or other amounts contained in the any accounts controlled by the DIP Lender or the charging of interest as payment in kind at the default rate set forth in the DIP Note but excluding consummation of the Strict Foreclosure Transaction on the terms set forth below), the DIP Lender shall be required to file a motion with the Court (the "Stay Relief Motion") on five (5) Business Days' notice (subject to the Court's availability) seeking an emergency hearing (the "Stay Relief Hearing"). The Court may fashion any appropriate remedy at a Stay Relief Hearing, which may include, *inter alia,* the exercise of any and all rights or remedies available to the DIP Lender under this Final Order, the DIP Loan Documents or applicable law against the DIP Collateral, *provided* that the rights of the Debtors to contest such relief are expressly preserved. If the DIP Lender provides a notice of its election to

proceed with the Strict Foreclosure Transaction (the "Foreclosure Notice"), such notice shall qualify as a Stay Relief Motion.  Upon the DIP Lender's issuance of the Foreclosure Notice, the Debtors and the Official Committees shall have three (3) Business Days to seek to enjoin (or otherwise object to) consummation of the Strict Foreclosure Transaction (a "Foreclosure Objection") only by proving that an "Event of Default" under the DIP Note has not occurred.  The DIP Loan Parties and the Official Committees shall not object to the shortened notice with respect to such Stay Relief Hearing.  The DIP Lender agrees that an adversary proceeding is not required for any Foreclosure Objection.

(c)     *Remedies Notice Period.* During the period from and after the Termination Declaration Date through the date of the Stay Relief Hearing (the "Remedies Notice Period"), the Debtors shall be permitted to use Cash Collateral solely to fund (i) payroll and other critical operating expenses included in (and subject to) the Approved Budget that are critically necessary to keep the Debtors' businesses operating or that have been consented to by the DIP Lender, (ii) payment on account of Prior Permitted Liens from the BOA Collateral Account, and (iii) the Carve Out Trigger Notice Reserve (as defined below); *provided, however*, that any fees or expenses incurred by the DIP Loan Parties or the Official Committees during the Remedies Notice Period shall permanently reduce the Carve Out Amount (as defined below); *provided, further,* that the Debtors may seek an emergency hearing with the Court during the Remedies Notice Period. For the avoidance of doubt, during the Remedies Notice Period, the DIP Lender shall not be obligated to provide any DIP Loans or advance any credit at any time from and after the occurrence of a DIP Termination Event.

(d)     *Leased Premises.*  Subject to the terms of the DIP Loan Documents, following a DIP Termination Event (subject to the terms of paragraph 18 herein), the DIP Lender

shall be entitled to enter upon any leased premises in accordance with (i) a separate agreement with the landlord by and between the DIP Lender and the applicable landlord, (ii) consent of the landlord, (iii) upon entry of an order of this Court, upon notice to the landlord and a hearing, or (iv) in accordance with the rights of the DIP Lender under applicable non-bankruptcy law.

(e)      *Cooperation.* The DIP Loan Parties shall cooperate with the DIP Lender in its efforts to enforce its liens and security interests in the DIP Collateral (without limiting in any way the Debtors' rights under the Remedies procedures set forth in this paragraph 18).  The DIP Loan Parties shall not take or direct any entity to take any action designed or intended to hinder or restrict in any respect such party from enforcing its rights or remedies in the DIP Collateral, provided that all such actions and efforts shall be consistent with and in accordance with the terms of the DIP Loan Documents.

19.      *No Waiver by Failure to Seek Relief.* The rights and remedies of the DIP Lender specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under this Final Order, the DIP Loan Documents, applicable law, or otherwise. The failure or delay on the part of any of the DIP Lender to seek relief or otherwise exercise its rights and remedies under this Final Order, the DIP Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of its respective rights hereunder, thereunder or otherwise. Except as expressly set forth herein, none of the rights or remedies of the DIP Lender under this Final Order or the DIP Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the DIP Lender. No consents required hereunder by the DIP Lender shall be implied by any inaction or acquiescence by the DIP Lender.

20.     *Carve Out.*  "Carve Out" as used in this Final Order means the Carve Out defined in the Prior Final DIP Orders,[6] which (along with all related provisions) is hereby incorporated by reference (without duplication) and which shall continue in effect for the duration of these Chapter 11 Cases; *provided, however*, that the Debtors are not required to fund the Carve Out Trigger Notice Reserve (as defined in the Prior Final DIP Orders) for purposes of this Final Order.  The DIP Liens and the DIP Superpriority Claims shall be subject and subordinate to payment of the Carve Out and any transaction fee or the like owed to Moelis & Company LLC or M3 Advisory Partners, LP.  The Carve Out shall be senior to all claims and liens over all assets of the Debtors, including any DIP Collateral, as set forth in this Final Order, other than the Prior Permitted Lien in the BOA Collateral Account.

21.     *Limitations on Use of DIP Collateral, Cash Collateral, Carve Out or Other Funds.* Notwithstanding anything contained in this Final Order or any other order of the Court to the contrary, no DIP Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing, or any portion of the Carve Out may be used (including to pay professional fees) by any of the DIP Loan Parties, the Official Committees, any statutory or non-statutory committees appointed or formed in the Chapter 11 Cases or any Successor Cases, or any other party-in-interest (including without limitation any chapter 7 trustee or chapter 11 trustee or examiner appointed or elected for any of the Debtors in the Chapter 11 Cases or any Successor Cases), directly or indirectly, to:

---

[6]    For purposes hereof, the term "Prior Final DIP Orders" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 324], the *Final Order (I) Authorizing the Debtors to (A) Obtain Junior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* [Docket No. 1112], and the *Final Order (I) Authorizing the Debtors to (A) Obtain Replacement Senior Secured Superpriority Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Modifying the Automatic Stay, (IV) Granting Stalking Horse Protections and (V) Granting Related Relief* [Docket No. 1184].

(a)     investigate (including by way of examinations or discovery proceedings, whether formal or informal), prepare, initiate, commence, support or prosecute (or finance the preparation, initiation, commencement, support or prosecution of) any claim, counterclaim, cross-claim, cause of action, suit, arbitration, application, motion, contested matter, objection, defense, adversary proceeding, litigation or other proceeding of any kind or nature (whether for monetary, injunctive, affirmative relief or otherwise) (i) against the DIP Lender or its representatives (each in their capacities as such), (ii) objecting to, challenging, contesting, or raising any defense to, the amount, validity, enforceability, perfection, priority, extent or scope of the claims, liens and security interests granted under this Final Order or the DIP Loan Documents, (iii) asserting avoidance (whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), any so-called "lender liability" claims, or any other any claim or cause of action seeking reduction, setoff, offset, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharging or recovery, in each case, with respect to the DIP Liens, the DIP Obligations, the DIP Loan Documents, or the DIP Collateral, (vi) any claim or cause of action of any kind or nature whatsoever, whether arising under the Bankruptcy Code or applicable non-bankruptcy law, against the DIP Lender or its representatives;

(b)     object to or seek to impair, modify or interfere with any of the rights, remedies, priorities, privileges, protections or benefits granted to the DIP Lender under this Final Order or the DIP Loan Documents; *provided* that, for the avoidance of doubt, this provision shall not apply to an objection filed in the Court to the relief sought at the Hearing;

(c)     object to or seek to prevent, hinder, interfere with or otherwise delay any of the DIP Lender's assertion, enforcement, exercise of remedies or realization upon any DIP Collateral in accordance with this Final Order or the DIP Loan Documents (other than to contest whether a DIP Termination Event has occurred);

(d)     request authorization from the Court to obtain postpetition financing (whether equity or debt) or other financial accommodations pursuant to sections 364(c) or (d) of the Bankruptcy Code or otherwise, unless such financing is sufficient to cause the Payment in Full of all DIP Obligations contemporaneously with the consummation of such financing (or as otherwise agreed in writing by the DIP Lender);

(e)     request authorization from the Court to obtain superpriority claims or liens or security interests (other than liens or security interests expressly permitted under this Final Order) in any portion of the DIP Collateral that are senior to or *pari passu* with the DIP Liens or the DIP Superpriority Claims unless all DIP Obligations have been Paid in Full (or as otherwise agreed in writing by the DIP Lender); or

(f)     use, or request authorization to use, Cash Collateral or sell or otherwise dispose of DIP Collateral (without the prior written consent of the DIP Lender) other than as expressly permitted in this Final Order and in the DIP Loan Documents.

22.     *Limitation on Charging Expenses.* Except to the extent of the Carve Out (subject to the terms herein), no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases (or any future proceedings that may result therefrom) at any time, including, without limitation, any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Lender upon the DIP Collateral shall be charged against or recovered from the DIP Collateral, whether pursuant to section 506(c) of the Bankruptcy Code or other similar legal or equitable doctrine or otherwise, without the prior written consent of the DIP Lender with respect to the DIP Collateral, in its sole discretion, and no such consent shall be implied, directly or indirectly, from anything contained in this Final Order (including, without limitation, consent to the Carve Out or the approval of any budget hereunder) or from any other action, inaction, or acquiescence by the DIP Lender to any charge, lien, assessment or claim against the DIP Lender to the DIP Collateral, whether under section 506(c) of the Bankruptcy Code or otherwise.

23.     *No Marshaling.* In no event shall the DIP Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the DIP Obligations and all proceeds of DIP Collateral shall be received and applied in accordance with this Final Order and the DIP Loan Documents.

24.     *Right to Credit Bid.* Subject to the terms of the DIP Loan Documents, the DIP Lender or its designee (in each case, acting at the instruction of the DIP Lender), shall have the unqualified right to credit bid for all or any portion of DIP Collateral in accordance with the DIP Loan Documents up to the full amount of any DIP Obligations with respect to the sale of any of the DIP Loan Parties' assets, whether in a sale under or pursuant to section 363 of the Bankruptcy Code, a Chapter 11 plan subject to confirmation under section 1129(b)(2)(A) of the Bankruptcy

Code, a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, or otherwise. The DIP Lender shall have the absolute right to assign, transfer, sell, or otherwise dispose of its respective rights to credit bid (subject to this Final Order) to any acquisition vehicle formed in connection with such bid or other designee in accordance with the terms of the DIP Loan Documents.

25.     *Binding Effect; Successors and Assigns*. Immediately upon entry of this Final Order, the DIP Loan Documents and this Final Order, including all findings and conclusions of law herein, shall be binding upon all parties-in-interest in the Chapter 11 Cases and any Successor Cases, including without limitation, the DIP Lender, the Official Committees or any other statutory or non-statutory committee appointed or formed in the Chapter 11 Cases and any Successor Cases, and their respective successors and assigns (including any chapter 11 trustee or chapter 7 trustee or examiner appointed or elected in the Chapter 11 Cases or any Successor Cases, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), and shall inure to the benefit of each of the Debtors and the DIP Lender, and their respective successors and assigns; *provided, however,* that, for the avoidance of doubt, the DIP Lender shall have no obligation to make any loan, permit the use of DIP Collateral (including Cash Collateral) or extend any financing to any chapter 11 trustee or chapter 7 trustee or similar responsible person appointed for the estate of any Debtor in the Chapter 11 Cases or any Successor Cases.

26.     *No Modification of Final Order.*

(a)     The DIP Loan Parties irrevocably waive the right to seek, and shall not seek or consent to, directly or indirectly, without the prior written consent of the DIP Lender (unless

-36-

and until the DIP Obligations have been Paid in Full), (A) any modification, stay, vacatur or amendment to this Final Order, (B) the allowance of any claim against any Debtor in the Chapter 11 Cases or any Successor Cases equal or superior to the DIP Superpriority Claims (other than the Carve Out), (C) the grant of any lien or security interest on any DIP Collateral with priority equal to or superior to the DIP Liens, except as expressly permitted hereunder or under the DIP Loan Documents, or (D) the entry of any order authorizing the use of DIP Collateral (including Cash Collateral) that is inconsistent with this Final Order (except in connection with a request for approval of financing sufficient to cause the Payment in Full of all DIP Obligations contemporaneously with the consummation of such financing).

(b)     Without limiting the provisions of the immediately preceding paragraph, if at any time prior to the Payment in Full of all DIP Obligations, either the DIP Loan Parties, the DIP Loan Parties' estates, any chapter 11 trustee, chapter 7 trustee or examiner with enlarged powers, or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy Code in violation of this Final Order or the DIP Loan Documents, then, unless otherwise agreed in writing by the DIP Lender, all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender.

27.     *Preservation of Rights Granted Under Final Order.*

(a)     *Senior to Other Liens.* Other than the Carve Out and Prior Permitted Liens, no claim (including any intercompany claim) or lien having a priority superior to or *pari passu* with those granted by the Final Order to the DIP Lender shall be permitted while any of the DIP Obligations remain outstanding, and, except as otherwise expressly provided in this Final Order, (i) the DIP Superpriority Claims shall not be subject or junior to any intercompany or affiliate

claims of the Debtors; and (ii) the DIP Liens shall not be: (A) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code; (B) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise; (C) unless the DIP Obligations have been Paid in Full, subordinated to or made *pari passu* with any liens arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal, or other governmental unit (including any regulatory body), commission, board or court for any liability of the Debtors; or (D) subject or junior to any intercompany or affiliate liens or security interests of the Debtors.

(b)     *Payment in Full.* Until Payment in Full of all DIP Obligations, none of the DIP Loan Parties shall propose or support any chapter 11 plan or sale of all or substantially all of the DIP Loan Parties' equity or assets, or any order confirming such plan or approving such sale, that is not conditioned upon the Payment in Full (unless otherwise agreed in writing by the DIP Lender) of all DIP Obligations on or prior to the earlier to occur of the effective date of such chapter 11 plan or sale with any proposed buyer having escrowed amounts in excess of the DIP Obligations on or before the date of any motion seeking approval of such alternative sale.

(c)     *Dismissal/Conversion.* Notwithstanding any order that may be entered dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or converting any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code: (A) all of the claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Lender hereunder and under the DIP Loan Documents (including, without limitation, the DIP Superpriority Claims and the DIP Liens), shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall

-38-

have been Paid in Full, and all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections shall, notwithstanding such dismissal or conversion, remain unaffected and shall remain binding on all parties in interest (and any such order shall, in accordance with sections 105 and 349 of the Bankruptcy Code, so provide), and (B) this Court shall retain jurisdiction, notwithstanding such dismissal or conversion, for the purposes of enforcing all such claims, liens and security interests, rights, priorities, privileges, remedies, benefits and protections granted to the DIP Lender hereunder and under the DIP Loan Documents.

(d)     *Reversal/Modification.* Based on the findings set forth in this Final Order and the record presented during the Hearing and the Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, in the event that any or all of the provisions of this Final Order or the DIP Loan Documents are hereafter reversed, modified, vacated or stayed by a subsequent judgment or order of this Court or any other court, any such reversal, stay, modification or vacatur shall not affect (i) the validity or enforceability of advances previously made hereunder or under the DIP Loan Documents by the DIP Lender to the Debtors, (ii) the validity or enforceability of any obligation, indebtedness or liability incurred under this Final Order or the DIP Loan Documents (including, without limitation, the DIP Obligations) by the DIP Loan Parties to the DIP Lender, (iii) the validity, enforceability, or perfection of any of the claims, liens, security interests, rights, privileges or benefits granted hereunder or under the DIP Loan Documents to the DIP Lender, or (iv) the payment of any fees, costs, expenses or other amounts to the DIP Lender under this Final Order and the DIP Loan Documents, in each case, prior to the actual receipt of written notice by the DIP Lender of the effective date of such reversal, stay, modification, or vacatur. Notwithstanding any such reversal, stay, modification or vacatur, the claims, liens, security interests, rights, privileges, remedies and benefits set forth in the Final Order shall be

governed in all respects by the original provisions of this Final Order and the DIP Loan Documents.

(e)     *Survival*. Except as expressly provided in this Final Order, until all of the DIP Obligations have been Paid in Full (unless the DIP Lender has otherwise agreed), all claims, liens and security interests, rights, priorities, privileges, remedies, benefits, and protections granted to the DIP Lender under this Final Order and the DIP Loan Documents shall survive and shall not be modified, impaired, or discharged by: (i) the entry of an order confirming any chapter 11 plan in any of the Chapter 11 Cases (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive any discharge as to any remaining DIP Obligations), (ii) the entry of an order converting any or all of the Chapter 11 Cases to a case (or cases) under chapter 7 of the Bankruptcy Code, dismissing any or all of the Chapter 11 Cases or terminating the joint administration of the Chapter 11 Cases or by any other act or omission, or (iii) the entry of an order approving the sale or disposition of any DIP Collateral (except to the extent expressly permitted in the DIP Loan Documents).

28.     *Proof of Claim.* The DIP Lender shall not be required to file proofs of claim in any of the Chapter 11 Cases or any of the Successor Cases in order to assert claims for payment of the DIP Obligations. The Debtors' acknowledgments and the provisions of this Final Order, together with the evidence accompanying the Motion and presented at the Hearing, are deemed sufficient to and do constitute timely filed proofs of claim in respect of such claims arising under the DIP Obligations against each of the applicable Debtors. Any order entered by the Court establishing a bar date in any of the Chapter 11 Cases or any Successor Chapter 11 Cases shall not apply to the DIP Lender or the DIP Obligations.

-40-

29.    *Limitation of Liability.*

(a)    Nothing in this Final Order, the DIP Loan Documents, or any documents related thereto shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claim arising from, in connection with or related to the prepetition or postpetition activities of the DIP Loan Parties or their respective affiliates (as defined in section 101(2) of the Bankruptcy Code) in the operation of their businesses, their restructuring efforts or the administration of these Chapter 11 Cases.

(b)    In determining to make any loan or extension of credit under the DIP Loan Documents, or permit the use of Cash Collateral, or in exercising any rights or remedies under this Final Order, the DIP Loan Documents, the DIP Lender shall not (i) have any liability to any third party or be deemed to be in control of the operations of any of the DIP Loan Parties, (ii) owe any fiduciary duty to any of the DIP Loan Parties, their respective creditors, shareholders or estates, or (iii) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" with respect to the operation or management of any of the DIP Loan Parties (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42, U.S. §§ 9601 *et seq*., as amended, or any other federal or state statute, including the Internal Revenue Code).

