IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Sorrento Therapeutics, Inc., *et al.*,[1] | Case No. 23-90085 (CML) |
| Debtors. | (Jointly Administered) |
| | Related ECF Nos.: 1879 |

**OPPOSITION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO THE UNITED STATES TRUSTEE'S MOTION TO
TRANSFER VENUE OR DISMISS PURSUANT TO 28 U.S.C. § 1408 AND
FEDERAL RULE BANKR P. 1014(A)(2)**

The Official Committee of Unsecured Creditors (the "Creditors' Committee") of Sorrento Therapeutics, Inc., *et. al* (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), by and through its undersigned counsel, hereby submits this opposition to the *United States Trustee's Motion to Transfer Venue or Dismiss Pursuant to 28 U.S.C. § 1408 and Federal Rule Bankr P. 1014(A)(2)* [Docket No. 1879] (the "Motion").[2]

**PRELIMINARY STATEMENT**

1. Even if all of the allegations made in the Motion were true, the Court should deny the Motion. The Office of the United States Trustee (the "Trustee") has failed to carry its burden of showing that dismissal or transfer of venue for these Chapter 11 Cases would be convenient to parties or in the interests of justice. Further, and alone fatal to the Motion, the Trustee failed to bring the Motion timely. The Motion was filed well after the Court confirmed the plan of liquidation [Docket No. 1442] (the "Plan"), over a year after the voluntary petitions were filed on

---

[1]  The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Sorrento Therapeutics, Inc. (4842) ("Sorrento") and Scintilla Pharmaceuticals, Inc. (7956) ("Scintilla"). The Debtors' service address is: 9380 Judicial Drive, San Diego, CA 92121.

[2]  Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

February 13, 2023, and more than nine months after the § 341(a) meeting of creditors at which all of the relevant facts about the filing of this case were discussed.

2. The Trustee is considering a number of issues in connection with these cases and others, but at the core of the consideration of any issue must be the question of how estate recoveries are affected by the relief sought. And recoveries can only be harmed by the relief requested here. The economic reality of these cases is that the Debtors began the case with virtually no liquidity and no organized restructuring plan—a result of both the failure to develop commercial products and a variety of extremely troubling decisions made on the eve of bankruptcy that served to further diminish the estates' resources. These core facts cannot be altered through a change of venue. Transferring venue will not improve recoveries, and will instead diminish them further, by requiring the expenditure of further resources these estates do not have in educating a new court on the long history of these cases.

3. The Motion, far from being in the interests of justice or convenience, runs counter to both. It is filed nearly a year into these cases. The relief requested would not relieve harm, but cause it. The Creditors' Committee respectfully submits that the Motion should be denied.

### RELEVANT BACKGROUND

    **A.    Events Leading Up to the Chapter 11 Cases Show a Company Desperate for Liquidity Without Any Marketable Product.**

4. Despite spending nearly $500 million in the year prior to the commencement of these cases, the Debtors were unable to develop a product that they could bring to market. The Debtors have not received any funds from the commercialization of any of their products in the market during these cases.

5. To complicate matters, shortly before filing for bankruptcy, Sorrento improperly distributed shares of its (almost) wholly owned subsidiary, Scilex Holding Company, to its

shareholders.[3] Had those shares not been transferred, the Debtors would have been able to use those shares to fund an orderly bankruptcy process and create a runway for value-maximizing asset sales, or would have been able to make distributions to unsecured creditors (who, as a matter of law, have priority over equity holders).

6. In addition, the estates are owed money by third parties, including Lee Pharma. Had such third parties paid the estates what they owe, the estates may have had a longer runway. But such third parties have not paid, and, in the case of Lee Pharma, are denying any current obligation to pay.[4]

7. As the Debtors were unable to successfully develop the products with the money that shareholders had invested and took actions that impaired liquidity unnecessarily, the Debtors entered bankruptcy on an emergency basis without adequate liquidity or a defined exit strategy.

> **B.     Events During These Chapter 11 Cases Extended the Runway to Monetize Assets, But Did Not Solve the Debtors' Underlying Problem—the Failure to Bring Products to the Market.**

8. Given these severe liquidity issues, at the outset of these cases, the Debtors immediately sought and obtained an emergency debtor-in-possession loan [Docket No. 74] (the "Initial DIP"). The Initial DIP provided only a few months of liquidity, with proceeds expected to be exhausted by June 2023. Through a series of asset sales, cost-cutting, collaboration with various parties, and other efforts, the Debtors were able to extend the runway to monetize assets into 2024, an extension effectively funded with resources that otherwise could have been used to satisfy creditor claims.

