```
                 UNITED STATES BANKRUPTCY COURT
               SOUTHERN DISTRICT OF TEXAS (HOUSTON)

                                   .
IN RE:                             .   Case No. 23-90085-CML
                                   .   Chapter 11
SORRENTO THERAPEUTICS, INC.        .
et al.,                            .
                                   .   515 Rusk Street
                                   .   Houston, TX 77002
                 Debtors.          .
                                   .   Friday, March 8, 2024
. . . . . . . . . . . . . . . . .  .   1:03 p.m.
```

TRANSCRIPT OF [1884] DEBTORS' EMERGENCY MOTION FOR ENTRY OF
ORDERS APPROVING (I) SENIOR SECURED SUPERPRIORITY FINANCING AND
(II)(A) SALE OF ASSETS AND (B) MODIFICATION TO CHAPTER 11 PLAN
           BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
             UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

 For the Debtor:            Latham & Watkins LLP
                            By:  CAROLINE RECKLER, ESQ.
                                 JONATHAN GORDON, ESQ.
                            330 N Wabash Ave #2800
                            Chicago, IL 60611
                            312-876-7700

                            Latham & Watkins LLP
                            By:  CHRISTOPHER HARRIS, ESQ.
                            1271 6th Ave
                            New York, NY 10020
                            212-906-1200

 APPEARANCES CONTINUED.

 Audio Operator:           Courtroom ECRO Personnel

 Transcription Company:    Access Transcripts, LLC
                           10110 Youngwood Lane
                           Fishers, IN 46048
                           (855) 873-2223
                           www.accesstranscripts.com

     Proceedings recorded by electronic sound recording,
transcript produced by transcription service.
```

APPEARANCES (Continued):


For the Debtors:          Jackson Walker LLP
                          By:  KRISTHY M. PEGUERO, ESQ.
                          1401 McKinney St.
                          Ste 1900
                          Houston, TX 77010
                          713-752-4440


For Vivasor Inc.:         Paul Hastings
                          By:  JAMES T. GROGAN, ESQ.
                          600 Travis Street
                          58th Floor
                          Houston, TX 77002
                          713-860-7300


For the Official          Milbank LLP
Committee of Unsecured    By:  MARK SHINDERMAN, ESQ.
Creditors:                2029 Century Park East
                          33rd Floor
                          Los Angeles, CA 90067-3019
                          424-386-4000

                          Norton Rose Fulbright US LLP
                          By:  Ryan E. Manns, ESQ.
                          200 Ross Ave
                          Ste 3600
                          Dallas, TX 75201
                          214-855-0000


For the Official          Glenn Agre Bergman & Fuentes LLP
Committee of Equity       By:  ANDREW K. GLENN, ESQ.
Securities Holders:       1185 Avenue of the Americas
                          22nd Floor
                          New York, NY 10036
                          212-970-1600

                          Greenberg Traurig LLP
                          By:  SHARI HEYEN, ESQ.
                          1000 Louisiana
                          Ste 1800
                          Houston, TX 77002
                          713-374-3500

                          Greenberg Traurig LLP
                          By:  John Hutton, ESQ.
                          333 SE 2nd Avenue
                          Suite 4400
                          Miami, FL 33131
                          305-579-0500

```
TELEPHONIC APPEARANCES (Continued):


  For the U.S. Trustee:     Office of the U.S. Trustee
                            By:  ALICIA LENAE BARCOMB, ESQ.
                                 HECTOR DURAN, JR., ESQ.
                                 MILLIE A. SALL, ESQ.
                            515 Rusk
                            Suite 3516
                            Houston, TX 77002
                            713-718-4661

  For China Oncology        Locke Lord LLP
  Focus Limited:            By:  WILLIAM STEVEN BRYANT, ESQ.
                            300 Colorado Street, Suite 2100
                            Austin, TX 78701
                            512-305-4726

  For Timothy Culberson:    The Culberson Law Office, PLLC (Pro
                            se)
                            By:  TIMOTHY CULBERSON, ESQ.
                            25700 I-45 North
                            Suite 100
                            Spring, TX 77386
                            832-236-2326

  For Indena S.p.A.:        K&L Gates LLP
                            By:  BRIAN T. PETERSON, ESQ.
                            925 Fourth Avenue
                            Suite 2900
                            Seattle, WA 98104-1158
                            206-370-5774

  For Jackson Walker        Kane Russell Coleman Logan
  LLP:                      By:  JOHN KANE, ESQ.
                            5151 San Felipe St #800
                            Houston, TX 77056
                            713-425-7400

  For Dr. Gang Gary Chen    Franklin Soto Leeds LLP
  and Dr. Zhenwei David     By:  DEAN T. KIRBY, JR., ESQ.
  Miao:                     444 West C Street
                            Ste 300
                            San Diego, CA 92101
                            619-525-1652

