IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 23-90085-11 |
| | § | HOUSTON, TEXAS |
| SORRENTO THERAPEUTICS, INC., | § | MONDAY, |
| ET AL, | § | MARCH 11, 2024 |
| | § | |
| DEBTORS. | § | 9:02 A.M. TO 12:40 P.M. |

### MOTION TO TRANSFER OR DISMISS

BEFORE THE HONORABLE CHRISTOPHER M. LOPEZ
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER:    ZILDE COMPEAN

(Audio issues noted.)

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 Eldridge Road, #144
Sugar Land, TX  77478
281-277-5325
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

**<u>APPEARANCES</u>:**

| | |
|---|---|
| US TRUSTEE: | OFFICE OF THE U.S. TRUSTEE<br>Aubrey Thomas, Esq.<br>Alicia Barcomb, Esq.<br>Kevin Efsay (phonetic), Esq.<br>515 Rusk, Ste. 3516<br>Houston, TX 77002<br>713-718-4661 |
| FOR THE DEBTORS: | LATHAM & WATKINS LLP<br>Caroline Reckler, Esq.<br>Chris Harris, Esq.<br>Jonathan Gordon, Esq.<br>330 North Wabash Ave.<br>Ste. 2800<br>Chicago, IL 60611<br>312-993-9667 |
| FOR THE OFFICIAL COMMITTEE OF<br>UNSECURED CREDITORS: | NORTON ROSE FULBRIGHT<br>Ryan Mann, Esq.<br>2200 Ross Avenue, Ste. 3600<br>Dallas, TX  75201<br>214-855-0000<br><br>MILBANK, LLP<br>Mark Shinderman, Esq.<br>2029 Century Park East<br>33rd Floor<br>Los Angeles, CA  90067<br>424-386-4000 |

(Please also see Electronic Appearances.)

**<u>INDEX</u>**

| WITNESSES: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> | <u>Redirect</u> |
|---|---|---|---|---|---|
| CHRISTY SIMMONS | | | | | |
| By Ms. Thomas | 35 | . | 79 | . | . |
| By Mr. Harris | . | 66 | . | . | . |
| | | | | | |
| MOSHIN MEGHJI | | | | | |
| By Ms. Thomas | 82 | . | 139 | . | . |
| By Ms. Reckler | . | 106 | . | . | . |

| EXHIBITS: | <u>Admitted</u> |
|---|---|
| ECF 2004-1, -17, -19, -20 | 34 |
| ECF 2004-25, -27 | 148 |
| ECF 2005-1 to -11 | 34 |
| ECF 2004-22 | 57 |
| ECF 2004-23 | 61 |
| ECF 2004-24 | 63 |
| ECF 2004-28 | 64 |
| ECF 2005-12 | 149 |
| | |
| Exhibits 12, 13 to 16 | 104 |
| Exhibits 14, 15, 16 | 124 |
| Exhibits 13 to 16 | 126 |

\*\*\*

4

1          **HOUSTON, TEXAS; MONDAY, MARCH 11, 2024; 9:02 A.M.**

2          THE COURT:  Good morning, everyone.  This is Judge

3   Lopez.  Today is March the 11th.  I'll call the 9:00 a.m.

4   case, Sorrento, here in connection with the motion to transfer

5   or dismiss the case.

6          Just give me one moment, and we will get started.

7          A little over 100 people on the line, so I'm going

8   to enable the mute feature.  I'd ask everyone to please if

9   you're going to just make an appearance that you just please

10  hit 5*.  Go ahead and I will unmute your line if you know you

11  are going to be speaking today.

12         Otherwise, I'd just ask everyone please make an

13  electronic appearance.  Don't forget just jump on the Southern

14  District of Texas website, and you can make an electronic

15  appearance there.  Just find my home page.  Find the link, and

16  you will find a place to make an appearance.

17         Why don't I start by taking appearances in the

18  courtroom?

19         MS. THOMAS:  Thank you.  Aubrey Thomas appearing on

20  behalf of the United States Trustee.  I have my colleague

21  Alicia Barcomb here with me today, and U.S. Trustee Kevin

22  Efsay (phonetic).

23         THE COURT:  Okay.

24         MS. THOMAS:  Thank you.

25         THE COURT:  Good morning.  Good morning to all of

1    you.  Good to see you.

2         MS. RECKLER:  Good morning, Your Honor.  Caroline

3    Reckler of Latham & Watkins on behalf of the Debtors.  I'm

4    joined in the courtroom with my colleagues Mr. Harris and

5    Mr. Gordon, and on the video is our client, the Debtors' Chief

6    Restructuring Officer, Mr. Meghji.

7         THE COURT:  Okay.  Good morning.

8         MR. KANE:  Good morning, Your Honor.  John Kane of

9    Kane Russell Coleman Logan on behalf of Jackson Walker, LLP.

10        THE COURT:  Good morning.

11        MR. MANNS:  Good morning, Your Honor.  Ryan Manns,

12   Norton Rose Fulbright, on behalf of the Official Committee of

13   Unsecured Creditors.  And I'm joined remotely by Mark

14   Shinderman.

15        THE COURT:  Okay.  Good morning.  I'm just going to

16   go in the order in which I see things here.  There's a 607

17   number.

18        MS. LOVRIC:  Good morning, Your Honor.  Margaret

19   Lovric, Glenn Agre Bergman & Fuentes on behalf of the Official

20   Equity Committee.

21        THE COURT:  Good morning.

22        There is an 832 number.

23        MR. CULBERSON:  Good morning, Your Honor.  Tim

24   Culberson, attorney pro se.

25        MR. CULBERSON:  Good morning, Mr. Culberson.

1          There is a 213 number.

2          MR. SHINDERMAN:  Good morning, Your Honor.  Mark

3   Shinderman, Milbank on behalf of the Creditors Committee.

4          MR. CULBERSON:  Okay.  Good morning.

5          Give me one second here.

6       (Pause in the proceedings.)

7          THE COURT:  I believe we have covered everyone on

8   the line.  If I've unmuted your line, I'd ask that you please

9   just keep monitoring yourself so we can all hear each other.

10         Okay.  I'll turn it over to the Trustee on the

11   motion.

12         MS. THOMAS:  Thank you, Your Honor.  I'd like to

13   just make a brief opening statement before we get into the

14   evidence.

15         THE COURT:  Sure.

16               OPENING STATEMENT

17         BY MS. THOMAS:  I know that the Court has reviewed

18   our motion, and my colleagues' responses, and the U.S.

19   Trustees' reply.  I wanted to address for you the two

20   underlying concerns in regards to the motion to transfer venue

21   that you mentioned at the February 26th hearing, because I

22   think they are important.

23         The first is the requirement under Rule 1014 that a

24   motion to transfer venue timely.  I would urge this Court to

25   find that the U.S. Trustee's motion was timely.

1        The Debtor and the Unsecured Creditors Committee

2   have not argued that the U.S. Trustee had actual knowledge of

3   the fact that the address listed on the petition was a Post

4   Office Box at a UPS Store, or that the signature bank account

5   was opened just days prior to the filing of this motion, and

6   there's good reason for this.

7        Because it was not clear from the petition, nor the

8   341 testimony, that those facts were in existence.  My client

9   was not made aware of the facts surrounding venue until early

10  2024 and timely brought a motion thereafter.

11       Arguing that the U.S. Trustee should have known

12  improperly shifts the burden from the Debtors to make

13  accurate, forthright disclosures that is baked into the

14  Bankruptcy Code onto the Trustee to independently verify all

15  information in the Petition and Schedules.

16       We rely on a Debtors' forthright disclosures.  The

17  Bankruptcy Code requires that both Debtors and counsel engage

18  in reasonable due diligence and adequately disclose all

19  information relevant to the case.

20       And we'd note in the consumer context, a Debtor can

21  lose their discharge for the failure to make adequate

22  disclosures, and the defense of "My lawyer told me it was

23  okay" is not acceptable.

24       This Court should not set a lower bar for corporate

25  debtors.  Now counsel can certainly argue for an extension of

1     the law, and lawyers exist, I think, in part for our ability

2     to come up with novel solutions to tough problems.

3              But that's not what happened in this case.  The

4     Debtor had an opportunity to disclose its novelty of point or

5     venue at the 341 Meeting, and chose not to do so.  That isn't

6     arguing for an extension of the law.  It equates to taking

7     cookies out of the jar without permission and hoping that you

8     don't get caught.

9              It was reasonable for the U.S. Trustee to rely on

10    the representations of the Debtors and their counsel in the

11    Petition and at the 341 Meeting, and to conclude that there

12    was nothing unusual about the venue selection in this case.

13             It is simply untenable to take the position that the

14    U.S. Trustee cannot trust simple disclosure such as the

15    appropriateness of the venue, and instead, must investigate

16    each answer to verify the truth or suss out a novel legal

17    argument.

18             The Bankruptcy Code has squarely put that obligation

19    to be transparent on the Debtor, and this Court should not

20    condone this kind of type of gamesmanship by Debtors.

21             And make no mistake, the evidence today will show

22    that this was not simple legal maneuvering; this was forum

23    shopping and improper gamesmanship of the bankruptcy system.

24             And I want to address this Court's second concern --

25    what happens to the Creditors?  And the Court noted the

1     overwhelming support of the plan and the fact that this case

2     has been ongoing and contentious for over a year.

3              Certainly, the purpose of the bankruptcy system is

4     to provide relief to creditors and Debtors alike.  So what is

5     the Court supposed to do with the tension between the obvious

6     lack of venue and concerns that transfer might harm the

7     creditors?

8              First, when venue is improper, there is no

9     discretion under the Code or the rules for this Court to

10    retain the case.  There are two exclusive remedies --

11    dismissal or transfer to an appropriate venue.

12             The U.S. Trustee has not argued in favor of

13    dismissal.  Instead, we've asked for a transfer to either

14    Delaware or California where a venue is clearly proper.

15             What the Court will hear today is there is no

16    evidence that transfer of venue will harm the Debtor or

17    Creditors in this case.  It is fear mongering, plain and

18    simple.

19             THE COURT:  Do you think me transferring a case like

20    this to the busiest District in America is fear mongering?

21    You think I created that?  Right, Delaware's, like, the

22    busiest bankruptcy District in America.  Do you think that's

23    fear mongering?  I think my concerns were legitimate.  It's

24    not fear mongering.

25             MS. THOMAS:  And I apologize if I gave the

1    impression that it was the Court.

2            THE COURT:  No, but you said they're my concerns.

3    So is it what you're saying that there's no evidence that's

4    going to be presented that sending something to the busiest

5    District in America, arguably the busiest District -- I don't

6    know; I don't keep in charge of rankings, but they're

7    certainly up there on anyone's list.

8            MS. THOMAS:  They're certainly busy.  I think --

9            THE COURT:  So you --

10           MS. THOMAS:  -- one of the busiest Districts.  I

11   apologize.

12           THE COURT:  Go ahead.  No, I'm just saying.  Go

13   ahead.  In other words, it's an unfounded concern?

14           MS. THOMAS:  I think it is unfounded, Your Honor.  I

15   think that I was referring to the arguments made in the

16   Unsecured Creditors Committee response, and the Debtors

17   response to the motion.

18           THE COURT:  I apologize.  I thought you were talking

19   about my concerns.  You said you were addressing two of my

20   concerns.  I misunderstood.

21           MS. THOMAS:  Sure.  And I think your concerns were

22   borne out of the Debtors' and the Unsecured Creditors'

23   responses.

24           THE COURT:  No.

25           MS. THOMAS:  Okay.  So that was my mis-impression.

1        THE COURT:  No, no.  They're just borne out of this.

2   All right.  You have a large number of Creditors who voted,

3   right?

4        MS. THOMAS:  Certainly.

5        THE COURT:  When you send something on a case that's

6   so complicated with so many moving pieces to another District,

7   there are natural concerns that come along with that.  And not

8   to say that my colleagues in Delaware or in California can't

9   do the job.  That'd be silly of me to think that.

10       The question is you've got to think about, you know,

11  that's sending a lot.  That's not sending a Chapter 13 case

12  where the Plan is confirmed and people are just paying on

13  their debts, right?

14       This is a lot of moving pieces in a case, lots of

15  moving pieces in a case, and I have to think about that, and

16  what's in the best interests, right, administration of

17  justice, right, you know, in the best interest of Creditors

18  and the best interest of administration.

19       It's you've got to think about that.  It's not to

20  say that my colleagues -- of course, they could.  Of course,

21  they're smart enough, and I'm not worried about any of that.

22  But the concept of fear mongering, I think, is a concept I

23  would push back on because I'm thinking about how long it took

24  for me to get up-to-speed on a case like this with a lot of

25  moving pieces.

1          And someone would have to do the same.  And that's

2     not fear mongering.  That's just knowing what it took me to do

3     it, and to send it somewhere else, and the realities of what

4     sending something to somewhere else, what that really means,

5     and what that entails.

6          MS. THOMAS:  Absolutely.  I think there are two

7     issues that are related on this.  So first, there's the issue

8     of judicial economy, right, what you are speaking to towards

9     this is a large case, this is a complicated case.

10          I think the answer to that is what you've just said,

11     that we have capable judges in these other Districts that,

12     although I'm sure you're probably more painfully aware than

13     anywhere else the amount of work that it takes to get up-to-

14     speed on these types of cases is certainly what these judges

15     signed up to do.

16          You know, they took an oath to administer the cases

17     and sit on the cases that they've been assigned to.  So I have

18     no concern about the judge being able to take on that case

19     and --

20          THE COURT:  I'm not either.  I'm just pushing back

21     on the concept --

22          MS. THOMAS:  Sure.

23          THE COURT:  -- of fear mongering were the words that

24     you used, and I'm pushing --

25          MS. THOMAS:  Absolutely.

1          THE COURT:  -- back on that.

2          MS. THOMAS:  And absolutely.  Let me address that

3     piece, because that's the second portion of it.

4          I think that in the response filed by the Debtor and

5     the Unsecured Creditors Committee, and during the depositions

6     that we're going to get into, there was discussions.  There

7     was argument that somehow transfer of venue at this time was

8     going to negatively impact the sale or other aspects of the

9     administration of this case.

10          And the point I was getting to is that we don't have

11     any evidence that will show that there will be an impact on

12     the sale or administration of this case by virtue of simply

13     transferring the venue.  So that's the piece that I think that

14     are related, but slightly different.

15          So I apologize for causing any confusion on that

16     piece.

17          THE COURT:  No worries.  I just wanted to make sure

18     we were on the same page.

19          MS. THOMAS:  Absolutely.  The evidence we're going

20     to present today will show that Dr. Ji, the sole director of

21     Scintilla, directed and approved all actions of Scintilla from

22     his headquarters in San Diego, California.

23          The decision to file in the Southern District of

24     Texas was as a result of counsel's advice, and counsel was

25     actually the party to facilitate the attempted manufacturing

14

1      of venue.

2              Dr. Ji's testimony transcript, which we're going to

3      go through with the Court just shortly, is 41 pages.  And

4      during that short deposition, Dr. Ji could not answer the most

5      basic questions about the operative facts in this case,

6      answering "I don't recall" or "I don't remember" at least 35

7      times, and asserting that he had no separate factual knowledge

8      outside of attorney-client privilege more than ten times.

9              The evidence will further show that the Chief

10     Restructuring Officer had no involvement in establishing a

11     Houston Post Office Box at the UPS Store, establishing the

12     bank account prior to filing, and the choice of venue.

13             Thus, the evidence is going to demonstrate that the

14     actions at issue in this case were taken by Debtors' counsel,

15     and they were taken with the express purpose of attempting to

16     manufacture venue here in the Southern District of Texas.

17             In *Hertz*, the Supreme Court directed that, quote,

18     "If the record reveals attempts at manipulation, for example,

19     that the alleged nerve center is nothing more than a mail drop

20     box, a bare office with a computer, or the location of an

21     annual executive retreat, the Court should instead take as the

22     nerve center the place of actual direction, control, and

23     coordination in the absence of such manipulation."

24             The U.S. Trustee respectfully asks that the Court

25     find the venue is not proper here in the Southern District of

1      Texas and transfer this case to either Delaware or the

2      Southern District of California.

3              I'm happy to go through our exhibits that we'd like

4      to move for admission, but perhaps, other parties would like

5      to make an opening statement first.

6              THE COURT:  Okay.  I'll give them an opportunity

7      and --

8              MS. THOMAS:  Thank you.

9              THE COURT:  -- then we'll talk about exhibits.

10              Anyone who opposes -- oh, I should -- maybe I should

11     say, Mr. Culberson, I know you filed a motion in support of

12     the -- well, your own motion, I should say.  Anything you wish

13     to say at this time, sir?

14              MR. CULBERSON:  Thank you, Your Honor.  First of

15     all, just for the Record, I was the first to file our motion

16     to transfer venue, the motion to dismiss.

17              THE COURT:  That's correct.

18                     OPENING STATEMENT

19              BY MR. CULBERSON:  The U.S. Trustee has done an

20     amazing job taking the time and finishing the conclusive proof

21     that there never has been, never there is not, and there never

22     there will be venue in the Southern District of Texas.

23              And this type of venue manipulation should not be

24     awarded by giving these attorneys the opportunity to basically

25     transfer assets that -- and actually devalue the assets in

1   this case without -- and the evidence will show down the road,

2   maybe not today, but before our final attorney fee prove-up

3   hearing, that the value of these assets was not properly met

4   or marketed, and that it was done with at least negligence in

5   terms of the failure to market these assets for the sole

6   purpose that we are standing here today with the CEO of

7   Sorrento who was part of this manipulation that is now getting

8   the benefit of buying these assets for basically scrap value.

9          And this is an outrage.  And any judge in any other

10  District who is allowed to preside over this case and do so

11  properly will find that as fact.  And in the --

12          THE COURT:  Mr. Culberson, Mr. Culberson --

13          MR. CULBERSON:  -- interest of justice, I would

14  say --

15          THE COURT:  -- Mr. Culberson, I hate to interrupt

16  you.  Are you implying that I'm incapable of doing that?

17          MR. CULBERSON:  Absolutely not, Your Honor.  But my

18  point is the law doesn't allow you to do that in light of the

19  venue manipulation and the facts of this case, and I would say

20  that the law requires the dismissal or transfer of venue in

21  this case.

22          And I believe that is what the evidence shows, and

23  the manipulation that's been done in this case should not be

24  awarded.  And so, I'm going to defer to the U.S. Trustee as

25  far as the remainder of the presentation of the evidence, as

1    they have done a tremendous job in presenting the evidence in

2    this case.  And I thank you for your time.

3         THE COURT:  Thank you.  Mr. Culberson, I appreciate

4    the clarification.  I'm going to keep your line open because

5    obviously, I'll give you an opportunity to provide any closing

6    comments as well because you are right.  You are the first

7    person to have filed this motion.  I'll give you an

8    opportunity to provide any closing argument.

9         MR. CULBERSON:  Thank you, Your Honor.

10        THE COURT:  Okay.

11        From parties opposing it, any opposing?

12                         OPENING STATEMENT

13        BY MS. RECKLER:  Good morning, Your Honor.  Caroline

14   Reckler of Latham & Watkins on behalf of the Debtors.  Your

15   Honor, I'd like to give some opening remarks to set the stage,

16   and the most of my argument will be at closing.

17        Even for the opening remarks, I think it might be

18   helpful in light of the United States Trustee's comments to

19   put some documents up on the screen recognizing they are not

20   yet in evidence.

21        Would Your Honor please give my colleague,

22   Mr. Gordon permission to share his screen?

23      (Pause in the proceedings.)

24        THE COURT:  I think he has it, unless I've done

25   something wrong.

1          MR. GORDON:  We're good.

2          THE COURT:  Okay.

3          MS. RECKLER:  Thank you, Your Honor.  Your Honor,

4      I'd like to start by recognizing where we are and where we're

5      heading.

6          Your Honor approved the sale of the Debtors'

7      remaining assets on Friday, and as Mr. Meghji testified, we

8      expect that sale to close in about two to three weeks.  There

9      is a part of the sale that you also heard about, and that was

10      raised by Mr. Glen, the NOLs.

11          And depending on if a transaction related to those

12      NOLs emerge, there may be further proceedings before the Court

13      with respect to both the sale and the Plan.  So the timing is

14      a bit unclear, although directionally, we still do think it

15      will close in two to three weeks.

16          In light of that and after speaking to the Creditors

17      Committee this weekend, we repeated an offer to the United

18      States Trustee that we made prior to the hearing on the

19      interim DIP, and I think that was around February 26th.

20          And we said that if we would consent to a transfer

21      of venue if that transfer could occur after the key remaining

22      issues in this case were completed.  And that was namely the

23      sale, consummation of the Plan, and a few other remaining

24      items, and Mr. Meghji will speak to what those are.

25          That is what is most important to our Creditors, and

1    we recognize they represent the fulcrum security in this case.

2         We also asked the Equity Committee what their

3    position was, and they simply told us they are monitoring the

4    situation.

5         The United States Trustee rejected the proposal.

6    They want the case transferred imminently, and we don't think

7    that is what is in the best interests of our economic

8    stakeholders, nor do we think that is legally required.

9         And I want to be very clear.  We do not think that

10   venue should or needs to be transferred in this case for a

11   number of reasons.

12        Given the rejection of our offer, we feel as if we

13   have no choice but to proceed with the hearing.  And Your

14   Honor, I want to start noting a few things, and that's there

15   are very few relevant facts in dispute in connection with the

16   motions to transfer or dismiss filed by Mr. Culberson or the

17   United States Trustee, and the key there are the relevant

18   facts.

19        The Movants don't dispute that at the time

20   Scintilla's position was filed, which is the relevant moment

21   in time for purposes of a venue analysis, Scintilla had rented

22   a small mailbox at a UPS Store in The Woodlands, and had

23   established a bank with a Signature Bank account that was

24   funded with $60,000, and that Signature Bank told the Debtors

25   that account was affiliated with a Houston office, nor do they

1    dispute that prior to the establishment of those assets, that

2    Scintilla had no other operations or assets since 2019.

3         And for their part, the Debtors do not dispute that

4    Scintilla did not have these assets or contacts with the

5    Southern District of Texas until just days before the filing

6    of the bankruptcy case on February 13, 2023.

7         In fact, we even offered to stipulate to that with

8    the United States Trustee.

9         Mr. Gordon, can you pull up Exhibit 3, please?

10        And I don't normally speak to exhibits in opening

11   remarks, but I want to respond to something the United States

12   Trustee said in their opening remarks.  And this is

13   Scintilla's Petition, and you can see in question 4, where it

14   says the Debtors' address, it says principal place of

15   business, 7 Switchbud Place, Suite 192-513, PO Box 513, The

16   Woodlands, Texas, 77300.  That document was filed over a year

17   ago.

18        And Mr. Gordon, can you pull up Exhibit 13?

19        Again, I recognize this document is not yet in

20   evidence.  This document will show that a year ago tomorrow on

21   March 13, 2023, the Debtors sent to the United States Trustee

22   a bank account statement showing that the bank opening balance

23   was zero dollars on February 10, 2023, and $60,000 on

24   February 12, 2023.

25        There was nothing hidden, there was nothing the

1      Debtors lied about, and I find those statements offensive.

2      The only thing the Debtor didn't actively disclose was when

3      the PO box was opened.  There has never been an effort to

4      disclose the existence of the PO box.

5              THE COURT:  I understand what the Trustee's concern

6      is.  Its concern about setting a precedent that it's now going

7      to be their burden in every case to prove whether something

8      is, you know, filed in the right District or not.

9              And when they want to bring these motions, that

10     someone's just going to, you know, hit them with a timeliness

11     objection because they -- and I think they're concerned about

12     the burden, the potential burden shift.

13             What response do you have to that?

14             MS. RECKLER:  Your Honor, I think that's a fair

15     question, and you'll hear from Mr. Meghji that there were

16     several lengthy opportunities in which the Debtors and the

17     United States Trustee's Office engaged in conversations about

18     the Debtors' assets and liabilities.

19             And that started at the initial Debtor interview,

20     and it continued in a three-part, 341 Meeting that was

21     designed to facilitate a conversation between Debtor

22     representatives and the United States Trustee.

23             And a Creditor, the Debtors' largest creditor at

24     that time, Nant, showed up at the 341 Meeting last spring and

25     asked these very questions.  The United States Trustee did not

1      follow up with the Debtors or ask anything further.

2              And the very questions -- and we will go through

3      this with Mr. Meghji in his testimony -- show a discussion

4      about the Debtors' principal place of business, where the

5      Debtors' assets resided, whether the Debtor was operating and

6      for how long, and also about the PO box and what occurred, if

7      anything, in that PO box.

8              It wasn't a secret.  And it's a forum where the

9      United States Trustee has ample opportunity to examine a

10     Debtor representative under oath to suss out those questions.

11     I don't think there can be anything more clear about the

12     PO box than putting it on the face of the Petition.  And Your

13     Honor, we'll get to this.

14             The Debtor didn't have to do that.  The Debtor, the

15     UPS mailbox, we would've received mail in that mailbox had we

16     just used the 7 Switchbud -- I can't remember the rest of the

17     address.  We didn't need to include a PO box.  Had we wanted

18     to be manipulative or hidden that, we could've removed the

19     PO box.  The mail would've been received all the same.

20             THE COURT:  My concern as well -- well, I want you

21     to address two concerns raised by the U.S. Trustee upfront.

22     One is the concept of fear mongering in the papers that have

23     been, I think, the U.S. Trustee raised, whether you're trying

24     to create a situation where, you know, the fear of transfer

25     should weigh in my mind, and I want to know what you think

1    about that.

2         And two, I think the timing issue is something also

3    the U.S. Trustee is concerned about.  So what is your response

4    to that?  I'm sorry.  I'm taking -- this is an important

5    hearing, so I might as well get all the cards on the table

6    early on, which is why I'm pushing everyone in a couple of

7    different directions.

8         MS. RECKLER:  No, Your Honor.  And thank you.  I

9    appreciate the questions.  I think speaking to your last

10   question first, this is about timeliness.  It doesn't matter

11   if Your Honor thinks, as the U.S. Trustee believes, that 1406

12   applies, or if Your Honor thinks that 1412 and Rules 1014(b)

13   apply.  It's all about being timely.

14        The cases are clear, the statute is clear, and so

15   are the rules.  And Your Honor, going back to your prior

16   question about should it be the U.S. Trustee's burden,

17   frankly, the law is clear as well that any party challenging

18   venue has the burden to show by a preponderance of the

19   evidence that venue is improper.

20        And as to fear mongering, Your Honor, respectfully,

21   I think the inquiry is the interest of justice or the

22   convenience of the parties.  I don't think it's about fear.  I

23   think it's about evaluating the relative facts that are

24   available at the specific point in time that the Debtor makes

25   them available, which was on the Petition date and shortly

1      thereafter.

2               THE COURT:  Okay.

3               MS. RECKLER:  Your Honor, I just want to be clear

4      again because to varying extents, Mr. Culberson and the United

5      States Trustee's Office have alleged that the Debtors hid the

6      truth, perjured themselves, mislead the Court intentionally.

7      None of that is true.  And frankly, I find those statements as

8      offensive as they are inaccurate.

9               And I look forward to this hearing because the

10     actual evidence -- and I know that evidence is important in

11     this Court -- will show that such allegations are without

12     merit as this Court has previously found.

13              I think the evidence will show that all of the

14     relevant facts were known or easily knowable months, if not a

15     year ago, and these motions are not timely.  The fact is

16     dispositive under Rule 1014, which controls here, whether or

17     not Section 1406 of Title 28 applies as the U.S. Trustee

18     argues in the Debtors' dispute.

19              In all cases, an untimely motion is not a basis to

20     transfer.  And as I said previously, the Movants have the

21     burden of proof here.  And to prevail today, they have to

22     carry it on all three of the main items -- the first, that the

23     motions are timely; the second, that venue is improper; and

24     the third, that transfer is either in the interest of justice

25     or for the convenience of the parties.

1              The Movants can't carry their burden on any of these

2    issues, much less all three.  And we'll address that through

3    evidence and at closing.  Thank you, Your Honor.

4              THE COURT:  Thank you.

5              Anyone else?

6              MR. SHINDERMAN:  Yes, Your Honor.  Mark Shinderman

7    for the Committee.

8              THE COURT:  Yes, Mr. Shinderman.

9                          OPENING STATEMENT

10             BY MR. SHINDERMAN:  For opening, Your Honor, Mark

11   Shinderman of Milbank on behalf of the Creditors Committee.

12   Can you hear me okay, Your Honor?

13             THE COURT:  Just fine.

14             MR. SHINDERMAN:  Okay.  Thank you, Your Honor.

15   Well, the Committee would prefer not to change venue for very

16   pragmatic reasons.  The Court is familiar with the underlying

17   facts of this case.  The Court approved confirmation of the

18   Plan.  The Court approved the sale of assets.  The Court knows

19   about potential litigation.

20             Judge Rodriguez is handling a very important aspect

21   of the case, looking at the case in other matters.  And now

22   we'd have to proceed in two courts if we were to change venue.

23   And the parties didn't come back to you as you heard on

24   Friday, Your Honor, to amend the Plan, to address the NOL

25   issue.

1      We can figure out in the Equities Committee the best

2  way to exploit that asset.  The problem is, Your Honor, we

3  don't want to waste money on appeal if the U.S. Trustee were

4  to lose this.  It's not worth it.  It's not worth spending the

5  precious few dollars that we have.

6      If they really want to change venue, if Your Honor

7  finds the venue is not proper, we don't feel it to be a

8  question of fear mongering.  We're not fear mongering.  We're

9  not worried about change of venue.  A change in venue would

10  not alter the financial position which the estate finds

11  itself.

12      It wouldn't reverse any order of this Court.  It

13  doesn't change our trajectory.  But what it will do is cause

14  delay and impose costs as we get a new Court up-to-speed, and

15  then there's the issue regarding employment of local counsel

16  for now in two jurisdictions.

17      So it's a very pragmatic approach.  Because of this

18  pragmatic approach, Your Honor, on three occasions, we offered

19  the U.S. Trustee to transfer venue essentially once the trust

20  was up and running, and the Plan was effective, going into a

21  different phase of the case.

22      Specifically, we offered on three occasions that we

23  would agree to transfer venue once the sale closed, once the

24  Court heard pending motions to extend the trading restriction

25  period, and once the Plan goes effective, which necessarily

1    involves perhaps adjusting NOLs before we go effective if the

2    Trustee wants to go forward and transfer venue now.

3         So it's our position that if you find venue is

4    inappropriate -- and that's a big if -- then it really comes

5    down a question of timing and when do we transfer venue, and

6    ought we transfer venue.  It's not in the best interest,

7    economic interest of the parties.

8         And we notice that the U.S. Trustee hasn't said that

9    it is.  And then we'd come back to the Judge Gerber (phonetic)

10   case that we mentioned to you a while ago that (inaudible)

11   case of how even if a transfer is mandatory, it can be delayed

12   in the interest of justice for the benefit of the parties.

13        But I want to be very clear what the evidence shows,

14   right.  The evidence, the Petition very clearly indicated a

15   PO box, and the Committee at the very outset of this case was

16   very well aware of this issue and made inquiry to the Debtors'

17   counsel.

18        We knew all the issues, just like the U.S. Trustee

19   knew all the issues.  As we put in our papers, the Committee

20   decided not to seek a transfer of venue at the time for

21   several reasons.

22        First, there is a DIP motion that had already been

23   approved by the parties.  Second, the Court has already timely

24   appointed the Committee.  They are well-versed on potential

25   litigation in this case, what the issues are, why our CRO is

1    necessary, and how the case ought to proceed.

