**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON**

| | |
|---|---|
| DAVID WEINHOFFER, in his capacity as Liquidating Trustee of the Sorrento Therapeutics, Inc. et al., Liquidating Trust, <br><br> Plaintiff, <br><br> v. <br><br> HENRY JI, DORMAN FOLLOWWILL, KIM JANDA, DAVID LEMUS, TAMMY REILLY, JAISIM SHAH, YUE WU, ELIZABETH CZEREPAK, and LIANG ZHAO, <br> Defendants. | Chapter 11 <br><br> Case No. 23-90085 <br><br> Jointly Administered <br><br><br> Adv. Proceeding No. _____ |

**LIQUIDATING TRUSTEE'S ORIGINAL COMPLAINT**

David Weinhoffer, in his capacity as the Liquidating Trustee of the Sorrento Therapeutics, Inc. et al., Liquidating Trust ("Trustee"), hereby files this complaint ("Complaint") against Henry Ji, Liang Zhao, Elizabeth Czerepak, Yue Wu, Jaisim Shah, Tammy Reilly, David Lemus, Kim Janda, and Dorman Followwill, Sorrento's Board of Directors and Officers, ("Defendants"). In support of this Complaint, the Trustee alleges that:

**NATURE OF THE ACTION**

1. This case arises from the duplicitous transfer of roughly half the value of Sorrento Therapeutics, Inc. ("Sorrento" or "the Company") in a one-time, extraordinary, and gratuitous dividend ("Dividend") to Sorrento's shareholders only one month before Sorrento filed voluntary petitions for Chapter 11 relief.

2. Defendants are Sorrento's fiduciaries: the Directors and Officers who designed, proposed, approved, and implemented the Dividend, notwithstanding their first-hand knowledge that Sorrento suffered from: (1) a lack of internal financial, conflict, or transaction controls; (2)

1

mounting losses; (3) an expensive, poorly performing, delayed, and unsustainable pharmaceutical product pipeline; (4) evaporating financing options; and (5) perhaps most egregiously, an adverse $173 million arbitration award (the "Nant Arbitration Award") against Sorrento just before the Dividend that, once enforced, manifested an existential threat to the Company. Sorrento's demise was led by Henry Ji, the Chief Executive Officer of Sorrento and Chairman of its Board of Directors, who was the mastermind and domineering force in the decision-making. The Defendants enabled Ji's irrational directives and conduct and failed to implement controls, to the detriment of all Sorrento stakeholders.

3.      Given Sorrento's mounting losses and chronic underperformance, there was no rational basis for Sorrento's fiduciaries to approve and implement the Dividend. Their failure to reconsider the Dividend once the Nant Arbitration Award was issued defies logic. From Sorrento's inception until January 2023, it had never issued a dividend. From fiscal year 2020 forward, its auditors had issued going concern warnings that the company might not survive. Then, in the span of just over two months, Sorrento was hit with the Nant Arbitration Award, issued its first and only Dividend comprising half of Sorrento's value when it was unable to pay its debts as they came due, and abruptly filed for relief under chapter 11 of title 11 of the United States Code.

4.      Sorrento's fiduciaries knew that the company lacked any effective controls over its financial and transactional decision-making. Since its inception, Sorrento's primary methods of generating revenue were: (1) acquiring and merging with other companies in the pharmaceutical industry, (2) using those acquisitions to inflate its own stock price, and (3) selling its stock through at-the-market ("ATM") offerings. At no point during any of Sorrento's acquisitions—dating from 2015 to 2022—did it have adequate controls to prevent conflicts of interest between the leadership of Sorrento and its target companies or to ensure an adequate business justification for the

acquisitions. Indeed, its *own* management flagged Sorrento's lack of controls to its external auditors on multiple occasions. And, though its auditors warned that Sorrento's lack of controls was a material risk to the company, Sorrento's fiduciaries never took action to prevent the company's ruin. Indeed, its own Chief Financial Officer, hired as a face-saver to satisfy Sorrento's auditors, was often kept in the dark with regard to the extent of the material risks that Sorrento's fiduciaries knew it faced.[1]

5.      Sorrento's fiduciaries knew that Sorrento was never profitable and could not sustain itself based on its operational cash flows.  It had, for years, financed its operations through the ATM sale of its own stock because its leadership knew that it had no prospect of profitability.  But, in the year leading to the Dividend and eventual bankruptcy, even its ATM financing was insufficient to prop up its operations.  Sorrento's cash was diminishing, and its need for cash to sustain its operations was growing, so it undertook short-term bridge loans.  But, because it had no plan or sustainable business model, simply taking out more debt was not enough to turn around its business.  It had to resort to more ATM funding just to stay current on its bridge loans.  This was unsustainable; as the going concern warnings of its external auditor made clear: Sorrento's ability to continue to operate was in significant doubt.

6.      At the time of the Dividend, Sorrento was insolvent, unable to pay its debts as they became due, and inadequately capitalized.  Between September 2022 and the January 2023 dividend date, several events adversely impacted Sorrento's liquidity, accelerating Sorrento's demise into bankruptcy:

---

[1] Indeed, even though she served as the Chief Business Officer and Executive Vice President of Sorrento from May 18, 2022 to November 3, 2023, Defendant Czerepak was not informed of Sorrento's imminent bankruptcy filing until immediately before the filing.

a.  In connection with the Scilex Merger, Sorrento agreed to exchange all of Scilex's outstanding indebtedness owed to Sorrento (approximately $290.5 million) for preferred shares in the new Scilex entity.[2]

b.  Sorrento raised significantly less in proceeds of equity offerings in the fourth quarter of 2022 than it had on average in the previous three quarters.[3]

c.  Sorrento received the adverse Nant Arbitration Award, requiring it to pay approximately $173.5 million, plus post-award, pre-judgment interest, to NantCell, Inc. and Immunotherapy NANTibody LLC.[4]

d.  Sorrento also was awarded an arbitration award in the amount of $125 million against NantPharma, LLC, but the ability to collect that judgment was doubtful.[5]

e.  Sorrento elected to repay $36 million due under a bridge loan early, in the fourth quarter of 2022, although the loan did not mature until January 31, 2023.[6]

f.  Sorrento was operating under a going concern warning from its auditors, acknowledged by management in its public filings.[7]

7.  Sorrento's fiduciaries had actual knowledge of the foregoing and, despite knowing that Sorrento faced imminent material risks to its financial stability, nevertheless approved the Dividend and failed to reconsider it prior to closing.  Contrary to the exercise of sound business judgment, after the Nant Arbitration Award, rather than preserving the company's limited assets

---

[2] Current Report (SEC Form 8-K), Scilex Holding Company (Nov. 10, 2022) at 1.  Scilex issued 29,057,097 preferred shares to Sorrento in exchange for and satisfaction of Scilex's outstanding indebtedness to Sorrento at the time the merger closed, approximately $290.5 million.  *Id.*

[3] *Compare* Annual Report (SEC Form 10-K), Sorrento Therapeutics, Inc. (March 15, 2023) at F-88 *with* Quarterly Report (SEC Form 10-Q), Sorrento Therapeutics, Inc. (Nov. 8, 2022) at F-30. During the nine months ended September 30, 2022, Sorrento sold shares of common stock for aggregate net proceeds averaging approximately $113 million per quarter.  During the final quarter of 2022, Sorrento sold shares of common stock for aggregate net proceeds of approximately $62 million.

[4] *See* Current Report (SEC Form 8-K), Sorrento Therapeutics, Inc. (Dec. 5, 2022) at 1.

[5] *See* Current Report (SEC Form 8-K), Sorrento Therapeutics, Inc. (Dec. 21, 2022) at 1.

[6] *See* Annual Report (SEC Form 10-K), Sorrento Therapeutics, Inc. (March 16, 2023) at F-30.

[7] *See, e.g.*, Annual Report (SEC Form 10-K), Sorrento Therapeutics, Inc. (March 11, 2022) at F-3 (going concern language in audit opinion for 2021 10-K); Quarterly Report (SEC Form 10-Q), Sorrento Therapeutics, Inc. (Nov. 8, 2022) at 9 ("management has concluded that the aforementioned conditions, among others, raise substantial doubt about the Company's ability to continue as a going concern for one year after the date the financial statements are issued").

for the benefit of Sorrento and its creditors, Ji instead "expedited" the Dividend in conscious disregard of the known material risks.