(c)    The DIP Lender shall not, in any way or manner, be liable or responsible for (i) the safekeeping of the DIP Collateral, (ii) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (iii) any diminution in the value thereof, or (iv) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and all risk of loss, damage, or destruction of the DIP Collateral shall be borne solely by the DIP Loan Parties.

30.     *Release of DIP Lender*. Effective as of entry of, and approved on a final basis pursuant to, this Final Order, each of the DIP Loan Parties and its estate, on its own behalf and on behalf of its predecessors, successors and assigns, hereby absolutely, unconditionally and irrevocably releases and forever discharges and acquits the DIP Lender and each of its representatives (in their capacities as such) from any and all obligations and liabilities to the DIP Loan Parties (and their successors and assigns) and from any and all claims, counterclaims, cross-claims, demands, defenses, objections, challenges, offsets or setoff, debts, accounts, contracts, liabilities, remedies, suits, controversies, actions, causes of action, losses, damages, indemnities, reimbursement obligations, attorneys' fees, costs, expenses or judgments, of every kind or nature whatsoever, whether matured or unmatured, known or unknown, asserted or unasserted, suspected or unsuspected, foreseen or unforeseen, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, pending or threatened, arising in law or equity, upon contract or tort, under the Bankruptcy Code, any state or federal common law, statute, rule, regulation or otherwise, including, without limitation, any claim or cause of action seeking (i) any so-called lender liability, (ii) any and all claims arising under the Bankruptcy Code, whether under Chapter 5 of the Bankruptcy Code or under applicable law (including any applicable state law Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law)), or otherwise, (iii) reduction, recoupment, recharacterization, subordination (whether equitable, contractual or otherwise), reclassification, disgorgement, disallowance, impairment, marshalling, surcharge or recovery, in each case, that may be asserted by any of the DIP Loan Parties, their respective estates, predecessors, successors and assigns, in each case, against any of the DIP Lender or their respective representatives (in their capacities as such) for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time prior to the date of this Final Order,

in connection with, arising under or related to this Final Order, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Collateral, the transactions contemplated thereunder or hereunder, or the negotiation thereof or hereof, including, without limitation, any claim or cause action with respect to the validity, enforceability, priority, scope, extent or perfection of the DIP Liens, the DIP Obligations or the DIP Loan Documents.

31.     *Fisher Scientific Matters*.  This Final Order does not affect or impair any rights or remedies that Fisher Scientific and its divisions and subsidiaries (collectively, "FS") may have (a) in relation to any goods supplied to the Debtors in the ordinary course of business within forty-five days prior to the Petition Date, (b) to assert an administrative expense claim against the Debtors under any applicable provision of the Bankruptcy Code, subject to the priorities set forth herein; or (c) in respect of any executory contracts between FS and the Debtors, if any.  Any such rights and remedies, if any, are preserved and reserved; provided, however, that the rights of the Debtors and all other parties in interest to oppose and object to FS's assertion of any such rights or remedies, if any, and to seek any related relief, are preserved and reserved.

32.     *Exculpation*.  Neither the Debtors nor the DIP Lender, nor their respective owners, directors, officers, employees, professionals and agents, shall have any liability for making, receiving, or negotiating the DIP Facility or the terms thereof.  For the avoidance of doubt, this paragraph is not exculpating or releasing any claim or liability for, or arising from or relating to, any prepetition acts or omissions.

33.     [Reserved.]

34.     *Payments Free and Clear*. Any and all payments or proceeds required to be remitted to the DIP Lender pursuant to the DIP Loan Documents, this Final Order or any subsequent order of this Court shall be irrevocable (subject, solely in the case of the DIP

Professional Fees, only to the procedures set forth in paragraph 10 of this Final Order), and shall be received free and clear of any claim, charge, assessment or other liability, including without limitation, any claim or charge arising out of or based on, directly or indirectly, section 506(c) of the Bankruptcy Code (whether asserted or assessed by, through or on behalf of the DIP Loan Parties) or otherwise.

35. *Joint and Several Liability.* Nothing in this Final Order shall be construed to constitute or authorize a substantive consolidation of any of the DIP Loan Parties' estates, it being understood, however, that the DIP Loan Parties shall be jointly and severally liable for all obligations (including all DIP Obligations) under this Final Order and the DIP Loan Documents.

36. *Third-Party Beneficiary.* Except as expressly set forth herein, no rights are created hereunder for the benefit of any third party, any creditor, equity holders, or any direct, indirect or incidental beneficiary.

37. *Final Order Controls.* In the event of any conflict or inconsistency between or among the terms or provisions of this Final Order and any of the DIP Loan Documents, unless such term or provision in this Final Order is phrased in terms of "defined in" or "as set forth in" the DIP Note or the DIP Loan Documents, or in the event of any conflict or inconsistency between the terms of this Final Order and any other order of the Court, the terms and provisions of this Final Order shall govern and control.

38. *Effectiveness.* This Final Order shall constitute findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014, any Local Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

39.     *Bankruptcy Rules.* The requirements of Bankruptcy Rules 4001, 6003, and 6004, in each case to the extent applicable, are satisfied by the contents of the Motion.

40.     *Headings.* Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Final Order. When used in this Final Order, the word "including" shall not imply limitation.

41.     *Necessary Action.* The DIP Loan Parties and the DIP Lender are authorized to take any and all such actions as are necessary, required or appropriate to implement and effectuate the terms of this Final Order, the DIP Loan Documents, and the transactions contemplated hereunder and thereunder.

42.     *Retention of Jurisdiction.* The Court retains jurisdiction to hear, determine and enforce the terms of any and all matters arising from or related to the DIP Facility, the DIP Loan Documents and this Final Order, and the Court's jurisdiction shall survive confirmation and consummation of any Chapter 11 plan for any of the Debtors notwithstanding the terms or provisions of any such Chapter 11 plan or any order confirming any such Chapter 11 plan.


Dated: _____, 2024
           Houston, Texas

                                        _____
                                        CHRISTOPHER LOPEZ
                                        UNITED STATES BANKRUPTCY JUDGE

**<u>Exhibit 1</u>**

**DIP Note**

# DEBTOR-IN-POSSESSION
## TERM LOAN PROMISSORY NOTE AND SECURITY AGREEMENT

Up to $5,000,000            Dated as of February [__], 2024

FOR VALUE RECEIVED, and subject to the terms and conditions set forth herein, SORRENTO THERAPEUTICS, INC. ("Sorrento" or the "Borrower"), a Delaware corporation, hereby unconditionally promises to pay to the order of Vivasor, Inc., a Delaware corporation (in such capacity, together with its successors and assigns in such capacities, collectively, the "Lender"), the aggregate of any and all amounts the Lender has disbursed to the Borrower and that remain outstanding pursuant to this Debtor-in-Possession Term Loan Promissory Note and Security Agreement (as the same may be amended, modified, renewed, restated or supplemented from time to time, this "Note"), not to exceed the aggregate principal amount at any time outstanding of up to five million dollars ($5,000,000) (plus any amounts that are added to the principal in accordance with the terms hereof), together with all accrued and unpaid interest and fees thereon, as provided in this Note.  This Note is being executed pursuant to the Final Order, the terms of which are fully incorporated herein.

On February 13, 2023 (the "Petition Date"), the Borrower and Scintilla (as defined below) filed voluntary petitions ("Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., as amended (the "Bankruptcy Code").  The Chapter 11 Cases are being jointly administered under Case No. 23-90085 (CML).  The Borrower and Scintilla continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Borrower and the Guarantors (as defined below) have requested that the Lender make loans to the Borrower from time to time on the terms, and subject to the conditions, set forth in this Note and the Final Order.  The Borrower intends to utilize such loans to fund its working capital requirements and certain costs and expenses of administration of the Chapter 11 Cases.

1.      Term Loans.

(a)      Subject to the terms and conditions in Section 2(a) hereof, the Lender hereby agrees to make available to the Borrower in a single draw within two Business Days of the entry of the Final Order a term loan (the "Initial Term Loan") in an aggregate principal amount of three million dollars ($3,000,000).  Any portion of the Initial Term Loan that is repaid may not be re-borrowed.

(b)      Subject to the terms and conditions in Section 2(b) hereof, the Lender hereby agrees to make available to the Borrower in a single draw on March 1, 2024 a term loan (the "Subsequent Term Loan"; together with the Initial Term Loan, collectively, the "Term Loans") in an aggregate principal amount equal to the Subsequent Term Loan Amount (as defined below).  Any portion of the Subsequent Term Loan that is repaid may not be re-borrowed.

(c)      The entire unpaid balance of the Term Loans and all other Obligations shall be immediately due and payable in full in cash in immediately available funds on the Maturity Date.

(d)      The Borrower shall utilize the proceeds of Term Loans to fund working capital requirements and costs and expenses of administration of the Chapter 11 Cases, in each case, in accordance with the Approved Budget.

2.     <u>Conditions Precedent</u>.

(a)     The Lender's obligation to fund the Initial Term Loan is subject to the satisfaction or waiver (in the Lender's sole discretion) of each of the following items on or before the date hereof:

A.     the Borrower and Guarantors (which shall include Scintilla and each of its and the Borrower's respective subsidiaries in existence as of the date hereof, in addition to such of their affiliates as is required by the Lender) shall have duly executed and delivered this Note and the other Loan Documents;

B.     the Borrower and Guarantors shall have delivered corporate resolutions, incumbency certificates and similar documents, in form and substance reasonably satisfactory to Lender with respect to this Note and the other Loan Documents and the transactions contemplated hereby and thereby;

C.     (i) the Bankruptcy Court shall have entered the Final Order and (ii) the Final Order shall not have been stayed, vacated, reversed, modified or amended without the Lender's consent in its sole discretion;

D.     the Borrower shall have delivered to the Lender a four-week budget that sets forth in reasonable detail and separated into line items for each category of receipts or disbursements, all of the Borrower's projected (i) Cash Operating Receipts, (ii) Cash Operating Disbursements, and (iii) Other Disbursements, each on a weekly basis and in form and substance reasonably acceptable to the Lender (the "<u>Approved Budget</u>"), which is attached hereto as <u>Exhibit A</u>;

E.     a Bankruptcy Court order has not been entered (i) authorizing the Borrower or any Guarantor to obtain financing or credit pursuant to section 364 of the Bankruptcy Code from any Person other than the Lender; or (ii) providing adequate protection to any Person under sections 361 through 364 of the Bankruptcy Code other than as authorized pursuant to the Final Order;

F.     the Lender shall have received a certificate signed by an authorized officer of the Borrower certifying that, as of the funding date: (i) the representations warranties made by the Borrower and Guarantor contained herein or in any other Loan Documents are true and correct in all material respects (other than any representation or warranty that is made only as of a specific date and other than representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) and (ii) no Default or Event of Default shall have occurred and be continuing;

G.     the delivery by the Borrower to the Lender of a duly executed customary borrowing notice (in form and substance reasonably satisfactory to the Lender) at least two Business Days prior to the expected draw date; and

H.     the Lender shall have received all UCC financing statements and other documentation necessary to provide the Lender with a valid, perfected priming security interest in the Collateral pledged by the Borrower.

(b)     The Lender's obligation to fund the Subsequent Term Loan is subject to the satisfaction or waiver (in the Lender's sole discretion) of each of the following items on or before March 1, 2024 (or such later date as may be agreed by the Lender in its sole discretion):

2

A.      the delivery by the Borrower to the Lender of a duly executed customary borrowing notice (in form and substance reasonably satisfactory to the Lender) at least two Business Days prior to the expected draw date;

B.      (i) the Bankruptcy Court shall have entered the Final Order and (ii) the Final Order shall not have been stayed, vacated, reversed, modified or amended without the Lender's consent in its sole discretion;

C.      the Borrower shall have delivered to the Lender an Approved Budget; and

D.      the Lender shall have received a certificate signed by an authorized officer of the Borrower certifying that, as of the funding date: (i) the representations warranties made by the Borrower and Guarantor contained herein or in any other Loan Documents are true and correct in all material respects (other than any representation or warranty that is made only as of a specific date and other than representations and warranties that are qualified by materiality or Material Adverse Effect, which shall be true and correct in all respects) and (ii) no Default or Event of Default shall have occurred and be continuing.

Each request for the Lender to make, and each acceptance by the Borrower of the proceeds of, any Term Loan shall be deemed to constitute, as of the date of such request and acceptance, (i) a representation and warranty by the Borrower and Guarantors that the conditions in this Section 2 have been satisfied and (ii) a reaffirmation by the Borrower and Guarantors of the granting and continuance of the Lender's Liens, pursuant to the Collateral Documents.

3.      Payment of Principal.  FOR VALUE RECEIVED, Borrower promises to pay to the Lender, in the manner and at the place hereinafter provided, the unpaid principal amount of the Term Loans made by the Lender pursuant to this Note to the Borrower on the Maturity Date.

4.      Payment of Interest.

(a)      The Borrower also promises to pay interest on the unpaid principal amount hereof from the date of entry of the Final Order until Payment in Full at the rate of [eight percent (8%)] per annum, to be paid in-kind, with such interest being added to the principal amount of the Obligations, on each applicable Interest Payment Date commencing on the first Interest Payment Date occurring after the execution of this Note.

(b)      If any payment of any of the Obligations becomes due and payable on a day other than a Business Day, the maturity thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(c)      All computations of fees and interest shall be made by the Lender on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such fees or interest are payable.  Each determination by the Lender of an interest rate hereunder shall be final, binding and conclusive on the Borrower (absent manifest error).

(d)      From and after the date of the occurrence of any Event of Default, and for so long as any such Event of Default shall be continuing, upon the election of the Lender, the interest rate applicable to the Obligations shall be increased by five percent (5.00%) per annum above the rate of interest otherwise applicable hereunder (the "Default Rate"), and all outstanding Obligations shall bear interest at the Default Rate applicable to such Obligations.  Interest at the Default Rate shall accrue from the date of such Event of Default until such Event of Default is waived and shall be payable in full in cash upon demand.

(e)      Notwithstanding anything to the contrary set forth in this Section 4, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the Lender is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the closing date as otherwise provided in this Note.  Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in Sections 4(a) through (d), unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again apply.   If the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made.  If, notwithstanding the provisions of this Section 4(e), a court of competent jurisdiction shall finally determine that the Lender have received interest hereunder in excess of the Maximum Lawful Rate, the Lender shall, to the extent permitted by applicable law, promptly apply such excess to the payment of other outstanding Obligations and thereafter shall refund any excess to Borrower or as a court of competent jurisdiction may otherwise order.

5.      Payments.  All payments of principal and interest in respect of this Note (and all proceeds of Collateral) shall be made in Dollars in same day funds to the Lender to an account as shall be designated in a written notice delivered by the Lender to the Borrower at least two (2) Business Days prior to the date on which any payment is made (or required to be made).  Each payment made hereunder shall be (other than payments made pursuant to Section **Error! Reference source not found.** hereunder) paid ratably among the Term Loans and (other than payments made pursuant to Sections 4 and **Error! Reference source not found.** hereunder) shall be credited first, to fees and reimbursable expenses of the Lender then due and payable pursuant to any of the Loan Documents; second, to interest then due and payable on the Term Loans; third, to the principal balance of the Term Loans until the same has been Paid in Full; and fourth, to all other Obligations.

If the Borrower fails to make any payment of interest or principal to the Lender (or any other payment to the Lender hereunder) when due hereunder, the Borrower hereby authorizes the Lender to, and the Lender may, from time to time, charge the Loan Account of the Borrower with any amount due and payable by the Borrower under any Loan Documents.  Any amount charged to the Loan Account of the Borrower shall be deemed a Term Loan hereunder made by the Lender to the Borrower and will cure any continuing Default or Event of Default resulting from such non-payment.  The Borrower confirms that any charges that the Lender may so make to the Loan Account of the Borrower as herein provided will be made as an accommodation to Borrower and solely at the Lender's discretion.

6.      Optional Prepayments.  The Borrower shall have the right at any time and from time to time to prepay the principal of the Term Loans in whole or in part.  Any prepayment or repayment hereunder shall be accompanied by interest on the principal amount of the Term Loans being prepaid or repaid to the date of prepayment or repayment.

7.      Mandatory Prepayments.

(a)      Within two (2) Business Days of receipt by the Borrower or any Guarantor (as applicable) of cash proceeds of any asset disposition (other than asset dispositions permitted pursuant to Section 16(o), unless the Lender agrees otherwise, the Borrower or Guarantor (as applicable) shall prepay the Term Loans in an amount equal to 100% of such cash proceeds, net of (A) reasonable commissions and other reasonable and customary transaction costs, fees and expenses properly attributable to such

4

transaction and payable by the Borrower or Guarantor (as applicable) in connection therewith (in each case of any commissions or fees, paid to non-affiliates), (B) income, transfer, sales, or other taxes paid or payable by the Borrower or any Guarantor in connection with such asset disposition, (C) amounts required to be applied to the repayment of debt secured by such assets sold, and (D) cash escrows (until released from escrow).  Any such prepayment shall be applied in accordance with Section 7(d).

(b)     Upon the receipt by the Borrower or any Guarantor of any Extraordinary Receipts received in cash (other than any (x) insurance proceeds, to the extent such proceeds are reflected in the Approved Budget for use by the Loan Parties, (y) receipts in respect of Socazolimab and (z) amounts received in respect of the return of adequate insurance deposits on leases), the Borrower or Guarantor (as applicable) shall prepay the outstanding principal of the Term Loans in an amount equal to 100% of such cash Extraordinary Receipts, net of any reasonable expenses incurred in collecting such Extraordinary Receipts.  Any such prepayment shall be applied in accordance with Section 7(d).

(c)     [Reserved].

(d)     <u>Application of Certain Mandatory Prepayments</u>.  Any prepayments made by the Borrower or Guarantors pursuant to Sections 7(a) or (b) above shall be applied pursuant to Section 5 hereof.

(e)     <u>No Implied Consent</u>.  Nothing in this Section 7 shall be construed to constitute the Lender's consent to any transaction that is not permitted by other provisions of this Note or the other Loan Documents.  For the avoidance of doubt, no reinvestment of the proceeds of any Extraordinary Receipts, asset sales or other proceeds of Collateral shall be permitted without the prior written consent of the Lender in its sole and absolute discretion, except as otherwise provided in the Approved Budget.