---

[3]   As the Creditors' Committee has previously disclosed, the estates should claw back those shares as fraudulent conveyances or illegal liquating dividends given that the recipients—the shareholders of the Debtors—provided no consideration for such shares.

[4]   In the event that the proposed Sale (defined and discussed herein) is approved, the estates would preserve all claims against Lee Pharma and other such third parties who have failed to make payments owed the Debtors.

9. In addition, creditors and equity holders benefited greatly from the settlement that the Debtors reached with the Nant parties, which reduced claims against the Estates by more than $170 million—a claim that would have had priority over shareholder interests.

10. It also bears noting that the Debtors' investment banker, Moelis & Company, led a sale effort that, unfortunately, did not result in sufficient material sales to provide for creditor recoveries. On several occasions, parties indicated a willingness to buy but withdrew, following diligence or for unknown reasons. Moelis's process was multi-pronged, seeking to monetize Sorrento's remaining holdings in Scilex, raise exit financing to consummate a reorganization, and sell non-Scilex assets, all in parallel. Much time and effort were expended in pursuit of a reorganization, which could have resulted in some reinstatement of equity. The Debtors and Moelis kept the Equity Committee and Creditors' Committee informed about these efforts—successful and unsuccessful—every step of the way.

### C. Creditor Claims Are Likely in Excess of Available Recoveries.

11. In addition to the Debtors' prepetition equity investments in projects that did not result in the commercialization of any products, the Debtors also incurred substantial prepetition liabilities. The Creditors' Committee estimates that unsecured claims exceed $150 million and may exceed $300 million, depending on rejection damages, earnout provisions, litigation against Debtors, and other liabilities. These creditor claims are required by law to be paid ahead of equity interests.

12. As has been reported throughout these cases, including at the confirmation hearing, equity holders are most likely out of the money. Indeed, creditor recoveries may be very low depending on the success of potential litigation and the success of the buyer in the proposed Sale (defined and discussed herein) in developing the Debtors' intellectual property.

13. The Debtors' disclosure statement [Docket No. 1443] (the "Disclosure Statement") estimated that creditors might recover between 50% and 60% of what they are owed. This assumed certain very favorable results in litigation as well as the lack of additional claims. Lease rejections, litigation against the estate, and certain earnout provisions that might be triggered if the Debtors ceased operating would increase the amount of claims significantly, thus lowering the expected recovery.

## ARGUMENT

I.  **The Motion Should Be Denied.**

14. For either of two reasons, the Court should deny the Motion: the Trustee (i) has failed to carry its burden, as it has demonstrated neither that a change of venue is in the interests of justice nor convenient to any parties, and (ii) has failed to bring the Motion timely. Each reason is discussed more fully below.

> A. **Changing Venue at This Stage in the Cases Is Neither in the Interests of Justice Nor Convenient for the Parties.**

15. Federal Rule of Bankruptcy Procedure 1014 requires a court to evaluate whether venue transfer of a case filed in an improper venue would be "in the interest of justice or for the convenience of the parties." Fed. R. Bankr. P. 1014(a)(2). "There is no litmus test or set of hard and fast rules that offer precise guidance for transfer of venue, and the bankruptcy courts are left to a case-by-case determination based upon all relevant factors." *In re New Luxury Motors, LLC*, No. 10-30835-H3-11, 2010 WL 817204, at *3 (Bankr. S.D. Tex. Mar. 4, 2010).

16. The movant carries the burden of showing, by a preponderance of the evidence, that transfer is in the interests of justice or for the convenience of the parties. *Id.* And the Debtors' choice of forum is given considerable weight: when "the transferee venue is not clearly more convenient than the venue chosen by the debtor, the debtor's choice should be respected." *Id.*

17. The Trustee fails to explain how parties would be better off if the Court transferred (or dismissed) these Chapter 11 Cases, offering no argument whatsoever as to how the interests of justice would be served or the convenience of the parties would be served by a transfer of venue at this time. It does not, because it cannot. Changing venue at this point in time would be neither just nor convenient.

18. A new court would need to become familiar with the Plan, the liquidating trust agreement provided for thereunder, the pending mediation, the estates' current liquidity position, the long history of sale efforts, a variety of prepetition transactions, the currently proposed sale and alternatives thereto. The Court's familiarity with this litany of issues renders *this* venue the most convenient venue, by far, as these issues continue to resurface in these cases. For example, the new court would need to become familiar with the prepetition dividend of Scilex stock to Sorrento's shareholders, the claims arising therefrom, and this Court's orders extending the restricted trading period, as (among other reasons) the Creditors' Committee is seeking to extend that restricted trading period further. That duplication of effort could not be justified by the interests of justice or convenience.