  Also Present:             JACQUELYN WILSON

                            MARK BRUNSWICK

                            JEANNE RIDGWAY
```

<u>I N D E X</u>
<u>3/8/24</u>

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| <u>FOR THE DEBTORS:</u> | | | | |
| Mohsin Meghji | 36 | 45/47 | -- | -- |

| <u>EXHIBITS</u> | <u>ADMITTED</u> |
|---|---|
| ECF Number 1974-8 | 51 |
| ECF Numbers 1985-1 through 1985-5 | 53 |

| | <u>Page</u> |
|---|---|
| ARGUMENT BY MR. GORDON | 53 |
| ARGUMENT BY MR. KIRBY | 59 |
| REBUTTAL ARGUMENT BY MR. GORDON | 65 |
| COURT DECISION | 66 |

1       (Proceedings commence at 1:03 p.m.)

2           THE CLERK:  All rise.  Please be seated.

3           THE COURT:  Good afternoon, everyone.  Okay.  Okay.

4  Good afternoon, everyone.  This is Judge Lopez.  Today is March

5  the 8th.  I'm going to call the 1 p.m. case which is Sorrento

6  Therapeutic Inc., Case Number 23-90085.

7           Why don't I take appearances in the courtroom.  And

8  then if anyone knows they're going to be speaking today, why

9  don't you hit "five star" and I will unmute your line.  There's

10  about a 178 people on the line, so I've enabled the mute

11  feature.  Once I unmute your line, I'd ask that you please just

12  monitor yourselves.

13          Also ask parties who are going to make appearances,

14  why don't you make an electronic appearance today, and just

15  find the Southern District of Texas website.  You'll find a

16  link to my home page.  You can find a place to make appearances

17  and you'll find a link to this case.

18          Okay.  Let me take appearances in the courtroom.

19          MS. RECKLER:  Good afternoon, Your Honor.  Caroline

20  Reckler of Latham & Watkins on behalf of the debtors.  I'm

21  joined in the courtroom with my colleagues Mr. Harris and

22  Mr. Gordon and the debtors' chief restructuring officer

23  Mr. Meghji.

24          THE COURT:  Okay.  Good afternoon.

25          MR. GROGAN:  Good afternoon, Your Honor.  James

 1    Grogan from Paul Hastings.  We're here today on behalf of

 2    Vivasor, Inc., V-I-V-A-S-O-R, which is the prospective buyer in

 3    the sale that --

 4              THE COURT:  Oh, okay.

 5              MR. GROGAN:  -- before Your Honor today.  With me

 6    online is Mr. Rawlins, my partner, Justin Rawlins.

 7              THE COURT:  Okay.  Good afternoon.

 8              MR. SHINDERMAN:  Good afternoon, Your Honor.  Mark

 9    Shinderman of Milbank on behalf of the official creditors

10    committee.  I'm here with John Schlant of BRG, who's the

11    financial advisor to the committee.

12              THE COURT:  Okay.  Good afternoon.

13              Mr. Glenn, good afternoon.

14              MR. GLENN:  Nice to finally see you in person.

15    Andrew Glenn, Glenn Agre Bergman & Fuentes on behalf of the

16    equity committee.  Your Honor, we're on a very strict budget in

17    this case with fee caps.  That's the primary reason why I've

18    been appearing remotely before the Court, but it's certainly a

19    pleasure to be before you today.

20              THE COURT:  It's certainly acceptable as well.  I

21    completely -- good to see you though.

22              MR. GLENN:  And thank you.  Rebwar Berzinji of

23    Seaport is here also on behalf of the equity committee.  It's

24    our investment banker.

25              THE COURT:  Okay.  Good afternoon.

1          MR. GLENN:  Thank you.

2          THE COURT:  Good afternoon, Ms. Barcomb.

3          MS. BARCOMB:  Good afternoon, Your Honor.  Alicia

4   Barcomb on behalf of the United States Trustee.  I'm joined in

5   the courtroom today by my colleagues, Millie Sall and Hector

6   Duran.

7          THE COURT:  Okay.  Good afternoon to both of you.

8          MS. HEYEN:  Good afternoon, Your Honor.  Shari Heyen

9   of Greenberg Traurig, also here on behalf of the equity

10  committee.

11         THE COURT:  Okay.  Good afternoon.

12         Alrighty.  Let me just going to go online.  There's

13  about 190 people on the line now, so I'm just going to unmute

14  lines in the order in which I see them.

15         So here's a 512 number.

16         MR. BRYANT:  Thank you, Your Honor.  This is Steven

17  Bryant on behalf of China Oncology Focus Limited.

18         THE COURT:  Good afternoon, Mr. Bryant.

19         Alrighty.  Here's an 832 number.

20         MR. CULBERSON:  Good afternoon.  This is Tim

21  Culberson, Your Honor, on behalf of myself.

22         THE COURT:  Good afternoon, Mr. Culberson.

23         Just going down the line here.  Checking it one more

24  time.  Okay.  That's everyone.

25         Who should I turn this over to?

1          MS. RECKLER:  Good afternoon, Your Honor.  Caroline

2   Reckler of Latham & Watkins on behalf of the debtors.

3          Your Honor, our agenda is at Docket Number 1984 and

4   our witness and exhibit list is at Docket Number 1974.  We are

5   here for approval of the DIP on a final basis.  That's a $5

6   million DIP loan, as well as the related sale of substantially

7   all of the debtors' remaining assets, along with approval of

8   certain plan modifications.

9          Your Honor, that combined motion was filed on

10  February 9th, and it's at Docket Number 1884.  The proposed

11  final DIP order is at Docket Number 1978, and the proposed sale

12  order, which also includes the plan modifications and the asset

13  purchase agreement, is at Docket Number 1995.  And in a minute,

14  I have one modification that I need to read onto the record to

15  resolve an objection.

16         THE COURT:  Okay.

17         MS. RECKLER:  Your Honor, in terms of the objections,

18  the United States Trustees' DIP objection from the prior

19  hearing remains pending at Docket Number 1910.  We spoke to the

20  United States Trustee, and we believe their issues will be

21  resolved once we put on our evidence and they've asked us to do

22  that.

23         THE COURT:  Okay.

24         MS. RECKLER:  But I will let them confirm after we

25  get through the evidence and hopefully that objection will be

1   resolved.

2          THE COURT:  Okay.

3          MS. RECKLER:  They've also asked that we make a

4   statement on the record, which I'm happy to do now.  The final

5   DIP order contains a finding that venue is proper today.  The

6   debtors represent that the finding does not and will not

7   prejudice the pending motions to transfer venue, as I believe

8   Your Honor acknowledged at the prior hearing.

9          THE COURT:  Okay.  Thank you.

10          MS. RECKLER:  Your Honor, regarding the sale, there

11   are a few remaining objections on the docket.  One was filed by

12   the equity committee, and that is at Docket Number 1930.  And

13   I'll get to that in a moment, and I do think that has been

14   resolved just in the last few minutes.

15          THE COURT:  Okay.

16          MS. RECKLER:  One objection was also filed by

17   litigants Doctors Chen and Miao, and that's at Docket Number

18   1969.  And that remains pending, and my colleague Mr. Gordon

19   will make an argument on that objection at the appropriate

20   time.

21          THE COURT:  Okay.

22          MS. RECKLER:  There was also an objection filed by an

23   IP license counterparty at Docket Number 1890, and we have

24   resolved that objection as well with language in the order, but

25   I do need -- there was a typo, so I do need to make one

1  clarification on the record.  And that clarification can be

2  found -- it will be relevant to paragraph MM, and the reference

3  to COFL license assets should read COFL license agreement

4  instead.  And the parties have agreed that was just an

5  inadvertent error in the language.

6          THE COURT:  Okay.

7          MS. RECKLER:  So that really -- where I think that

8  leaves us is with one live objection.  We filed a reply

9  yesterday, and that's at Docket Number 1983, regarding the

10  equity committee's now resolved objection and the Chen and Miao

11  objection.  The Creditors Committee filed responses in support

12  of the debtors at Docket Numbers 1896 and 1961.

13          In terms of a roadmap for today's hearing, I'd like

14  to provide some background on the transactions.  Some of it

15  will be repetitive of the February 26th hearing, but I do think

16  it'll be purposes -- I do think it will be helpful for purposes

17  of today's record.  And then I can put -- we can put Mr. Meghji

18  on to testify to create the appropriate record and also to

19  hopefully address the United States Trustee's concern.  And

20  then we'll also need to have argument on the Miao and Chen

21  objection.

22          THE COURT:  Okay.

23          MS. RECKLER:  Your Honor, I think at the outset, I

24  need to acknowledge that these transactions, like many other in

25  this case, have not been linear and they haven't been without

1  bumps in the road.  We've done our best to work with the

2  creditors committee and the equity committee advisors to keep

3  them up to date as to where things stand.  But to level set

4  with where we are, the DIP, the $3 million interim DIP was

5  funded this morning.  And the asset purchase agreement was

6  filed this morning as well.

7          And Mr. Meghji will speak to his confidence and

8  certainty and his beliefs about the ability of the buyer to

9  close the transaction and his comfort level with the financial

10  wherewithal.

11          I don't think for purposes of today's hearing with

12  some of the objections being resolved, I need to get into why

13  there was a delay with the funding and the signatures being

14  released on the asset purchase agreement.  But the good news is

15  those things have now happened, and maybe at a later time, if

16  it ever becomes relevant, those issues will be brought to Your

17  Honor.  But I don't think it's needed for today.

18          THE COURT:  Okay.

19          MS. RECKLER:  Taking a step back, we filed this case

20  on February 14th, 2023, so over a year ago now.  We've since

21  extended this case as long as possible in our effort to

22  maximize value.  We are on our fourth DIP, and the previous

23  three have been satisfied in full.

24          But we're at the end of the road now.  We don't have

25  any options.  And without the approval of the DIP and a short

1  closing of the sale, we will be out of money.  And to be

2  direct, it's this transaction or it's Chapter 7.

3          You'll hear that from Mr. Meghji, and you'll also

4  hear him to speak as to why the sale cannot be consummated at

5  the same price point in Chapter 7, and why Chapter 7 is worse

6  for Sorrento stakeholders.  Value will not be maximized in

7  Chapter 7.  So we're here today with a package of documents, a

8  proposed sale, a proposed final DIP, and plan modifications,

9  all of which are related.

10          Starting with the sale, as I previewed at

11  confirmation, we need to close asset sales in order to

12  consummate the plan.  Unfortunately, some of the --

13          THE COURT:  Sorry about that.

14          MS. RECKLER:  Oh, no, no problem.

15          THE COURT:  My pen ran out of ink.

16          MS. RECKLER:  It happens to all of us.

17          THE COURT:  Call for emergency backup.

18          MS. RECKLER:  Your Honor, unfortunately, some of the

19  asset sales that we had thought would be consummated at the

20  time when we were at confirmation have fallen through, and

21  Mr. Meghji can speak to that as well.  But the good news is the

22  debtors did continue to pursue all available alternatives, and

23  we now have a sale transaction in hand.  And it's the only

24  actionable transaction of which we are aware.  There is nothing

25  else that exists today.

1          The proposed sale is a sale of substantially all of

2   the debtors' remaining assets to a newly formed Delaware entity

3   called Vivasor.  The buyer is an entity associated with the

4   debtors' CEO, Dr. Henry Ji, and will be funded by a syndicate

5   of investors led by a private investment vehicle owned by a

6   former principal of a leading middle market life sciences-

7   focused investment bank that had raised over $100 million for

8   Sorrento Therapeutics in the last years through private

9   placements, registered direct financing, convertible debt

10  financings, at-the-market shell financings, and a combination

11  of the following.  And that client is represented by

12  Mr. Rawlins and Mr. Grogan, and they're here and can speak to

13  that.

14          The purchase price has five major components.  The

15  first is $15.5 million in cash.  The second is a $5 million

16  note.  The third is a waiver by Dr. Ji of over $400,000 in past

17  due compensation and benefits, plus go-forward compensation and

18  benefits.  The fourth is 7 percent equity interest in all

19  purchaser subsidiaries, which will contain the acquired drugs.

20  And lastly, if the purchaser receives $500 million or more in

21  cash from monetizing the acquired assets, then the purchaser

22  owes Sorrento $35 million in cash.

23          One other noteworthy component of the APA, which I

24  want to talk about, is the Virex option.  Under the APA, the

25  buyer has the option to buy Virex, which is a subsidiary of

1   Sorrento that produces and sells diagnostic testing kits.  And

2   that option is for $500,000 if we do not sell Virex to another

3   buyer after 60 days from closing.  And as of now, at the plan

4   effective date, Virex would be transferred to the liquidating

5   trust, which would then complete any sales if the sale is not

6   done before the effective date.

7          The equity committee is looking at a proposed

8   transaction, and you heard about this at the prior hearing,

9   related to NOLs that would require or involve Sorrento, not

10  liquidating trust, but Sorrento keeping Virex instead of it

11  being transferred to the trust.  So the equity committee has

12  until the plan effective date --

13         THE COURT:  No, that's the additional time.

14         MS. RECKLER:  -- which will be the sale closing date.

15         THE COURT:  That's going to give them the additional

16  time to see if they can get it.  Got it.

17         MS. RECKLER:  Yeah.  And Mr. Meghji will speak to how

18  much time that is, but directionally, it's about two to three

19  weeks.  It could be a little shorter as of 10 days, but let's

20  call it two to three weeks.

21         THE COURT:  Okay.

22         MS. RECKLER:  And if that happens, and if Virex does

23  remain in Sorrento, and if there is another transaction, then

24  it is possible to -- then the NOLs could be preserved.  If the

25  transaction comes forward, we can revisit the issue and

1  potentially keep Virex in Sorrento for an NOL transaction

2  instead of it being transferred to the trust.  That flexibility

3  remains open.  And I know that's very important to the equity

4  committee, the creditors committee, and ultimately the debtors,

5  because we believe it would be additive and value maximizing if

6  it indeed can come together.

7          So approving the sale today, I want to be very clear,

8  does not close the door on that option.  And that, again, I

9  believe, and you'll hear from the equity committee, but I do

10  believe that was the key component to resolving their objection

11  today.

12          And one last note regarding the sale terms, the

13  structure of the sales allows the current equity holders to

14  remain rather than to be canceled.  And so preserves the

15  possibility that those shares will become valuable if the

16  assets in the trust, including the interest in the purchaser's

17  subsidiaries, become sufficiently valuable.  And time will tell

18  whether or not that happens.

19          Given the affiliation with Dr. Ji, we are very

20  careful about the process to make sure that negotiations were

21  conducted in good faith and at arm's length.  Dr. Ji had no

22  role whatsoever on behalf of the debtors, but was solely on the

23  lender and buyer's side represented by Paul Hastings.  The

24  lender and buyer negotiated very hard, and they, at times,

25  often negotiated both directly with the debtor and also with

1  the creditor's committee.  And they indeed have also been in

2  touch frequently with the equity committee.

3          And throughout these cases, we have also kept the

4  equity committee in the loop and shared drafts of the documents

5  with them.  And we have done our best to accommodate comments

6  that we have received, recognizing our leverage and our

7  negotiating position.

8          The debtors believe that the sale is a valid exercise

9  of their business judgment under Section 363, because it will

10  help us avoid Chapter 7, and it will allow us to consummate the

11  plan and to maximize the value of debtors remaining assets.  We

12  believe the sale of plan are substantially better than a

13  conversion because they allow the assets to be sold for

14  substantial value as a going concern, much more than they would

15  be worth if the debtors stop operating.

16          If consummated timely, they will provide funding for

17  the litigation trust to pursue recoveries for unsecured

18  creditors.  And if there's anything remaining, it will go to

19  equity holders.  They allow for the greater chance of recovery

20  to equity because they increase the chance that creditors will

21  be paid in full and keep the existing shares in existence.  And

22  Mr. Meghji's testimony will speak further to this.

23          Turning now to the plan modifications, they can be

24  seen at Exhibit 4 at Docket Number at 1995.  As part of the

25  sale, the debtors are modifying their confirmed plan so that

1   shareholders retain their equity interest in Sorrento.  But

2   Sorrento's only assets will be a reversionary interest in the

3   liquidating trust.  And the liquidating trust recoveries will

4   only revert to Sorrento once creditors are paid in full in

5   cash.  Thus, the shares have no value and the shareholders thus

6   receive no recovery under the plan unless and until creditors

7   are paid in full.

8            The value is no different than the previously

9   confirmed plan where shareholders would receive excess trust

10  recoveries following payment of creditors in full.  The only

11  difference, Your Honor, is the mechanism.  Excess recoveries

12  will now go to Sorrento for the benefit of shareholders rather

13  than to the shareholders directly from the trust.  In either

14  scenario, creditors must be paid in full in cash.

15           So there's no absolute priority issue and no material

16  adverse changes in treatment and no need to re-solicit.  The

17  plan continues to satisfy the confirmation requirements of

18  Section 1122, 1123, and 1129, and we request that the

19  modifications be approved.

20           And Your Honor, lastly, turning to the DIP.  The DIP

21  was approved on an interim basis on the 26th, and that provided

22  $3 million in liquidity to the debtors.  The debtors are now

23  seeking final approval, the remaining $2 million of that

24  facility.  And as we talked about at the last hearing, the DIP

25  is a bridge to the sale to ensure that the estate has the

1  liquidity needed to close the sale.

2          The DIP matures at the end of March, and we intend to

3  satisfy and close the sale by then.  And that also features 8

4  percent interest with no fees, and there is no prepayment

5  penalty.  In fact, the DIP doesn't even require the debtors to

6  pay the lender's professional fees unless there's a default.

7          The proposed collateral for the loan consists of

8  substantially all of the debtors' assets except for certain

9  estate claims that have been excluded, which was an important

10  concession from the perspective of the creditors' committee.

11  And all of that collateral is generally unencumbered other than

12  the interim DIP liens.

13          As I mentioned at the last hearing, the DIP limits

14  the lender's ability to foreclose on the collateral in the

15  event of a default by requiring the lenders to come out of

16  pocket to pay the cash needed to fund the remaining purchase

17  price if they want to proceed with a foreclosure.  So the

18  result of the foreclosure from the estate's perspective is

19  essentially the same as if the sale was consummated, except the

20  lenders can deduct its professional fees from the purchase

21  price in a foreclosure.  This was a very important and hard-

22  fought and bargained-for provision because we did not want a

23  lender to come in, fund $5 million, we default for no reason or

24  no fault of our own, but it happens, something happens, and we

25  didn't want them to be able to steal the asset for $5 million,

1  so we have that protection built in.

2          The DIP is the best financing available to the estate

3  and it satisfies the requirements of Section 364.  The lenders

4  are unwilling to extend financing on an unsecured basis and

5  require a lien on the debtors' property to secure the new loan.

6  And the DIP is a sound exercise of the debtors' business

7  judgment because it provides the debtors with sufficient

8  liquidity to close the sale, which in and of itself is a value-

9  maximizing exercise of business judgment for the reasons that

10  I've mentioned and Mr. Meghji will address.

11          So taking this all together, in short, the DIP and

12  the sale will help us avoid Chapter 7, it will allow us to

13  consummate the plan, and it will allow us to maximize the value

14  of these assets.

15          Your Honor, I don't know if others want to make

16  opening statements, but when you're ready, we'd like to present

17  Mr. Meghji's testimony and then turn to argument on the Miao

18  and Chen issues, which we believe are legal arguments and not

19  evidentiary issues.

20          THE COURT:  Okay.  Thank you.

21          MS. RECKLER:  Thank you.

22          THE COURT:  Mr. Glenn?

23          MR. GLENN:  Thank you, Your Honor.  A few opening

24  remarks.

25          Throughout this case, the equity committee has tried

1   to search for value.  We have monitored the company's efforts

2   to sell its assets unsuccessfully.  We have tried to market

3   them separately ourselves.  We have tried to look for financing

4   of our own with mixed results, and up until today, we took Your

5   Honor up on your offer to try to find an alternative

6   transaction.  We were negotiating with a third party up through

7   last night.  Those efforts were unsuccessful.

8           We're here today to address that reality.  I think a

9   lot of people who are monitoring this case have a lot of

10  questions about how we got to where we are today.  We're not

11  here to address those today.  We have a lot of unhappy people.

12  When you don't get paid, when your creditors don't get paid,

13  when your equity is facing a dim recovery, obviously, there are

14  a lot of unhappy people.  There are mostly individuals, not

15  institutions, and this is a very unfortunate day for them for

16  the most part.

17          But what we've tried to do, facing the choice today

18  of putting the company -- arguing to Your Honor that the

19  company should be put into liquidation.  Really, that's the

20  only alternative.  We're pushing forward with this sale with

21  what I'm going to present, offers the shareholders a better

22  possibility of getting something directly.

23          The proposal, I don't believe Ms. Reckler covered

24  this, we negotiated for a $5 million investment right for

25  existing equity holders to go into this new transaction so they

1  could invest alongside the new investors.  The problem with

2  that $5 million is that it's only available to accredited

3  investors.  And I'm sure that most of our existing shareholders

4  are not accredited investors, so that opportunity would not be

5  available to them.  We asked and asked and asked to allow the

6  broader shareholder community to invest.  We were refused.

7          So where does that leave us now?  We have been

8  searching for this NOL transaction.  And we believe, although

9  there are no guarantees, that there are real prospects for that

10 transaction to materialize.

11         We have an agreement with Mr. Shinderman, which

12 provides for a sharing of the proceeds of that transaction

13 between his trust and between the old equity.  So there's an

14 actual possibility that the shareholders can get a piece of

15 this recovery directly.

16         What I don't want to do at this point is to provide

17 anyone any guarantees.  This is going to be a highly structured

18 transaction that's going to involve a variety of components.

19 What we have agreed to is a process over the next few weeks

20 with some of the key terms agreed to that will allow that

21 sharing mechanism to occur.

22         It's our hope that the transaction will produce cash

23 available for the old shareholders that they will not get

24 directly, but that they will hopefully, and we have to

25 negotiate this with the buyer, have an opportunity to put that

1   money, which they could not take out of their pockets and put

2   into the new deal, that this money will be a trust fund for

3   those shareholders, so their old equity will have a vested

4   equity interest in the buyer.  The buyer has not yet agreed to

5   that.

6          So all these things need to be negotiated.  If we had

7   three more weeks, I'm confident that we could have come to a

8   more concrete agreement on these terms.  But once again, as

9   Ms. Reckler told you, the company's run out of money.  I think

10  this is the fourth or the fifth time, and this literally is the

11  end.

12         So to the Court, to the equity holders, we pledge our

13  continuing determination to try to get this deal done.  We have

14  encouraged the investor group that we engaged with to keep

15  working in the unlikely event that this deal doesn't close so

16  that someone else will be there and maybe even offer more

17  value.  But we, as fiduciaries for the shareholders, were faced

18  with a horrible choice, which was fight this and likely get

19  nothing or come to an agreement with some potential for the

20  shareholders to get something meaningful.

21         So we look forward to trying to accomplish that, and

22  we look forward to presenting more information to the Court and

23  hopefully the shareholder community so they can better

24  understand what's going on.

25         THE COURT:  Thank you very much.

23