2         Third, we have a very short runway, a very short

3    liquidity (inaudible) and we didn't want to waste time getting

4    a new Court up-to-speed, much like we don't want to waste time

5    getting a new Court up-to-speed now.

6         Fourth, there was a pending motion to remove a

7    Committee member, and any motion to transfer venue would have

8    looked like an attempt to shield that motion from the light of

9    day.

10        So we made a very conscious business decision, the

11   Creditors Committee, to proceed in this Court.  This Court has

12   been available to us, is familiar with the facts, et cetera.

13   At the end of the day, if, and it's a big if, you found that

14   venue was improper in the first instance coming down to a

15   dispute or a conflict between Bankruptcy Rule 1014 and part of

16   the 28 U.S.C. Code, only the Fifth Circuit has ruled in an

17   attempt to reconcile those.

18        But in reconciling those essentially, the Fifth

19   Circuit read 1014 out of the Code including the bankruptcy

20   rules completely.  There is no such precedent in the Fifth

21   Circuit.  There is no guidepost in the Fifth Circuit.

22        Again, the Committee's position is very simple.  If

23   -- if you find that venue is not appropriate, that's not the

24   end of the inquiry.  There's a question about timeliness and

25   the interest of justice under 1014.  And as we put it on

1     papers, we don't think either would be served.

2             But again to your question, we're not fear

3     mongering.  If we have to move to another court, we are

4     suggesting we move to the District of Delaware, but -- but

5     only after those items I mentioned before are resolved.

6             To do anything else would impose costs on the

7     estate, would impose risk and harm.  And that is not in the

8     best interest of justice.

9             Thank you, Your Honor.

10            THE COURT:  Thank you.

11            Okay.  Let's proceed with evidence.  I think we were

12    going to talk about exhibits first.

13            MS. THOMAS:  Thank you, Your Honor.  Just two brief

14    points before I get into all of my exhibits.  I want to make

15    clear the U.S. Trustee has not made any allegations of fraud

16    or misconduct at this point in time.

17            The Court does not have to find that any of the

18    professionals engaged in bad faith or any untoward conduct to

19    still find that transfer is appropriate under the statute.  So

20    I just wanted to make that clear because I know that there

21    were some other allegations in Mr. Culberson's motion, and

22    those were not part of the U.S. Trustee's motion, so

23    clarification on that piece.

24            I can acknowledge that offers were made, as the

25    parties have said, in regards to a voluntary transfer of

1     venue.  And the U.S. Trustee just simply cannot be complicit

2     in venue manipulation.  And so, at this point, we're asking

3     that the Court transfer venue immediately.

4              So with those two points, I'm going to turn to our

5     evidence.  Our exhibits are at ECF 2004-1 through 24.  I did

6     have an opportunity to confirm --

7              THE COURT:  Can you repeat the docket number?  I was

8     just writing it down.

9              MS. THOMAS:  I'm so sorry.  2004 --

10             THE COURT:  Okay.

11             MS. THOMAS:  -- 1 through 24.  Sorry -- -28.  My

12    apologies.  28.

13             THE COURT:  1 through 28?

14             MS. THOMAS:  1 through 28.

15             THE COURT:  Okay.

16             MS. THOMAS:  I did confer with Debtors' counsel, and

17    I believe that they have no objection to the admission of 1

18    through 17, as well as 19 and 20.  The deposition transcripts

19    are Exhibits 25, 26, and 27.  And they were generally

20    comfortable with the admission of those transcripts except

21    where they may have a particular objection about a particular

22    question.

23             Today, Dr. Ji and Drew Lockart of Stretto are

24    unavailable witnesses.  So under Rule 32, we are submitting

25    their transcripts, their deposition transcripts as if it was

1    their testimony today.  And we'll get to that piece.  But I

2    want to just acknowledge that Debtors wanted to reserve their

3    objections on those pieces.

4              THE COURT:  1 through 17, 19, 20, 25, 26, 27, okay

5    except when there was an objection that you made in connection

6    with the deposition, for me to rule on the objection at the

7    time, or how do we --

8              MS. THOMAS:  Did I get it right?

9              MR. HARRIS:  Your Honor, Chris Harris of Latham for

10   the Debtors.

11             That is correct except for 26, which was

12   Mr. Meghji's deposition transcript.  We were not agreeing to

13   that one because he's here in court.

14             THE COURT:  Okay.  So 25 and 27.

15             MR. HARRIS:  Yes.

16             MS. THOMAS:  Okay.

17             MR. HARRIS:  But otherwise, that is all correct.

18             THE COURT:  1 through 17, 19, 20, 25, and 27 for the

19   aforementioned reasons.

20             MR. HARRIS:  Yes.

21             THE COURT:  Okay.

22             MS. THOMAS:  And so, I think it's probably best to

23   simply address the objections to those exhibits as we get to

24   them through the presentation of evidence.

25             Also, the U.S. Trustee did not have an objection to

32

1      the admission of the Debtors exhibits.  I believe it's at

2      ECF 2005-1 through 11.  And 12 through 18, the U.S. Trustee,

3      those were just supplemented yesterday, and so the U.S.

4      Trustee would object primarily that they're simply untimely.

5              THE COURT:  Okay.  But you're okay with 1 through

6      11; did I get that right?

7              MS. THOMAS:  Absolutely.  1 through 11, --

8              THE COURT:  Okay.

9              MS. THOMAS:  -- we have no objection to that.

10             THE COURT:  Okay.

11             MR. HARRIS:  I don't know, Your Honor, if I should

12     -- I'm sorry, Your Honor.  Chris Harris of Latham & Watkins.

13     I don't know if I should address my exhibits now.  U.S.

14     Trustee mentioned them, but I could wait until our case.

15             THE COURT:  Why don't you come up to the mic just so

16     I can get a good record here.

17             2005, 1 through 11, okay.  Everything else, no.  Is

18     that?

19             MR. HARRIS:  Yes.  So the other documents are 12

20     through 18.  My understanding is that the objection is that

21     they're not timely.  My response is that they are, and I'll

22     explain what each of them are.

23             They are rebuttal exhibits in response to arguments

24     made in the reply brief that U.S. Trustee submitted which

25     challenges in particular that they were aware of the relevant

1    facts.  And these documents go directly to that.  In

2    particular, --

3                 THE COURT:  Mr. Harris, why don't we just -- I don't

4    want to pre-judge anything.  Why don't we just proceed with 1

5    through 11.  If you want to try to get the other ones in, you

6    can.

7                 MR. HARRIS:  Okay.  Can I argue them when it's time

8    for our case-in-chief and explain why they're timely and

9    relevant?

10                THE COURT:  Uh-huh.

11                MR. HARRIS:  Thank you.

12                MS. THOMAS:  I would like to call our first witness,

13   Ms. Simmons.

14                THE COURT:  Okay.

15                Ms. Simmons, why don't you come on up?

16                MS. THOMAS:  And Judge, it's just a matter of

17   housekeeping.  Are those Exhibits 1 through 17 --

18                THE COURT:  19 --

19                MS. THOMAS:  -- 19, 20 --

20                THE COURT:  So I'll make it really clear.

21                MS. THOMAS:  Thank you.

22                THE COURT:  Docket 2004, 1-17, 19, 20, 25, and 27 --

23   wait.  2004, 1-17, 19, and 20 are admitted for all purposes.

24                25 and 27 are admitted, but there are some

25   objections within that depo transcript which the parties are

1     reserving their rights to -- with respect to, and 2005, 1-11,

2     are admitted.

3         (ECF 2004, 1-17, 19, 20, 25, and 27 received in

4     evidence.)

5         (ECF 2005, 1-11, received in evidence.)

6            THE COURT:  Okay?

7            MS. THOMAS:  Thank you, Your Honor.

8            THE COURT:  What's Ms. Simmons' first name?

9            MS. THOMAS:  Christy.

10          THE COURT:  Christy.  Ms. Christy Simmons, can you

11     raise your right hand, please.

12         (Witness sworn.)

13          THE WITNESS:  Yes, Your Honor.

14          THE COURT:  Okay.  I'll let the record reflect that

15     the witness has been properly sworn in.  I'd just ask that you

16     please speak close to the mic.  Make sure we can all hear you.

17     And if at any point, you hear objections, just give me an

18     opportunity to resolve that objection.  And at some point, if

19     you need a break, just let me know.

20          Counsel, you may proceed.

21          MS. THOMAS:  Thank you, Your Honor.  Can you please

22     give Ms. Barcomb control of the exhibits?

23          THE COURT:  Sure.

24          MS. THOMAS:  Thank you.

25          THE COURT:  Okay.

1                           DIRECT EXAMINATION

2     BY MS. THOMAS:

3     Q     Please state your name for the Record.

4     A     Christy Simmons.

5     Q     And what is your position with the Office of the United

6     States Trustee?

7     A     I'm a bankruptcy auditor.

8     Q     And which Region do you work in?

9     A     Region 7.

10    Q     Does Region 7 include the Houston Division?

11    A     Yes, it does.

12    Q     And as part of your employment, do you maintain files and

13    contracts for authorized depositories within Region 7?

14    A     Yes, I do.

15    Q     And in February 2023, were you similarly responsible for

16    that task?

17    A     Yes, I was.

18    Q     In February 2023, was Signature Bank an authorized

19    depository for Region 7?

20    A     Yes, it was.

21    Q     Do you have to have a bank branch in Region 7 in order to

22    be an authorized depository?

23    A     No, you do not.

24    Q     And why not?

25    A     Debtors may have operations outside of the Region that

1    require a local bank, so they're more than welcome to be an

2    authorized depository in our Region.

3         MS. THOMAS:  If we can please pull up exhibit, what

4    has been marked as Exhibit 18, 2004-18.  And I understand that

5    this is one of the documents that they have an objection to.

6         MR. HARRIS:  Your Honor, could we have argument

7    whether it's admissible before it's discussed in Court?

8         THE COURT:  I don't even know if it's been

9    authenticated yet.

10        MR. HARRIS:  It has not, and that's one of our

11   objections.

12        THE COURT:  I'll let her ask the question, if she

13   can pull up --

14        MS. THOMAS:  Right.  I need to authenticate it

15   first.  Absolutely.

16        THE COURT:  So I'll overrule the objection.

17        MS. THOMAS:  Okay.  Sorry.  She's having an issue

18   with technology.  Hold on just a moment.

19        (Pause in proceedings.)

20        MS. THOMAS:  For some reason, we are having

21   technical difficulties.  I truly apologize, Your Honor.

22        THE COURT:  No worries.

23        MS. THOMAS:  We just need probably three minutes to

24   restart her computer.

25        THE COURT:  Not a problem at all.  I'll step off,

1    and then I'll come back on.  Why don't we --

2                MS. LOVRIC:  Your Honor, would it help for

3    Mr. Gordon to put them up?

4                THE COURT:  No, I'm going to give it to them so they

5    can control their own presentation.  So it's -- let's say, I

6    will call it 9:46.  I'll come back at 9:50.

7                So, I will remind you that you're still under oath.

8    You can go back, you can come back on, but I'd just ask that

9    you speak with no one about --

10               MS. THOMAS:  Well, --

11               THE COURT:  Well, now I'll come back on.  So we are

12   taking no breaks.

13               MS. THOMAS:  All right.  Thank you, Your Honor, for

14   the accommodation there.  Okay.

15   BY MS. THOMAS:

16   Q    Ms. Simmons, we have pulled up what the U.S. Trustee has

17   marked as Exhibit 18.  Do you see the document in front of

18   you?

19   A    Yes, I do.

20   Q    And what is the title of this document?

21   A    It's Signature Bank's SBA Trading and Sales 2018 slide

22   presentation.

23               MR. HARRIS:  Objection, Your Honor.  That is not the

24   title of the document, and I don't know --

25               THE COURT:  Well, no.  And also, the witness can

1    identify the document, but we don't read from a document

2    unless it's admitted into evidence.  So I'm going to sustain

3    that objection.  So she can authenticate the document.  She

4    can't read from the document unless it's admitted into

5    evidence.

6              MS. THOMAS:  Certainly.  My apologies, Your Honor.

7              THE COURT:  No worries.

8    BY MS. THOMAS:

9    Q    Ms. Simmons, is this a -- can you tell me how you

10   obtained this document?

11   A    I Googled Signature Bank SBA Trading, and this was the

12   document that I produced -- that was produced from that

13   search, from that Google search.

14   Q    Okay.  And if we -- I was going to ask if it was a true

15   and accurate copy of the document.  If you can scroll through

16   the document and tell the Court if this is the document that

17   you pulled from the internet on a Google search.

18   A    It is the document that I pulled.

19             MS. THOMAS:  I would move to admit the document,

20   Your Honor.

21             MR. HARRIS:  Objection, Your Honor.  There has not

22   been a foundation laid as to what this document is.

23             THE COURT:  I just want you to get closer.

24             MR. HARRIS:  Sorry.

25             THE COURT:  Just I want to make sure we have a clean

1    record.

2              MR. HARRIS:  My initial objection is to

3    authenticity.  There's been no record made about where this

4    document is from, who authored it, when it was created.  On

5    its face, it reveals nothing at all about its source, where it

6    was stored.  There's nothing to authenticate this.  The fact

7    that someone did a Google search and a webpage came up is not

8    authentication.

9              There's not even a webpage on this document, and it

10   is also very clear on the Exhibit List that the Debtors filed

11   that this is not a Signature document.  It's from a document

12   from a website CTAGGL.com.

13             THE COURT:  I don't want to go -- if there's not

14   been proper authentication that this witness has -- clearly,

15   she's ran a Google search.  But to admit a document off of

16   Google search into evidence for the truth of the matter

17   asserted is when there's been nothing on authentication, but

18   this document has not been -- or maybe her Google search has

19   been -- we know, that's all we know.

20             But this document has not been properly

21   authenticated.  I'll sustain the objection.

22             MS. THOMAS:  Moving on to Exhibit 19.

23   BY MS. THOMAS:

24   Q    Ms. Simmons, can you please identify this document for

25   the Record?

CHRISTY SIMMONS - DIRECT BY MS. THOMAS                    40

1    A    It's the annual, the 2022 annual report from Signature
2    Bank.
3    Q    And have you reviewed this report?
4    A    I have.
5    Q    Does it identify any Signature Bank branch in Texas?
6    A    It does not.
7                MR. HARRIS:  Objection.
8                THE COURT:  I'm going to sustain.  The document has
9    not been moved into evidence, and so we can't testify about
10   where the document comes and without first properly admitting
11   it into evidence.
12               MS. THOMAS:  Your Honor, this is one of the
13   stipulated --
14               THE COURT:  Oh, this one was already stipulated to.
15               MS. THOMAS:  Yes.  It was stipulated to admission.
16               THE COURT:  I apologize.  And what's the objection?
17   She's read it.  I'm wrong about that.
18               What's the objection?
19               MR. HARRIS:  The objection is lack of foundation.
20   This witness didn't author this document.  The document says
21   whatever it says, but she can't characterize what a
22   200-something page document says.
23               THE COURT:  But she can testify to the best of her
24   knowledge.  I'll allow it for that purpose.  If she believes
25   it's not in there, if somebody can cross or point something to

1    it.  I'll allow it.  I'll overrule the objection.

2    BY MS. THOMAS:

3    Q    Does this document identify any Signature Bank facility

4    in Texas?

5    A    It does.  On the last page, it lists all of the

6    facilities.

7              MS. THOMAS:  If we can please scroll to that last

8    page?

9    BY MS. THOMAS:

10   Q    And can you please read out loud from this document the

11   Texas facility that's identified there?

12   A    It's 9 Greenway Plaza, 31st Floor, Houston, Texas, 77046.

13   Q    Okay.

14             MS. THOMAS:  And can we scroll up a little bit so we

15   can see -- well, I want to be able to show her what's --

16             THE WITNESS:  Down at the bottom.

17             MS. THOMAS:  Down a little bit further.

18             THE WITNESS:  There's a footnote.

19   BY MS. THOMAS:

20   Q    Okay, please.  And how do you know that that location,

21   what that location is?

22   A    There's three asterisks.  And down at the bottom, the

23   three asterisks means that it's an SBA Institutional Trading

24   and Sales Representative Office.

25   Q    Perfect.  Let's move on to Exhibit 20, please.

1          THE COURT:  Could you scroll up just a little bit?

2          MS. THOMAS:  Sure.

3          THE COURT:  I just wanted to see -- thank you.

4    Thank you.

5          MS. THOMAS:  Thank you.

6    BY MS. THOMAS:

7    Q    Ms. Simmons, can you please identify Exhibit 20 for the

8    Record?

9    A    It's Signature Bank's Form 10K for 2022.

10   Q    Thank you.

11         MS. THOMAS;  And this is another exhibit that we've

12   stipulated to the admission.

13   BY MS. THOMAS:

14   Q    Ms. Simmons, is this a true and accurate copy of the form

15   10K?

16   A    Yes.

17   Q    Have you reviewed this 10K report?

18   A    Yes.

19   Q    Does it identify any Signature Bank branch in Texas?

20   A    No.

21   Q    Does it identify any Signature Bank facility in Texas?

22   A    Yes.

23   Q    And let's --

24         MS. THOMAS:  -- please scroll to page 7.

25   BY MS. THOMAS:

1    Q    Can you tell us what that Signature Bank facility in

2    Texas is?

3              MR. HARRIS:  Sorry.  What page did you say?

4              MS. THOMAS:  Page 7.  It's 7 of the pdf.  My

5    apologies.  6 on the bottom number, isn't it?

6              THE WITNESS:  It's labeled page 6 on the document,

7    but it's page 7 of the pdf.

8              THE COURT:  You have a well-prepared witness.

9              MS. THOMAS:  We try, Your Honor.

10             Okay.  Let's skip to the section that talks about

11   the locations.

12             All right.  Okay, perfect.  Thank you.

13   BY MS. THOMAS:

14   Q    So my question that I got sidetracked because I was

15   having trouble reading the tiny print on my own, so can you --

16   does this document tell you what the Signature Bank facility

17   in Texas is?

18   A    Yes.  It states that additionally, through a

19   representative office in the -- of the bank in Houston, Texas,

20   we purchase, secure ties and sale of the guarantee portions of

21   U.S. Small Business Administration loans.

22   Q    Thank you.

23             MS. THOMAS:  Your Honor, as a matter of housekeeping

24   on Exhibit 6 and Exhibit 21, those were provided in unredacted

25   form with routing numbers listed.  What we uploaded with the

1      Court was redacted just out of respect for that's how they

2      were originally placed by Debtors' counsel on the Record.

3              But for this next line of questioning, I think it

4      would be critical to her testimony to have the fully

5      unredacted exhibit in front of her and in front of you.  So I

6      have copies, hard paper copies.  May I approach the bench and

7      provide those copies?

8              THE COURT:  Sure.

9              MR. HARRIS:  We have no objection.

10             MS. THOMAS:  Can I --

11             THE COURT:  I can look at the hard copy from my

12     screen, the unredacted version, so I'm okay, Ms. Barcomb.

13     We're good.  Thank you.

14     BY MS. THOMAS:

15     Q    All right, Ms. Simmons, I've handed you what has been

16     admitted as Exhibit 6.  Do you see this document?

17     A    Yes, ma'am.

18     Q    And can you identify it for the Record?

19     A    It's the wire transfer instruction sheet.

20     Q    And related to the Debtor Sorrento Therapeutics?

21     A    Yes, ma'am.

22     Q    Okay.  And do you see an unredacted routing number listed

23     on this document?

24     A    Yes, I do.

25     Q    Okay.

1          MS. THOMAS:  We're going to turn to Exhibit 21, and

2     I'm going to establish the authentication first because I know

3     that document has not been admitted yet.

4     BY MS. THOMAS:

5     Q    Can you please look at the document that has been marked

6     as Exhibit 21?

7     A    Yes.

8     Q    Can you please -- well, let me ask you this:  With the

9     routing number that was listed on Exhibit 6, were you able to

10     utilize a search engine to determine where that routing number

11     is located, like, where that routing number sends money?

12     A    Yes.

13     Q    And what search engine did you utilize?

14     A    The American Banker Association look up.

15     Q    Okay.  And what does that ABA routing number look up do?

16     A    It tells where that routing number, which branches it's

17     associated with or where those locations that that routing

18     number sends deposits or funds back and forth from.

19     Q    And is this a database that is available to the public

20     from the American Bankers Association?

21     A    Yes.

22     Q    And the purpose is to verify routing numbers?

23     A    Yes, it is.

24          MS. THOMAS:  I would move to admit this as under

25     803-17.  I appreciate that it's hearsay, but it is a database.

1      And I guess I'm getting ahead of myself.  I can let you say

2      your objection, and I can probably respond to it.

3                  THE COURT:  Okay.

4                  MR. HARRIS:  The objection is hearsay.

5                  MS. THOMAS:  There we go.  All right.  So under

6      803-17, there is a public database exception.  And *U.S. v.*

7      *Goudy* at 792 F.2d 664 (7th Cir. 1986), it allowed testimony

8      regarding bank routing numbers from a Polks Bank Director

9      Digest basically.

10                 I would argue that this database provided by the

11     American Bankers Association is essentially the modern catalog

12     of routing numbers for you to access.

13                 Under *U.S. v. Grossman*, 614 F.2d 295 at 297, the

14     First Circuit said that a catalog of a bank's products are

15     admissible.

16                 And then we have out of the Eastern District,

17     actually, I think this one might be New York, *Conoco v.*

18     *Department of Energy* at 99 F.3d 387 at 393, the court

19     explained that under this exception comes databases that are

20     generally used by people in the industry and --

21                 THE COURT:  Where has that been established?  What

22     testimony do I have that this has been generally relied upon

23     by the public or by people in the industry?  I don't think

24     you've established that, so I will overrule your objection.

25     Maybe you can provide some more foundation.

1          I know she looked it up and she thinks that, but I

2     don't have any evidence that the American -- I don't -- I'm

3     not saying -- I'm not familiar with the American Bankers

4     Association.  That may not mean anything, but I do think you

5     have to establish that it's generally relied upon by market

6     participants.

7          I think you're telling me you went to -- I think

8     there's a difference between this, for example, and telling me

9     that someone used, you know, looked up stock prices on, you

10    know, Yahoo Finance or something of that nature.

11         I think market compilations, I think there could be

12    an exception, but I just don't think you've provided enough

13    foundation to get over -- to get with 317, but I'll let you

14    get there if she can answer.

15         MS. THOMAS:  I'm going to try.

16    BY MS. THOMAS:

17    Q    Okay.  Ms. Simmons, in the course of your employment as

18    an auditor, do you have occasion to need to look up or verify

19    routing numbers?

20    A    Yes, I do when the banks are applying for to be an

21    authorized depository within our Region.  They have to provide

22    their ABA numbers, and that's what they use to then pledge

23    collateral for those accounts or within a DIP account or a

24    bankruptcy estate account that were held within that bank.

25    Q    So when you say their ABA numbers, are you referring to

1  the American Bankers Association?

2  A It's the routing numbers, yes.

3  Q Okay.  So when you are doing your work as an auditor,

4  banks provide you routing numbers?

5  A Yes.

6  Q And those routing numbers are -- are those gathered under

7  the American Bankers Association?  Is that your understanding?

8  A I don't know.

9  Q Okay.  If you needed to look up a routing number for

10  verifying an authorized depository, where would you go?

11  A To the bank.  It's where I -- the bank itself gives me

12  the ABA number.

13  Q Could you independently verify that ABA number?

14  A I haven't had occasion to do that.

15  Q Okay.  In your course of preparing for today, did you

16  have a chance to go through the database for the American

17  Bankers Association?

18  A I did.  I used that to look up the ABA number that was

19  provided to me to see what branches or banks for that

20  particular bank was assigned that ABA number.  Banks can have

21  up to five different ABA numbers.  And this number, this gives

22  a list of the banks or the branches for that -- for Signature

23  Bank that was assigned this particular ABA number.

24  Q You seem to be using ABA number and routing number

25  interchangeably.  Can you explain that a little bit?

CHRISTY SIMMONS - DIRECT BY MS. THOMAS

1    A    On the banks, because my responsibilities are more on the

2    banking aspect of it, as opposed to particular accounts for

3    the Debtors, I work with the banks making sure they have

4    collateralized, enough collateralized to pledge so that they

5    cover all of the accounts within our Region.

6          And it's based on their pledging for those ABA or

7    accounts.  It goes off of the ABA numbers that the bank has,

8    and that's what this -- to protect accounts that are assigned

9    under that ABA or routing number.

10   Q    Okay.  So ABA number and routing number are synonymous?

11   A    Correct.

12   Q    And ABA stands for American Bankers Association.

13   A    Yes.

14   Q    And so, did you have occasion to verify a routing number

15   using the ABA's database?

16   A    Yes.

17          MS. THOMAS:  I would again move to admit Exhibit 21

18   before I get too far.

19          THE COURT:  Okay.

20          MR. HARRIS:  Objection, Your Honor.  The --

21          THE COURT:  I'm sorry.  One of their mics should get

22   you what you're looking for.

23          MR. HARRIS:  Let me come up here.

24          THE COURT:  You can come up here.  I just want to

25   make sure that we have a clean Record.

1           MR. HARRIS:  I don't believe that the foundation for
2     a market compilation has been met.  The test is whether it's
3     generally used by the public or generally used by
4     participants.

5           The only evidence for foundation is that this
6     particular person has used them, and we don't even know on
7     what occasions.  There's no evidence this is a generally-used
8     database or foundation.

9           THE COURT:  I agree.  The only testimony I've heard,
10    and maybe I'm wrong about this, is that she looked at it in
11    connection with this litigation.  Because she says she
12    normally goes to the bank to get the routing number.  So I
13    don't think you've established the proper foundation for this
14    document.

15          I'm also a little -- I'll just leave it there.  I
16    can't even tell what the search was by looking at this
17    document.  We don't even get there because I don't think
18    you've established a proper foundation.

19          I think the witness was honest.  She had occasion to
20    look at this in connection with this hearing.  She normally
21    calls the bank when she wants to get an ABA number.  So, I
22    mean, I'll let you keep trying.  But as of right now, it's not
23    in.

24          MS. THOMAS:  I would also argue, Your Honor, that it
25    is a public record under 803.8.  And --

1         THE COURT:  I don't know if the public can use this.

2    Nobody's established any foundation that the public can

3    actually use this.

4         MR. HARRIS:  I would also, Your Honor, object.  That

5    is limited to reports of a public office.  The American

6    Bankers Association is not a governmental entity.

7         MS. THOMAS:  All right.  We can pull down Exhibit 21

8    and just put up Exhibit 6, the redaction version, Ms. Barcomb.

9    BY MS. THOMAS:

10   Q    Ms. Simmons, you have the unredacted version of Exhibit 6

11   in front of you, correct?

12   A    Yes, I do.

13   Q    And do you see the routing number that is listed on this

14   document?

15   A    Yes, I do.

16   Q    Did you have occasion to research this routing number?

17   A    Yes, I did.

18   Q    And I think you've already testified routing numbers --

19   well, let's do this again.

20        What does a routing number tell you?

21   A    The -- which bank and which Region of -- well, maybe not

22   Region, but which bank is assigned that routing number.

23   Q    So if someone were to utilize a routing number to wire

24   funds as this document instructs, that would tell you which

25   bank it's going to?

1    A    Yes.

2    Q    Did you search this number that's listed on Exhibit 6?

3    A    Yes.

4    Q    Does this routing number send funds to a bank in Texas?

5              MR. HARRIS:  Objection, Your Honor.  My objection is

6    either that the witness is being asked to elicit hearsay

7    testimony based on the document that was found inadmissible,

8    or that the witness is being attempted to be used by expert

9    testimony.

10             The witness has no personal knowledge about this

11   routing number or the account.  That's been established.  All

12   she's done is apparently as an auditor taken steps to find

13   things.  If she was going to be designated as an expert

14   witness, certainly, an expert could do that.  But she was not

15   designated as an expert witness on the Witness and Exhibit

16   List.

17             So she has no personal knowledge about what this

18   account is associated with, what this ABA number is associated

19   with.

20             THE COURT:  I'll overrule.  I don't think this is

21   requiring expert.  She's an auditor for the U.S. Trustee, and

22   I'll let you cross on it to determine -- I'll let her answer.

23   But, I mean, I don't -- she can provide the answer, and we'll

24   see where it goes.

25             MS. THOMAS:  I will ask the question again.

MS. THOMAS:

Q    When you searched this routing number, did it send the funds to a bank located in Texas?

A    Not that I saw.

Q    Do you happen to recall any of the locations that were associated with this routing number?

A    They were in New York, California, Connecticut, Nevada, and North Carolina, I believe.

Q    Okay.

MS. THOMAS:  Moving on to Exhibit 22, please.

This is another document that was not stipulated to admission, so I will work on admissibility first and then authenticating.

MS. THOMAS:

Q    Ms. Simmons, can you please identify the document that is marked as Exhibit 22 for the Record?

A    It is a printout of the acquisition of Signature Bank from Flagstar.

Q    Okay.  And is this a printout of a document generated on the internet by the FDIC?

A    Yes, I pulled it from the FDIC website utilizing the data tool, and then searched Signature Bank and the history.

Q    Does this appear to be a true and accurate copy of the document that you pulled when you used that search function on the FDIC website?

1    A    Yes, it is.

2              MS. THOMAS:  I'd move to admit.

3              THE COURT:  Okay.  Counsel?

4              MR. HARRIS:  Objection, Your Honor.  Two objections.

5    One is authenticity.  I don't think it's clear where on the

6    website this document is from.  Apparently, it's from an FDIC

7    website, but without indicating what the web address is.

8    There is a web address in the Exhibit List which does not link

9    to this page.  So my objection is authenticity, and the second

10   is hearsay.

11             THE COURT:  All right.  I'll sustain the

12   authenticity of the document.  I don't have any evidence right

13   now that this came from a website.  I know that the witness is

14   testifying to that.  But whether this came from an FDIC, I

15   certainly can't tell from the face of the document where this

16   came from.

17             And so I think -- I've got -- it says contact the

18   FDIC, but that doesn't tell me that this was from the actual

19   search that she ran.  I need a little bit more foundation to

20   determine whether this was actually from an FDIC website.  I

21   just can't tell from the face of it, so I'll sustain the

22   authenticity objection.

23             MS. THOMAS:  All right.  I'm going to --

24             THE COURT:  The authentication objection.

25             MS. THOMAS:  I'm going to attempt to get a little

CHRISTY SIMMONS - DIRECT BY MS. THOMAS          55

1    bit more.

2    BY MS. THOMAS:

3    Q    Ms. Simmons, did you visit in preparation for today's

4    testimony the FDIC Federal Government official website?

5    A    Yes, I did.

6    Q    And on that website, were you able to locate a tool that

7    allows you to search for official FDIC documents?

8    A    Yes, under resources, there's a data tool option which I

9    selected.  And then once I was in there, I clicked, I searched

10   Signature Bank, and clicked on the second option.  And that

11   took me to -- and clicked history, and then it brought up this

12   particular document.

13        MS. THOMAS:  And I'm going to have you scroll

14   through the whole document, please, Ms. Barcomb.

15   BY MS. THOMAS:

16   Q    Ms. Simmons, please take a very careful look at this

17   document.  Is this the webpage that appeared on the FDIC's

18   website when you selected the information for Flagstar's --

19   I'm trying to be careful that I don't get into the document.

20        Let me say it this way:  When you selected a document on

21   that data tool, on the FDIC's website, is this a true and

22   accurate copy of the document that comes up on that Federal

23   Government webpage?

24   A    Yes, it is.

25        MS. THOMAS:  Move to admit, Your Honor.

1              THE COURT:  Okay.

2              MR. HARRIS:  Your Honor, I'll withdraw my

3      authenticity objection.  I understand what was done, but I

4      continue to object on hearsay grounds.