8.     There was no business justification for Sorrento to issue the Dividend, which transferred a significant portion of the Company's most significant assets—its equity interest in Scilex Holding Company ("Scilex")—out of the Company and to Sorrento's shareholders, for no consideration. Spiraling toward bankruptcy, Sorrento's lack of capital, diminished value, and inability to obtain financing was swept under the rug, just so Ji and his fellow Defendants could participate in the first dividend in the Company's history.

9.     Prior to the Dividend, Sorrento held an approximately 96% ownership interest in Scilex. The Dividend transferred approximately 48% of Sorrento's ownership interest in Scilex (76 million common shares) to Sorrento's shareholders.  The timing of the transfer had no purpose other than to place the shares outside of the reach of Sorrento's creditors.  At the time of the Dividend, the shares were subject to a transfer restriction—so neither Sorrento nor its shareholders could trade them for months.

10.     The Dividend was gratuitous and provided no value to Sorrento, as Sorrento received nothing in return.  It instantaneously siphoned off half of the Company's value, and the Company received nothing. While the shareholders profited, Sorrento and its creditors were harmed.

11.     As shareholders, the Defendants engineered a personal benefit from the Dividend at the direct expense of the Company and its creditors. Even more, however, each of the Defendants except for Janda was conflicted because they simultaneously held positions at Scilex. Defendants were on each side of the transfer because, in distributing a material portion of the shares, Defendants freed Scilex from Sorrento's 99.7% control and thereby the risks imposed by

Sorrento's Nant Arbitration Award obligation.  Despite these conflicts, Defendants—in addition to their on-going failure to implement controls and monitor Sorrento's operations—failed to cleanse their decision-making through the appointment of a non-conflicted special committee or any other mechanism to ensure that Sorrento's interests were prioritized.  Tellingly, they did not even ensure that their advisors were conflict free, relying on Scilex's counsel to advise Sorrento's board about the issuance of a dividend of Scilex's stock. Rather than use the value transferred in the Dividend to secure Sorrento's future and prevent further harm to its creditors, Defendants acted for their own conflicted benefit.

12. Through the bankruptcy process, the real impact of Defendants' failures became clear.  Subsequent investigation revealed that Sorrento's assets were overstated and liabilities were understated.  Its controls over financial accounting and projections were wholly absent.  Its ability to monetize its drug pipeline was illusory and based on flawed and aggressive assumptions.  Assets that were inflating Sorrento's books had little marketable value.  And Ji's self-dealing transactions were uncovered as wasteful expenditures.  The other Defendants enabled Ji's self-motivated and irrational decisions rather than (i) ensuring effective controls and processes; (ii) making an informed decision about Sorrento's prospects; (iii) reconsidering the Dividend in light of Sorrento's diminishing prospects and massive liabilities under the Nant Arbitration Award, and (iv) taking the interests of Sorrento's creditors into account.  The other Defendants abdicated their fiduciary duties by doing Ji's bidding.

13. Accordingly, the Trustee seeks to recover the damages caused by Defendants' breaches of fiduciary duties, including but not limited to, the value of the Dividend, the Company's lost enterprise value, the decrease in the Company's assets, the losses arising from Defendants' failure to exercise appropriate control over Sorrento's cash and financial systems, the expenses

arising from the foreseeable bankruptcy of Sorrento, and all other losses suffered by the Company as a result of those breaches.

## **PARTIES**

14.     Plaintiff David Weinhoffer is the Liquidating Trustee of the Sorrento Therapeutics, Inc. et al., Liquidating Trust ("Trust").  The Trust was established pursuant to the Plan and Confirmation Order in *In re Sorrento Therapeutics, et al.*, Case No. 23-90085 (CML), pending before the Honorable United States Bankruptcy Judge Chris Lopez of the United States Bankruptcy Court for the Southern District of Texas. The Trustee was appointed pursuant to the Liquidating Trust Agreement.

15.     Defendant Henry Ji was the Chief Executive Officer and Chairman of the Board of Directors for Sorrento at all times relevant to this action. He was also Chairman of the Board of Directors at Scilex at all times relevant to this action.  Ji may be served at 77 Charlton Street, Apt. N3C, New York, NY 10014.

16.     Defendant Elizabeth Czerepak was the Executive Vice President and Chief Financial Officer for Sorrento. She was also Executive Vice President, Chief Business and Chief Financial Officer of Scilex beginning in May 2022 and at the time of the Dividend. Czerepak may be served at 3 Rosemaries Lane, East Hampton, NY 11937.

17.     Defendant Dorman Followwill was a Member of the Board of Directors and the Lead Independent Director for Sorrento at all times relevant to this action. He was also a board member of Scilex at all times relevant to this action. Followwill may be served at 1092 Mountain Oak Place, Newbury Park, CA 91320.

18.     Defendant Kim Janda was a Member of Sorrento's Board of Directors at all times relevant to this action.  Janda may be served at 5787 La Jolla Corona Drive, La Jolla, CA 92037.

19.     Defendant David Lemus was a Member of Sorrento's Board of Directors at all times relevant to this action. He was also a board member of Scilex at all times relevant to this action. Lemus may be served at 11004 S. Glen Road, Potomac, MD 20854.

20.     Defendant Tammy Reilly was a Member of Sorrento's Board of Directors at all times relevant to this action. She was also a board member of Scilex at all times relevant to this action. Reilly may be served at 601 Biddle Street, Chesapeake City, MD 21915.

21.     Defendant Jaisim Shah was a Member of Sorrento's Board of Directors at all times relevant to this action. He was also a board member, CEO, and President of Scilex at all times relevant to this action Shah may be served at 212 Monroe Drive, Mountain View, CA 94040.

22.     Defendant Yue Wu was a Member of Sorrento's Board of Directors at all times relevant to this action. He was also a board member of Scilex at all times relevant to this action. Wu may be served at 1960 Noel Drive, Los Altos, CA 94024.

23.     Defendant Liang Zhao was the Corporate Controller for Sorrento at all times relevant to this action. Zhao may be served at her home or business address in San Diego, CA.

## JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this adversary proceeding, which arises in and under title 11 and relates to cases filed under title 11 pending in the United States Bankruptcy Court for the Southern District of Texas (the "Court"), captioned *In re Sorrento Therapeutics, Inc., et al.*, Case No. 23-90085 (CML), under 28 U.S.C. §§ 157 and 1334(b).

25.     Venue is proper under 28 U.S.C. § 1409.

## FACTUAL BACKGROUND

### The Debtors' History and Business.

26.     Henry Ji founded Sorrento as the San Diego Antibody Company in 2006.  In 2009, Ji reincorporated the San Diego Antibody Company as Sorrento Therapeutics, Inc., a Delaware

corporation.  In 2013, Sorrento went public and was traded on the NASDAQ Stock Exchange under the ticker symbol "SRNE" until the filing of the bankruptcy petition.

27.     Sorrento's ostensible business involved testing and developing drugs for the treatment of various cancers, infectious diseases, pain disorders, and autoimmune disorders, but it was never able to deliver on that mission.  Rather than build a successful pipeline of pharmaceutical drugs, Ji built Sorrento on speculative and self-interested acquisitions, false hope, and unfounded promises of current capabilities and future results that it had no ability to deliver.

28.     In the years heading into its bankruptcy, Sorrento grew primarily through uncontrolled mergers with, and acquisitions of interests in, other pharmaceutical companies—often companies in which Ji had a simultaneous, material interest.  The expenditures associated with those endeavors, which never faced internal evaluation or neutral approval by Sorrento's fiduciaries, continually drained Sorrento of assets without returning significant (or even commensurate) value.  Money went out the door, but never came back in.