8.     <u>Lender's Out-of-Pocket Expenses</u>.  The Borrower and Guarantors shall reimburse the Lender for all reasonable and documented out-of-pocket expenses incurred in connection with the negotiation and preparation of the Loan Documents, the Strict Foreclosure Transaction and the obtaining of approval of the Loan Documents and the Strict Foreclosure Transaction by the Bankruptcy Court (including the reasonable and documented fees and expenses of Paul Hastings LLP ("<u>PH</u>"), counsel for the Lender, all of the Lender's special counsel, advisors, consultants and auditors retained in connection with the preparation and negotiation of the Loan Documents, the Strict Foreclosure Transaction and advice in connection therewith).   In addition, the Borrower and Guarantors shall reimburse the Lender for all reasonable and documented actual fees, costs and expenses, including the reasonable and documented actual fees, costs and expenses of counsel (including PH) or other advisors for advice, assistance, or other representation in connection with:

(1)     any amendment, modification or waiver of, consent with respect to, or termination or enforcement of, any of the Loan Documents or advice in connection with the administration of the Term Loans made pursuant hereto or its rights hereunder or thereunder (including all matters related to the Strict Foreclosure Transaction);

(2)     the review of pleadings and documents related to the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code, attendance at meetings or hearings related to the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code, and general monitoring of the Chapter 11 Cases and any subsequent cases under Chapter 7 of the Bankruptcy Code;

(3)     any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Lender, the Borrower, a Guarantor or any other Person, and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement

to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case commenced by or against the Borrower, a Guarantor or any other Person that may be obligated to the Lender by virtue of the Loan Documents, including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default;

(4)     any attempt to enforce any remedies of the Lender against the Borrower, a Guarantor or any other Person that may be obligated to the Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default (including with respect to the Strict Foreclosure Transaction);

(5)     any work-out or restructuring of the Term Loans during the pendency of one or more Events of Default; and

(6)     any efforts to (i) monitor the Term Loans or any of the other Obligations, (ii) evaluate, observe or assess the Borrower, Guarantors or their respective affairs, and (iii) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

(7)     including, as to each of clauses (1) through (6) above, all attorneys' and other professional and service providers' fees arising from such services, including those in connection with any appellate proceedings, and all expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this Section 8(c), all of which shall be payable by the Borrower and Guarantors to the Lender in accordance with the procedures set forth in the Final Order.  Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include:  fees, costs and expenses of accountants, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; long distance telephone charges; air express charges; telegram or telecopy charges; secretarial overtime charges; and expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.  For the avoidance of doubt, all of the foregoing fees, costs, and expenses shall be Obligations under the Note.

Notwithstanding the foregoing or anything herein to the contrary, to the extent that the Lender (or any of its affiliates) acquires all or substantially all of the Collateral (x) in a sale under or pursuant to section 363 of the Bankruptcy Code, the Lender agrees that the Borrower and Guarantors shall not be required to reimburse the Lender for any amounts contemplated by this Section 8, or (y) pursuant to the Strict Foreclosure Transaction, the Lender agrees that the Borrower and Guarantors shall only be required to reimburse the Lender for any amounts contemplated by this Section 8 to the extent such amounts were incurred in connection with the enforcement of the Lender's rights hereunder, including any fees, costs and expense incurred in connection with the consummation of the Strict Foreclosure Transaction.

9.     <u>Indemnity</u>.

(a)     The Borrower and Guarantors shall jointly and severally indemnify and hold harmless the Lender and its respective affiliates, members, officers, directors, employees, attorneys, agents and representatives (each, an "<u>Indemnified Person</u>"), from and against any and all suits, actions, proceedings, claims, damages, losses, liabilities and expenses (including reasonable attorneys' fees and disbursements and other costs of investigation or defense, including those incurred upon any appeal) that

6

may be instituted or asserted against or incurred by any such Indemnified Person as the result of credit having been extended, suspended or terminated under this Note, the other Loan Documents and the Strict Foreclosure Agreement and the administration of such credit, and in connection with or arising out of the transactions contemplated hereunder and thereunder and any actions or failures to act in connection therewith, and legal costs and expenses arising out of or incurred in connection with disputes between or among any parties to any of the Loan Documents and the Strict Foreclosure Transaction (collectively, "Indemnified Liabilities"); provided that neither the Borrower nor the Guarantors shall be liable for any indemnification to an Indemnified Person to the extent that any such suit, action, proceeding, claim, damage, loss, liability or expense results from that Indemnified Person's (or any Affiliate of such Indemnified Person's) fraud, gross negligence, bad faith or willful misconduct as finally determined by a court of competent jurisdiction.  **NO PERSON SHALL BE RESPONSIBLE OR LIABLE TO ANY BORROWER, GUARANTOR OR INDEMNIFIED PERSON (AS APPLICABLE), ANY SUCCESSOR, ASSIGNEE OR THIRD PARTY BENEFICIARY OF SUCH PERSON OR ANY OTHER PERSON ASSERTING CLAIMS DERIVATIVELY THROUGH SUCH PARTY, FOR INDIRECT, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES THAT MAY BE ALLEGED AS A RESULT OF CREDIT HAVING BEEN EXTENDED, SUSPENDED OR TERMINATED UNDER ANY LOAN DOCUMENT OR AS A RESULT OF ANY OTHER TRANSACTION CONTEMPLATED HEREUNDER OR THEREUNDER.**  For the avoidance of doubt, the Borrower's and Guarantors' obligations under this paragraph shall be included in their "Obligations" under this Note.

10.    Adjustments for Withholding, Capital Adequacy, Etc.  Notwithstanding anything to the contrary contained herein, all payments to the Lender by the Borrower and Guarantors under this Note shall be made free and clear of and without deduction or withholding for any and all present or future taxes, duties, levies, imposts, deductions, charges or withholdings (including backup withholding), assessments, fees or other charges and all related liabilities (collectively, "Taxes") imposed by the United States of America or any other nation or jurisdiction (or any political subdivision or taxing authority of either thereof), unless such Taxes are required by applicable law to be deducted or withheld.  If the Borrower or Guarantors shall be required by applicable law to deduct or withhold (as determined in the good faith discretion of the Borrower or Guarantors, as applicable) any such Taxes from or in respect of any amount payable under this Note, then (i) the amount payable shall be increased (and for greater certainty, in the case of interest, the amount of interest shall be increased) as may be necessary so that after making all required deductions or withholdings, (including deductions or withholdings applicable to any additional amounts paid under this Section 10) the Lender receives an amount equal to the amount it would have received if no such deduction or withholding had been made, (ii) the Borrower or Guarantors shall make such deductions or withholdings, and (iii) the Borrower or Guarantors shall immediately pay the full amount deducted or withheld to the relevant governmental entity in accordance with applicable law.

If the effect of the adoption, effectiveness, phase-in or applicability after the date hereof of any law, rule or regulation (including without limitation any Taxes on or from payments due from the Borrower or Guarantors (but excluding taxation on the overall net income of the Lender)), or any change therein or in the interpretation or administration thereof by any governmental authority, taxing authority, central bank or comparable agency charged with the interpretation or administration thereof, is to reduce the rate of return on the capital of the Lender with respect to this Note or to increase the cost to the Lender of making or maintaining amounts available under this Note, the Borrower and Guarantors jointly and severally agree to pay the Lender such additional amount or amounts as will compensate the Lender on an after-tax basis for such reduction or increase.

The Borrower and Guarantors jointly and severally agree to immediately pay any present or future stamp, court or documentary, intangible, recording, filing or similar taxes or any other excise or property taxes, charges, financial institutions duties, debits taxes or similar levies (collectively, "Other

7

Taxes") which arise from any payment made by the Borrower or Guarantors under this Note or from the execution, delivery, performance, enforcement or registration of, or otherwise with respect to, this Note.

The Borrower and Guarantors shall jointly and severally indemnify the Lender for the full amount of Taxes or Other Taxes (including, without limitation, any Taxes or Other Taxes imposed by any jurisdiction on amounts payable by the Borrower or Guarantors hereunder) paid by the Lender and any liability (including penalties, interest and expenses) arising from or with respect to such Taxes or Other Taxes, whether or not they were correctly or legally asserted, excluding taxes imposed on the Lender's overall net income.  Payment under this indemnification shall be made within 10 days upon demand.  A certificate as to the amount of such Taxes or Other Taxes submitted to the Borrower or Guarantors by the Lender shall be conclusive, absent manifest error, of the amount due from the Borrower to the Lender.

The Borrower and Guarantors shall furnish to the Lender the original or a certified copy of a receipt evidencing payment of Taxes or Other Taxes made by the Borrower or Guarantors within thirty (30) days after the date of any payment of Taxes or Other Taxes.

11.     [Reserved].

12.     Priority of Obligations and the Lender's Liens.  The priority of the Lender's Liens on the Collateral and of the Obligations, including liens and superpriority claims granted to the Lender under the Final Order shall be as set forth in the Final Order.

13.     Further Assurances.  The Borrower and Guarantors represent that no other Indebtedness of the Borrower or any Guarantor exists other than this Note and the Permitted Indebtedness.  The Borrower and Guarantors agree that they shall, at the Borrower's and Guarantors' expense and upon the reasonable request of the Lender, duly execute and deliver or cause to be duly executed and delivered, to the Lender such further instruments and do and cause to be done such further acts as may be reasonably necessary or proper to carry out more effectively the provisions and purposes of this Note or any other Loan Documents, including, upon the Lender's written request and in form and substance satisfactory to the Lender, security agreements, UCC-l financing statements and other Collateral Documents granting to the Lender, Liens in the Collateral to secure the Obligations as set forth in the Final Order.

14.     Reports and Notices.

(a)     On or before Thursday of every week (or, to the extent such Thursday is not a Business Day, the next Business Day thereafter) commencing on the first full week after the date hereof, the Borrower hereby agrees to deliver to the Lender (i) a report of total receipts and total disbursements with respect to the immediately preceding week, and (ii) a statement setting forth in reasonable detail the cash balance for each deposit account of the Borrower and the Guarantors as of the previous Friday.

(b)     On Thursday of every week (or, to the extent such Thursday is not a Business Day, the next Business Day thereafter) commencing on the first full week after the date hereof, the Borrower shall deliver to the Lender a variance report, in a form satisfactory to the Lender, for the rolling cumulative four (4)-week period ending the immediately preceding Friday (each a "Measuring Period") calculating the Net Operating Disbursements Variance for such Measuring Period and explaining in reasonable detail all material Net Operating Disbursements Variance (each such report, a "Variance Report").

(c)     The Borrower (or its financial advisor) shall use commercially reasonable efforts to participate in a weekly conference call at such time to be agreed between the Borrower and the Lender, if requested by the Lender regarding the Approved Budget, management issues, sale process, and other

8

matters. If reasonably requested by the Lender, the chief restructuring officer of the Borrower shall participate in such conference calls.

(d)     The Borrower and Guarantors hereby agree to deliver, or cause to be delivered to the Lender, each of the following, which shall be in form and detail acceptable to the Lender in its sole discretion:

(1)     promptly and in any event no later than one (1) Business Day after the Borrower or any Guarantor (as applicable) obtains knowledge of (or reasonably should have obtained knowledge of) the occurrence of any Default or Event of Default under any Loan Document, notice of such occurrence, together with a detailed statement the Borrower or Guarantor (as applicable) of the steps being taken by the Borrower or Guarantor (as applicable) to cure the effect of such Default or Event of Default;

(2)     (x) promptly upon receipt (if filed by any party other than the Borrower or any Guarantor and to the extent not available on the Electronic Court Filing (ECF) system), or (y) if by the Borrower or any of the Guarantors, as soon as reasonably practicable and in any event at least two (2) calendar days prior to filing, all motions, applications or other papers (other than any affidavits or certificates of service and, solely with respect to any objections or responses, at least one (1) day prior to filing) filed (or to be filed) or served (or to be served) in the Chapter 11 Cases that relate to this Agreement or the Sale;

(3)     promptly upon request, such other information, documents, reports or other materials concerning the condition or operations, financial or otherwise, of the Borrower or any Guarantor as the Lender may reasonably request, to the extent available to the Borrower and/or any of the Guarantors (and, if applicable, in the same form received or prepared by the Borrower or such Guarantor).

(e)     The Borrower and Guarantors shall disclose and make available to the Lender as reasonably requested by the Lender any and all financial statements and other supporting financial documents, schedules and information relating to the Borrower and Guarantors or any of their respective subsidiaries (including copies of any issued management letters) with respect to the business, financial condition and other affairs of the Borrower and Guarantors or any of their respective subsidiaries.

15.    <u>Affirmative Covenants</u>.

The Borrower and Guarantors agree that from and after the date of this Note and until the repayment in full in cash of all Obligations:

(a)     The Borrower and Guarantors will keep accurate books of record and account pertaining to the Collateral and pertaining to the Borrower's and Guarantors' businesses and financial condition and such other matters as the Lender may from time to time reasonably request, in which true and complete entries will be made in accordance with GAAP and, upon the reasonable request of the Lender, will permit any officer, employee, attorney, accountant or agent of the Lender to audit, review, make extracts from or copy, at the Borrower's and Guarantors' expense, any and all corporate and financial and other books and records of the Borrower and Guarantors at all times during ordinary business hours, and to send and discuss with account debtors and other obligors requests for verification of amounts owed to the Borrower and Guarantors.  The Borrower and Guarantors will permit the Lender, or any of its respective

officers, employees, accountants, attorneys or agents, to examine and inspect any Collateral or any other property of the Borrower and Guarantors at any time during ordinary business hours.

(b)     (i) The Borrower and Guarantors will (A) comply with all requirements of law, the non-compliance with which could reasonably be expected to have a Material Adverse Effect and (B) use and keep the Collateral, and require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance, except to the extent that any such violation could not reasonably be expected to result in a Material Adverse Effect, and (ii) the Borrower and Guarantors will obtain, maintain in effect and comply with all governmental permits, licenses and similar approvals necessary for the operation of their business as now or hereafter conducted, except to the extent that any such failure to obtain, maintain or comply could not reasonably be expected to result in a Material Adverse Effect.

(c)     The Borrower and Guarantors will pay or discharge, when due (except for any pre-petition taxes and any taxes, assessments and governmental charges prohibited or excused from payment by the Bankruptcy Code or the Bankruptcy Court), (i) all taxes, assessments and governmental charges levied or imposed upon them or upon their income or profits, upon any properties of the Borrower or Guarantors (including, without limitation, the Collateral) or upon or against the creation, perfection or continuance of the security interest, prior to the date on which penalties attach thereto, (ii) all federal, state and local taxes required to be withheld by them, and (iii) all lawful claims for labor, materials and supplies which, if unpaid, might by law become a lien or charge upon any properties of the Borrower and Guarantors; provided that none of the foregoing need to be paid if it is being contested in good faith by appropriate proceedings and reserves to the extent required by GAAP shall have been made therefor.

(d)     (i) The Borrower and Guarantors will keep and maintain the Collateral and all of their other properties necessary in their business in good condition, repair and working order (normal wear and tear excepted) and will from time to time replace or repair any worn, defective or broken parts, (ii) the Borrower and Guarantors will defend the Collateral against all claims and/or demands of all Persons (other than the Lender and, if applicable and authorized by the Final Order) claiming the Collateral or any interest therein, and (iii) the Borrower and Guarantors will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances.

(e)     The Borrower and Guarantors will conduct their business and affairs without infringement of or interference with any intellectual property of any other Person in any respect and shall comply in all respects with the terms of the written agreements governing the Borrower's and Guarantors' use of any intellectual property licenses.

(f)     The Borrower and Guarantors will keep all Collateral free and clear of all security interests, liens and encumbrances, except Permitted Encumbrances.

(g)     The Borrower and Guarantors will obtain and at all times maintain insurance with responsible and reputable insurers in such amounts and against such risks as is usually carried by companies engaged in a similar business and owning similar properties in the same general areas in which the Borrower and Guarantors operate.  Without limiting the generality of the foregoing, the Borrower and Guarantors will at all times keep all tangible Collateral insured against risks of fire (including so-called extended coverage), theft, collision (for Collateral consisting of motor vehicles), with any loss payable to the Lender to the extent of its interest, and all policies of such insurance shall contain a loss payable endorsement in favor of the Lender, and all policies of liability insurance required hereunder shall name the Lender as an additional insured, subject to customary exceptions, in each case, which endorsements shall be provided via the Final Order.

10

(h)      The Borrower and Guarantors will preserve and maintain (i) their existences, except as permitted pursuant to Section 16(a) and (ii) all of their rights, privileges and franchises necessary in the normal conduct of their business.

(i)      The Borrower and Guarantors shall make payments in accordance with the Approved Budget subject only to Permitted Variances.

(j)      The Borrower and Guarantors shall comply with all terms, conditions, requirements and obligations set forth in the Final Order.

16.      <u>Negative Covenants</u>.

The Borrower and Guarantors agree that from and after the date of this Note and until the repayment in full in cash of all Obligations, without the prior written consent of the Lender in its sole discretion:

(a)      The Borrower and Guarantors shall not directly or indirectly merge or consolidate with, acquire all or substantially all of the assets or capital stock of, or otherwise combine with any Person, except that (i) any Guarantor can merge into or with the Borrower so long as the Borrower is the surviving entity, (ii) any Guarantor can merge into or with another Guarantor or (iii) as otherwise consented to by the Lender in its sole discretion.

(b)      The Borrower and Guarantors shall not create, incur, assume or permit to exist any Indebtedness, except (without duplication), to the extent not prohibited by the Bankruptcy Code, Permitted Indebtedness.

(c)      The Borrower and Guarantors shall not make any changes in their capital structures or amend their charters or bylaws in a manner that could adversely affect the Lender or its interests.

(d)      The Borrower and Guarantors shall not create, incur, assume or permit to exist any Lien on or with respect to any of their properties or assets (whether now owned or hereafter acquired), including the Collateral, except for Permitted Encumbrances.  In addition, Borrower and Guarantors shall not become a party to any agreement, note, indenture or instrument or take any other action that would prohibit the creation of a Lien on any of their properties or other assets (including any Collateral) in favor of the Lender as collateral for the Obligations.