19. In any event, transferring these cases would bring no benefit to any stakeholder party, and therefore fails to be in the interests of justice. The Debtors, the Court, two official committees, mediators, government officials, a liquidation trustee, and a host of other parties have spent nearly a year attempting to negotiate a resolution to these cases in this forum. In that time, the Debtors solicited and obtained the overwhelming acceptance for a plan of liquidation that has been confirmed [Docket No. 1652] (the "Confirmation Order"). General unsecured creditors approved the Plan nearly unanimously because it provided their best prospects of recovery.

20. As described in the Disclosure Statement and as the Court has been informed at prior hearings, creditors have continued to negotiate the sale of the Debtors' assets post-confirmation. The result of these negotiations is a proposed financing and sale (the "Sale") described in the *Debtors' Emergency Motion For Entry of Orders Approving (I) Senior Secured Superpriority Financing and (II)(A) Sale of Assets and (B) Modifications to Chapter 11 Plan* [Docket No. 1884] (the "Sale Motion").

21. Critically, the Debtors lack funds to keep operating. If a hearing on the Sale Motion is delayed by transferring venue, the proposed Sale could not proceed. The Debtors instead would be forced to convert these chapter 11 cases to cases under chapter 7, which conversion would cause great harm to creditors and other stakeholders. Specifically:

   a. In chapter 7, the Debtors would not have the cash necessary to protect their intellectual property from legal challenges and to take whatever acts are necessary to renew or register their patents.

   b. Liquidation of the Debtors' equipment would destroy existing cell banks and other drug program materials, almost certainly rendering some of the estates' intellectual property worthless.

   c. Asset valuations would fall precipitously, as purchasers in the biotechnology industry are unlikely to purchase early-stage intellectual property as standalone assets—sales typically require the transfer of drug materials, program, and key employees who have knowledge of the products' uses.

   d. The Debtors' China-based subsidiaries and assets would likely be abandoned in a chapter 7 given the substantial costs remaining before these assets may be monetized.

   e. At least two of the Debtors' foreign subsidiaries would be forced to file insolvency proceedings of their own, further decreasing the likelihood that the estates would be able to monetize those assets.

   f. The estates would lack funding to pursue receivables owed to them, reducing the value of those receivables.

   g. Earn-outs may be triggered if a chapter 7 trustee is forced to abandon assets, which could lead to additional liabilities being asserted against the estates.

      h.  A chapter 7 scenario would likely result in an additional $6 million or more of lease rejection damages.

      i.  There could be environmental liabilities if the estates are unable to properly fund biohazard cleanup costs.

In addition, the Debtors would forego the financial benefits of the Sale, which includes $15 million cash, a $5 million note, 7% of the equity of certain companies going forward, and a percentage of litigation recoveries for certain claims that the buyer would purchase.

22. In sum, the Trustee fails to consider that creditors and other stakeholders will lose substantial value and considerable progress towards an exit from bankruptcy if the Court were to grant the Motion. Because transfer or dismissal of these Chapter 11 Cases at this late stage is not in the interests of justice or convenient to the parties, the Trustee has failed to satisfy its burden. Thus, the Court should deny the Motion.[5]

### B.    The Court Should Deny the Motion as Untimely.

23. "If a petition is filed in an improper district, the court, on the ***timely*** motion of a party in interest or on its own motion . . . may dismiss the case or transfer it to any other district if the court determines that transfer is in the interest of justice or for the convenience of the parties." Fed. R. Bankr. P. 1014(a)(2) (emphasis added); *see also* 28 U.S.C. § 1406(b) ("Nothing in this chapter shall impair the jurisdiction of a district court of any matter involving a party who does not interpose timely and sufficient objection to the venue."). A party "waives venue by failing seasonably to assert it[.]" *Hoffman v. Blaski*, 363 U.S. 335, 343 (1960); *see also In re Land*, 215 B.R. 398, 403 (B.A.P. 8th Cir. 1997) (If "a timely motion to dismiss for improper venue is not filed, the right to object to venue is waived.") (quoting Fed. R. Bankr. P. 1014, Advisory

---

[5] Given the presence of other issues continuing to be litigated in these cases, including issues involving the engagement of counsel presently pending before Judge Rodriguez in which the Trustee is interested, the Creditors' Committee finds the Trustee's instant Motion to change venue now, while those matters are pending, perplexing.

Committee Note (1987)). Thus, "even if [a] Debtor's bankruptcy case were improperly venued," the Court should find that "the [movants] have not interposed a timely and sufficient objection to venue of the Debtor's case and accordingly have waived that objection." *In re Bavelis*, 453 B.R. 832, 867 (Bankr. S.D. Ohio 2011).