```
 1            I'll hear from the committee and then the United
 2   States Trustee.
 3            MR. SHINDERMAN:  Thank you, Your Honor.  Mark
 4   Shinderman, Milbank, on behalf of the committee.  I'll be very
 5   brief.
 6            I want to thank all the estates professionals for
 7   being open to possibilities.  This was a difficult case because
 8   of severe liquidity constraints and products that were in
 9   development that were not in the marketplace, so there was no
10   cash flow.  So you're trying to raise money against assets that
11   aren't producing revenue.  It's a very difficult process.
12            We didn't always agree.  There were lots of fights.
13   It's been a difficult case.  But the professionals conducted
14   themselves accordingly.  They were commercial, they were
15   reasonable, and they always listened.
16            And that's why we were able to forge the conclusion
17   and the settlement Mr. Glenn and Ms. Reckler just spoke to.
18   More details on that to come.  It's not a done deal.  It's an
19   opportunity to negotiate an end game.
20            Look, nobody should be happy here.  Equity invested
21   $600 million, which was all but gone on the day the case
22   commenced.  There was less than $5 million in the bank, as you
23   heard testimony previously, right?  So the equity was out of
24   the money.
25            This case was financed on the back of creditors.  If
```

1    there was an asset, we could have liquidated that asset and

2    paid it to creditors or liquidate that asset and use the cash

3    flow to fund the case.  Everybody was hoping to exploit the

4    assets.  Everybody was hoping to get to asset sales.

5         So money that could have otherwise gone to creditors

6    was put back into the estate, creating an opportunity to go to

7    the sales.  Unfortunately, as you heard, those sales did not

8    close.  So nobody's happy with the result of this case, and

9    nobody should pretend otherwise.

10        But under the circumstances, this is the best deal

11   available to all constituents at the current time.  As the

12   testimony you're about to hear will show, we have two choices:

13   have no funds, convert the case to Chapter 7, or to consummate

14   the sale.

15        As you heard me here the last time, as I stated last

16   time, the sale has three primary benefits.  One, it pays all

17   administrative costs in full.  Two, it funds the trust so the

18   trust could do its two functions.  One, reconcile claims, and

19   two, prosecute certain causes of action intended to bring money

20   back into the estate.  And third, the trust will get residual

21   interest in some of the subsidiaries of the buyer, so that if

22   the buyer successfully exploits these assets, and we hope they

23   do, there'll be some more money for creditors, and if creditors

24   are paid in full, then value for equity.

25        The settlement with the equity permits possible

1  monetization of tax attributes in asset of the estate that

2  belongs to the estate.  And as Mr. Glenn suggested, there are

3  conditions predicate that are beyond anyone's control that we

4  need to work through.  There are financial issues we need to

5  work through.  We need to attract a merger partner.  But there

6  are things that we will do together to try to maximize value

7  because it would benefit his constituents and mine and the

8  estate as a whole.

9          Again, Mr. Meghji, the CRO, Latham & Watkins, their

10 financial advisors, M3 and Moelis, our financial advisors, BRG,

11 the equity committee's counsel, and their financial advisors

12 have all been instrumental in getting to this point.

13         Again, obviously people would like more money.  Under

14 the circumstances, this is the best deal available to

15 everybody.  And with that, the committee strongly supports this

16 sale, Your Honor.

17         THE COURT:  Thank you.

18         MR. SHINDERMAN:  Thank you.

19         THE COURT:  Let me hear from the committee.  I should

20 say the United States Trustee.  I apologize.

21         Ms. Barcomb, good afternoon.

22         MS. BARCOMB:  Good afternoon, Your Honor.  Alicia

23 Barcomb on behalf of the United States Trustee.

24         Your Honor, admittedly, Ms. Reckler addressed many of

25 my talking points for an opening, but I just wanted to clarify

1   a few things, Your Honor.

2           THE COURT:   Okay.

3           MS. BARCOMB:   First, as Your Honor is aware, the U.S.

4   Trustee did file a limited objection related to the DIP motion

5   that appears at ECF Number 1910.   In that limited objection,

6   the U.S. Trustee attempted to address three issues, the first

7   being that the Court should not enter any orders until it rules

8   on the pending venue motion.   Second, that but for the payment

9   of professional fees, the DIP was unnecessary.   And third, that

10  the debtors did not disclose sufficient information about its

11  forecasted professional fees and the method by which accruals

12  were calculated.

13          Your Honor, the U.S. Trustee only urges its objection

14  to that last point.   And following a very helpful conference

15  with debtors' counsel and its financial advisors, we do

16  understand that the testimony today may provide much needed

17  clarification about the DIP budget and particular line items.

18          Your Honor, related to the sale, the U.S. Trustee

19  takes no position on the proposed sale here today.   One item

20  that I did want to note for the Court, Ms. Reckler did note the

21  debtors' agreement with the U.S. Trustee about the venue

22  language in the proposed DIP order.   That came as an agreement

23  to the U.S. Trustee's request for some kind of qualifying

24  language to the venue provisions of the order.   I noticed in

25  the proposed order for the sale filed at 1995, that qualifying

1   language is likewise not there.  And so we would just ask that

2   the Court also likewise hold no prejudice against the U.S.

3   Trustee and its prosecution of its venue motion if it orders

4   the sale today.

5            THE COURT:  That's no issue on that from my end.

6            MS. BARCOMB:  Thank you, Your Honor.

7            THE COURT:  Okay, thank you.

8            Anyone else wish to be heard?

9            MR. BRYANT:  Your Honor, W. Steven Bryant on behalf

10  of China Oncology Focus Limited.

11           THE COURT:  Yes, sir.

12           MR. BRYANT:  Your Honor, China Oncology is the

13  licensee the debtors' counsel referred to.  We did file a

14  limited objection that appears in Docket Number 1980.  The

15  concern we had was that the license IP would be sold free and

16  clear of the licensee's rights under the license agreement.

17  That concern was resolved in our discussion with purchaser and

18  buyer.  The purchaser represented to us that in assuming the

19  license agreement, the parties did negotiate to language,

20  including the language referred to at Paragraph NM.  And that

21  resolved our limited objection with the one correction the

22  debtors' counsel referenced in that paragraph.

23           And so we would withdraw our limited objection at

24  Docket Number 1980.

25           THE COURT:  Thank you.

```
 1                    MR. BRYANT:  Thank you, Your Honor.
 2                    THE COURT:  Anyone else?  Going once.
 3                    Mr. Kirby, I can't hear you.  You may need to hit
 4      "five star" or maybe I need to -- maybe I mute myself all the
 5      time.  Maybe, it maybe it too.  Now, can you hit "five star"
 6      one more time, Mr. Kirby?
 7                    UNIDENTIFIED:  (Indiscernible) object.
 8                    THE COURT:  Mr. Kirby?  Yeah, I still can't hear you.
 9      Well, oh, let's see.
10                    You're on an 832 number and you sound like you're
11      outside.  I'm asking, please place your phone on mute.
12                    Mr. Kirby, is that you?  No.  Give me a second.
13                    MR. SHINDERMAN:  Your Honor, you may want to suggest
14      to Mr. Kirby that he takes off his headset and he just tries
15      the phone directly.
16                    THE COURT:  Well, the problem is I don't think I've
17      unmuted his line.  Thanks, though.  Let's see, I'm just
18      unmuting him.  Mr. Kirby, can you hear me?  He may not have
19      dialed in.  No.  Hold on a second.  I just got something here.
20      Mr. Kirby, is that you?  Well, it looks like he's dialing.
21      Mr. Kirby, hold on.  If you can hit "five star", let's see if I
22      can find you.  Ah, I think I found you.  Wait.
23                    MR. KIRBY:  Hear me?
24                    THE COURT:  Mr. Kirby?
25                    MR. KIRBY:  Can you hear me?
```