5              MS. THOMAS:  And I would respond that it is a public

6      record, and it is a public database run by the FDIC.

7              THE COURT:  For what purpose is it being offered?

8              MS. THOMAS:  We are using it to establish our next

9      document, which is --

10             THE COURT:  Oh, okay.

11             MS. THOMAS:  -- Exhibit 23.  So we want to show the

12     Court where we've gone to show some -- where branches are

13     located for Signature Bank.

14             MR. HARRIS:  Can I respond on the public records,

15     please?

16             THE COURT:  Sure.  Of course.

17             MR. HARRIS:  Well, I guess also on the database.

18     I'll go to the database first.  There is no foundation laid

19     that anyone in the public uses this database.  So it does not

20     satisfy subpart (17).

21             In terms of a government record, a government record

22     is limited to a record or statement of the government agency

23     sets out the office's activities.  That is not what this

24     appears to be.  It doesn't list any activity.  There may be

25     some information, but it doesn't list any activity by the

CHRISTY SIMMONS - DIRECT BY MS. THOMAS                    57

1   FDIC.  It doesn't fit within that.

2         MS. THOMAS:  And I would say if you look at the

3   center of the document, it says action taken, FDIC certificate

4   number.  That absolutely shows what the action that the

5   government took.  I'm trying not to get into the nature of the

6   document to make sure that I'm not going too far.

7         And I'm happy to ask Ms. Simmons if this is a

8   database that the public has access to, if that will address

9   counsel's concerns.

10        THE COURT:  I think both of you are arguing two

11  different rules.  I think he was arguing under 803.7 -- 803.8,

12  right, that this public record doesn't set out the office's

13  activities.

14        MR. HARRIS:  Yes, Your Honor.

15        THE COURT:  I think that's where he was going.

16        MS. THOMAS:  Well, and I was responding that it

17  absolutely does, Your Honor.  If we can get into the content

18  of the document, it has a certificate number and action taken.

19  The outgoing institution, the acquiring institution, the

20  surviving institution.

21        THE COURT:  I'm going to overrule the objection.

22  I'll allow this document.

23        (Exhibit 2004-22 received in evidence.)

24  BY MS. THOMAS:

25  Q    Ms. Simmons, can you generally describe what this

1    document is telling us?

2    A    When Flexstar acquired --

3              MR. HARRIS:  Objection.

4              THE WITNESS:  -- Signature --

5              THE COURT:  Yeah.

6              MR. HARRIS:  Objection, Your Honor.  This document

7    is in evidence, but this witness has no personal knowledge

8    about the situation.  She should not be allowed to describe

9    and characterize a document that she has no personal knowledge

10   of.

11             THE COURT:  Well, the document will speak for

12   itself, Counsel.  In other words, if she has personal

13   knowledge about something in here, but if she's just pulling

14   it --

15             MS. THOMAS:  Certainly.

16             THE COURT:  -- then I think the document will speak

17   for itself.

18             MS. THOMAS:  Absolutely.  Just trying to give some

19   context.  Happy to move on.

20             If we can scroll down, please, to the middle of the

21   page?

22   BY MS. THOMAS:

23   Q    There's a button, do you see, Ms. Simmons, that says view

24   branches?

25   A    Yes, I do.

1      Q      Did you click on that link?

2      A      I did.

3      Q      Okay.

4             MS. THOMAS:  Let's click Exhibit 23.

5      BY MS. THOMAS:

6      Q      Now when you clicked that button to see view branches, is

7      this the document that came up on your computer screen?  And

8      we can scroll through so you can see it.

9      A      Yes, it was.

10            MS. THOMAS:  I'd move to admit this document as

11     well.

12            THE COURT:  I understand there will be a similar

13     objection.  I just have -- and I'll admit it -- I have one

14     question.  Is there a way to tell what existed in January of

15     2023?  Did you ever run a search like that?  In other words,

16     maybe, like, is there a way to tell whether this has been

17     updated or changed since January of 2023?

18            THE WITNESS:  This was March of 2023.

19            THE COURT:  When you ran this search?

20            THE WITNESS:  No.  It's the date, the historical

21     date on -- when I did the historical data from the previous,

22     when I first was in Signature Bank.

23            THE COURT:  Okay.  Got it.

24            THE WITNESS:  And then I clicked on historical.  And

25     so, this was the document that came up.

1          THE COURT:  But can you tell whether the -- do you

2     have personal knowledge whether when you see view branches,

3     whether that relates to that time period?  Do you have

4     personal knowledge of that?

5          THE WITNESS:  This is the list.

6          THE COURT:  I'm asking do you have personal

7     knowledge of what that means.

8          THE WITNESS:  I understand what it means.  I don't

9     know what --

10         MS. THOMAS:  Your Honor, I don't mean to interrupt.

11    If I could ask a couple questions, I think I can get to where

12    you're going.

13         THE COURT:  She can answer my question.  Then you

14    can ask her any follow-up questions.

15         MS. THOMAS:  Sure.

16         THE COURT:  I'm just asking.

17         THE WITNESS:  The -- it was what Flagstar acquired

18    from when they took over Signature --

19         THE COURT:  In March of 2023.  And then you click on

20    that link and got it.

21         THE WITNESS:  And you click there, there's --

22         THE COURT:  Okay.

23         THE WITNESS:  -- branches.

24         THE COURT:  Thank you.

25    BY MS. THOMAS:

1     Q     Perfect.  You answered the question.  Okay.

2              MS. THOMAS:  I just wanted to clarify that we're

3     admitting 23?

4              THE COURT:  Yes.

5              MS. THOMAS:  Thank you, Your Honor.

6         (ECF 2004-23 received in evidence.)

7     BY MS. THOMAS:

8     Q     Okay.  Does this document identify the 40 branches --

9     well, let me back up.

10         Do you have personal knowledge of when Signature Bank

11    failed?

12    A     Yes.

13    Q     And when about was that?

14    A     It was early 2023 in February, I believe.

15    Q     Okay.  And who took over Signature Bank's branches?

16    A     Flagstar.

17    Q     Okay.  So when this says Flagstar at the top, this is

18    telling us the Signature Bank branches that it took over in

19    March of 2023, right?

20    A     Yes, it does.

21    Q     Okay.  Does this identify any branch in Texas?

22    A     No, it does not.

23    Q     Okay.

24              MS. THOMAS:  Let's move on to Exhibit 24, please.

25              And again, this is not one of the documents that

1     we've stipulated to admission, so I will start with

2     authenticity.

3     BY MS. THOMAS:

4     Q    Ms. Simmons, can you please identify this document for

5     the Record?

6     A    It is the FDIC supervision of Signature Bank press

7     release from April 28, 2023.

8     Q    And how did you obtain this document?

9     A    Through the FDIC website.

10    Q    Can you give a little bit more detail how you went

11    through to get this document?

12    A    On the FDIC website, I searched Signature Bank, and this

13    was, I think, the third option that popped up.

14    Q    Was this the same database that you found Exhibit 22?

15    A    Yes, it was.

16    Q    Okay.  Is this a true and accurate copy of the document

17    that you pulled from the FDIC's website after engaging in a

18    search on their government database?

19    A    Yes.

20          MS. THOMAS:  We can scroll through.

21          THE COURT:  Yeah, I was going to ask if -- I don't

22    want her answering questions without having the opportunity to

23    flip through.

24          MS. THOMAS:  Yeah.  Let's flip through.

25          THE WITNESS:  Yes, it is.

1            MS. THOMAS:  Okay.  Thank you.

2            I'd move to admit this document.

3            MR. HARRIS:  No objection.

4            THE COURT:  Okay.  It's admitted.  This was 24,

5     right?

6            MS. THOMAS:  Yes.  Yes.

7            THE COURT:  Okay.

8         (ECF 2004-24 received in evidence.)

9            MS. THOMAS:  Thank you, Your Honor.

10           THE COURT:  Okay.

11    BY MS. THOMAS:

12    Q    Does this document by the FDIC identify any Signature

13    Bank branches in Texas?

14    A    It does not.

15    Q    Does it list anywhere in this document where Signature

16    Bank's branches were located?

17    A    I believe so.

18           MS. THOMAS:  We can scroll to pages 6 and 7, it

19    would be helpful.

20           I think it's the next page, please.  Thank you.

21           Okay.  Yes, if we could go to that paragraph with

22    background, please.

23    BY MS. THOMAS:

24    Q    All right.  Ms. Simmons, from this document, do you see

25    that there are 40 branches for Signature Bank?

1    A    Yes, I do.

2    Q    And where are they located?

3    A    The New York Metropolitan area, Connecticut, California,

4    North Carolina, and Nevada.

5    Q    Okay.

6              MS. THOMAS:  I'm going to skip on to Exhibit 28.

7              And I believe we've stipulated to admission of 28,

8    correct?

9              THE COURT:  I don't have 28 on my -- no, I don't

10    have 28.

11              MS. THOMAS:  I just don't recall.  I apologize.

12              MR. HARRIS:  I have no objection to 28.

13              MS. THOMAS:  Okay.

14              THE COURT:  Okay.  Let's just admit 28 then.

15         (ECF 2004-28 received in evidence.)

16    BY MS. THOMAS:

17    Q    All right.  Ms. Simmons, can you identify this document

18    for the Record?

19    A    It's the annual report for 2021 for Signature Bank.

20    Q    And have you reviewed this document?

21    A    I have.

22              MS. THOMAS:  And if we can scroll through, please?

23    BY MS. THOMAS:

24    Q    Does this appear to be a true and accurate copy of the

25    2021 Annual Report?

1     A    It does.

2     Q    And does this document identify any Signature Bank branch

3     in Texas?

4     A    It does not.

5     Q    And does it identify any Signature Bank branch or

6     facility?  Let me say it again so we have a clean Record.

7          Does it identify any Signature Bank facility in Texas?

8     A    Yes, it does.

9          MS. THOMAS:  Now let's go to the last page, please.

10    BY MS. THOMAS:

11    Q    And if you can just identify for the Record, what is the

12    Texas facility that is identified in this document?

13    A    It's the 9 Greenway Plaza, Suite 3120, Houston, Texas,

14    77046.  Again, it's the --

15         MS. THOMAS:  I see those three asterisks at the

16    bottom.  So if we can scroll all the way to the bottom?

17    BY MS. THOMAS:

18    Q    What do those three asterisks tell you?

19    A    It's the SBA Institutional Trading and Sales and

20    Representative Office.

21    Q    Okay.

22         MS. THOMAS:  I think I'm done.

23         Thank you, Your Honor.

24         THE COURT:  Thank you.

25         Can we just take a five-minute break?  I'm just

1    going to -- do you want to take a moment and just come back in

2    about five minutes, and we'll begin with cross-examination.

3    Thank you.

4             (Recess taken from 10:25 a.m. to 10:35 a.m.)

5                  THE COURT:  We are back on the Record in Sorrento.

6                  Mr. Harris, are you conducting the Cross?

7                  MR. HARRIS:  Yes, Your Honor.

8                  THE COURT:  Okay.  Anything you need to give

9    Mr. Gordon?

10                 MR. HARRIS:  Yes, I did.

11                 THE COURT:  Okay, you got it.

12                 And, Ms. Simmons, I remind you that you are still

13   under oath.

14                 Okay, you may proceed.

15                           CROSS-EXAMINATION

16   BY MR. HARRIS:

17   Q    Good morning, Ms. Simmons.  We didn't meet before, we

18   didn't have a deposition, but my name is Chris Harris.  I'm

19   one of the attorneys representing the Debtor.

20        And, Ms. Simmons, you've never worked for Signature Bank;

21   right?

22   A    No, I have not.

23   Q    So you weren't involved in establishing Signature Bank's

24   policies regarding checking accounts, for instance; correct?

25   A    No, I have not.

1    Q    Or its policies regarding wiring instructions; correct?

2    A    Correct.

3    Q    Or its policies regarding what activities can be

4    conducted in offices in hosted branches; right?

5    A    Correct.

6    Q    You have no personal knowledge of any of those topics;

7    right?

8    A    No.

9    Q    And do you know, as the auditor for the United States

10   Trustee, that the United States Trustee considered the

11   appropriateness of venue of the initiations of these

12   Chapter 11's?

13            MS. THOMAS:  Objection. (Indiscernible).

14            THE COURT:  What's your response, Counsel?  Can you

15   ask the question again?

16            MR. HARRIS:  Yes.  I asked whether the witness

17   knows, in her role as the auditor for the United States

18   Trustee, whether the U.S. Trustee considered the

19   appropriateness of any of the initiations of each Chapter 11

20   case.

21            THE COURT:  Overruled.  You may -- the witness was

22   asked about the processes that the United States Trustee does.

23   I think this is -- we're here on a motion to transfer based on

24   venue.  You opened the door by asking questions about the U.S.

25   Trustee processes and what they do in connection with finding

1    out what's going on with the bank exhibits, and that opened

2    the door to where we are, so I'll overrule your objection.

3              THE WITNESS:  I am not involved in most -- in this

4    case at all, so I -- it was just the banking aspect a couple

5    -- a week and a half ago that they were -- that I was asked to

6    search Signature Bank.  So I have no knowledge of the case

7    specifically.

8    BY MR. HARRIS:

9    Q    I understand you had no role on this matter until a few

10   weeks ago.  That's what you just explained; right?

11   A    Yes.

12   Q    My question was different, which is that, does the Unitd

13   States Trustee consider the appropriateness of venue as a

14   general matter at the initiation of each Chapter 11.

15             MS. THOMAS:  Objection.

16             THE COURT:  Now, I'm going to sustain the objection,

17   only because the witness has just testified, at least that she

18   has no knowledge about anything about this case until about a

19   week and a half ago, and that testimony will stand.

20             If she -- if you want to ask her about her job

21   generally, I think that's fair.  She's testifying as an

22   auditor for the United States Trustee's Office, and I'll

23   sustain the objection.  I'm not sure she knows the answer to

24   that question based upon the testimony that I heard.

25             I'll sustain the objection.

1          MS. THOMAS:  And, Your Honor, just for a clear

2      Record, I want to make sure that Ms. Simmons is not being

3      asked to disclose anything that is work product in terms of

4      what she's talking about with attorneys or the U.S. Trustee.

5          THE COURT:  She's only been on the case for a week

6      and a half so, you know.

7          MR. HARRIS:  Let me ask a different question.

8          THE COURT:  And I think it's -- I think it's fair.

9      I don't -- I'm not asking -- I don't think you've been asked

10      to disclose anything in connection with attorneys.  To the

11      extent you have, I'm going to give your counsel an opportunity

12      to raise an objection, okay?

13      BY MR. HARRIS:

14      Q    On other Chapter 11 matters, have you conducted

15      investigations regarding venue facts, like initiation of

16      Chapter 11s.

17          MS. THOMAS:  Objection.  This exceeds the scope and

18      it also goes into our work product.  What she's doing is

19      working on legal matters for a client, the United States

20      Trustee, and that comes -- all of it is under supervision of

21      the trial attorney.

22          THE COURT:  Well, I'll sustain the objection, but at

23      the closing I'm going to need to understand -- well, I'll let

24      the evidence come out, and then we'll see where this goes.

25      But I'll sustain the objection.  If she doesn't have

1    knowledge, then I want you to stay within the scope of this

2    case.

3    BY MR. HARRIS:

4    Q    Do I understand what you've done in the last few weeks,

5    you've done searches on the Internet to attempt to determine

6    the status of Signature's Houston office as of February 2023;

7    is that right?

8    A    Correct.

9    Q    If you had been asked, you could have done these same

10   searches back in February of 2023; right?

11   A    Yes.  If they asked, yes.

12   Q    All right.  I want to talk about some of the things that

13   you didn't do in the last few weeks.  You did not speak to

14   anyone currently at Flagstar Bank; right?

15   A    No.

16   Q    And you didn't speak to anyone who used to work at

17   Signature Bank; right?

18   A    Not -- not specifically for this -- what we're going into

19   this case for any policies.  On other matters for collateral,

20   yes.

21   Q    But for purposes of the investigation and for this case,

22   you didn't speak to anyone who used to work for Signature

23   Bank; right?

24   A    No.

25   Q    You also didn't collect any documents from Signature Bank

1     or its successor, Flagstar; correct?

2     A     No.

3           MR. HARRIS:  Could -- Mr. Gordon, could you please

4     pull up the U.S. Trustee's Exhibit 3?

5           THE COURT:  It's 2004-3.  The US Trustee's are 2004;

6     is that correct?

7           MR. HARRIS:  Okay, right.

8           THE COURT:  Thank you, just wanted to be sure.

9        (Pause in the proceedings.)

10    BY MR. HARRIS:

11    Q     And have you seen this document before, Ms. Simmons?

12    A     No, I have not.

13    Q     Okay.  And one -- I just really have one thing to ask you

14    about.  If we go down to the bottom of the page, do you see at

15    the very bottom there's a name, Eli Rodriguez, and under it

16    says "account officer name"; do you see that?

17          MS. THOMAS:  Your Honor, objection.  It speaks --

18    the document speaks for itself.  (Indiscernible)

19          THE COURT:  Well, she can be crossed on a document,

20    right, that's admitted into evidence.

21          THE WITNESS:  Yes, I see that.

22    BY MR. HARRIS:

23    Q     You didn't attempt to speak to Mr. Rodriguez, whose name

24    appears above "account officer name"; right?

25    A     No, I did not.

1    Q    Okay.  Have you ever seen the account wiring instructions

2    that Signature Bank sent, that listed the Houston office as

3    the local office?  Have you ever seen that?

4    A    (No response.)

5    Q    I believe you did --

6    A    Was that Exhibit 6?

7    Q    Yes.

8    A    I saw it.

9    Q    You didn't attempt to determine who prepared that

10   Signature Bank, those account wiring instructions; did you?

11        MS. THOMAS:  Objection, lack of foundation.  We

12   don't -- there's no evidence that Signature Bank actually

13   created those wiring instructions.

14        THE COURT:  Just -- you're not testifying, counsel.

15   And I think I'm going to overrule the objection.

16        You can answer.

17   BY MR. HARRIS:

18   Q    You didn't attempt to determine who at Signature Bank or

19   somewhere else, created those account wiring instructions; did

20   you?

21   A    No, I did not.

22   Q    You didn't speak to any other Signature representatives

23   to determine what their policies are about sponsoring checking

24   accounts through the Houston office; did you?

25   A    No, I did not.

1    Q    Did you go to the Greenway Plaza address?

2    A    No, I did not.

3    Q    Do you know if Flagstar still has an office there?

4    A    No, I do not.

5    Q    If you had done this investigation in 2023, in February,

6    while Signature was still in operation, could you have spoken

7    to people at that office to determine what activities needed

8    to be done?

9              MS. THOMAS:  Objection, speculation.

10             THE COURT:  Sustained.

11   BY MR. HARRIS:

12   Q    Let me ask it this way.  Do you think it might have been

13   a -- do you think you could have more easily determined the

14   status of the Houston office in February 2023 if you had

15   conducted your search in February of 2023?

16             MS. THOMAS:  Objection, calls for speculation.

17             MR. HARRIS:  Your Honor, this person has been

18   brought up here not as an expert but as an auditor to explain

19   the investigation she did.  I should be allowed to find out

20   whether she thinks she could have conducted a better

21   investigation on the status of this office in 2023 if she had

22   done the investigation in 2023.

23             THE COURT:  Overruled.  She can answer, if she

24   knows.

25

1   BY MR. HARRIS:

2   Q    Do you think -- let me ask this.  Do you think you could

3   have conducted a more thorough investigation on the status of

4   the Houston office in November of 2023, if you had been asked

5   to do that investigation while it was still in

6   (indiscernible)?

7   A    I don't know.

8   Q    You didn't -- to be clear -- attempt to determine from

9   Signature's records, whether Signature interpreted the

10  applicable rules such that it could handle checking accounts

11  in its Houston office; right?

12  A    No, I did not.

13  Q    You didn't also request records from the New York

14  Superintendent of Insurance to determine how the Houston

15  office was recorded at the Superintendent's files, did you?

16  A    No, I did not.

17  Q    You didn't, for instance, attempt to determine whether

18  Signature had the dispensation from the New York

19  Superintendent of Insurance to allow checking accounts to be

20  sponsored by that office; did you?

21          MS. THOMAS:  Objection.  Calls for speculation.  She

22  already testified she had no personal knowledge of that.

23          THE COURT:  I'll sustain.

24  BY MR. HARRIS:

25  Q    You didn't do anything to find out how Signature -- well,

1     you didn't go into what rules Signature has about checking

2     accounts being sponsored by its Houston office; did you?

3               MS. THOMAS:  Again, Your Honor, she already

4     testified that she had no personal knowledge from New York

5     Banking.

6               THE COURT:  Repeat that question again.

7               MR. HARRIS:  Sure.

8     BY MR. HARRIS:

9     Q    You didn't do anything to attempt to determine what

10    policies Signature had in place in February 2023 about

11    sponsoring checking accounts in its Houston office.

12              THE COURT:  Overruled.  I think she can testify as

13    to what she was asked to do and asked what not to do.

14              THE WITNESS:  No, I did not.

15              THE COURT:  It wasn't asked (indiscernible) -- all

16    right.

17    BY MR. HARRIS:

18    Q    And you were shown a number of documents in your Direct

19    Examination; do you recall that?

20    A    Yes.

21    Q    None of those documents said that the Houston office

22    cannot sponsor a checking account; did it?

23    A    No, they did not.

24    Q    I'm going to show you a document, for cross-examination

25    purposes, and I have moved it into evidence, but let me -- I

1    want to see about the -- it goes to the thoroughness of your

2    investigations, and it is the Debtors' Exhibit 18.

3              MS. THOMAS:  Are you going to establish

4    authentication?

5              MR. HARRIS:  Well, it's cross-examination.  I do not

6    need to put a document into evidence when cross-examining the

7    witness.

8              THE COURT:  Okay.

9    BY MR. HARRIS:

10   Q    All right.  If you could turn to the first page.  Do you

11   see at the top corner, it has a website address,

12   www.advertisingco.sec.gov.  Do you see that?

13   A    Yes, I do.

14   Q    And then you see it says IAP Report, and under it Cory

15   Ginasia (phonetic).  Do you see that?

16   A    Yes, I do.

17   Q    I assume you do not know who Mr. Ginasia is; is that

18   right?

19   A    Correct.

20   Q    And I think you said you did not attempt to interview or

21   meet with any people who used to work at Sorrento's Houston

22   office; correct?

23   A    Correct.

24   Q    So you don't know what the views are of those people as

25   to the status of the office they worked in or what kind of

1    activities they were allowed to conduct; right?

2    A    Correct.

3    Q    If we could turn to page 5, do you see there's a box that

4    says "employment."  Do you see that?

5    A    (No audible response.)

6    Q    And under it, it says "Firm Name: Flagstar Advisors,

7    Inc."  Do you see that?

8    A    Yes.

9    Q    And do you see underneath it, it says, "Branch office

10   locations, Flagstar Advisors, Inc., 9 Greenway Plaza, Suite

11   3210, Houston, Texas 77046."  Do you see that?

12   A    Yes.

13            MS. THOMAS:  I'm going to object to that.  I think

14   that's hearsay if they're using that to prove the truth of the

15   matter asserted, or that she simply sees that those words are

16   on a page.

17            MR. HARRIS:  It is not in evidence and --

18            THE COURT:  It's not being offered for the truth of

19   the matter.  It's cross-examination.  It's to impeach the

20   witness.

21            So you can continue.

22   BY MR. HARRIS:

23   Q    And do you see it lists as the branch office location on

24   this page, the 9 Greenway Plaza address; correct?

25   A    Yes.

1    Q    And can you -- can we turn to page 7 of 8?

2    A    (Locating page.)

3    Q    You see the section "employment history"?  Do you see

4    that?

5    A    Yes.

6    Q    Okay.  And do you see the most recent employment history

7    listed is for Flagstar Advisors; do you see that?

8    A    Yes.

9    Q    But the one below that is for Signature.  Do you see

10   that?

11   A    Yes.

12   Q    So in the course of your investigation, your Internet

13   searching, did you try typing in the address of the Houston

14   office just to see what would come up?  Did you type in

15   9 Greenway Plaza, Suite 3120, Houston, Texas?

16   A    No, I did not.

17   Q    Okay.  So you don't know what descriptions of that

18   office, such as the one we looked here, that would have arisen

19   if you had done that search; right?

20   A    If I'd searched it that way, no, sir.

21        MR. HARRIS:  Just one second.

22        Nothing further, thank you.

23        THE COURT:  Thank you.

24        Anyone else -- anyone else in the courtroom?  Any

25   Redirect, counsel?

79

REDIRECT EXAMINATION

BY MS. THOMAS:

Q    Ms. Simmons, do you recall you were just asked if you attempted to review any documents created by Signature Bank?

A    Yes.

Q    Okay.  And in the course of your investigation, we discussed what has been marked as Exhibit 18, not admitted, but that appeared to be -- well, in the course of your investigation, did you find a document created by Signature Bank?

        MR. HARRIS:  Objection, Your Honor.  I believe that the witness is being asked about a document that was not admitted and partly because it was not authenticated.  And I also --

        MS. THOMAS:  He --

        THE COURT:  I'm not sure it was within the scope of the Redirect.

        MR. HARRIS:  And I also did not ask if she's reviewed any documents created by Signature Bank.  I asked if she requested any documents from Signature Bank and the answer was no.

        MS. THOMAS:  I specifically heard a question about if she reviewed -- made any attempt to review documents created by Signature Bank.  And so I just wanted to clarify for the Record.

1          THE COURT:  I'll allow it.

2     BY MS. THOMAS:

3     Q    Did you review any document created by Signature Bank?

4     A    Yes, I did.

5     Q    And generally what was that document?

6          MR. HARRIS:  Objection, Your Honor.  This is

7     hearsay.

8          THE COURT:  That was hearsay.

9     BY MS. THOMAS:

10    Q    Counsel asked you a lot of questions about sponsoring an

11    account.  Do you know what sponsoring an account means?

12    A    Not specifically.  I do not know that.

13         MS. THOMAS:  I think that's all I have.  Thank you,

14    Your Honor.

15         THE COURT:  Any Cross, further Cross?

16         MR. HARRIS:  No, Your Honor.

17         THE COURT:  Okay.  Ms. Simmons, thank you very much

18    for your time.

19         (Witness Simmons excused.)

20         MS. THOMAS:  Your Honor, the next witness we would

21    like to call is the Chief Restructuring Officer, Mr. Meghji.

22         THE COURT:  Okay.

23         (Witness Meghji takes the stand.)

24         THE COURT:  Mr. Meghji, can you hear me okay?

25         THE WITNESS:  (No response.)

1          THE COURT:  Maybe you need -- let me try -- just

2     give me one -- Mr. Meghji, can you hear me now?

3          THE WITNESS:  Yes.  Could you hear me, Your Honor?

4          THE COURT:  Yes.  Just one moment, please.

5          Okay, Mr. Meghji, let me just ask you to raise your

6     right hand.

7          (Witness sworn.)

8          THE WITNESS:  Yes, I do.

9          THE COURT:  Okay.  And you understand the oath that

10    you took is the same that you would take if you were live and

11    in the courtroom here?

12         THE WITNESS:  I do, yes.

13         THE COURT:  And I'd ask that you please confirm for

14    me and tell me who's in the room with you?

15         THE WITNESS:  Nobody.

16         THE COURT:  Are there any notes in front of you that

17    would assist you in your testimony?  If there are, I want you

18    to remove them now.

19         THE WITNESS:  No, there are none.

20         THE COURT:  Okay.  And you understand that I want to

21    make sure that you're only looking at the screen and that

22    you're not looking at any phone and that there can be no

23    messages provided to you; do you understand that?

24         THE WITNESS:  Yes.  My phone is not in front of me

25    and I have a blank piece of paper, so I'll put it away.

1          THE COURT:  Okay.  And if there are any documents

2     that are going to be shown to you, that we will show them live

3     on the screen so that all can see, okay?

4          THE WITNESS:  Thank you.

5          THE COURT:  All right.  Counsel, you may proceed.

6          MS. THOMAS:  Thank you, Your Honor.

7          And just for clarity of the Record, I've conferred

8     with Debtors' counsel and I have no objection to us being

9     efficient with our time and then conducting their Direct and

10    Cross of Mr. Meghji at the same time.  And they wanted to

11    utilize Ms. Reckler, I believe, for the Direct, and Mr. Harris

12    for the Cross, and I don't have an issue.

13         THE COURT:  Got it.  Okay.

14         MS. THOMAS:  If the Court doesn't, I have no issue

15    with that.

16         THE COURT:  Thank you.

17                        DIRECT EXAMINATION

18    BY MS. THOMAS:

19    Q    Mr. Meghji, I believe that we met last week.  My name is

20    Aubrey Thomas.  I'm an attorney with the Office of the United

21    States Trustee.

22         And can you please state your name for the Record?

23    A    Mohsin Meghji.

24    Q    And what is your role for Scintilla?

25    A    I'm the Chief Restructuring Officer of the Sorrento

1    Debtors, which includes Scintilla.

2    Q    And Scintilla is a Delaware entity; correct?

3    A    Correct.

4    Q    Where are you physically located today?

5    A    In Manhattan, New York.

6    Q    Were you physically in Manhattan, New York between

7    February 9th and the 13th of 2023?

8    A    To the best of my recollection, yes.

9    Q    Do you recall whether or not you were at Houston at all

10   during that same time period?

11   A    I was not.

12   Q    Were you involved in the decision of where to file these

13   bankruptcy cases?

14   A    No.

15   Q    Do you know why the Debtor chose to file in the Southern

16   District of Texas?

17   A    The Debtor -- the board of the Debtors was advised by

18   counsel to file in Texas, the way I understand that.

19        MS. THOMAS:  If we could please pull up Exhibit 3?

20        (Counsel & staff conferring.)

21        THE COURT:  Yeah, absolutely.  Just give me one

22   second, Ms. Barcomb, and let me find it.  Found you, just give

23   me one second.

24        (Pause in the proceedings.)

25        THE COURT:  Ms. Barcomb, you should be there.

84

1              MS. THOMAS:  Thank you.

2      BY MS. THOMAS:

3      Q    Okay.  Mr. Meghji, can you see the document on the screen

4      in front of you?

5      A    Yes.

6      Q    And can you please identify the document for the Record?

7      A    It's the Signature Bank account application for the

8      account in the name of Scintilla Pharmaceuticals.

9      Q    Okay.

10             MS. THOMAS:  And I'd just note for the Record that

11     this was stipulated to for admission.

12             Can we scroll down to the signature section?

13     BY MS. THOMAS:

14     Q    Mr. Meghji, did you sign this document?

15     A    Yes.

16     Q    And what date is listed there for your signature?

17     A    March 8th, 2023.

18     Q    Is this the account agreement for the Signature Bank

19     account of the Debtor, Scintilla, that is at issue for today's

20     hearing?

21     A    Yes, I believe so.

22     Q    And do you know when this account was actually opened?

23     A    I think it was opened around February -- on

24     February 10th.

25     Q    Okay.  And if the account was opened approximately

1    February 10th, why was the application not completed until

2    March 8th, 2023?

3    A    Well, there was obviously a lot going on between the

4    period I got retained and the filing, which was on

5    February 9th, and the filing of the Bankruptcy Petition, which

6    was on February 13th.

7         So these forms administratively came around after, and

8    they were completed in March.