29.     For example, in 2015, Sorrento entered into a Stock Purchase and Sale Agreement with Nantpharma, LLC, to pursue a joint venture in development and marketing of certain drugs with entities associated with Nantpharma, LLC (the "Nant Entities"). As described below, in the ensuing years, Sorrento's activities and failures related to this joint venture ultimately doomed the company to bankruptcy when the risk of a devastating, adverse arbitration award—a risk Sorrento's fiduciaries knew about—materialized.  The risky venture with the Nant Entities was emblematic of Sorrento's pattern of transferring its much needed cash to other ventures in conflicted transactions, without any controls or governance over the processes.

30.     In another example, in May 2020, Sorrento's Board of Directors approved the acquisition of 50% ownership in Cytimm Therapeutics, Inc. ("Cytimm"), for $2.5 million in cash.

At the time of the acquisition, Ji was the Chairman of Cytimm's Board of Directors and on information and belief was personally offered 10% ownership of Cytimm to facilitate the acquisition.

31.     Similarly, in May 2020, Sorrento entered into a licensing agreement with Pulsar Therapeutics, Inc. ("Pulsar"), under which Sorrento would license Pulsar's technology and receive a 5% ownership stake in Pulsar, in exchange for an unspecified payment in cash, one million shares of Sorrento's common stock, and other unspecified royalties and sublicense fees. At the time of the acquisition, Ji was the Chairman of Pulsar's Board of Directors and personally owned approximately 45% of Pulsar. Defendant Jaisim Shah was also a Director of Pulsar and personally owned approximately 5% of Pulsar at the time.

32.     Money continued to flow out of Sorrento in the years leading into its bankruptcy. Beginning in 2021, Sorrento initiated a series of unchecked and uncontrolled investments that depleted it of its liquidity and strained its capital for no apparent gain.

33.     To start, it purchased interests in Deverra Therapeutics, Inc. ("Deverra") pursuant to which Sorrento acquired nearly 20% of Deverra's common stock in exchange for $10.2 million in consideration (consisting of a cash payment of $4.1 million and cancellation of $6.1 million in debt that Deverra owed to Sorrento). As a part of this investment, Ji and Shah became board members of Deverra.

34.     Also in 2021, Sorrento acquired ten million preferred shares in Elsie Biotechnologies, Inc. ("Elsie") for $10 million in cash. As a part of the acquisition, Ji was appointed to Elsie's board of directors. Sorrento wrote off its entire $10 million investment one year later.

35.     In April 2021, Sorrento's Board approved a $15 million transaction with Aardvark Therapeutics, Inc. ("Aardvark"), whereby Sorrento jettisoned $15 million in much-needed cash to acquire certain of Aardvark's speculative assets and intellectual property via an asset purchase agreement.

36.     Two months later, in June 2021, Sorrento merged with ACEA Therapeutics, Inc. ("ACEA"), acquiring 100% ownership of ACEA for $39.9 million.

37.     In February 2022, Sorrento purchased Virex Health, Inc. for $11.4 million (consisting of $6.8 million in cash, $100,000 of transaction costs paid in cash, and just under 1.3 million shares of Sorrento's common stock, then-valued at $4.5 million).

38.     In May 2022, Sorrento acquired 51% ownership of Zhengzhou Fortune Bioscience Company ("Zhengzhou") for $5 million in cash.

39.     Despite Sorrento's cash-acquisition approach, it never achieved operational profitability or positive cash flows and failed to put in place governance processes and procedures to ensure the decision-making was in the Company's best interests.

**Sorrento's Pipeline Was Unprofitable and Unsustainable.**

40.     In Sorrento's history of conflicted acquisitions, it and its subsidiaries had brought only one drug to market. This drug, ZTLido, never returned significant profits to Sorrento.  ZTLido is currently marketed by Scilex.  No other drug in Sorrento's developmental pipeline has approached any point at which it would yield revenue.

41.     Sorrento bled money on a drug development pipeline that was never capable of profitability.  Led by Ji, and without appropriate fiscal or operational discipline, controls, or management, Sorrento underestimated the cost, time, and regulatory hurdles to bring pharmaceutical drugs to market and overstated the size and share of the markets that could be achieved.

11

42.     For example, Sorrento's most advanced candidate, *Ovydso*, was a COVID-19 therapeutic in phase III clinical trials in China.   Management significantly overvalued this candidate.  Chinese phase II clinical trials required multiple steps before achieving regulatory approval, yet Sorrento assumed a probability of success far above the average for Chinese drug applications.  Furthermore, at the time, the Chinese market had a cheap, relatively efficacious treatment, Azvudine, and Pfizer was negotiating with the Chinese government for reduced-priced *Paxlovid*, the most efficacious treatment on the market, so management's price assumptions were unfounded. In light of the clinical phase and market competition, Sorrento dramatically overestimated the probability of success for completion of the clinical trials, the cost to obtain regulatory approval, the price it could obtain in China, and its market share in China.  Sorrento also assumed that it could immediately go to market in the United States and Canada (in addition to China) based on emergency applications, achieving most of its revenue from the United States market.  Such an approval would require additional expenditures, testing, and regulatory process risks that Sorrento misjudged, and there was no basis to assume it would be able to market the drug outside of China (even assuming success there).  Even marginal corrections to adopt a reasonable probability of success and a price the market could support would reduce the value of *Ovydso* by hundreds of millions of dollars, not accounting for more realistic estimates of market share and costs to bring the drug to market.  Despite spending tens of millions on its development, Sorrento received no interest from third parties for the acquisition of *Ovydso* in bankruptcy.

43.     Similar problems existed in Sorrento's developmental program for *RTX*, a pain medicine in phase II clinic trials.  As with *Ovydso*, Sorrento's significantly overestimated the probability of success for completion of the clinical trials, the cost to obtain regulatory approval, the price it could obtain, and its market share as compared to the standard of care, *Ziltretta*.  Indeed,

Sorrento's management assumed that its phase II clinical trial data would automatically result in regulatory approval for a phase III trial and thus overestimated its probability of success by three-fold, despite published industry data to the contrary. Furthermore, it assumed a price significantly higher than the price of *Ziltretta*, overstating the marketable price by thousands of dollars. Again, even marginal corrections to adopt a reasonable probability of success and price would reduce the value of *RTX* by millions, not accounting for more realistic estimates of market share and costs to bring the drug to market.

44.     Another developmental therapeutic, *Fujovee*, was likewise overvalued by the Company. *Fujovee* targeted two indications (non-small cell lung cancer (NSCLC) and prostate cancer). As with *Ovydso*, Sorrento tried to sidestep the United States FDA clinical testing requirements by obtaining regulatory approval in China for the NSCLC indication. But, when Sorrento consulted with the FDA after phase II studies, the FDA rejected the data, meaning Sorrento would have to start over. Even had the FDA accepted the data, however, the results showed that it was not superior to the existing standard of care, *Tigresso*. The only path forward for *Fujovee* NSCLC was for *Tigresso*-resistant patients, which would require an entirely new clinical program (new patients, new dosing, new data) and severely limit its market potential. Review of the therapeutic potential for prostate cancer was so early stage that it could not be fairly valued, yet Sorrento overvalued its potential.

45.     Sorrento's other drug candidates were even less likely to result in profitable drugs. Upon bankruptcy, the debtors in possession developed a new business plan that assumed research and development spending (i.e., the amounts Sorrento would spend to bring its pipeline candidates to market) would be cut by more than half—yet there had been no material changes in the

underlying facts, evidencing that the previous investment levels, economics, business model and ability to bring drug candidates to market profitability was dramatically overstated.

**Sorrento Acquires Scilex.**

46.     Even decisions that ultimately added assets with value to Sorrento (setting aside the corresponding costs) lacked any effective governance, vetting by Sorrento's fiduciaries, or internal controls.  In late 2016, Sorrento acquired approximately 72% ownership of Scilex Pharmaceuticals ("Scilex Pharma"). Between 2017 and 2021, Sorrento acquired additional ownership of Scilex,[8] culminating in a 99.9% ownership stake in Scilex as of November 2022. By the time of the Dividend, Sorrento owned approximately 136 million of 141 million shares of Scilex common stock and 29 million shares of preferred stock.

47.     Through a series of intracompany promissory notes and note payables issued from 2018 to 2022, Scilex accumulated a massive amount of debt to Sorrento.