(e)      The Borrower and Guarantors shall not enter into any material contractual agreement or any amendment to any material contractual agreement, other than the Loan Documents, unless, in each case, with the prior written consent of the Lender.

(f)      The Borrower and Guarantors shall not maintain any deposit account or securities account that is not subject to a perfected first priority security interest in favor of the Lender pursuant to the Final Order (except as otherwise set forth therein).

(g)      The Borrower and Guarantors shall not consent to any amendment, supplement or other modification of any of the terms or provisions contained in, or applicable to, the Final Order without the written consent of the Lender.

(h)      [Reserved].

11

(i)     The Borrower and Guarantors shall not make any payment (whether in cash, of property or otherwise) other than in accordance with the Approved Budget, subject to any Permitted Variance.

(j)     The Borrower and Guarantors shall not make any changes in any of their business objectives, purposes or operations that could in any way adversely affect the repayment of the Term Loans or any of the other Obligations or could reasonably be expected to have or result in a Material Adverse Effect.  The Borrower and Guarantors shall not engage in any business other than the businesses currently engaged in by them as of the date hereof or businesses reasonably related thereto.

(k)     The Borrower and Guarantors will not assume, guarantee, endorse or otherwise become directly or contingently liable in connection with any obligations of any other Person, except (i) the endorsement of negotiable instruments by the Borrower and Guarantors for the deposit or collection or similar transactions in the ordinary course of business, (ii) Permitted Indebtedness, and (iii) Permitted Investments.

(l)     The Borrower and Guarantors will not purchase or hold beneficially any stock or other securities or evidences of indebtedness of, make or permit to exist any loans or advances to, or make any investment or acquire any interest whatsoever in, any other Person, including specifically, but without limitation, any partnership or joint venture (each, an "Investment"), other than Permitted Investments.

(m)     The Borrower and Guarantors will not permit any breach, default or event of default to occur under any note, loan agreement, indenture, mortgage, or other security agreement binding upon the Borrower or any Guarantor, except for breaches, defaults or events of default existing on the date of commencement of the Chapter 11 Cases or resulting from such commencement.

(n)     The Borrower and Guarantors will not (x) pay salaries, bonuses, commissions, consultant fees or other compensation to any director, shareholder or employee, or (y) increase the salary, bonus, commissions, consultant fees or other compensation of any director, shareholder or employee, in each case other than as provided in the Approved Budget.

(o)     The Borrower and Guarantors will not convey, sell, lease, assign, transfer or otherwise dispose of any of the Collateral (other than the sale of any Excluded Assets (as defined in the Final Order)).

(p)     The Borrower and Guarantors shall not form any subsidiaries.

(q)     The Borrower and Guarantors shall not cancel any claim or debt owing to them, except for reasonable consideration negotiated on an arm's-length basis.

17.     Events of Default; Rights and Remedies.  Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

(a)     The Borrower or any of the Guarantors (i) shall fail to make any payment of principal or interest on, or fees owing in respect of the Term Loans or any of the other Obligations when due and payable, or (ii) shall fail to pay or reimburse the Lender for any expense reimbursable hereunder or under any other Loan Document in accordance with the Final Order.

12

(b)      The Borrower or any of the Guarantors shall fail or neglect to perform, keep or observe any of the provisions of (i) Section 16, (ii) Section 14 and, in the case of this clause (ii), such failure remains uncured for five (5) calendar days after notice thereof is provided by the Lender or (iii) any other provision of this Note or any other Loan Document and, in the case of this clause (iii), such failure remains uncured for ten (10) calendar days after notice thereof is provided by the Lender.

(c)      Any representation or warranty herein or in any other Loan Document or in any written statement, report, financial statement or certificate made or delivered to the Lender by the Borrower or any of the Guarantors is untrue or incorrect in any material respect (but without duplication of any materiality qualifiers) as of the date when made or deemed made.

(d)      Any provision of any Loan Document shall for any reason cease to be valid, binding and enforceable in accordance with its terms (or the Borrower or any of the Guarantors shall challenge the enforceability of any Loan Document or shall assert in writing, or engage in any action or inaction based on any such assertion, that any provision of any Loan Document has ceased to be or otherwise is not valid, binding and enforceable in accordance with its terms), or any Lien created under any Loan Document shall cease to be a valid and perfected first priority Lien (except as otherwise permitted herein or therein) in any of the Collateral purported to be covered thereby.

(e)      Any of the following shall occur:

(1)      The Final Order is not entered by February 23, 2024

(2)      By March 1, 2024, the Bankruptcy Court shall not have entered an order approving the sale summarized in the Sale Term Sheet (as defined in the Final Order) (the "Sale"), which order shall be in form and substance acceptable to the Lender (the "Sale Order"); and

(3)      By March 31, 2024, the Borrower shall not have consummated the Sale in accordance with the Sale Order.

(4)      An order is entered in any of the Chapter 11 Cases approving a sale or other disposition of any of the Collateral.

(5)      An order is entered in any of the Chapter 11 Cases confirming a chapter 11 plan (other than the orders at ECF 1652 and 1616 in the Chapter 11 Cases), which plan is not in form and substance acceptable to the Lender in its sole discretion (unless such plan provides for the Obligations to be Paid in Full).

(6)      An order is entered in any of the Chapter 11 Cases (i) authorizing the Borrower and Guarantors to obtain financing from any Person other than the Lender or one of its wholly-owned subsidiaries under sections 364(c) or 364(d) of the Bankruptcy Code; (ii) granting any Lien other than Permitted Encumbrances upon or affecting any Collateral; (iii) granting recovery from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) of the Bankruptcy Code; or (iv) authorizing any other action or actions adverse to the Lender, or its rights and remedies hereunder or its interests in the Collateral, that would, individually or in the aggregate, have a Material Adverse Effect.

(7)      The allowance of any claim or claims under section 506(c) of the Bankruptcy Code against or with respect to any Collateral.

(8)    The Final Order is reversed, vacated, revoked, stayed, amended, supplemented, or otherwise modified in any matter without the prior written consent of the Lender in its sole discretion.

(9)    The occurrence of any postpetition judgments, liabilities or events that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(10)    The entry by the Bankruptcy Court of an order authorizing the appointment of an interim or permanent trustee in any of the Chapter 11 Cases or the appointment of an examiner (other than a fee examiner) in any of the Chapter 11 Cases.

(11)    The Chapter 11 Cases, or any of them, shall be dismissed or converted from cases under Chapter 11 to cases under Chapter 7 of the Bankruptcy Code.

(12)    The entry of an order in the Chapter 11 Cases avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Note or the other Loan Documents.

(13)    The entry of an order in the Chapter 11 Cases granting any other superpriority administrative claim or Lien equal to or superior to that granted to the Lender (other than the Carve Out (as defined in the Final Order) or as permitted by the Final Order), unless consented to by the Lender in its sole discretion.

(14)    The entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (i) to allow any creditor (other than the Lender) to execute upon or enforce a Lien on any Collateral, or (ii) with respect to any Lien of or the granting of any Lien on any portion of the Collateral to any state or local environmental or regulatory agency or authority that could reasonably be expected to have a Material Adverse Effect.

(15)    There shall commence any suit or action against the Lender by or on behalf of (i) the Borrower or Guarantors or (ii) any of the Committees, in each case, that constitutes a challenge or that asserts a claim or seeks a legal or equitable remedy that would have the effect of subordinating the claim or Lien of the Lender and, if such suit or action is commenced by any Person other than Borrower or any of the Guarantors, such suit or action shall not have been dismissed or stayed within ten (10) calendar days after service thereof on the Lender, and, if stayed, such stay shall have been lifted.

If any Event of Default shall have occurred and be continuing, then the Lender may, subject to the terms of, and after giving effect to the procedures, notice and cure periods set forth in, the Final Order, including any Remedies Notice or Remedies Notice Period, as applicable: (i) terminate this Note and any unfunded Commitments; (ii) declare all or any portion of the Obligations, including all or any portion of the Term Loans, to be forthwith due and payable; (iii) revoke the Borrower's and the Guarantors' rights to use Cash Collateral in which Lender has an interest; (iv) exercise any rights and remedies under the Loan Documents, including the Final Order, or at law or in equity and/or (v) consummate the Strict Foreclosure Transaction.  Upon the occurrence of an Event of Default and the exercise by Lenders of their rights and remedies under this Note and the other Loan Documents pursuant to clause (iv) above, the Borrower and each of the Guarantors shall assist the Lender in effecting a sale or other disposition of the Collateral upon such terms as are designed to maximize the proceeds obtainable from such sale or other disposition.

Except as otherwise provided for in this Note, the Final Order or any other Loan Document, the Borrower and Guarantors waive: (a) presentment, demand and protest and notice of presentment, dishonor, notice of intent to accelerate, notice of acceleration, protest, default, nonpayment, maturity, release, compromise, settlement, extension or renewal of any or all commercial paper, accounts, contract rights, documents, instruments, chattel paper and guaranties at any time held by the Lender on which the Borrower or Guarantors may in any way be liable, and hereby ratifies and confirms whatever the Lender may do in this regard; (b) all rights to notice and a hearing prior to the Lender's taking possession or control of, or the Lender's replevy, attachment or levy upon, the Collateral or any bond or security that might be required by any court prior to allowing the Lender to exercise any of its remedies; and (c) the benefit of all valuation, appraisal, marshaling and exemption laws.

In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, subject to the terms of the Final Order, the Lender is hereby authorized at any time or from time to time, without notice to the Borrower or to any other Person, any such notice being hereby expressly waived, to offset and to appropriate and to apply any and all balances held by it at any of its offices for the account of the Borrower and/or any of the Guarantors (regardless of whether such balances are then due to the Borrower and/or any of the Guarantors) and any other properties or assets at any time held or owing by the Lender to or for the credit or for the account of the Borrower and/or any of the Guarantors against and on account of any of the Obligations that are not paid when due.

To the extent permitted by law and subject in all respects to the terms of the Final Order, the Lender's sole duty with respect to the custody, safekeeping and physical preservation of the Collateral in its possession shall be to deal with it in the same manner as the Lender deals with similar securities and property as a secured lender in other transactions. The Lender's duty of care with respect to Collateral in the custody or possession of a bailee or other third person shall be deemed fulfilled if it exercises reasonable care in the selection of the bailee or other third person, and the Lender need not otherwise preserve, protect, insure or care for any Collateral, and the Lender shall not be obligated to preserve any rights the Borrower may have against prior parties.

18. <u>Reference Agreements</u>. This Note evidences the Term Loans that may be made to the Borrower from time to time in the aggregate principal amount at any time outstanding of up to $5,000,000 (plus interest that has been added to the principal in accordance with the terms of this Note) and is issued pursuant to and entitled to the benefits of the Final Order to which reference is hereby made for a more complete statement of the terms and conditions under which the Term Loans evidenced by this Note are made and are to be repaid.

19. <u>The Guarantees</u>.

(a) To induce the Lender to execute this Note and advance the Term Loans described herein and in consideration of benefits expected to accrue to the Borrower by reason of the Term Loans and for other good and valuable consideration, receipt of which is hereby acknowledged, each of Scintilla Pharmaceuticals, Inc., a Delaware corporation ("<u>Scintilla</u>"), and each of Scintilla's subsidiaries that becomes a guarantor of the Borrower's obligations under this Note from time to time (together with Scintilla, each a "<u>Guarantor</u>" and, collectively, the "<u>Guarantors</u>") hereby unconditionally and irrevocably guarantees, jointly and severally, to the Lender, the due and punctual payment and performance of all present and future Obligations of the Borrower to the Lender, including, but not limited to, the due and punctual payment of principal of and interest on the Term Loans and the due and punctual payment of all other Obligations now or hereafter owed by the Borrower under the Loan Documents, in each case, as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, according to the terms hereof and thereof (including all interest, costs, fees, and charges). In case of failure

15

by the Borrower to punctually pay any Obligations owed to the Lender guaranteed hereby, each Guarantor hereby, jointly and severally, unconditionally agrees to make such payment or to cause such payment to be made punctually as and when the same shall become due and payable, whether at stated maturity, by acceleration, or otherwise, and as if such payment were made by the Borrower.

(b)     The obligations of each Guarantor shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(1)     any extension, renewal, settlement, compromise, waiver  or release in respect of any obligation of the Borrower or any other Guarantor under this Note or any other Loan Document or by operation of law or otherwise;

(2)     any modification or amendment of or supplement to this Note or any other Loan Document;

(3)     any change in the corporate existence, structure or ownership of the Borrower or any other Guarantor, or any of their respective assets, or any resulting release or discharge of any obligation of the Borrower or of any other Guarantor contained in any Loan Document;

(4)     the existence of any claim, set-off, or other rights which the Borrower or any other Guarantor may have at any time against the Lender or any other Person, whether or not arising in connection herewith;

(5)     any failure to assert, or any assertion of, any claim or demand or any exercise of, or failure to exercise, any rights or remedies against the Borrower, any other Guarantor or any other Person or property;

(6)     any application of any sums by whomsoever paid or howsoever realized to any obligation of the Borrower or other Guarantor, regardless of what obligations of the Borrower or other Guarantor remain unpaid (other than any payment of the Obligations);

(7)     any invalidity or unenforceability relating to or against the Borrower or any other Guarantor for any reason of this Note or of any other Loan Document or any provision of applicable law or regulation purporting to prohibit the payment by the Borrower or any other Guarantor of the principal of or interest on the Term Loans or any other amount payable under the Loan Documents (in each case, other than in connection with the Payment in Full of the Obligations); or

(8)     any other act or omission to act or delay of any kind by the Lender or any other Person or any other circumstance whatsoever that might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the obligations of any Guarantor under this paragraph.

(c)     Each Guarantor's obligations under this Note shall remain in full force and effect until the Obligations payable by the Borrower and the Guarantors under this Agreement and all other Loan Documents shall have been Paid in Full.  If at any time any payment of the Obligations by the Borrower or any Guarantor under the Loan Documents is rescinded or must be otherwise restored or returned, each Guarantor's obligations under this Note with respect to such payment shall be reinstated at such time as though such payment had become due but had not been made at such time.

16

(d)     Each Guarantor agrees it will not exercise any rights which it may acquire by way of subrogation by any payment made hereunder, or otherwise, until all the Obligations shall have been Paid in Full.  If any amount shall be paid to a Guarantor on account of such subrogation rights at any time prior to Payment in Full of the Obligations, such Guarantor agrees to hold such amount in a segregated account as agent for the Lender and to promptly turn such amounts in full over to the Lender in the same form as received.

(e)     To the fullest extent permitted by law, each Guarantor irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by the Lender or any other Person against the Borrower, another Guarantor, or any other Person.

(f)     If acceleration of the time for payment of any Obligation payable by the Borrower, all such amounts otherwise subject to acceleration under the terms of this Note or the other Loan Documents shall nonetheless be payable by the Guarantors hereunder forthwith on demand by the Lender.

(g)     The Borrower and the Guarantors are engaged in related businesses and integrated to such an extent that the financial strength and flexibility of the Borrower has a direct impact on the success of each Guarantor.  Each Guarantor will derive substantial direct and indirect benefit from the extensions of credit hereunder.

(h)     Each Guarantor shall take such action as the Borrower is required by this Agreement to cause such Guarantor to take, and shall refrain from taking such action as the Borrower is required by this Agreement to prohibit such Guarantor from taking.

20.     Definitions.  The following terms used in this Note shall have the following meanings (and any of such terms may, unless the context otherwise requires, be used in the singular or the plural depending on the reference):

"Approved Budget" has the meaning specified in Section 2(a)(D).

"Avoidance Actions" means any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code.

"Bankruptcy Code" shall have the meaning given such term in the recital to this Note.

"Bankruptcy Court" shall have the meaning given such term in the recital to this Note.

"Borrower" shall have the meaning given such term in the recital to this Note.

"Business Day" means any day other than a Saturday, Sunday or legal holiday under the laws of the State of New York or any other day on which banking institutions located in the State of New York are authorized or required by law or other governmental action to close.

"Cash Operating Disbursements" means disbursements of the type listed under the "Cash Operating Disbursements" category in the Approved Budget; provided that, for the avoidance of doubt, Cash Operating Disbursements shall include contingency disbursements but exclude Other Disbursements.

"Cash Operating Receipts" means receipts of the type listed under the "Cash Operating Receipts" line item in the Approved Budget.

LEGAL_US_W # 118946025.5

"Chapter 11 Cases" shall have the respective meanings given such terms in the recital to this Note.

"Collateral" shall mean means, collectively, (a) all prepetition and post-petition real property and all prepetition and post-petition tangible and intangible personal property of the Borrower and each Guarantor, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, intellectual property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, arbitration awards, commercial tort claims, money, insurance, receivables, receivables records, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications or "amendments to alleged use" filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all equity interests, all books and records relating to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)), and (b) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of the Collateral and Avoidance Actions and proceeds of Avoidance Actions; provided, that, notwithstanding the foregoing, "Collateral" shall not include any Excluded Claims (as defined in the Final Order).

"Collateral Documents" shall mean any agreement entered into pursuant to Section 13 hereof and all similar agreements entered into guaranteeing payment of, or granting a Lien upon property as security for payment of, the Obligations, including the Final Order.

"Commitments" means, collectively, the Initial Term Loan Commitment and the Subsequent Term Loan Commitment, in each case, as the same may be terminated or reduced from time to time in accordance with the terms of this Note.

"Committees" means the statutory committee of unsecured creditors appointed by the United States Trustee in relation to the Chapter 11 Cases, the statutory committee of equity securities holders appointed by the United States Trustee in relation to the Chapter 11 cases, and any other official committees appointed in the Chapter 11 Cases.

"Contingent Obligation" means, with respect to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (i) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (ii) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, (iii) any obligation of such Person, whether or not contingent, (A) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (B) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (C) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (D) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however,

18

that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business.  The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Default Rate" shall have the meaning given such term in Section 4(d) of this Note.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Event of Default" shall have the meaning given such term in Section 17 of this Note.