24. To avoid duplication of effort and waste of resources, some courts have determined that a motion under Rule 1014 is timely only if filed within sixty days of the petition date. *See, e.g.*, *In re Boca Raton Sanctuary Assocs.*, 105 B.R. 273, 275 n.2 (Bankr. E.D. Pa. 1989) ("We believe that such motions should generally be filed no later than sixty (60) days after the case filing, before the debtor and the original filing court have expended resources in reliance upon the case's presence."). Other courts analyze multiple factors to determine whether a motion under Rule 1014 is timely, including the "fragmentation or duplication of administration, increase expense, or delay closing of the estate[.]" *In re Blagg*, 223 B.R. 795, 802 (B.A.P. 10th Cir. 1998). Under any analysis, a motion under Rule 1014 is not timely if "sufficiently substantial developments" have occurred during the case. *In re Pickett*, 330 B.R. 866, 871 (Bankr. M.D. Ga. 2005). Accordingly, courts overrule Rule 1014 motions filed after plan confirmation. *See, e.g.*, *In re Land*, 215 B.R. 398, 403 (B.A.P. 8th Cir. 1997) (affirming bankruptcy court's denial of venue transfer motion brought post-confirmation).

25. The Motion is not timely under any of the aforementioned standards. These cases have been pending for nearly a full year. In that time, nearly two thousand entries have been entered onto the docket, including the confirmation of the Plan, approved nearly unanimously by general unsecured creditors. As such, there have been sufficiently substantial developments in these cases to render untimely any motion to transfer venue.

26. Moreover, such transfer would result in precisely the duplication of effort, increased expenses, and administrative delay that the timeliness consideration is intended to guard against. The Debtors and the Creditors' Committee have reached a post-confirmation agreement to sell assets set out in the Sale Motion, which preserves the prospect of some return to unsecured creditors and maintaining the potential upside of the Debtors' assets for the benefit of all stakeholders. Further, the plan contemplates the creation of a Liquidating Trust. David Weinhoffer of Maaco has been selected as the Liquidating Trustee and has been working to have the Liquidating Trust up and running once the plan goes effective. This value would be lost if these cases were converted to cases under chapter 7 (the almost assured result of a change of venue).

27. The Motion's untimeliness is thrown into sharp relief when it is acknowledged—as it must be—that all of the predicate facts cited in the Motion in purported support of a change of venue have been public for months, and, in certain instances, since the filing of the petitions. For example, the Debtors represented Scintilla's principal place of business to be a post office box in Scintilla's petition [Case No. 23-90084, Docket No. 1]:

| 4. Debtor's address | Principal place of business | Mailing address, if different from principal place of business |
|---|---|---|
| | 7 Switchbud Place, Suite 192-513<br>Number    Street | 4955 Directors Place<br>Number    Street |
| | P.O. Box 513 | |
| | The Woodlands    TX    77380<br>City    State    Zip Code | San Diego    CA    92121<br>City    State    Zip Code |
| | | Location of principal assets, if different from principal place of business |
| | Montgomery<br>County | Number    Street |
| | | City    State    Zip Code |

Given the above, the Trustee cannot credibly claim that it just recently uncovered evidence that Scintilla's "business address" is 4955 Directors Place, San Diego, CA 92121. It is listed on

- 10 -

Scintilla's petition under "Mailing address" and was discussed at the meeting of creditors. Indeed, nearly every pleading filed in these Chapter 11 Cases have stated that fact on the first page.

28. Further, the Trustee inquired about such facts at the 341(a) meeting of creditors last year, held in May and June 2023. At that meeting, as the Court has heard, the Trustee inquired as to the Debtors' principal place of business, location of assets, nature of assets, and so on. And the Debtors disclosed, in their statement of financial affairs filed on June 16, 2023, a $60,000 payment from Sorrento to Scintilla on February 10, 2023, described as "[f]unding for Scintilla Account."[6] Accordingly, the Debtors publicly disclosed all of the relevant predicate facts to jurisdiction and venue at the outset of these cases, and the Trustee had actual knowledge of all of those facts.[7]

29. Attempting to minimize the timeliness requirement, the Trustee contends that the Court does not have discretion to retain these cases. *See* Motion ¶ 29. Not so. Both section 1406 of title 28 and Rule 1014 explicitly require venue challenges ***to be timely***. Courts will retain jurisdiction—even if there is no basis for venue—if the challenge is untimely. *See Utterback v. Trustmark Nat'l Bank*, 716 F. App'x 241, 244 (5th Cir. 2017) (denying request to transfer venue after deeming venue challenge waived); *Resol. Tr. Corp. v. Sonny's Old Land Corp.*, 937 F.2d 128, 130 (5th Cir. 1991) (rejecting challenge to venue, finding that movant failed to "assert a seasonable objection and thereby waived the defect").