```
 1                 THE COURT:  Touchdown.  Okay, we got you.
 2                 MR. KIRBY:  Your Honor, I apologize for that.
 3                 THE COURT:  No worries.
 4                 MR. KIRBY:  I presume when it happens, it's always my
 5       fault.  But it always seems to happen when I'm trying to appear
 6       in court.
 7                 I am appearing in the case, Dean Kirby, Franklin Soto
 8       Leeds, for Doctors Chen and Miao.  And I'm speaking, of course,
 9       about one little corner of this complex and important
10       transaction.  And I understand that and I understand the
11       importance of the transaction to all creditors.
12                 But it's also important to my clients, who are
13       individual people, and are involved in a complex transaction
14       that's hard to even talk about without taking a little time.
15       And I'm asking the Court's patience about that, even though we
16       have a crowd of expensive lawyers who are going to sit here and
17       listen to me for as long as the Court allows me to speak.
18                 The Exhibit 1, which is on our list of exhibits, is a
19       copy of a complaint that was filed by the debtor, Sorrento
20       Therapeutics, and it alleges the validity of and seeks to
21       enforce a merger agreement, what the parties call in that
22       litigation a 2016 merger agreement.  And the merger agreement
23       is part of that exhibit, it's Exhibit H, starting at -- H, as
24       in horse, starting at PDF Page 380, and amended in one small
25       particular at Exhibit I at Page 465.
```

1          And what is important to refer to that merger

2     agreement, because the crux of this, as far as my clients are

3     concerned, is what is being sold and free and clear of what

4     claims.  The sale motion refers only, from my client's point of

5     view, to the sale of stock of a subsidiary of the debtor called

6     Concortis Biosystems Corp.  And Exhibit A to the motion, that's

7     Page 41 of the debtors' motion, lists Concortis Inc. as a

8     subsidiary of Concortis Biosystems Corp.  Concortis Biosystems

9     is not a debtor in bankruptcy.

10          Drs. Chen and Miao were sued in California Superior

11    Court by both the debtors and, yes, Sorrento Pharmaceuticals,

12    and by the non-debtor, Concortis Biosystems, as co-plaintiffs.

13    And we've designated a copy of that complaint as Exhibit 1, as

14    I said.  And we believe that the complaint's a document that

15    the Court can take judicial notice of for the limited purpose

16    of establishing that this claim for breach of the merger

17    agreement was made.  And it's offered here on that basis.

18          I don't anticipate the counsel for the debtor will

19    disagree with my recital of one or two relevant terms of that

20    merger agreement.  If they're not willing to stipulate, we can

21    call Dr. Chen as a witness to authenticate it.

22          If you open the Exhibit 1 PDF at Page 380, on Page 1,

23    the first thing you notice is that the debtor, Sorrento

24    Therapeutics, is not a party to the merger agreement.  Sorrento

25    Biosystems is named, or excuse me, Concortis Biosystems is

1  named in the agreement as the quote/unquote "parent".  And as

2  stated in the concluding paragraph on the first page of the

3  merger agreement, what happened is that a merger subsidiary of

4  the parent, that is, a subsidiary of Concortis Biosystems,

5  merged with Concortis Inc., which is my clients' corporation.

6  And Concortis Inc. was a surviving company as a subsidiary of

7  Concortis Biosystems, just like the debtors' motion says.  The

8  debtors' motion shows it to be a subsidiary of Concortis

9  Biosystems.

10          Now, so a copy of the Chen Miao cross-complaint filed

11  in the state court action is designated as well as an exhibit.

12  And anyway, it's just simply -- well, excuse me, I'm sorry.

13  The cross-complaint is an exhibit to the proof of claim that

14  was filed on behalf of Chen and Miao, and that those two claims

15  respectively are marked as exhibits, and solely to show the

16  nature of the claims and interests of Chen and Miao.

17          The debtor, Sorrento Therapeutics, does not claim to

18  own the stock of Concortis Inc.  That stock is an asset of non-

19  debtor Concortis Biosystems.  And you can read in the merger

20  agreement or in the proof of claim, again, if deemed necessary,

21  via the testimony of Dr. Chen, that he and Dr. Miao and the

22  remaining small group of minority shareholders of Concortis

23  gave up 100 percent of the Concortis Inc.'s stock and were to

24  receive in exchange 30 percent, later amended to 20 percent, of

25  the stock in Concortis Biosystems.  Dr. Chen can testify, if

1  necessary, that he never actually received the share

2  certificates.

3          If the merger agreement is valid, as the debtor

4  contends, then the debtor owns 80 percent of the stock of

5  Concortis Inc., not 100 percent.  And Chen and Miao are

6  entitled, unless they breach the agreement, to 20 percent of

7  that stock.  So at a minimum, I think this order needs to be

8  made clear that 80 percent of the stock is being sold, or at

9  least that the sale is whatever rights the debtor has in that

10  stock of Concortis Biosystems.

11          Now, the debtor claims the right to sell the

12  Concortis Inc. stock, I think, free and clear of any disputed

13  rights that Chen and Miao have.  The Court should not enter an

14  order that says that, and for two independent reasons.  First,

15  as I explained, I mean, Concortis Inc. is not a subsidiary of

16  the debtor.  If the merger agreement is valid, it's a

17  subsidiary of the debtors' subsidiary, Concortis Biosystems,

18  which is not in bankruptcy.

19          Second, you know, if the merger agreement is valid,

20  Chen and Miao own 20 percent of the stock of Concortis

21  Biosystems.  And that's a claim of ownership.  And we've cited

22  cases which stand for the proposition that you can't sell free

23  and clear of a claim of ownership without first adjudicating

24  that ownership dispute.  The claim of ownership is in limbo

25  right now, because the state court litigation is not -- is

1  unresolved.  And I note in the opposition I filed that early in

2  the case Chen and Miao moved for a modification of the stay to

3  allow that litigation to go forward.  And that motion was

4  denied.

5          So you know, within the last hour, we were served

6  with the final version of the proposed order.  And I anticipate

7  that if this order is entered in its current form, the debtor

8  may claim down the road that it affects my clients' rights to

9  continue the state court litigation to determine rescission

10  claims against the non-debtor, Concortis Biosystems, as to the

11  ownership of stock of the non-debtor subsidiary, Concortis Inc.

12          Now, I'm available immediately today or over the

13  weekend to meet and confer with counsel on some language that

14  makes clear that that is not what's being sold.  The stock in

15  Concortis Inc. is not being sold.  And I think that that's

16  important to put in the order because of the substantial

17  potential for misunderstanding, shall we say, about the effect

18  of the order.

19          Now, as to the rest of it, Section 3.8 of the merger

20  agreement is quoted in our opposition, one moment, and it says

21  restricted securities.  And it says the key stockholder, which

22  the debtor notes in its reply is Chen and Miao, understand that

23  the shares of the parent common stock, that is the shares of

24  Concortis Biosystems, have not been and will not be registered

25  under the Securities Act.  And it goes on to say that Chen and

1   Miao must hold the shares of the parent common stock for that

2   reason indefinitely unless they're registered or unless an

3   exemption applies.

4          I have a feeling that this may affect many of these

5   subsidiaries, but I don't know that and I'm not concerned with

6   that.  But the debtor in its reply doesn't tell us what

7   exemption they claim applies, if that's their claim.  They

8   haven't given us a copy of share certificates or in any way

9   established that this stock in Concortis Biosystems that

10  they're selling is not a restricted security.

11         So onward to the disclosure of benefits.  I want to

12  briefly address the arguments made in the debtors' reply about

13  the failure to disclose in the motion, which was served on the

14  ECF creditors, at least, what Dr. Ji personally stands to gain

15  in relation to the sale.

16         THE COURT:  Wait, wait.

17         MR. KIRBY:  The debtor --

18         THE COURT:  Mr. Kirby, why don't we just wait?

19  Sounds like you're doing an intro and closing.  Maybe we can

20  just do everything at the end once I hear all the evidence and

21  then we can see if it's still an issue.

22         MR. KIRBY:  Certainly, Your Honor.  Thank you.

23         THE COURT:  Okay.

24         Ms. Reckler?  Oh, Mr. Harris, I apologize.

25         MR. HARRIS:  Thank you, Your Honor.  We're ready to

1    call our one and only witness, which is Mr. Meghji, our CRO

2              THE COURT:  Okay, let's call him up.  Mr. Meghji, why

3    don't you come up?

4              MR. CULBERSON:  Wait, wait, wait, wait.

5              THE COURT:  I'm sorry.  Who's speaking?

6              MR. CULBERSON:  This is Tim Culbertson.

7              THE COURT:  Oh.

8              MR. CULBERSON:  I wasn't called on.

9              THE COURT:  Sorry, Mr. Culbertson.  I apologize.  Did

10   you file an --

11             MR. CULBERSON:  No, that's okay, Your Honor.

12             THE COURT:  Go ahead.

13             MR. CULBERSON:  I will be brief, but I do want to get

14   on the record since I wasn't party to the conversation between

15   the U.S. Trustee and the lawyers this morning.  I don't waive

16   my objection to the motion to transfer venue.  I think it

17   should be heard before this proceeding.  There is absolutely

18   now, as the U.S. Trustee did last night in its reply, clearly

19   shows there's no asset in Texas.  There's no principal place of

20   business in Texas.  There was and never and never will be a

21   basis for this Court to have venue.

22             And therefore, I believe this hearing should not be

23   going forward.  And there's no reason why we couldn't have the

24   venue issue resolved before this hearing.  So I just want to

25   make sure that that's on the record.

```
 1              THE COURT:  Absolutely.  And I apologize,
 2    Mr. Culbertson.  Your objection is duly noted.
 3              MR. CULBERSON:  Okay.  Thank you, Your Honor.
 4              THE COURT:  Okay.  Mr. Meghji, come on up.
 5              Are there going to be any docs shown or anything?  Do
 6    I have to give permission?
 7              MR. HARRIS:  Yes.  Could you let Mr. Gordon be our
 8    presenter?
 9              THE COURT:  Alrighty.  Just a second.
10              MR. HARRIS:  Thank you, Your Honor.
11              THE COURT:  And then I'll swear the witness in.
12    Mr. Gordon, where are you?  Let's see.  Mr. Gordon, where --
13    oh, there you are.  Thank you.  Okay.
14              Mr. Meghji, can you please raise your right hand?
15                MOHSIN MEGHJI, DEBTORS' WITNESS, SWORN
16              THE COURT:  Okay.  Let the record reflect the witness
17    has been properly sworn in.  You may continue.
18                           DIRECT EXAMINATION
19    BY MR. HARRIS:
20    Q    Mr. Meghji, for the record, could you state your title on
21    behalf of the debtors?
22    A    I'm the chief restructuring officer of the -- of the -- of
23    the debtors.
24    Q    Okay.  And before Dr. Ji came forward with the current
25    proposed transaction that's, you know, before the Court today,
```

1    were the debtors recently contemplating a conversion to Chapter

2    7?

3    A    Yes, we were.

4    Q    And why is that?

5    A    Because, really, for three reasons.  One, we felt that we

6    had, at that point, pretty much exhausted the sales effort and

7    marketing process.  Two, we were administratively insolvent.

8    We had a little under $5 million of cash a couple weeks ago,

9    and $12 million of -- of administrative claims.  And

10   essentially, all -- all of -- all of those efforts had --

11   had -- and three, the unsecured creditors committee was really

12   pushing us to strongly consider that, given that it looked like

13   there would not be sort of additional capital or sales offers

14   coming.

15   Q    And does the transaction that's before the Court today,

16   does that change the debtors' expectation that need to convert?

17   A    Yes, absolutely.

18   Q    And just can you describe generally the terms of the

19   transaction?

20   A    Yes.  I think that this transaction will allow us to go

21   effective with the plan that was confirmed in November.  We get

22   $15 and a half million of cash consideration, of which three

23   has been funded this morning, five -- an additional $5 million

24   in the form of a note two years from now, and then future

25   consideration if Nucro does well in the amount of $35 million

1   when the enterprise value exceeds $500 million, and a 7 percent

2   ownership interest in any operating investments that Nucro

3   makes going forward.

4   Q    So what would you describe as the benefits to the estate

5   of the transaction?

6   A    Well, first, it -- it deals with the administrative

7   insolvency and allows the plan to go effective.  It also leaves

8   some cash to fund the litigation trust or the liquidation trust

9   that's going to be set up as part of the plan of reorganization

10  and leaves the, at least the potential or hope for upside for

11  creditors and or equity holders in future.

12  Q    So if the trust is eventually able to pay creditors in

13  full, where does the residual value go?

14  A    It goes to the -- to Sorrento, which will be preserved for

15  the benefit of Sorrento shareholders.

16  Q    So to be clear, under the new structure that's enabled by

17  the transaction, are the Sorrento equity shares being canceled?

18  A    No.

19  Q    And are there any other potential benefits to existing

20  shareholders from this transaction?

21  A    I think as Mr. Glenn indicated today, they will have the

22  ability to participate in Nucro as investors.  And I think, you

23  know, I'm hopeful that if -- if the efforts that -- that he

24  also described today with the NOL process for a transaction

25  materializes there, there could be additional upside from that.

1  Q    And what safeguards are there in place, given the fact

2  that Dr. Ji is on or was in part of the buyer group?

3  A    Well, he has not been part of the, you know, while he's

4  been, you know, managing the operations, or -- or -- and been

5  actively involved in that day-to-day operations, he has not

6  been involved in any of the sort of non-operating issues.  The

7  board had turned those responsibilities over to me fairly early

8  in the case, I think sometime in March.  So I've been -- and

9  we've kept them out of that decision-making process.

10 Q    And has Dr. Ji ever interfered with any sale effort during

11 the course of bankruptcy?

12 A    Not to my knowledge.

13 Q    And to be clear, the debtors made other efforts to sell

14 these particular assets during the bankruptcy?

15 A    Yes, all the way through from March of last year through

16 now.

17 Q    Okay.  And for these assets, have there been any

18 actionable offers other than the one before the Court today?

19 A    No.

20 Q    And did the debtors have financing that would allow them

21 to instead develop these assets rather than sell them?

22 A    No.

23 Q    And what's the outside closing date for the transaction?

24 A    March 31st.

25 Q    And if the transaction closes on March 31st, how much cash

1 | do you expect will be left for the liquidating trust?

2 | A    Approximately a couple -- approximately two million bucks

3 | or slightly under that.  And if it closes earlier than that,

4 | then we could -- there could be a little bit more cash left.

5 | Q    Okay.  And has the buyer indicated that it might be able

6 | to close in as early as 10 days?

7 | A    Yes, they have.

8 | Q    And do the debtors believe that the purchasers have the

9 | ability to close?

10 | A    Yes.

11 | Q    What's your basis for that belief?

12 | A    So over the past two days, if not longer, but certainly

13 | intensively over the past two days, we have been very engaged

14 | with Dr. Ji and his counsel, Mr. Rawlins, who's -- who's on by

15 | Zoom here.  And also in some case -- in some cases, I've had

16 | conversations with Dr. Ji's investors.  So I think there is a

17 | stock purchase agreement backing the buyer.  And I'm

18 | comfortable based on the representations that Dr. Ji and

19 | Mr. Rawlins have made to me that they can go ahead and close

20 | this deal.

21 | Q    Just to be clear, what is the alternative to this sale for

22 | the debtors?

23 | A    Well, there's no other sale or financing alternative.  So

24 | if the sale doesn't happen, we would be filing for Chapter 7.

25 | Q    And what effect would liquidation have on recoveries to

1   the estate's constituents?

2   A    I think very negative.

3   Q    All right, now let's just talk briefly about the DIP.  For

4   the record, what are the terms of the DIP at a high level?

5   A    So the DIP bears PIK interest, payment in kind interest, a

6   rate of 8 percent per annum.  There are no fees associated with

7   it unless we, the debtors, default on the DIP.  And there is no

8   prepayment penalties associated with the -- with the DIP as

9   well.

10  Q    And was the DIP lender willing to lend on an unsecured

11  basis?

12  A    No.

13  Q    Is there any other potential lender that the DIPs are

14  aware -- that the debtors are aware of?

15  A    No.

16  Q    And do the debtors have funding to close the sale

17  transaction, you know, through March 31 without the DIP?

18  A    No.

19  Q    Okay.

20          MR. HARRIS:  Could we display the DIP budget, which

21  is Debtors' Exhibit 8?  Okay.  And if you go to the next page,

22  okay.

23  BY MR. HARRIS:

24  Q    And then we're going to look at the lines under cash

25  receipts at the top.  Do you see that there is listed a -- if

1  you scroll down a little to see the --

2  A    I see the dates.

3  Q    -- the periods, also the dates, yeah.  Yeah, there it is.

4  Do you see there's a 300,000 receipt that was budgeted to be

5  received on February, the week of February 18th?

6  A    Yes.

7  Q    Okay.  Have the debtors received that $300,000 payment

8  yet?

9  A    No, we're still -- we're still chasing that.  We do expect

10  to receive it, but it hasn't yet come in.

11  Q    Okay.  And then if you look two periods over the week of

12  March 3rd, you see a $1.9 million payment that was expected to

13  be received?

14  A    Correct.  That was the AIG insurance settlement.

15  Q    Okay.  And has that payment been received yet?

16  A    No, we are now expecting to get that on Monday or Tuesday.

17  Q    Okay.  So excluding the interim DIP draw that was recently

18  received, how much cash do the debtors have today?

19  A    About -- we have 1.8 or 1.9 million in the operating

20  account, and we have 1.8 or so in the car ride account.

21  Q    And how do the debtors intend to use the existing cash and

22  the DIP draws?

23  A    To -- to continue to fund, as we show here, the operating

24  disbursements and professional payments that we have.

25  Q    Okay.  And I want to focus on a few specific line items.

1   How are the disbursements for retained professionals

2   calculated?

3   A    So through a combination, the -- the process we had set up

4   from the inception -- inception of the case is that on a weekly

5   basis, every professional in the case reports their fees or

6   their estimated fees for that week to -- to us, to one of the

7   M3 team.  That's tracked, maintained, and -- and -- and

8   calculated.  And then, obviously, there are monthly filings by

9   the professionals with the Court.

10  Q    Okay.  And how are the disbursements for ordinary course

11  professionals calculated?  Is it the same process?

12  A    Well, I mean, we -- we created a member of my team, and

13  working very closely with Sorrento management, prepared a very

14  detailed budget, which has been maintained and updated on a

15  weekly basis from the inception of the case to determine the --

16  all of the kind of operating disbursements, as well as the

17  operating, sort of the ordinary course professionals fees.

18  Q    All right, one more line item.  If we can scroll down to

19  the bottom, there's a line item.  It's called professional fee

20  accruals unpaid.  Do you see that line item, sir?

21  A    Yes.

22  Q    Okay.  How was the professional fee accruals unpaid

23  calculated?

24  A    Well, that's based on the -- the fees that have been, you

25  know, incurred and estimated and have not been paid by the

1   debtor.

2   Q     All right, thank you.

3            MR. HARRIS:  We can take the budget down.

4   BY MR. HARRIS:

5   Q     Briefly about the default terms in the DIP.  What happens

6   if the debtors default under the DIP?

7   A     If the -- if the debtors default under the DIP, then I

8   think, you know, we'd be responsible for any professional fees

9   incurred by the DIP lender and the buyer.  But importantly,

10  they don't -- the DIP lender does not have a right to foreclose

11  on our assets unless they pay the remainder of the

12  consideration that's required under the sale agreement.

13  Q     Okay.  And other than the 400 -- $40,000 of interest, does

14  the DIP cost the debtors anything if the transaction closes?

15  A     You know, it's less than $40,000, not 440.  I --

16  Q     40,000, sorry.  All right.  So other than the $40,000 of

17  interest, does it -- would --

18  A     No.

19  Q     Okay.

20  A     There's no other cost.

21  Q     Likewise, if someone else comes around with an alternative

22  transaction or places the DIP, would it cost the debtors

23  anything?

24  A     No, there's no prepayment penalty.

25  Q     Okay.