9    Q    Now, if we scroll down through -- past the application,

10   let me ask you this:  Do you recall reviewing this document in

11   the past?

12   A    Yes.  I believe it was filled out by one of my

13   colleagues, Ms. Mary Karicki (phonetic).  Then I reviewed it

14   before signing.

15   Q    And there are some agreements attached to this

16   application that are part of Exhibit 3; correct?

17   A    Yes.

18   Q    Are you generally familiar with the agreements that are

19   attached to the application?

20   A    Very generally, yes.

21   Q    Do you know anywhere in the application or the bank

22   agreement that provide where Signature Bank would actually

23   hold Scintilla's funds?

24   A    I don't.

25   Q    When you signed this application, did you have personal

MOSHIN MEGHJI – DIRECT BY MS. THOMAS                          86

1      knowledge of whether or not Signature Bank had a branch in

2      Houston, Texas?

3      A    I did not.

4      Q    Have you personally investigated whether or not Signature

5      Bank has a branch in Houston?

6      A    I have not personally investigated that.

7      Q    Why did the Debtor open an account with Signature Bank?

8      A    I think it was based on advice from counsel, and I was

9      not involved in those discussions as I previously indicated to

10     you in my deposition.

11     Q    Do you recall your deposition that occurred on March 5th,

12     2024?

13     A    Yes.

14          MS. THOMAS:  Okay.  Let's turn to Exhibit 26, right?

15     His deposition transcript.

16          THE WITNESS:  Yes.

17          MS. THOMAS:  I think I got the number right.  All

18     right, please pull up 26 and turn to page 33.

19          MR. HARRIS:  Before you display it, could you tell

20     me what the purpose is?  Are you impeaching?  And if so, what

21     line?

22          MS. THOMAS:  So just said that --

23          THE COURT:  Is it for impeachment purposes?

24          MS. THOMAS:  Yes.

25          THE COURT:  Okay.

1              MS. THOMAS:  His answer now was just inconsistent

2     with what --

3              THE COURT:  Let's just -- let's just go again.

4              MS. THOMAS:  Okay.

5              Let's go to page 33, please.

6              THE COURT:  I just want to hear the direct

7     examination on it, please.

8              MS. THOMAS:  Thank you.

9     BY MS. THOMAS:

10    Q    Mr. Meghji, do you see at line 6 where I asked you:  "In

11    the months that followed, did you retain any personal

12    knowledge that Signature Bank had a branch in Houston, Texas."

13             And do you see your answer there?

14    A    Yes.

15    Q    And can you read your answer from lines 9 through 16?

16             MR. HARRIS:  Objection, Your Honor.  This is not

17    impeaching.

18             THE COURT:  Well, I don't know yet.  I haven't read

19    it.

20             THE WITNESS:  Yes.  I said:  "Listen, the reason we

21    opened an account at Signature Bank was that it was approved

22    by the US Trustee Program, and that is -- that's really what I

23    sort-of cared about in going out of business, which was

24    another experience altogether."

25             MS. THOMAS:  Sure.  So you --

1           THE COURT:  What was the --

2           MS. THOMAS:  He testified --

3           THE COURT:  Hold on a second.

4           THE WITNESS:  Could I just finish?

5           THE COURT:  Yeah.  Go ahead.  No, Mr. Meghji, you

6    can't.

7           THE WITNESS:  Yeah.  But, no, I am not personally --

8           THE COURT:  Mr. Meghji, Mr. Meghji, this is Judge

9    Lopez.  I have a question.

10          What was the inconsistent statement?

11          MS. THOMAS:  So I had asked him, why did the Debtor

12   open a Signature Bank account.  And he said it was because of

13   advice from counsel.  And he just -- he testified

14   inconsistently at deposition that I was able to read now, for

15   a different reason.

16          THE COURT:  Oh, understood.  Agreed.  Yep, yep, yep.

17          MS. THOMAS:  So I just wanted a clear Record of why

18   he (indiscernible).

19          THE COURT:  Got it.

20          MS. THOMAS:  Thank you.

21          Okay, we can pull that document down.

22   BY MS. THOMAS:

23   Q    Mr. Meghji, I think you may have already answered this,

24   but just so I can make sure I've gotten through everything.

25   Were you personally involved in the opening of the Signature

1     Bank account for Scintilla before the filing of the case?

2     A     No.

3            MS. THOMAS:  Let's pull up Exhibit 6, please.

4     BY MS. THOMAS:

5     Q     Mr. Meghji, do you recognize this document?

6     A     I think I'm seeing it for the first time.

7     Q     Well, I can represent to you, Mr. Meghji, that this is

8     what has been admitted as Exhibit 6, the wiring instructions

9     at issue in this case.

10           Have you ever reviewed this -- these wiring instructions

11    for the funding of the Signature Bank account?

12    A     Is this for the 60,000?

13    Q     Correct.  I thought the document would be helpful, but

14    perhaps I don't even need it.

15           Were you involved in reviewing any of the wiring

16    instructions for that -- for the transaction in which Sorrento

17    transferred $60,000 to Scintilla?

18    A     No, I was not.

19    Q     So you don't recall having seen this document before?

20    A     No.  As I just said, I'm seeing it for the first time, I

21    think.

22    Q     Do you have any personal knowledge of whether or not the

23    funds in the Debtors' Signature Bank account in February and

24    March of 2023 were actually held in a Texas bank branch?

25           MR. HARRIS:  Objection.  I believe the witness --

1        we're just calling for a legal conclusion.

2                    THE COURT:  I don't think so.

3                    Would you repeat the question?

4                    MS. THOMAS:  Sure.

5        BY MS. THOMAS:

6        Q    Do you have any personal knowledge of whether or not the

7        funds in the Signature Bank account in February and March of

8        2023 were actually held in a Texas bank branch?

9                    THE COURT:  He can answer as to personal knowledge.

10       I'll overrule your objection.

11                   Mr. Meghji, you can answer the question.

12                   THE WITNESS:  I have no personal knowledge of where

13       those funds were held physically.

14                   MS. THOMAS:  Thank you.

15                   Let's please turn to Exhibit 4.

16       BY MS. THOMAS:

17       Q    Mr. Meghji, do you recognize this document?

18       A    Yes.

19       Q    Okay.  What is it?

20       A    It's the Signature Bank statement for the period of

21       February 10th to 12th, 2023.

22       Q    And what address is listed for Scintilla Pharmaceuticals

23       on this statement?

24       A    4955 Directors Place, San Diego, California.

25       Q    Mr. Meghji, were you involved in the decision for

MOSHIN MEGHJI - DIRECT BY MS. THOMAS

1  Scintilla to open a Post Office Box at the UPS store in Texas?

2  A    No.

3  Q    Before filing this case -- and let me clarify.  I'm not

4  going into the scope of anything that you may spoken with with

5  your attorneys.  But before this case was filed, did you have

6  any conversations regarding opening a Post Office Box at the

7  UPS store in Texas?

8  A    Not that I can recall.

9  Q    Do you know who's responsible for picking up the mail at

10  the Debtors' Post Office Box?

11  A    No.

12  Q    Do you know if Scintilla actually receives any mail at

13  the Post Office Box?

14  A    No.

15  Q    Has the Post Office Box been used by the Debtor for

16  anything besides potentially receiving mail?

17  A    Not that I'm aware of.  And given that Scintilla is a

18  non-operating entity and essentially dormant, I wouldn't

19  expect there to be much mail anyway.

20  Q    Okay.  Are you aware of any business that Scintilla was

21  conducting at the Post Office Box located in the UPS Store in

22  Texas?

23  A    No.

24  Q    And I believe you just testified that when you became the

25  CRO, Scintilla was a non-operating subsidiary; correct?

1    A    Correct.

2    Q    Do you recall testifying at the 341 Meeting of Creditors

3    for Sorrento and Scintilla on May 30th, 2023?

4    A    Yes.

5              MS. THOMAS:  We can go ahead and pull that up.

6    BY MS. THOMAS:

7    Q    At the 341 Meeting on May 30th, where did you believe

8    Scintilla's headquarters were?

9    A    4955 Directors Place, San Diego.

10   Q    When did you learn that the address at 7 Switchbud Place

11   was a Post Office Box at the UPS Store?

12   A    I don't recall exactly when I knew that.

13   Q    Was it prior to the 341 Meeting on May 30th?

14   A    It was probably after that because it -- to be honest, I

15   don't recall being focused on the PO Box issue -- I may have,

16   but I just don't recall that -- until it came up in a question

17   in the 341 Meeting.

18   Q    Okay.  So after the 341 Meeting, what -- did you learn

19   in, let's say, June of 2023 that the Switchbud Place address

20   was a Post Office Box?

21   A    I think at the 341 Meeting, when the question -- and you

22   have the transcript -- was posed to me, I think it was on

23   May 30th, that where the headquarters are.  My answer was

24   4955 Directors Place in San Diego.  And then at some point,

25   counsel had stepped in to address a question of where the

1        principal place of business of Scintilla was, so that was the

2        legal definition of principal place of business.  And

3        Ms. Reckler indicated that that was in Houston at The

4        Woodlands, and that was the PO Box.

5                 MS. THOMAS:  Well, let's go to that -- that section,

6        please.  I think it's down on page 23.

7        BY MS. THOMAS:

8        Q    Okay.  So do you see this -- that document on your

9        screen?

10       A    Yes.

11       Q    Okay.  And we see at around line 20 Mr. Kelly asks you:

12       "Where is Scintilla's principal place of business?"  You

13       didn't answer that question, did you?

14       A    Not based on the transcript, yes.

15       Q    Okay.  Who answered that question for you?

16       A    Ms. Reckler, as I just said a couple minutes ago.

17       Q    And let's read, starting at line 25, what her answer was

18       so it was -- it's really clear.  (Reading)  "Scintilla has a

19       Post Office Box in Houston" -- next page please -- "and it has

20       a bank account in Houston as well, and its principal place of

21       business is in Houston."

22                 Is it your testimony today that that statement by

23       Ms. Reckler gave you notice that Scintilla was utilizing the

24       Post Office Box as its headquarters?

25       A    That's my recollection, yes.

Q    Okay.  So as of May 30th, you knew that a Post Office Box was where Scintilla was conducting its business?

A    I'm sorry.  Can you repeat that question?

Q    So as of May 30th, you understood that the Post Office Box at the UPS Store is where Scintilla was conducting its business.

A    Scintilla had no operating business.  I don't know what you mean by conducting their business.

Q    Well, I was trying to get a little bit more clarity from your answer because I believe you just testified that you are aware that the headquarters were at this Post Office Box as of that date; correct?

A    No.  I said -- I said earlier that I had answered the question in fact that the headquarters of Scintilla and Sorrento was in San Diego, which is what I had said earlier at the 341 Meeting.  And then when Ms. Reckler stepped in to answer that, I think she explained that the legal definition of where the principal place of business of Scintilla was in Houston.

Q    She didn't say the legal definition of principal place of business in her statement; right?

A    She's a lawyer, so I assumed that that's what she meant.

Q    That doesn't necessarily answer my question, Mr. Meghji. She didn't say, in the sentence that we just read onto the Record, that that was a legal definition; correct?

1                MR. HARRIS:  Objection, Your Honor.

2                THE WITNESS:  Obviously --

3                THE COURT:  Hold on, Mr. Meghji.  There's an

4       objection, Mr. Meghji.  Yes?

5                MR. HARRIS:  The transcript speaks for itself.

6                THE COURT:  Right.

7                MR. HARRIS:  The point of a deposition, of a trans

8       -- this is not to impeach him.  The transcript says what it

9       says.  In terms of any further questions about what the

10      principal place of --

11               THE COURT:  I got it.

12               MR. HARRIS:  All right.

13               THE COURT:  I'm with you.

14               MS. THOMAS:  I can move on.

15               THE COURT:  No, no, no, no.  I just think, if you

16      want, just point -- I'll let you point to the transcript and

17      see if, you know, you see the word in there.  I'll let you do

18      all that if you want.  I think it's easier just referring to

19      the depo.

20               MS. THOMAS:  Okay.

21               Let's go -- let me see.  Let's go to page 10 of the

22      341 testimony, please.  And if we can scroll down a little

23      bit, please, where Mr. Duran is asking you right around

24      line 19 and we're going to go from there.

25               Scroll down the page, I'm sorry.  My apologies,

1    Mr. Meghji.

2    BY MS. THOMAS:

3    Q    All right, so Mr. Duran asked you at line 19 -- do you

4    see his question there?

5    A    Yes.

6    Q    And -- scroll up, please -- and he asked you if you

7    reviewed the Debtors' Statements, Schedules and Petition;

8    correct?

9    A    Can you scroll up to line 19?

10   Q    Yes.

11   A    Yes.

12   Q    And what was your answer to that question?

13   A    Yes.

14   Q    Okay.  So before the 341 Meeting, you reviewed

15   Scintilla's Petition; correct?

16   A    I believe so.

17              MS. THOMAS:  Okay.  And if we could please pull up

18   the Petition for Mr. Meghji?

19   BY MS. THOMAS:

20   Q    Mr. Meghji, is this the Voluntary Petition that you

21   reviewed prior to the 341 Meeting?

22   A    Can you please scroll down?

23   Q    Absolutely.

24   A    Yes.

25              MS. THOMAS:  If we can go to No. 4, please.  No. 4,

1    yeah.

2    BY MS. THOMAS:

3    Q    Do you see where it says principal place of business,

4    7 Switchbud Place, Suite 192-513?

5    A    Yes.

6    Q    And you reviewed this Petition prior to your 341

7    testimony; correct?

8    A    I believe so.  I mean, this was eight months ago, so I

9    don't -- I can't specifically --

10   Q    Sure.

11   A    -- recall what I -- and let me finish -- what I reviewed

12   and didn't review.

13   Q    But you have no reason, as you sit here today, to doubt

14   your 341 testimony in which you said you reviewed the

15   Petition?

16   A    I don't.

17   Q    Okay.  And still having reviewed this Petition, you

18   considered the San Diego, California address to be the

19   principal place of business, or the head -- excuse me.  Let me

20   rephrase that question.

21        Having reviewed this Petition as of May 30th, you still

22   believed the headquarters for Scintilla was in San Diego,

23   California; correct?

24   A    I answered the question -- again, going from my

25   recollection -- on the basis of where I dealt with most of the

1    -- where the operating headquarters of the Sorrento Debtors

2    were, including Scintilla.  So I don't recall having read this

3    and looked at -- having looked at these two addresses and

4    analyzing which was the legal principal place of business

5    versus the mailing address.  Both addresses are on -- on here.

6         This issue has come up now, this whole venue issue.  I

7    was focused on what -- you know, working with the management

8    team, with the business, and a lot of other things going on.

9    I certainly wasn't sitting there on May 30th before that

10   meeting thinking about the legal principal place of business,

11   vis-à-vis the mailing address.

12        Nor had I been -- as I've testified previously -- been

13   involved in deciding where to file.  So I think you're sort of

14   inflating a lot of things after the fact based on the

15   transcript.  But I just wanted to kind of explain that.

16   Q    Well, sure, Mr. Meghji.  Thank you for your explanation.

17        I just want to be clear, because I believe your testimony

18   already today was that you didn't know 7 Switchbud Place was a

19   Post Office Box at the UPS Store until May 30th; correct?

20   A    Correct.

21   Q    Okay.

22   A    But I think we had already established that.

23        THE COURT:  Mr. Meghji, I just want to make sure

24   that you can only answer the questions that are asked.

25   Additional commentary, you can probably -- you'll have another

1    -- your lawyers will be able to ask you, but I just want you

2    to answer the questions.

3                THE WITNESS:  Okay.  And my apologies.

4    BY MS. THOMAS:

5    Q    Mr. Meghji, when did you -- I'm still not sure, and I

6    apologize if I'm asking you the same question.  When do you

7    recall the date that you learned 7 Switchbud Place was a UPS

8    Store?

9    A    I don't -- I'm trying to answer that.  I don't recall the

10   exact date when I learned that.  But it makes sense to me,

11   sitting here today, that what I recall is that the first time

12   I generally would have focused on that was at that 341 Meeting

13   or shortly after.

14   Q    What action -- when you finally learned that the

15   7 Switchbud Place was a UPS Store, what action did you take to

16   notify parties of this fact?

17   A    I'm sorry.  Nothing.  What parties of what act?  This was

18   -- on the Petition, it was fully disclosed.  I don't know

19   what --

20   Q    Thank you, Mr. Meghji.  Thank you.

21               MR. HARRIS:  Your Honor --

22               THE COURT:  I'll allow it.  Go ahead.  You can ask

23   your next question.

24               MR. HARRIS:  I was just going to say I'd ask that

25   counsel not cut off the witness.

1          THE COURT:  No, understood.  Understood.

2          MS. THOMAS:  Just a moment, Your Honor.  I want to

3    make sure that I've gotten through everything that I wanted to

4    address with Mr. Meghji.

5    BY MS. THOMAS:

6    Q    Mr. Meghji, we've heard your counsel speak towards their

7    concerns with the transcript, venue.  I would like, if you

8    could, please explain to the Court any concerns you have as

9    the CRO with transferring venue at this time.

10   A    Yes.  My concern with transferring venue at this time is

11   this has been a long, complicated, and difficult case.  We got

12   a sale approved last Friday.  There's still some work to do to

13   close that sale.  And I'm hopeful that the Equity Committee --

14   the Equity Committee's efforts in bringing forth an allowed

15   sale deal will be successful.

16        I strongly believe that the way to maximize the remaining

17   value of the estate, for the benefit of creditors and maybe

18   ultimately the equity holders as well, is to close the sale

19   and hopefully, you know, do all the transactions and stuff to

20   get that done.

21        That's what I'm focused on.  And moving this to a new

22   venue with all the history, 12-plus months of history has been

23   the case, will make that more difficult and far less

24   efficient.

25   Q    Can you explain how transferring to another District

1    Court for the administration of this case would actually

2    impact the closing of the sale?

3    A    There could be -- well, the history of this case is that

4    even when sales have sometimes been agreed upon, agreements in

5    some way, there could be issues that come up between the

6    agreed contracts and closing sales that's happened in a couple

7    of instances, and that we may need the Court's help in

8    adjudicating issues related to the sale.

9         And if those are required, it will be a very significant

10   impediment to getting those issues resolved and the case

11   closed.  And I think that if the Equity Committee brings forth

12   a proposal, then there may be changes required to the Plan or

13   to the sale agreement to let that happen.  And this Court is

14   now up-to-speed on all of those issues and the difficult

15   complicated history of this case.

16        So I think that's really my concern.

17   Q    Do you have any personal knowledge that a Bankruptcy

18   Judge in Delaware or the Southern District of California could

19   not timely address any issues that might come up in the

20   closing of the sale?

21   A    My judgment -- I obviously don't have any personal

22   knowledge about a change of judge.

23   Q    Okay.  And what is that judgment and opinion based upon?

24   A    The history and complexity of this case.

25   Q    But the history and the complexity of this case doesn't

1    inform what another Court could accomplish; right?

2    A    I think I told you that was my judgment.

3    Q    Okay.

4              MS. THOMAS:  That's all I have.  Thank you.

5              THE COURT:  Thank you.

6              Mr. Meghji, why don't we take just -- if I could

7    just grab some more water.  Why don't we just take about five

8    minutes and I'll come back out.

9              Mr. Meghji, I want you to speak with no one.  If you

10   can, stay on the camera.  I want to make sure you speak with

11   no one, check no notes.  You're still under oath, okay.

12             We'll come back in five minutes.

13             THE WITNESS:  Your Honor?

14             THE COURT:  Yes.

15             THE WITNESS:  Could I go to the restroom?

16             THE COURT:  Oh, of course, yeah.  No, that was a bad

17   one.  Yeah, you're allowed to go to the restroom.

18        (Recess taken from 11:29 a.m. to 11:35 a.m.)

19             THE COURT:  Please be seated.

20             We are back on the Record in Sorrento.

21             Mr. Meghji, I'm reminding you that you are still

22   under oath.  We will now proceed with examination.  So --

23             MS. RECKLER:  Your Honor, Caroline Reckler on behalf

24   of the Debtors.  Just procedurally would you like us -- it may

25   be most efficient if we take out the rest of our exhibits that

1    have not yet been admitted.

2              THE COURT:  I'll let you proceed however you want.

3              MR. HARRIS:  All right.  Chris Harris again.  So our

4    remaining exhibits, and they're at Docket 2005, our Exhibits

5    12 through 18.

6              THE COURT:  Give me a second.

7              MR. HARRIS:  So Exhibit 12 is the transcript of the

8    Third 341 Meeting conducted by the US Trustee, Exhibits 13

9    through 16 are emails between the Debtors and the US Trustee.

10             We can stop there and see if we have any objections

11   to those.

12             MS. THOMAS:  Yes, I mean our first objection was

13   simply that these were not filed until yesterday and so we

14   haven't had sufficient notice, they're untimely and should not

15   be admitted for that reason.

16             THE COURT:  Okay.  What's your response, Counsel?

17             MR. HARRIS:  Your Honor, these are rebuttal

18   exhibits.  It's actually quite difficult for me to supplement

19   their Exhibit List.  There's no prejudice as these are

20   documents that the US Trustee actually had, they're even the

21   US Trustee's documents.  They are the transcript from a

22   341 Meeting that the US Trustee conducted, and there are

23   emails with the US Trustee.  So there's no surprise.

24             And the reason why they're rebuttal is because

25   there's --

1    THE COURT:  I don't want -- I don't want anything

2    outside the presence of the witness.  Both of you have in your

3    Witness and Exhibit List that you've reserved the right to put

4    any rebuttal exhibits, or any exhibit.  Both of you have it,

5    so it's fair game.  I'll allow it.

6    If it's purely rebuttal, I'll allow it because both

7    of you -- I'll overrule the objection because both of you

8    reserved the right and -- to represent rebuttal exhibits, and

9    so if it's purely rebuttal, we'll see where it goes, but

10   you're going to have to -- you going to have to prove that

11   it's rebuttal.

12   I mean, I'm just noting 2004 and 2005, both

13   documents, both say any rebuttal -- "Any exhibits necessary

14   for the impeachment and/or rebuttal purposes."  So everybody

15   was on notice that they could come in and both of you reserved

16   the right, and I'll give -- extend the same courtesy to the US

17   Trustee's Office if they have any rebuttal exhibits that they

18   would need to present in light of the evidence presented, so

19   admitted.

20   (Exhibit Nos. 12 and 13 through 16 received into

21   evidence.)

22   MS. THOMAS:  Well, so the secondary concern that we

23   have, Your Honor, is that the emails, there's no one here to

24   testify as to those emails, they're hearsay, and I don't see

25   why they're relevant.

1          THE COURT:  No, I'm not (indiscernible) for now --

2          MS. THOMAS:  Okay.

3          THE COURT:  -- I'm just saying on the timeliness

4     we'll --

5          MS. THOMAS:  Okay.

6          THE COURT:  -- have to play this out and see where

7     it goes.

8          MS. THOMAS:  Sure.  Okay.

9          THE COURT:  Yeah.  No, no, I think that's fair.

10         MR. HARRIS:  The emails, just to be clear, are --

11         THE COURT:  No, no, you can try to get them in, if

12    you can.

13         MR. HARRIS:  Can I just -- they're -- I don't know

14    if the objection is authenticity.  If so, Mr. Duran was on all

15    the emails and he is here and we call him to authenticate

16    them.  I can't believe there is an objection to the

17    authenticity.

18         THE COURT:  If there is or not, that's what I'm

19    saying, we'll take it up as we go and --

20         MR. HARRIS:  Okay.  And as to hearsay, they are

21    party admissions to the extent they're statements by the US

22    Trustee, and they are --

23         THE COURT:  You all are playing this out before

24    any --

25         MR. HARRIS:  Okay.  And I think we're trying to

1    decide the admissibility of the exhibits --

2            THE COURT:  No, no, I -- we were -- no, I was just

3    taking up whether you could even ask questions about some of

4    these documents in the first instance.

5            MR. HARRIS:  All right.

6            THE COURT:  No, no, no, no worries.

7            Ms. Reckler.

8            MS. RECKLER:  Thank you, Your Honor.

9                         CROSS-EXAMINATION

10   BY MS. RECKLER:

11   Q    Mr. Meghji, I will try to be very brief and not

12   repetitive.

13           THE COURT:  Just so you know, from a housekeeping

14   standpoint, I've given Mr. Gordon the presenter.

15           MS. RECKLER:  Thank you.

16           THE COURT:  Okay.  Just in case.  And I will do the

17   same with the US Trustee, just in case.  I'll do a better job

18   of that, I apologize.

19           Go ahead.

20   BY MS. RECKLER:

21   Q    Mr. Meghji, when did you first become employed by the

22   Debtors?

23   A    February 9 of '23.

24   Q    And what services does your firm provide to the Debtors?

25   A    We're the Chief Restructuring Officer of the Debtors and

1    we also are providing financial advisory services and

2    (indiscernible).

3    Q    And does this include treasury and cash management

4    oversight of the Debtors?

5    A    Yes.

6    Q    And I think we've heard the name Mary Korycki from your

7    office earlier.  Does Ms. Korycki oversee the treasury

8    function?

9    A    She does, she's the senior director at our firm and she

10   oversees all of the Debtors' treasury and cash management

11   functions.

12   Q    Okay.  Thank you.

13        Just to be abundantly clear can you name the two Debtors

14   in these cases here?

15   A    Sorrento Therapeutics and Scintilla Pharmaceuticals.

16   Q    And they both filed for bankruptcy on February 13, 2023.

17   Is that correct?

18   A    Yes.

19   Q    And are you aware now that Scintilla has a mailbox in The

20   Woodlands, Texas?

21   A    I am.

22   Q    And are you aware that Scintilla opened the PO Box the

23   day before it filed for bankruptcy?

24   A    Yes.

25              MS. RECKLER:  And can we turn to, I believe it's

1  Debtors' Exhibit 3, which is the Petition.

2  BY MS. RECKLER:

3  Q    In Question 4 is the PO Box listed on the face of the

4  Scintilla Petition?

5  A    Yes.

6  Q    And was this PO Box opened at a UPS Store?

7  A    Yes.

8       MS. RECKLER:  Can we pull up Debtors' Exhibit 17?

9  BY MS. RECKLER:

10  Q    Have you seen this document before?

11  A    Yes.

12  Q    Can you tell the Court what this document is?

13  A    This is a printout of the frequently asked questions from

14  the UPS website.

15  Q    And have you personally been on the UPS website?

16  A    Yes.

17  Q    And is this a copy of the UPS website representative and

18  an accurate copy of what you saw on the UPS website?

19  A    Yes.

20       MS. RECKLER:  Your Honor, I'd like to move this

21  document into evidence.

22       THE COURT:  Any objection?

23       MS. THOMAS:  Yes, Your Honor, we -- you know, I

24  appreciate that Mr. Meghji is testifying that he looked it up,

25  but we have no representative to question its hearsay, I don't

1     know if he's the one who actually pulled this document for

2     purposes of attaching it to the exhibit.  I don't know what he

3     testify to about this document that could be of any relevance.

4              THE COURT:  Okay.  I'll try and give you an

5     opportunity to see if you can more foundation in, but I'm not

6     letting it in.

7     BY MS. RECKLER:

8     Q    Mr. Meghji, does this document speak to information

9     provided to customers as to how to open up a mailbox and what

10    you can do with the mailing address of that mailbox?

11             MS. THOMAS:  Objection, it calls for hearsay.

12             THE WITNESS:  I believe so, yes.

13             THE COURT:  Hold on a second, there's an objection,

14    it calls for hearsay.  What's your response?

15             MS. RECKLER:  Your Honor, it doesn't go to the truth

16    of the matter, it goes to what UPS is advising its customers.

17             THE COURT:  How would he know?

18             MS. THOMAS:  Yeah, I mean what they're advising is

19    hearsay.

20             THE COURT:  Yeah, sustained.

21             MS. RECKLER:  Your Honor, it's the effect on the

22    recipient is --

23             THE COURT:  Well, the question is was he a

24    recipient, that's where I'm going.  In other words that he

25    received it.

1          MS. RECKLER:  Well, as a reader of the website we

2     believe that would make him a recipient of the information

3     being provided by UPS.

4          THE COURT:  If that's what you want to use it for,

5     I'll take it for (indiscernible), but I'm not sure how much it

6     weight it goes, excuse me, but I'll allow it for that purpose.

7          MS. THOMAS:  Just for the Record, Your Honor,

8     Mr. Meghji has already testified -- well, we haven't heard any

9     testimony of when he actually looked at this website.  So

10     would it be relevant if he read about it today?  Probably not.

11     Nobody has taken more relevancy credit since February of 2023.

12          THE COURT:  It's a fair question.  Why don't you ask

13     the question?

14     BY MS. RECKLER:

15     Q    Mr. Meghji, did you read the UPS website in the last few

16     days prior to this hearing?

17     A    Yes.

18     Q    And is it fair to say you did not do that in February of

19     2023?

20     A    Correct.

21          MS. RECKLER:  Your Honor, the question that we're

22     really trying to elicit from Mr. Meghji is actually quite

23     simple, and it is, is it your understanding, based on the UPS

24     website, that you do not need to list the PO Box in the

25     address to receive mail at this mailbox?

1          MS. THOMAS:  And I would object, Your Honor, for --

2          THE COURT:  Sustained.

3          MS. RECKLER:  Can we turn back to Exhibit 3, please?

4          Can we scroll down to Question 4?

5    BY MS. RECKLER:

6    Q    Mr. Meghji, do you see where it says, PO Box 513?

7    A    Yes.

8    Q    And in the line above it does it read, 7 Switchbud Place,

9    Suite 192-513?

10   A    Correct.

11   Q    Do you understand the 513 in the second -- in the first

12   line to be the same 513 in the second line?

13   A    Yes, I see that.

14   Q    Is it your understanding that the Debtors could receive

15   mail at this mailbox by simply listing 7 Switchbud Place,

16   Suite 192-513 while omitting PO Box 513?

17   A    Yes.

18   Q    Can you do anything in a PO Box other than receive mail?

19   A    I don't believe so.

20   Q    Can you have meetings inside a PO Box?

21   A    Not to my knowledge.

22         MS. RECKLER:  I think we've belabored this enough, I

23   will move on.

24   BY MS. RECKLER:

25   Q    Also in Exhibit 3 what is listed as the Debtors',

1    Scintilla'S mailing address?

2    A   4955 Directors Place, San Diego, California.

3    Q   So does this disclose that the PO Box was not used as the

4    mailing address?

5    A   Correct.

6    Q   So by listing this address as a PO Box and listing a

7    different mailing address what did this disclose to readers?

8           MS. THOMAS:  Objection, calls for speculation, he

9    doesn't know what it (indiscernible).

10          THE COURT:  He can certainly testify as the CRO as

11    to what his understanding is as to what the Petition was

12    intended to communicate.  I'll take it for that reason, but

13    not for what may have been in the mind of a specific reader,

14    or what he understood these two addresses to mean and the

15    difference.

16          THE WITNESS:  Yeah, in my mind this is that the

17    legal principal place of business was the Switchbud Place

18    PO Box and the actual mailing address was in San Diego,

19    California.

20          MS. RECKLER:  Thank you, Mr. Meghji.

21    BY MS. RECKLER:

22    Q   Turning now to the bank accounts, I think you testified

23    that you're aware that Scintilla had a bank account at

24    Signature Bank.  Correct?

25    A   Correct.

1    Q    And you're aware that that bank account was opened just a

2    few days before the bankruptcy filing.   Correct?