48.     In May 2022, Sorrento assigned all its rights, liabilities, and obligations in the Aardvark acquisition to Scilex in exchange for a $5 million promissory note that was soon converted to a liquidation preference on Sorrento's preferred equity ownership of Scilex.

49.     In September 2022, Sorrento entered into a Debt Exchange Agreement with Scilex, by which $275 million of Scilex's debt to Sorrento was extinguished in exchange for approximately $302.5 million in preferred shares in Scilex. The proceeds from part of the note payable were used to finance the acquisition of Semnur and to finance Scilex's operations. On

---

[8] In November 2016, Sorrento acquired a majority of the outstanding capital stock of Scilex Pharma, which was contributed to its majority-owned subsidiary Scilex Holding in connection with the corporate reorganization of Scilex Holding and acquisition of Semnur by Scilex Holding in March 2019. Those assets, together, constitute Sorrento's Scilex segment.

information and belief, the debt that Sorrento gave up was worth more than the shares received from Scilex.

50.    In November 2022, Sorrento closed a merger with a special purpose acquisition company concerning Scilex (the "Scilex deSPAC"). Under the Scilex deSPAC, Scilex merged with Vickers Vantage Corporation. At the close of the merger, Sorrento owned approximately 99.9% of the total publicly tradable common stock in the newly merged Scilex. As a part of the transaction, Sorrento and other Scilex shareholders were restricted from trading their shares in the post-merger entity until May 11, 2023.

51.    In conjunction with the Scilex deSPAC, Sorrento forgave even more of Scilex's debt. Sorrento's board revised its September Debt Exchange Agreement with Scilex, increasing the amount of Scilex's debt that was forgiven so that it forgave *all Scilex's* outstanding debt (approximately $290.5 million).  On information and belief, the debt that Sorrento gave up was worth more than the shares received from Scilex.

52.    Nonetheless, because of the Scilex deSPAC, Scilex's shares nominally became Sorrento's most valuable asset.

**The Debtors' Declining Financial Position.**

53.    In the years leading into the Dividend and eventual bankruptcy, Sorrento's business prospects plummeted and its eventual bankruptcy became unavoidable.

54.    Unable to generate organic profits, and with a too expensive and overly optimistic pipeline, Sorrento had only been capable of obtaining cash to fund its operations through ATM stock offerings.  ATM offerings are risky and expensive ways for a company to fund its operations, but Sorrento had no other options.

55.    In December 2021, Sorrento entered into an ATM agreement with Cantor Fitzgerald, H.C. Wainwright, and B. Riley Securities, whereby those entities would sell Sorrento's

shares on the secondary market to third parties to generate revenue. The parties agreed that the proceeds of those sales would be distributed to Sorrento or held on deposit for Sorrento's use.

56.     Shortly thereafter, for the 2021 fiscal year, Sorrento reported that its auditor, Ernst & Young LLP, issued an opinion expressing doubt about Sorrento's ability to continue as a going concern.  Ernst & Young also reported—based on input from Sorrento's own management—that Sorrento lacked basic internal controls over its accounting and financial processes, a major red flag that its accounting could not be trusted to deliver reliable results. Specifically, Ernst & Young found that "[Sorrento] did not employ sufficient accounting resources with appropriate experience and technical expertise to effectively execute controls over certain judgmental and technical accounting areas . . . [and that] the combination of [these] deficiencies results in a reasonable probability that a material misstatement of [Sorrento's] financial statements will not be prevented or detected on a timely basis." As of 2022, Ernst & Young reported that the material weaknesses remained.

57.     Defendants knew about these management concerns and audit conclusions.

58.     Desperate to stay in business, Sorrento took out its first bridge loan of $84 million from B. Riley Commercial Capital on February 11, 2022.  Due to its unsustainable operating costs (including its development pipeline and active litigation, among other expenses), Sorrento quickly spent the proceeds of the loan without any tangible improvement in its ability to operate as a going concern.   As 2022 progressed, Sorrento continued to bleed cash and deplete its available liquidity —with no revenue (let alone profit) in return.

59.     On September 30, 2022, continuing to burn through its liquidity with little revenue and only negative cash flows, Sorrento took out its second bridge loan of $41.6 million from B. Riley Commercial Capital, set to mature on January 31, 2023.  The same day, Sorrento filed a

Form 10-Q with the Securities and Exchange Commission, disclosing $176 million in assets, but only $70 million in available cash.

60.     By the fourth quarter of 2022, Sorrento realized significantly less in proceeds from ATM offerings than it had on average in the previous three quarters. Sorrento's ability to raise cash through ATM offerings had dissipated.

61.     On November 8, 2022, Sorrento disclosed another going concern warning in its quarterly Form 10-Q filed with the Securities and Exchange Commission.  In December 2022, Sorrento reported negative retained earnings of $21.7 million, and by March 31, 2023, Sorrento's balance sheet reflected $127 million in negative equity value.

62.     Sorrento's stock price also decreased quickly during this period. On November 18, 2022, Sorrento's stock price fell by approximately 6% following the announcement that the Board of Directors authorized the company to explore and consider the Dividend. On December 5, 2022, Sorrento's stock price fell by another 6% following the disclosure of the Nant Arbitration Award. On December 19, 2022, Sorrento's stock fell by 15% when it filed a Shelf Registration (in anticipation of a future securities offering in the amount of $41.2 million) and announced that shareholders rejected the Board of Directors' recommended executive compensation. Sorrento's stock price even fell by another 3% on December 21, 2022 when it announced its own ostensibly favorable award in the Cynviloq Arbitration (defined below). In other words, the momentum of Sorrento's stock price plummet was so dramatic that, even though Sorrento announced a favorable, nominal nine-figure arbitration award, the market reacted negatively and continued to dump Sorrento stock.

63.     Sorrento's fiduciaries had actual knowledge of these material risks as they materialized; they were aware of Sorrento's quickly declining financial position, and never took remedial action to implement adequate and effective controls to stabilize the company.

**Sorrento is Saddled with a Devastating Adverse Arbitration Award**

64.     Adding fuel to the inferno—and after several years of active litigation—Sorrento was hit with the Nant Arbitration Award in December 2022.  The arbitration had been pending for years.  Beginning in 2019, Sorrento engaged in separate cross-arbitrations related to its joint venture with the Nant Entities. In one proceeding (the "Nant Arbitration"), the Nant Entities accused Sorrento of failing to perform under the parties' Stock Purchase and Sale Agreement ("Nant Agreement"), among other claims. In another proceeding (the "Cynviloq Arbitration"), Sorrento pursued various claims against the Nant Entities related to the business venture.

65.     The Cynviloq Arbitration was filed on April 3, 2019. Sorrento filed a derivative suit on behalf of NANTibody for unauthorized acts, breach of contract, breach of fiduciary duties, abuse of control, corporate waste, and unjust enrichment.

66.     On May 24, 2019, the Nant entities sued Sorrento, and Ji personally, for breach of contract, unjust enrichment, fraud, and fraudulent inducement related to the Nant Agreement. Among other conduct, the Nant entities alleged that Ji, despite advertising Sorrento as the next leader in developing anti-cancer drugs and therapeutics, was only interested in trading therapeutics to inflate Sorrento's own stock values and never made a genuine effort to make advances in medical science.

67.     Ji and Sorrento moved to compel arbitration. Ji was actively involved in defending against Nant's claims, and had full knowledge of the risks and potential liability of the same, including potential damages of hundreds of millions of dollars.

18

68.     As directors and officers, Defendants had an obligation to stay informed of the risks posed by the Nant Arbitration and to ensure that the Company was appropriately mitigating those risks and could account for any resulting liabilities.  Defendants utterly failed in that obligation, or worse, consciously disregarded those risks in their business judgments.  Either Defendants were fully informed of the progression of, developments in, and results of the Nant Arbitration and Sorrento's potential exposure and did not take reasonably necessary steps, or they failed to inform themselves of material information about—and put in place processes to maintain controls over—the Company they were leading. As a result, Sorrento was wholly unequipped to deal with any financial fallout stemming from the Nant Arbitration.