"Extraordinary Receipts" means any cash received by the Borrower or a Guarantor not in the ordinary course of business (and not consisting of proceeds described Section 7(a) hereof), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance (other than to the extent such insurance proceeds are immediately payable to a Person that is not the Borrower or any of its subsidiaries), (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) condemnation awards (and payments in lieu thereof), (vi) indemnity payments (other than to the extent such indemnity payments are immediately payable to a Person that is not the Borrower or any of its subsidiaries), and (vii) any purchase price adjustment received in connection with any purchase agreement.

"Final Order" shall mean an order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing pursuant to section 364 of the Bankruptcy Code and Bankruptcy Rule 4001, in form and substance satisfactory to the Lender in its sole discretion, together with all extensions, modifications and amendments thereto that are in form and substance satisfactory to the Lender in its sole discretion, (i) authorizing the Borrower and Guarantors to obtain credit, incur Indebtedness, and grant Liens under this Note and the other Loan Documents, (ii)  modifying the automatic stay, and (iii) granting related relief, all as set forth in such order.

"GAAP" shall mean generally accepted accounting principles in the United States of America.

"Indebtedness" shall mean, without duplication, with respect to any Person, (i) all indebtedness of such Person for borrowed money; (ii) all obligations of such Person for the deferred purchase price of property or services (other than trade payables, payables to vendors or other account payables incurred in the ordinary course of such Person's business); (iii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made; (iv) all obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or the lender thereunder are limited to repossession or sale of such property; (v) all capitalized lease obligations of such Person; (vi) all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities; (vii) all obligations and liabilities, calculated on a basis reasonably satisfactory to the Lender and in accordance with accepted practice, of such Person under interest rate or currency swaps and other derivatives; (viii) all Contingent Obligations; (ix) all other items which, in accordance with GAAP, would

19

be included as liabilities on the liability side of the balance sheet of such Person; and (x) all obligations referred to in clauses (i) through (ix) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.  The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venturer.

"Indemnified Person" shall have the meaning given such term in Section 9 of this Note.

"Initial Term Loan Commitment" means the commitment of the Lender to make the Initial Term Loan to the Borrower in the principal amount of $3,000,000 upon satisfaction of the applicable conditions precedent thereto.

"Initial Term Loan" has the meaning given to such term in Section 1(a).

"Interest Payment Date" shall mean the first Business Day of each month to occur while any Term Loans are outstanding; provided that, in addition to the foregoing, each of (x) the date upon which the Obligations have been Paid in Full and (y) the Maturity Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued hereunder.

"Lender" shall have the meaning given such term in the recital to this Note.

"Lien" shall mean any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan Account" means an account maintained hereunder by the Lender on its books of account with respect to the Borrower, in which the Borrower will be charged with the Term Loans made to, and all other Obligations incurred by, the Borrower.

"Loan Documents" shall mean this Note, the Collateral Documents and the Final Order. Any reference in this Note or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Effect" means a material adverse effect on (i) the operations, business assets or properties or financial condition of the Borrower and the Guarantors, taken as a whole (other than those resulting solely from the commencement of the Chapter 11 Cases or the actions and events related thereto or resulting therefrom), (ii) the ability of the Borrower and the Guarantors, taken as a whole, to perform any of its payment obligations under any Loan Document to which it is a party (other than those resulting solely from the commencement of the Chapter 11 Cases), (iii) the legality, validity or enforceability of this Note or any other Loan Document, (iv) the rights and remedies of the Lender under any Loan Document, or (v) the validity, perfection or priority of a Lien in favor of the Lender on any of the Collateral.

"Maturity Date" means the earliest of:  (i) the Stated Maturity Date; (ii) the date on which the Sale is consummated; (iii) substantial consummation (as defined in section 1101 of the Bankruptcy

Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court; (iv) the acceleration of the Term Loans; and (v) as otherwise ordered by the Bankruptcy Court.

"<u>Maximum Lawful Rate</u>" shall have the meaning given such term in Section 4(e) of this Note.

"<u>Measuring Period</u>" has the meaning specified in Section 14(c).

"<u>Net Operating Disbursements Variance</u>" means, for each Measuring Period, the difference, expressed as a percentage, between (a) actual Net Operating Disbursements for such Measuring Period *and* (b) projected Net Operating Disbursements for such Measuring Period, as set forth in the relevant Approved Budget.

"<u>Other Disbursements</u>" means disbursements of the type listed under the "Other Disbursements" category in the Approved Budget; <u>provided</u> that, for the avoidance of doubt, Other Disbursements shall include Professional Fees, interest payments in respect of the Loans and other expenses paid pursuant to the Final Order.

"<u>Note</u>" shall have the meaning given such term in the recitals of this Note.

"<u>Obligations</u>" shall mean all loans, advances, debts, liabilities and obligations for the payment of monetary amounts (whether or not such amounts are liquidated or determinable) owing by the Borrower and Guarantors to the Lender arising under this Note or any of the other Loan Documents.  This term includes all principal, interest, fees, charges, expenses, attorneys' fees and any other sum chargeable to the Borrower and Guarantors under this Note or any of the other Loan Documents.

"<u>Other Taxes</u>" shall have the meaning given such term in Section 10 of this Note.

"<u>Paid in Full</u>" or "<u>Payment in Full</u>" means either (a) the indefeasible repayment in full in cash of all Obligations and the termination of all Commitments or (b) at the election of the Lender following the occurrence of an Event of Default, consummation of the Strict Foreclosure Transaction.

"<u>Permitted Encumbrances</u>" shall mean (a) liens for Taxes which are being contested in good faith by appropriate proceedings diligently conducted, including in connection with the Chapter 11 Cases, so long as reserves, if any, to the extent required by GAAP shall have been made for any such contested amounts, or for Taxes not yet due and payable, (b) bankers' liens (i) relating to (x) Indebtedness in respect of netting services, overdraft protections and similar arrangements and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds incurred in the ordinary course of business or (y) the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, and (ii) relating to pooled deposit or sweep accounts of Borrower or any Guarantor to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business, and (c) the Prior Permitted Liens (as defined in the Final Order).

"<u>Permitted Indebtedness</u>" shall mean:  (a) current Indebtedness maturing in less than 90 days and incurred in the ordinary course of business for supplies, equipment, services, taxes or labor; (b) Indebtedness arising under this Note and the other Loan Documents; (c) deferred taxes; (d) other Indebtedness listed in the Approved Budget; (e) administrative expenses of Borrower for which the Bankruptcy Court has not directed payment; and (f) Indebtedness in respect of netting services, overdraft

21

protections and similar arrangements and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds in the ordinary course of business.

"Permitted Investments" means (i) Investments in cash and (ii) Investments by Borrower or any Guarantor in the Borrower or any Guarantor to the extent contemplated by the Approved Budget.

"Permitted Variance" means a positive [20]% or less Net Operating Disbursements Variance.

"Person" shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Petition Date" shall have the meaning given such term in the recitals of this Note.

"Professional Fees" means all unpaid fees and expenses incurred by persons or firms retained by the Loan Parties pursuant to Sections 327, 328, 329, 330, 331, 363, or 503(b)(4) of the Bankruptcy Code; provided that to the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

"Remedies Notice" has the meaning set forth in the Final Order.

"Remedies Notice Period" has the meaning set forth in the Final Order.

"Sale" has the meaning given to such term in Section 17.

"Subsequent Term Loan Commitment" means the commitment of the Lender to make the Subsequent Term Loan in the amount of the Subsequent Term Loan Amount upon satisfaction of the applicable conditions precedent thereto.

"Subsequent Term Loan" has the meaning given to such term in Section 1(b).

"Subsequent Term Loan Amount" means two million dollars ($2,000,000).

"Stated Maturity Date" means March 31, 2024, or such earlier date agreed to by the Lender in its sole discretion.

"Strict Foreclosure Transaction" means the consummation of a strict foreclosure of the assets of the Borrower and the Guarantors pursuant to the terms of the Strict Foreclosure Agreement and the Final Order.

"Strict Foreclosure Agreement" means an agreement substantially in the form of Exhibit B and otherwise acceptable to the Lender.

"Taxes" shall have the meaning given such term in Section 10 of this Note.

"Term Loans" shall have the meaning given such term in Section 1 of this Note.

"Variance Report" has the meaning specified in Section 14(c).

22

21.     <u>Representations and Warranties</u>.  The Borrower and Guarantors represent as follows:

(a)     the Borrower and Guarantors are limited liability companies or corporations duly organized, validly existing and in good standing under the laws of their respective jurisdictions of incorporation;

(b)     the execution and delivery of this Note and the other Loan Documents and the performance by the Borrower and Guarantors of the Borrower's and Guarantors' obligations hereunder and under the other Loan Documents are within their corporate powers, have been duly authorized by all necessary corporate action of the Borrower and Guarantors and their respective shareholders and affiliates, have received all necessary bankruptcy, insolvency or governmental approvals, and do not and will not contravene or conflict with any provisions of applicable law or of the Borrower's and Guarantors' or any of their respective shareholders or affiliates corporate charter or by-laws or of any agreements binding upon or applicable to the Borrower and Guarantors or any of their respective affiliates or any of the Borrower's and Guarantors' properties;

(c)     this Note and each other Loan Document is a legal, valid and binding obligation, enforceable against the Borrower and Guarantors in accordance with its terms except as limited by equitable principles relating to enforceability;

(d)     the Borrower and Guarantors have good and marketable title to, or valid leasehold interests in, all of their respective properties and assets; none of the properties and assets of the Borrower and Guarantors are subject to any Liens other than Permitted Encumbrances, and there are no facts, circumstances conditions that may result in any Liens other than Permitted Encumbrances;

(e)     no information contained in this Note, any of the other Loan Documents, any projections, financial statements or collateral reports or other reports from time to time delivered hereunder or any written statement furnished by or on behalf of the Borrower and Guarantors to the Lender pursuant to the terms of this Note, any Loan Document or otherwise contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made;

(f)     except for proceedings in the Chapter 11 Cases, no action, claim, lawsuit, demand, investigation or proceeding is now pending or, to the knowledge of the Borrower and any of the Guarantors, threatened against the Borrower or any of the Guarantors before any governmental authority or before any arbitrator or panel of arbitrators that challenges the Borrower's or any Guarantor's right or power to enter into or perform any of its obligations under the Loan Documents to which it is a party, or the validity or enforceability of any Loan Document or any action taken thereunder;

(g)     the execution, delivery and performance of this Note and the other Loan Documents will not (immediately or with the giving of notice or passage of time, or both) (i) violate the articles of incorporation or bylaws of the Borrower or any of the Guarantors, or violate any law or regulation; or (ii) result in the creation or imposition of any Lien upon any of the property of the Borrower or any of the Guarantors, except in favor of the Lender; and

(h)     except for the Chapter 11 Cases, there is no order, notice, claim, litigation, proceeding or investigation pending or threatened against or in any way affecting this Note or any other Loan Document.

22.     <u>Grant of Security Interest in the Collateral</u>. Subject to the terms and conditions of the Final Order, to secure the payment and performance of the Obligations, the Borrower and each Guarantor hereby

grants, pledges and assigns to the Lender, pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, binding, continuing, enforceable, non-avoidable automatically and fully perfected security interests in all Collateral (including the proceeds of this Note), as set forth in the Final Order.

23.    <u>Miscellaneous</u>.

(a)    All notices and other communications provided for hereunder shall be in writing (including facsimile communication) and mailed, telegraphed, telexed, telecopied, cabled or delivered as follows:

If to Borrower or Guarantors:

Sorrento Therapeutics, Inc.
c/o Scintilla Pharmaceuticals, Inc.
9380 Judicial Drive
San Diego, CA 92121
Attn: Mohsin Y. Meghji, Chief Restructuring Officer
Telephone: 212-202-2300
Email: mmeghji@m3-partners.com

with a copy to (which shall not constitute notice):

Latham & Watkins LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Attn: Caroline Reckler
      Jonathan Gordon
Telephone: +1.312.876.7663
Email: Caroline.Reckler@lw.com
       Jonathan.Gordon@lw.com

If Lender:

BioVintage, Inc.
P.O. Box 3531
Rancho Santa Fe, CA 92067
Attention: Henry Ji, Ph.D.
Email: henryji92130@yahoo.com

With a copy (not constituting notice to):

Paul Hastings LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
Attention:  Justin Rawlins
Email: justinrawlins@paulhastings.com

All such notices and communications shall, when mailed or sent by overnight courier, be effective when deposited in the mails or delivered to the overnight courier, as the case may be, or when sent by telecopier be effective when confirmation is received.

LEGAL_US_W # 118946025.5

(b)     No failure or delay on the part of the Lender or any other holder of this Note (or any portion thereof) to exercise any right, power or privilege under this Note and no course of dealing between the Borrower, Guarantors, and the Lender shall impair such right, power or privilege or operate as a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies expressly provided in this Note are cumulative to, and not exclusive of, any rights or remedies that the Lender would otherwise have.  No notice to or demand on the Borrower or any of the Guarantors in any case shall entitle the Borrower or any of the Guarantors to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Lender to any other or further action in any circumstances without notice or demand.

(c)     The Borrower, Guarantors and any endorser of this Note hereby consent to renewals and extensions of time at or after the maturity hereof without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

(d)     If any provision in or obligation under this Note shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(e)     **THIS NOTE AND THE RIGHTS AND OBLIGATIONS OF BORROWER, GUARANTORS AND THE LENDER HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING WITHOUT LIMITATION SECTION 5-1401 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK), WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.**

(f)     **THE BORROWER, GUARANTORS, AND, BY THEIR ACCEPTANCE OF THIS NOTE, THE LENDER AND ANY SUBSEQUENT HOLDER OF THIS NOTE, HEREBY IRREVOCABLY AGREE TO WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS NOTE OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS NOTE AND THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED**.  The scope of this waiver is intended to be all-encompassing of any and all disputes that may be filed in any court and that relate to the subject matter of this transaction, including without limitation contract claims, tort claims, breach of duty claims and all other common law and statutory claims.  The Borrower, Guarantors, and, by their acceptance of this Note, the Lender and any subsequent holder of this Note, each (i) acknowledges that this waiver is a material inducement to enter into a business relationship, that each has already relied on this waiver in entering into this relationship, and that each will continue to rely on this waiver in their related future dealings and (ii) further warrants and represents that each has reviewed this waiver with its legal counsel and that each knowingly and voluntarily waives its jury trial rights following consultation with legal counsel.  **THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS OF THIS NOTE**.  In the event of litigation, this provision may be filed as a written consent a trial by the court.  Each party hereto hereby submits to the exclusive jurisdiction of the Bankruptcy Court for purposes of all legal proceedings arising out of or relating to this Note or the transactions contemplated hereby.

(g)     The Borrower and Guarantors hereby waive the benefit of any statute or rule of law or judicial decision which would otherwise require that the provisions of this Note be construed or interpreted most strongly against the party responsible for the drafting thereof.

(h)     The Borrower and Guarantors shall not have the right to assign their obligations or liabilities under this Note without the prior written consent of the Lender.  The Lender may assign to one or more entities all or any part of, or may grant participation's to one or more entities in or to all or any part of, the amounts outstanding hereunder, and to the extent of any such assignment or participation (unless otherwise stated therein) the assignee or participant shall have the same rights and benefits hereunder as it would have it were a Lender hereunder.  The Lender shall notify the Borrower and Guarantors of any such assignment which notice shall include a description of the assignment and include customary instructions from the Lender and its assignee with respect to the making of payments and other communications with the Lender and such assignee.

(i)     No provision of this Note may be amended or waived unless such amendment or waiver is in writing and is signed by the Borrower, the Guarantors and the Lender.

(j)     If any provision of this Note is held invalid, illegal or unenforceable, the parties shall negotiate in good faith so as to replace each invalid, illegal or unenforceable provision with a valid, legal and enforceable provision which will, in effect, from an economic viewpoint, most nearly and fairly approach the effect of the invalid, illegal or unenforceable provision and the intent of the parties in entering into this Note.

(k)     This Note, the other Loan Documents, and all Liens created hereby or pursuant to the Collateral Documents or any other Loan Documents shall be binding upon the Borrower, the Guarantors, the estates of the Borrower and Guarantors, and any trustee or successor in interest of the Borrower and Guarantors in the Chapter 11 Cases or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to section 365 of the Bankruptcy Code.  This Note and the other Loan Documents shall be binding upon, and inure to the benefit of, the successors of the Lender and its respective assigns, transferees and endorsees.  The Liens created by this Note, and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of any of the Chapter 11 Cases or any other bankruptcy case of the Borrower or any of the Guarantors to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of any of the Chapter 11 Cases or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Lender files financing statements or otherwise perfect its security interests or Liens under applicable law.

(l)     THIS WRITTEN PROMISSORY NOTE REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES, AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

*[Remainder of Page Intentionally Left Blank]*

       IN WITNESS WHEREOF, the Borrower, the Guarantors and Lender have caused this Note to be executed and delivered by their duly authorized officer as of the day and year and at the place first above written.

**BORROWER:**

**SORRENTO THERAPEUTICS, INC**.

By:_____
Name:_____
Title:_____

**GUARANTORS:**

**SCINTILLA PHARMACEUTICALS, INC.**

By:_____
Name:_____
Title:_____

**LENDER:**

**BIOVINTAGE, INC.**

By:_____
Name:
Title:

<u>Exhibit A</u>

**Approved Budget**

See attached

<u>Exhibit B</u>

**Strict Foreclosure Agreement**

See attached

## STRICT FORECLOSURE AGREEMENT

This STRICT FORECLOSURE AGREEMENT (this "Agreement") is made and entered into as of the [_____] day of [_____], 2024 by and among: (a) BioVintage, Inc., a California corporation, as the lender (in such capacity, together with its successors and assigns in such capacity, collectively, the "Lender"); (b) Sorrento Therapeutics, Inc., a Delaware corporation ("Sorrento"); and (c) Scintilla Pharmaceuticals, Inc., a Delaware corporation ("Scintilla" and, together with Sorrento, collectively, the "Loan Parties"). The parties listed in (a) through (c) are hereinafter referred to individually as a "party" and collectively as the "parties." Each capitalized term used but not defined herein shall have the meaning assigned to it in the Note (defined below) unless otherwise specified.