30. Indeed, the authority cited by the Trustee for this position expressly acknowledges that section 1406 of title 28 and Rule 1014 authorize transfer or dismissal ***only if the movant files a motion timely***. *See*, *e.g.*, Motion ¶ 30 (citing *Thompson v. Greenwood*, 507 F.3d 416, 422 (6th Cir. 2007) ("Thus, where a bankruptcy case is brought in an improper venue, and an interested

---

[6] Docket No. 900 at PDF p. 51 of 57.

[7] It is worth noting that the Equity Committee, which presumably knew of the underlying facts, never filed a motion to change venue.

party *timely* objects, the court must either dismiss it or transfer it to a jurisdiction of proper venue in accordance with § 1406, notwithstanding any differing language in Rule 1014(a)(2).") (emphasis added); *see also In re Sorrells*, 218 B.R. 580, 589 (B.A.P. 10th Cir. 1998) ("[I]t is clear that objections to venue may be waived if not *timely* made.") (emphasis added).

31. The Motion is not timely. A year has passed since the petition date, the Plan has been confirmed, and the Trustee knew all of the salient facts more than nine months ago. The Motion should be denied.

II. **If the Court Finds Transfer of Venue Appropriate, It Should Wait Until After the Closing of the Sale, the Plan Effective Date, and Consideration of Related Matters on which the Court Has Knowledge.**

32. To the extent the Court is inclined to grant the Motion, the Court has discretion over when the transfer of venue should take place. "[S]ection 1406 of title 28 requires only that the Court dismiss or transfer. It does not say when and does not tie the hands of a court in mitigating the resulting damage to the creditor community." *In re Houghton Mifflin Harcourt Pub. Co.*, 474 B.R. 122, 137 (Bankr. S.D.N.Y. 2012). Accordingly, if the Court intends to grant the Motion, it should do so in a manner that "minimizes" the "harm to creditors and other stakeholders[.]" *Id.*

33. In *Houghton Mifflin*, the court agreed with the movant that the case should be transferred to a different venue. There, the chapter 11 case had included a prepackaged plan approved by its creditors. *Id.* at 124. The United States trustee *timely* brought a motion to transfer venue. Despite agreeing that venue was improper, and the motion was timely, the court determined that the interests of creditors would best be served if the timing of such transfer occurred after the effective date. *Id.* at 137.

34. Like in *Houghton Mifflin*, if the Court is inclined to grant the Motion, it should not do so until after the closing of the Sale, the Plan's effective date, and consideration of the Creditors' Committee's contemporaneously filed motion to further extend the restriction period for trading

- 13 -

Scilex dividend shares. This modest extension of time would greatly minimize the harm to creditors and other stakeholders—described *supra* section I.A.—that would result from transferring venue before these events have occurred.

## CONCLUSION

The Creditors' Committee respectfully submits that the Court should deny the Motion.

[*Remainder of page intentionally left blank*]

Dated:  March 1, 2024

Respectfully submitted,

By: */s/ Ryan Manns*

**NORTON ROSE FULBRIGHT US LLP**

Ryan Manns
(Texas SBT # 24041391)
Julie Harrison
(Texas SBT# 24092434)
1301 McKinney St., Suite 5100
Houston, TX 77010
Tel: (713) 651-5151
Email: ryan.manns@nortonrosefulbright.com
Email: julie.harrison@nortonrosefulbright.com

– and –

**MILBANK LLP**

Nelly Almeida (admitted *pro hac vice*)
55 Hudson Yards,
New York, NY 10001
Tel: (212) 530-5271
Email: nalmeida@milbank.com

Mark Shinderman (admitted *pro hac vice*)
2029 Century Park East, 33rd Floor,
Los Angeles, CA 90067
Tel: (424) 386-4411
Email: mshinderman@milbank.com

*Counsel to the Official Committee of Unsecured Creditors*

**CERTIFICATE OF SERVICE**

I, Ryan Manns, hereby certify that on the 1st day of March, 2024, a copy of the foregoing *Opposition of the Official Committee of Unsecured Creditors to (A) Timothy Culberson's Motion to Dismiss or Transfer Venue Pursuant to Rule 1014(A)(2) and (B) United States Trustee's Motion to Transfer Venue or Dismiss Pursuant to 28 U.S.C. § 1408 and Fed. R. Bankr. P. 1014(A)(2)* was served via Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

By: */s/ Ryan Manns*
Ryan Manns