```
1              MR. HARRIS:  No further questions.

2              THE COURT:  Anyone in the courtroom who supports the

3    relief request that have any questions for the witness?  Anyone

4    in the courtroom -- else in the courtroom have any questions

5    for the witness?  Ms. Barcomb.

6              MS. BARCOMB:  Thank you, Your Honor.

7                        CROSS-EXAMINATION

8    BY MS. BARCOMB:

9    Q    Good afternoon, Mr. Meghji.

10   A    Good afternoon.

11   Q    My name is Alicia Barcomb.  I'm a trial attorney with the

12   United States Trustee's Office.  I wanted to ask you some

13   additional questions about the professional fee line items in

14   the DIP budget.

15             MR. BARCOMB:  Mr. Gordon, could I trouble you to put

16   that back on the screen?  Thank you.  Mr. Gordon, could you

17   please scroll up to where it displays -- yes, thank you.

18   Great.

19   BY MS. BARCOMB:

20   Q    Mr. Meghji, regarding the total retained professionals

21   line item in the budget, do you see that under other

22   disbursements?

23   A    Yes.

24   Q    Okay.  I believe you testified, and I may be summarizing

25   your testimony, that essentially historical averages from
```

1  weekly receipts of emails from the retained professionals were

2  calculated and these numbers were forecasted in the budget.  Do

3  I have that right?

4  A     No.

5  Q     Okay.  Could you please describe your calculation of the

6  forecasted budget line item for total -- for retained

7  professionals?

8  A     Yeah, so it wasn't based on just a straight historical

9  average.  I think we -- we -- we looked at what needed to be

10  done between now and March 31st, spoke to each of the

11  professionals, and -- and sort of came up with a budget on that

12  basis.

13  Q     Okay.  And for the ordinary course professionals, did you

14  also speak with those professionals about the forecast?

15  A     I think with the ordinary course professionals, it's been

16  probably more consistent with how you described it in your

17  question, which is -- it's ordinary course.  It's sort of

18  relatively consistent historically, although it's not the same

19  every week.  It's the same sort of pattern on a weekly,

20  monthly, quarterly basis.  So we extrapolated that based on

21  what's going on and what activities are going on.  But one of

22  my colleagues, Mr. Greenhaus, maintains that has a very good

23  handle on all of that.

24  Q     Mr. Meghji, did the forecast for retained professionals,

25  did it include the terms of the interim compensation

1  procedures?

2  A     Can you help me with what that means?

3  Q     Yes, I will be more specific.  Thank you.  Did the

4  forecasted amounts include a recognition of the applicable

5  objection period based on the interim compensation procedures?

6  A     So just to clarify in terms of 80 percent of being -- it

7  being paid as opposed to the full amount?

8  Q     Mr. Meghji, that is one of the terms of the interim

9  compensation procedures, but also the noticing requirements and

10  then a 14-day objection period.  Did the forecast contemplate

11  those terms?

12  A     Yes, I believe it does.  Absolutely.

13  Q     Thank you, Mr. Meghji.

14           MS. BARCOMB:  No further questions, Your Honor.

15           THE COURT:  Thank you.  Anyone else?

16           Okay, let's see, anyone on the line who filed an

17  objection wish to have any questions for this witness?

18           MR. KIRBY:  Yes, Your Honor.

19           THE COURT:  Okay.  Just state your name for the

20  record again.

21           MR. KIRBY:  Am I being heard now?

22           THE COURT:  We can hear you, Mr. Kirby.

23           MR. KIRBY:  All right.

24                        CROSS-EXAMINATION

25  BY MR. KIRBY:

```
 1  Q    Dr. Meghji, when you negotiated with the purchaser, what
 2  persons did you negotiate with?
 3  A    With the purchaser for this agreement?
 4            THE COURT:  Mr. Meghji, can you just make sure that
 5  your mic is just twisted just so we can hear you a little bit
 6  better?
 7            THE WITNESS:  Sorry.
 8            THE COURT:  No, no worries.
 9            THE WITNESS:  Okay.  Can -- is it better?
10            THE COURT:  Much better for me.  Can you repeat your
11  answer -- Mr. Kirby, can you ask your question again and let's
12  get an answer from the witness?
13            MR. KIRBY:  Certainly.
14  BY MR. KIRBY:
15  Q    When you negotiated with the purchaser, what persons did
16  you negotiate with?
17  A    With Dr. Ji and with his counsel, Mr. Rawlins, for the
18  most part.  And I'd probably say it was more with his counsel
19  than Dr. Ji.
20  Q    Did you have any contact with Dr. Ji's proposed equity
21  partner when you were negotiating this?
22  A    Yes.  Not -- not -- now, I just want to be clear.  Not
23  specifically on the negotiation of the terms, but as I -- I --
24  I think I testified earlier, over the past couple of days, I've
25  had several discussions and -- and several of my colleagues
```

1  have and my advisors have as well with the principals and some

2  of the investors backing Dr. Ji in -- in relation --

3  Q    And --

4  A    -- to timing of funding, when the funds are coming in, the

5  DIP proceeds, et cetera.

6  Q    All right.  Did you negotiate the actual terms of the

7  purchase directly with the proposed equity partner?

8  A    I did not personally do that directly with the equity

9  partner.  This -- the agreement was negotiated between -- I may

10  have this slightly off, but between January 22nd, which is when

11  we first received a term sheet from Dr. Ji and, you know, when

12  we filed it a couple weeks ago.  So it was a long process with

13  the involvement of Latham, Moelis, M3, the creditors committee

14  was actively -- Mr. Shinderman and BRG were actively involved

15  in that process.  So it was a fairly involved process.  It

16  wasn't me and Dr. Ji negotiating.

17  Q    Now, in negotiating the purchase, did you understand that

18  it was important to the purchaser that Dr. Ji continue on in

19  the business?

20  A    Well, Dr. Ji is the buyer.  So yeah.

21  Q    Yeah.  So --

22  A    So -- so yes, they -- they wouldn't have backed them if

23  they didn't think so, but I -- I --  that's my understanding.

24  Q    And to your knowledge, were discussions with Dr. Ji and

25  his proposed equity partners going on at the same time that you

1  were negotiating the purchase itself?

2  A    I mean, I assume so.

3  Q    And did you participate at all in the negotiations between

4  Dr. Ji and his new equity partners in the purchaser entity?

5  A    No, I -- I -- I am -- I, as you know, I'm the CRO of the

6  sellers.  So I'm not involved with the purchaser.

7  Q    Do you know what benefits Dr. Ji proposed as a condition

8  to his continued involvement in business?

9         MR. SHINDERMAN:  Objection, Your Honor.  Calls for

10  speculation.

11         THE COURT:  Sustained.  It calls for speculation.

12  BY MR. KIRBY:

13  Q    Did anyone tell you, sir, what benefits Dr. Ji proposed as

14  a condition to his involvement?

15  A    No.

16  Q    Did anyone tell you what the equity partner offered to him

17  in order to obtain his involvement?

18  A    Sir, I have no involvement or knowledge of any of the --

19  the discussions between Dr. Ji and his investors.  I -- you can

20  ask me that 10 different ways, but I -- I just don't know.

21  Q    And so today, as you sit here, do you know the terms under

22  which Dr. Ji agreed to participate in the purchaser entity?

23  A    No.

24         MR. KIRBY:  I have nothing further, Your Honor.

25  Thank you.

1            THE COURT:  Thank you very much.

2            Anyone else have any questions who filed an

3    objection?

4            Okay, Mr. Meghji, thank you very much.

5            THE WITNESS:  Thank you.

6        (Witness excused)

7            MR. HARRIS:  Your Honor, the only other evidentiary

8    matter on behalf of the debtors is we'd move into admission

9    Exhibit 8, and that would close our evidence.

10            THE COURT:  Can you tell me the docket number?

11            MR. HARRIS:  Oh, it is 1974-8.

12            THE COURT:  1974-8?  Any objection to the admission

13    of 1974-8?  Okay, it's admitted.

14        (ECF Number 1974-8 admitted into evidence)

15            MR. HARRIS:  And that closes our evidence.

16            THE COURT:  Okay, let me -- any additional evidence

17    from any party moving in support of the relief request?  Any

18    additional documents?  Anyone who opposes the relief requested

19    or objecting to the relief requested, any evidence that the

20    parties seek to submit at this time?

21            MR. KIRBY:  Your Honor, is somebody hearing me?

22            THE COURT:  Yes.

23            MR. KIRBY:  All right.  I would like to offer our

24    Exhibits 1 through 5 that are listed in our exhibit list.

25    Exhibit 1 is a copy of the state court complaint filed by the

1    debtor.  I've already told you why I think that judicial notice

2    can be taken of that, and it is the debtors' assertion of the

3    validity of this merger agreement and the merger agreements

4    attached to it.  I can call Dr. Miao to authenticate that, but

5    I don't believe it should be necessary.

6              THE COURT:  All right.  Let me just ask debtors'

7    counsel here.  Mr. Harris, 1985 Exhibits 1 through -- you said

8    1 through 4 or 1 through 5, Mr. Kirby?

9              MR. KIRBY:  I believe it's 1 through 5.

10             THE COURT:  1 through 5.  Any objection to 1, 2, 3,

11   4, or 5?

12             MR. HARRIS:  We have no objection.  I think the

13   document number is 1976.

14             THE COURT:  I'm looking at 1985.  Maybe I --

15             MR. KIRBY:  Your Honor, the --

16             THE COURT:  No, no, no.  It's 1976.  I'm looking at

17   the wrong doc here.  You're right.  I'm wrong.

18             MR. KIRBY:  Your Honor --

19             THE COURT:  Go ahead.

20             MR. KIRBY:  I'm sorry to interrupt.  We saw -- we

21   filed an exhibit list, and then we saw other people filing them

22   on a court form and actually attaching the exhibit, so we went

23   ahead and did that and filed an amended one a couple of days

24   ago, so --

25             THE COURT:  Oh.

```
 1              MR. KIRBY:  That's --

 2              THE COURT:  We're all right.

 3              MR. HARRIS:  Still no objection.  Yes.

 4              THE COURT:  Any objection to 1 through 5?

 5              MR. HARRIS:  No, Your Honor.

 6              THE COURT:  1985-1 through -5 are admitted.

 7         (ECF Numbers 1985-1 through 1985-5 admitted into evidence)

 8              THE COURT:  1 is the complaint.

 9              MR. KIRBY:  Thank you, Your Honor.

10              THE COURT:  2 is the proof of claim number 26 filed

11   by Miao.  3 is a proof of claim 27 filed by Chen.  4 is the

12   Scintilla Pharmaceuticals petition.  5 is an operating report

13   dated Docket 1947 in this case.  Okay.