3    A    Correct.

4    Q    I think you testified earlier that in early March of 2023

5    Signature Bank failed.   Correct?

6    A    Yes.

7    Q    Why was this significant to these specific Debtors?

8    A    The Signature Bank failure?

9    Q    Correct.

10   A    Because we had 20 million approximately, a little over

11   $20 million in cash at Signature Bank --

12   Q    And that was the --

13   A    -- which was the proceeds of the initial DIP funding,

14   which was about 27-1/2 million that we had drawn and deposited

15   into the Signature Bank account.

16   Q    So it's safe to say that all of the Debtors' money in

17   early March of 2023 was at Signature Bank?

18   A    Correct.  Well, I mean, there were a couple of other

19   smaller bank accounts at Bank of America, but most, the vast

20   majority of the Debtors' cash was at Signature Bank.

21   Q    Thank you, Mr. Meghji.

22        And as part of the failure of Signature Bank in early

23   March of 2023 were there extensive communications with the

24   United States Trustee about the Signature account and finding

25   a replacement bank?

1    A    Yes.

2    Q    And did your office provide the United States Trustee

3    documents about the Signature Bank account including bank

4    statements?

5    A    Yes, I believe so.

6    Q    And did those documents show an opening balance of $0 and

7    a closing balance of $60,000?

8    A    Yes, between the period February 10th and 12th.

9    Q    And did those documents show from where Scintilla

10   received the $60,000?

11   A    Yes, I believe the documents showed that the money came

12   in from Sorrento Therapeutics.

13        MS. RECKLER:  Can we pull up Exhibit 13?

14   BY MS. RECKLER:

15   Q    Mr. Meghji, do you recognize this document?

16   A    Yes.

17   Q    Can you describe what this document is?

18   A    This is an email from -- email record of information

19   forwarded to the US Trustee's office, to Mr. Snow (phonetic)

20   and a copy to Mr. Duran on March 12 --

21   Q    And --

22   A     -- which shows the account -- or it shows the account

23   information and balance for each of the Debtors' bank

24   accounts.

25   Q    Okay.  Just to be clear, when you say March 12, that's

1    March 12, 2023?

2    A    Correct.

3    Q    Okay.

4             MS. RECKLER:  And can we scroll down further,

5    please?

6    BY MS. RECKLER:

7    Q    Is one of the attachments a Scintilla bank account

8    statement from Signature Bank?

9             MS. THOMAS:  Your Honor, I think I've already

10   objected to admission of the exhibit and asking questions in

11   regards to them.

12            THE COURT:  Are you asking about this document here,

13   Ms. Reckler?

14            MS. RECKLER:  Yes.

15            THE COURT:  Okay.  I think that document has already

16   been --

17            MS. RECKLER:  Correct.

18            THE COURT:  -- admitted, that page, or at least

19   that page, I don't know if you want to pull up the same doc,

20   just so we can avoid --

21            MS. THOMAS:  No, I think that the concern was the

22   emails.

23            THE COURT:  The emails attachment, no, no, but

24   that's where I'm going, I'm just kind of being really careful.

25            MS. THOMAS:  Yes.

1            THE COURT:  If what you're asking questions are

2    about that page --

3            MS. THOMAS:  That's fine.

4            THE COURT:  -- I've got no issues.  But if you want

5    more than that, then I agree, counsel has the opportunity to

6    object.

7            MS. THOMAS:  If it's just that page, that's fine,

8    the emails.

9            MS. RECKLER:  Your Honor, I'd like to move the

10   emails establishing the time line of when that document was

11   provided into evidence.  There are a number of people on these

12   emails that are in the courtroom today that can authenticate

13   them.

14           THE COURT:  Counsel?

15           MS. THOMAS:  My understanding is that we're using

16   these exhibits solely for rebuttal purposes, and so I don't

17   think I understand what the -- because she doesn't dispute

18   that we were regularly given documents by Debtors in regards

19   to their bank accounts.  I'm not sure what fact they're

20   rebutting.

21           THE COURT:  I think it's -- well, go ahead, handle

22   it.  Well, Ms. Reckler, why don't you answer, you're here.

23           MS. RECKLER:  Your Honor, the United States Trustee

24   made very clear in their opening that they weren't aware of

25   when the Signature Bank was opened, and I think this document

1        and the emails detail exactly what was transmitted to the

2        United States Trustee and when.

3                MS. THOMAS:  I think our argument is different.  I

4        think our argument is simply that we --

5                THE COURT:  I mean we can do this one of two ways, I

6        mean --

7                MS. RECKLER:  Yeah.

8                THE COURT:  -- Mr. Duran is there, you can put him

9        on the stand if you want and you can put him up and I'll allow

10       it, or you can authenticate documents.

11               Now it's really -- it's either a party admission --

12       I think you have -- I think that there are a lot of questions

13       that have been asked about when that document -- you did ask

14       Mr. Meghji about when the document -- you know, that the

15       Signature Bank account was opened and whether he had done

16       any -- what his scope of knowledge was.  I think -- you know

17       what I mean?

18               MS. RECKLER:  Yeah, and Mr. Meghji --

19               THE COURT:  Okay.

20               MS. RECKLER:  -- has no personal knowledge, he's --

21               THE COURT:  Okay.  All right.

22               MS. RECKLER:  -- he's not on the emails.

23               THE COURT:  I'm just trying to avoid Mr. Duran

24       getting on the stand and answering questions, but if that's

25       what you want to do.  I've got no issues with that

1    (indiscernible).  I'm just trying to -- if that's -- if that's

2    where we're going, I'm serious, I've got no issues with that

3    and I was just -- the US Trustee has -- did ask questions

4    about -- and Mr. Meghji may not be the right witness, I agree

5    with that.  But the right witness is right there, and maybe we

6    can just get him on at some point.

7            So I'll allow you to -- I'll sustain your objection.

8    We can just -- you can ask if he has personal knowledge of the

9    documents here, but we can -- we can certainly get him on if

10   we have to.

11           MS. RECKLER:  But --

12           THE COURT:  Just to authenticate the document if

13   that's what we're doing.  There is an opportunity to rebut,

14   the Trustee did ask a question and it has raised questions

15   about when -- what the Trustee knew or didn't know.  Right?

16   And you're saying no one's objecting whether we have specific

17   knowledge about what was going on, or whether they get general

18   information.  Right?  Whether the Trustee gets general

19   information.

20           But the question that is now is, is, you know, what

21   specific information and when did -- what the Trustee did or

22   didn't know.  In other words, all I'm saying is I'll sustain

23   your objection, and that just means Mr. Duran will have to get

24   on the stand and we'll see where it goes.  That's all I mean.

25           MS. THOMAS:  Well, I want to reserve the right -- so

1    my concern is that Mr. Meghji's not on these emails and he's

2    testifying about emails for which he has no personal

3    knowledge.

4            THE COURT:  Yes, but --

5            MS. THOMAS:  So that's that piece.

6            THE COURT:  No, that's what I'm saying --

7            MS. THOMAS:  If they want to call Mr. -- okay.

8            THE COURT:  No, no, no, I'm saying --

9            MS. THOMAS:  If they want to call Mr. Duran, he was

10   never listed on the Witness and Exhibit List and we never --

11           THE COURT:  Both of you -- both of you listed

12   impeachment -- both of you listed witnesses for impeachment

13   purpose.  Right?  Or supplemental for rebuttal purposes.  Both

14   of you listed, everybody knows how it works.

15           MS. THOMAS:  Certainly, but as a federal employee,

16   as well, there are certain requirements that you have to

17   follow in order to call a federal employee as a witness.

18           THE COURT:  And I'm going to let him -- you're not

19   going to be able to use it as a short (indiscernible).  Right?

20   You're not going to be able to use that you have -- both of

21   you have the right to do so.

22           You can raise your objection, both of you can raise

23   your objections, I'm not saying that, but the United States

24   isn't going to be given any more deference than any other

25   witness who's here and potentially listed.

1          You all are going to have to figure out what you

2   want to do, but -- and maybe Mr. Duran says he can't answer

3   the question, but he's here.  The door -- the door has been --

4   in other words the United States Trustee, you can stipulate to

5   the fact that you've received emails on these dates.  I've got

6   no issues with that.  But if you want to say that you -- you

7   want to get into evidence that you didn't --

8          MS. THOMAS:  No.

9          THE COURT:  That's what I'm saying, this is --

10          MS. THOMAS:  Maybe you're making much ado about

11   nothing.

12          THE COURT:  No, no, what I'm saying is maybe the

13   parties can just stipulate to certain facts.

14          MS. THOMAS:  You sent and we received this email, I

15   don't have a problem stipulating to that fact.

16          THE COURT:  Okay.

17          MS. THOMAS:  What you were going to ask Mr. Meghji

18   about it, that was my concern because he wasn't a party to

19   these emails.

20          THE COURT:  I think that's fair.

21          MS. THOMAS:  Okay.

22          THE COURT:  So, wait, wait, so we're just

23   stipulating to --

24          MS. THOMAS:  Admission for the fact that these

25   documents --

1          THE COURT:  That those --

2          MS. THOMAS:  -- and this email was sent.

3          THE COURT:  -- the emails were sent on this date

4    and they said these words, and no questions about -- no

5    questions to Mr. Meghji because he's not on these emails.

6          MS. THOMAS:  Exactly, Your Honor.  Thank you.

7          THE COURT:  I think that's -- I think that's fair.

8          MS. RECKLER:  Thank you.

9          Can we pull up Exhibit 9, which I believe is already

10   admitted into evidence.

11   BY MS. RECKLER:

12   Q    Mr. Meghji, do you recognize this?

13         THE COURT:  Ms. Reckler, can I ask you, before he

14   answers that question, I know that there are two -- well, I

15   think there's Exhibit 9 in 2004 and 2005, I just want to know

16   which Exhibit 9 we're talking about.  Your Exhibit 9 or --

17         MS. RECKLER:  My Exhibit 9, yes.

18         THE COURT:  Okay.  So that would be 2005-9.  Okay.

19   I apologize.

20   BY MS. RECKLER:

21   Q    Mr. Meghji, do you recognize this document?

22   A    Yes.

23   Q    And what is it?

24   A    The Amended Schedules of Assets and Liabilities for

25   Scintilla Pharmaceuticals.

1    Q    And did your help to prepare this?

2    A    Yes.

3    Q    Can you tell us on what day it was filed?  And if you

4    need us to flip to the end of the document, we can do that.

5    A    Yes, that would be very helpful.

6         (Pause in the proceedings.)

7              THE COURT:  And can you make this a little bit

8    larger too just for -- I'm just -- I'm not telling you where

9    to go, I'm just saying whenever you -- whenever you get ready

10   to ask a question just blow it up.

11             THE WITNESS:  May 29, 2023.

12             MS. RECKLER:  Thank you.

13             Can we turn now to Page 17?

14             THE COURT:  Are you using the -- where you kind of

15   make it a full page -- ah, thank you.

16   BY MS. RECKLER:

17   Q    Mr. Meghji, do you see any information about a bank

18   account listed here?

19   A    Yes.

20   Q    And what is that?

21   A    The Signature Bank checking account, the last four digits

22   of the account are 7311, and the current value of the Debtors'

23   interest is $60,000.

24             MS. RECKLER:  Can we pull up Exhibit 8, please?

25   BY MS. RECKLER:

1    Q    Mr. Meghji, do you recognize this document?

2    A    Yes, this is the Statement of Financial Affairs for

3    Sorrento Therapeutics.

4    Q    And did your team help to prepare this document?

5    A    Yes.

6    Q    And on what day was it filed?

7    A    If you could scroll down, I believe it was the same date

8    of May 29, 2023, but I want to confirm that.

9         Oh, this was filed on June 16, 2023.

10         MS. RECKLER:  Mr. Gordon, can you turn to page 52,

11    and can you try to make that as big as possible on page 52?

12         (Pause in the proceedings.)

13    BY MS. RECKLER:

14    Q    Does this also show the transfer of $60,000 from Sorrento

15    to Scintilla?

16    A    Yes, the fifth line from the bottom -- sorry, it's

17    moving -- it says, $60,000 in the Scintilla account on

18    February 10, 2023.

19    Q    To your knowledge before that transfer did Scintilla have

20    any cash with which to open a bank account?

21    A    No.

22    Q    And after the Signature Bank collapsed in early March of

23    2023 were there continued discussions with the United States

24    Trustee specifically about moving the Debtors' bank accounts?

25    A    Yes.

1          MS. RECKLER:  Your Honor, I'd like to turn to

2     Exhibits 14, 15, and 16.

3          Your Honor, we offer these exhibits for admission

4     for a limited purpose, and that's to establish that the

5     Debtors sent these emails and they were sent to the United

6     States Trustee on the date included in the email transmission.

7          THE COURT:  Are you talking about 14, 15 and 16?

8          MS. RECKLER:  Yes, Your Honor.

9          THE COURT:  Any objection?

10          MS. THOMAS:  No, Your Honor.

11          THE COURT:  Okay.  14, 15 and 16 are admitted for

12     the purposes of establishing that there were emails sent on

13     days to parties and that they sent what they said.

14          (Exhibit Nos. 14, 15 and 16 received in evidence.)

15     BY MS. RECKLER:

16     Q    And, Mr. Meghji, did you direct your team and your

17     counsel to send these emails to the United States Trustee to

18     provide them with the information they requested regarding the

19     Debtors' bank accounts?

20     A    I did.

21     Q    Mr. Meghji, are you familiar with what an initial Debtor

22     interview is?

23     A    Yes.

24          MS. RECKLER:  Can we pull up Exhibit 13?

25     BY MS. RECKLER:

1    Q    Mr. Meghji, under your supervision was M3 responsible for

2    attending the initial Debtor interview?

3    A    Yes.

4    Q    And did you personally participate?

5    A    I believe so, with Ms. Korycki.

6    Q    And in advance of that meeting did you and your team

7    gather information requested by the United States Trustee?

8    A    We did.

9         MS. RECKLER:  Your Honor, I'd like to offer

10   Exhibit 13, the transmission of the information by the

11   Debtors' advisors to the United States Trustee.

12        THE COURT:  I don't see anything in here that shows

13   that something was transmitted.  If you want to admit it for

14   the purposes of the email was sent, kind of the same

15   stipulation?  No, that was part of the larger --

16        MS. RECKLER:  Yes, Your Honor.

17        THE COURT:  These documents have already been

18   admitted, right?

19        MS. RECKLER:  Correct.

20        THE COURT:  Any objection?

21        MS. THOMAS:  Your Honor, I think (indiscernible)

22   we're just admitting -- I don't think the US Trustee is

23   denying that we received certain bank documents in connection

24   with (indiscernible).  If that's the purpose for it, fine.

25        MS. RECKLER:  That's fine, Your Honor.  I just want

1       to be clear that we want the Record to reflect why these

2       documents were sent, not just that they were sent.

3                    THE COURT:  The date of the email was -- let's see

4       what it says.  Yeah, there.  13, 14, 15 and 16 -- do I have

5       that right? -- are admitted for essentially the same purpose

6       of showing that there were emails to and from and say what

7       they said on the date they were sent.

8                    MS. RECKLER:  Correct, Your Honor.

9                    THE COURT:  Okay.  Thank you.

10           (Exhibit Nos. 13 through 16 received in evidence.)

11      BY MS. RECKLER:

12      Q    Mr. Meghji, to your knowledge did any of the requests

13      from the United States Trustee did those include information

14      about the Debtors' PO Box?

15      A    I believe so.

16      Q    Let me ask the question again, I just want to make sure

17      you heard me.  I'm not speaking about bank accounts, I'm

18      speaking about the PO Box.

19           Did the United States Trustee request information about

20      the Debtors' PO Box prior to the IDI meeting?

21      A    Not that I'm aware of.  Sorry, I misheard the question,

22      your earlier question.

23      Q    And in March of 2023 the United States Trustee conducted

24      an initial Debtor interview in this case.  Correct?

25      A    Yes.

1    Q    And is it your understanding that one of the purposes of

2    that meeting is for the United States Trustee to ask the

3    Debtor questions, including questions about their assets and

4    their business?

5    A    Correct.

6         Sorry, Your Honor, could I just take -- could I get a

7    one-minute break because I just need to let my colleagues know

8    on some other matters that I will not be able to make a

9    meeting.  I had originally pushed the meeting --

10             THE COURT:  How much more do you have?

11             MS. RECKLER:  Ten to 15 minutes.

12             THE WITNESS:  Can I take --

13             THE COURT:  You're on the stand so I'm not going to

14   let you off.  Please continue.

15             THE WITNESS:  Okay.

16        (Pause in the proceedings.)

17             THE COURT:  Let me just ask -- which is fine.  No,

18   no, no, what you're going to do is send the -- kind of go out

19   there, I don't want you talking to anyone, but what you're

20   going to do is kind of stand at your computer and send a

21   message saying, I can't make the meeting or something.  The

22   Trustee --

23             THE WITNESS:  That's all I want to do is --

24             THE COURT:  Okay.

25             MS. THOMAS:  Or, Mr. Meghji, I can have my team send

1  an email to your colleagues letting them know that you're on

2  the stand and unavailable.

3          THE WITNESS:  I need to let -- it's a different

4  group of people.

5          THE COURT:  I'll let you -- are you going to sit

6  there -- right there and send it?

7          THE WITNESS:  Yes.

8          THE COURT:  Go ahead.  You got 60 seconds.  Let's

9  go.

10      (Pause in the proceedings.)

11          THE WITNESS:  Thank you, Your Honor.

12          THE COURT:  Proceed.

13  BY MS. RECKLER:

14  Q    Mr. Meghji, did you participate in the 341 Meetings?

15  A    I did.

16  Q    And there were three sessions.  Correct?

17  A    Yes, in April, May and June.

18  Q    And that the first meeting was called and then adjourned

19  without any questions?

20  A    Correct.

21          MS. RECKLER:  Can we turn to the second session of

22  the 341 Meeting and pull up Exhibit 5?

23          Can we turn to page 5, please?

24  BY MS. RECKLER:

25  Q    Mr. Meghji, did Mr. Duran ask you if Scintilla was a non-

1     operating subsidiary?

2     A     Correct, on Line 20 of this, it is says Mr. Duran asked

3     me that question and I replied yes.

4     Q     And did Mr. Duran also ask where the Debtors'

5     headquarters and books and records were located?

6     A     Correct.

7     Q     And how did you answer?

8     A     On Line 25 I said the headquarters are at 4955 Directors

9     Place in San Diego.

10    Q     All right.

11          MS. RECKLER:  Can we turn to the bottom of Page 12?

12    BY MS. RECKLER:

13    Q     Did Mr. Duran ask about the Debtors' bank accounts?

14    A     He did.

15    Q     And did your colleague, Ms. Korycki, answer that one

16    account was the Scintilla account at Signature Bank?

17    A     Correct, the top of Page 12 at Line 1 she said, "We still

18    have one at Signature Bank which is the Scintilla account that

19    we're looking -- we're in the process of transferring it over

20    to Bank of America."

21          MS. RECKLER:  So let's go to Page 24 now.

22    BY MS. RECKLER:

23    Q     Mr. Meghji, do you know who Mr. Kelly is?

24    A     Yes, he was the lawyer from Quinn Emanuel.

25    Q     And who was his client?

1    A    The Nant parties.

2    Q    And at the time were they the Debtors' largest creditor?

3    A    Correct.

4    Q    And did Mr. Kelly ask where Scintilla's principal place

5    of business was?

6    A    Yes.

7    Q    And did I answer by saying that it had a PO Box and a

8    bank account in Houston?

9    A    You did.

10   Q    And on the next page do you see that Mr. Kelly asked

11   where the Scintilla bank account was located?

12   A    I see that.

13   Q    And how did I respond?

14          THE COURT:  If all we're going to do is go back and

15   forth, if somebody can point me during the break on this.

16          The document says what it says.

17          THE WITNESS:  I --

18          THE COURT:  Now, Mr. Meghji, I can read it, too, so

19   I just want to make sure that you're getting asked

20   questions -- you don't need to answer questions about a back

21   and forth between Mr. Kelly and Ms. Reckler, I can read it.

22          THE WITNESS:  Thank you.

23   BY MS. RECKLER:

24   Q    Mr. Meghji, was Mr. Duran from the United States

25   Trustee's Office present for all of these questions when they

1    were asked?

2    A    Yes, I believe so.

3    Q    And during this meeting is it fair to say that people

4    asked about the PO Box?

5    A    It was obviously discussed at the 341 Meeting.

6    Q    Did anyone ask when the PO Box was opened?

7    A    Not to my recollection.

8    Q    And had that question been asked, how would you have

9    answered?

10    A    I would have checked and -- if I'd known the answer, I

11    would have given it.  If I didn't, I would have checked and

12    got back to them.

13    Q    If the US Trustee had follow-up questions about the

14    timing of the opening of the Post Office Box after the 341

15    Meeting, would the Debtors have answered truthfully and fully?

16    A    Of course.

17        MS. RECKLER:  Let's turn to the third session of the

18    341 Meeting.

19        Can we pull up Exhibit 12?

20    BY MS. RECKLER:

21    Q    Did the US Trustee ask any follow-up questions at this

22    meeting regarding Scintilla's PO Box?

23    A    Not to my knowledge.

24    Q    Did it ask questions about Scintilla's bank account,

25    operations, assets or principal place of business?

MOSHIN MEGHJI - CROSS BY MS. RECKLER

1    A    Again, not to my knowledge.

2    Q    Had the US Trustee done so how would you have answered?

3    A    Like every other question we had, we would have done our

4    best to answer them promptly.

5    Q    Are you aware of any unanswered questions or inquiries

6    from the United States Trustee's Office related to anything in

7    this case?

8    A    I don't believe so.

9    Q    Would you have provided answers if there were unanswered

10   questions or inquiries?

11   A    To the best of our ability.

12   Q    To your knowledge has the United States Trustee ever

13   complained to you or to the Court that the Debtors haven't

14   been forthcoming?

15             MS. THOMAS:  Objection --

16             THE WITNESS:  Again, not to my knowledge --

17             THE COURT:  Hold on second.  Hold on a second.

18             Wait, wait, Mr. Meghji.  What's the objection?

19             MS. THOMAS:  I think just some clarification in the

20   complaint.

21             THE COURT:  Yeah, I agree.  Sustained.

22   BY MS. RECKLER:

23   Q    Had the United States Trustee ever filed anything with

24   the Court requesting information from the Debtors?

25   A    Not to my knowledge.  I think we provided everything they

1   needed directly without having a court filing.

2   Q    Mr. Meghji, where are the professionals for the key

3   constituents in this case located?

4   A    All over, all over the country, New York, Chicago,

5   California, so I think the professionals are located all over

6   the country.

7   Q    In your opinion would it be more convenient for the key

8   constituents to transfer this case to Delaware?

9   A    No, I don't think so.

10  Q    In your opinion would it be more convenient for the key

11  constituents to transfer this case to any other court?

12  A    I don't believe so.

13  Q    Mr. Meghji, was it your prior testimony that this case

14  has been complicated?

15  A    Incredibly.

16  Q    How so?

17  A    Well, given the nature -- to start with, the nature of

18  the assets, which are early stage biopharma programs, you

19  know, a very difficult capital market environment for

20  biopharma companies over the past two to three years after the

21  capital markets collapsed.

22      With this background and the complexity of these assets

23  being very early stage assets made it in some ways very

24  difficult in terms of assets to monetize against and deal

25  with.

1          There was an incredible amount of litigation at the

2     outset of the case from the Nant parties, so that was another

3     complexity.  There were dividend shares that have been

4     dividend -- dividended out to shareholders within a very short

5     period of time prior to filing for bankruptcy, so -- and the

6     sale process itself was protracted and complicated.

7     Q    Mr. Meghji, have there been issues that are unique to

8     this case based on your experience as a restructuring

9     professional?

10    A    Yes, you know, the dividend shares, the dividend of

11    equity shares is something I have not encountered before, and

12    then as I explained, and I will repeat it, the capital market

13    environment combined with the nature of these assets was also

14    pretty unusual.

15    Q    And, Mr. Meghji --

16    A    And -- I'm sorry, one other factor, this company, due to

17    the nature of its operations, had no remedies, so every -- its

18    survival potentially depended on our ability to continue to

19    raise financing.  The company had raised $460 million in the

20    14 months prior to bankruptcy through the equity markets, used

21    up almost all of it.  But raising financing for a company with

22    all those hard assets in Chapter 11 is particularly difficult.

23    Q    Mr. Meghji, you mentioned the Scilex dividend shares.

24    Are you aware that in this case working with the Creditors

25    Committee there was a lock up of those shares pursuant to an

1    order of this Court?

2                MS. THOMAS:  Objection --

3                THE WITNESS:  Yes.

4                MS. THOMAS:   -- I'm not sure it's really relevant

5    where we're going.

6                THE COURT:  Yeah, that's a good point.

7                Ms. Reckler?

8                MS. RECKLER:  Your Honor, there is a pending motion,

9    and I was going to ask Mr. Meghji about it, but it's set to be

10   heard at the end of the month.  It's a further lock up, an

11   extension of the lock up that's already in place.  So that is

12   a matter that is on the docket that will have to be

13   adjudicated here by this Court or some other court.

14               THE COURT:  I think you can discuss it generally,

15   but I don't want you getting into the specifics.  That there's

16   a pending matter set, I think it says what it says.

17               MS. RECKLER:  No, but it's that it's a pending

18   matter related to prior motions adjudicated by this Court.

19               THE COURT:  I think you can ask general questions

20   about that, but nothing more, nothing specifically about the

21   merits or what's going on with it.

22               MS. RECKLER:  No, no, I don't intend to, Your Honor.

23   BY MS. RECKLER:

24   Q    Mr. Meghji, are you aware that the Creditors Committee

25   motion to extend the lock up on the dividend -- the Scilex

1    shares is scheduled for a hearing at the end of this month?

2    A    Yes.

3    Q    Do you anticipate needing further Court involvement with

4    respect to the sale and to the Plan?

5    A    I do.

6    Q    And is that because you would need to come back to Court

7    if an NOL transaction emerges?

8    A    Correct, or if there are any complexities or issues arise

9    anticipating Court approval, which was last Friday, and the

10   closing of the sale.

11   Q    And, Mr. Meghji, are you aware that final fee

12   applications will be filed by the state professionals in this

13   case and the Court will be asked to approve them based on the

14   activities in this case?

15   A    Yes.

16   Q    Is it fair to say that various parties have reserved

17   their right with respect to the interim fee statements filed

18   by certain of the professionals?

19   A    Correct.

20   Q    Mr. Meghji, are you aware that there's a Rule 60(b)

21   motion pending with respect to Jackson Walker before this

22   Court?

23   A    I am.

24           MS. THOMAS:  Your Honor, I have an objection as to

25   the relevance as to Jackson Walker.

MOSHIN MEGHJI - CROSS BY MS. RECKLER

1          THE COURT:  Well, I think it -- overruled.  I think
2     that --
3          THE WITNESS:  And there is no pending 60(b) motion,
4     it's in Judge Rodriguez's Court.
5          MS. RECKLER:  My understanding was that the
6     discovery matters were pending before Judge Rodriguez and that
7     the actual motion remained with this Court.
8          THE COURT:  The document will say what it says.
9          MR. CULBERSON:  That's news to me.
10          MS. RECKLER:  I'm sorry, who was speaking?
11          THE COURT:  That was Mr. Meghji.  I think that said,
12     "That's news to me."  No, that was Mr. --
13          (Several speaking at the same time.)
14          MR. CULBERSON:  So, that was me, sorry, Tim
15     Culberson.  That was Mr. Culberson on the motion.
16          THE COURT:  The order says what it says, and it will
17     say what it says.  And that -- but that's not -- it says what
18     it says.  I signed an order and it says what it says.  I don't
19     think we need to ask Mr. Meghji about that.  I'm well aware
20     what my orders say.
21          MS. RECKLER:  Understood, Your Honor.
22          THE COURT:  No, no, understood.  But just for the
23     purposes of clarity.
24          Mr. Culberson, I'd ask that you please refrain from
25     asking questions while the witness is testifying.

1              Let's continue.

2              THE WITNESS:  And, sorry, Your Honor, I wouldn't

3    speak, that wasn't me.

4              THE COURT:  No, no, no, we were clarifying.

5              THE WITNESS:  Thank you.

6              THE COURT:  You're going to get a fresh new question

7    and you can give an answer.

8    BY MS. RECKLER:

9    Q    Mr. Meghji, I only have a handful of questions.  Are you

10   aware that the Equity Committee filed a 2004 motion seeking

11   discovery from Latham & Watkins and M3?

12   A    Yes.

13   Q    And are you aware that that motion was denied by this

14   Court?

15   A    Correct.

16   Q    And did the Equity Committee appeal that order as to

17   Latham & Watkins?

18   A    Yes.

19   Q    And that appeal is pending before Judge Rosenthal?

20   A    Correct.

21   Q    And did you authorize your counsel to provide a

22   three-week extension to the Equity Committee to file their

23   opening brief?

24   A    I have, I did.

25   Q    And has that brief been filed as of today?

1     A     Not to my knowledge.

2     Q     So it's fair to say that the appeal is in the very early

3     stages.  Correct?

4     A     It makes sense.

5     Q     And is it possible that if the appeal is not dismissed,

6     that it could be remanded back to the Bankruptcy Court?

7     A     That's my understanding.

8          MS. RECKLER:  Thank you, Mr. Meghji.  That's all I

9     have.

10         THE COURT:  Any further questions?

11                      REDIRECT EXAMINATION

12         MS. THOMAS:  If we could please turn to the

13    Voluntary Petition again?  It's Exhibit -- the US Trustee's.

14         (Pause in the proceedings.)

15         THE COURT:  Oh, wait.  I need my --

16         MS. THOMAS:  Thank you, Your Honor.

17         (Pause in the proceedings.)

18         THE COURT:  There you are.

19    BY MS. THOMAS:

20    Q     Mr. Meghji, do you recall just a few moments ago

21    Ms. Reckler was asking you questions in regards to Question

22    Number 4 on the Voluntary Petition for Scintilla?  Do you

23    recall this question --

24    A     Yes.

25    Q     Thank you.

1          MS. THOMAS:  If you can scroll down so he can see

2     that question?

3     BY MS. THOMAS:

4     Q    And she asked you if you knew that if you sent -- and all

5     you did was address it to 7 Switchbud Place at Suite 192-513

6     that you wouldn't have to list the Post Office Box to get mail

7     there.  Do you recall that question?

8     A    Yes.

9     Q    Okay.  And you answered, "Yes."  Right?

10    A    Correct.

11    Q    Okay.  What was the basis of your knowledge of that fact?

12    A    Just having read the frequently asked questions from the

13    UPS website which I looked at over the weekend.

14    Q    Okay.  So you didn't know that until you looked at it

15    this weekend which was, what, March -- I've lost track of

16    days -- March 10th, 2024?

17    A    Yes.  I had not looked at that website before this past

18    weekend.

19    Q    So is it fair to say that when you testified at the

20    341 Meeting you didn't know that if you sent email -- or,

21    excuse me, you didn't know that if you sent mail with just

22    simply the suite number that the mail would get there?

23    A    I think that's right, because I looked at all of it over

24    this past weekend.

25    Q    Okay.  Again, here do you see on the right-hand side

1    where it says, "Location of principal assets, if different

2    from the principal place of business."  Do you see that?

3    A    I do.

4    Q    And it's blank.  Right?

5    A    Clearly.

6    Q    Thank you.

7         MS. THOMAS:  If you can go to the 341 testimony,

8    please?