69.     Despite all this, Ji and Sorrento's other Directors and Officers proposed the Dividend of Scilex stock while the Nant Arbitration was still pending, with full knowledge of the potential for hundreds of millions in forthcoming liability—and no contingency planning to deal with an adverse ruling.

70.     These known risks came to fruition on December 2, 2022, when an adverse award was issued in the arbitration brought by the Nant Entities. The arbitrators concluded that Sorrento breached its obligations under the Nant Agreement. As a result, the Nant Entities were awarded over $173 million in damages, plus pre-judgment interest and post-judgment interest of approximately $43,000 per day until paid.

71.     Everyone knew the threat to Sorrento was existential.  The Nant Arbitration Award exceeded the entire asset base Sorrento had recorded on its balance sheet as of December 2022.

72.     Further, the Nant Entities informed Sorrento that they intended to enforce the award.  On December 3, 2022—the day after the award issued—counsel for the Nant Entities

contacted Sorrento's arbitration counsel to request assurances that Sorrento would not take any action to deplete its liquidity or dissipate assets until the Nant Arbitration Award was paid.

73.     Sorrento's board was informed of this development; on December 5, Sorrento's arbitration counsel responded to counsel for the Nant Entities that their concerns had been shared with Sorrento's Board of Directors.

**Despite the Debtors' Lack of Liquidity and Looming Obligations, the Directors Approved the First and Only Dividend in Sorrento's History.**

74.     On information and belief, the Dividend of the Scilex shares was Ji's brainchild.  Ji was a member of Scilex's Board, and in the months before he could convince the Sorrento Board to approve a Dividend of Scilex shares, Ji put the process in motion.  Yet, his plans encountered various obstacles, including the tax liabilities associated with such a Dividend and the Company's mounting losses and litigation risks.

75.     But Ji was more interested in currying favor with shareholders, who upon information and belief, had recently voted down a proposal (by Ji) to increase the compensation of Sorrento's executives amidst Sorrento's financial woes. In Ji's mind, a gratuitous dividend could ingratiate Sorrento's leadership to its shareholders and increase their willingness to increase the leaderships' compensation.

76.      Undeterred, Ji pressed ahead in disregard of imminent risks.  By November 18, 2022, Sorrento's Board announced a potential dividend to its shareholders, consisting of a substantial portion of Scilex's common stock.  By December 6, after the announcement and after the Nant Arbitration Award, Sorrento's stock value plunged to an all-time low, as described above.

77.     On December 8, 2022, the Nant Entities filed an *ex parte* application for right to attach order, prejudgment writ of attachment, temporary restraining order and order to show cause on why a preliminary injunction should not issue.  At the hearing, the Nant Entities sought to

enjoin the Dividend's issuance as a flagrant attempt to render the Nant Arbitration Award uncollectible. That injunction was denied because Sorrento misled the court. Specifically, Sorrento claimed it was solvent when its Officers and Directors knew it was not. This decision left the Nant Entities with no recourse to prevent Sorrento from deliberately depleting assets that could have been used to satisfy the award or any other creditor.

78.     Despite the known risks and collection attempts by the Nant Entities' arbitration counsel, Ji advocated in favor of issuing the stock Dividend and Sorrento's other Directors and Officers imprudently rubber-stamped its approval. In the ensuing month, Ji, management, and the Board manufactured the justifications for the Dividend. Ji's purported rationale for the Dividend was to increase the liquidity potential for Scilex stock and provide a return for shareholders, but that makes no sense. Each recipient of Scilex stock would be bound by trading restrictions resulting from the Scilex de-SPAC transaction until May 2023, and Sorrento could have just as easily sold the shares once the restrictions were lifted to provide the same value to the Company, its creditors, and (had it been proper) those same shareholders.

79.     On December 29, 2022, Sorrento's management presented its proposed Dividend to the Board of Directors: 76 million shares of Scilex common stock to Sorrento shareholders and certain warrant holders, representing approximately 54% of the total outstanding shares of Scilex common stock. Sorrento would receive no consideration or value in return—it was an insolvent company's giveaway to shareholders at the expense of Sorrento and its creditors.

80.     None of Sorrento's Board meeting minutes from the deliberation of the Dividend reflect *any* consideration of the impact of the Award on Sorrento's ability to fund the Dividend. The word "arbitration" does not even appear anywhere in the Board meeting minutes, though the meeting took place just a few weeks after Sorrento was hit with the Nant Arbitration Award. All

that the meeting minutes say is that further questions were asked and full discussion ensued, but that is artifice; the Company made no provisions to pay for the Nant Arbitration Award from available cash, and the Board never asked questions or pressed management on the plan.

81. Nor do any Board meeting minutes reflect the deliberation of Sorrento's going-concern warnings and lack of financial controls, both of which Sorrento's Directors knew about and should have given the Directors pause when reviewing internal company valuations presented by management.

82. Despite its going-concern warning and lack of controls, Sorrento's Board did not obtain a third-party valuation or solvency analysis to support the Dividend. Instead, on December 8, Liang Zhao, Sorrento's Corporate Comptroller, performed a surplus calculation to support the proposed dividend. It did not attempt to arrive at a fair valuation of Sorrento's assets and liabilities; it only used book value, except for the value of Scilex stock, which up until that time had not been reflected on Sorrento's balance sheet. It did not provide for any stress testing on Sorrento's financials. Despite counsel's request to get final approval from Ernst & Young, Zhao never did. Furthermore, even though the Board was told that Sorrento must also have the ability to pay its debts as they became due (including the Nant Arbitration Award) and that Sorrento must have adequate capital for its continuing business operations (including its cash-intensive clinical development programs), no such tests were performed or presented to the Board.

83. Sorrento's Board also failed to obtain the advice of non-conflicted advisors. Sorrento's counsel, which presented the legal requirements and fiduciary obligations for issuing a Dividend, represented both Sorrento and Scilex—a clear conflict since Sorrento's proposed dividend was of Scilex shares. Sorrento's counsel nonetheless presented the Officer's Certificate and balance sheet valuation.

84.     Ji also manipulated the process to facilitate the Dividend.  With a series of payments on December 2, 5, 6, 9, 12, 13, 14, 20, and 21, Sorrento pre-paid $26 million on its $41.6 million bridge loan with B. Riley Commercial Capital, despite the fact that it would not mature until the end of January 2023.  These prepayments were made to entice B. Riley to refrain from objecting to the Dividend.

85.     Nor did the Directors ensure that the decision to issue the Dividend was being made by disinterested directors.  At the time of the Dividend's approval, Ji and other Directors were simultaneously directors of Scilex and motivated to act in Scilex's interest to the detriment of Sorrento. A majority of the Board also received a portion of the Dividend, a benefit not enjoyed by Sorrento's creditors.  Yet, without any cleansing, the Board of Directors unanimously approved the Dividend.

86.      By the end of 2022, Sorrento's ongoing liquidity issues and its adverse award caused Sorrento's stock price to plummet to an all-time low of $1.125 per share, and Sorrento's retained earnings fell to a negative $21.7 million.

87.     On or around January 19, 2023, Sorrento issued the Scilex stock Dividend.

88.     On February 13, 2023, Sorrento filed IRS Form 8937. A company files a Form 8937 when an organizational action affects the basis of holders of a security or holders of a class of the security. In the Form 8937, Sorrento admitted that its retained earnings were insufficient to fund the Dividend, so it would record the stock Dividend as a non-dividend return of capital (one of the tax implications that Ji originally said should preclude the issuance of the dividend).

**Sorrento's Directors and Officers failed to implement financial and operational controls to monitor and manage its risks and cash positions.**

89.     Publicly traded companies are obligated under the Sarbanes-Oxley Act to implement and maintain internal controls to protect their financial stability.

23

90. Among other requirements, a company's Directors and Officers must establish a framework of controls, change management, and segregation of independent financial duties.

91. Further, companies must file reports with the Securities and Exchange Commission in which Chief Executive and Financial Officers certify that the company's financial statements are accurate and that their financial controls are effective.

92. Sorrento's Directors and Officers never established effective financial controls to ensure the company's financial stability.

93. At no time during Sorrento's downward spiral did Ji or other Directors and Officers establish adequate corrective financial controls to stabilize the company or address the known legal and financial risks it faced.