## BACKGROUND

A.      The Loan Parties and the Lender are parties to that certain Debtor-in-Possession Term Loan Promissory Note and Security Agreement, dated as of [_____], 2024 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "Note"). The U.S. Bankruptcy Court for the Southern District of Texas entered an order approving the Note on February [__], 2024 [Docket No. ____] (the "Final DIP Order").

B.      Pursuant to the Note, each of the Loan Parties granted to the Lender a security interest in and lien upon the Collateral (as defined in the Note).

C.      One or more Events of Default have occurred and are continuing under the Note. In connection with those Events of Default, the Lender had and continues to have the right to exercise all applicable rights and remedies under and in relation to the Loan Documents, the Uniform Commercial Code as in effect in the State of New York (the "NYUCC") and other applicable law.

D.      The Loan Parties acknowledge (i) their current joint and several obligation to repay all Obligations under the Note, and (ii) that the Lender has the current right under the Loan Documents at any time in its sole discretion to enforce any and all rights in respect of the Collateral.

E.      The Loan Parties have agreed to transfer, convey, assign and surrender to the Lender all of the Loan Parties' possession, right, title and interest in, all of the Loan Parties' assets described on Exhibit A-1 (the "Transferred Assets"), free and clear of all liens, claims, interests and encumbrances (other than restrictions on transfer imposed under applicable securities laws and those Permitted Liens set forth on Schedule 1 hereto) and that such transfer and satisfaction are intended to comprise a strict foreclosure (i.e., acceptance of collateral in full satisfaction of the Loan Parties' obligations to the Lender) for purposes of Section 9-620(c)(1) of the NYUCC. The Transferred Assets constitute a subset of the Collateral.

F.      The Lender has agreed to accept the transfer of the Transferred Assets as set forth above in exchange for (a) the satisfaction of all of the Loan Parties' existing obligations under the Loan Documents (including, without limitation, any and all fees, costs and expenses incurred by the Lender in connection with enforcing its rights under the Note; provided, that, at the option of the Lender, such fees, costs and expenses may either be (x) included in the Satisfied Obligations or (y) deducted from the original issuance amount of the Seller Note (defined below) on a dollar-for-dollar basis) in an aggregate amount equal to $[_____] (the "Satisfied Obligations"), (b) the payment by the Lender to the Loan Parties of $[_____][1] in cash (the "Cash Payment"), (c) the issuance by the Lender to the Borrower of a

_____

[1] NTD: to be the difference between $15,500,000 and the amount of the Satisfied Obligations

promissory note in substantially the form attached hereto as Exhibit D (the "Seller Note"), and (d) the performance of, and compliance with, all other obligations in the Sale Term Sheet (as defined in the Final DIP Order) (including, but not limited to, the delivery of the 7% equity interests of "NewCo" subsidiaries, the waiver of certain claims, the assumption of certain liabilities, and the delivery of 20% of litigation recoveries, in each case as described in greater detail in the Sale Term Sheet), all in accordance with and subject to the provisions set forth more fully below and in the Sale Term Sheet. For the avoidance of doubt, the transfer of the Transferred Assets to the Lender upon the Closing shall be final and irrevocable upon the Closing.

G.      Upon the Strict Foreclosure (defined below), all Obligations owing under the Note and the other Loan Documents shall be deemed satisfied in full.

## TERMS

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree:

1.      Recitals Incorporated.  The recitals and prefatory phrases and paragraphs set forth above are hereby incorporated in full and made a part of this Agreement.

2.      Existing Indebtedness.  As of [_____], 2024, the amount necessary to satisfy the payment in full of the Term Loans and all other unpaid Obligations outstanding under the Loan Documents, inclusive of all principal, interest, fees, costs and expenses (including, without limitation, legal fees and expenses for counsel to the Lender), was not less than $[_____].

3.      Liabilities Being Assumed. Subject to the terms and conditions set forth in this Agreement, the Lender agrees to assume the liabilities, including the liabilities under the contracts and other agreements, identified on Exhibit A-2 attached hereto (the "Assumed Liabilities").  For the avoidance of doubt, other than the Assumed Liabilities, the Lender is not hereby assuming any other liabilities or obligations, including, without limitation, any other liabilities or obligations of any Loan Party.

4.      Transfer of the Collateral.  Pursuant to Section 9-620 of the NYUCC, effective as of the time immediately following the satisfaction or waiver of the closing actions set forth in Section 7 herein (the "Closing"), each of the Loan Parties hereby voluntarily conveys, assigns and transfers to the Lender, any and all of its legal, equitable and beneficial right, title and interest in and to all of the Transferred Assets in exchange for the satisfaction of the Satisfied Obligations, the payment by the Lender to the Loan Parties of the Cash Payment and the issuance by the Lender to the Borrower of the Seller Note (such transaction, the "Strict Foreclosure").  Each Loan Party shall (a) concurrently with the occurrence of the Closing, take all actions reasonably required to effect the conveyance, transfer and assignment of the Transferred Assets and to ensure that any payments, refunds, or distributions related to the Transferred Assets will be endorsed, delivered, and/or transferred to the Lender, and (b) from and after the closing of the Strict Foreclosure, not take any action inconsistent with or harmful to the Lender's absolute ownership, possession and control of the Transferred Assets.  To the extent any "cure" payments are required in connection with the assumption and assignment of any executory contracts or unexpired leases designated by the Lender, such cure costs shall be funded by the Lender.

5.      Acceptance of the Transferred Assets as Full Satisfaction.  Upon the Closing, the Lender shall accept the conveyance, transfer and assignment to the Lender from the Loan Parties, pursuant to Section 9-620 of the NYUCC and other applicable laws, of all of the Loan Parties' possession, right, title and interest in and to the Transferred Assets in exchange for the satisfaction of the Satisfied Obligations, the payment by the Lender to the Loan Parties of the Cash Payment and the issuance by the Lender to the

Borrower of the Seller Note.  The Loan Parties hereby consent without any objection of any kind or nature to the acceptance of the Transferred Assets by the Lender.

6.      Adequacy of Notice; Waivers.  Each of the Loan Parties:  (a) agrees that it has received notice sufficient for compliance with Sections 9-620 and 9-621 of the NYUCC or otherwise, and, in the alternative, hereby expressly waives (i) any requirement for receipt of such notice and any right to notification of sale, transfer, conveyance or surrender of the Transferred Assets pursuant to Sections 9-620 and 9-621 of the NYUCC or otherwise, and (ii) any remedies, rights, defenses or actions it might have as a result of failure to have received such notice; (b) waives the right to redeem the Transferred Assets under Section 9-623 of the NYUCC or otherwise; (c) waives any right to object to the sale, transfer, conveyance or surrender of the Transferred Assets pursuant to Section 9-620 of the NYUCC or otherwise; (d) waives any obligation of the Lender to dispose of the Transferred Assets; (e) waives any obligation of any Loan Party to deliver a written agreement; (f) waives any other rights, whether legal or equitable, which it may possess in and to any of the Transferred Assets; and (g) agrees that the transactions contemplated herein are in good faith and are commercially reasonable.  Each of the Loan Parties acknowledges and agrees that the waivers set forth in this Section 6 and elsewhere in this Agreement constitute material consideration for the agreement of the Lender to execute and deliver this Agreement.

7.      Conditions to Closing.  The Parties shall have no obligation to complete the Closing prior to the fulfilment of each of the following conditions (any of which may be waived by the Lender in its sole discretion):

(a)      each Party shall have received, on the date hereof, a copy of this Agreement countersigned by each other Party;

(b)      the Lender shall have received evidence reasonably satisfactory to the Lender that the execution, delivery and performance of this Agreement by each of the Loan Parties has been duly authorized, and all other necessary corporate actions have been taken;

(c)      the Lender shall have received a duly executed Bill of Sale, substantially in the form attached hereto as Exhibit B;

(d)      the Loan Parties shall have received payment in full of the Cash Payment;

(e)      the Borrower shall have received the Seller Note, executed by the Lender;

(f)      to the extent requested by the Lender, the Lender shall have received duly executed assignments of copyright rights, patent rights and trademark rights, with respect to all copyrights, patents and trademarks owned by the Loan Parties, in each case, in form and substance reasonably satisfactory to the Lender; and

(g)      to the extent requested by the Lender, each of the Loan Parties shall have delivered to the Lender a properly completed and duly executed IRS Form W-9.

8.      [Reserved].

9.      Representations and Warranties of the Loan Parties.  Each of the Loan Parties hereby represents, warrants, covenants and acknowledges that:

(a)      the Loan Parties own, beneficially and of record, and have good and valid title to the Transferred Assets, free and clear of any lien (other than restrictions on transfer imposed under

applicable securities laws and the liens and restrictions on transfer created by the Loan Documents and those Permitted Liens set forth on <u>Schedule 1</u> hereto);

(b)     it knowingly and freely has entered into this Agreement without any duress, coercion or undue influence exerted by or on behalf of the Lender or any affiliate of the Lender, and it has other business and legal options available to it;

(c)     it is acting in good faith (as such term is defined in Section 9-102(a)(43) of the UCC) in connection with this Agreement and the transactions contemplated hereby, including the transfer of the Transferred Assets;

(d)     the execution, delivery and performance by it of this Agreement do not and will not contravene: (i) with regard to each business organization, its organizational documents; (ii) any law, judgment, award, rule, regulation, order, decree, writ or injunction of any court, legislature, agency, board, bureau, commission, instrumentality of any legislative, administrative or regulatory body (in each case whether federal, state, local, foreign or domestic or any agreement), except in each case where the failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; or (iii) any material agreement, instrument, or indenture, binding on or otherwise affecting it, except to the extent waivers in form and substance reasonably satisfactory to the Lender of each such contravention have been obtained;

(e)     the execution, delivery, and performance by the Loan Parties of this Agreement do not and will not require any filing or registration with, consent, or authorization or approval of, or notice to, or other action with or by, any court, legislature, agency, board, bureau, commission, instrumentality of any legislative, administrative or regulatory body (in each case whether federal, state, local, foreign or domestic or any agreement) or other Person, except to the extent which such filings, registrations, consents, authorizations or approvals have been obtained or notices have been given, in each case, in form and substance reasonably satisfactory to the Lender;

(f)     it (i) is duly organized, validly existing and in good standing under the laws of the state of its incorporation, and (ii) has full corporate or other similar power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby, including without limitation to own, hold, sell and transfer (pursuant to this Agreement) the Transferred Assets;

(g)     it is in good standing and duly qualified, licensed or admitted to do business in each jurisdiction in which the ownership, use or leasing of its assets and properties, or the conduct or nature of its business, makes such good standing, qualification, licensing or admission necessary;

(h)     it does not and shall not dispute the validity, priority, enforceability or extent of the Lender's liens and security interests in the Transferred Assets, nor the Lender's entitlement to the immediate possession of the Transferred Assets, in any judicial, administrative or other proceeding; and

(i)     the Loan Parties have obtained all permits, approvals, licenses, accreditations, certificates, and certifications from, and all material filings, reports, registrations and contractual obligations with, and all material reports to, any Governmental Authority whether federal, state, local, and all agencies thereof, or other third party, which are required for the Loan Parties' business thereon.

10.     Covenants.

(a)      Taxes and Information.

(i)      Solely for U.S. federal and all other applicable income tax purposes, the transfer of the Transferred Assets provided for herein shall be treated as a transfer of assets, subject to their liabilities, in exchange for a full satisfaction and full forgiveness of the obligations under the Loan Documents and the receipt of the Cash Payment and the Seller Note. Each of the Lender and Loan Parties shall, and shall cause their respective Affiliates to, file all of the income tax returns consistent with this Section 10(a)(i) and not take a position during the course of any audit or other proceeding that is inconsistent with such treatment, unless otherwise required by a final "determination" as defined in Section 1313(a) of the Code (or any similar applicable provision of any state, local or non-U.S. tax law).

(ii)      Consistent with the principles of Section 1060 of the Code and the Treasury Regulations thereunder (and any similar provisions of state, local, or non-U.S. Tax Law, as appropriate), any amounts treated as consideration for U.S. federal Income Tax purposes, shall be allocated among the assets of the Loan Parties in accordance with the Lender's proposed allocation delivered to the Loan Parties within sixty (60) days after the Closing.

(iii)      The Lender and the Loan Parties shall cooperate in good faith as and to the extent reasonably requested in connection with the filing of tax returns (including income tax returns of the Loan Parties) and any audit, litigation or other proceeding with respect to taxes. Such cooperation shall include the retention and (upon the other party's reasonable request) the provision of records and information that are reasonably necessary to the preparation and filing of any tax return or relevant to any such audit, litigation or other proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.

(b)      Releases. Each of the Loan Parties (each for itself and on behalf of each of its Subsidiaries and affiliates and their respective equityholders, managers, representatives, agents, employees, officers and directors and successors and assigns claiming by, through or under it) hereby, as of the Closing, irrevocably and unconditionally remises, releases, acquits, satisfies and forever discharges the Lender and each of its Subsidiaries and affiliates and each of their respective equityholders, managers, members, representatives, agents, employees, officers and directors, and its and their respective successors and assigns claiming by, through or under it (collectively, the "Lender Parties"), in each case, of and from any and all manner of actions, causes of action, suit, debts, accounts, covenants, contracts (including any obligations under shareholder notes or management contracts), controversies, agreements, variances, damages, judgments, claims and demands whatsoever, in law or in equity, and whether known or unknown, absolute, fixed or contingent, suspected or unsuspected, liquidated or unliquidated, due or to become due or otherwise, in each case, which any Loan Party ever had, now has or, to the extent relating to, arising from or in connection with any act, omission or state of facts taken, failed to have been taken or existing on or prior to the Closing and to the extent relating to, in connection with, or arising our of the Note, the other Loan Documents, this Strict Foreclosure or the processes or transactions contemplated or effectuated hereby or thereby.  Without limiting the generality of the foregoing, each of the Loan Parties (each for itself and on behalf of each of its Subsidiaries and affiliates and their respective equityholders, managers, representatives, agents, employees, officers and directors and successors and assigns claiming by, through or under it) irrevocably and unconditionally waives and affirmatively agrees not to, and to cause each of their subsidiaries and affiliates not to, allege or otherwise pursue any counterclaims, claims or causes of action they shall or may have prior to, on or after the date hereof, in each case, relating to the above-referenced claims, including, but not limited to, the rights to contest the conduct of any of the Lender Parties relating to, in connection with, or arising out of their relationship with any Loan Party prior to the date hereof, the Note or any of the other Loan Documents on or prior to the date hereof, or this Strict Foreclosure.

11.    <u>Notices</u>.  All notices, demands, or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given or made when (a) delivered personally to the recipient, (b) sent to the recipient by electronic mail (in which case, it will be effective upon receipt of confirmation of good transmission, including, but not limited to, any response to such electronic mail), or (c) one business day after being sent to the recipient by reputable overnight courier service (charges prepaid), and in the cases of clauses (a) and (c) above, will be accompanied by email within one (1) business day of the day notice is given.  Such notices, demands and other communications will be sent to the parties at the addresses indicated below, or at such address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party:

<u>If to the Lender</u>:

BioVintage, Inc.
P.O. Box 3531
Rancho Santa Fe, CA 92067
Attention: Henry Ji, Ph.D.
Email: henryji92130@yahoo.com

<u>with copies to (which will not constitute notice)</u>:

Paul Hastings LLP
1999 Avenue of the Stars, 27th Floor
Century City, CA 90067
Telephone: (310) 620-5760
Email: justinrawlins@paulhastings.com
Attention: Justin Rawlins

<u>If to the Loan Parties</u>:

Sorrento Therapeutics, Inc.
9380 Judicial Drive
San Diego, CA 92121
Attn: _____
Email: _____

<u>with copies to (which will not constitute notice)</u>:

Latham & Watkins LLP
330 Wabash Avenue
Chicago, IL 60611
Email: _____
Attention: _____

12.    <u>Definitions</u>.  Some capitalized terms used in this Agreement have the meanings set forth below and other capitalized terms used in this Agreement are defined in the Sections where such terms first appear.

(a)    "<u>Affiliate</u>" means with respect to any Person, means any Person directly or indirectly controlling, controlled by or under common control with such Person.

(b)      "Person" means an individual, a partnership, a joint venture, a limited liability company, a corporation, a trust, an unincorporated organization, a group, a governmental or regulatory authority, or any legal entity or association.

13.      [Reserved].

14.      Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal, or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed, and enforced in such jurisdiction as if such invalid, illegal, or unenforceable provision had never been contained herein.

15.      Complete Agreement.  This Agreement, those documents expressly referred to herein and other documents of even date herewith embody the complete agreement and understanding among the parties hereto and supersede and preempt any prior understandings, agreements, or representations by or among the parties hereto, written or oral, which may have related to the subject matter hereof in any way.  EACH PARTY HERETO AGREES THAT NONE OF THE LOAN PARTIES OR THE LENDER MAKE ANY REPRESENTATIONS OR WARRANTIES OTHER THAN THOSE OF THE LOAN PARTIES SET FORTH IN SECTION 9, AND EACH HEREBY DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES MADE BY ITSELF OR ANY OF ITS OFFICERS, DIRECTORS, MEMBERS, MANAGERS, EMPLOYEES, AGENTS, FINANCIAL AND LEGAL ADVISORS OR OTHER REPRESENTATIVES, WITH RESPECT TO THE EXECUTION AND DELIVERY OF THIS AGREEMENT OR THE TRANSACTION CONTEMPLATED HEREBY, OTHER THAN THOSE OF THE LOAN PARTIES SET FORTH IN SECTION 9.

16.      No Strict Construction.  The language used in this Agreement will be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction will be applied against any party.

17.      Counterparts.  This Agreement may be executed in separate counterparts each of which will be deemed to be an original and all of which taken together will constitute one (1) and the same agreement.

18.      Successors and Assigns.  Except as otherwise provided herein, this Agreement will bind and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns; provided, that the rights and obligations of each party will not be assigned or delegated without the express written consent of all other parties.