14              Alrighty.  Let us proceed then to argument.  I'll

15   consider the record, then, the evidentiary record closed.

16              MR. GORDON:  Good afternoon, Your Honor.  Jonathan

17   Gordon of Latham & Watkins on behalf of the debtors.

18              The claimant's main argument is that the sales should

19   not be free and clear of their claim to rescind a 2016 contract

20   under which they transferred the Concortis assets to Sorrento.

21   Their Exhibit Number 2, which is a proof of claim, as well as

22   Exhibit Number 3, attaches the complaint, and Pages 23 to 24

23   showed the cause of action for the rescission claim.  That

24   rescission claim is against Sorrento, the debtor, and Concortis

25   Biosystems.
```

1        They seem to say that the sale cannot be free and

2   clear because Biosystems is not a debtor, but Biosystems is an

3   asset of the debtor, and this is no different than a lien on or

4   a claim against a piece of land that is owned by the debtor.

5        Our response to the objection is at Docket Number

6   1983, and as our response explains, this issue is squarely

7   answered by both the Code and rescission-related case law, both

8   inside and outside of bankruptcy.

9        Starting with the Code, 363(f)(4) allows a debtor to

10  sell free and clear of a claim if there's a bona fide dispute

11  over it.  That is clearly met here, and I don't think there's a

12  dispute that there is a dispute.  The parties have been

13  litigating this rescission claim since the summer of 2018, and

14  so (f)(4) is met.

15        (f)(5) is also met.  (f)(5) says a debtor can sell

16  free and clear if the claimant could be compelled to accept

17  money satisfaction of such claim.  A number of cases going all

18  the way up to the Supreme Court have explained that

19  rescissionary monetary damages are available to claimants if

20  rescission is no longer available.  Those damages serve as a

21  substitute for or satisfaction of rescission.  Those cases are

22  in our reply, and so (f)(5) is met too.

23        The claimant's response to all this is that 363(f)

24  only applies to estate property.  Again, Biosystems is estate

25  property.  It is an asset of the debtor.  And because there's a

1 | rescission claim that this Concortis stock is purportedly not

2 | estate property, that argument fails.

3 |      Turning again to the case law, we cite a number of

4 | cases holding that a rescission claim inherently assumes that

5 | the contract was valid, that the assets in question were

6 | transferred.  That's clear under the cases, and that means this

7 | is estate property.

8 |      Indeed, the claimants here even admit as much in

9 | their objection.  In Paragraph 3, they say that the assets,

10 | quote, "were fraudulently acquired", end quote, by Sorrento.

11 | The parties can and do dispute the fraudulent piece of that,

12 | but the claimants admit that Sorrento acquired the assets.

13 |      And they do it again later in their objection.  In

14 | Paragraph 18, they say they want to, quote, "regain ownership",

15 | end quote, of the assets.  Again, they are admitting that they

16 | lost ownership to Sorrento.

17 |      And if you want to see how all this applies in the

18 | bankruptcy context, there's a case for that too.  That's the

19 | Fillion case from the Seventh Circuit that we cited in our

20 | reply, 181 F.3d 859.  There, the debtor was selling real estate

21 | free and clear through the plan, and there is an objection

22 | based on a claim to rescind that property.  The Court said the

23 | Code explicitly authorized the sale free and clear, in quotes,

24 | "an objection based on merely the existence of the claim of

25 | rescission could not be successful", end quote.

1           All of these cases support the sale being free and

2    clear.  On the other hand, none of the cases cited by the

3    claimants are relevant because they do not involve a rescission

4    claim.  We distinguish all of them in our reply, but for

5    example, one is about consignment.  One is about adverse

6    possession.  None of them are about rescission.

7           And not only is the debtors' position supported by

8    the case law, but it makes good sense too, which takes us full

9    circle back to the Code.

10          I'm going to paraphrase what Section 510(b) basically

11   says that you don't get to jump ahead in the priority line just

12   because you asserted a claim for rescission.  For example, a

13   shareholder's equity interests are junior to creditor claims.

14   We all know and understand that.  And the shareholder doesn't

15   get to just allege some kind of rescission or fraud claim with

16   respect to that equity to turn itself into a creditor and jump

17   ahead in line.

18          That's essentially what the claimants here are trying

19   to do.  They're general, unsecured, litigation claimants.

20   That's even what their proofs of claims say.  Those claims are

21   now in evidence.  Yet they're trying to jump ahead of other

22   unsecured creditors by arguing that their rescission and fraud

23   claim gives them some kind of secured property right that

24   attached to the assets and survives a free and clear sale.

25   That doesn't comply with the Code or the case law and the

1  argument should be overruled.

2           As for the rest of the arguments and the objection,

3  I'll address them mostly briefly and then we'll otherwise rely

4  on the brief.

5           THE COURT:  So explain to me what you think the

6  lawsuit -- what's being alleged in the lawsuit.  Just give me

7  just some pure understanding.  The complaint is in evidence.

8  What's your understanding of what's being alleged and what's

9  the dispute, the legal dispute in the lawsuit?

10          MR. GORDON:  My understanding is the litigation is

11 about rescinding the merger contract.  The claim is against

12 Sorrento, the debtor, and Concortis Biosystems, the wholly

13 owned subsidiary of the debtor to rescind the contracts.

14 Really, it's a dispute about consideration.  I don't think

15 there's even really a dispute that the parties intended to do

16 some kind of transfer and I don't think anyone's really

17 disputing the assets that were transferred.  It's all about

18 consideration, which just goes back to the fact that money

19 damages are available to satisfy that claim.

20          THE COURT:  Okay, thank you.

21          MR. GORDON:  As for the rest of the arguments, again,

22 first that the merger agreement has transfer restrictions

23 prohibiting the sale.  I think that's a fundamental misreading

24 of a fairly boilerplate securities restriction and does not say

25 what the claimants think it does.  In fact, and the claimants

1  even put this in their objection, the shareholder that the

2  restriction is referring to is Chen and Miao, is not Sorrento.

3          Second, that the debtors have not adequately

4  disclosed Dr. Ji's equity in the buyer.  We have disclosed

5  multiple times in the brief, in argument here, at the previous

6  hearing, Dr. Ji is getting equity.  He will be involved.  That

7  amount of equity is still being determined as other parties are

8  investing in the buyer, but the exact number is irrelevant.  We

9  are acknowledging and admit this is an insider deal.  Whether

10  Dr. Ji gets 1 percent or 100 percent, we have treated this as a

11  fully insider deal that satisfies the fairness test for that.

12  The price and the process were entirely fair and the exact

13  amount of Dr. Ji's equity does not change that.

14          Third, that the claimants should be adequately

15  protected by having their rescission rights continue in the

16  assets post-sale.  That's really just another way of saying the

17  sale should not be free and clear, and that fails for

18  everything I talked about earlier.

19          Fourth, that the plan modifications need to be pre-

20  solicited.  As Ms. Reckler explained, they are simply

21  mechanical.  They do not change the value of the treatment of

22  any claims.  They are not material or adverse.

23          Fifth, that the modified claim violates the absolute

24  priority rule.  Again, shareholders are not getting any value

25  until creditors are paid in full.

1           And sixth, to the extent it's still being pursued,

2    that emergency consideration is not appropriate.  We filed the

3    motion 18 days ago.  We're very close to regular notice.

4    Emergency consideration is appropriate for all the reasons

5    Mr. Meghji testified to today and at the prior hearing when the

6    Court set the issue for today.

7           So unless the Court has any further questions, we

8    would ask that the objection be overruled.

9           THE COURT:  Thank you.

10          Anyone else in the courtroom wish to be heard?

11          Okay.  Mr. Kirby, why don't I turn things over to

12   you, sir?

13          MR. KIRBY:  Have I just been called upon?

14          THE COURT:  Yes, just for any --

15          MR. KIRBY:  All right.  Thank you.

16          THE COURT:  -- closing arguments that you wish to

17   make, sir.

18          MR. KIRBY:  Thank you very much.  First, the Court

19   asked counsel what was the basis for the rescission, and I want

20   to address that very briefly.  It's set out, of course, in that

21   cross-complaint that is now in evidence.  But Dr. Ji and

22   Dr. Miao owned a corporation that had a business that was given

23   to Concortis Biosystems and they had received nothing in

24   return, not even the stock that they were promised.

25          Now, why?  Well, one reason is that this transaction

 1  was orchestrated by Counsel Paul Hastings.  Paul Hastings

 2  represented Sorrento Therapeutics and Concortis Biosystems.

 3  And Chen Miao thought that they also represented them.  They

 4  did not have separate counsel in relation to that very

 5  important to them agreement because they believed that Paul

 6  Hastings was looking out for them that's perhaps minute, but

 7  understandable.

 8          THE COURT:  Counsel, you're arguing stuff that's not

 9  in the record anymore.  So I going to -- I gave everyone an

10  opportunity to argue within the record.  Now, unless you're

11  going to argue stuff within the record, I'm going to give you

12  an opportunity to do so.  But I've got to limit you to that

13  just to be fair to everyone.

14          MR. KIRBY:  These claims are set forth in great

15  detail in the lawsuit that is attached to the proof of claim

16  that has been admitted into evidence.

17          THE COURT:  Okay.

18          MR. KIRBY:  And even looking at the cross-complaint,

19  you'll see that Paul Hastings is a co-defendant.  And my client

20  has been practically prevented from pursuing that lawsuit as

21  well because of the automatic stay and how the Court deals with

22  those situations where one of several defendants files a

23  bankruptcy petition.

24          So they do have rescission rights.  They were

25  represented by counsel who didn't disclose to them as the

1  complaint alleges.  And the proof of claim is prima facie

2  evidence of the validity of the claim that they weren't

3  protected.

4         And they weren't protected.  And that became obvious

5  when the merger agreement was breached and they had no

6  practical recourse.  They didn't even, as I said, get the stock

7  that the merger agreement says they were supposed to be issued.

8  And there were, of course, allegations of fraud in the

9  inducement by both sides that I don't need, I think, to go into

10  detail about.

11        So that aside, I want to address what counsel argued.

12  He made a number of statements.  And I think I'm quoting, this

13  is estate property.  This asset.  What is estate property?

14  What is the asset?  What is being sold within the four corners

15  of that agreement attached to their motion is the stock in

16  Concortis Biosystems.  They're subsidiary.

17        Sorrento, they're saying, well, they're suing to

18  rescind as to Sorrento.  Why as to Sorrento?  Sorrento did not

19  sign that agreement.  It wasn't a party to that agreement.

20  Now, yes, I mean, both Sorrento and Concortis Biosystems are

21  parties to the litigation, but they are not seeking to sell the

22  stock of Concortis Inc.  And it is Concortis Inc. that our

23  client contends should not be a subsidiary of Concortis

24  Biosystems.  They are being sued, Concortis Biosystems, to

25  rescind that transaction, which they were a party to, the non-

1  debtor was a party to.  So I don't understand rescind or from

2  Sorrento Therapeutics.  It doesn't make any sense.

3         The stock that is in dispute is the stock in

4  Concortis Inc., which is a non-bankrupt subsidiary of a non-

5  bankrupt subsidiary of the debtor.  So these arguments about

6  selling free and clear of rescission rights are in some ways

7  irrelevant.  This order should not be used to bar my clients

8  from asserting their rights against Concortis Biosystems to,

9  for one thing, get the 20 percent of the stock that they were

10 promised, if they haven't breached the agreement, and two, to

11 exercise rescission rights to get that stock in Concortis Inc.

12 back.

13        As to the remainder, on restricted securities, I just

14 heard counsel just basically say, you don't understand enough

15 to know what this means.  I quoted the passage in my papers.  I

16 read it again in argument.  If that isn't clear, then I can't

17 help the Court any further than that.

18        As to disclosure, and this is where I started to

19 argue and the Court kindly asked me to wait until now.  There

20 is no disclosure in this motion and in the evidence that's been

21 presented of what Dr. Ji personally stands to gain in relation

22 to this sale.  And what he stands to gain obviously affects the

23 purchase price that was obtained.  Obviously, if the purchaser

24 is going to grant Dr. Ji equity rights in all of these

25 businesses that are being transferred, what percent?  The

1  creditors are getting 7 percent.  I wonder what he's getting.

2  There's no way to know that.

3         Now, you know, the debtor admits in the reply that

4  this is an insider deal.  And just saying that constitutes

5  disclosure.  And the Court knows that an insider deal is

6  subject to strict requirements of disclosure and examination

7  for fairness.  That hasn't happened here.  The debtor now

8  discloses in this reply that was filed a day ago, that Dr. Ji

9  through trust is going to initially loan 100 percent of the

10  buyer.  Only then after the sale closes, I guess, will Dr. Ji

11  negotiate and document his deal.  I don't believe that.

12         So that to me is an issue because the fact that Dr.

13  Ji's benefits that he's negotiated for at the same time that

14  this purchase was negotiated with him, apparently, affects the

15  consideration.  And a sale to an insider based on inadequate

16  disclosure, one could say concealment, cannot be found to be a

17  sale in good faith.  And so that's our argument on disclosure.

18         Plan modification, just very briefly, on the simple

19  face of it, creditors were told in the disclosure statement and

20  the confirmed plan provided that existing equity rights will be

21  canceled.  Now the debtor wants to modify the plan, feels it's

22  important enough to modify the plan to provide that those

23  rights are preserved.  And I confess that I don't understand

24  why.  I heard and understand that the argument that creditors