9    BY MS. THOMAS:

10   Q    So Ms. Reckler was asking you some questions about the

11   location of the books and records.  Do you recall --

12        MS. THOMAS:  If we can go to Page 24, please.  If

13   you can see that?

14   BY MS. THOMAS:

15   Q    Do you see at Line 21 where Mr. Kelly asked you where

16   Scintilla's books and records were located?

17   A    Yes.

18   Q    And what was your answer?

19   A    I said, "Let us confirm it and come back to you on that."

20   Q    Why did you answer that way instead of telling them where

21   the books and records were maintained?

22   A    In just going by recollection, I think the fact that

23   these two addresses had come up and I sort of learned about

24   that during the course of the 341 Meeting, I was probably a

25   little bit unsure of exactly where the books and records were.

MOSHIN MEGHJI - REDIRECT BY MS. THOMAS

I think earlier, I guess if you go back up, I think I answered the question of where the company's headquarters are, or to say that it was at 4955 Directors Place.

Q    Sure.  And --

A    So this was -- let me -- can I finish?  So it was simply -- there was probably a little bit of pictures in my mind and I thought rather than addressing his question, I would confirm exactly.

Q    Did you ever actually get back to Mr. Kelly?

A    I believe that my counsel did.  I did not call him personally.

Q    So you have no personal knowledge that Mr. Kelly was ever given that information.  Correct?

A    Well, I had asked our counsel to circle back to him on any open questions.

Q    But you don't know if that actually happened.  Right?

A    I don't.

Q    Thank you.

     Mr. Meghji, when did you know that the Post Office Box at 7 Switchbud Place was opened the day before the filing?

A    I don't -- I don't know exactly when I knew that.

Q    Did you know it --

A    I cannot recall that today.

Q    So the US Trustee filed this motion February of 2024, did you know it in February 2024 before our motion was filed?

MOSHIN MEGHJI - REDIRECT BY MS. THOMAS                    143

1     A     Yes.

2     Q     Did you know that fact in December of 2023?

3     A     Sorry, let me just answer it this way, which is I

4     certainly knew about it -- I think I've already testified to

5     this -- at or -- at the 341 -- during the 341 Meeting and

6     afterwards.  But I might have known about it before then, I

7     just don't recall knowing about it before the -- let me

8     finish -- before the 341 Meeting.

9     Q     Well, I want to be really clear about what I'm asking

10    you, Mr. Meghji.  I'm not asking when you knew about

11    7 Switchbud Place being a UPS Store.  I want to know when did

12    you know what -- so we've heard that the Post Office Box, I

13    don't this is a disputed fact, the Post Office Box was opened

14    the day before the case was filed by counsel.

15          When did you know that that event occurred?

16    A     I just don't -- I don't recall.  I think early in the

17    case I had asked the question of counsel of where are we

18    filing.  And I was told the Southern District of Texas

19    because -- I don't recall sort of engaging in a long

20    discussion of that.  You know, my focus has been around

21    understanding the operations of the company, hoping, you know,

22    to sort of getting financing, and so all of this was

23    substantive issues in the case.

24          So it is possible that somebody had mentioned it to me, I

25    just couldn't -- I can't recall that.

MOSHIN MEGHJI - REDIRECT BY MS. THOMAS

1   Q   So as you sit here today you don't know when you learned

2   the 7 Switchbud Place was -- I'm sorry, scratch that.

3       As you sit here today you don't know when you learned

4   that the PO Box was opened the day before filing.  Correct?

5       MS. RECKLER:  Your Honor, objection, asked and

6   answered.

7       THE COURT:  He can answer.  Overruled.

8       THE WITNESS:  Yeah, sitting here today I can't

9   recall what the exact date of when it was.

10      (Pause in the proceedings.)

11      MS. THOMAS:  Mr. Meghji, you -- this will be my last

12  question.

13  BY MS. THOMAS:

14  Q   You testified that transfer to a different District would

15  be inconvenient for the parties.  But I don't think I have a

16  good understanding why.

17      Can you tell me why it would be inconvenient to have your

18  motions and matters heard before another District Court?

19  A   I don't believe I said anything about inconvenience.  I

20  said that this Court and the Southern District of Texas is

21  fully up-to-speed with all of these issues, and my concern

22  simply is to ensure that the sale of -- that was approved on

23  Friday, is closed on a timely basis.  And to the extent that

24  any changes to that or to the Plan or the -- you know, coming

25  to fruition of an allowable transaction would require guidance

1       or approval from the Court, it would make it potentially risky

2       and inefficient for another Court to timely get up-to-speed as

3       compared to this Court.

4                   MS. THOMAS:  I think that's all my questions.  Thank

5       you.

6                   THE COURT:  Anything further?

7               (No audible response.)

8                   THE COURT:  Okay.  Mr. Meghji, thank you very much

9       for your time.

10                  THE WITNESS:  Thank you.

11              (Witness steps down.)

12                  THE COURT:  Why don't we do a little housekeeping?

13                  I have a hearing at 12:30 and a hearing at 1:00.

14      I'm going to start the 12:30 at 12:45 and I'm going to start

15      the 1:00 hopefully right around 1:00.  I don't know on the

16      12:45.

17                  Why don't we all come back here and continue this,

18      and the earliest I can do is 2:00 o'clock.  I'm going to push

19      a 3:00 o'clock out.

20                  Mr. Harris?

21                  MR. HARRIS:  Can we just close the evidentiary

22      record?  The only thing we have remaining on the Debtors' side

23      is Exhibit 12 which is the transcript --

24                  THE COURT:  Well, maybe that's a better question.

25      In terms of -- I don't want to prejudice -- I guess what I'm

1      saying is we're going to have to come back at 2:00 o'clock to

2      discuss and I want to give everyone an opportunity to grab

3      lunch and to figure out -- what's left in terms of your case-

4      in-chief, in terms of witnesses?

5               MS. THOMAS:  Absolutely.  So as I mentioned at the

6      beginning the parties have stipulated to use Mr. Drew

7      Lockard's testimony --

8               MR. MEGHJI:  Your Honor --

9               THE COURT:  Hold on a second.

10              MR. MEGHJI:   -- knowledge, not only if looking

11     at -- well, it details the fact that we're looking at the

12     pharmacy businesses are buying from a truck distributor --

13              THE COURT:  Mr. Meghji, I can hear you.

14              MR. MEGHJI:  And so -- (indiscernible).

15          (Conference unmuted / conference muted.)

16              THE COURT:  Now I can't hear anyone and everybody --

17     can you talk -- I don't know if it was Mr. Meghji or

18     Mr. Culberson, if there's someone else.  But --

19              MR. THOMAS:  I don't.

20              THE COURT:   -- I apologize.  Yeah, I don't.  Go

21     ahead.

22              MS. THOMAS:  So the last two witnesses that we

23     intended to use their testimony today are Dr. Ji and

24     Mr. Lockard of Stretto.  Both of them are unavailable today,

25     and so we were going to read portions of the deposition

1   transcripts into the Record, and I think it's really important

2   that the Court hear their testimony because there's important

3   parts that go to our case, so we have that piece left to do.

4          THE COURT:  Can you tell -- I'm going to read it, I

5   don't want -- and it doesn't need to be read to the Court, but

6   you just have to point me to what it is that you want me to

7   read that the parties have stipulated to and I can -- I can do

8   that, and I won't rule until I read it.  Which exhibit?

9          MS. THOMAS:  Well, so Mr. -- Dr. Ji's testimony is

10  quite short, it's only 42 pages.

11         THE COURT:  Okay.

12         MS. THOMAS:  And I intended to use almost the

13  entire -- or portions on every single page frankly so --

14         THE COURT:  Okay.

15         MS. THOMAS:   -- I mean if you read the whole

16  transcript, that would get you what was necessary.

17  Mr. Lockard's, I certainly have -- it's only 36 pages,

18  37 pages I think, and I have just some very shorter portions

19  marked for that transcript.

20         THE COURT:  Well, then why don't you stipulate to

21  what I'm supposed to read.

22         MR. HARRIS:  Your Honor, we're fine having them

23  admitted in bulk.  They're quite short --

24         THE COURT:  Okay.  Well, why don't I just -- what

25  are the exhibit numbers for those transcripts?

1          MS. THOMAS:  They are --

2          THE COURT:  Hold on --

3          MS. THOMAS:   -- 25 and 27.

4          THE COURT:  Oh, okay, that's 25 and 27.

5          MS. THOMAS:  25 and 27.

6          THE COURT:  Oh, I'm sorry.  Yes, yes, yes.  Okay.

7    25 -- so we'll admit 25 and 27 in full, and I will read them

8    both.

9          (Exhibit Nos. 25 and 27 received in evidence.)

10          MS. THOMAS:  Okay.

11          THE COURT:  Okay.

12          MS. THOMAS:  Okay.

13          THE COURT:  And then what other witnesses do you

14    have?

15          MS. THOMAS:  That is it for the presentation of

16    evidence, it would just be closing arguments and --

17          THE COURT:  Okay.  So I will then, in terms of

18    Movants here in terms of presentation of evidence I will

19    close -- not close the Record, but I will -- your side will --

20    the US Trustee going to rest?

21          MS. RECKLER:  Yes.

22          THE COURT:  Okay.  Why don't we just take --

23          Go ahead.

24          MR. HARRIS:  Judge, I can close also, I just wanted

25    to move in one more document, which was (indiscernible).

1          THE COURT:  Are you presenting any evidence?

2          MR. HARRIS:  Just the --

3          THE COURT:  Just in terms of witnesses.

4          MR. HARRIS:  No more witnesses, Your Honor, and only

5     one more exhibit that has not already been admitted.

6          THE COURT:  What exhibit is that?

7          MR. HARRIS:  Exhibit 12, which is the transcript of

8     the June 341 Meeting (indiscernible).

9          THE COURT:  Oh.  Any objection to the admission of

10    12?

11         MS. THOMAS:  No, our original objection had been

12    that it was untimely, but I appreciate the Court's position

13    and it's our 341 Meeting, so I don't have an objection.

14         THE COURT:  So 2005-12 is admitted.

15       (Exhibit No. 12 received in evidence.)

16         MR. HARRIS:  I believe 1 through 16 --

17         THE COURT:  No, I'm just adding that to the list

18    of --

19         MR. HARRIS:  Yes.

20         THE COURT:  -- for running.

21         MR. HARRIS:  Correct.

22         THE COURT:  Do you have any additional?

23         MR. HARRIS:  No, we will not be moving in otherwise

24    17 or 18 and we have no more witnesses.  That is our

25    evidentiary --

1              THE COURT:  So why don't we do this, why don't we

2      come back at 2:30 p.m.?  I will finish with my 12:45, 1:00

3      o'clock.  Once the 1:00 o'clock is done I'm going to go back

4      and I'm going to read these transcripts carefully, and that

5      will give me 30 minutes before closing arguments, I should

6      read the transcripts.

7              I think that's the way I should do it.  Okay?

8              MS. THOMAS:  Thank you, Your Honor.

9              THE COURT:  All right, folks.  Thank you.  So will

10     close the evidentiary record in other words, and then we will

11     proceed, I'll come back and read 25 and 27, and I will read

12     the 341 transcript, the recent one that was just admitted, and

13     then we will come back and we'll take closing arguments.

14             For the 12:30, let's do 12:50, and I got it, the

15     1:00 o'clock is going to get pushed.  We're going to push --

16     I'm going to ask Ms. Saldaña to reach out to the folks who are

17     going to come in for the 3:00 p.m. and I'm going to ask them

18     to come back at 3:45 p.m.  I'm going to give as much

19     opportunity to -- for closing arguments.  Well, tell them

20     4:00, tell them to come back at 4:00 o'clock.  I think it's

21     fair.  Thank you.

22             MS. THOMAS:  Thank you, Your Honor.

23          (Recess taken from 12:40 p.m. to 2:30 p.m.)

24             THE COURT:  Okay, good afternoon, everyone.  This is

25     Judge Lopez.  Today is March 11th.  I'm calling continuation

1    of the Sorrento case.  It is now 2:30 p.m.  I want to thank

2    the parties for their patience and the accommodations as I

3    worked with a couple of other matters.

4            Evidentiary record has closed.  And we will proceed

5    to argument.  First, if there is anyone who will be making

6    argument, I will allow it over the line, if you have filed a

7    pleading.  I ask that you please hit five star before we get

8    started.

9            I ask that you please monitor yourself as I unmute

10   the line.  I'm just going in order in which I see them.

11   There's a 213 number.

12           MR. SHINDERMAN:  Your Honor, this is Mark Shinderman

13   for the Debtors.

14           THE COURT:  Okay.  There's an 832 number.

15           MR. CULBERSON:  Hi, Your Honor, it's Tim Culberson.

16           THE COURT:  Oh, good.  Good afternoon.

17           There's a 607 number.

18           MS. LOVRIC:  Good afternoon, Your Honor, Margaret

19   Lovric, Glenn Agre Bergman & Fuentes, on behalf of the SEC.

20           THE COURT:  Okay.  Good afternoon.

21           I've unmuted your line, just please go ahead and

22   just monitor yourselves.  Please place your phones on mute and

23   we will proceed with closing arguments.

24           I will let the U.S. Trustee go first.  And then I'll

25   turn to any comments from Mr. Culberson.  I will then turn to

1      Debtors' counsel, then I'll turn to the Committee and then if

2      the Equity Committee wishes to speak, I'll let you go there,

3      in that order.

4              So we'll go the U.S. Trustee, Mr. Culberson,

5      Debtors, Unsecured Creditors Committee and then the Equity

6      Committee, if you have any statements to make.  We'll go in

7      that order and then we'll see where we are.

8              Good afternoon, counsel.

9              MS. THOMAS:  Good afternoon, Your Honor.  Aubrey

10     Thomas, again, on behalf of the United States Trustee.  Thank

11     you for the accommodation to continue this matter to the

12     afternoon.

13                      CLOSING ARGUMENTS

14             BY MS. THOMAS:  Let us start with the relevant

15     statute.  Section 1408 provides four ways a Debtor can

16     establish venue.  The first three require you to determine

17     where was the Debtors' domicile, principal place of business

18     or the location of principal assets during the greater part of

19     the 180-day period prior to the filing of the case.

20             The fourth method of the statute venue is under

21     subsection (2) of the statute, "If an affiliate has already

22     filed in that District, they then have venue to file a relief

23     affiliate case."

24             So importantly, we haven't spent much time talking

25     about Sorrento today.  But Sorrento's Voluntary Petition,

which is at the U.S. Trustee's Exhibit 16, claims venue under

14, week two, relying on filing of Scintilla's Petition as the

basis for venue.

So as a practical matter, Sorrento can only claim

venue in the Southern District of Texas.  Scintilla's venue

was properly established.

So turning to the facts regarding Scintilla.

There's no dispute that Scintilla's domicile was and continues

to be Delaware.  The second option, the principal place of

business, is the focus of our evidentiary dispute today.

The evidence shows that Sorrento and it's

subsidiaries have always been headquartered in San Diego,

California.

Dr. Ji testified that he formed Scintilla many years

ago, but it is has been non-operational for years.  From his

testimony, we know that Scintilla has had no operations and no

assets for 2022 and 2023 until it went ahead and opened a Post

Office Box.

The singular act that the Debtor asserts made the

Southern District of Texas the appropriate venue for the

principal place of business was the opening of a Post Office

Box at a UPS store in The Woodlands, Texas.

You heard testimony today that the CRO, Mr. Meghji,

was not involved in the decision to open the Post Office Box.

Nor did he even know that 7 Switchbud Place was a UPS store

1    until at the earliest the May 30th, 2023, 341 Meeting.

2    Similarly, Dr. Ji testified at his deposition that he was not

3    involved in the opening of the Post Office Box.

4           He doesn't know if Scintilla has ever received mail

5    there.  And he admitted in his deposition testimony that he

6    never conducted any business at that Post Office Box.

7           The fact that he admitted that he didn't even know

8    that 7 Switchbud Place was a UPS store until, quote,

9    "recently."  And he could not recall the first time he knew

10   Scintilla had a Post Office Box.

11          Exhibit 7 demonstrates that a lawyer for the Debtor

12   went to the UPS store and opened a PO Box on behalf of

13   Scintilla.  This court should find that having a lawyer open a

14   Post Office Box is not business activity qualifying for a

15   principal place of business.

16          What this Court could potentially consider as

17   business activity was the Debtors' sole officer, Dr. Ji,

18   participating in legal meetings and making decisions to put

19   Scintilla into bankruptcy.

20          That activity occurred between February 9th and

21   February 12th, 2023.  And there's no dispute that during that

22   time period Sorrento and it's subsidiaries were being directed

23   from headquarters in San Diego.

24          Let's turn to the law. The guiding opinion is *Hertz*

25   *versus Friend*, which 559 US Reporter 77.  It's a 2010 case.

The Supreme Court concluded that the principal place of business refers to the place where the corporation's high-level officers direct control and coordinate the corporation's activities.  The nerve center.  Under that definition, Scintilla's principal place of business is unquestionably San Diego.

The Debtor relies on *Harris v. Black Clawson Company*, 56 or excuse me, 961 F2d 547, saying that the case stands for the proposition that when you have an inactive corporation, the last business activity determines the principal place of business.  And that's a misreading of the case.

Theirs is a pre-curse case addressing how to establish diversity jurisdiction when a corporation is no longer operational.  The entity at issue in that case was incorporated in the State of New York.  But when it was operational, primarily did business in Louisiana.

The business ceased operations and years later was sued in Louisiana.  The Plaintiff sought to remand the lawsuit to State Court due to lack of total diversity for purposes of diversity jurisdiction.

In discussing the parties' argument, the Court held that the place of incorporation is not necessarily the principal place of business.  It also rejected the argument that an inactive corporation could not have a principal place

1    of business.

2         The Court opined that the last business activity of

3    a corporation would be relevant to the inquiry of the

4    principal place of business.  And importantly is not case

5    determinative and they -- we quoted this in our reply brief.

6    But at 551 it says, "To adopt a rule the place of an inactive

7    corporation's last business activity is relevant to

8    determining its citizenship or subject matter jurisdiction

9    purposes, especially where that activity took place in its

10   last principal place of business is perfectly consistent with

11   the total activity test."

12        The rule that the place of an inactive corporation

13   last activity is always determinative of its citizenship for

14   diversity purposes, however, has the potential to produce the

15   odd results that an inactive corporation may be held at its

16   principal place of business in a jurisdiction in which it

17   would never have been held to have it's principal place of

18   business while it was active.  Surely Congress cannot have an

19   intended to produce these results either.

20        Thus a wholesale adoption of the last activity test

21   would appear to be at odds with the total activity test.

22   Therefore, we hold that level place of inactive corporations

23   last business activity is relevant to determine it's principal

24   place of business.  It is not dispositive.

25        So, there's a couple key take aways, I think, from

1    this case.  First, is that as a pre-*Hertz* case, the Court

2    should not rely on *Harris* to reach a result that is

3    inconsistent with *Hertz.*  What *Harris* actually looked at was

4    the last business activity before the business went inactive.

5         The company operated in Louisiana and it's last

6    business activity was in Louisiana and then it had a period of

7    inactivity.  So it was that last business activity while

8    activity was occurring.

9         And last, finally, the last business activity is not

10   determinative of the principal place of business.

11        To follow the Debtors' argument would be to find

12   that an inactive, inoperable business does not have a

13   principal place of business.  But that position was rejected

14   again out of Fifth Circuit in *Harris.*

15        So when looking at the greater part of the 180 days

16   prior to the Petition, we look at the principal place of

17   business for that entire time period.  There is -- and this is

18   a little cheesy -- there isn't a scintilla of evidence that it

19   was in Texas.

20        Instead, all of the activities of Scintilla were

21   directed from San Diego.

22        So that leaves us with a final venue hook, the

23   location of the principal assets.  As set forth in our brief,

24   there are two ways that the Court can determine the location

25   of the principal assets.

1          The majority viewpoint is that assets like phones

2     and a bank account that can be accessed anywhere are located

3     where the company's headquarters are, principal place of

4     business.

5          The Voluntary Petition appears to be designed to

6     have that assumption baked into the forum.  The Debtor can

7     market its assets are not the same place as their principal

8     place of business.

9          As we went through this morning, Scintilla wrote

10    anything in that box from question four that their principal

11    assets were located anywhere other than their principal place

12    of business.

13         THE COURT:  I want to make sure that I understand

14    what you're saying.  You're saying that the majority view is

15    that principal assets are where the headquarters are?

16         MS. THOMAS:  For intangible assets like money in a

17    bank account, right.  So, the idea being if you have tractors,

18    obviously where that tractor is parked that's gonna be where

19    that asset is.

20         But for money in a bank account where you can access

21    it from pretty much anywhere in the world, I think the

22    majority viewpoint that we set out in our reply brief is that

23    it would be where the principal place of business is.

24         THE COURT:  Where do you see that in the text?

25    You're relying on case law.  Does the text say that?

1          MS. THOMAS:  The text for (indiscernible)?  It does

2     not address how to locate or how to determine where the

3     location of the principal assets are.

4          And we acknowledge that in our reply brief that this

5     where money in a bank account is, we don't believe that

6     there's a controlling case law.  So that's why --

7          THE COURT:  I'm asking what the text says.

8          MS. THOMAS:  Sure, absolutely.  It says where the

9     principal assets are located.

10          THE COURT:  Got it.  So there are cases that then

11     try to determine what that means?

12          MS. THOMAS:  Absolutely.  In terms of the bank

13     account.  So the first would be tying the funds to wherever

14     the business is headquartered.  Right?

15          The alternative amount --

16          THE COURT:  But that's not where they're located,

17     right?  Those cases say that, but that's not where they're

18     located, right?

19          In other words, these things have to mean different

20     things.  Other than that, we're just combining the two.  So,

21     State of incorporation domicile makes sense.  Principal place

22     of business, you kind of got to figure out what is the

23     principal place of business.

24          But then principal place of assets, that's got to be

25     different than where the headquarters are.  Other than that,

1      you don't -- there's three different -- there's got to be

2      three different ways to do it, if not, then we're just reading

3      one out of the text.

4              MS. THOMAS:  Not necessarily.  I mean, you could be

5      domiciled in Texas, have your principal assets here in Texas,

6      and have your principal place of business.

7              THE COURT:  Right, but the State would be there, but

8      there are three different -- in other words, you wouldn't

9      combine -- you're exactly right.  Someone could be domiciled

10     in Texas with the headquarters in Texas, but the assets would

11     be located in a State or in a Division within that State, as

12     opposed to just having domiciled in the State of Texas, for

13     example, or the State of New York or the State of California

14     or State of Delaware.

15             MS. THOMAS:  And I think that the factual -- I

16     understand where you're coming from.  And I think it arises

17     out of the fact that this Debtor only had the evidence that we

18     have is that it had $60,000 in a bank account.

19             So that's the only asset that we're really dealing

20     with at this point in time is that money.  So I agree that it

21     is a slightly strange result to necessarily say that it's --

22     well, the principal assets are where the principal place of

23     business is.

24             I don't think that's writing it out of the statute.

25     It's just simply applying the definition or the term for the

1  principal assets, how to determine where the bank account

2  money is located, applying that text.

3          And so a lot of Courts have applied principal place

4  of business is where we're going to say that those assets are

5  actually located.

6          The alternative approach is the Courts look to where

7  the funds are actually held, which branch of the bank.  And we

8  spent a lot of time today establishing that.  And I think that

9  despite counsel's intentions, the funds did not go to the

10  Houston branch of Signature bank.

11          THE COURT:  How do we know that?  Where's the

12  evidence to show that whether it did or didn't?

13          MS. THOMAS:  Absolutely.

14          THE COURT:  I'm going to ask the other side the same

15  question.  But where's the evidence?  Is it just pulling up

16  someone, you know, an auditor who's been on a case for a month

17  and a half?  I mean, a week and a half, pulling -- doing a few

18  Google searches?

19          That's the evidence that I'm supposed to rely on as

20  to whether it went there or not?  Tell me what shows whether

21  it did or it didn't.

22          I'm a little surprised that the actual auditor

23  didn't testify today.  The person who actually worked the

24  case.  I'm not saying they had to, but -- in other words,

25  somebody may or may have not done the research on it.

But what we had today was someone who is as honest
as can be showed up and said here's what I was asked to do and
I ran a few searches and I found a couple of things on Google
searches and it doesn't show it.

And I'm not saying it's your burden.  What I am
saying is I don't know -- kind of I'm just hearing you out.
But where's the evidence that shows like -- there's a document
saying that it was transferred to a Houston -- there's a
Houston address or something, right?

And so how do we know whether it hit the bank
account or it didn't hit a bank account in Houston?

MS. THOMAS:  That's an excellent question.  So the
only evidence -- the only evidence we have today that it went
to Houston bank branch are wiring instructions.

THE COURT:  And what refutes that?  That's what I'm
saying.

MS. THOMAS:  Well, importantly, we have no evidence
of who drafted those wiring instructions.  You read the
testimony of Mr. Lockard during his deposition.  Asked where
did these wiring instructions come from?  His banking team.
Okay, where's your banking team get them from?  I don't know.
Do you know who put in Houston as that address?  I don't know.

I asked Dr. Ji:  Dr. Ji, did you review these wiring
instructions?  No.  Did you verify these instructions?  No.
We asked Mr. Meghji the exact same questions.

1          And we hit a point where -- and I'm not trying to

2     have this reflect negatively on the witnesses.  I certainly

3     appreciate the need to assert attorney-client privilege.  But

4     we were -- we couldn't get any additional facts that were not

5     coming from a lawyer because the lawyers, apparently, were the

6     ones who directed the opening of the account and they relied

7     upon wiring instructions.

8          So we had our wiring instructions.  We have no idea

9     who wrote them, how the Debtor got them, and where the funds

10    went.

11         Now let's talk about the evidence we do have.

12    Routing numbers are standard numbers that are utilized in

13    banking.  And Ms. Simmons testified that she investigated this

14    routing number.  And that the routing number did not direct

15    funds to a bank in Houston.

16         We provided annual reports from 2021 and 2022 that

17    showed that Signature Bank did not have a branch for receiving

18    funds in Houston.  We provided the FDIC documents that showed

19    the number of bank branches that were located in Houston -- or

20    sorry, in the country for Signature Bank.  And none of those

21    40 branches were located in Houston.

22         And so, in some sense, I would love to walk into

23    Court with a definitive document or testimony from a witness

24    that says I'm the one who wrote these wiring instructions and

25    Signature Bank doesn't exist any more.

1      So we're left with putting together the documents we

2 do have.  And there is nothing that shows that these wiring

3 instructions sent money to Houston.  There's no evidence.

4 None.  Except for the expression of counsel that that's what

5 they intended.

6      We have emails where they say we wanted a Houston

7 bank account.  But even Mr. Lockard could not confirm that

8 these funds went to a Houston bank account.  He could not

9 confirm that for us.

10      So if the Court is looking at this secondary test of

11 where the money went, and you heard testimony from Ms. Simmons

12 that she looked up the routing number and it didn't pull up a

13 Texas branch.

14      We reviewed all the FDIC documents.  And there is no

15 dispute that counsel wanted a bank in Texas, but no one on the

16 Debtors' team -- not Mr. Meghji, Mr. Lockard and not even

17 Counsel -- had verified the routing number actually went to a

18 Houston bank branch.

19      The evidence today is that the only asset of the

20 Debtor was a $60,000 wired to the Debtor shortly before the

21 bankruptcy was filed and that those funds were not held in

22 Texas.

23      This analysis leaves us with the conclusion,

24 supported by the evidence today, that venue is not proper in

25 the Southern District of Texas.  And I respectfully request

1    that the Court find the venue is not proper.

2    So what is the remedy when venue is not proper?  The

3    remedy is set forth in 1406(a) which provides that dismissal

4    or transfer are the only remedies.  The interest of justice

5    inquiry determine whether transfer or dismissal is warranted

6    comes into play at that point.

7    We think that there is sufficient evidence on the

8    Record that transfer is in the interest of justice and that

9    dismissal would not benefit the Creditors.

10   I would note that there is no time limit for this

11   requirement under the statute.  Instead, Rule 1014(a)(2)

12   provides that if a Petition is filed in the improper District,

13   the Court on a timely motion may dismiss the case or transfer

14   it to any other District if the Court determines that transfer

15   is in the interest of justice and for the convenience of the

16   parties.

17   So the rule tracks 1406(a) in that the inquiry into

18   the interest of justice and convenience of the parties as to

19   whether to dismiss or transfer.  The advisory committee notes

20   from the 1987 amendments make it clear that there is no right

21   to retain an improperly venued case.  So the remedy would be

22   transfer or dismissal.

23   The final issue that we spent a lot of time on today

24   is timeliness.  Debtors argue that the Voluntary Petition and

25   the 341 testimony was sufficient to put the U.S. Trustee on

1     notice, that the 7 Switchbud Place was a Post Office Box at

2     the UPS store.

3          That is holding the U.S. Trustee to an incredibly

4     high standard that not even the Debtors' own representatives,

5     signed documents and testified under penalty of perjury could

6     meet.

7          Mr. Meghji testified today that he didn't know that

8     the address at 7 Switchbud Place was at the UPS store.  And he

9     reviewed the Petition and Schedules before testifying at that

10    341 Meeting.

11         Dr. Ji equally, could not testify as to when he knew

12    the 7 Switchbud Place address was a UPS Store Post Office Box.

13    If the Petitions and Schedules and statements were

14    insufficient that the Debtors' own representatives on notice,

15    how would the U.S. Trustee be onto this?

16         There's a lot of evidence about when the U.S.

17    Trustee knew about the Signature Bank account.  It is not

18    unusual for a Debtor to open a new bank account.  Mr. Meghji,

19    himself, testified that what he cared about was that Signature

20    Bank was an authorized depository.

21         That was certainly the U.S. Trustee's focus as well.

22    But there's a more important reason the U.S. Bank -- the

23    Signature Bank, sorry, issue didn't come up until now.

24    Because based on the Petition, the U.S. Trustee had every

25    reason to believe that the venue was properly based on the

1   office space, a principal place of business, at 7 Switchbud

2   Place.

3           It had no reason to question if funds were located

4   in Texas until the Debtor raised the issue as a defense for a

5   motion to transfer venue.  The Debtors' argument essentially

6   today is that the U.S. Trustee should have looked closer.

7           In preparing for today's hearing, I was reviewing an

8   opinion about Disclosure Statements.  And I think it applies

9   with equal weight to this case.  Because neither the Court,

10  nor Creditors or other parties-in-interest should be forced to

11  be detectives, clairvoyants or soothsayers to figure out

12  exactly what Counsel's arrangement is with his clients or

13  parties-in-interest in a bankruptcy case.

14          As one Court ample stated, coy and incomplete

15  disclosures which leave the Court to ferret out pertinent

16  information from other sources are not sufficient.

17          And that's *in re: Cialella* at 643 B.R. 789.  And so

18  I think in -- and this is a disclosure issue for counsel's

19  relationship with their client.

20          But I think that that rings true equally important,

21  if not more so, for a Voluntary Petition that is signed under

22  penalty of perjury.  And I would ask that the Court not set a

23  lower bar for those statements than we do for attorney

24  disclosures.

25          The U.S. Trustee should not have to be a soothsayer,

1    an investigator to understand when an attorney represents the

2    principal place of business on a 341 Meeting is located at a

3    particular address, to question whether or not that is

4    actually a principal place of business as that term is

5    commonly understood between lawyers.  And that they should

6    investigate as to whether or not it's a Post Office Box.

7           I want to just review the final exhibits

8    (indiscernible) with you to make sure I covered all of the

9    exhibits that we discussed today.

10          (Pause in the proceeding.)