94. In fact, as early as 2021, Sorrento's third-party auditor, Ernst & Young, found that Sorrento "did not employ sufficient accounting resources with appropriate experience and technical expertise to effectively execute controls over certain judgmental and technical accounting areas." These findings were supported by information provided by Sorrento's own management.

95. And by the end of 2022, Ernst & Young *again* concluded—based on risks identified by management—that "certain of the Company's control activities in the areas of revenue, business combinations, investments, debts, derivative liabilities, contingent consideration and intangibles did not operate effectively and have been deemed deficient [, and these deficiencies] represent[] a material weakness in our internal control over financial reporting" as of December 31, 2022. This conclusion epitomized the risks faced by Sorrento—including the risks attendant to its liabilities arising from the Nant Arbitration and its business combinations.

96.     Despite these management-sourced observations, Sorrento's Directors and Officers never established internal controls to ensure the company had effective control over its legal risks and financial decision-making.  Sorrento's Directors and Officers failed to implement monitoring systems or an internal auditing process to independently ensure accurate financial reporting, detect red flags affecting the Company—including the legal risks associated with the Nant Arbitration and its various business combinations, or prevent fraud. Sorrento's Directors and Officers maintained grossly inadequate oversight of operations and failed to monitor or supervise corporate activities, including Sorrento's cash accounts and Sorrento's mergers, acquisitions or transactions. Sorrento's Directors and Officers failed to implement proper oversight systems, ignored red flags about potential liabilities arising from legal claims and business combinations, and were willfully blind to issues related to legal and business liabilities.

97.     Sorrento's Directors and Officers also had a duty to ensure that, once insolvent, they were complying with their duties to the Company in light of the fact that the Company's creditors, not its shareholders, were the beneficiaries of the residual value of the Company.  The Directors and Officers were warned in multiple consecutive years by the Company's auditors regarding the doubts about its ability to continue as a going concern.

98.     In multiple audits, Ernst & Young explicitly found that management concluded that the company's recurrent losses and negative cash flows from operations, along with other factors, raise "substantial doubt about [Sorrento's] ability to continue as a going concern."

99.     Yet Ji, along with Sorrento's other Directors and Officers, deliberately ignored, in bad faith, external auditors' going-concern warnings at the time they considered and approved the Dividend.  They also abdicated responsibilities by rubber stamping the Debt Exchange Agreement, Debt Forgiveness and Dividend without meaningful consideration of risks to the Company.

25

100.    Ji, along with Sorrento's other Directors and Officers, failed to ensure that the Company had the ability and financial controls in place to satisfy the liability stemming from the Nant claims and, after the Nant Arbitration Award issued, the Nant Arbitration Award itself.  They utterly failed to put in place a process to ensure that the Nant Arbitration Award could be satisfied after issuing the Dividend.  Upon information and belief, despite their awareness of the Nant claims and their potential outcomes, neither Ji nor any other Directors or Officers advocated for imposing reasonable financial checks and controls to ensure that any adverse judgments would not sink Sorrento as a whole.

101.    Accordingly, Sorrento's Directors and Officers failed to ensure that Sorrento was adequately capitalized to continue its operations.

**Sorrento was Insolvent, Unable to Pay its Debts, and Inadequately Capitalized at the Time of the Dividend.**

102.    In January 2023, when Sorrento issued the Dividend (as well as in December 2022, when the Directors and Officers pursued and approved the Dividend), Sorrento was balance-sheet insolvent, unable to pay its debts as they became due, and inadequately capitalized.

103.    The December 8 back-of-the-envelope surplus calculation did not even attempt to analyze the fair value of Sorrento's assets and liabilities.  Rather, it used the book value of the company—despite Sorrento's auditors' going-concern warnings—for clear reason: valuing Sorrento's costly and underperforming pipeline would have shown that Sorrento was insolvent. The scheduled assets and liabilities did not present a realistic picture of the likelihood of approval, cost of development, time to monetization, or market penetration of the pipeline drugs. The pipeline was based on aggressive assumptions failing to appropriately discount highly speculative pharmaceutical candidates. Sorrento underestimated cost budgets and discounted competition. Even then, the Scilex stock that Sorrento added to its balance sheet for the first and only time as a

way to bridge the deficit was also overvalued because it was subject to trading restrictions. The value of the stock was improperly derived from limited market trading that did not reflect the value of the vast majority of shares of Scilex, which were prohibited from being traded. Furthermore, Sorrento credited as an asset more than $1 billion of net operating losses ("NOLs"), which on their own evidenced its perpetual business losses. But the value of the NOLs was overstated because NOLs are subject to usage restrictions, illiquid, and not readily monetized. Correcting for these errors would clearly result in balance sheet insolvency. By year-end 2022, Sorrento's liabilities exceeded Sorrento's enterprise value by over $80 million.[9]

104.    Sorrento was also unable to pay its foreseeable debts as they became due. Sorrento was perpetually bleeding cash. Sorrento's cumulative cash flow from operations from 2018 to 2022 was negative $1.023 billion. Sorrento's cumulative unlevered free cash flow from operations over the period was negative $738.5 million. Sorrento's cumulative EBITDA over the period was negative $1.242 billion. And, Sorrento's cumulative operating income (EBIT) over the period was negative $1.298 billion. In keeping with Sorrento's pattern of generating consistently negative cash flows, EBITDA and EBIT, Sorrento's cumulative net loss over the period was negative $1.716 billion.[10]

105.    By the fourth quarter of 2022, Sorrento realized significantly less in proceeds from ATM offerings than it had on average in the previous three quarters. By the end of 2022, Sorrento's ability to raise cash through ATM offerings disappeared. With its ATM facilities drying up and

---

[9] Based on the market values of the aggregate common stock of Sorrento and related shares outstanding as of December 29, 2022.

[10] Ranging from a negative $203.5 million for the twelve months ending December 31, 2018 to negative $493.6 million for twelve months ended September 30, 2022.

having repaid the bridge loan, Sorrento had no ability to satisfy its other debts (including either the Nant Arbitration Award or the cost of its clinical trials).

106.    Most prominently, Sorrento had no plan and no ability to pay the Nant Arbitration Award.  As of December 31, 2022, Sorrento reported only cash and cash equivalents of $23.6 million. By February 13, 2023, Sorrento had approximately $5 million in unrestricted cash and few other short-term assets.  Sorrento received the Nant Arbitration Award in early December, it paid the Dividend in mid-January, and it entered bankruptcy because it could not pay a $50 million portion of the Nant Arbitration Award that was progressing toward enforcement in February.

107.    Sorrento was also woefully undercapitalized considering the capital-intensive nature of its pharmaceutical development business.  Sorrento had never generated sufficient profits to sustain its operations organically and, at the time of the Dividend, it lacked the capital to bring any of its pipeline drug candidates to market to sustain its operations.  Even prior to the Dividend, Sorrento failed by a significant degree under four of the five industry ratios for capital adequacy as compared to seven comparable clinical-stage biotechnology companies (which were also selected by Sorrento for executive compensation benchmarking analyses and categories in the same SIC Industry Code of 2836).[11] After issuance of the Dividend, Sorrento failed every single

---

[11] The first ratio tests a company's ability to meet short-term obligations with its current assets on an ongoing basis by dividing the company's current assets by its current liabilities. Sorrento's ratio was .88, while the median and mean for comparable companies was 6.21 and 5.92, respectively, placing Sorrento below the mean of the comparable companies by 85% and median by 86%. The second ratio tests a company's ability to cover short-term obligations with cash and other assets readily converted into cash. Sorrento's ratio was .70, while the median and mean for comparable companies was 6.09 and 5.71 respectively, placing Sorrento below the median and mean of the comparable companies by 88%. The third ratio tests the riskiness of funds permanently invested by shareholders and temporarily risked by creditors, ultimately gauging the risk to creditor returns, by comparing a company's liabilities to its net worth. For Sorrento, the ratio of liabilities to net worth was equal to 1.55 before issuance of the Dividend. By comparison, the median and mean for comparable companies was 0.14 and 0.25 in both cases. The fourth ratio measures the extent

industry ratio.[12] Moreover, by distributing out half of its value for no benefit, Sorrento undercut its ability to obtain capital in the markets or otherwise fund its operations.