19.      Choice of Law.  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without reference to the conflicts or choice of law principles thereof that would require application of the law of another jurisdiction other than the State of New York. Each of the Loan Parties hereby irrevocably consents to the jurisdiction of the U.S. Bankruptcy Court for the Southern District of Texas in any action, claim or other proceeding arising out of any dispute in connection with this Agreement, any rights or obligations hereunder, or the performance of such rights and obligations.  Each of the Parties hereby irrevocably consents to the service of a summons and complaint and other process in any action, claim or proceeding brought by the Lender in connection with this Agreement, any rights or obligations hereunder, or the performance of such rights and obligations, on behalf of itself or its property, in the manner specified in the applicable Loan Document.  Nothing in this section shall affect the right of any Party to serve legal process in any other manner permitted by applicable law or

affect the right of any Party to bring any action or proceeding against any of the other Parties or any of their respective properties in the courts of any other jurisdictions.

20. <u>MUTUAL WAIVER OF JURY TRIAL</u>. BECAUSE DISPUTES ARISING IN CONNECTION WITH COMPLEX TRANSACTIONS ARE MOST QUICKLY AND ECONOMICALLY RESOLVED BY AN EXPERIENCED AND EXPERT PERSON AND THE PARTIES HERETO WISH APPLICABLE STATE AND FEDERAL LAWS TO APPLY (RATHER THAN ARBITRATION RULES), THE PARTIES HERETO DESIRE THAT THEIR DISPUTES BE RESOLVED BY A JUDGE APPLYING SUCH APPLICABLE LAWS. THEREFORE, TO ACHIEVE THE BEST COMBINATION OF THE BENEFITS OF THE JUDICIAL SYSTEM AND OF ARBITRATION, EACH PARTY TO THIS AGREEMENT HEREBY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT AND/OR THE TRANSACTIONS CONTEMPLATED HEREBY.

21. <u>Remedies</u>. Each of the parties to this Agreement will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction (without posting any bond or deposit) for specific performance and/or other injunctive relief in order to enforce or prevent any violations of the provisions of this Agreement.

22. <u>Amendment and Waiver</u>. The provisions of this Agreement may be amended and waived only with the prior written consent of the parties hereto.

23. <u>Electronic Delivery</u>. This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of DocuSign® or a photographic, photostatic, facsimile, portable document format (.pdf), or similar reproduction of such signed writing using a facsimile machine or electronic mail will be treated in all manner and respects as an original agreement or instrument and will be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. No party hereto or to any such agreement or instrument will raise the use of DocuSign® or a facsimile machine or electronic mail to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or electronic mail as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

24. <u>Further Assurances</u>.

(a) On and after the date hereof, upon the request of any party hereto, the other party shall execute and deliver such assignments and other instruments as may be reasonably requested by the requesting party in order to evidence and effectuate the transactions contemplated by this Agreement, including, without limitation, (x) any assignments of copyright rights, patent rights and trademark rights, with respect to all copyrights, patents and trademarks owned by the Loan Parties, in each case, in form and substance reasonably satisfactory to the Lender, and (y) properly completed and duly executed IRS Form W-9 for each of the Loan Parties, in each case, to the extent requested by the Lender from time to time.

(b)      At reasonable times, upon reasonable notice, and as reasonably requested by the Lender, the Loan Parties shall reasonably cooperate with the Lender to provide access to documents, records and other information related to the Loan Parties.

25.      <u>No Third Party Beneficiaries</u>.  This Agreement shall define the relative rights of the parties hereto. This Agreement shall not be deemed to create any rights or priorities in favor of any other Person (other than the successors and assigns of the parties hereto), and there are no other parties or Persons whatsoever, who are intended to be benefited in any manner whatsoever by this Agreement (other than the successors and assigns of the parties hereto).

[*The remainder of this page is intentionally left blank; signature page to follow*]

IN WITNESS WHEREOF, the parties hereto have executed this Strict Foreclosure Agreement as of the date first above written.

**LENDER:**

BIOVINTAGE, INC.

By: _____
Name:
Title:

**LOAN PARTIES:**

SORRENTO THERAPEUTICS, INC.

By: _____
Name:
Title:

SCINTILLA PHARMACEUTICALS, INC.

By: _____
Name:
Title:

*[Signature Page to Strict Foreclosure Agreement]*

**Schedule 1**

**Permitted Liens on the Transferred Assets**

1.   [_____]

**EXHIBIT A-1**

**Transferred Assets**

(a) All prepetition and post-petition real property and all prepetition and post-petition tangible and intangible personal property of each Loan Party, in each case wherever located and whether now owned or hereafter acquired, including, but not limited to, all accounts, contracts rights, chattel paper, cash, general intangibles, intellectual property, machinery, equipment, goods, inventory, furniture, fixtures, letter of credit rights, books and records, deposit accounts, documents, instruments, arbitration awards, commercial tort claims, money, insurance, receivables, receivables records, collateral support, supporting obligations and instruments, all interests in leaseholds and real properties, all patents, copyrights, trademarks (but excluding trademark applications or "amendments to alleged use" filed in the United States Patent and Trademark Office on the basis of the applicant's intent-to-use such trademark unless and until evidence of use of the trademark has been filed with, and accepted by, the United States Patent and Trademark Office pursuant to Section 1(c) or Section 1(d) of the Lanham Act (15 U.S.C. §1051, et seq.)), trade names and other intellectual property (whether such intellectual property is registered in the United States or in any foreign jurisdiction), all equity interests, all books and records relating to the foregoing, and all proceeds, products, accessions, rents and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of New York (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)), and (b) actions brought under section 549 of the Bankruptcy Code to recover any post-petition transfer of the Collateral and Avoidance Actions and proceeds of Avoidance Actions; <u>provided</u>, <u>that</u>, the Transferred Assets shall not include any Excluded Assets (as defined in the Final Order).[2]

---

[2] NTD: definition of Transferred Assets to align with definition of Purchased Assets in the APA, once finalized

EXHIBIT A-2

**Assumed Liabilities**

1.      [_____]

**Schedule 1 to Exhibit A-2**

Assumed Accounts Payable

[see attached]

**Exhibit B**

**Secured Party Bill of Sale**

This BILL OF SALE is made and entered into as of [_____], 2024 (this "Bill of Sale") by and among Sorrento Therapeutics, Inc., a Delaware corporation ("Sorrento"), Scintilla Pharmaceuticals, Inc., a Delaware corporation ("Scintilla" and, together with Sorrento, collectively, the "Loan Parties"), and BioVintage, Inc., a California corporation (the "Lender").

WHEREAS, pursuant to the Strict Foreclosure Agreement, dated as of even date herewith, by and among the Loan Parties and the Lender (the "SFA"), the Lender, in accordance with its rights as a secured party under the Uniform Commercial Code as enacted in the State of New York (the "UCC"), has agreed to accept the transfer to the Lender by the Loan Parties of all of the Loan Parties' right, title and interest in the Transferred Assets as a full satisfaction of the obligations of the Loan Parties owing to the Lender under the Note. Capitalized terms used and not otherwise defined herein shall have the meanings given to them in the SFA.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Lender hereby agrees as follows:

1. Subject to the terms and conditions of the SFA, the Loan Parties do hereby, sell, transfer and deliver unto the Lender, its successors and assigns, the Transferred Assets.

2. To the extent that any provision of this Bill of Sale is inconsistent or conflicts with the SFA, the provisions of the SFA shall control.

3. The validity of this Bill of Sale, and the construction, interpretation and enforcement hereof, shall be governed by and shall be construed and interpreted in accordance with the laws State of New York (without giving effect to principles of conflicts of law).

4. This Bill of Sale may be executed in multiple counterparts, each of which when executed shall constitute one and the same agreement.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, each of the parties hereto has executed and delivered this Bill of Sale on the date first above written.

SORRENTO THERAPEUTICS, INC.,
as a Loan Party

By: _____
Name:
Title:

SCINTILLA PHARMACEUTICALS, INC.,
as a Loan Party

By: _____
Name:
Title:

ACCEPTED AND AGREED:

BIOVINTAGE, INC.,
as the Lender

By: _____
Name:
Title:

**Exhibit 2**

**Initial Budget**

**Sorrento Therapeutics**
Cash Flow Forecast

| Week #<br>Week Beginning<br>Week Ending | 54<br>2/18<br>2/24<br>Fcst. | 55<br>2/25<br>3/2<br>Fcst. | 56<br>3/3<br>3/9<br>Fcst. | 57<br>3/10<br>3/16<br>Fcst. | 58<br>3/17<br>3/23<br>Fcst. | 59<br>3/24<br>3/30<br>Fcst. | Total |
|---|---|---|---|---|---|---|---|
| *($ in millions)* | | | | | | | |
| **Cash Receipts** | | | | | | | |
| Non-Operating Receipts | $0.30 | – | – | – | – | – | $0.30 |
| Insurance Settlement | – | – | 1.90 | – | – | – | 1.90 |
| **Total Cash Receipts** | **$0.30** | **–** | **$1.90** | **–** | **–** | **–** | **$2.20** |
| **Cash Disbursements** | | | | | | | |
| **Operating Disbursements** | | | | | | | |
| Payroll, Taxes, and Medical | ($0.23) | ($0.37) | ($0.01) | ($0.43) | ($0.15) | ($0.37) | ($1.57) |
| Rent / Operating Leases | (0.04) | (0.44) | – | (0.09) | – | – | (0.57) |
| Licensing, Taxes, and Insurance | (0.06) | – | – | – | – | – | (0.06) |
| SG&A Other | (0.33) | (0.58) | (0.40) | (0.38) | (0.05) | (0.44) | (2.17) |
| **Total Cash Operating Disbursements** | **($0.65)** | **($1.39)** | **($0.42)** | **($0.90)** | **($0.20)** | **($0.81)** | **($4.37)** |
| **Other Disbursements** | | | | | | | |
| **Total Retained Professionals** | **($0.88)** | **($0.92)** | **($0.59)** | **($1.69)** | **($0.70)** | **($0.15)** | **($4.93)** |
| Professional Fees - Ordinary Course Professionals | (0.29) | (0.26) | (0.59) | (0.10) | (0.08) | (0.08) | (1.40) |
| **Total Other Disbursements** | **($1.17)** | **($1.18)** | **($1.18)** | **($1.79)** | **($0.78)** | **($0.23)** | **($6.33)** |
| **Total Disbursements** | **($1.83)** | **($2.57)** | **($1.60)** | **($2.69)** | **($0.98)** | **($1.03)** | **($10.70)** |
| **Cash Roll-Forward** | | | | | | | |
| **Net Cash Flow** | **($1.53)** | **($2.57)** | **$0.30** | **($2.69)** | **($0.98)** | **($1.03)** | |
| Beginning Cash | $3.60 | $5.06 | $2.50 | $4.80 | $2.11 | $1.13 | |
| Net Cash Flow | (1.53) | (2.57) | 0.30 | (2.69) | (0.98) | (1.03) | |
| DIP Funding | 3.00 | – | 2.00 | – | – | – | |
| **Ending Unrestricted Cash** | **$5.06** | **$2.50** | **$4.80** | **$2.11** | **$1.13** | **$0.10** | |

**<u>Exhibit 3</u>**

**Sale Term Sheet**

<u>EXECUTION VERSION</u>

**SORRENTO ASSETS ACQUISITION**

SUMMARY OF KEY TERMS

February 16, 2024

*The following is a summary of principal terms for the proposed transaction (the "<u>Transaction</u>") and is not intended to be a complete description of a transaction, an agreement or terms capable of binding any party, or a legal offer of any kind. This term sheet is provided for discussion purposes only. Unless and until a definitive written agreement with respect to the Transaction has been executed, no party will be under any legal obligation of any kind whatsoever with respect to such a transaction (other than any obligations of confidentiality and non-disclosure pursuant to any separate confidentiality agreement entered into by a party).*

| | |
|---|---|
| **Acquired Assets:** | A limited liability company owned by Henry Ji and certain other investor(s) or a shelf company designated by such limited liability company (in each case, "<u>NewCo</u>"), funded entirely by said other investor(s), will acquire from the bankruptcy estate of Sorrento Therapeutics, Inc. ("<u>Sorrento</u>")[1] the following assets (the "<u>Acquired Assets</u>"), subject to statutory requirements for assumption and assignment, to the extent applicable: |

- All equity interests held directly or indirectly by Sorrento in the entities set forth on <u>Exhibit A</u> hereto, including all affiliates and subsidiaries of such entities (collectively, the "<u>Acquired Equities</u>"). For the avoidance of doubt, the Acquired Equities include all Sorrento's subsidiaries on <u>Exhibit A</u> hereto (collectively, the "<u>Acquired Subsidiaries</u>"). For further avoidance of doubt, the Acquired Equities shall include: (i) ACEA Therapeutics, Inc., (ii) Concortis Biosystems, Corp. ("<u>Concortis</u>"), (iii) Aardwolf Therapeutics, Inc., and (iv) each of Sorrento's subsidiaries incorporated in the People's Republic of China, including, without limitation: Levena Suzhou Biopharma Co., Ltd.; Sorrento Therapeutics (Shanghai) Co., Ltd.; and Nanjing Levena Biopharma Co. Ltd.

- Certain assets of Sorrento, including: any drugs under development held directly by Sorrento and its Acquired Subsidiaries (the "<u>Acquired Drugs</u>"); any and all equipment, instruments and laboratory supplies, office furniture and supplies; any and all intellectual property, including patents, patent applications, and rights in know-how; any and all regulatory filings, documentation for all drugs and drug

---

[1] Following the effective date of the plan, the Liquidating Trust shall be the successor to Sorrento, subject to the Sorrento estate's reversionary interest as provided herein.

candidates under development; any and all business licenses; any and all laboratory notebooks, recordings and results thereof; and any and all license agreements and contracts not otherwise excluded hereunder.

- All rights and liabilities under that certain Asset Purchase Agreement, dated as of July 2, 2018, among Kimberly-Clark Corporation, Kimberly-Clark Global Sales, LLC, and Sorrento Therapeutics, Inc. (the "Kimberly Clark Contract"), provided that the estimated cure payment shall be $0; provided further that upon assumption NewCo shall assume any contingent consideration due under said contract and other liabilities and obligations thereunder.

- The ACEA Earn-Out Agreement, including the assumption of any contingent consideration due under said contract and other liabilities and obligations thereunder.

- All claims, counterclaims and causes of action, other than the Identified Causes of Action (as defined below) (collectively, the "Acquired Causes of Actions"). For the avoidance of doubt, (i) the matters set forth on Exhibit B hereto are all Acquired Causes of Action and (ii) the claims against Nant Parties under the Nant Settlement (each as defined by the Plan) have been settled, and the Nant Settlement has been approved by the Bankruptcy Court [Docket No. 1205].

- All rights, interests and obligations in leases with respect to: (i) building located at 9380 Judicial Drive, San Diego, California 92121, (ii) Sorrento's Camino Sante Fe facilities at 8395 Camino Santa Fe, Suite A-C and 8340 Camino Santa Fe, Suite D-E in San Diego, California 92121, and (iii) Sorrento's Sofusa facilities at 8601 Dunwoody Pl. Unit 570, 580, and 620, Sandy Springs, GA (collectively, "Assumed Leases").

- All rights and obligations under contracts with ImmuneOncia and Yuhan (other than as described below in the section of this term sheet entitled "Excluded Assets").

- An option to acquire all rights and interests in the Virex Diagnostic Technology (including, for the avoidance of doubt, equity interests of Virex Health Inc), exercisable by NewCo for $500,000 and assumption of milestone liabilities if Sorrento has failed to enter into a purchase agreement for the sale of such technology to a third party within sixty (60)

days following the consummation of the Transaction (such option, the "<u>Virex Option</u>").

**Total Consideration:**    In consideration for the Acquired Assets, NewCo will:

- Pay $20.9 million to Sorrento, subject to customary working capital adjustment, consisting of $15.5 million in cash, plus Henry Ji's agreement to waive in excess of $400,000 in compensation and benefits (including accrued PTO), plus a $5 million promissory note with a 2-year term. The promissory note shall accrue simple interest at a rate of 4% per year and shall be prepayable by NewCo without penalty.

- Issue a 7% equity interest as of the date of the Initial Capitalization of NewCo to Sorrento in each of certain subsidiaries of NewCo as set forth on <u>Exhibit C</u> hereto (further described below in the section of this term sheet entitled "***Acquired Drugs***").

- Prior to unsecured claims being paid in full, that 7% cannot be diluted by an additional equity infusion from a party other than NewCo[2] unless

    – NewCo has raised $50mm (excluding the $15.5 million cash consideration for this transaction); and

    – NewCo has invested at least $10 million cash in the subsidiary where additional new money would be contributed; and

    – NewCo determines in good faith that such equity is needed for that subsidiary's continued operation and growth; and

    – NewCo determines in good faith that debt funding is either not readily and commercially available or, to the extent readily and commercially available, is not superior to an equity raise for that subsidiary.

- Dilution would work as follows:

    – For purposes of the equity investment, the subsidiary is valued at no less than $50mm; and

---

[2] An additional equity infusion by NewCo would not dilute the 7% given to the estate.

– That value is increased by the new cash (not NewCo cash).[3]

- Assume all debts and other liabilities of the Acquired Subsidiaries.

- Assume from Sorrento certain debt and other liabilities, including (i) the obligations under the Kimberly Clark Contract which, if not assumed, could lead to large claim against the Sorrento bankruptcy estate and (ii) the obligations under the Assumed Leases other than the excluded leases described in the Excluded Assets, subject to NewCo and the claimants reaching mutually acceptable terms with respect to the assumption of such obligation.

In addition:

- If Sorrento undertakes any financing after the consummation of the Transaction, proceeds shall be used to pay any fees and expenses in association with the financing and thereafter 80% of the remaining net proceeds shall be allocated to the liquidating trust for the benefit of Sorrento's unsecured creditors until Sorrento's unsecured creditors are paid in full.

- Upon NewCo's receipt of aggregate payouts through asset sales by, mergers and acquisitions involving, or otherwise from the operation of, the subsidiaries of NewCo equaling or exceeding $500 million in cash, and exclusive of value available to distribute to Sorrento through the initial 7% equity interest granted, NewCo shall distribute to Sorrento $35 million in cash.