25  retain priority in distribution before equity, but I don't

1  believe that that means that equity holders can receive
2  anything if creditors are not provided for in full.

3          So I think it's a violation of the absolute priority
4  rule as it stands.  If it's accepted by classes of creditors
5  after full disclosure, then yes, otherwise no.

6          So the final point that I wanna make is this.  I
7  think that this order in its present form, as presented a few
8  hours ago, is subject to being misused to contend that somehow
9  Dr. Chen and Dr. Miao are barred from asserting rights against
10 Concortis Biosystems, you know, to recover the stock in the
11 merger agreement that was between them and Concortis and not
12 between them and Sorrento.  I also think that it may be misused
13 to somehow cause Concortis Biosystems to refuse to issue the 20
14 percent in equity that was clearly promised in black and white
15 under that merger agreement.

16         So I think, I mean, and this to everyone here,
17 perhaps is a minor point.  You know, we're going from the
18 sublime to the banal in my presentation about Dr. Chen and Dr.
19 Miao.  But I think that this possible misuse of the order
20 should be guarded against by the inclusion of appropriate
21 language in it.  And I am available to do that quickly.

22         They're talking about a sale that will close by the
23 end of this month.  I don't know in light of that, how a record
24 has been made about waiving the provisions of the Federal Rules
25 of Bankruptcy Procedure that stay this closing for 14 days

1  after entry of the order.  But regardless, I mean, there is

2  enough time for us to at least discuss.

3          And I've been, and I will say with Mr. Gordon, he's

4  been very open to discussing these things with me.  And I have

5  no problem meeting conferring with him or anybody else on the

6  debtors' side.  To put some language in the order that makes

7  clear what is being sold and what it is being sold free and

8  clear of.

9          And if we can't reach an agreement, I would ask for

10  the opportunity to submit an alternative order with this little

11  redline paragraph that does explain that.  And that the Court I

12  think can agree with based on this record.  And thank you.  And

13  thank you in particular for putting up with my inability to use

14  the telephone, I guess it is.

15          THE COURT:  You just haven't been around long enough

16  to see how bad I am, Mr. Kirby.  So anyhow, thank you very much

17  for your time.

18          Okay.  I'll give debtors' counsel an opportunity to

19  respond to everything and then I'm going to rule.

20          MR. GORDON:  And just a few things.  I think counsel

21  focused on the fact that the claim was against Sorrento, the

22  debtor, which I did know, but I also noted as he did that the

23  claim is against Biosystems as well.  And like I said before,

24  Biosystems is an asset of the debtor.  This is no different

25  than a piece of land.

1            Number two, I think he again admitted they are trying

2    to get the assets, quote, "back".  Again, he's acknowledging

3    that the assets were transferred to Sorrento.

4            Number three on the insider deal, just to clarify,

5    Dr. Ji owns 100 percent now based on the trust.  The equity

6    splits will be determined pre-closing, not post-closing,

7    depending on the investments that come in for the sale.  But

8    again, in any event, we contend that that's all irrelevant.

9    Even if he owns 100 percent now and forever, this is the best

10   and only actionable transaction, the process was fair, it was

11   negotiated by an unsecured creditors committee, a chief

12   restructuring officer with Dr. Ji completely on the other side.

13           And last, in terms of why equity remains alive, I

14   don't think that it's super relevant to the modifications, but

15   just for clarity and for information, it frankly allows equity

16   to have upside if recoveries are significant enough to pay

17   creditors in full.  There's really not any downside and it

18   allows equity to trade if they want to trade.  And also

19   frankly, it's a little easier on the process where the

20   reversionary consideration of the trust exceeds creditors'

21   claims can go to Sorrento, the entity for the benefit of

22   shareholders rather than directly.

23           So unless Your Honor has any further questions, we

24   would ask that the objection be overruled.

25           THE COURT:  Thank you.  So before the Court is

1  consideration of a motion filed by the debtors seeking to -- it

2  was filed a Docket Number, I wanna make sure I've got this

3  right, 1884, seeking to do a few things to enter into a final

4  DIP, approval of a final debtor in possession financing to

5  approve the sale of assets to Dr. Ji and an entity related

6  there too.  And also to make certain modifications to the

7  confirmed Chapter 11 plan.

8          The motion I would note for the record was filed,

9  again, at Docket Number 1884.  And the motion actually

10  requested emergency relief well before today and was filed on

11  February 19th.  And it sought emergency relief far sooner than

12  we were today.  The Court held initial hearing.  Initial

13  request was for February 24th.  The Court held a hearing and

14  based in part on statements from Mr. Glenn, a member of the --

15  represents the equity committee, the Court extended until

16  today.  The Court entered an interim order approving the DIP

17  here.

18          But again, based on discussions at that hearing,

19  including kind of certain requests made by the United States

20  Trustee at the time, Mr. Duran was here, and limited the amount

21  of the interim DIP to kind of an initial draw.  No final

22  request was approved at that time.  Allowed the debtor to just

23  have essentially 3 million, a draw of 3 million to pay for just

24  necessary operating expenses.  So all rights were preserved

25  till today.

1          I'm going to find that there's been proper notice and

2   service of all required notices to getting us to today.  Let me

3   just deal, I'm going to deal with them in buckets.  I'm going

4   to deal with the DIP.  I'm going to deal with the sale of the

5   assets.  And then I'm going to deal with the modifications to

6   the Chapter 11 plan.

7          The Court has considered the evidence before the

8   Court today.  The Court understands, I'll note this at the

9   outset too so I don't forget that there have been certain

10  agreements made that are in a proposed order with certain

11  objecting parties to resolve their objections and certain

12  statements made on the record today.  I am accepting all of

13  those agreements.  I find that they're in the best interest of

14  the estate and consensually resolve disputes.  So I'll note

15  that.

16         So let me deal with the DIP.  The request is for a

17  senior secured superpriority financing.  We look to Section 364

18  of the Bankruptcy Code based upon the testimony of Mr. Meghji.

19  I'm going to note a few things.  The relief requested certainly

20  immediate.  Note that Mr. Meghji testified that the debtor is

21  essentially going to run out of cash and that has uncontested

22  here today.  That the debtor is in certain need of financing

23  and the Court has presented no other alternative for the

24  proposed financing that is before the Court today.

25              I'd note that Mr. Meghji testified that there was no

1  opportunity to find funding on an unsecured basis.  And the
2  proposed financing here, the terms are necessary.  The amount
3  is necessary.  And it also has very favorable terms, one that
4  you rarely see in debtor in possession financings that this
5  Court sees.  No fees, right, only payment of interest, a
6  $40,000 payment of interest, no prepayment penalty.  So better
7  financing comes along.  Someone can take this out for a short
8  period of time.
9          The inability to foreclose, even on a final basis,
10  you still got to come into court on short notice, give everyone
11  an opportunity to come in and let the debtor come in.  You
12  know, and then even if the lender wants to foreclose based upon
13  the evidence, you know, the lender is going to be -- you know,
14  the lender is going to have to come in and essentially get a
15  purchaser today.  They're going to have to complete the
16  purchase, right.  You can't just come in and just take the
17  assets for $5 million.  And so I find that the terms of the
18  financing are proper.  I find that the proposed terms of the
19  financing are proper.
20          And I do find, and I do note, you know, it's not
21  uncommon to have emergency motions for debtor in possession
22  financing that are heard on far shorter notice.  And so I find,
23  think the process in terms of due process has been well served
24  here.  We had an interim hearing and parties had opportunity
25  for a final.

1          I do note that the terms of the debt involve an

2    insider, Dr. Ji, make the Court give this a much closer look

3    and made sure that there was no undue influence here.  But I

4    find that based upon the evidence before me, Mr. Meghji

5    negotiated on behalf of the debtor.  The debtor had independent

6    advice and so did Dr. Ji represented.  They each had their own

7    law firms.  There was arm's length transactions, arm's length

8    negotiations.  And so I'm going to approve the terms of the

9    financing here.

10          Again, this is the second hearing that we've had on

11   this.  And so, and we intentionally -- I think it's important

12   to note that we intentionally slowed the process down here.  I

13   give a lot of credit on that to Mr. Glenn, counsel for the

14   equity committee, and Ms. Heyen, who are here today, and the

15   United States Trustee, the office of the United States Trustee.

16   I feel very comfortable approving the terms of the financing

17   here.

18          So next we go to the sale of the assets.  To that, we

19   look to Section 363 of the Bankruptcy Code, which authorizes

20   the debtor to sell assets outside of the ordinary course of

21   business.  The standard, applicable standards under the Fifth

22   Circuit require sound business justification, right, and

23   articulated business reasons to sell the assets outside of the

24   ordinary course of business.

25          Here, the proposed assets, again, are being sold to a

1  company, but it really involves an insider.  And again, the

2  Court, again, gives this insider transaction, considers it an

3  insider transaction, gives it a much closer scrutiny to

4  determine whether the transaction was really at arm's length,

5  and whether there was a fair and reasonable negotiation here.

6  And if the buyer is really entitled to the protections of a

7  good faith buyer.  The Court also looks to other sections of

8  the Code, right, at 363(n), right, whether there was any

9  collusion in connection here.

10         Based upon the evidence that is before the Court, the

11  Court finds that the proposed terms of the sale, the price of

12  the sale, the negotiations, including the sale, are all sound

13  business justifications here.  The business judgment standard

14  has been met.  There are, even looking at this at a closer, and

15  looking closer, because the sale involves an insider.

16         The Court understands where the debtor are.  And I

17  take Mr. Meghji's words seriously because he said it a lot.

18  And that is that the alternative to today, and why people are

19  wondering why we're holding a hearing today, and it's because,

20  based upon everything that I've been hearing, which is

21  uncontested, the debtor was going to have to liquidate.  And

22  that would have created a, you know, right, it would have

23  created severe harm for creditors and equity holders, right?

24         And once a case converts, it is a blunt object

25  conversion.  There is no smooth landing into Chapter 7.  It

1   just occurs, and people's rights get stripped.  And the Code

2   says what it says, and that's what happens.  And here there was

3   an opportunity to provide an opportunity.  So to me, based upon

4   the evidence before me, the debtor has well-established sound

5   business justification, and I understand the sale is to an

6   insider.  There is no alternative.  There is no other buyer

7   that is sitting here before today.  And the Court has given

8   plenty of time, and anybody could have showed up today.

9          We are where we are.  I take Mr. Shinderman's words

10  carefully.  You know, we are where we are.  Based upon where

11  this debtor is today, I'm going to find that the sale is,

12  should be approved.

13         There's one objection out here by Chen Miao.  Chen

14  Miao, objecting parties, and that goes to the proposed sale of,

15  you know, their interests in certain property.  There are

16  arguments that the rescission claim should not, sales should

17  not be part, shouldn't be sold free and clear of their claims.

18  And they're in connection with this sale, or there should be

19  qualifying and clarifying language that at some point a sale

20  order won't be used offensively against them.

21         So the argument here involves Section 363(f) of the

22  Bankruptcy Code.  And let's go then back to interpreting the

23  Bankruptcy Code starts with analyzing the text.  That's where

24  we always start.  Whitlock v. Lowe (In re DeBerry), 945 F.3d

25  943, 947 (5th Cir. 2019), in matters of statutory

1    interpretation, text is always the alpha.

2          Go to Bedroc Ltd. v United States.  I cite it

3    virtually in all of my decisions.  This is incredibly

4    consistent of me.  541 U.S. 176, 183, (2004).  The preeminent

5    canon of statutory interpretation requires to presume that the

6    legislature says in a statute what it means and means in a

7    statute what it says there.  It was quoting Connecticut

8    National Bank v. Germain, 503 U.S. 249, 253-254, (1992).

9          So what does 363(f) say?  As a trustee, which is the

10   debtor in this case, in their Chapter 11 case, may sell

11   property under Subsection (b) or (c), which (b) is what they're

12   proceeding here, free and clear of any interest in such

13   property of an entity other than the estate, only if, and the

14   focus here is (f)(4), such interest is in bona fide dispute, or

15   (5), the entity could be compelled in a legal or equitable

16   proceeding to accept the money satisfaction.

17         So what does it mean to be in a bona fide dispute?

18   Again, you look at what the Code says.  It contemplates that

19   the debtor can sell property free and clear of any interest in

20   property if it's subject to bona fide dispute.  That's what the

21   text says.

22         Interest in property is what's at issue here, and

23   what Mr. Kirby is describing on behalf of his client is an

24   interest in property.  They think they're entitled to 20

25   percent.  The Code expressly contemplates that interest in bona

1  fide dispute, the trustee is allowed to sell it subject to the

2  dispute so that the estate's liquidation won't be improperly

3  delayed while these disputes are being litigated.  And then

4  what's in the evidence right now is a complaint.  Parties are

5  fighting about an interest in property and who owns the

6  interest in property and whether that interest should be

7  rescinded at some point.

8         I would note that for the record, at Docket 1985,

9  both Chen and Miao have both filed perusive claims and they're