11          MS. THOMAS:  Exhibit 4 we have as Signature Bank

12   statement which lists the address in San Diego, California.

13   As we listed in our reply brief that is one of the factors

14   we're looking at the principal place of business where they're

15   using their address on bank statements.

16          As we discussed already, Exhibit 6, the wiring

17   instructions.  There is no evidence as to whether or not --

18   who created those wiring instructions.  And I know there was

19   some statements earlier that they were given to them by

20   Signature Bank.

21          I think Mr. Lockard's testimony makes clear that

22   he's the one, Stretto, provided these wiring instructions.

23   That there's no Signature Bank employee involved in the

24   communicating of the wiring instructions to Debtors' counsel.

25          We have Exhibit 7 where the Post Office Box was

1     established by counsel approximately 12 hours before the case

2     was filed.

3          The Court, I know, reviewed Dr. Ji's testimony.

4     Exhibits 11 through 14 are essentially the State of

5     California's filings which list solely the San Diego address

6     and do not list any point in time the Texas address.

7          And unless the Court has any other questions, I

8     think that's it.  Thank you, Your Honor.

9          THE COURT:  Thank you very much for your time.  I

10    did want to confirm that I did -- my 1:00 o'clock finished

11    with sufficient time.  I was able to really carefully read all

12    of the depo transcripts.  Thank you.

13         MS. THOMAS:  Thank you, Your Honor.

14       (Pause in the proceeding.)

15         THE COURT:  Oh, Mr. Culberson, you're -- do you wish

16    to make any statements, now is the time.

17         MR. CULBERSON:  Thank you, Your Honor.  I'll be

18    brief.

19                       CLOSING ARGUMENTS

20         BY MR. CULBERSON:  I fully commend Ms. Thomas and

21    her work and she's done a great job in presenting the law and

22    the facts in this case.

23         Just a couple of points that I think are important

24    to this analysis and I think this case is precedential.  I

25    think that it's important to set the standard here when it

1  comes to what we know now, which is the lawyers for the

2  Debtors in this case, there's no question, manufactured venue

3  facts.  And the time of these events is critical.

4          Fifty-seven hours before they filed the Petition,

5  this is after Mr. Meghji has admitted that he was retained as

6  the CRO, which means we are absolutely going forward with

7  bankruptcy.  We know we're going to file bankruptcy.  So,

8  guess what we're going to do?  We're going to go ahead and

9  figure out a way to get this in the Southern District of

10  Texas.

11         We're going to basically render the venue statute

12  powerless because if this is allowed to go forward -- let's

13  assume that there was a bank account in Texas, which I don't

14  think the Debtors have proven that.  I think it's their burden

15  to do that.  That hasn't been shown here today.

16         And the fact -- even if it was an account in Texas,

17  they manufactured the venue facts for the sole purpose of

18  getting this case in the Southern District.  That means that

19  any Debtor in the United States that wants to get into any

20  District they want to, they now have a battle plan.

21         They can simply set up a checking account in that

22  District, days, hours before they file the Petition and claim

23  that they have venue in that District.

24         That is not what this venue statute contemplates.

25  And it would render the venue statute and the purpose of the

1    venue statute basically pointless.  And that never is the

2    intent of Congress when they pass a law.

3            And so, I believe that there is no question that

4    there is absolute manufacture of the PO Box in hours before

5    they filed the Petition.  These venue facts came out of thin

6    air -- absolutely out of thin air.

7            This was a stagnant, stale, dormant company that had

8    no debt.  They were not doing business, but they were used as

9    an anchor to get this case improperly into the Southern

10   District.

11           The second point I want to make and I think this is

12   great questioning on part of Ms. Thomas of Mr. Meghji.  When

13   asked -- we heard from the lawyers, but the lawyers aren't

14   evidence.

15           We've heard a lot of broad generalities about what

16   they've done, what the problems have been, how complex this

17   case has been.  But where's the evidence of what has really

18   occurred in this case, especially when we're talking about

19   justice and convenience of the parties to transfer this case

20   which should happen.

21           When Mr. Meghji was asked what's the reason why you

22   are saying that this is against fairness and in interest of

23   justice to transfer this case to the Southern District of

24   California or to Delaware?  And all he said was, well, this is

25   very complex.  You just have to take my word for it.  It's my

1    judgment.

2              And I think this could possibly cause problems with

3    the sale deal.  That there are risks that the sale may not go

4    through, which there's been no specifics as to what that

5    possibly could mean.  And in fact, even if this case stays in

6    this Court, there's risk that the sale deal may fail.

7              So there's been no specific evidence raised to this

8    Court by Mr. Meghji to give any reason why that if this case

9    were transferred tomorrow to the Court in California or a

10   Court in Delaware that a competent District Federal Judge

11   cannot pick this case up and get on board with what's going on

12   quickly, and things can still proceed in the orderly fashion

13   that they are.

14             This is not impossible to do.  And I don't believe

15   the burden has been met in establishing that there's an

16   inconvenience or injustice to the parties to do what's right,

17   to follow the law, and transfer venue.

18             And I thank you for your time, Your Honor.

19             THE COURT:  Thank you very much.

20             Okay, from the Debtors.

21          (Pause in the proceeding.)

22                    CLOSING ARGUMENTS

23             BY MS. RECKLER:  Good afternoon, Your Honor.

24   Caroline Reckler, Latham and Watkins, on behalf of the

25   Debtors.

1          Your Honor, just to remind the Court -- and I think

2     there's been some discussion about it from Mr. Culberson and

3     Ms. Thomas, the Movants have the burden of proof today.

4          And Your Honor, I'm happy to cite to those cases.  I

5     think they were in our paper, but I think it bears repeating.

6     It's 150 F3d 788, 792 the 7th Circuit Case from 1998 and 896

7     F2d, 1384, 2nd Circuit, 1990.

8          And again, Your Honor, the Movants have to win on

9     all three issues.  First, that their motions are timely.

10    Second, that they knew it was improper here.  And third, the

11    transfer is either in the interest of justice or for the

12    convenience of the parties.

13         And let's talk about timeliness first because it's

14    dispositive under Rule 1014(a) or 1014(b), which only allows

15    for dismissal or -- transfer or dismissal on a timely motion.

16         And even under Section 1406(b), on which the U.S.

17    Trustee provides, we believe that statute is inapplicable.

18    But even if it does apply, it provides that nothing in this

19    chapter shall impair the jurisdiction of a District Court of

20    any matter involving a party who does not interpose timely

21    sufficient objections to the venue.

22         Even the primary case on which the U.S. Trustee

23    relies in arguing that transfer or dismissal is mandatory

24    where venue is improper, *Thompson v Greenwood*, still refers

25    over and over to the fact that the question before the Court

1    there was whether the Court could retain a case file in an

2    improper venue over a timely objection.

3            Not an untimely one.  And you can read about that in

4    Pages 420 to 422.

5            These cases have been pending for over a year.  A

6    lot has happened in the year.  The timeliness not only goes to

7    when parties learned of what they believe have only now

8    uncovered.  But also what has transpired in the year that the

9    Debtors have been in bankruptcy.

10           The relevant facts were disclosed a year ago.  And

11   in the meantime, significant events have transpired in these

12   cases, including multiple sales, four DIP financings, the

13   lockup of it's the Silex shares and the multiple extensions of

14   that lockup.

15           There is currently further extension pending.  And

16   even if they hadn't been, stakeholders who questioned the

17   Debtors' venue selection had ample opportunity to inquire, and

18   in fact, did so.

19           Let's walk through the relevant history.  On

20   Exhibit 3, on the very first day of the case, February 13th,

21   2023, the Debtors noted on the face of the Petition that their

22   principal place of business was PO Box 513 at 7 Switchbud

23   Place, Suite 192-513.

24           Next to that, the Debtors noted their mailing

25   address was 4955 Directors Place in San Diego.  Had the

1    Debtors wanted to obfuscate the truth, they simply could have

2    listed The Woodlands address, 7 Switchbud Place, Suite 192-513

3    on the Petition and eliminated the reference to the PO Box.

4         513 is the mailbox number as is clear from the next

5    line that says PO Box.  Had they omitted the words PO Box it

6    would have appeared as though the Debtors had a physical

7    presence, such as an office in The Woodlands beyond a small

8    mailbox.  Any mail would have been delivered all the same.

9         Your Honor, we're hearing for the first time in

10   closing that the U.S. Trustee thought that address was more

11   than a PO Box, that it was a lease or an office or something

12   else.  We did not hear evidence of that fact.

13        Next, like all other Debtors, we participated in

14   initial Debtor interview with the United States Trustee on

15   March 7th.  Part of the IDI, the Debtors with the assistance

16   of M3 answered questions for the United States Trustee and

17   provided information such as bank account information in

18   advance of that meeting.

19        The U.S. Trustee could have asked any further

20   questions it wanted about the PO Box, Scintilla's activities

21   in Houston, The Woodlands, or the bank account including the

22   timing of all of that.

23        And immediately thereafter, as Your Honor likely

24   recalls, in early March of 2023, Signature Bank failed.  Not

25   surprisingly there was a flurry of activity, communications

1   with the United States Trustee about replacing that account.

2        If we look at Debtors' Exhibit 13 and the United

3   States Trustee's Exhibit 4, this will show that on March 12th,

4   the Debtors sent the U.S. Trustee Scintilla's February bank

5   statement, which showed very clearly that it was opened on

6   February 10th and that $60,000 in it by February 12th, the day

7   before the filing.

8        On February 10th, it showed it had zero dollars.  It

9   also shows that the $60,000 was transferred by Sorrento.

10  That's a year ago, tomorrow.  The U.S. Trustee had all of the

11  facts about the opening of the Signature account, including

12  this timing.

13       And then on March 30th, 2023, the U.S. Trustee

14  conducted the 341 Meeting where both the PO Box and the bank

15  account were explicitly discussed.  And to the extent that

16  anyone had questions, they could have been further raised.

17       Mr. Kelly, counsel to the Debtors' largest creditor

18  of the time then, asked the Debtors' representatives questions

19  of the 341 Meeting that were clearly designed to gather

20  information about the Debtors' choice of venue.

21       I personally corrected Mr. Kelly on the Record and

22  noted that the Debtors' principal place of business was a

23  PO Box.  And pointed to question four on the Petition.

24       The Debtors provided information and answered all of

25  the questions that were asked that day and they answered them

1    truthfully.  Had anyone, including the United States Trustee,

2    asked when the mailbox was obtained, we would have answered

3    truthfully.

4         Mr. Meghji testified to that and that is not

5    controverted.  There were no follow-up questions on any topic,

6    including bank accounts at issue, the mailbox or anything else

7    that went unanswered following the final meeting of the 341 in

8    June.  Mr. Meghji also testified to that.

9         The Debtors' Schedules and Statements at Exhibits 8

10   and 9 further disclose the bank account and the transfer of

11   $60,000 from Sorrento to Scintilla to fund the account on

12   February 10th.

13        Again, all of this information had already been

14   provided to the United States Trustee when the Debtor sent the

15   February bank statement.

16        The Debtors also understand that in the spring of

17   2023, the Unsecured Creditors Committee with knowledge of all

18   the relevant facts based on the Debtors' various filings and

19   at the 341 Meeting in conversations with the Debtors' counsel

20   evaluated the Debtors' venue and ultimately determined not to

21   challenge that.

22        Mr. Shinderman spoke to that earlier and it's in his

23   papers.  Mr. Shinderman and his Committee evaluated the facts,

24   the circumstances of the case, and declined to file a motion

25   seeking to transfer venue.  Similarly the Equity Committee

never sought transfer of venue.

There has never been an attempt to hide the existence of the PO Box or when the PO Box and bank account were created or why they were created.

Had the Debtors been asked by the United States Trustee or anyone else, the Debtors simply would have answered with the truth.  We created venue.

In hindsight, I wish someone had asked this question last spring because we would have squarely addressed it and truthfully addressed it back then before these cases had developed.

In fact, the only fact that the United States Trustee focuses on that wasn't disclosed months or years ago is when the PO Box was opened.  But that fact is irrelevant to the U.S. Trustee's position.

If it had been opened a year ago, under their legal framework, the venue would be just as allegedly improper.

While much of my argument has been specific to the United States Trustee, it applies all the same to Mr. Culberson.  He has been an active participant in these cases as early as his notice of appearance in August of '23, if not earlier.

Again, the face of the Petition clearly lists the PO Box as Scintilla's principal place of business.  It is so clear that Mr. Culberson was even able to visit it.

1    The Movant's arguments that they only recently came

2    into information that put them on notice of their potential

3    venue objection should fall on deaf ears and the Court should

4    find that those objections are untimely and should be deemed

5    waived.

6    Paragraph 20 of our objection details the cases

7    where Courts are overwhelmingly clear that venue can be waived

8    if it is not timely challenged.  I will not repeat those cases

9    now.

10   Federal Rule of Bankruptcy Procedure 1014 Advisor

11   Committee Notes also say that if a timely motion to dismiss

12   for improper venue is not filed, the right to object to venue

13   is waived.

14   And even if 28 USB 1406 applies to bankruptcy cases,

15   1406(b) still provides that a motion must be timely.  The

16   Court does not need to go further to determine whether a venue

17   is proper.  But if the Court does reach that question, the

18   evidence will show that it is.

19   As a threshold matter, because Scintilla filed in

20   the Southern District of Texas, venue is presumed proper here

21   and as I noted earlier the Movants bear the burden of proof.

22   They must prove by a preponderance of evidence that

23   the case was improperly venued.  The objectors argue that the

24   proximity of time between the establishment of the mailbox and

25   the bank account and the filing means that Scintilla's choice

1    of venue didn't satisfy Section 1408 of Title 28 because it

2    did not have a principal place of business or principal assets

3    for a longer portion 180-day period preceding filing that it

4    had a principal place of business, principal assets in another

5    Federal District.

6         This argument fails.  Here both Scintilla's

7    principal place of business and principal assets were located

8    in the Southern District for the longer portion of that

9    period.

10        I will rest on our papers with respect to the

11   principal place of business argument.  But I would like to

12   touch on the principal assets on Section 1408.

13        The Movants haven't provided any compelling rebuttal

14   to the notion that Scintilla's principal assets were in the

15   Southern District for a longer portion of 180-day period than

16   it was in any other District.

17        Neither Movant has argued that Scintilla had any

18   assets outside the Southern District of Texas during the

19   180-day period other than the U.S. Trustee's arguments that

20   the Signature Bank account is not, in fact, located in Texas.

21        But the law and the evidence don't support the U.S.

22   Trustee's argument.  It also ignores the existence of the

23   PO Box.  I don't think anyone today has disputed and the

24   evidence is uncontroverted that that PO Box is, indeed,

25   located in The Woodlands.

1          If you look at Exhibit 1 of the Debtors' exhibit,

2     this shows the instructions sent by Debtor counsel to Stretto

3     to open a PO Box in Houston.  If you look at Exhibit 2,

4     Signature then sent the Debtors funding instructions for the

5     account, which identified the relevant local office of the

6     bank as being located at 9 Greenway Plaza in Houston.

7          It's not clear if the U.S. Trustee is somehow

8     suggesting that Exhibit 2 is not from Signature Bank.  But the

9     document is in evidence without objection.  It says at the

10    top, Scintilla.  It has -- excuse me.

11         It says at the top, Signature.  It has the Signature

12    logo as you can see by comparing it with the annual report,

13    which are United States Trustee's Exhibits 19 and 28.

14         This is not a credible argument.  As to Mr. Lockard

15    and what he did or didn't know or what he was or was not

16    allowed to testify to, I want to be clear.  Mr. Lockard is a

17    Stretto employee.  He's not an employee of the Debtors.  The

18    Debtors did not defend that deposition and the Debtors

19    certainly didn't claim any privilege.

20         Mr. Lockard testified that he was the relationship

21    person at Stretto.  He was not in charge of the banking

22    operations at Stretto.  And he deferred to his colleagues.  He

23    simply wasn't the right person to ask questions about wire

24    instructions and bank accounts.

25         His testimony was not evasive.  He answered

1    truthfully.  He just wasn't the right person the U.S. Trustee

2    was asking those questions.

3         In response, U.S. Trustee offers various documents

4    which it interprets to suggest that the Houston office must

5    have been merely a representative office.  But none of those

6    documents say that the Houston office can't accept deposits or

7    can't serve as the local office for a bank account.

8         The U.S. Trustee's witness, Ms. Simmons, admitted

9    that.  The only Signature document that addresses whether the

10   Houston office can serve as the local office is the bank

11   wiring instructions, which says Houston's local office.

12        So what they are raising is that most an

13   inconsistency between what Signature told the Debtors and what

14   the U.S. Trustee believes Signature's locations were.  But the

15   U.S. Trustee didn't contact Signature or its successor to find

16   out what Signature's policies were, how to interpret -- how it

17   interpreted New York regulations.

18        And the U.S. Trustee didn't contact the New York

19   superintendent to find out how the Houston office is

20   registered and what communications there were about it.  The

21   only entity that can answer why Signature identified the

22   Houston office as the local office, whether the Houston office

23   can handle the checking account would be Signature.

24        And in the Debtors' opinion, it indicated that it

25   could.  There is a way to answer this.  Ask Signature Bank or

1    whoever worked at Signature Bank at the time had provided the

2    wiring instructions.

3           That has not happened.  And the U.S. Trustee chose

4    not to call a Signature Bank representative or someone who

5    used to work there to explain.

6           We're left with Signature saying the account was

7    affiliated with the Houston office and the U.S. Trustee

8    offering secondary evidence to suggest that its interpretation

9    of New York regulations.  That is not enough to carry the U.S.

10   Trustee's burden.

11          Moreover, setting the bank aside completely, no

12   Movant has asserted that Scintilla's only other asset, the UPS

13   mailbox, was located outside of the District, nor could they

14   given the location of UPS store in The Woodlands.

15          In sum, Scintilla's only asset during the 180-day

16   period were located in Texas at all times.  The Movant might

17   attempt to characterize those assets as *de minimis*, but they

18   were the only assets that Scintilla had.  As a result,

19   Scintilla was well within its rights to seek bankruptcy

20   protection in this venue under the principal assets of Section

21   1408.

22          Your Honor, we think, again, this ends the analysis.

23   The Movants' motions are untimely and in any event, they have

24   failed to meet their burden to prove that venue was improper.

25   Therefore, the Movants' request to transfer based on improper

1    venue should be denied.

2           But even if that were not the case, this transfer or

3    dismissal of these cases would not be mandatory under 1406(a).

4    And I now want to turn to argument advanced by the U.S.

5    Trustee on this point.

6           In the Debtors' view, the relevant legal framework

7    applicable to venue transfer motions, Section 1412 of

8    Title 28, which by its own words specifically applies to

9    bankruptcy cases.  You can read that in the text.

10          And it allows, but does not require, District Courts

11   to transfer bankruptcy cases to another District in the

12   interest of justice or for the convenience of the party.

13          And Bankruptcy Rule 1014, which permits transfers on

14   the same grounds.  Notably subsection (82) of Rule 1014

15   specifically applies to cases filed in an improper District.

16   The plain language of that subsection makes clear that the

17   Court retains discretion.  It uses the word "may," instead of

18   the word "shall."

19          And that distinction has been made in other rules

20   such as Rule 2007(c), to decide whether to transfer or retain

21   the case.  The fact that the case is filed in an improper

22   District doesn't even affect the applicable procedure under

23   relevant considerations.

24          Under each of the subsections of (a)(1) governing

25   cases filed in a proper District, and (a)(2) the rule

1    governing cases where venue is not proper, they allow the

2    Court to transfer the case, quote, "on a timely motion of a

3    party-in-interest or on its own motion" and, quote, "After

4    hearing and notice of Petitioners" provides that the Court

5    "may," not "shall," transfer venue for where the case is filed

6    in an improper District dismiss the case.

7            And states that the relevant considerations in

8    deciding whether to transfer or dismiss are, quote, "In the

9    interest of justice and convenience of the parties, consistent

10   with Section 1412 of Title 28."

11           The text of subsections (a)(1) and (a)(2) is

12   virtually identical.  The only substantive difference is in a

13   case filed in an improper District, the Court has the option

14   of dismissing the case rather than transferring it.

15           Despite the fact that the U.S. Trustee original

16   motion was styled as a motion to transfer or dismiss under

17   Rule 1014(a)(2), which again clearly preserves the Court's

18   discretion to decide whether or not to transfer or dismiss a

19   case even when filed in an improper venue.

20           The U.S. Trustee is arguing here that it's actually

21   Section 1406(a) of Title 28 that governs and deprives the

22   Court of the discretion to retain cases filed in an improper

23   venue.

24           With that Section title, quote, "pure or waiver of

25   effects" does not on its face apply to bankruptcy cases as

1    opposed to general, civil litigation in Federal Courts, unlike

2    Section 1412 of Title 28 which specifically in the text seeks

3    the cases filed under Title 11.

4        And while some Courts outside of Fifth Circuit have

5    held that it does, that view is not universal.  And at least

6    one case from the Western District of Texas, *In re Lazaro*

7    (phonetic), as expressly held to the contrary.

8        There Judge Clark concluded that Congress intended

9    in Title 28 to create special rules for venue of bankruptcy

10   cases, quote, "Distinct from general venue rules applied in

11   general civil litigation filed in Federal Courts."  End quote.

12       The Court went on to explain why.  And here's what

13   Judge Clark said.  He said, "Congress seems to have recognized

14   that venue considerations in bankruptcy cases are decidedly

15   different from venue issues in general and civil litigations.

16   And the Hallmark for venue issues in Title 11 cases, should be

17   maximum flexibility.  Leaving to the Court the ability to move

18   or not move bankruptcy cases depending -- in the words of the

19   statute -- on the interest of justice and the convenience of

20   the parties."

21       We agree whole heartedly with that, Your Honor.

22   This case demonstrates precisely why that flexibility is so

23   important.  If transfer or dismissal were mandatory, this

24   Court would have no choice to impose further delay and

25   additional expense at an estate that simply can't afford

1   either.

2          Your Honor, whether or not you believe venue was is

3   properly established in this District -- and we think it

4   was -- the decision to transfer or dismiss is ultimately yours

5   to make given the discretionary nature of Rule 1014(a) or (b)

6   taking into account the interest of justice and the means of

7   the party.

8          And neither of those factors weighs in favor or

9   transfer or dismissal here particularly in this stage of the

10  case.  Both of those considerations are addressed in our

11  objection and I don't have much more to say about the means of

12  the parties in a case with constituents and advisors all over

13  the country.

14         Houston is a geographically central forum that is

15  largely equally convenient or inconvenient for all parties.

16  There is simply no reason to believe another forum would be

17  more convenient for the bulk of the parties in this case.

18         I do, however, want to spend a bit more time on the

19  interest of justice prong.  In applying it, Courts focus on

20  objectives like efficiency, judicial economy, timeliness and

21  fairness.  None of these factors favor a transfer of venue

22  now.

23         I won't repeat what's in our objection, but there

24  have been over a year's worth of significant development in

25  these cases and as Your Honor knows first hand, it would take

1    new judge considerable time and effort to get up-to-speed to

2    administer what remains to be done in these cases, some of

3    which, admittedly, do not require Court involvement unless

4    there are disputes.

5            For example, there maybe disputes in connection with

6    the consummation of the sale.  This could include what to do

7    with the buyer's assets that you heard about on Friday,

8    whether not it should remain with the estate in connection

9    with an NOL transaction or not.

10           The Debtors may need to seek further approval to

11   Plan amendments or modifications if there's a transaction

12   involving the Debtors' NOLs.

13           The UCC has a pending motion at Docket 1962 to

14   further extend the lock up of the Silex shares, which is set

15   for a hearing at the end of the month.  This is a further

16   extension of three prior extensions granted by the Court at

17   Docket Nos. 524, 1237, 1316.

18           Jackson Walker has pending discovery matters before

19   Judge Rodriguez in a miscellaneous proceeding.  The Equity

20   Committee has a pending appeal in denial of their 2004

21   discovery motion.  If the Equity Committee prevails on that

22   appeal, it could get remanded back to the Bankruptcy Court.

23   It doesn't make sense to have a different Bankruptcy Court

24   address those issues, given that this Court has already

25   adjudicated the motion.

1          Professionals will need to file final fee

2     applications where the Court will be asked approve fees based

3     on everything that's happened on the last 13 months.  There

4     are two pending adversary proceedings.

5          From an efficiency standpoint, no Court is better

6     positioned than this one to oversee those remaining matters.

7          In arguing that a transfer or dismissal would be in

8     the interest of justice, Mr. Culberson, in particular, almost

9     exclusively focuses on the allegations that Scintilla

10    manufactured venue in bad faith.

11         Mr. Culberson goes as far as to suggesting that the

12    Debtors committed bankruptcy fraud in alleging that venue was

13    chosen for the purpose of taking advantage of a relationship

14    between former Judge Jones and Ms. Freeman.

15         These allegations are reckless and defamatory and

16    couldn't be further from the truth.  Latham was unaware of

17    that relationship at all times prior to it becoming public in

18    October of 2023.

19         I made that representation under oath in a

20    Declaration previously submitted to the Court at Docket

21    No. 1783.  And I reiterate today everything that was said in

22    that Declaration.

23         The Debtors chose this venue for far less remarkable

24    reasons.  Like many large, complex corporate Debtors before

25    them, they took the steps to facilitate a filing in the

1    Southern District of Texas because of this Court's deep

2    experience in complex corporate cases, the high power of its

3    judges, and it's well deserved reputation for efficiency and

4    flexibility, which it turns out the Debtors and many other

5    parties, including Mr. Culberson, have benefitted from

6    numerous times over the course of these cases when they

7    requested emergency relief.

8         Dr. Ji testified at his deposition that the Debtors

9    only prepared to file for bankruptcy a few days before the

10   actual filing.  That's at page 15.

11        The Debtors' First Day Declaration submitted by

12   Mr. Meghji, Exhibit 4, provides that they were down to less

13   than $5 million of cash on filing.  That's at paragraph 18.

14        It also provides that the Debtors had a creditor

15   with 175 million judgment seeking to exercise remedies.  The

16   Debtors filed these cases with no DIP.  I don't even think

17   they filed initially with any First Day Motions.  But knew

18   they would have to be pulled together quickly and they would

19   need to secure a DIP and have it approved immediately.

20        There is nothing remarkable about the Debtors'

21   choice of venue.  Scintilla is not the first company to take

22   corrective steps to be able to access its preferred venue and

23   it likely won't be the last.

24        Some Courts have even suggested that the Debtors

25   have a fiduciary duty to file for bankruptcy in the most

1     favorable jurisdiction.  For example, in *Patriot Cole* Judge

2     Chapman said that it could indeed be argued that the Debtors'

3     venue actions were entirely consistent with or even required

4     by the Debtors' fiduciary duties.  And that's at 482 B.R. 742.

5          I am fully aware that some people look at those

6     efforts skeptically or critically or find them disfavorable.

7     The Section 1408 is flexible and it permits those measures.

8          To the extent promoting venue shopping is bad

9     policy.  Respectfully, that is Congress's determination to

10    make and they haven't made it.

11         THE COURT:  What else do you got?

12       (Pause in the proceeding.)

13         MS. RECKLER:  Your Honor, very briefly I am done on

14    the venue transfer motion.  But Mr. Culberson's motion also

15    seeks reconsideration denial of his discovery motion with

16    respect to Latham.

17         We believe that this should be denied.  As I

18    discussed there's no new evidence or fraud, let alone any new

19    evidence.  There's no basis for the Court to reconsider that

20    prior ruling.

21         THE COURT:  Thank you.

22         MR. SHINDERMAN:  Yes, Your Honor.  Mark Shinderman

23    on behalf of the Committee.  Can you hear me okay, Your Honor?

24         THE COURT:  Just fine.  Thank you.

25                    CLOSING ARGUMENTS

1          MR. SHINDERMAN:  Okay, thank you, Your Honor.  I

2    have said and raised related points.  The first is mention at

3    the opening, the Committee and the Debtor did not want to

4    waste time and money on this particular fight, they made three

5    offers.

6          They would also fight late transfer venue we can do

7    it later.  We (indiscernible).  It was rejected.

8          Similarly the Debtor and the Committee made an offer

9    to stipulate to all the relevant facts you heard today in

10   order to streamline this process.  That was rejected.

11         The consequence was, as we told the Trustee's

12   Office, we needed to fight this issue, which leads to my

13   second point.  As I said on the outset, we don't fear changing

14   venues.  Change venues will not change any of the orders

15   (indiscernible) this far.

16         It would not change the comments that all the money

17   invested by Equity and significant liabilities prior to the

18   commencement of this case.

19         It will not change the creditors must

20   (indiscernible) before equity can get any recovery.  In short,

21   transferring venue doesn't change what is happening today.

22         Brings me to the third point.  Transferring venue

23   would be inefficient.  We have a pending motion regarding the

24   trading and (indiscernible) period.

25         That (indiscernible) period expires at the end of

1    this month.  If we don't get relief on that motion by the end

2    of this month, then claims of (indiscernible) equity would be

3    free to trade.  This would hurt our ability to bring value

4    back into the lawsuit as we (indiscernible) estate as we

5    claimed in prior motions.  There would be real harm.

6         You heard on Friday from the Equity Committee that

7    we are working hand in glove to try to figure out how to

8    monetize the NOL.  That may require a Plan negotiation.  The

9    Plan, does not, of course, is not complex.  We spent some time

10   with it.

11        Third, the testimony delay the sale.  The sale will

12   hopefully close according to schedule and on time, no

13   problems.  But if not, we need the Court to enforce it because

14   of our liquidity constraints, need someone who is already up-

15   to-speed and familiar to step in help the parties resolve

16   issues, if there are any.

17        And lastly we also have the action pending before

18   Judge Rodriguez which involves DIP and a number of other

19   cases.  If we move the venue to another Court, would only

20   invite more, not less costs.

21        During testimony in this case is complex, unusual

22   (indiscernible) operations.  Once a summary statement, Judge,

23   Mr. Meghji explained under penalty of perjury that giving that

24   you had assets that was not fully developed, was not in the

25   marketplace.  Funding for the sale became very difficult.

1          Transferring to another venue will take time to

2     bring another Judge up-to-speed.  We're not saying that

3     another judge couldn't do this.  Of course another Judge

4     could.  But when we get on calendar timely?  Would he

5     understand the context?  Would we have to spend a lot more

6     money educating him?  That's the problem.

7          (Indiscernible), which is a simple one.  In short

8     there's no benefit in changing venue only harm.  So that makes

9     (indiscernible), let's turn to the statute.

10          The U.S. Trustee essentially argues that if the

11     jurisdiction isn't proper, you must, absolutely must, shall

12     transfer venue.  As the Debtor points out, Debtor does not

13     believe that venue is improper for first instance.

14          I looked at the evidence just like you did and I was

15     struck by Trustee's Exhibit No. 6 where it says that the money

16     was transferred to the branch, Signature branch in Houston.  I

17     think that's very important.  That's from U.S. Trustee Exhibit

18     No. 6.

19          (Indiscernible) seem like our brief, the Committee's

20     brief, the statutes do say and what they don't say.

21          28 USC 1406 doesn't stop the 1406(a).  1406(a) does,

22     as the U.S. Trustees say, that if anything is improper

23     transfer is either you must transfer or dismiss.  1406(c) then

24     imposes entirely (indiscernible 3.31.34).

25          So it can't be read in a vacuum.  It says any motion

1    must be timely.  And we spent a lot of time talking about

2    whether or not timeliness means relative to discovery of the

3    issue.  But that's not what the case law talks about.