108.    Finally, even absent the Dividend, Sorrento was destined for bankruptcy under the Altman Z"-Score Model, which is one of the leading and most widely accepted statistical predictors of business failure. Based on both Sorrento's reported financials through the last quarter of 2022 and Sorrento's financials following issuance of the Dividend, the model predicted bankruptcy in every single period, especially in the last quarter of 2022.

109.    Accordingly, based on the foregoing and numerous accepted solvency tests, Sorrento was insolvent at the time of the Dividend and issuing the Dividend foreclosed any ability to recover outside of bankruptcy.

### Debtors' File for Chapter 11 Relief, and David Weinhoffer is Appointed the Debtors' Liquidation Trustee.

110.    Less than one month after the Dividend, on February 12, 2023, Sorrento and a wholly owned subsidiary, Scintilla Pharmaceuticals, Inc., filed voluntary petitions for bankruptcy under Chapter 11.   At the time of the bankruptcy filing, Sorrento had less than $5 million in unrestricted cash available to pay its creditors.   Ji testified at the First Day Hearing that the Debtors only had a "few million dollars" in available cash.

---

to which debt and/or preferred stock with fixed interest and/or dividend payments are used to increase the return on common equity by examining the ratio of total liabilities to net worth. As compared to comparable companies' median and mean total liabilities to net worth ratios of 0.25 and 0.42, Sorrento was highly leveraged with total liabilities to net worth equal to 3.73 prior to the Dividend.

[12] In addition to failing the same ratios as *before* the Dividend, Sorrento additionally failed the fifth ratio following the Dividend, where Sorrento's fixed assets to net worth ratio was -0.25 (as compared to respective industry median and means of .16 and .11), reflecting Sorrento's negative net worth.

111.     On November 30, 2023, the Court entered an order confirming the Debtors' chapter 11 plan of liquidation (the "Plan") [Dkt. No. 1616](with a corrected order entered on December 13, 2023 at Dkt. No. 1652 (the "Confirmation Order")).

112.     The Plan went effective on April 10, 2024 (the "Effective Date").

113.     The Debtors' cases are currently pending in the United States Bankruptcy Court for the Southern District of Texas, captioned *In re Sorrento Therapeutics, et al.*, Case No. 23-90085.

114.     The Liquidation Trust was created on the Effective Date, appointing David Weinhoffer as the Trustee.

## **FIRST CAUSE OF ACTION**

**Breach of Fiduciary Duty Against the Director Defendants (Delaware Common Law)**

115.     The Trustee reincorporates and realleges the allegations in paragraphs 1-114 above.

116.     As Directors of Sorrento, each Director Defendant owed it the highest obligations of due care, loyalty, and good faith. Those duties extended, upon insolvency, to Sorrento's creditors as residual owners of the company.

117.     The duty of due care required the Directors to, at all times, perform their duties in good faith, on an informed basis, and in honest belief that the action in question was in Sorrento's best interest.

118.     The duty of loyalty required independence and disinterestedness. Independence required the Directors' decisions to be based on the corporate merits of the subject before the board, rather than extraneous considerations or influences.  Disinterestedness required that the Directors not personally receive a benefit from a transaction, not generally shared by other shareholders, from which it could be reasonably questioned whether the Directors objectively considered its advisability. These benefits are not limited to monetary benefits, but may include

decisions or transactions that allow Directors to maintain their positions, stock options, or other benefits of their positions.

119.    The duty to act in good faith required the Directors to not act grossly negligent and not in conscious disregard for their duties.

120.    Under Sorrento's articles of incorporation, the Director Defendants are not exculpated for a breach of the director's duty of loyalty, any act done in bad faith, or any action taken in conscious disregard of their fiduciary duties.

121.    As alleged above, the Director Defendants acted in breach of their duty of loyalty, in bad faith, and in conscious disregard of their duties.

122.    Each of the directors breached his duties by, among other acts and omissions:

    a.    Approving the Dividend knowing Sorrento was insolvent;

    b.    Approving the Dividend, including approving the Dividend the same month that it faced the adverse Nant Arbitration Award that it did not have the ability to pay; based on what they knew to be a facially and critically flawed, inadequate, and incomplete valuation analysis; despite the conflicts of interest within the Board, of officers of Sorrento, and of the Company's advisors; despite knowing that the Company was insolvent, lacked adequate capital, and was unable to meet its debts as they became due; despite knowing about the lack of controls over the very information which he purported to rely;

    c.    Failing to engage a third-party valuation and solvency advisor;

    d.    Failing to oversee, monitor, and ensure adequate controls over key accounting, financial, legal, and risk-managements functions for legal risks, pipeline development, and cash management, including implementation of information and reporting systems;

    e.    Relying on the advice of Sorrento's management knowing that there was a lack of internal controls over key accounting and financial functions; and

    f.    Failing to ensure that Sorrento had adequate capital, financial controls, and reasonable decision-making processes to continue its operations when faced with the Nant Arbitration Award, depletion of financial resources, and declining revenue.

123. Further, the Directors failed to maintain independence in consideration of the Dividend, because they had no rational business purpose in awarding a stock dividend when Sorrento's assets were actively being depleted, had no new streams of revenue, and had been saddled with the $173 million adverse Nant Arbitration Award.

124. The Defendant Directors further failed to maintain independence by considering the Dividend under the influence of Ji, other Sorrento officers, and what they knew to be inaccurate and critically flawed information, rather than the corporate merits of the Dividend based on objective material facts.

125. The Director Defendants knew about the risks—including having been warned by corporate and litigation counsel—and intentionally disregarded their fiduciary obligations in committing the above-described acts and failures to act.

126. The Director Defendants (with the exception of Janda) were conflicted and/or interested in the Dividend as shareholders and board members of Sorrento and board members of Scilex. Furthermore, as a result of their breaches, the Director Defendants received monetary and other benefits not shared by Sorrento's creditors. On information and belief, the Board was conflicted as a whole because the majority of Directors also personally received or maintained stock options with respect to Scilex by virtue of the Dividend, which materially improved the Director Defendants' positions with regard to Scilex because they were also Directors of Scilex at the time of the Dividend. This transaction, which comingled the Defendants' stock options and corporate control of Scilex, caused the Director Defendants to receive a far greater benefit than that received by Sorrento's creditors.

127. As a result of these breaches, Sorrento's creditors were injured because the Dividend transferred substantial assets to the personal hands of shareholders and the Director

Defendants. Accordingly, Sorrento's creditors, including the Nant Entities, were injured by the substantial depletion of Sorrento's assets, which in turn accelerated Sorrento's bankruptcy.

128.    As a result of these breaches, Sorrento and its creditors were injured by loss of value of the dividend and damages incurred when Sorrento entered bankruptcy, in the amount of not less than $100 million.  The Director Defendants are liable to the Trustee, as the successor to claims of the Debtors, to compensate for these and other results of their breaches of fiduciary duties.

## SECOND CAUSE OF ACTION

**Breach of Fiduciary Duty Against the Officer Defendants (Delaware Common Law)**

129.    The Trustee reincorporates and realleges the allegations in paragraphs 1-128 above.

130.    As Chief Executive Officer of Sorrento, Henry Ji was entrusted by the Board of Directors with overseeing Sorrento's operations, financial health, and team of executives. He had the responsibility for the general management and control of the business and affairs of Sorrento. Ji also had general supervision and direction of all of the other officers, employees, and agents of Sorrento.

131.    As Chief Financial Officer of Sorrento and Executive Vice President, Elizabeth Czerepak was entrusted by the Board of Directors with keeping accurate financial records and preparing the financial statements. The Board trusted that she would keep Sorrento's books in a thorough and proper manner. Additionally, as Vice President, she had powers and duties that were commonly incident to that office.

132.    As Corporate Controller of Sorrento, Liang Zhao should have directed the company's overall accounting functions, secured accurate financial reporting, implemented internal controls, and provided accurate, fulsome insights to the Board of Directors.