---

[3] How this dilution provision is intended to work in practice:

- Assume all conditions are satisfied here are two examples of how this is intended to work:
  – Example #1: NewCo raises $10mm of new investor money for sub-1
    ▪ Sub 1 then has an implied value of $60mm ($50mm assumed plus $10m cash)
    ▪ For that new $10, the new investor would own 1/6th ($10mm/$60mm)
    ▪ The existing equity of that subsidiary would be diluted by 1/6th
  – Example #2: Newco raises $50 mm of new investor money for sub-1
    ▪ Sub 1 then has an implied value of $100mm ($50mm assumed plus the $50mm of new cash)
    ▪ For that new $50mm, the new investor obtains 50% of sub 1 ($50mm/$100mm)
    ▪ Existing equity would be diluted by 50%

4

- Sorrento shall receive 20% of any net proceeds received by NewCo in connection with settlement or resolution of any Acquired Causes of Action, with such proceeds to be allocated to the Liquidating Trust provided, that Sorrento's entitlement to such proceeds shall cease once all of Sorrento's unsecured creditors holding allowed claims have been paid in full.

- NewCo will provide to Sorrento a senior secured debtor-in-possession ("DIP") loan due March 31, 2024 with an aggregate principal amount of $5 million pursuant to which Sorrento and the creditors' committee shall agree that, if there has been a material default or event of default or if the Transaction has not been consummated on or before March 31, 2024, NewCo and Sorrento may proceed with a partial strict foreclosure on substantially all of the assets of Sorrento (including, without limitation, the assets contemplated to be purchased pursuant to the Transaction), provided that such partial strict foreclosure provides for payment on the terms set forth herein, provided however, the Purchase Price shall be reduced on a dollar for dollar basis by the amount of any fees, expenses, and costs incurred by NewCo in exercising remedies.

- After consummation of the Transaction, NewCo shall provide the following co-invest opportunities to certain Sorrento equity holders:

  - Accredited investors (and to the extent not burdensome to NewCo, in NewCo's judgment, and in compliance with applicable securities laws, non-accredited investors) may invest in common equity of NewCo on a pro rata basis for up to $5 million in aggregate value, to be funded within seven (7) calendar days of closing of the Transaction.

  - Accredited investors (and to the extent not burdensome to NewCo, in NewCo's judgment, and in compliance with applicable securities laws, non-accredited investors) will also have the opportunity to participate for up to 10% of the aggregate amount of the first registered public equity offering undertaken by NewCo or any of its subsidiaries.

**Clawback Claims**     Sorrento may, in its discretion, elect to (i) settle and dispose of the pending claims with respect to any shares of Scilex clawed back by Sorrento pertaining to the Scilex Distribution (defined

5

below) (including, for the avoidance of doubt, any Scilex shares contemplated to be distributed in connection therewith but which are currently held in abeyance by Sorrento) (collectively, such claims, the "<u>Clawback Claims</u>") or (ii) sell all rights with respect to the Clawback Claims to NewCo for $1 million in cash. Notwithstanding the foregoing, prior to the closing of the Transaction, Sorrento shall file a motion with the bankruptcy court to extend the automatic stay prohibiting trading and other restrictions applicable to the transfer of the Scilex shares through a date for two (2) months after the date on which the Transaction is consummated (such period, the "<u>Restricted Period</u>") and Sorrento shall use commercially reasonable efforts to obtain approval of such motion.  For the avoidance of doubt, during the Restricted Period, Sorrento may not transfer, pledge, encumber or otherwise dispose of any Scilex shares.

**Bidding Procedures:**  This term sheet is subject to the bidding procedures previously approved by the Court including reimbursement of expenses (and associated interest, if applicable) incurred by NewCo in connection with the Transaction in the event Sorrento enters into an alternative transaction.

**Excluded Assets:**  The following assets will be excluded from the Transaction (the "<u>Excluded Assets</u>"):

- cash or cash equivalents (including any deposits or prepayments) held by Sorrento

- any accounts receivable held by Sorrento

- all monies payable to Sorrento under Article 6 of that certain Exclusive License and Development Agreement between Sorrento and China Oncology Focus Limited (Lee's Pharma), deducting all legal expenses/fees associated with the enforcement of the milestone payment under Article 6.

- publicly traded securities held by Sorrento (including, for the avoidance of doubt, any securities that are issued by Scilex Holding Company ("<u>Scilex</u>") (including, without limitation, any shares of common stock of Scilex which Sorrento currently holds in abeyance for certain warrant holders of Sorrento, regardless of whether or not such shares of common stock subsequently become an unencumbered asset of Sorrento))

- (A) all causes of action (or proceeds thereof) and defenses under Chapter 5 of the Bankruptcy Code, including under

section 502(d) and (B) other causes of action related to (i) the distribution by Sorrento of its common stock in Scilex to Sorrento's shareholders on or about January 19, 2023 (the "Scilex Distribution"), including the Clawback Claims, (ii) the current or former directors or officers of Sorrento, Scintilla Pharmaceuticals, Inc. ("Scintilla") or Scilex (other than in connection with the Facility), (iii) any transfer by Scintilla or Sorrento to any of their subsidiaries or affiliates occurring prior to the petition date, and (iv) any insider or affiliate transaction, including investments by Sorrento in other companies (the "Identified Causes of Action").

- NewCo shall use commercially reasonable efforts to preserve defenses the Debtor may have against parties with claims against the Debtor.

- While NewCo will acquire all causes of action [4] (other than the Identified Causes of Action), Sorrento may prosecute counterclaims and assert a right of set-off with respect to objections to proofs of claim.

- To the extent Sorrento asserts counterclaims and set-off rights in seeking to settle proof of claim filed against it, Sorrento may not enter into a settlement or other resolution with respect to such claim without prior consultation with NewCo. Further, Sorrento shall not settle or resolve such claim without NewCo's consent to the extent NewCo provides Sorrento with an acceptable backstop with respect to such claim up to the amount of such claim.

- NewCo and Sorrento shall agree to cooperate with the primary goal of minimizing claims against Sorrento and maximizing affirmative recoveries for NewCo, if any. NewCo does not currently intend to pursue the Acquired Causes of Action unless it determines in its reasonable judgment that doing so would be in the best interests of NewCo's consolidated post-closing businesses.

- all rights, interests and obligations in leases with respect to properties located at: (i) 4930 Directors Place, San Diego, California 92121, (ii) 4921 Directors Place, San Diego,

---

[4] While Newco is acquiring all causes of action other than the Identified Causes of Action, as a matter of disclosure Newco will not pursue causes of action other than acquired causes of actions that are materially beneficial to NewCo's operations, intellectual property, or drug development and not adverse to the Liquidating Trust.

California 92121, (iii) 4955 Directors Place, San Diego, California 92121, (iv) 4939 Directors Place, San Diego, California 92121, (v) 4690 Executive Drive, San Diego, California 92121, and (vi) the lease described under Docket 436.

- any insurance policies or proceeds thereof relating to any Excluded Claims

- any tax assets/attributes of Sorrento

- The certain Manufacturing Know-How, Supply Chain, Material and Consulting Agreement, by and between Sorrento, Ark Animal Health, Inc., and EDRR, LLC, as amended from time to time.

- The remaining outstanding payments under the contracts with Yuhan, provided that Sorrento may only retain an amount equal to the lesser of (i) $900,000 and (ii) $900,000 minus any fees and expenses expended in pursuing the recovery of payment from Yuhan.

- All rights, interests and obligations in leases with respect to: all buildings, offices, facilities and other properties of Bioserv Corp and its subsidiaries in San Diego, California.

"Facility" has the meaning ascribed to such term in the Junior Secured, Super-Priority Debtor-in-Possession Loan and Security Agreement, dated as of July 28, 2023, by and among Sorrento, Scintilla, and Scilex.

In addition, the Excluded Assets also include any assets (including intellectual property or inventory) relating to the following business units/entities: (a) Cytimm Therapeutics, Inc. and (b) ImmuneOncia.

**Structure:**  In connection with the Transaction, Sorrento shares will not be cancelled and any reversionary interest retained by Sorrento's shareholders in the liquidating trust will be run through Sorrento.

**Acquired Drugs:**  Following the closing of the Transaction, separate subsidiaries of NewCo will own each of the Acquired Drugs (each such subsidiary, a "NewCo Subsidiary"), with initially 93% of the equity interests of each such NewCo Subsidiary to be owned by NewCo and 7% of the equity interests of each such NewCo Subsidiary to be owned by Sorrento (and then the Liquidating

8

Trust).  Such equity interests will initially take the form of preferred equity (to the extent legally permissible), convertible to common equity on a 1-to-1 ratio at the Liquidating Trustee or equity holder's election, provided that such preferred equity shall automatically convert into common equity upon the earlier to occur of the following:  (i) payment to the Liquidating Trust of an amount sufficient to satisfy all allowed general unsecured claims in full, (ii) effectiveness of any settlement between Sorrento and the creditors or Liquidating Trustee (on behalf of the Liquidating Trust and its beneficiaries) of similar effect, and (iii) in the event such NewCo Subsidiary's common equity becomes publicly listed and traded on a national securities exchange or other trading market (including, for the avoidance of doubt, the over-the-counter market) (any such exchange or market, a "<u>Securities Market</u>") or such NewCo Subsidiary consummates a merger or acquisition.  The organizational documents of each NewCo Subsidiary will include customary tag and drag provisions.

Sorrento will remain a publicly listed entity following the closing of the Transaction, provided that NewCo shall provide all services and bear all costs associated with maintaining Sorrento's public company status (including, if NewCo so elects, any termination of Sorrento's public company status).

Sorrento shall distribute the equity interests of each NewCo Subsidiary to the Liquidating Trust for the benefit of Sorrento's creditors and/or then-current shareholders and the Liquidating Trustee shall have the option to distribute the equity interests of each NewCo Subsidiary to Sorrento's creditors and/or then-current shareholders (i) in the event such NewCo Subsidiary's common equity becomes publicly listed and traded on a Securities Market or such NewCo Subsidiary consummates a merger or acquisition and (ii) <u>if and only if</u>, at such time, Sorrento's common equity remains publicly listed and traded on a Securities Market (or Sorrento merges with a company whose equity securities are publicly listed and traded on a Securities Market) following Sorrento's emergence from bankruptcy.

NewCo will use commercially reasonable efforts to develop and commercialize the Acquired Drugs.

**Conditions to Signing:**

- Non-Material Modification of Chapter 11 plan:  The Company's Chapter 11 plan shall be modified as may be necessary to clarify that outstanding shares of Sorrento shall not be cancelled, with shareholders of Sorrento retaining their equity interests against Sorrento and Sorrento retaining

a reversionary interest in the liquidation trust (to allow Sorrento to make distributions to shareholders). Liquidating Trust/Trustee does not owe any duty to Sorrento.

- Negotiation and execution of definitive agreements

- CRO approval

**Conditions to Closing:**

- Entry of order by bankruptcy court approving the Transaction

**Governance of Reorganized Sorrento**

Directors:

- Henry Ji (Chairman)

- [*To come.*]

Officers:

- Henry Ji (President & CEO)

- [*To come.*]

**Purchase Agreement:**

The Purchase Agreement will provide for the acquisition of the Acquired Assets on an "as is, where is" basis and contain customary representations and warranties (*i.e.*, with respect to fundamental matters relating to Sorrento's power and ability to consummate the Transaction, such as title to interests) and covenants for a transaction of this type.

Sorrento will use its commercially reasonable best efforts to assign and assume contracts and leases to NewCo, including taking into account any requirements thereunder with respect to assurances of financial status, creditworthiness or future performance, such assumption and assignment shall be in accordance with the Bankruptcy Code, including, without limitation, Sections 363 and 365 of the Bankruptcy Code.

NewCo to provide certain representations with respect to Mr. Ji's activities with respect to process leading up to entry into the Transaction.

Closing to occur as promptly as reasonably practicable after execution of this term sheet (and in any event within two (2) weeks of entry of court order approving the Transaction).

**Public Announcements:**

Sorrento will not issue any press release or public statement with respect to the Transaction without the prior written consent of

10

NewCo, subject to customary exceptions for applicable law (including disclosures to bankruptcy court).

**Expenses:**          Except as otherwise provided herein, Sorrento and NewCo will each bear its own expenses, provided, however, Sorrento shall pay NewCo's expenses in the event of a successful overbid, subject to a mutually acceptable cap.

**Governing Law**      Delaware

**Venue:**             Texas Bankruptcy Court

\*       \*       \*

IN WITNESS WHEREOF, the undersigned have agreed to sign and deliver this non-binding summary of key terms as of the date first written above

HENRY JI

By: _____

DocuSigned by:

*Henry Ji*

6937F2A785014E7...

SORRENTO THERAPEUTICS, INC.

By:

Name:  Mohsin Meghji
Title:  Chief Restructuring Officer

U.C.C.

Mark Shinderman,
Counsel

## <u>EXHIBIT A</u>

- Concortis Biosystems Corp
  - ○ Levena Biopharma US Inc
  - ○ Concortis Inc
  - ○ Levena (Suzhou) Biopharma CO Ltd
    - ▪ Levena (Nanjing) Biopharma Co Ltd
    - ▪ Jiangsu Levena
- Ark Animal Health Inc
- Vavotar Life Sciences LLC
- Bioserv Corporation
- SmartPharm Therapeutics Inc
- Scintilla Health Inc
- TNK Therapeutics Inc
  - ○ CARgenix Holdings LLC
  - ○ BDL Products Inc
  - ○ Virtu Biologics Limited
  - ○ Sorrento Therapeutics (Shanghai) Co Ltd
  - ○ Siniwest Holding Corp
    - ▪ Shanghai 3 Biotechnology Co Ltd
- Sorrento Holding Company
- Sorrento Capital Acquisition Corp I
- Sorrento Biologics Inc
- SNAN HoldCo LLC
- ACEA Therapeutics Inc
  - ○ ACEA Therapeutics Ltd (HK)

- - Zhejiang ACEA Pharmaceutical Co LTD

  - Hangzhou ACEA Pharmaceutical Research Co Ltd

- Sorrento Therapeutics Inc Hong Kong Ltd

- Sorrento Mexico

- Virex Health Inc (pursuant to the Virex Option)

- Brink Biologics Inc

- Coneksis Inc

- SNAN HoldCo LLC

- Pulsar Therapeutics Inc

- Globavir Biosciences Inc

- Deverra Therapeutics Inc

- TNK Therapeutics Inc

  - Sorrento Therapeutics (Shanghai) Co Ltd

  - Ningbo Ziyuan Medical Device Co Ltd

  - Sorrento Shangai Medical Technology Co Ltd

    - Shenzhen Sorrento Medical Technology Co Ltd

  - Shenzhen Yunma Biotechnology Co Ltd

    - Yunnan Masheng

- Aardvark Therapeutics, Inc

- Aardwolf Therapeutics, Inc.

## EXHIBIT B

1. Sorrento Therapeutics, Inc. v. NantPhama, LLC, Case No. 23STCP00295 (LA Superior Court filed Feb 2, 2023).

2. Sorrento Therapeutics, Inc. v. NantCell, Inc., et. al, Case No. 19STCV11328 (filed April 3, 2019).

3. Immunotherapy NANTibody, LLC, et al. v. Sorrento Therapeutics, Inc., et. al, Case No. 19STCV18304 (filed May 24, 2019).

4. Sorrento Therapeutics, Inc. v. Patrick Soon-Shiong, Case No. 20STCV08789 (filed March 3, 2020).

5. Sorrento Therapeutics, Inc. v. NantPharma, LLC, Case No. 23STCP00295 (LA Superior Court filed Feb 2, 2023).

6. Sorrento Therapeutics, Inc., et al. v. Miao, et al., Case No. 37-2018-00032934 (filed July 2, 2018 S.D. Superior Court).

7. Sorrento Therapeutics, Inc., et al. v. Li, et al., Case No. 37-2021-00026791 (filed June 21, 2021 S.D. Superior Court).

8. Sorrento Therapeutics, Inc., et al. v. Li, et al., CAUSE NO: FSD 183 OF 2022 (CRJ) (Grand Court of the Cayman Islands).

9. Sorrento Therapeutics, Inc. v. CBC Group Investment Mgm't, HKIAC/A21102 (Hong Kong International Arbitration Centre).

10. Sorrento Therapeutics, Inc. v. Deverra Therapeutics, Inc. et al., Case No. 37-2022-00034031-CU-BC-CTL (San Diego Superior Court).

11. PROSPECT MEDICAL HOLDINGS, INC., a Delaware Corporation; and PROSPECT CHARTERCARE RWMC, LLC d/b/a ROGER WILLIAMS MEDICAL CENTER, a Rhode Island Limited Liability Company vs. SORRENTO THERAPEUTICS, INC., and TNK THERAPEUTICS, INC. and TNK THERAPEUTICS, INC. vs. PROSPECT CHARTERCARE RWMC, LLC, et al., JAMS Ref. No. 1100110590.

12. Other than settled claims and Identified Causes of Action, all claims, of any kind, arising out of or relating to, the facts and claims at issue in Sorrento's prior litigations against any of the above parties.

## <u>EXHIBIT C</u>

1. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the Ovydso drug candidate (SubCo 1).

2. A subsidiary company of the NewCo ("ACEA Therapeutics Inc") consists of the Abivertinib drug candidate (SubCo 2).

3. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the CD38 ADC and CD38 DAR-T drug candidates (SubCo 3).

4. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the Sofusa Technology (SubCo 4).

5. A subsidiary company of the NewCo ("Virex Health Inc") consists of the Virex Diagnostic Technology (SubCo 5), if the Virex Option is exercised.

6. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the TROP2 ADC (SubCo 5).

7. A subsidiary company of the NewCo ("Levena (Suzhou) Biopharma CO Ltd") consists of the Levena's ADC CDMO Business in China (SubCo 6).

8. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of the RTX Drug candidate (SubCo 7).

9. A newly formed subsidiary company of the NewCo (To-Be-Named) consists of Mayo Clinic's Adnic Technology (SubCo 8).