10  asserting money damages, and they believe that they're entitled

11  to damages.  So there's clearly a dispute.  There's a complaint

12  that is into evidence that the parties are being litigated.

13  The stay has been requested.  The prior judge didn't lift a

14  stay at the time, but there's clearly a litigation that's out

15  there right now.

16         And whether what will happen one way or the other in

17  terms of the litigation, that's really not before the Court

18  today.  The Court will just permit, to the extent applicable,

19  363(f)(4) is satisfied by the sale of the debtors' interest

20  that are contemplated today.

21         I would note for the record too, that the Court has

22  taken the time and really considered the Ninth Circuit decision

23  Mr. Kirby cites, the Rodeo Cannon Development in which the

24  Ninth Circuit noted that under 363(f)(4), the Court there, the

25  Ninth Circuit held in that particular case that, you know, the

1   Court may have, should have in some instances, or should have

2   considered really resolving the property dispute before ruling

3   on 363(f)(4).

4            But that's not what the Code says.  And the code

5   doesn't provide that.  And I'm not going to read anything into

6   the Code.  But the Code doesn't already say, the Code

7   contemplates that these disputes, and they happen more than

8   people think, not just in the Chapter 11 context, but in the

9   consumer context, these disputes are readily resolved.

10  363(f)(4) says what it says, and the Court will enforce it as

11  written.  Strict textualism is what is required here, and the

12  Court will enforce it.

13           You know, the trustee was really -- the debtor was

14  really here, just required to establish that there was an

15  objective basis for a factual dispute.  But the complaint

16  itself does that.

17           There was a legal dispute as to the validity here.

18  The Court's not required on a 363 sale, and the rules don't

19  contemplate it, and neither does the Code that is a condition

20  to authorizing a sale under 363, including sales-free clear on

21  the 363(f), that I must determine and resolve property

22  disputes.  Right?  I mean, in other words, it would essentially

23  write 363(f)(4) out if the Court -- there would be no bona fide

24  dispute, because the Court would have to resolve it before

25  then.

1          But I do note that that is a case that has been cited

2     there, the Rodeo Cannon case, and even Collier's, you know, if

3     you look at Collier's on Bankruptcy on the 363(f), it

4     acknowledges that.  I would note for the record, and so I think

5     strict textualism provides that, and so I don't think -- it's

6     not binding on me as well.

7          I would also note that the Ninth Circuit BAP, in a

8     decision shortly after that, read and construed that Ninth

9     Circuit language as a -- not as a condition, but maybe guidance

10    that courts somehow should do that.  And I would also note that

11    at 362 F.3d 603, the Ninth Circuit in 2004 actually withdrew

12    its decision on the Rodeo case based on a subsequent

13    stipulation.  So it's unclear what binding effect that Ninth

14    Circuit decision even has in California.  But certainly in the

15    Fifth Circuit, I find no authority for it, and I think strict

16    textualism would provide for a different answer.

17         So to the extent that what we have here is, which has

18    been established, if what the debtor seeks to sell, and it's

19    based upon the evidence that's what they're seeking to sell, an

20    interest in property, at the property of the estate, that asset

21    may be sold free and clear of interest in property that are

22    subject to a bona fide dispute.

23         Parties can look to the cash and there are proofs of

24    claims here.  Also questionable whether this debtor may,

25    whether, excuse me, this creditor may be subject to bona fide,

1  not just to a bona fide dispute, I should say, but whether they

2  submitted to the jurisdiction here by filing proofs of claims

3  and may be subject to the remedies sought in there.  I do note

4  that they also request equitable remedies here, but I assure

5  folks, and I'm, you know, I don't think 105 in any way can be

6  used to the extent that that's the equitable remedy, can be

7  used to override the express provisions of the Bankruptcy Code.

8         So I'm going to overrule that objection here.

9  Because what's established here is an interest in property of

10  the estate that is held by the debtor.  And that's what I'm

11  saying can be sold free and clear of interest under 363 (f)(4)

12  and (f)(5).

13         I need to make  sense.  So I'm approving the sale.

14  And I understand that today that has consequences, are the

15  results of consequences.

16         I'm going to note for the record, I'll just say it.

17  I've been involved in this case since October.  I won't rehash

18  everything, but I am going to say this and I'll say it so that

19  it's said, because I think it's important to note for the

20  record.  The evidence presented before me about where the

21  debtor is, its cash position, its efforts to market are

22  uncontested.  I'm also going to note that the creditors

23  committee has been zealously advocating for unsecured creditors

24  the entire case.  I'm looking out for them and I understand why

25  they support the relief requested.

1        I'm also going to say representatives from the equity
2   committee are here today.  And if there is one thing that I
3   know that they've been doing since October, since I got here,
4   is representing the interest of equity holders.  It's an
5   extremely difficult case.  I know I see Mr. Glenn here today.
6   I know he and I didn't see eye to eye in a prior hearing, but
7   there can be never question that he is advocating zealously.
8   Every time he's come into this court for the committee and for
9   equity interest holders, I take him at his word.  And it's not
10  just taking him at his word.  Ms. Heyen has been here for a few
11  hearings as well.  They've been trying, and I'm not even going
12  to begin to even -- it's today, I guess we'll talk a little bit
13  more about that on Monday.

14        But I just note that I got it.  There are tough
15  consequences, and I'm sure unsecure creditors are still
16  wondering and may be wondering kind of when they might actually
17  receive a recovery in connection with this case.  This case has
18  been cash-strapped, and I'll take judicial notice of it from
19  the very beginning of this case.  It's incredibly difficult
20  circumstances this debtor has found itself in from the very
21  beginning of this case.  I'm only saying it so that it's said.

22        Everybody's been advocating incredibly hard for their
23  constituencies and for their clients.  I understand that the
24  equity committee, it could be some potential upside in a couple
25  of weeks.  And if that's it, reach out to my case manager.

1  It'll get in front of me really fast.  If something gets

2  finalized, and I'm asking the parties to continue to negotiate

3  in good faith and see if something can get done as we've always

4  had.

5        Now Let me turn to the last portion of it, which is

6  1127.  And again, I go back to the Code.  Section 1127(b) of

7  the Bankruptcy Code says that debtor can modify a plan at any

8  time after confirmation after the plan, but before substantial

9  consummation.  If the Court, after noticing a hearing, confirms

10 such plan is modified under Section 1129 of this title, that's

11 1127(b).  Plan modifications must comply with 1125, which

12 requires disclosures to claim holders and solicitations of

13 their acceptance or rejection of the proposed modifications.

14        I'd note that in matter of Highland Capital

15 Management, 57 F.4th 494 (5th Cir. 2023) said, although the

16 bankruptcy, of course not, every proposed post-confirmation by

17 the reorganized debtor is a plan modification.  I'm quoting

18 them.  Although the Bankruptcy Code does not define

19 modification, we have previously held that post-confirmation

20 proposals constitute modifications in cases where they would

21 alter the party's rights, obligations, and expectations under

22 the plan.  U.S. Brass, it's quoting its decision in U.S. Brass

23 Corp v. Travelers Insurance Group, 301 F.3d 296, 309 (5th Cir.

24 2002).  So that's what the Code says.

25        You know, so the first question is, is this even a

1  plan modification?  What is being proposed here?  It is to

2  modify the plan to provide that equity on the effective date

3  isn't being canceled.  But if after all, and I do note that the

4  text of the proposed amendment say if unsecured creditors get

5  paid in full, then shareholders will, those equity owners,

6  right, equity isn't being canceled.

7          So theoretically, someone who holds the shares on

8  this day may have the ability to sell the shares or can retain

9  the shares.  But if there's some upside, they can share in the

10  upside it provides, I would note for the record.  You know,

11  does that require a plan modification to, you know, does that

12  alter the rights or the expectations of unsecured creditors?

13  No, because unsecured creditors have to get paid in full before

14  an equity can get anything.  All right.

15          The absolute priority rule is not being violated here

16  because unsecured creditors are going to get paid in full.

17  1129(a)(7) isn't being violated here because no one is going to

18  receive on account of any proposed modifications under the plan

19  more than they would receive in a proposed liquidation.  That

20  hasn't changed.  Unsecured creditors still have to get paid in

21  full before equity receives anything.

22          Does this provide a better, a potential more

23  optionality for equity?  I think it does.  They were deemed to

24  reject under the plan.  They weren't solicited under the plan.

25  So it doesn't require resolicitation to a group that was

1   already deemed to reject the plan.  And it doesn't change the

2   priorities, <u>Bedroc</u> principles under the Bankruptcy Code.

3        So you know, is this a real plan modification?  I'm

4   not so sure it actually is.  I'm not sure that on the Fifth

5   Circuit guidance and what the Fifth Circuit has said, what a

6   plan modification is, I'm not sure.  For the sake of providing

7   completeness for the parties, assuming that it is, you know,

8   does 1125 mean work?  It's after confirmation.  Is it before

9   substantial consummation of the plan?  Yes, it is.  Right.

10       There have been no, what the substantial consummation

11   of the plan mean?  You then turn to Section 1102 of the

12   Bankruptcy Code, which defines what substantial consummation of

13   a plan means.  There have not been distribution of all or

14   potentially all assets under the Chapter 11 plan equity.  Quite

15   frankly, there was substantial consummation.  We wouldn't even

16   be talking about this provision here because equity would have

17   been canceled here upon the effective date.

18       If the plan never went effective and it was described

19   in the disclosure statement, which I note, and it was stated at

20   the confirmation hearing that plan confirmation was not going

21   to go effective, although confirmed in early -- I signed an

22   order in early December because there were still certain

23   transactions that needed to happen.  So it was always

24   contemplated that something could happen between December and

25   where we are today.

1          And again, no one is working harder here.  Well,

2   maybe working as hard and, you know, bankruptcy courts only see

3   what they see and it is limited, but no one's working harder

4   than the creditors committee, the equity committee here and the

5   debtors to try to see if there's something that can get done.

6          And I got it.  We're going to have a really contested

7   hearing on Monday and we'll see where it goes.  I have nothing

8   to say about it other than we'll see each other on Monday.  But

9   I got to make this, I got to make rulings today.

10          Liquidation is on the table today.  That's what's on

11   the table today.  Chapter 7, based on the undisputed evidence,

12   is here.  There's a proposed financing that gets to us closing

13   an uncontested, I'm putting an uncontested amount of money to

14   fund a potential litigation trust with the opportunity for

15   equity to continue to have an opportunity to continue to see if

16   they can do a deal with NOLs and if that can be done to give

17   the equity committee more time that it asked for.  It's a

18   difficult decision, but an easy one because the evidence takes

19   the Court where it is and the Code says what it says.

20          I'm going to grant the proposed financing in the best

21   interest of the estate.  It satisfies 364.  I'm going to

22   approve the sale of the assets to the proposed buyer.  I'm

23   going to find that 363(m) is satisfied, and 363(n) is

24   satisfied, the sale on the 363(f) is satisfied, everybody.

25          You know, if there's some proposed use of the order

1   at a later point in time, then I'll deal with it.  That's not

2   what I'm having today.  I'm just being asked to approve a sale

3   and I'm going to limit it to what we've got.

4          There's potential settlements that have been reached

5   with other parties here and I'm going to approve those

6   settlements in the proposed order.  I understand there's going

7   to be some tweaks and I'm going to ask debtors' counsel, if

8   they could, to submit a revised order when I know there was

9   like some knit language that there wasn't any additional tweaks

10  that need to be done.  Just submit an order.

11          MR. GORDON:  Your Honor, sorry, I think we're good

12  and I don't know if counsel is still on.  I think we're good

13  with the order that's on the docket and we'll just do the

14  spelling on the record if that works.

15          THE COURT:  All right, that works for me.  I'll sign

16  it there.  I think I've made an assurance to the United States

17  Trustee and I'll honor that as well in terms of the venue

18  language I'm going to approve.

19          I'm going to overrule any objections to the extent

20  that they -- that we haven't talked about them.  But my

21  understanding is all of them have been resolved.  I'll signed

22  the proposed order.  And unless there's anything else to talk

23  about, I'll see everyone on Monday.

24          MR. GORDON:  One housekeeping item, Your Honor.  We

25  filed a motion last Friday to approve what we called the Virex

1  settlement.  And since we would be here on Monday, if it's

2  acceptable, we'd like to have that heard then as well.

3          THE COURT:  Okay.  We can talk about it on Monday,

4  and if anyone has any objections that anybody wants to put in

5  now, we'll take that up.

6          Okay.  Thank you very much.  Have a good day.

7      (Proceedings concluded at 3:12 p.m.)

8                          * * * * *

9

10

11

12

13

14

15              C E R T I F I C A T I O N

16

17      I, Heidi Jolliff, court-approved transcriber, hereby

18  certify that the foregoing is a correct transcript from the

19  official electronic sound recording of the proceedings in the

20  above-entitled matter.

21

22

23  _____

24  HEIDI JOLLIFF, AAERT NO. 2850    DATE: March 12, 2024

25  ACCESS TRANSCRIPTS, LLC