4         The case law talks about timeliness within

5    constraints of the development of the case.  So absent the

6    administrator as the Court was brought up-to-speed has

7    testimony solicited, have pleadings been filed.

8         There's substantial case law that talks of

9    timeliness in terms of administration of the estate, not just

10   relative to the discovery.  And that, that is really most

11   important.

12        It's the Trustee's position that this case was fully

13   administered and the only thing we had left to do was approve

14   or not approve or question final fee applications, then you

15   must transfer.  But clearly all these dozens of cases talk

16   about the estate being fully administered or partially

17   administered or the Court is up-to-speed on important stuff.

18        Formulating opinions on the veracity of witnesses

19   and positions of the parties.  That's what timeliness means.

20   All those cases will be rendered meaningless in the Trustee's

21   view that shall of 1406(a) should be read in a vacuum.

22        You can't simply read 1406(b) timeliness of the

23   statute, which leads us to 1412, 28 USC, and Bankruptcy

24   Rule 1014.  They actually speak to the interest of justice.

25   And really important to note, especially from the Trustee's

1    argument, 1014(a) talks of cases that are improperly filed.

2    In 1014(b) seeking cases that properly filed.  They have the

3    same text.

4         If venue must be transferred, if it was improper in

5    the first instance, you wouldn't have the same test in (a) and

6    (b), which is discretionary based on the interest of justice

7    intervenes with the parties.

8         So the Trustee's position was not only raised 28 USC

9    1406(b) out of (indiscernible) but also (indiscernible) the

10   rules to render (indiscernible).  And that's very, very

11   important and not in evidence, which brings me to my sixth

12   point.

13        In the closing argument the Government, the U.S.

14   Trustee and Mr. Culberson talks about the precedential effect

15   on this case.  And talks about whether or not the test is

16   really headquarters, the principal place of business, or where

17   your assets are located.

18        I don't see Congress every couple of years takes up

19   legislation about change of venue statutes.  It's a fair

20   question and there are no venue issues in (indiscernible).

21        And those don't rely just on headquarter questions,

22   they go to complex case proceedings.  The Ninth Circuit, for

23   example, rejects the idea of the complex case procedures.

24   Texas does not.  Other courts have adopted those.

25        When we talk about venue in terms of foreign

1    (indiscernible).  Every few years Congress takes up question

2    whether or not we should change the rules that's been in place

3    for 20 years.  And thus far has rejected it.  Okay?

4          Congress is supposed to make precedent, not the

5    Courts, Your Honor.

6          Does Your Honor have questions?

7          THE COURT:  No, I just wanted to get to the seven if

8    you've got one.

9          MR. SHINDERMAN:  I'm sorry?

10          THE COURT:  That was your sixth point.  I wanted to

11    know if you had a seventh.  That's where I was going.

12          MR. SHINDERMAN:  Yes, I do, Your Honor.  I have a

13    seventh point and I'll get to it right now.

14          If the Court finds that it must transfer venue that

15    it's not discretionary, we urge a delay of about one month

16    until two things are resolved.  Until the sale is closed that

17    necessarily involves the NOL question, when Your Honor hears

18    the pending motion regarding the trading restriction because

19    again, it could cause great harm to the estate if we can't get

20    timely hearing in another Court on that question.

21          So if the Court believes that you must transfer

22    venue, then in that case we ask that as Judge Therber

23    (phonetic) did with a one-month delay.

24          Thank you, Your Honor.  I have nothing further.

25          THE COURT:  Thank you very much.

1        I'll hear from the Equity Committee.

2                CLOSING ARGUMENTS

3        BY MS. LOVRIC:  Thank you, Your Honor.  Just

4    briefly.  And again for the Record, Margaret Lovric, Glenn

5    Agre Bergman & Fuentes, on behalf of the Equity Committee.

6            Your Honor, the Equity Committee is supportive of

7    the U.S. Trustee's motion to transfer venue in the estate.  We

8    understand the Court's concerns with respect to the timing of

9    the motion.  But we also believe concerns articulated by the

10   US Trustee are real and valid and (indiscernible) due process.

11           It appears that the price of venue in this District

12   was liking at the very beginning of the case.  And accordingly

13   we believe that the relief requested in the U.S. Trustee's

14   motion is appropriate and should be granted.

15           THE COURT:  Thank you.

16           MS. LOVRIC:  Just one --

17           THE COURT:  Sorry, I apologize.

18           MS. LOVRIC:  Oh, sorry.  Just a few quick points,

19   Your Honor.  I definitely want to say Mr. Meghji referenced

20   the Equity Committee is continuing to pursue a deal to modify

21   the Debtors' NOLs.

22           Just to be very clear, the Equity Committee will

23   continue to work to modify the NOLs regardless of which

24   District it proceeds in.  And we will work with the other

25   professionals to try to prevent any such transaction to

1    whichever Court receives this case going forward.

2            Do not believe that the mere potential of a future

3    deal to modify the NOL is relevant to whether or not you

4    should transfer it.

5            Similarly, Mr. Meghji was asked about what can

6    conceivably happen in the future with respect to the Equity

7    Committee's pending appeal on the Rule 2004 motion.  Again,

8    speculation could happen in connection on that appeal has no

9    bearing on whether or not venue is proper today.

10           And for those reasons, Your Honor, we'd ask the

11   Court grant relief requested by the United States Trustee.

12           THE COURT:  Thank you.

13           Is there anyone who has not spoken who filed either

14   in support of the relief or against the relief requested?

15       (No audible response.)

16           THE COURT:  Okay.  I want to think about a few

17   things.  Why don't I -- it's 3:37.  Why don't we come back on

18   in 10 minutes?  Thank you.

19       (Recess taken from 3:38 p.m. to 3:48 p.m.)

20           THE COURT:  This is Judge Lopez.  It's March 11,

21   about 3:50, I am still here in connection with the Sorrento

22   hearing.  There may be some folks who are here in connection

23   with what was a 3:00 o'clock, which then got pushed to 4:00.

24   I will take that matter up.

25           The line has been

completely muted.  You're more than welcome to stay.  After I
rule, we're probably going to get -- realistically start that
hearing around 4:15, but just in case somebody's dialing in
and trying to figure out what's going on, no, I have not
started the *Free Speech* matter.  We'll get started with that
around 4:15, if that's okay.  So I thank everyone for that.

Okay.  Let me get started.  I thank the parties for
their presentation today, the arguments that are presented to
the Court.

I think everything was incredibly important.  Every
document that has been admitted into evidence.  I've been
listening to the arguments and also kind of walking through
the documents that were admitted into evidence.

And there was some depositions transcripts which I
read as well in between matters, but I took the time and I
feel comfortable -- I mean, I'm prepared to rule now on all
matters.

So before the Court is consideration of a motion to
dismiss these cases, or to transfer them to another District.
The Court has jurisdiction over this matter and this is a core
proceeding under 28 USC 157(b).

The motions were filed by Timothy Culberson, an
attorney who appears today in his capacity pro se.  He's also
an equity holder of Sorrento, and also the office of the
United States Trustee.  The Debtors and the Official Committee

1    of Unsecured Creditors opposed the motion.

2              The Official Committee of Equity Holders has

3    expressed statement in support of the motion.

4              I'm going to provide some background, a little long,

5    but I'm going to ask that everyone -- I think it's important

6    to have a good Record.

7              These cases were filed on February 13, 2023, in the

8    Southern District of Texas.  February 28th, the U.S. Trustee

9    appointed an Official Committee of Unsecured Creditors, which

10   has been reconstituted several times.

11             I believe on March 28th, June 7th, and July 28th.

12   On April 10th, the U.S. Trustee appointed an Official

13   Committee of Equity Security Holders, which was again

14   reconstituted, I believe, on April 14th.

15             Both Official Committees have been active in these

16   Chapter 11 cases.  There have been numerous financing orders

17   that have been entered in this case by prior bankruptcy judge.

18   I became affiliated with this case in early October, so from

19   February to I'd say early October or mid-October, it was

20   another bankruptcy judge, and I became in middle to late

21   October.

22             In March of 2023, the Bankruptcy Court entered an

23   Order approving for example $75 million post-Petition.  I see

24   as facility on a financing, final basis.  There was another

25   one in July of 2023.  In August of 2023, there was a

1    replacement post-Petition senior financing facility.

2         In August of 2023, after negotiations between a

3    replacement lender and the Debtors, the parties later agreed

4    that the Debtor would sell certain stock which the bankruptcy

5    court approved in September of 2023.

6         This Court recently, after another DIP last Friday,

7    to get to a sale.  This last order is not used to support the

8    Court's ruling today.  That was upon agreement of the parties

9    last Friday, as part of the ruling and the history.

10        The Debtors also sold and marketed plenty of assets,

11   too.  This Court recently approved the sale last Friday with

12   the support of many parties.  Again, not used to support any

13   Court ruling today, but it is part of the Record and history

14   of this case.

15        The Chapter 11 case has also been confirmed in this

16   case.  The Chapter 11 Plan, I should say, has also been

17   confirmed in connection with this case.  In October of 2023,

18   I, this -- the judge on that case, entered an order

19   conditionally approving the Disclosure Statement, setting a

20   hearing to consider confirmation of the Chapter 11 plan of

21   liquidation.

22        Loads of unsecured creditors were solicited in

23   connection the Plan Confirmation.  The Plan was overwhelmingly

24   adopted by the solo class, which was the class of general

25   unsecured creditors, with over 96 percent of voting creditors

1    in number, over 94 percent of voting claims accepting the

2    Plan.

3            I confirm that Plan.  It satisfied the Bankruptcy

4    Code's requirements.  It's now a Final Order.  It contains no

5    third party releases, doesn't exculpate anyone.  Entering an

6    order again last Friday, which modified the Plan, provides

7    that equity won't be canceled on the effective date.

8            But the holders can trade their shares if they want,

9    giving some additional flexibility, and if somehow unsecured

10   creditors get paid in full, shareholders would stand to gain

11   any excess.

12           I said before, and I'll say it again, I said it last

13   Friday, I know the Equity Committee is working hard to see if

14   that is a possibility based on certain deals.  Movants seek

15   relief under 28 USC 14 (indiscernible) to 1406, and Bankruptcy

16   Rule 1014.

17           So let's start with Section 1408.  Section 1408

18   provides a case under Title 11 may be started in District

19   Court, the District in which the domicile resident's principal

20   place of business in the United States, or principal assets in

21   the United States for the entity, and subject to that case,

22   where it had been located or the 180-days immediately

23   proceeding the commencement (indiscernible) longer, under any

24   period, and they were located in any other District.

25           1408 doesn't say who may challenge venue in a

1    bankruptcy case, or the process by which it may be challenged.

2    The answer to those questions are found in the Federal Rules

3    of Bankruptcy Procedure.

4          Bankruptcy Rule 1014 sets out the procedure for when

5    a case is properly filed in the District, and when a case is

6    not properly filed in the District.  Bankruptcy Rule 1014(a)

7    deals with situations where the Petition was properly filed to

8    transfer the case to another District.

9          1014(a) says the Court, on a timely motion of a

10    party-in-interest or on its own, may transfer the case to

11    another District if the Court determines that the transfer is

12    in the interest of justice or for the convenience of the

13    parties.

14          1014(b) deals with the cases that are filed in an

15    improper District.  It says that the Court, on a timely motion

16    of a party-in-interest may dismiss the case or transfer it to

17    another District if the Court determines that the transfer is

18    in the interest of justice or the convenience of the parties.

19          The difference between subsection (a), and

20    subsection (b) is that (b) has the potential for a dismissal

21    if the case was filed in the wrong District.  But both, I'd

22    say, Bankruptcy Rules 1014 standard is consistent with what's

23    found under 28 USC 1412, which says that a District Court may

24    transfer a case or a proceeding to a District Court, or

25    another District in the interest of justice or for the

1    convenience of the parties.

2          You still see that interest of justice, convenience

3    of the parties by which they are.  Movant's argue that the

4    venue was never proper in the Southern District of Texas, they

5    point to evidence that before the filing, attorneys for the

6    Debtor opened up a PO Box that was used as the principle place

7    of business for the Debtor.

8          The Petition also, several days before the filing,

9    the Debtor transferred $60,000, to a bank in Houston, that

10   would be used to justify the principal assets problem in

11   Section 1408.

12         Debtors don't dispute that this opening of the

13   PO Box or the transfer of the funds -- they just counter the

14   first file Debtor, Scintilla was used to establish venue in

15   the District.  It was not operative and there was nothing

16   improper about what it did.

17         I've said before, and I'll say it again, I said it

18   about a week or so ago, I previously ruled that the acts,

19   those acts of opening up the PO Box and transferring the fund,

20   they didn't amount to fraud or warrant sanctions.

21         The PO Box was listed in the Bankruptcy Petition,

22   and it does say PO Box.  The bank account was listed in public

23   filings.  I've also said before and I'll say it again, I think

24   the actions taken by the Debtor in opening up the PO Box and

25   transferring the funds were certainly not new or unique to

1   this District.

2          It's not rampant.  You know, there was some

3   discussion -- I'm also aligned with bankruptcy judges across

4   the country that disfavor these types of legal maneuvers to

5   establish venue in a District.

6          But let's start with the legal analysis.

7   Interpreting the Bankruptcy Code and the rules begin with

8   analyzing the text.  I've cited too often, *Whitlock versus*

9   *Lowe*, 945 F3d 943, 947, Fifth Circuit 2019, the matters of

10  statutory interpretation text is always the alpha.

11         Bankruptcy Rule 1014(a) and 14(b) reading regardless

12  of whether the Petition was filed or not filed in the right

13  District requires that a motion to be brought must be timely.

14         The rules specify what constitute a timely

15  objection, but one can look to the advisory committee notes.

16  I think they're really helpful here.  But before I do that, I

17  think I would note it's very consistent.

18         I mean, I think textural analysis, we can also

19  determine what timely means just by understanding its common,

20  everyday use of the term.  When you look at the definition of

21  timely just using a Merriam Webster Dictionary, appropriate or

22  adapted to the times for the occasion, right.

23         That's what timeliness means.  If you look to the

24  Advisory Committee rules and they're consistent, and that's

25  why I find it helpful.  I want to be really clear about that.

1    I think the Advisory Committee rules are consistent with that

2    understanding of what it means to be timely.

3         The Committee notes subdivision (a) protects the

4    parties, and I'm quoting, "The parties against being subjected

5    to a transfer except upon a timely motion of a party-in-

6    interest.  If the transfer would result in fragmentation or

7    duplication of administration, increase expense or delay

8    closing the estate, such a factor would bear on the timeliness

9    of the motion, as well as the propriety of the transfer under

10   the standards prescribed under subdivision (a)."

11        1987, the Committee advisory notes that if a timely

12   motion to dismiss for improper venue is not filed, the right

13   to object to venue is waived.  I think that's consistent with

14   what the plain textural definition of what timely means.

15        Fifth Circuit Court of Appeals has also held that

16   venue is a privilege, personal and even when venue is laid in

17   a court what would otherwise be improper, it may be waived by

18   the express agreement or conduct, *Hunt versus Bankers Trust*

19   *Company*, 799 F2d 1060, cite 1068, Fifth Circuit, 1986.

20        Failure to object to venue in a timely manner

21   results in waiver in the objection to venue, and there are

22   cases across the country that cite that.  I'll cite to a few,

23   but there are a lot of them.

24        *Bryan versus Land*, 215 BR 398, Eighth Circuit, 1997.

25   *In Re: Moss*, 249 BR 200, Bankruptcy Western District of

1    Missouri, 2000.  You know, that's the first test.  If the

2    motion's not timely, filed by either party, then 1014 says,

3    you don't consider anything else.

4           Here, I find that both motions are not timely, and

5    that the argument for venue has been waived for a number of

6    reasons.  First, this case has been pending in this Court,

7    this jurisdiction for over a year.  If nothing had happened

8    substantively within the year, like if it was a dormant case,

9    nothing much had happened during that time, maybe I'd consider

10   things a little different, or weigh it differently.

11          I recounted earlier just the hint of all that's

12   happened in one year.  I didn't even get into the nine months

13   of mediation with the Debtors and two Official Committees

14   before another bankruptcy judge in this District, out of which

15   came a major settlement with the Nant parties which a

16   settlement would be on Nant parties.

17          I'd also note that on February 13th, and this was in

18   evidence that the Debtor, Scintilla filed this Petition,

19   listing its PO Box as his principle place of business.

20   Scintilla also listed Sorrento's San Diego address, the 4955

21   Director's Place as its mailing address.

22          May 25, 2023, Scintilla filed Schedules and Assets

23   and Liabilities showing that it's only asset was $60,000 of

24   cash in the bank account.  Well, it was 60,000 cash in bank

25   account.

1          On May 30th, the U.S. Trustee conducted a

2     Section 341 Meeting of creditors which counsel to a creditor

3     which was the main parties that came out, asked various

4     questions about Scintilla and its venue, including questions

5     about the PO Box, the bank account, books and records and

6     place of incorporation.

7          And the Creditors Committee noted that they had

8     looked into it, and elected not to pursue it.  We also had an

9     active Equity Committee at the time.  Remember, the Equity

10    Committee was appointed before the 341 Meeting.

11         I said this before, too, and I'll say it again, I'm

12    not here to fault anyone, including the U.S. Trustee.  I know

13    who conducted that exam, and I'm going to say this, that

14    there's not a better United States Trustee, in my opinion, and

15    the individual who conducted by exam, someone's who conducted,

16    who has dedicated over 20 years, at least 20 years of public

17    service.

18         I'm not here to claim Monday morning quarterback,

19    but I don't think the office of the United States Trustee at

20    the same time can claim Monday morning revision.  Certainly on

21    an opportunity ask questions.

22         But if anyone reads anything that I'm saying today

23    as looking, or questioning the integrity for anything about

24    that United States Trustee, you could not be any more wrong

25    about how I feel about the work that that individual does, the

1    work that the Houston office in the Southern District of

2    Texas, the office of the United States Trustee does, it means

3    something new for me.

4           I've defended their work publicly on several

5    occasions, and I'm not going to get into the cases, but they

6    know it.  I don't think they can play Monday morning

7    quarterback either.

8           I'd also note as has been noted, Mr. Culberson has

9    been incredibly active in this case.  But in August of 2023,

10   he certainly filed a motion to appear pro hac.  The Debtors

11   plan was confirmed in December of 2023.  It's a Final Order.

12          In April of 2023, I'd note -- well, we can stress,

13   they recently discovered the information.  But the information

14   was available since the beginning of the case.  Indeed, they

15   were questioned about it at the 341 Meeting of Creditors.  But

16   provided follow up information about bank accounts was readily

17   available.

18          I think the advisory -- I think the plain text,

19   plain meaning definition of what it is to be timely and the

20   Advisory Committee's consistent guidance on timeliness

21   considers the stage of the case, the location of evidence,

22   administration of justice.

23          Why I was asking the question about where it should

24   go, and where you send it, because that's what the rule --

25   that's what you got to consider when something is timely.

1    I've said this before, too, if the issue was raised, as it

2    often is, at or near the beginning of the case and it was

3    timely, I think I'd think differently.

4          That's not the case here.  It's a confirmed

5    Chapter 11 Plan that's been voted on by creditors holding tens

6    of millions of dollars of claim.  None have received payment

7    yet.  And there are also pending several multi-million sales

8    that are pending.

9          I also note the Bankruptcy Court has entered over --

10   I found, not counting the ones that I said I wouldn't count.

11   There are over 60 Orders by Bankruptcy Courts finding that

12   venue was proper.

13         You're going to be entitled *res judicata* effect,

14   including Plan Confirmation, including the conditional

15   approval of Disclosure Statement, including final approval of

16   Disclosure Statement, including confirming a Chapter 11 plan.

17   Don't ever question it.  Those findings are entitled to *res

18   judicata*.

19         Duplication of efforts is big here.  You'd going to

20   have to be able to deal with -- I don't -- this case was first

21   transferred from one judge to me, another judge.

22         To get up-to-speed, it took me at least 40 hours of

23   dedicated, listening to hearings, reviewing pleadings and

24   orders and studying the law.  It had to be done quickly, and

25   there were a lot of moving pieces going on in connection with

1   this case, and there continue to be a number of moving pieces.

2          But I did it, mostly between 9:00 p.m. and 2:00 a.m.

3   in the morning.  It's not a simple task to get up-to-speed.

4   So that's -- do I have any doubt of the ability of my

5   colleagues?  No.

6          They're the Southern District of Texas

7   (indiscernible) are out there, or my colleagues in Delaware.

8   No, the duplication of effort, that's real, and I know what it

9   takes because I had to do it.

10          This case was transferred in October of 2023 to me.

11   It's incredibly complicated, confirmed plan.  And appeal over

12   Rule 2004 denial pending in this District Court.

13   Miscellaneous proceeding about professionals fees that are

14   underway, right?

15          I may not consider that in connection with whether

16   something is timely in light of the guidance from the Advisory

17   Committee rules and guiding what timely means, right.  I'm

18   being asked to consider, that's not timely a post -- a case, a

19   post-confirmation modified -- why don't we just call it a

20   post-confirmation case in which there are pending sales, in

21   which an Equity Committee kind of raised, you know, deals and

22   multiple pieces of who's the absolute best judge to be able to

23   deal with that?  Me.  No one is up-to-speed on this.  The only

24   one in the country that's up-to-speed right now as to what's

25   going on and can deal with something if somebody filed an

1    emergency motion tomorrow.

2          Do I have any doubts that my colleagues are up to

3    the task, or smart enough to do it, there's no question about

4    that.  I don't ever question that.  The question is

5    duplication of effort, administration of justice.

6          Is it timely, has venue been waived by those parties

7    who sat there and knew?  Of course.  To me, this ends the

8    analysis, and that's what the rules say to do.  The motion's

9    not timely, the venue has been waived by both parties,

10   Mr. Culberson and the Government.

11         I understand the Government's concern, but the

12   Government is not going to be held to any higher standard, or

13   lower standard by which it must -- it's a litigant, it's

14   treated just as a party-in-interest, and be treated like every

15   other party-in-interest.

16         And if they had information, then pursue it.  That's

17   where we are.

18         Let's proceed a little bit further.  To me, that

19   ends the analysis.  The only question is, and you know, should

20   I proceed on the 1014(a) or 1014(b)?  The only answer is under

21   either one, the analysis is over.  It's not timely.  And based

22   upon the evidence presented to me, and based upon the shifting

23   burdens in this case, you know, what do I have in this case?

24   What evidence has been presented into the Record?  A wiring

25   instruction for $60,000 that has been placed in a Signature

1    Bank account that's listing a Houston branch location.

2         And I have an auditor who's just as honest as can

3    be, who said I've been doing Google searches for about a week

4    and a half, and I found a couple of things on Google and

5    overcome the evidence that's into the record.

6         I have in evidence, a $60,000 bank account, a PO Box

7    that's listed and no one's questioning.  I think venue is

8    proper under 1014 based on the facts.  Based upon the evidence

9    that's been presented to me.

10         And again parties are questioning good faith.  Those

11    are 1112 motions.  I don't think that'd be timely either.  Let

12    me just note, right, that's when you get into other line of

13    cases.

14         So our parties, I think Mr. Culberson may be one of

15    the parties, just rendered.  No, there are other sections of

16    the Code that are here to deal with good faith and what you do

17    there.  It's not before me at this stage of the case.

18         Again, they are (indiscernible) to convince me at

19    this point based upon the actions that have been taken in

20    connection with this case.  And I also quite frankly defend

21    the orders that have been entered in connection with this

22    case.

23         I've reviewed every one of them.  I've asked out

24    loud, are there any orders where people have found that are

25    questionable.  Not one, not one person has questioned one in

1       open court.  I take that for what it's worth.

2               I do note Section 1408 contemplates principal

3       assets.  I know that principal assets can be located in more

4       than one District, and I rely on cases like *In Re: MidAtlantic*

5       *Retail Group*, 2008 Westlaw 61287, Bankruptcy Middle District

6       of North Carolina case, January 4, 2008, (indiscernible)

7       relied on in connection with (indiscernible) analysis there.

8               The venue statute doesn't require that the only

9       principal asset may support, but here the only principal asset

10      is located, based upon the evidence in front of me, in

11      Houston.

12              The question is whether these cases should be

13      transferred to another District is quite frankly up to the

14      Court's discretion.  *In Re: Commonwealth*, 596 F2d 239, 247,

15      Fifth Circuit, 1979.  And whether this Court should exercise

16      its discretion based on the convenience of the parties and the

17      interest of justice, I would note I heard zero testimony about

18      which (indiscernible).  I heard zero evidence about which

19      court, which District would be more convenient for the

20      convenience of the parties or interest of justice.

21              It's like, Judge, you pick, right?  Southern

22      District, Delaware, just get it out of here, not a shred of

23      evidence as to which Court would be more convenient or in the

24      interest of justice.  Just you pick it, Judge.

25              The Committee argued something a little different,

1    saying, "Judge, if you got to pick one, we would ask that you

2    send it to Delaware."  I'll do my own analysis.  The proximity

3    of the Creditors to (indiscernible) of the court, proximity of

4    the Debtor to the Court, these are Commonwealth refinancing

5    standards.

6         Proximity of witnesses, location of assets, the

7    economic administration of the estate, the necessity, excuse

8    me, for ancillary administration.  Again, I didn't hear any

9    evidence on that, and I'm not sure -- to me, that stops the

10   analysis right there, you know.

11        Telling me to just transfer it, and I get to pick.

12   I don't think that's the analysis, but I'll proceed a little

13   bit further.  And I asked questions about what courts could

14   do, and I got it.

15        I would note the U.S. Trustee is with the most

16   knowledge of this case and the moving pieces are located in

17   this building.  The (indiscernible) restructuring is based in

18   New York.  These lawyers are based in other cities.

19        The Equity Committee's lawyers based in Missouri,

20   and they've all -- the Debtors, UCC and the Equity Committee

21   have all retained local lawyers in Houston.  Mr. Culberson,

22   the Movant, is located in Texas.

23        No evidence in the Record that proximity of

24   witnesses favors any District.  The only evidence about

25   economic administration of the estate, the only argument quite

1    frankly, was presented by -- meaningful argument was presented

2    by the Official Committee of Unsecured Creditors.

3            I'm saying there are a lot of moving pieces.  The

4    interest of justice mandates that it stays here, too.  And

5    again, I'm only using this if the case were going to 1014(a),

6    if somehow I rule on timeliness, which I'm not.

7            And I'll go a little step further.  Interest of

8    justice mandates that it stays here.  Again, the case was

9    confirmed by the overwhelming majority of Creditors.  The case

10   was already transferred to a new judge, that being me in

11   October of 2023.

12           The interest of justice is to a judge with the most

13   knowledge, where it's already been transferred, one, and not

14   send it somewhere to be transferred again.  And again, with no

15   knowledge as to where it should send it, just me, pick me,

16   right?

17           And I don't think that's the way the rules should

18   work, and I don't think I should just do it that way without

19   any analysis.  But I think I'm the one with the most knowledge

20   who could deal with these complicated matters in a timely

21   manner, I will say that.

22           No question about that.  In fact, it's

23   (indiscernible).  So I think the reason timeliness and waiver

24   makes sense in the rule is that you don't have to consider

25   transferring and the consequences of transferring or

1   dismissing until you deal with something being timely.

2              In other words, things can be so far along, right,

3   that it just makes sense to allow it to complete the work as

4   to where it is.  And I am not here -- there's been a lot of

5   talk about rules and what's there for Congress to do.

6              I don't get into the work of the legislature, but I

7   do know I'm here to enforce the rules as written, applying the

8   most strict textural analysis that I know how, and then I know

9   what to do.

10             So for the reasons I've stated, I'm going to

11  overrule the objections, I should say the motions.  I'm going

12  to deny the motions.  I should just be really clear.  I

13  shouldn't overrule their motion.  I should just deny their

14  motions.

15             Mr. Culberson, the U.S. Trustee's motion is denied

16  as untimely under Bankruptcy Rule 1014, and waived based upon

17  binding of applicable Fifth Circuit case law.  You know,

18  that's the analysis.  And to the extent -- I'll just leave it

19  there.

20             I should also address one last point, and that has

21  to do with the motion for reconsideration filed by

22  Mr. Culberson.  Did a motion for -- did request

23  reconsideration of a prior court ruling.

24             I would note Mr. Culberson did not -- I don't

25  believe identified the rule, the applicable ruling that he

sought reconsideration under, so I'll just say this.  Rule of
Civil Procedure 60 applies to bankruptcy cases to Federal Rule
of Bankruptcy Procedure 9024.

Rule 60(b) provides that on a motion and just terms,
the Court may relieve a party or its legal representative from
a final judgment order or a proceeding for the following
reasons: mistake, inadvertence, surprise or excusable neglect.

This is on the (indiscernible), but that was one.
Two is newly discovered evidence that with reasonable
diligence could not have been discovered in time to move for a
new trial under Rule 59(b).

Three, fraud, misrepresentation or misconduct by an
opposing party, that's three.  Or six, any other reason that
justifies relief.  Rule 60(b)(6) is a general catchall phrase
and it is reserved for extraordinary circumstances, *Buck V
Davis*, 580 US 100, 10.123, 2017, United States Supreme Court
case.

I'd note *U.S. V Stephens*, 731 F3rd 370, pinpoint
cite, 374, Fifth Circuit, 2013 case has the same United States
Supreme Court has held, that it provides courts with
adequate -- authority adequate to enable them to vacate
judgments whenever such action is necessary to accomplish
justice.

I'd also caution it should be applied in
extraordinary circumstances, right?  Those are the Health

1    Services Acquisition Corp, 486 US 847, pin cite 864, 1988, and

2    *Liljeberg versus Health Services Acquisition* -- and let me

3    just say -- excuse me.

4           In *Yesh Music versus Lakewood Church*, 727 F3rd 356,

5    Fifth Circuit case out of 2013, held that 60(b)(6) requires a

6    showing of manifested justice, and will not be used to reveal

7    party from the free calculated deliberate choices is made.

8    The Court has heard no evidence presented to mistake or any

9    other 60(b)(6).

10          I haven't heard any evidence presented to the Court

11   on mistake, inadvertence, surprise or excusable neglect, any

12   newly discovered evidence.  I think I've already ruled on

13   there's been no fraud or misrepresentation or conduct.

14          I think the evidence shows the opposite, or for any

15   other reasons under 60(b)(6).  And I'd note there's been no

16   other showings, I mean other 60(b) factors that would play.  I

17   haven't heard any evidence that was presented to me.  I'd also

18   note that today Rule 7059 came into effect.

19          I haven't heard any evidence that would justify

20   relief under Rule 7059.

21          So therefore, that is my ruling.  I'll enter a short

22   order saying that for the reasons stated on the Record, I am

23   denying both motions under two separate orders.  I believe

24   that's the appropriate way to do it.

25          There were two separate motions.  I'm considering

1    them at the same time.  I thank the parties for their time.

2    I'll get you a short order, in short form.

3            And for the parties who showed up the 4:00, I mean

4    once 3:00, now 4:00, if you can just give me 10 minutes, so I

5    can just gather some docs.  And we'll start with *Free Speech*

6    *Systems* at 4:35.  Thank you.

7            (Proceeding concluded at 4:24 p.m.)

8                            * * * * *

9            *I certify that the foregoing is a correct transcript*

10   *to the best of my ability produced from the electronic sound*

11   *recording of the proceedings in the above-entitled matter.*

12       */S./  MARY D. HENRY*

13   *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

14   *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

15   *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

16   *JTT TRANSCRIPT #68376*

17   *DATE FILED:  MARCH 17, 2024*

18

19

20

21

22

23

24

25