133. The Board of Directors delegated each of these responsibilities to the respective Officer Defendants. Each Officer Defendant had an obligation to comply with their respective fiduciary obligations owed to Sorrento as its executives.

134. For corporate officers, the duty of care required them, at all times, to perform their duties in good faith, on an informed basis, and in honest belief that the action in question was in Sorrento's best interest.

135. For corporate officers, the duty of loyalty required independence and disinterestedness. Independence required the Officers' decisions to be based on the corporate merits of the subject before the board, rather than extraneous considerations or influences.

136. For corporate officers, the duty of good faith requires them to not act grossly negligent and not in conscious disregard for their duties.

137. Those duties extended, upon insolvency, to Sorrento's creditors as residual owners of the company.

138. Under Sorrento's articles of incorporation, the Officer Defendants are not exculpated from breaches of these duties.

139. The Officer Defendants acted in bad faith, with gross negligence and in conscious disregard of their fiduciary duties.

140. Ji breached his duties by, among others:

    a. Promoting the Dividend, including promoting the Dividend the same month that it faced the Nant Arbitration Award that it did not have the ability to pay; based on what he knew to be a facially, and critically flawed, inadequate, and incomplete valuation analysis; despite the conflicts of interest and those of the company's advisors; despite knowing that the company was insolvent, lacked adequate capital, and was unable to meet its debts as they became due; despite knowing about the lack of controls over the financial and accounting systems;

    b. Failing to institute adequate controls over key accounting and financial functions;

    c.   Failing to acquire a third-party valuation of Sorrento;

    d.   Promoting false and self-interested assumptions about the company's pharmaceutical drug pipeline;

    e.   Failing to ensure that Sorrento had adequate capital to continue its operations when faced with the Nant Arbitration Award;

    f.   Failing to reconsider the Dividend after receiving the Nant Arbitration Award;

    g.   Pressuring Zhao to find a surplus wherever she could; and

    h.   Promoting the Dividend despite the self-dealing nature of the transaction.

141.    Czerepak breached her duties by, among others:

    a.   Failing to implement adequate controls over Sorrento's financial and accounting systems;

    b.   Signing the CFO certificate without basis and without adequate oversight over the surplus calculation;

    c.   Presenting the CFO certificate at the Board of Directors meeting knowing that an independent auditor, Ernst & Young, would not sign off on the legality of the surplus calculation;

    d.   Failing to procure a third-party valuation of Sorrento; and

    e.   Failing to ensure proper business and financial controls over Sorrento's drug pipeline.

142.    Zhao breached her duties by, among others:

    a.   Presenting the surplus calculation to the CFO even though an independent auditor, Ernst & Young, would not sign off on the legality of the surplus calculation;

    b.   Failing to procure a third-party valuation of Sorrento; and

    c.   Failing to keep realistic accounts of Sorrento's drug pipeline.

143.    As a direct and proximate result of these breaches, Sorrento and its creditors were injured by loss of value of the dividend and damages incurred when Sorrento entered bankruptcy

totaling not less than $100 million.  The Officer Defendants are liable to the company and its bankruptcy estate to compensate for these and other results of their breaches of fiduciary duties.

## THIRD CAUSE OF ACTION

### Aiding and Abetting Breaches of Fiduciary Duty (Officer Defendants)

144.    The Trustee reincorporates and realleges the allegations set forth in paragraphs 1–143 above.

145.    As Officers of Sorrento, Henry Ji, Liang Zhao, and Elizabeth Czerepak owed it the highest obligations of due care, loyalty, and good faith. Those duties extended, upon insolvency, to Sorrento's creditors as residual owners of the company.

146.    The duty of loyalty required these Officers to place Sorrento's best interests above any personal interest possessed by the Officers or Directors that was not shared by Sorrento's shareholders.

147.    The duty of due care required the Officer Defendants to, at all times, perform their duties in good faith, on an informed basis, and in honest belief that an action in question was in Sorrento's best interest.

148.    The duty to act in good faith required the Directors to not act grossly negligent and not in conscious disregard for their duties.

149.    Under Sorrento's articles of incorporation, the Officer Defendants are not exculpated from breaches of these duties.

150.    As an Officer of Sorrento, Henry Ji aided and abetted the Directors' conscious disregard and breach of their fiduciary duties by, including and without limitation:

    a.   Recommending approval of the Dividend the same month that it faced the Nant Arbitration Award that it did not have the ability to pay; based on what he knew to be a facially, and critically flawed, inadequate, and incomplete valuation analysis; despite the conflicts of interest and those of the company's advisors; despite knowing that the company was insolvent,

lacked adequate capital, and was unable to meet its debts as they became due; despite knowing about the lack of controls over the very information which they purported to rely;

b. Failing to ensure adequate controls over key accounting and financial functions;

c. Failing to engage a third-party valuation expert; and

d. Failing to ensure that Sorrento had adequate capital to continue operations when faced with the Nant Arbitration Award.

151. As an Officer of Sorrento, Elizabeth Czerepak aided and abetted the Director's conscious disregard and breach of their fiduciary duties by, including and without limitation:

a. Recommending approval of the Dividend the same month that it faced the Nant Arbitration Award that it did not have the ability to pay; based on what she knew to be a facially, and critically flawed, inadequate, and incomplete valuation analysis; despite the conflicts of interest and those of the company's advisors; despite knowing that the company was insolvent, lacked adequate capital, and was unable to meet its debts as they became due; despite knowing about the lack of controls over the very information which they purported to rely;

b. Failing to ensure adequate controls over key accounting and financial functions;

c. Failing to engage a third-party valuation expert; and

d. Failing to ensure that Sorrento had adequate capital to continue operations when faced with the Nant Arbitration Award.

152. As an Officer of Sorrento, Liang Zhao aided and abetted the Director's conscious disregard and breach of their fiduciary duties by, including and without limitation,

a. Recommending approval of the Dividend the same month that it faced the Nant Arbitration Award that it did not have the ability to pay; based on what she knew to be a facially, and critically flawed, inadequate, and incomplete valuation analysis; despite the conflicts of interest and those of the company's advisors; despite knowing that the company was insolvent, lacked adequate capital, and was unable to meet its debts as they became due; despite knowing about the lack of controls over the very information which they purported to rely;

b. Failing to ensure adequate controls over key accounting and financial functions;

c. Failing to engage a third-party valuation expert; and

d. Failing to ensure that Sorrento had adequate capital to continue operations when faced with the Nant Arbitration Award.

153.   At the time that the Officers evaluated, prepared, promoted, and recommended the Dividend, they had actual knowledge that the Directors' approval of the Dividend would constitute a breach of the Directors' fiduciary duties to Sorrento and its residual owners.

154.   At the time that the Officers evaluated, prepared, promoted, and recommended the Dividend, each Officer Defendant knowingly participated in the Directors' breaches of their own fiduciary duties of due care, loyalty, and good faith owed to Sorrento and its residual owners.

155.   By engaging in this conduct, each Officer Defendant knowingly and willfully aided and abetted each Director's breach of their own fiduciary duties of due care, loyalty, and good faith owed to Sorrento and Sorrento's residual owners.

156.   As a direct and proximate result of these breaches, Sorrento and its creditors were injured. The Officer Defendants are liable to the company and its bankruptcy estate to compensate for these and other results of their breaches of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, the Trustee prays for the following relief:

      a. An award of damages of in the amount of the value of the Dividend, the losses suffered by Debtors before and during bankruptcy, in amounts to be determined at trial;

      b. Punitive damages;

      c. Attorneys' fees;

      d. Pre-judgment and post-judgment interest; and

      e. Such other and further relief as the Court may deem just and proper.

DATED:    Houston, Texas
           July 17, 2025

                      MCKOOL SMITH, P.C.

                      By:   */s/ Joshua J. Newcomer*

                      Joshua J. Newcomer
                      David Kellam
                      Hannah Syburg
                      Adam Skrzecz
                      600 Travis St # 7000
                      Houston, TX 77002
                      Telephone: (713) 485-7300
                      Facsimile: (713) 485-7344
                      Email: jnewcomer@mckoolsmith.com

                      *Attorneys for Plaintiff*