United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 22, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 23-90085 |
| SORRENTO THERAPEUTICS, | § | |
| INC., *et al.*, | § | |
| Post Effective Date Debtors. | § | Jointly Administered |
| | § | CHAPTER 11 |

**MEMORANDUM OPINION GRANTING MOTIONS TO
ENFORCE PLAN OF REORGANIZATION
(RELATES TO ECF NOS. 2674 & 2676)**

The California Plaintiffs filed claims in a United States District Court in California based on alleged pre-petition and post-petition conduct of estate professionals in these Debtors' bankruptcy proceedings. This Court confirmed the Debtors' Plan long ago, and it contained a Gatekeeping Provision requiring the California Plaintiffs to seek authorization from this Court before pursuing such claims. The claims were filed in the California District Court, nonetheless. Now, approximately two and a half years after confirmation, the Parties are back before this Court to determine the extent of its post-confirmation jurisdiction, and whether the California Plaintiffs have authorization to pursue their claims under the terms of the Debtors confirmed Plan. The express object of this Court is the fair, efficient, and impartial administration of justice. That is what the Court will pursue here. The law, in conjunction with this Court's prior orders, mandates that the California Plaintiffs lack standing to assert the claims as plead in the Complaint. Accordingly, they must be denied authorization to pursue them, and the Motions to Enforce must be granted.

## BACKGROUND

### I.   SORRENTO'S BANKRUPTCY PROCEEDINGS.

On February 13, 2023, (hereinafter the "Petition Date"), Sorrento Therapeutics, Inc. (hereinafter "Sorrento"), a Delaware corporation with

1 / 54

its principal place of business in San Diego, California, along with its affiliates (collectively the "Debtors" and after the Effective Date, the "Post Effective Date Debtors") filed voluntary petitions for Chapter 11 bankruptcy in this Court.[1]  Approximately one day prior to filing their petitions for Chapter 11 bankruptcy, counsel for the Debtors opened a post office box under the name of Scintilla Pharmaceuticals, Inc. (hereinafter "Scintilla"), an affiliate of Sorrento, in The Woodlands, Texas.[2]  Two days prior, Sorrento wired $60,000 to a newly opened Signature Bank checking account bearing the name of Scintilla.[3]  That post office box and funded checking account served as the basis for this Court's jurisdiction over the Sorrento bankruptcy at the time it was filed in 2023.[4]  Pursuant to this Court's Complex Case Procedures, former Judge David R. Jones was assigned to preside over the Debtors' bankruptcy proceedings.[5]

Also prior to filing their voluntary petitions, the Debtors retained M3 Advisory Partners, LP (hereinafter "M3") as Financial Advisor and appointed Mohsin Y. Meghji (hereinafter "Mr. Meghji") as their Chief Restructuring Officer (hereinafter "CRO").[6]  On March 14, 2023, the Debtors filed an application to employ M3 as Financial Advisor and designate Mr. Meghji as CRO.[7]  On April 13, 2023, the Court entered an order authorizing the employment of M3.[8]

---

[1] ECF No. 1.

[2] *Transcript for Hearing on March 11, 2024, regarding Timothy Culberson's and the United States Trustee's Motions to Dismiss or Transfer Venue*, ECF No. 2049 at 205:8–25, 206 at 1 [hereinafter the "*Motions to Dismiss or Transfer Venue Hearing*"].

[3] *Id.*

[4] *Id.*; *Id.* at 208:17–25.

[5] *See* Order Regarding Complex Case Assignment, *In re Consolidated Docket for Complex Chapter 11 Cases*, General Order 2018-1 (Bankr. S.D. Tex. 2018).

[6] ECF No. 5 at ¶ 49.

[7] ECF No. 227.

[8] ECF No. 440.

On April 10, 2023, the United States Trustee appointed the Official Committee of Equity Security Holders,[9] which was subsequently reconstituted on April 14, 2023 (hereinafter the "Equity Committee").[10]

On October 11, 2023, the Debtors filed their Joint Plan of Liquidation of Sorrento Therapeutics, Inc., and Scintilla Pharmaceuticals, Inc., Under Chapter 11 of the Bankruptcy Code.[11] Also on October 11, 2023, the Debtors filed an emergency motion seeking conditional approval of their disclosure statement (hereinafter the "Disclosure Statement"), and seeking the scheduling of a combined hearing on adequacy of the Disclosure Statement and confirmation of their plan of reorganization (hereinafter the "Combined Hearing").[12] On November 16, 2023, the Debtors filed the Modified Joint Plan of Liquidation of Sorrento Therapeutics, Inc., and Scintilla Pharmaceuticals, Inc., Under Chapter 11 of the Bankruptcy Code.[13]

On October 13, 2023, the United States Court of Appeals for the Fifth Circuit filed a complaint against former Judge Jones under the Judicial Improvements Act of 2002.[14] In the complaint, Chief Judge Priscilla Richman found probable cause to believe former Judge Jones engaged in judicial misconduct in certain bankruptcy proceedings he presided over, based on allegations arising out of his romantic and extra-judicial relationship with attorney Elizabeth Freeman.[15] Shortly thereafter (October 16, 2023), former Judge Jones announced he was stepping away from this Court's Complex Panel, and his involvement in the Sorrento bankruptcy proceedings was contemporaneously

---

[9] ECF No. 391.

[10] ECF No. 448.

[11] ECF No. 1404.

[12] ECF No. 1406.

[13] ECF No. 1562.

[14] Complaint Identified by the Chief Judge of the Fifth Circuit Court of Appeals Against United States Bankruptcy Judge David R. Jones, Southern District of Texas, Under the Judicial Improvement Act of 2002, Compl. No. 05-24-90002 (5th Cir. 2023).

[15] *Id.* at 4.

terminated.[16]   Judge Christopher M. Lopez was added to the case as replacement presiding judge on or about the same time.

On October 18, 2023, the Court held an emergency hearing where it conditionally approved the Disclosure Statement and scheduled the Combined Hearing.[17]   On November 30, 2023, the Court held the Combined Hearing and entered the Order Approving the Debtors' Disclosure Statement and Confirming Modified Joint Plan of Liquidation of Sorrento Therapeutics, Inc. and Scintilla Pharmaceuticals, Inc. under Chapter 11 of the Bankruptcy Code,[18] which the Court subsequently modified on December 13, 2023 (hereinafter the "Confirmation Order").[19]

On February 9, 2024, interested party Timothy Culberson (hereinafter "Mr. Culberson") filed the Motion to Dismiss or Transfer Venue Pursuant to Rule 1014(a)(2) Due to Fraudulent Venue Selection by Debtors' Counsel, based on use of The Woodlands, Texas post office box and Signature Bank account as the basis for this Court's jurisdiction and the repercussions from the Jones-Freeman relationship.[20]   On February 16, 2024, the United States Trustee filed its own Motion to Transfer or Dismiss Pursuant to 28 U.S.C. § 1408 and FED. R. BANKR. P. 1014(a)(2), based on *inter alia* the same allegations.[21]   On March 11, 2024, the Court held a  full hearing on both dismissal/transfer venue motions and denied both on the record, finding the opening of the post office box and transferring of the funds to the Signature Bank account, although generally viewed with disfavor across the country, did not fraudulently manufacture jurisdiction, but rather was consistent with prior practice.[22]   The Court also found the dismissal/transfer venue motions were not timely within the meaning of Bankruptcy Rule 1014(a)

---

[16] Order, Compl. No. 05-24-90002 (5th Cir. 2023) (stating Judge Jones submitted letter of resignation on October 16, 2023).

[17] ECF No. 1433; ECF No. 1436.

[18] ECF No. 1616

[19] ECF No. 1652.

[20] ECF No. 1851.

[21] ECF No. 1879.

[22] *Motions to Dismiss or Transfer Venue Hearing*, at 205:15–25, 206:1–5.

and (b).[23]  The Court entered corresponding orders to that effect the same day.[24]

On February 19, 2024, the Debtors filed the Emergency Motion for Entry of Orders Approving (I) Senior Secured Superpriority Financing and (II)(A) Sale of Assets and (B) Modifications of Chapter 11 Plan (hereinafter the "Vivasor Sale").[25]  On March 8, 2024, the Court entered the Order (I) Approving the Sale of Certain Assets to Vivasor, Inc. Free and Clear of all Liens, Claims, Interests, and Encumbrances, (II) Approving the Assumption and Assignment of Certain Executory Contracts, (III) Approving Modifications to Confirmed Chapter 11 Plan, and (IV) Granting Related Relief (hereinafter the "Sale Order").[26] Attached as Exhibit 3 to the Sale Order was the Second Modified Joint Plan of Liquidation of Sorrento Therapeutics, Inc. and Scintilla Pharmaceuticals, Inc. Under Chapter 11 of the Bankruptcy Code (hereinafter the "Second Modified Plan").[27]  The Sale Order provided that the Second Modified Plan would be the controlling plan following entry of the Sale Order.[28]  On March 26, 2024, the Second Modified Plan was subsequently modified by further order of the Court (the Second Modified Plan, together with such modifications, the "Plan").[29]  On April 10, 2024, the Liquidation Trust was created (hereinafter the "Effective Date").[30]

The instant motions before the Court implicate several Plan provisions.  First, Article X.C. of the Plan contains a gatekeeping provision (hereinafter the "Gatekeeping Provision") which provides

> [n]o Person or Entity (other than the Liquidation Trust, the Liquidation Trustee, or any of its representatives, successors, or assigns) who has held, holds, or may hold

---

[23] *Id.* at 208:4–21.

[24] ECF No. 2016; ECF No. 2017.

[25] ECF No. 1884.

[26] ECF No. 2001.

[27] ECF No. 2001, Ex. 3.

[28] *Id.* at 28.

[29] ECF No. 2093.

[30] ECF No. 2145.

Claims,[31] Equity Interests,[32] or Causes of Action[33] may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors or the Protected Parties,[34] as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with,

---

[31] "Claim" is defined as "any claim, as defined in section 101(5) of the Bankruptcy Code." *See* Second Modified Plan, at 4 ¶ 19.

[32] "Equity Interests" is defined as "(a) any Equity Security in any Debtor, including, without limitation, all issued, unissued, authorized or outstanding shares of stock and other ownership interests, together with (i) any options, warrants, or contractual rights to purchase or acquire any such Equity Securities at any time with respect to any Debtor, and all rights arising with respect thereto and (ii) the rights of any Entity to purchase or demand the issuance of any of the foregoing in any of the Debtors, and shall include: (1) conversion, exchange, voting, participation, and dividend rights; (2) liquidation preferences; (3) options, warrants, and call and put rights; and (4) share-appreciation rights; and (b) any 510(b) Equity Claim, in each case, as in existence immediately prior to the Effective Date." *Id.* at 7 ¶ 47.

[33] "Causes of Action" is defined as "any action, cause of action (including Avoidance Actions), claim, interest, liability, obligation, right, suit, debt, dues, sum of money, damages, reckoning, right to payment and claims, controversy, guaranty, account, covenant, promise, judgment, remedy, demand, setoff, power, privilege, license, defense, recoupment, cross claim, counterclaim, third-party claim, reimbursement claim, indemnity claim, contribution claim or any other claim, whether known or unknown, contingent or non-contingent, matured or unmatured, disputed or undisputed, suspected or unsuspected, liquidated or unliquidated, secured or unsecured, foreseen or unforeseen, *direct, derivative, or indirect, choate or inchoate, existing or hereafter arising, in contract or in tort, in law, in equity or pursuant to any other theory of law, whether arising before, on or after the Petition Date* and also includes, without limitation: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Equity Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action or state law fraudulent transfer claim." *Id.* at 3 ¶ 15 (emphasis added).

[34] "Protected Party" is defined as "each of: (a) *the Debtors*, (b) *the Committees*, (c) *the Committees' members, in their capacity as such*, (d) *Mohsin Meghji, in his capacity as Chief Restructuring Officer of the Debtors*, and (e) the *Related Persons of each of the foregoing*." *Id.* at 12 ¶ 110 (emphasis added). "Related Persons" is defined as, with respect to a Person, "each of such Person's financial advisors, attorneys, accountants, investment bankers, consultants, representatives, other professionals, and employees (other than current and former directors, officers (other than the Debtors' Chief Restructuring Officer), managers, managing members, principals, partners, members, and observers), each in their capacity as such." *Id.* at 12 ¶ 112.

relating to, or arising out of a Covered Claim,[35] without [this] Bankruptcy Court *(i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind,* and *(ii) specifically authorizing such Person or Entity to bring such Claim or Cause of Action, as applicable, against any such Debtor, or Protected Party, as applicable.* At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Protected Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person or Entity seeking to commence or pursue such Claim or Cause of Action file a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Federal Rules of Civil Procedure, including, but not limited to, Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.

*See* Second Modified Plan, at 44 (emphasis added).

---

[35] "Covered Claim" is defined as "any Claim or Cause of Action related to *any act or omission on or after the Petition Date* and *prior to the Effective Date* in connection with, relating to or arising out of the Debtors' in- or out-of-court restructuring efforts, the Debtors' Chapter 11 Cases, the DIP Facilities, the Mediation, the Scilex Stock Sale and any other section 363 sales by the Debtors, the formulation, preparation, dissemination, negotiation, solicitation or filing of the Disclosure Statement or this Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of this Plan, including the offering, issuance, sale, and/or distribution of property under this Plan or any other agreement (including any securities, to the extent applicable); *provided, however, that Covered Claims shall not include: (i) any act or omission that is determined in a Final Order to have constituted willful misconduct, gross negligence, criminal conduct or fraud*, and/or (ii) the rights of any Entity to enforce this Plan and the contracts, instruments, releases, and other agreements or documents delivered under or in connection with this Plan or assumed pursuant to this Plan or assumed pursuant to Final Order of the Bankruptcy Court." *Id.* at 5 ¶ 31 (emphasis added).

Second, the Plan transfers and vests <u>all</u> assets of the Debtors' Estates with the Liquidation Trust.  Specifically, Article V.C. of the Plan provides

> [n]otwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional assets become available, the Debtors shall be deemed to have automatically transferred to the Liquidation Trust all of their right, title and interest in and to all of the Estates' assets, including Causes of Action and any assets and rights under the NewCo Sale APA[.]

*See* Second Modified Plan, at 26.  The Third Plan Supplement, filed at ECF No. 1596, contains the Schedule of Liquidation Trust Causes of Action, which likewise provides:

> [T]he Debtors shall retain and, and shall transfer to the Liquidation Trust on the Effective Date, all rights to commence and pursue, as appropriate, any and all Causes of Action (including all Avoidance Actions), whether arising before or after the Petition Date, including but not limited to any actions specifically enumerated herein, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. []

> The Debtors expressly reserve and shall transfer to the Liquidation Trust on the Effective Date, all rights to prosecute any and all Causes of Action against any Entity, except as expressly provided in the Plan. []

> [T]he Liquidation Trust, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action.  The Liquidation Trust shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any

> third party or further notice to, or action, order, or approval of, the Bankruptcy Court. *The Bankruptcy Court shall retain exclusive jurisdiction to resolve all Causes of Action*[.]

*See* ECF No. 1596-4 (emphasis added).

Third, Article XII of the Plan contains a retention of jurisdiction provision (hereinafter the "Retention of Jurisdiction Provision"), which provides

> Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, *after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Liquidation Trust, the Liquidation Trustee, and this Plan to the fullest extent permitted by law*, including, without limitation, jurisdiction to: [] hear and determine disputes arising in connection with the *interpretation, implementation or enforcement of this Plan or the Confirmation Order*, including disputes arising under agreements, documents or instruments executed in connection with this Plan; *hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the injunctions, exculpations, and other provisions set forth in Article X of the Plan*[.]

*See* Second Modified Plan, at 47 ¶¶ 21, 23 (emphasis added).

On June 10, 2024, M3 filed its Fifth Interim and Final Fee Application of M3 Advisory Partners, LP for Compensation and Services Rendered and for Reimbursement of Expenses as Chief Restructuring Officer and Financial Advisor to the Debtors and Debtors in Possession for the Period of February 13, 2023 through April 10, 2024 (hereinafter

the "M3 Final Fee Application").[36]  On July 2, 2024, Mr. Culberson filed an Objection to various fee applications pending on the Court's docket, including the M3 Final Fee Application.[37]  On July 5, 2024, Alexander Espalin (hereinafter "Mr. Espalin," one of the California Plaintiffs, as defined below) filed his own Objection to the same fee applications.[38]  On July 10, 2024, the Equity Committee filed its Objection regarding the same.[39]  On September 13, 2024, Mr. Espalin filed a supplemental Objection to the fee applications.[40]  On September 16, 2024, the Court held a hearing during which, for the reasons stated on the record, it approved the M3 Final Fee Application and overruled each of the Objections.[41]

## II.   THE CALIFORNIA PLAINTIFFS' LAWSUIT AND RELEVANT ALLEGATIONS.

On April 3, 2026, putative plaintiffs Ethan Mevi, Enrique Curbello, Bruce Bradley, Michael Broome, Cynthia Broome, Aladdin Asfour, Kyle Hodes, Jennifer Hodes, Mr. Espalin, Moayad Altahhan, Shawn Franz, Leo Kishko, and AC Choudhury (collectively the "California Plaintiffs") filed a complaint (hereinafter the "Complaint") in the United States District Court for the Southern District of California (hereinafter the "California District Court"), naming M3, MIII Partners, L.P. (hereinafter "MIII"), and Mr. Meghji (collectively the "M3 Movants"), among others, as defendants.[42]  Each of the California Plaintiffs are noncontrolling shareholders of Sorrento.[43]  Certain plaintiffs were also noncontrolling shareholders of non-debtor entities

---

[36] ECF No. 2249.

[37] ECF No. 2278.

[38] ECF No. 2284.

[39] ECF No. 2286.

[40] ECF No. 2420.

[41] ECF No. 2426.

[42] ECF No. 2674-2.  The other named defendants in the Complaint include Henri Ji (hereinafter "Mr. Ji"), Jackson Walker, LLP (hereinafter "Jackson Walker"), Dorman Followwill, Kim D. Janda, David Lemus, Tammy Reilly, Jaisim Shah, Yue Alexander Wu, Stephen Ma, Vivasor Holding Company, Scilex Holding Company and Semnur Pharmaceuticals, Inc.  *Id.*

[43] *Id.* at 2–4.

associated with Sorrento.[44]   In addition to being a noncontrolling shareholder of Sorrento, Mr. Espalin was also a purported creditor of the company.[45]

The Complaint asserts the following six counts:

i)      Count I: Racketeering Included Corrupt Organizations Act (hereinafter "RICO"), under 18 U.S.C. § 1962(c) against Mr. Ji, M3, MIII, Mr. Meghji, and Jackson Walker;

ii)     Count II: Conspiracy to Violate RICO under 18 U.S.C. § 1962(d) against Mr. Ji, M3, MIII, Mr. Meghji, and Jackson Walker;

iii)    Count III: Breach of Fiduciary Duty against Mr. Ji as de facto controlling shareholder, Chairman of the Board and Chief Executive Officer of Sorrento and as Executive Chairman, Chief Executive Officer and President of non-debtors Scilex and Semnur;

iv)     Count IV: Aiding and Abetting Breach of Fiduciary Duty against M3, MIII, Mr. Meghji, Jackson Walker, Scilex, and Semnur;

v)      Count V: Violation of California Penal Code § 496 against Mr. Ji, M3, MIII, Vivasor, Scilex, and Semnur; and

vi)     Count VI: Breach of Fiduciary Duty against individual directors Dorman Followwill, Kim D. Janda, David Lemus, Tammy Reilly, Jaisim Shah, Yue Alexander Wu, and Stephen Ma.[46]

For purposes of the above captioned Motion to Enforce, the California Plaintiffs refer to Counts I and II as the "RICO Claims," Counts III, IV,

---

[44] *Id.*

[45] *Id.*

[46] *See* ECF No. 2674-2.

and VI as the "Fiduciary Duty Claims," and Count V as the "California Penal Code Claim."[47]

For purposes of laying a complete and sufficient record for its subsequent analysis, the Court will restate the relevant allegations in the Complaint without opining or commenting in any way on the truth of any such allegation or the merits of the California Plaintiffs' underlying putative claims.[48] The California Plaintiffs' RICO, Fiduciary Duty, and California Penal Code Claims arise out of allegations estate professionals and others were substantively involved in a widespread conspiracy to promote this Court as a prominent jurisdiction for large corporate bankruptcy filings, whereby those parties allegedly positioned themselves to facilitate extrajudicial communication and decision-making between estate professionals—including certain attorneys at Jackson Walker, namely, for a period of time, Ms. Freeman—and an ethically compromised Bankruptcy Court, utilizing the Sorrento debtor and the Court itself as supposed "RICO enterprises" which ultimately resulted in direct harm to Sorrento shareholders through the alleged pillaging of estate assets by professionals, the alleged fire sale of the company for pennies on the dollar, and the diminution in the value of equity. The Complaint (which conveniently omits any claims against general bankruptcy counsel, focusing instead on local counsel and other estate fiduciaries) alleges estate professionals intentionally guided Sorrento into an unnecessary bankruptcy filing before this Court, with jurisdiction having been fraudulently manufactured through Scintilla's The Woodlands, Texas post office box and bank account having been opened just days before the filing, despite Scintilla having no business operations or connections to Texas at the time.

The Complaint also alleges the M3 Movants took inappropriate actions regarding the substance and procedure of the Sorrento

---

[47] ECF No. 2698, at 5–6.
[48] The allegations made against the M3 Movants, if proven to be untrue, could result in potential claims against the California Plaintiffs.

bankruptcy itself,[49] including *inter alia* Mr. Meghji making numerous false statements under oath, either in sworn declarations or by live testimony at various junctures post-petition, post-confirmation, and post-Effective Date; failing to consult with Sorrento's Chief Financial Officer during the proceeding, despite her extensive experience in the biopharmaceutical industry; terminating her nearly eight months into the proceedings, which ultimately lead to the lapse in Sorrento's status as a publicly traded company; inappropriately denying stakeholders access to data-room privileges, preventing interested parties from accurately valuing the company to propose a competing bid; slow playing approvals of nondisclosure agreements, which effectively enabled Mr. Ji to acquire the company's assets at a fire sale price; obstructing a potential shareholder rights offering proposed by representatives of the Equity Committee; and inappropriately blocking an alternative plan proposed by a Sorrento executive that would have funded the reorganization with deferred payment to professionals and no equity dilution.

The Complaint also takes the position that this Court failed to properly address these issues as they arose during the administration of the case because it was ethically compromised from the get-go, infected by an inherent conflict of interest originating pre-petition. The M3 Movants hosted a private dinner in April, 2022, which former Judge Jones and Judge Lopez attended as guests of honor (hereinafter the "M3 Dinner"). The Complaint alleges the M3 Dinner created (or rather evidenced-by-inference) a conflict of interest between the M3 Movants and former Judge Jones and Judge Lopez, the nondisclosure of which constituted breaches of fiduciary duties and RICO predicate acts upon the subsequent Sorrento bankruptcy filing in February of 2023, and during estate professionals' and Judge Lopez's conduct in the administration of these cases—including *inter alia* confirmation of the

---

[49] The Complaint asserts such allegations despite the M3 Movants and other estate professionals acting, in every circumstance, subject to Court orders, none of which were appealed.

Plan, denial of the dismissal/transfer venue motions, approval of the Vivasor Sale, and approval of the M3 Final Fee Application—in the wake of the Jones-Freeman relationship and former Judge Jones' resignation from the Complex Panel.   Importantly, the Complaint alleges the M3 Movants' and Judge Lopez's continuing nondisclosure of the M3 Dinner post-Effective Date constituted additional RICO predicate acts and conduct amounting to continuing breaches of fiduciary duties.

### III.   THE MOTIONS TO ENFORCE THE DEBTORS' PLAN OF REORGANIZATION.

On April 14, 2026, the M3 Movants filed their Motion to Enforce, seeking entry of a proposed order finding the California Plaintiffs' claims against the M3 Movants in the Complaint violate the Plan's Gatekeeping Provision, directing the California Plaintiffs to amend their Complaint and dismiss all claims in the Complaint against the M3 Movants pending their compliance with the Plan and the Gatekeeping Provision, and imposing attorneys' fees and costs against the California Plaintiffs to adequately compensate the M3 Movants for their costs incurred in addressing the Complaint and filing the Motion to Enforce.[50] According to the M3 Movants, this Court has jurisdiction over this matter post-Effective Date because a court has power and authority to interpret and enforce its own prior orders.[51]

In the Motion to Enforce, the M3 Movants argue the California Plaintiffs violated the Plan by suing the M3 Movants for conduct in the Debtors' bankruptcy proceedings without first requesting authorization from this Court to do so.[52]   The M3 Movants argue the California Plaintiffs' claims constitute Covered Claims brought against Protected Parties and their Related Persons within the meaning of the Plan.[53] According to the M3 Movants, because the Breach of Fiduciary Duty and

---

[50] ECF No. 2674.
[51] *Id.* at 5 ¶ 12.
[52] *Id.* at 5.
[53] *Id.* at 6–7.

RICO Claims as plead allege the California Plaintiffs suffered indirect harms as a result of their relationship with the Debtors, those claims constitute derivative claims which were transferred to the Liquidation Trust under the Plan.[54]  Therefore, according to the M3 Movants, the California Plaintiffs lack standing to assert those Causes of Action against the M3 Movants.[55]  With respect to the California Penal Code Claim, the M3 Movants point out the Complaint fails to address how the M3 Movants would be liable under that theory.[56]  The M3 Movants also argue the California Plaintiffs do not and cannot assert any Causes of Action against Protected Parties for willful misconduct, gross negligence, criminal conduct, or fraud because no final order has been entered determining the M3 Movant's relevant conduct as amounting to such.[57]

Further, according to the M3 Movants, because this Court entered non-appealed final judgments in the Sale Order, the Confirmation Order, the orders denying the dismissal/transfer venue motions, and the order granting the M3 Final Fee Application, all relevant claims relating to the M3 Movants' prior conduct in these bankruptcy proceedings now rehashed in the Complaint are merged into those judgements and may not be relitigated under principles of res judicata.[58]

On April 17, 2023, Liquidation Trustee David Weinhoffer filed a Joinder to the M3 Movants' Motion to Enforce (hereinafter the "Motions to Enforce"), seeking entry of an order finding the California Plaintiffs' putative claims in the Complaint assert Causes of Action belonging exclusively to the Trust, which violates the ownership and exclusive control provisions of the Plan and Confirmation Order; directing the California Plaintiffs to dismiss with prejudice *all* claims in the Complaint as violative of the Plan and Confirmation Order; and

---

[54] *Id.* at 9 ¶ 22–23.
[55] *Id.* at 15 ¶ 37.
[56] *Id.* at 7 ¶ 16.
[57] *Id.* at 7 ¶ 18.
[58] *Id.* at 12–15.

imposing appropriate sanctions, including costs and attorneys' fees, against the California Plaintiffs to adequately compensate the Liquidation Trustee for expenses incurred in dismissal of the California Plaintiffs' Complaint.[59]   While the M3 Movants' motion is more so focused on dismissal of claims asserted against themselves, the Liquidation Trustee seeks dismissal of all Causes of Action currently asserted in the Complaint, on grounds those putative claims as plead belong exclusively to the Trust, and may only be pursued by the Liquidation Trustee.[60]

Much like the M3 Movants, the Liquidation Trustee takes the position that styling the Causes of Action as RICO, Breach of Fiduciary Duty, or California Penal Code Claims does not change the underlying injury complained of, and that here, the underlying injuries in the Complaint are ones indirectly suffered by equity as a result of direct harms to Sorrento.[61]   Accordingly, the Liquidation Trustee argues those claims are derivative liability claims which the California Plaintiffs could only ever bring on behalf of the Debtors', ownership of which was transferred from the Debtors to the Trust under the Plan.[62]   More plainly, the Liquidation Trustee also points out that breach of fiduciary duty claims were expressly transferred to the Trust under the Plan, in addition to derivative liability claims generally.[63]   The Liquidation Trustee also argues sanctions are appropriate here because the California Plaintiffs failed to voluntarily dismiss their Complaint after the Liquidation Trustee sent them a cease and desist letter advising they lacked authority to prosecute the as-plead claims under the Plan.[64]

On April 24, 2026, the Court entered the joint stipulated Order Temporarily Enjoining the Sorrento Shareholders' Prosecution of Their California Lawsuit, wherein the California Plaintiffs agreed to stay the

---

[59] ECF No. 2676.
[60] *Id.* at 7 ¶ 18–20.
[61] *Id.* at 7 ¶ 20.
[62] *Id.*; *Id.* at 8 ¶ 21.
[63] *Id.* at 8 ¶ 21.
[64] *Id.* at 5 ¶ 13–15, 6 ¶ 17.

California Lawsuit and all deadlines therein until such time as the Court ruled on the Motions to Enforce, and agreed to file the necessary stay pleading in the California District Court.[65]   The California Plaintiffs also agreed to be enjoined and restrained from taking any action to prosecute, advance, or otherwise pursue the California Lawsuit until this Court ruled on the Motions to Enforce.[66]

On May 4, 2026, the California Plaintiffs filed a Response to the Motions to Enforce.[67]   The California Plaintiffs assert that because their lawsuit involves claims against non-debtors, brought under federal non-bankruptcy law and state law, the California Lawsuit is a non-core proceeding this Court may not enter final judgment on vis-à-vis the Motions to Enforce.[68]   The California Plaintiffs argue this Court does not have "related-to" jurisdiction because the Fifth Circuit's test for post-confirmation jurisdiction is not satisfied.  *See Craig's Stores of Tex., Inc. v. Bank of La. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001).  The California Plaintiffs' argue their putative claims involve pre-confirmation, post-confirmation, and post-Effective Date conduct.[69]   They argue that none of their claims were pending as of Plan confirmation, and that while they had knowledge of the Jones-Freeman relationship, they did not know of the M3 Dinner, that both former Judge Jones and Judge Lopez were honored at such dinner, that there were "implications" of certain professionals having "access privileges" to this Court, or that the Jones-Freeman relationship was not just about the failure to disclose a romance, but the alleged manipulation of internal court processes.[70]   The California Plaintiffs argue that while common facts and parties are shared in the Sorrento bankruptcy and California Lawsuit, there is no law derived from the Sorrento bankruptcy necessary to adjudicate the California Plaintiffs' claims.[71]

---

[65] ECF No. 2692.

[66] *Id.*

[67] ECF No. 2698.

[68] *Id.* at 2 ¶ 2, 38 ¶ 118.

[69] *Id.* at 17 ¶ 61, 19 ¶ 64.

[70] *Id.* at 17 ¶ 60.

[71] *Id.* at 19 ¶ 63.

More broadly, the California Plaintiffs reject the characterization that this proceeding is one to determine what constitutes property of the estate, as no bankruptcy estate exists anymore.[72]

Regarding the Gatekeeping Provision, the California Plaintiffs argue that section of the Plan is unenforceable under then existing, *Nextpoint Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt. L.P.)*, 48 F.4th 419 (5th Cir. 2022) [hereinafter "*Highland Capital I*"] and current Fifth Circuit precedent, *Highland Cap. Mgmt. Fund Advisors, L.P. v. Highland Cap. Mgmt., L.P. (In re Highland Cap. Mgmt., L.P.)*, 132 F.4th 353, 358 (5th Cir. 2025) [hereinafter "*Highland Capital II*"], and that enforcement here would go beyond this Court's authority.[73]  The California Plaintiffs encourage the Court to read the Gatekeeping Provision narrowly and argue the Motions to Enforce fall outside that provision's scope.[74]

To the extent the Gatekeeping Provision *is* core or related-to and enforceable, the California Plaintiffs take the position that this Court's obligation is merely to determine whether their claims are colorable, and not to arrive at any summary disposition on the merits of their putative claims.[75]  Asserting that a colorable claim need only "raise a serious question," *La. World Exposition, Inc. v. Fed. Ins. Corp. (In re La. World Exposition, Inc.)*, 832 F.2d 1391, 1397 (5th Cir. 1987), or an "arguably sound claim," the California Plaintiffs argue those requirements are

---

[72] *Id.* at 19 ¶ 64.

[73] *Id.* at 21 ¶ 70, 22 ¶¶ 71–72.  The California Plaintiffs also argue the Exculpation Provision in the Plan is inapplicable to the instant matter because that provision was only meant to exculpate parties for conduct in connection with soliciting the Plan.  *Id.* at 22 ¶ 71.  The Exculpation Provision provides "[e]xcept as otherwise specifically provided in this Plan, from and after the Effective Date, no Exculpated Party shall have or incur, and each Exculpated Party is hereby exculpated from, any Covered Claim, obligation, Cause of Action or liability for any Covered Claim . . . The exculpation hereunder will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability."  Second Modified Plan, at 48.  The Exculpation Provision goes on to state *inter alia* Protected Parties are exculpated from conduct undergone in connection with Plan solicitation.  *Id.*

[74] *Id.* at 23 ¶¶ 75–76.

[75] *Id.* at 24 ¶¶ 74–79.

satisfied here and the Court should withhold from ruling on the substance of the underlying causes of action or any defenses the M3 Movants may raise—such as determinations of which causes of action were transferred to the Liquidation Trust and applicability of res judicata.[76]

Regarding the direct-derivative dichotomy, the California Plaintiffs assert their claims are direct claims not transferred to the Liquidation Trust under applicable Delaware, California, and federal non-bankruptcy law.[77]  Regarding their RICO Claims, the California Plaintiffs argue shareholders may bring RICO Claims as direct actions under circumstances such as these where allegations are made of predicate acts targeting shareholders directly, as opposed to indirectly through the Sorrento Debtor.[78]  *See Maiz v. Virani*, 253 F.3d 641, 645–55 (11th Cir. 2001) (citing *Bivens Gardens Office Bldg, Inc. v. Barnett Banks of Fla, Inc.*, 140 F.3d 898 (11th Cir. 1998); *Warner v. Alexander Grant & Co.*, 828 F.2d 1528, 1530 (11th Cir. 1987)).

Alternatively, the California Plaintiffs argue that a plaintiff need only allege an injury to her business or property resulting from some or all predicate acts which comprise a RICO violation in order to have standing to bring a direct action under RICO.[79]  They argue this standard is satisfied based on allegations their property— equity in the Sorrento Debtor—was used as a RICO enterprise to inflict injury directly on the California Plaintiffs, and that this injury was not dependent on any injury suffered by Sorrento.[80] They also argue certain alleged predicate acts, such as denying access to the data room to conduct necessary due diligence of the company, directly harmed them by preventing the submission of competing bids.[81]  They add that their RICO Claims cannot be property of the Estates because none of the

---

[76] *Id.*
[77] *Id.* at 27–36.
[78] *Id.* at 28–32.
[79] *Id.* at 30 ¶ 97.
[80] *Id.* at 31 ¶ 98.
[81] *Id.* at 31 ¶ 100.

claims in the Complaint could have been asserted as of the Petition Date as the "bankruptcy fraud" had yet to be perpetrated and revealed, and because the M3 Dinner and various other "access privilege" implications were only disclosed post-Effective Date.[82]  *Highland Cap. Mgmt., LP v. Chesapeake Energy Corp. (In re Seven Seas Petrol., Inc.)*, 522 F.3d 575, 584–85 (5th Cir. 2008).

Regarding the Breach of Fiduciary Duty Claims, the California Plaintiffs argue those claims are based on direct liability under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.* because they suffered harm as shareholders individually, and because they as shareholders would receive the benefit of any recovery on account of their putative claims.[83] 845 A.2d 1031 (Del. 2004).  Under *Tooley*, the California Plaintiffs represent that as minority shareholders, they are entitled to assert breach of fiduciary duty claims against majority shareholders, such as Mr. Ji, based on injury suffered directly by them.[84]  The California Plaintiffs argue that under *In re Seven Seas*, each of their Breach of Fiduciary Duty Claims do not belong to the Debtors' Estates because those claims could not have been asserted as of the commencement of bankruptcy case, and because the injuries were suffered by them individually, rather than all shareholders.[85]  522 F.3d at 584.

Similar to the RICO and Breach of Fiduciary Duty Claims, the California Plaintiffs argue the California Penal Code Claim is a direct claim because it could not have been brought by the Debtors as of the commencement of the case, and because injuries relating to the claim were suffered by the California Plaintiffs and not all shareholders (which would include Mr. Ji).[86]

Specifically with respect to the Liquidation Trustee's Motion, the California Plaintiffs argue that Motion is procedurally improper because

---

[82] *Id.* at 32 ¶ 102.
[83] *Id.* at 33–34.
[84] *Id.*
[85] *Id.*
[86] *Id.* at 35–36.

a determination of who has property interests in the disputed Causes of Action must be done through an adversary proceeding, and not by motion practice.[87]   The Court dispensed with this argument on the record at the Hearing on the Motions to Enforce, as BANKR. R. FED. P. 7001(g) excludes from the definition of "adversary proceeding" a proceeding to obtain an injunction or equitable relief when the relief is provided in a Chapter 11 plan.[88]   The California Plaintiffs also argue sanctions are not warranted here because the Liquidation Trustee's demand that the California Plaintiffs dismiss their lawsuit was unreasonable, there has been no long history of improper behavior by the California Plaintiffs, and because the California Plaintiffs have agreed to stay the California Lawsuit pending this Court's ruling on the Motions to Enforce.[89]

Finally, the California Plaintiffs argue that, to the extent this Court finds the Gatekeeping Provision enforceable, permissive abstention is warranted because (i) there is no longer a bankruptcy Estate to administer, (ii) the Plan has been implemented and consummated, and the Debtors' Causes of Action were transferred to the Liquidation Trust in April 2024, (iii) the Gatekeeping Provision is limited to determining if there is a colorable claim, not to determine if the M3 Movants have valid defenses to such claims or the Liquidation Trustee has property interests, (iv) the California Lawsuit is non-core, involves non-debtor parties, and is based on non-federal bankruptcy law and state law claims, (v) the M3 Movants and Liquidation Trustee are not prejudiced as they can assert any claims or defenses before the California District Court, (vi) the California Plaintiffs demanded a jury trial, (vii) the RICO Claims are complex and more appropriately handled in the California District Court, (viii) under Fifth Circuit law, this Court does not have jurisdiction, (ix) because the California Plaintiffs have not consented to final orders being entered on the Motions to Enforce or the California Lawsuit, this Court could only issue findings of fact and

---

[87] *Id.* at 3 ¶ 5, 25 ¶ 82.

[88] ECF No. 2708.

[89] ECF No. 2698, at 36–37.

21 / 54

conclusions of law which would be reviewed *de novo* by a district court, and (x) the California District Court has the power to interpret the Plan and enter final judgment.[90]

On May 8, 2026, the M3 Movants filed a Reply.[91] In their Reply, the M3 Movants reiterate their position that interpretation of the Plan, along with the Gatekeeping Provision, is related to, *In re Pearl Res. LLC*, 651 B.R. 285, 289 (Bankr. S.D. Tex. 2023); *In re Morning Treat Coffee Co., Inc.*, 77 B.R. 62, 63 (Bankr. M.D. La. 1987), if not core, *Carnero G&P, L.L.C. v. SN EF Maverick, L.L.C. (In re Sanchez Energy Corp.)*, 159 F.4th 309, 327 (5th Cir. 2025); *Natixis Funding Corp. v. GenOn Mid-Atlantic, L.L.C. (In re GenOn Mid-Atlantic Dev., L.L.C.)*, 42 F.4th 523, 538 (5th Cir. 2022), and therefore within this Court's post-confirmation jurisdiction under existing Fifth Circuit precedent.[92]

With respect to enforceability of the Gatekeeping Provision, the M3 Movant's emphasize that under *United States Aid Funds, Inc. v. Espinosa*, regardless of whether a confirmation order contains legal error, it is enforceable if not timely appealed.[93] 559 U.S. 260, 275 (2010). Accordingly, the M3 Movants argue that regardless of the California Plaintiffs' assertions that the Gatekeeping Provision is unenforceable under *Highland Capital I* or *Highland Capital II*, because the Confirmation Order was not timely appealed, enforcement of the Gatekeeping Provision as written is required.[94]

The M3 Movants also reiterate their position the California Plaintiffs claims are not colorable under the Gatekeeping Provision because (i) the Breach of Fiduciary Duty and RICO Claims against them are based on indirect liability, and there the California Plaintiffs lack standing to assert those claims and (ii) the Complaint and California Penal Code Claim fail to make factual allegations against the M3

---

[90] *Id.* at 38–39.
[91] ECF No. 2705.
[92] ECF No. 2705, at 5 ¶¶ 10–11.
[93] *Id.* at 4 ¶ 8.
[94] *Id.* at 4 ¶ 8 n. 7, ¶ 9 n. 8.

Movants in particular.[95]  According to the M3 Movants, the California Plaintiffs' claimed direct injuries are not independent of any alleged injury to the Debtors.[96]  With respect to their res judicata argument, the M3 Movants reiterate their position that the hearing on the M3 Final Fee Application and subsequent non-appealed order granting the application established res judicata as to claims based on the provision of restructuring services by the M3 Movants, and the California Plaintiffs may not relitigate claims based on that central transaction simply through artfully styling new pleadings.[97]  With respect to permissive abstention, the M3 Movants argue the Court need not take such discretionary action because (i) Plan enforcement is a key part of Estate administration, (ii) the primary issue is ownership of claims and standing to assert them, rather than substantive state law issues, (iii) Fifth Circuit and Delaware state laws governing ownership and standing requirements for the California Plaintiffs' putative claims are well-settled, (iv) Plan enforcement is highly related to the Debtors' main bankruptcy case, (v) Plan enforcement is core, (vi) the disputed claims cannot be severed because they are currently being asserted in violation of the Plan, (vii) no jury trial right exists in claims a party does not have standing to pursue, and (viii) other Sorrento shareholders would be prejudiced if the California Plaintiffs proceeded on their RICO Claims in the California District Court, because double recovery is not allowed.[98]

Also on May 8, 2026, the Liquidation Trustee filed its own Reply.[99]  In its Reply, the Liquidation Trustee argues the California Plaintiffs' "non-debtor" arguments with respect to this Court's post-confirmation jurisdiction are irrelevant because the Plan applies to them as former equity holders of Sorrento, their putative claims implicate the Plan, and this Court has jurisdiction to interpret its own

---

[95] *Id.* at 7 ¶ 16, 10 ¶ 25, 15–16.
[96] *Id.* at 7 ¶ 19.
[97] *Id.* at 16 ¶ 42.
[98] *Id.* at 20 ¶ 51.
[99] ECF No. 2704.

prior orders.[100] The Liquidation Trustee also argues that the distinction between whether the alleged conduct occurred post-petition or post-Effective Date is immaterial because the claims are derivative liability claims based on alleged misconduct by professionals before and during the bankruptcy case, which the Fifth Circuit has previously found to constitute property of the debtor's estate.[101] *In re Lothian Oil*, 531 F.App'x 428, 441 (5th Cir. 2013). Similarly, the Liquidation Trustee points out that various Plan provisions expressly contemplate transferring to the Liquidation Trust the Debtors' interest in Causes of Action "whether arising before or after the Petition Date" as well.[102]

With respect to whether the claims are direct or derivative, the Liquidation Trustee echoes the M3 Movant's position that under applicable Delaware state law and federal RICO law, the Complaint as plead alleges indirect injuries which correspond with derivative liability claims—not direct.[103] *Tooley*, 845 A.2d at 1039; *Maiz*, 253 F.3d at 655. Specifically with respect to Delaware law, the Liquidation Trustee adds that excluding culpable shareholders like Mr. Ji from recovery is properly understood as a remedy consideration and does not serve as grounds for transforming a derivative liability claim into a direct one.[104] *Goldstein v. Denner*, Case No. 2020-1061-JTL, 2022 WL 1797224, at *17–20 (Del. Ch. 2022). The Liquidation Trustee also asserts that intervention in the California Lawsuit is "ludicrous" and reiterates its position that sanctions for attorneys' fees and costs are warranted.[105] The Liquidation Trustee also joins in the M3 Movant's position that permissive abstention is unwarranted on the Motions to Enforce.[106]

---

[100] *Id.* at 4–5.
[101] *Id.*
[102] *Id.* at 8–9.
[103] *Id.* at 7–8.
[104] *Id.* at 10–11.
[105] *Id.* at 14–15.
[106] *Id.* at 15.

On May 11, 2026, the Court held a hearing where it admitted numerous exhibits and heard oral arguments on the Motions. The Court took both matters under advisement.[107]

## JURISDICTION

28 U.S.C. § 1334 provides the District Courts with jurisdiction over this proceeding. 28 U.S.C. § 157(b)(1) states "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title."

The Parties dispute whether this matter falls within the Court's post-confirmation jurisdiction under applicable Fifth Circuit precedent. *See In re Craig's Stores*, 266 F.3d at 390 ("After a debtor's reorganization plan has been confirmed, the debtor's estate, and thus bankruptcy jurisdiction, ceases to exist, other than for matters pertaining to the implementation or execution of the plan."). Resolution of that issue will help determine whether this Court has related-to jurisdiction under 28 U.S.C. § 1334(b), and whether this proceeding is core under 28 U.S.C. § 157(b)(1). For the reasons discussed below, the Court concludes the answer to each of those questions is yes.

Accordingly, because this matter is related-to under 28 U.S.C. § 1334(b) and core under 28 U.S.C. 157(b)(2)(A) and (L), this proceeding is of the kind referred to the Bankruptcy Court under General Order 2012-6. Moreover, the Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). And venue is proper in this District pursuant to 28 U.S.C. § 1408.

## DISCUSSION

### I.   THE COURT HAS SUBJECT MATTER JURISDICTION OVER THE MOTIONS TO ENFORCE.

---

[107] ECF No. 2708.

The Court will first address the issue of whether it has subject matter jurisdiction over the Motions to Enforce. In the Court's view, these matters pose two similar potential paths to jurisdiction. First, various Plan provisions transfer all the Debtors' interest in Estate property—including their interests in Causes of Action—to the Liquidation Trust as of the Effective Date and vest within the Liquidation Trustee sole authority over such property. The Liquidation Trustee's Motion to Enforce request the Court interpret those Plan provisions to determine the extent to which the California Plaintiffs have asserted claims in their Complaint which belong to the Liquidation Trust, sole authority over which has been vested in the Liquidation Trustee. In essence, interpreting these Plan provisions requires determining the extent to which the California Plaintiffs or the Liquidation Trustee have standing over the claims in the Complaint. The Liquidation Trustee's Motion to Enforce requests the Court enforce the Confirmation Order to the extent it determines the Liquidation Trustee, rather than the California Plaintiffs, has standing over any claims in the Complaint. The issues which arise under this jurisdictional basis are (i) whether Plan interpretation and Confirmation Order enforcement fall within the Court's post-confirmation jurisdiction under *Craig's Stores*, and (ii) whether this matter is related-to, or core.

Second, the M3 Movants' Motion to Enforce asks the Court to interpret the Gatekeeping Provision of the Plan which *inter alia* requires any party—other than the Liquidation Trust—seeking to assert Covered Claims against Protected Parties first obtain a determination from this Court that the claims are colorable and that the suing party has authorization to assert them. The next step in the M3 Movants' Motion then loops back into the first potential jurisdictional basis: because certain Plan provisions transfer the Debtors' interest in Estate property to the Liquidation Trust as of the Effective Date (including the Debtors' interest in Causes of Action), the Court is required to determine whether any claims in the Complaint belong to the Liquidation Trust, rather than the California Plaintiffs, and

whether the Liquidation Trustee has sole authority over them. In essence, standing is a prerequisite to colorability and authorization under the Gatekeeping Provision. The M3 Movants then ask the Court to enforce the Confirmation Order to the extent it determines the Liquidation Trustee has sole standing over any claims in the Complaint.[108]  The unique issues which arise under this jurisdictional basis are (i) whether the Gatekeeping Provision is applicable to the given circumstances (*i.e.*, whether the claims in the Complaint fall within the definitions of Covered Claims against Protected Parties under the Plan), and (ii) whether the Gatekeeping Provision is enforceable.

For the reasons discussed below, both jurisdictional bases are viable.

### A. Plan Interpretation and Confirmation Order Enforcement as a Jurisdictional Basis.

Federal district courts may hear "all civil proceedings . . . related to" bankruptcy cases.  28 U.S.C. § 1334(b).  A proceeding "relates to" a bankruptcy case if "the outcome of that proceeding could conceivably have any effect" on the debtor's estate (also referred to as "related-to jurisdiction").  *In re GenOn*, 42 F.4th at 524 (citing *Bass v. Denney (In re Bass)*, 171 F.3d 1016, 1022 (5th Cir. 1999)).  Post-confirmation, that jurisdiction narrows to narrows to "matters pertaining to the implementation or execution of the plan."  *In re Craig's Stores*, 266 F.3d at 390.  The *Craig's Stores* inquiry has been subsequently distilled to a three-factor test, which the Fifth Circuit has acknowledged as a "useful heuristic."  *In re GenOn*, 42 F.4th at 524 (citing *In re Enron Corp. Sec.*, 535 F.3d 325, 335 (5th Cir. 2008)).  But the issue of whether a matter "pertain[s] to implementation or execution of the plan" remains the determinative standard for post-confirmation jurisdiction, which the

---

[108] The M3 Movants also seek a ruling on res judicata with respect to claims specifically asserted against themselves in the Complaint.  For the reasons discussed *infra*, ruling on res judicata is premature and not warranted at this time based on the procedural posture of the Motions to Enforce.

Court will consider here.[109]  *See id.* (passing over application of the three factor *Craig's Store* test enumerated in *In re Enron Corp.*).  Interpreting Plan provisions which transfer the Debtors' interest in Estate property to the Liquidation Trust is standard related-to fare.  In "a dispute over the meaning of a provision of the reorganization plan . . . related-to jurisdiction is clear."  *Id.* (citing *U.S. Brass Corp. v. Travelers Ins. Grp. (In re U.S. Brass Corp.),* 301 F.3d 296, 304 (5th Cir. 2002)).

The California Plaintiffs continuous admonition that ruling on state-law causes of action between non-debtors tends to fall outside the boundaries of this Court's related-to jurisdiction conflates the relevant issue.  Here, the Court is doing two things: interpreting the Plan and enforcing the Confirmation Order to the extent necessary.  Interpreting the Plan requires determining whether the Complaint asserts Causes of Action theretofore transferred to the Liquidation Trust.  This question is one of standing: do the California Plaintiffs have a right to assert those claims, or was that right vested solely within the Liquidation Trust as of the Effective Date?  Enforcing the Plan means, if necessary, issuing an order requiring the California Plaintiffs to amend or dismiss claims the Liquidation Trustee has sole standing to pursue.

The California Plaintiffs presume that the Court would necessarily rule on the merits and substance of "their" putative claims in the California Lawsuit by enforcing the Confirmation Order.  For the reasons discussed *infra*, those claims *do not belong* to the California Plaintiffs, nor do they have authority to pursue them.  Those claims are each based on derivative liability, were expressly contemplated in the Plan, and were transferred to the Liquidation Trust as of the Effective Date.  In substance, there are not—or rather, there should not be—any

---

[109] The California Plaintiffs represent that using the three factors considered in *Craig Stores* is dispositive on this Court's post-confirmation jurisdiction.  The Fifth Circuit's consideration and declination to apply the same three factors in *GenOn* is instructive on what the proper inquiry is for determining whether a bankruptcy court has post-confirmation jurisdiction, which is the original, broader question asked in *Craig's Stores*: "whether the matter pertain[s] to implementation or execution of the plan."  42 F.4th at 534.  Accordingly, the Court will not use the three-factor version of the *Craig's Stores* test enumerated in *In re Enron Corp.*

live "disputes" to rule on with respect to those claims because no party with Article III standing has filed them. As a matter of law, the claims belong to the Liquidation Trust, and this Court's determination of *that issue*—not the substance of the putative claims themselves, *but rather whether the California Plaintiffs have standing to assert such*—that issue is purely a question of interpreting the Plan and enforcing the Confirmation Order. And those things are well within the boundaries of related-to jurisdiction contemplated in *GenOn*, because there, the Fifth Circuit determined certain removed state-law breach of contract claims between two non-debtors was related-to. 42 F.4th 538–39. Here, the supposed freestanding state-law and federal non-bankruptcy claims in dispute were *already transferred* to the Liquidation Trust under the Plan as of the Effective Date, and the Liquidation Trustee has sole authority to assert them. The California Plaintiffs' claims cannot be considered to have a tenuous or nonexistent connection with this bankruptcy proceeding, *In re Chesapeake Energy Corp.*, 70 F.4th 273, 284 (5th Cir. 2023); *In re Galaz*, 841 F.3d 316, 322–23 (5th Cir. 2016), because they are pertinent to the Debtor's reorganization and relevant to the pool of assets available in the Liquidation Trust for creditors. That is why express provisions defining and transferring those claims to the Trust were included in the Plan. Indeed, the Liquidation Trustee has already initiated an adversary proceeding before this Court asserting Causes of Action based on allegations nearly identical to those in the Complaint.[110] It is beyond doubt enforcing the Confirmation Order to bar litigating Causes of Action already asserted by the Liquidation Trustee is within this Court's related-to jurisdiction.

The California Plaintiffs argue the Fifth Circuit has only found post-confirmation related-to jurisdiction where the contemplated plans had not yet been fully consummated or rights had been assigned post-

---

[110] *See* Case No. 25-03596, ECF No. 1 (adversary complaint against Mr. Ji and Sorrento's Board of Directors and Officers for breaches of fiduciary duties based on **same prepetition transactions California Plaintiffs challenge in Complaint**); *see also* Case No. 25-03422, ECF No. 1 (adversary complaint against B. Riley Commercial Capital, LLC to avoid and recover alleged preferences based on prepetition transaction).

confirmation.  *See e.g.*, *GenOn*, 42 F.4th at 538; *In re U.S. Brass Corp.*, 301 F.3d 296; *First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In re Biloxi Casino Belle, Inc.)*, 368 F.3d 491 (5th Cir. 2004).  "Full consummation" is not the standard for post-confirmation jurisdiction, but rather whether the matter pertains to "implementation or execution of the Plan."  The Motions to Enforce fall within the meaning of Plan "implementation or execution" because they ask the Court to interpret and apply Plan provisions regarding Causes of Action transferred to the Liquidation Trust under the Plan.  Requiring litigants to dismiss lawsuits based on claims they do not own, brought with no authority, is the express purpose of the Gatekeeping Provision, and doing so implements the Plan by enabling the Liquidation Trustee to exercise his discretion and pursue those claims if he so chooses.

Reframing the issue as one of Plan interpretation, implementation, and Confirmation Order enforcement, rather than ruling on state-law Causes of Action between non-debtors reveals that the Motions to Enforce are not just related-to, but core.  A proceeding is core if it arises under title 11 or arises in a case under title 11.  28 U.S.C. § 157(b)(1); *In re U.S. Brass Corp.*, 301 F.3d at 304 ("[W]e have held that § 157 equates core proceedings with the categories of 'arising under' and 'arising' in proceedings; therefore, a 'proceeding is core under [§] 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.'").  The Motions to Enforce arise in the context of this bankruptcy case as they derive from and require the Plan, the Third Plan Supplement, and the Confirmation Order.  Confirmation of a plan of reorganization constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (L), and this Court retains continuous jurisdiction to interpret and enforce its own orders, under both case law and the Retention of Jurisdiction Provision.  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009); *See* Second Modified Plan, at 47 ¶¶ 21, 23.  It is likely this Court would lack constitutional authority to enter final judgment *if it were* to rule on the merits of some the Causes of Action asserted in the Complaint because regardless of whether those claims

arose in the context of the Debtors' bankruptcy case, 28 U.S.C § 157(b)(1), since at some of those claims are state-law causes of action independent of the federal bankruptcy law. *See Stern*, 564 U.S. at 487. On this point the California Plaintiffs and the Court agree. Where we disagree is the gravity of *Stern* applied here: it is the Liquidation Trust who owns those claims and the Liquidation Trustee who may assert them if he chooses to do so, and this Court will leave the merits of those claims for future adjudication. But the Court is not overstepping its constitutional authority by interpreting the Plan and enforcing the Confirmation Order today. Accordingly, the Court concludes it has post-confirmation jurisdiction over the Motions to Enforce under *Craig's Stores*, and the Motions are both related-to and core within the meaning of 28 U.S.C. § 1334(b), and 28 U.S.C. § 157(b), respectively.

B. **The Gatekeeping Provision as a Jurisdictional Basis.**

Based on the foregoing analysis, the proper manner of framing the Motions to Enforce is that the Court is not ruling on the substantive merits of the claims in the Complaint, but rather interpreting Plan provisions and enforcing the Confirmation Order. Interpreting the Gatekeeping Provision under the Plan is consistent with this approach, and the only unique questions raised through the Gatekeeping Provision avenue are whether that provision applies, and whether it is enforceable. As above, Plan interpretation in such a limited disposition is well within the Court's related-to jurisdiction under *GenOn*, and within this Court's post-confirmation jurisdiction under *Craig's Stores*. Interpreting whether the Gatekeeping Provision applies as to bar the litigation of certain claims in the Complaint necessarily implements the Plan and ensures the Liquidation Trustee has his due authority to assert such claims if warranted. 266 F.3d at 390. Moreover, confirmation of a reorganization plan is a core matter, and the Court has continuous authority to enforce its own prior orders. 28 U.S.C. § 157(b)(2)(A), (L) *Travelers Indem. Co.*, 557 U.S. at 151; *See* Second Modified Plan, at 47 ¶¶ 21, 23. Accordingly, the Court will address the remaining threshold issues of whether the Gatekeeping Provision

applies and whether it is enforceable.  In the Court's view, the answer to both questions is yes.

### *(1)    The Gatekeeping Provision Applies Because the California Plaintiffs Assert Covered Claims against Protected Parties Under the Plan.*

The Gatekeeping Provision requires that a "no person or entity (other than the [Liquidation Trustee], who holds [a] Cause of Action may commence or pursue [that] Cause of Action [] against [] the Protected Parties[,] that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Covered Claim, without [this Court] first determining whether that Claim or Cause of Action is colorable."[111]  The California Plaintiffs assert in their Complaint Causes of Action that fall within the broad definition of "Covered Claims": the claims relate to acts or omissions on or after the Petition Date and prior to the Effective Date, which relate to or arose out of the Debtors' in- or out-of-court restructuring efforts, various pre-petition transactions conducted in connection with the Debtors' bankruptcy, the circumstances surrounding the Debtors' filing of these Chapter 11 cases before this Court, the Vivasor Sale, various other 363 sales, various Mediation-related activities, and the general pursuit of Confirmation, Consummation, administration, and implementation of the Plan.[112]    Their claims are based on alleged pre-petition, post-

---

[111] Second Modified Plan, at 44.

[112] *Id.* at 5 ¶ 31.  The suggestion that post-Effective Date non-disclosure of the M3 Dinner would cause the claims in the Complaint to fall outside the definition of "Covered Claims" is wrong and ignores well established law regarding accrual. *See Rotella v. Wood*, 528 U.S. 549, 555 (2000) (adopting the "discovery of injury" rule for RICO claim accrual); *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004) (holding breach of fiduciary duty claims arise "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action."); *Jolly v. Eli Lilly & Co.*, 44 Cal.3d 1103, 1110 (Cal. 1988) (under California's "discovery rule," "the statute of limitations begins to run when the plaintiff suspects or should suspect that her injury was caused by wrongdoing, that someone has done something wrong to her.").  The alleged harm underlying each cause of action in the Complaint, whether they be RICO, Breach of Fiduciary Duty, or California Penal Code Claims, each occurred post-petition, pre-Effective Date.  As plead, no unique allegation in the Complaint which occurred post-Effective Date caused the California Plaintiffs harm independent of that

petition, and pre-Effective Date conduct by the M3 Parties and certain other professionals and non-debtor individuals.[113]   There is no final order determining that the conduct alleged in the Complaint amounted to willful misconduct, gross negligence, criminal conduct or fraud, and therefore the California Plaintiffs' claims are not carved out of the definition of Covered Claims under the Plan.[114]   The M3 Movants, along with each of the estate professionals and Debtor fiduciaries named as defendants in the Complaint fall under the broad definition of Protected Parties contemplated under the Plan.[115]   Each aspect of the Gatekeeping Provision is therefore implicated in the Complaint, and therefore the California Plaintiffs were required to seek authorization from this Court prior to filing their claims.

### (2)   The Gatekeeping Provision is Enforceable Despite Potential Legal Infirmity.

The Parties dispute whether the Gatekeeping Provision is enforceable under *Highland Capital I* and *II*.  Indeed, if that provision

---

which was allegedly suffered pre-Effective Date.  The non-disclosure of the M3 Dinner on its own does not give rise to a cause of action absent the alleged harm tied to it, which in turn occurred beforehand, pre-Effective Date—a time where the alleged non-disclosure was simultaneously occurring.  While the Court refrains from ruling on the merits of any Cause of Action in the Complaint, the California Plaintiffs cannot use this alleged post-Effective Date non-disclosure as a means of circumventing the Gatekeeping Provision, when the entire remainder of the Complaint alleges Causes of Action falling squarely within the definition of Covered Claims.

[113] The California Plaintiffs attempt to argue the non-disclosure of the M3 Dinner somehow transforms all of their underlying claims into post-Effective Date claims falling outside the definition of Covered Claim, and therefore outside the purview of the Gatekeeping Provision.  It is important to note, however, that this is the *only* allegation of post-Effective Date conduct that appears relevant to the California Plaintiffs claims.  All other allegedly dispositive conduct, and all alleged harm to the California Plaintiffs as Sorrento shareholders, occurred either pre-petition, post-petition, or pre-Effective Date (such as during the sale, or confirmation or the Plan).  Were a ruling court to apply an accrual analysis to these claims, it is likely the statute of limitations would begin to run pre-Effective Date.  The Complaint does not tie any independent post-Effective Date harm to the alleged post-Effective Date non-disclosure of the M3 Dinner.

[114] Second Modified Plan, at 5 ¶ 31.

[115] *Id.* at 12 ¶ 110.

of the Plan were unenforceable, this Court's related-to and core jurisdiction would crumble.  Thankfully, the Supreme Court's holding in *Espinosa* obviates the need to parse enforceability of the Gatekeeping Provision in the wake of both *Highland Capital*s.  559 U.S. 260.  There the Supreme Court held a non-appealed prior order containing legal error remained enforceable, unless parties in interest lacked notice of such legal defect or the defect was jurisdictional.  *Id.* at 273–76.  The Court explained that a bankruptcy court's confirmation order constitutes a final judgment, *see In re Optical Techs., Inc.*, 425 F.3d 1294, 1300 (11th Cir. 2005), and that ordinarily "the finality of [a] [b]ankruptcy [c]ourt's orders following the conclusion of direct review" would "stan[d] in the way of challenging [their] enforceability."  *Id.* at 269 (quoting *Travelers Indem. Co*, 557 U.S. at 140).  The Court further explained that FED. R. CIV. P. 60(b) provides an "exception to finality," *Gonzalez v. Crosby*, 545 U.S. 524, 529 (2005), which "allows a party to seek relief from a final judgment, and request reopening, under a limited set of circumstances."  *Espinosa*, 559 U.S. at 269–70.

Much like in *Espinosa*, this Court's Confirmation Order was a final judgment not subject to timely appeal.  The same goes for the Sale Order, denial of the dismissal/transfer venue motions, and the M3 Final Fee Application.  The difference here is that the California Plaintiffs did not move for relief from judgment under any provision of Rule 60(b), but rather filed a new lawsuit based on claims that did not belong to them, styled as new Causes of Action despite the underlying transactions having been previously litigated.

The Court is hesitant to issue an advisory opinion on the likelihood of success a Rule 60(b)(4) motion (or any Rule 60 motion) may have as a basis for challenging each of the implicated prior orders relevant to today's Motions to Enforce, but will note for the record that jurisdiction existed over the Confirmation Order, Sale Order, dismissal/transfer venue motions, and the M3 Final Fee Application at the time each were heard and ruled on.  Regarding notice of the alleged legal defect, *Highland Capital I* had already been issued at the time of

the Combined Hearing. To the extent the California Plaintiffs take issue with the Plan by arguing that exculpation through a gatekeeping provision must be limited to a debtor, trustee, or committee, that argument was available to them at the time of the Combined Hearing—but that legal issue is not before the Court today. Regardless, at the time of the Combined Hearing and on the date of entry of the Confirmation Order, the California Plaintiffs had notice of the potential legal defect they now complain of.[116] They cannot now come back before this Court two and a half years later and argue the Gatekeeping Provision is unenforceable when they failed to object and timely appeal those available issues when it was appropriate to do so. *See also Coney Island Auto Parts Unlimited, Inc. v. Burton Trustee for Vista-Pro Auto., LLC*, 607 U.S. 155, 157 (2026) (a Rule 60 motion alleging judgment is void must be brought within a reasonable time).

*Espinosa* and the authority on which it relies make clear that the Plan, including the Gatekeeping Provision, is enforceable today. *See also Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1054 (5th Cir. 1987) (granting res judicata effect to bankruptcy court's prior order despite reorganization plan containing non-consensual release of third-party guarantor). For purposes of ruling on the Motions to Enforce, this Court is required to hold the Gatekeeping Provision enforceable regardless of whether *Highland Capital I* was satisfied at the time of the Combined Hearing and on the date of entry of the Confirmation Order.

There is also the question raised of whether the Exculpation Provision is enforceable and what effect it may have on this proceeding and the California Lawsuit. That provision purports that Exculpated Parties—whose definition is limited to "the Debtors, [] the Committees, and [] Committees' members, in their capacity as such" may not be sued on account of Covered Claims" post-Effective Date.[117] To the extent the Exculpation Provision covers named defendants who are Protected

---

[116] The Equity Committee filed an Objection to Confirmation of the Plan on November 10, 2023. ECF No. 1525. This Objection did not mention enforceability of the Gatekeeping Provision. *Id.*

[117] *See* Second Amended Plan, at 43.

Parties, it only exculpates those individuals on account of Claims or Causes of Action relating to or arising out of "solicitation of acceptance or rejection of the Plan" and "the participation . . . in the offer, issuance, sale, or purchase of a security, offered or sold under the Plan."[118] Similar to the Gatekeeping Provision, the Confirmation Order was a non-appealed final judgment which approved the Plan containing the Exculpation Provision, so to the extent there are arguments on enforceability of that Provision absent jurisdictional or notice issues, *Espinosa*'s effect is clear: the Exculpation Provision is enforceable regardless of prior legal error contained therein.  Accordingly, to the extent Protected Parties are being sued in the California Lawsuit on account of conduct in connection with Plan solicitation or securities purchases under the Plan, those Parties would be exculpated from such liability.[119]

## II.    The California Plaintiffs Lack Standing and Are Not Authorized to Pursue Their Putative Claims.

Interpreting the Plan, whether by virtue of its general asset-transfer provisions or by virtue of the Gatekeeping Provision, requires determining whether the claims asserted in the Complaint were Estate Causes of Action transferred to the Liquidation Trust under the Plan.[120] To the extent any such claims have been asserted in the Complaint, the Liquidation Trustee has sole standing to assert such.  Moreover, to the extent the California Plaintiffs lack standing to assert their claims,

---

[118] *Id.*

[119] *Id.*  The Court believes it need not reach this issue, however, because the California Plaintiffs generally lack standing to bring the Causes of Action in the Complaint, as discussed below.

[120] Applying the Gatekeeping Provision requires determining whether the California Plaintiffs' claims are colorable.  "[A] colorable claim is one that raises a serious question even if the claim ultimately fails to survive a Rule 12(b)(6) motion to dismiss."  *In re ABC Utils. Servs.,* 2001 Bankr. LEXIS 2240 at *27 (Bankr. N.D. Tex. 2001) (citing *In re La. World Exposition, Inc.*, 832 F.2d 1391)).  If the California Plaintiffs lack standing to assert the claims, then there are no serious issues for determination in the California Lawsuit.  Accordingly, in this circumstance, the Court views the colorability question primarily as one of standing.  The standing question, in turn, hinges on whether the Causes of Action in the Complaint were Estate Causes of Action transferred to the Liquidation Trust under the Plan.

regardless of whether those claims belong to the Liquidation Trust under the Plan, those claims cannot be considered colorable within the meaning of the Gatekeeping Provision, and authorization to assert such must be denied.  For the reasons discussed below, the Court concludes the California Plaintiffs lack standing to assert **all** of the claims they have pleaded.  Accordingly, enforcement of the Confirmation Order to dismiss or amend all claims is warranted.

> **A.  The Breach of Fiduciary Duty and California Penal Code Claims are Derivative Liability Claims, Standing for Which Has Been Transferred to the Liquidation Trust.**

Filing a bankruptcy petition creates an estate comprised of, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  "The phrase 'all legal or equitable interests of the debtor in property' has been construed broadly, and includes 'rights of action' such as claims based on state or federal law."  *In re Seven Seas*, 522 F.3d at 584 (citing *Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1274 (5th Cir. 1983); *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Trust)*, 25 F.3d 1281, 1283 (5th Cir. 1994)).

The general standard regarding whether a claim belongs to the bankruptcy estate is "whether under applicable state law the debtor could have raised the claim as of the commencement of the case."  *Id.* (citing *In re Educators Grp. Health Trust*, 25 F.3d at 1284).  "As part of this inquiry, we look to the nature of the injury for which relief is sought and consider the relationship between the debtor and the injury."  *Id.* (citations omitted).  Under the injury analysis, "if a cause of action alleges only indirect harm to a creditor (*i.e.*, an injury which derives from harm to the debtor), and the debtor could have raised a claim for its direct injury under the applicable law, then the cause of action belongs to the estate."  *Id.* (internal quotation omitted).  "Conversely, if the cause of action does not explicitly or implicitly alleged harm to the debtor, then

the cause of action could not have been asserted by the debtor as of the commencement of the case, and thus is not property of the estate." *Id.* (internal quotation omitted).

This case does not fit cleanly into the § 541(a)(1) analysis articulated in *Seven Seas*, because while the Complaint alleges only indirect harm to creditors, as will be expounded upon *infra*, some of the Causes of Action arising from those harms could not have been brought by the Debtors *as of the commencement of the case*—they did not exist yet, because the alleged conduct had not occurred yet. The language "as of the commencement of the case" reflects § 541(a)(1)'s language of bringing within the Estate all interests in property the Debtor had at the time the case was commenced.

The Fifth Circuit has downplayed this particular wrinkle, however, as it subsequently held derivative liability claims based on conduct occurring prepetition *and* post-petition constituted estate property. *See In re Lothian Oil*, 531 F.App'x at 441 (holding as property of the estate derivative claims alleging professional misconduct by debtor's officers and directors before *and during* bankruptcy proceeding, and alleging estate professionals acted with negligence or gross negligence). Other courts have fashioned solutions to the issue of how post-petition causes of action assertable by the debtor are properly brought within the estate. *See In re Whittaker, Clark, & Daniels*, 663 B.R. 1, 14 (Bankr. N.J. 2024) (holding post-petition claims debtor could assert as a hypothetical judgment creditor under § 544(a)(1) constituted after-acquired estate property under § 541(a)(7)). Regardless, the primary inquiry in determining whether causes of action fall within the estate under § 541 is meant to focus on the nature of the injury alleged, which is typically a question of direct or derivative liability. *In re Seven Seas*, 522 F.3d at 584. Put simply, case law bears out that a derivative claim which accrued post-petition would not be prevented from entering the estate merely on timing grounds.

38 / 54

### *(1)    The Breach of Fiduciary Duty Claims.*

Sorrento is organized under the laws of Delaware, and the test there for parsing whether a breach of fiduciary duty claim is direct or derivative was laid out by the Delaware Supreme Court in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[121] 845 A.2d 1031 (Del. 2004). Under *Tooley*, the Court is required to ask two questions: (i) "[w]ho suffered the alleged harm—the corporation or the suing stockholder individually— and [(ii)] who would receive the benefit of the recovery or other remedy." *Id.* at 1035. For a claim to be assertable directly by shareholders, the underlying injury must be "independent of any injury to the corporation." *Id.* (citing *Parnes v. Bally Ent. Corp.*, 722 A.2d 1243, 1245 (Del. 1999)).

Scrutiny of the Complaint reveals that the injuries underlying the Breach of Fiduciary Duty Claims are dependent on injuries suffered by the Debtors. The harms underlying the Breach of Fiduciary Duty Claims involve three general types, all falling within the same bucket. The types of harms alleged include: pillaging of estate assets by Mr. Ji

---

[121] Pursuant to the "internal affairs" doctrine, Breach of Fiduciary Duty Claims are governed by Delaware law, the state where Sorrento is incorporated.

and estate professionals,[122] improper valuations of the Debtors,[123] and the corrupt sale of the Debtor's assets for pennies on the dollar.[124]  Each

[122] ECF No. 2674-2.  Paragraph 114 alleges the defendants engaged in their illegal pattern of conduct to "loot Sorrento of virtually all of [its] valuable assets, causing Plaintiffs to suffer significant damages." *Id.* at 23 ¶ 114.  Paragraph 115 details a number of allegedly negative outcomes related to the bankruptcy process, including Judge Isgur's mediated Nant Parties' settlement "where Sorrento gave up a stake in ImmunityBio worth over $400 million" and various other deals and 363 sales of Sorrento assets to non-debtors.  *Id.* at 24 ¶ 115.  Paragraph 117 reiterates that the defendants' alleged conduct was in "furtherance of a conspiracy to file bankruptcies in [this Court] and loot the assets of Sorrento." *Id.* at 24 ¶ 117.  Paragraphs 119 and 120 allege the Jones-Freeman backdoor scheme was used as a channel to sell Sorrento's assets to Mr. Ji for pennies on the dollar.  *Id.* at 25 ¶¶ 119, 120.  Paragraph 125 alleges a "vast majority of the valuable assets owned by Sorrento ended up under the control of [Mr.] Ji . . . and the [defendants] ha[ve] been paid exorbitant or unjustified fees and compensation." *Id.* at 25 ¶ 125.  Paragraph 126 is a catchall allegation which reiterates complaints about a number of allegedly valuable-diminishing sales of Sorrento assets to non-debtors during the bankruptcy.  *Id.* at 26 ¶ 126.  Paragraph 127 alleges the California Plaintiffs received nothing for their shares in Sorrento by virtue of the bankruptcy sales of Sorrento's assets.  *Id.* at 26–27, ¶ 127.  Paragraph 190 generally alleges Mr. Ji breached his fiduciary duties by acquiring Debtor property or entering into unfair purchase transactions for his own personal benefit.  *Id.* at 38, ¶ 190.  Paragraphs 205 and 206 detail a number of different pre-petition and post-petition transactions individual directors failed to oversee, but each of these transactions—whether it was the "unnecessary" bankruptcy filing, or the substance of debt exchange agreements or lack-luster acquisitions—resulted in alleged pecuniary harm to Debtor assets, from which the diminution in Sorrento share price followed.

[123] *See supra* note 117 (overlapping conduct resulting in alleged improper valuations).  Paragraphs 121, 123 and 128 allege M3 and Mr. Meghji furthered the conspiracy by blocking access to the data room, which prevented "legitimate" bids that would "properly value the [Debtors'] assets."  *Id.* at 25 ¶¶ 121, 123, 27 ¶ 128.  Paragraph 130 alleges various other avenues were available for Sorrento to exist bankruptcy and maintain its going concern value, as well as preserving equity. *Id.* at 27 ¶ 130.  Paragraphs 139 through 141 explain how Mr. Meghji's termination of the Sorrento CFO allegedly lead to Sorrento losing its listed status on the NASDAQ, which indirectly lead to further devaluation of Sorrento's assets as the company could only be sold on the OTC Market, limited to "institutions and accredited investors" not including the California Plaintiffs.  *Id.* at 29 ¶¶ 139–141.

[124] *See supra* notes 117, 118 (overlapping conduct resulting in alleged value-diminishing asset sales).  Paragraphs 119, 120, 123, 126, and 130 each complain of conduct that had the alleged effect of blocking alternate plans that would have benefitted the Debtors' asset value and share price.  *Id.* at 25–27, ¶¶ 119, 120, 123, 126, 130.  Paragraph 131 states that none of the issues in the Complaint were properly analyzed by the Court, which enabled the sale of Debtor assets at prices that were a fraction of their fair market value.  *Id.* at 27–28, ¶ 131.

type of harm to shareholders is dependent on injuries suffered to Sorrento.  The bucket each harm falls into: diminution in the value of equity, to the detriment of the California Plaintiffs.  Diminution in the value of equity is necessarily a harm the Debtor suffers directly, and any harm suffered through a reduction in shareholder's stock value is derivative of what is happening to the Debtor.  Accordingly, *Tooley* prong one is satisfied.

Regarding *Tooley* prong two, "who would receive the recovery," because the underlying harm was suffered by the Debtors, the Debtors would be entitled to the benefit of any recovery available.  Were those claims pursued, the California Plaintiffs recovery would derive from the return of corporate assets *to the Debtors* and a corresponding potential increase in stock price.  The claims are essentially claims based on mismanagement of the Debtors' assets, which *Tooley* and the cases it relies on make clear are derivative liability claims.  *Id.* at 1037–39; *Kramer v. Western Pac. Indus., Inc.*, 546 A.2d 348, 352 (Del. 1988).; *Bokat v. Getty Oil Co.*, 262 A.2d 246, 249 (Del. 1970); *Elster v. Am. Airlines, Inc.*, 100 A.2d 219, 224 (Del Ch. 1953).

Because both prongs of *Tooley* are satisfied with respect to injuries relating to the Breach of Fiduciary Duty Claims, those claims are derivative liability claims the Debtors could have asserted under applicable state law.  Accordingly, to the extent those claims exist, they belonged to the Estate and were transferred to the Liquidation Trust under the Plan as of the Effective Date.  *See* 11 U.S.C. §§ 541(a)(1), (7); *In re Seven Seas*, 522 F.3d at 584; *In re Lothian Oil*, 531 Fed.Appx. at 441.  Therefore, the California Plaintiffs lack standing to bring those claims, the Claims are not colorable within the meaning of the Gatekeeping Provision, and the California Plaintiffs are denied authorization to assert them in the California Lawsuit.

There is this point made about *Goldstein v. Denner* and whether derivative liability claims may warrant investor level recoveries, rather than recoveries to the company.  2022 WL 1797224, at *17–20.  The Liquidation Trustee correctly points out *Goldstein* is a remedies case,

41 / 54

and predetermining whether the California Plaintiffs might share in an investor level recovery on account of harm derivative of injuries to the Debtors puts the cart before the horse.  The only ruling the Court is making today is whether the California Plaintiffs' claims are colorable, which requires parsing whether the harms alleged give rise to direct or derivative liability claims under *Tooley*.   The *Goldstein* court contemplated equity as a mechanism for delivering investor level recovery for a derivative liability suit, but the decision on how to craft the appropriate remedy becomes relevant only once a court has determined a right to relief exists.  *Id.* at \*15 (citing *Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964) ("Fundamentally, once a right to relief in Chancery has been determined to exist, the powers of the [c]ourt are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected with the subject matter of the action."). Indeed, the recurring scenarios the *Goldstein* court identified as supporting investor-level recoveries on an entity-level claim implicate a number of different contingent legal and factual determinations that must be litigated first in the underlying lawsuit before those variables begin to influence how equity might craft a more appropriate remedy.[125] *Id.*  Predetermining which remedy is available is merely an attempt at maneuvering these claims out of *Tooley*'s prong two.  The Court declines to hold such.

---

[125] "Cases where the defendants are insiders who misappropriated corporate property such that an entity-level recovery would return the property to the wrongdoers' control."  *Id.* (citations omitted).  Applying this scenario here would presuppose the hypothetical defendants in the derivative claim actually misappropriated corporate property.  "Cases where an entity-level recovery would benefit 'guilty' stockholders, but an investor-level recovery could be more narrowly tailored to benefit only 'innocent' stockholder."  Again, this scenario applied here presupposes there are stockholders guilty of wrongdoing.  The relevant point here is that if and when the Liquidation Trustee were to pursue claims appropriately considered his domain, the future court adjudicating those matters may determine how equity might fashion the appropriate remedy.  Crafting the appropriate remedy is not before this Court today because the Court is not making any ruling on the merits of the asserted claims.

The California Plaintiffs argue the Delaware Supreme Court's holding in *Parnes v. Bally Entertainment Corp.* applies here to exempt the Count III Breach of Fiduciary Duty Claim against Mr. Ji individually from derivative characterization. *Parnes* involved claims brought by shareholders for alleged breaches of the fiduciary duty of loyalty by the CEO and Chairman of Bally Entertainment Corporation, Arthur M. Goldberg (hereinafter "Mr. Goldberg"), during a merger transaction with Hilton Hotels Corporation. 722 A.2d at 1245–46. There, the shareholders alleged Mr. Goldberg controlled merger negotiations by prospectively informing potential acquirors that his consent was required for any business combination with Bally, and that to obtain his consent the acquiror would be required to pay Mr. Goldberg kickbacks and transfer to him valuable Bally assets. *Id.* at 1245. The shareholders asserted that the unfair process not only enabled Mr. Goldberg to self-deal as part of the transaction but resulted in other interested acquirors being discouraged from purchasing the target for potentially higher prices. *Id.* at 1246. The Delaware Supreme Court concluded that this challenge to the fairness and price of the Bally/Hilton merger was a direct claim assertable by shareholders that was not contingent on any harm Bally suffered. *Id.*

*Parnes* was subsequently limited to merger situations, or scenarios involving the "forcible alteration in the status of shareholder[s]." *Furst v. Feinberg*, 54 Fed.Appx. 94, 99 (3rd Cir. 2002). The *Furst* court's limitation on *Parnes* was for good reason, too, as a bankruptcy sale involves a Court regulated process subject to the strictures of the Bankruptcy Code, with the added safety net of the Federal Rules' objection and appeals processes.

This is not a merger case, but rather a bankruptcy sale. The California Plaintiffs were not required to sell their shares by virtue of the Vivasor Sale, nor were they required to sell their shares as part of Plan confirmation. The choice to sell their shares remained with them, and the Sale and Plan did not result in forced alterations to their

shareholder status.[126]     Accordingly, "[the California Plaintiffs']
allegations of injury center, as they must, around the price at which they
sold those shares.  Since '[a]ny devaluation of stock is [an injury] shared
collectively by all the shareholders, rather than independently by the
[California Plaintiffs] or any other individual shareholder,' [] this injury
will not suffice to maintain a direct suit."  *Id.*[127]  This ruling is not meant
to opine on the merits of any breach of fiduciary duty of loyalty claim
that may exist, but rather distinguishes harms purportedly suffered
directly by the California Plaintiffs from harms suffered derivative of
their equity ownership in the Debtors.

### *(2)    The California Penal Code Claim.*

With respect to the California Penal Code Claim, this Cause of
Action is asserted against non-debtors under California state law, and
therefore the internal affairs doctrine does not necessitate application of
Delaware law and the *Tooley* test.  *Jones v. H.F. Ahmanson & Co.* is the
relevant standard for parsing direct and derivative liability claims
under California law.  1 Cal.3d 93.  Under *Jones*, "an action is derivative
if "'the gravamen of the complaint is injury to the corporation, or to the
hole body of its stock or property without any severance of distribution
among individual holders, or if it seeks to recover assets for the
corporation or to prevent the dissipation of its assets.'"  *Schuster v.
Gardner*, 127 Cal.App.4th 305, 313 (quoting *Jones*, 1 Cal.3d at 106–07).
"An individual cause of action exists only if damages to the shareholders
were not *incidental* to damages to the corporation."  *Id.*

---

[126] *See* Second Amended Plan, Article III(C)(1)(6)(B).

[127] *Furst* was a pre-*Tooley* case which focused on the injury alleged, and applied
both *Parnes* and *Kramer*—albeit conducting a "special harm" analysis in a separate
portion of the opinion.  *Id.* at 99–100.  The test articulated in *Tooley* recognized that
the injury-focused analyses from both *Parnes* and *Kramer* "remain[ed] the proper
analysis" for parsing direct and derivative claims.  845 A.2d at 1039.  Accordingly,
reliance on *Furst* is warranted here, particularly given its instructive guidance on
distinguishing *Parnes* merger-type cases from cases involving alleged injuries caused
from a bankruptcy sale and a Chapter 11 Plan.

Despite application of a different test, the result is the same. This claim is based solely on the underlying injury of the Debtor having its property allegedly stolen and concealed.[128]   The Complaint's legal allegations state the defendants stole and concealed the *California Plaintiffs'* property, but the factual allegations refer to the *Debtors'* property being stolen through *inter alia* inappropriate payment of large professional fees, and various below-market bankruptcy-related sales. Any damages to the California Plaintiffs as shareholders was incidental to damages Sorrento suffered.  The gravamen of the injury underlying the California Penal Code Claim is thus an injury to Sorrento, meaning that claim is derivative and the Debtor could have asserted it.  *Jones*, 1 Cal.3d at 106–07.  To the extent those claims exist, they belonged to the Estate and were transferred to the Liquidation Trust under the Plan as of the Effective Date.  *See* 11 U.S.C. §§ 541(a)(1), (7); *In re Seven Seas*, 522 F.3d at 584.  Thus, pursuant to the Plan the California Plaintiffs lack standing to assert the California Penal Code Claim as well.

### B.     The California Plaintiffs Lack Standing to Assert the RICO Claims.

The California Plaintiffs argue they have direct standing to assert the RICO Claims under Eleventh Circuit Precedent.  *Maiz v. Virani*, 253 F.3d at 654–55; *Bivens*, 140 F.3d at 906; *Warner,* 828 F.2d at 1530.

*Maiz v. Virani* applied here does not confer direct RICO standing on the California Plaintiffs.  253 F.3d 641.  There, the Eleventh Circuit explained the rule in its opinion that

> "RICO standing will not arise solely because one is a shareholder or a limited partner in a company that was the

---

[128] Paragraph 200 alleges that as of the date of filing the Complaint, Mr. Ji and non-debtors Scilex and/or Semnur were in illegal possession of the California Plaintiffs' property as to expose them to liability under the California Penal Code.  ECF No. 2674-2, at 40 ¶ 200.  The factual allegations supporting this relate to Mr. Ji's and certain fiduciaries' conduct in allegedly stealing and concealing the Sorrento Debtor's property, which the California Plaintiffs misleadingly frame as Mr. Ji and his cohort stealing *their* property.  *See supra* notes 117–19 (factual allegations in Complaint relate to injuries Debtor suffered directly, and California Plaintiffs indirectly).

> target of the alleged RICO violation.  Such an injury is too indirect or 'derivative' to confer RICO standing." [] [However, s]imply because the plaintiff is a shareholder of a corporation [does not necessitate] he lacks standing to seek RICO damages in his own right.  There is no bright-line rule for determining when an individual who is also a corporate shareholder sues under § 1964 to recover for a RICO violation that affects both the individual and the corporation.  The inquiry is inherently fact-specific.

*Id.* at 654–55.  The *Maiz* court went on to hold that under the facts of that case, the plaintiffs' injuries did not arise "solely" out of a scheme targeting the corporation because trial evidence indicated the defendants targeted their wrongful acts at the individual plaintiffs *before and after* formation of the corporation at hand.  *Id.* at 655.  The facts of *Maiz* and the rule it articulated are distinguishable from the Complaint and its allegations.

The RICO Claims allege harms derivative of injury to the Debtors.[129]  At no point does the Complaint allege conduct which directly

---

[129] *See supra* notes 117–19, 123.  Paragraph 157 alleges Jackson Walker engaged in RICO predicate acts by taking control of companies like Sorrento and orchestrating asset sale prices of those companies for below market value.  ECF No. 2674-2, at 31 ¶ 157.  Paragraphs 164 and 165 allege defendants engaged in RICO predicate acts which had the effect of preventing the California Plaintiffs from participating in "fair and noncorrupted bankruptcy proceedings and the right to object to the fraudulent sale of valuable assets" of Sorrento "in conflicted transactions," which in essence is a complaint about improper valuation of Sorrento assets which reciprocally affected share price.  *Id.* at 32, ¶¶ 164, 165.  Paragraph 172 alleges each defendant engaged in the RICO predicate acts of "bankruptcy fraud," and that they "conduct the affairs of a RICO enterprise" in the "corrupted Bankruptcy Court" which "caused the fraudulent looting of valuable assets" for the benefit of Mr. Ji and "payment of exorbitant compensation and fees" to estate professionals.  *Id.* at 36–36, ¶ 172.  Paragraphs 173 through 175 allege defendants engaged in RICO predicate act of bankruptcy fraud by participating in this bankruptcy proceeding while representing themselves as disinterested parties despite "knowledge" of unethical relationship between former Judge Jones and Ms. Freeman, and despite hosting/participating in the M3 Dinner, all of which had a "disastrous effect on the [Debtors' bankruptcy] proceedings."  *Id.* at 36 ¶¶ 172–75.  Paragraphs 176 and 178 alleges the foregoing RICO allegations resulted in direct and proximate cause to the California Plaintiffs, despite failing to explain why, and despite the underlying factual allegations indicating a direct and proximate injury to the Debtors.  *Id.* at 36 ¶¶ 176, 178.  Paragraph 177

targeted the California Plaintiffs shareholders, other than the misleading accusation that the pattern of racketeering activity directly affected shareholders by influencing the value of their stock price. This is not a situation where the defendants' conduct affected the California Plaintiffs in a different way than it affected the corporation. *Bivens*, 140 F.3d at 908 (explaining allegedly unlawful act "affected creditors in a manner distinct from shareholders," and therefore conferred on that creditor direct RICO standing).

Any alleged racketeering activity the defendants engaged in proximately caused a loss to *Sorrento's* "business or property," 18 U.S.C. § 1962(c); *Holmes v. Secs. Invest. Prot. Corp.*, 503 U.S. 258, 267–68 (1992), and the California Plaintiffs' share price was affected as a result. There are no allegations the defendants stole the California Plaintiffs' property personally: the loss of share value derived from the alleged wrongful conduct to the Debtor. Nor are there allegations the defendants fraudulently induced the California Plaintiffs to make unwise personal financial investments. *Beck v. Prupis*, 162 F.3d 1090 (11th Cir. 1998). Accordingly, neither Eleventh Circuit nor Supreme Court precedent serve to grant the California Plaintiffs direct RICO standing.[130]

The Fifth Circuit applies its own standard for determining whether shareholders have standing to bring a RICO claim for the loss

---

alleges the foregoing RICO allegations prevented and deprived the California Plaintiffs of their right to have their financial interests litigated or otherwise considered, which fails to justify how those injuries are direct, or why proximate cause exists within the meaning of 18 U.S.C. § 1962.

[130] Moreover, the policy undergirding the *Bivens* court's decision to deny shareholders direct RICO standing where there is a risk civil RICO plaintiffs might obtain a "double recovery" is directly implicated here, contrary to the California Plaintiffs assertion. 140 F.3d at 909. Regardless of whether the Liquidation Trustee has filed any actions asserting RICO claims to date, the general policy against double recoveries is meant to focus on the underlying injury suffered. Granting the California Plaintiffs direct RICO standing on account of injuries to Sorrento effectively takes away the opportunity for the Liquidation Trustee to pursue those recoveries for the benefit of the Debtor.

in value of their shares. *Whalen*, 954 F.2d at 1091. Under the approach synthesized in *Whalen*,

> this Court must ask three questions: (i) whether the racketeering activity was directed against the corporation; (ii) whether the alleged injury to the shareholders merely derived from, and thus was not distinct from, the injury to the corporation; and (iii) whether state law provides that the sole cause of action accrued to the corporation. [] If each of these questions can be answered 'yes,' then the shareholders do not have the requisite standing.

*Id.* (citations omitted). The Court has already answered each of these questions in the affirmative.

First, the alleged racketeering activity was directed against the Debtors, and not against the California Plaintiffs. There were no allegations that the California Plaintiffs were directly targeted, nor that the harms they suffered affected themselves distinctly in comparison to the Debtors. There is no racketeering activity alleged that the defendants stole property from the California Plaintiffs individually, but rather they stole Sorrento's property, and the California Plaintiffs stock value diminished as a result.

Second, the injuries to the California Plaintiffs derived from the loss, mismanagement, and diminution in value of corporate assets— each of which are harms the Debtor suffered. The California Plaintiffs do not allege a distinct injury they suffered which was not independent of an injury to the corporation or other shareholders. While the California Plaintiffs paint Mr. Ji as a bad actor who personally benefited from the racketeering activity, Mr. Ji as a shareholder suffered the same harm the California Plaintiffs complain of—a diminution in the value of equity. That Mr. Ji "made off with the assets" would not change the fact he and the California Plaintiffs were in the same position. To the extent Mr. Ji had equity in the company, a diminution in that stock's value was a harm he suffered in the same manner as the California Plaintiffs.

Third, *Tooley* as the applicable state law provides that the injuries in the Complaint are based on derivative liability claims, and therefore belong to Sorrento, not the California Plaintiffs. 845 A.2d at 1038; *see Whalen*, 954 F.2d at 1092 (looking to Louisiana law where business at center of RICO claims was incorporated in Louisiana, and under Louisiana law, damage claims predicated upon depletion of corporate assets belong to entity); *Leach v. FDIC*, 860 F.2d 1266, 1274 (5th Cir. 1988) (looking to Texas law where business at center of RICO claims was a Texas bank). Accordingly, each *Whalen* factor can be answered "yes," and therefore the California Plaintiffs do not have direct standing to assert RICO claims for the loss in value of their shares. 954 F.2d at 1091.

### C.      Ruling on Res Judicata is Premature at this Time.

The M3 Movants argue the California Plaintiffs cannot assert claims against them for Breach of Fiduciary Duty and RICO violations under principles of res judicata, based on this Court's order granting the M3 Final Fee Application. "Claim [] preclusion bars the litigation of claims that either have been litigated or should have been raised in an earlier suit." *In re Southmark Corp.*, 163 F.3d 925, 934 (5th Cir. 1999) (citing *Super Van Inc. v. San Antonio*, 92 F.3d 366, 370 (5th Cir. 1996)). Claim preclusion has four elements: (i) the parties are identical or in privity; (ii) the judgment in the prior action was rendered by a court of competent jurisdiction; (iii) the prior action was concluded to a final judgment on the merits; and (iv) the same claim or cause of action was involved in both actions." *Id.* (citing *Swate v. Hartwell*, 99 F.3d 1282, 1286 (5th Cir. 1996)).

Generally, the doctrine of res judicata must be plead as an affirmative defense, although trial courts may consider a Rule 12(b)(6) motion based on res judicata if the court is treating that motion as one for summary judgment. *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 599, 570 n.2 (5th Cir. 2005) (citing 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 (3rd ed. 2002); *Moch v. East Baton Rouge Parish Sch. Bd.*, 548 F.2d 594, 596 n.3

49 / 54

(5th Cir. 1977)).  Here, the Court is limited to conducting a colorability analysis under the Gatekeeping Provision.  Although standing and colorability are legally distinct, because Article III standing is always a prerequisite to entertaining a litigant's claim, the Court has no procedural or substantive qualms in ruling on standing to determine whether the Plan must be enforced and the California Plaintiffs must be denied authorization to assert their as-plead claims.  The Court is hesitant to overstep its jurisdiction and rule on whether any claims should be denied as a matter of law based on the doctrine of res judicata—or collateral estoppel, for that matter.[131]  Those issues shall be left for a future Court to decide, if and when the Liquidation Trustee chooses to litigate them in his proper discretion.  The Court declines to rule on the matter today.

### III.   PERMISSIVE ABSTENTION IS UNWARRANTED.

The California Plaintiffs request this Court permissively abstain from entertaining the Motions to Enforce to enable the California District Court to try the merits of their case.  The M3 Movants and Liquidation Trustee argue this is unnecessary, and that ruling on the Motions to Enforce would obviate the need to litigate the California Lawsuit.  The Court agrees with the latter position.

28 U.S.C. § 1334(c)(1) provides that district courts have broad discretion to "abstai[n] from hearing a particular proceeding arising

---

[131] Not to say the least about whether certain California Plaintiffs, such as Mr. Espalin, were already aware of the non-disclosure of the M3 Dinner based on his frequent reference to Wall Street Journal articles and other tabloid media in his filings. *See e.g.* ECF No. 2284 (July 5, 2024, Objection to M3 Final Fee Application, referencing statements made in June 20, 2024, WSJ article and June 3, 2024, Business Insider article); ECF No. 2420 (September 13, 2024, Objection to M3 Final Fee Application, referencing statements made in September 3, 2024 WSJ Article ***directly quoting statements about the M3 Dinner***, and referencing August 23, 2024, Bloomberg Law article).  Mr. Espalin filed a supplemental objection to the M3 Final Fee Application nearly two weeks after the WSJ article was published revealing the non-disclosure of the M3 Dinner, which he evidently read because he quoted portions of it in his filing. He then declined to appeal the order granting the M3 Final Fee Application, despite having another two weeks to further digest the article and file an appeal based on failure to consider such.

under title 11 or arising in or related to a case under title 11," if doing so is "in the interest of justice, or in the interest of comity with state courts or respect for state law." *Wood v. Wood (In re Wood)*, 825 F.2d 90, 93 (5th Cir. 1987). Notably, permissive abstention under § 1334(c)(1) applies to both core and non-core matters, while mandatory abstention applies only to non-core proceedings. *Id.*; *Matter of Gober*, 100 F.3d 1195, 1206 (5th Cir. 1996).

"Courts throughout the Fifth Circuit typically use a factors-based analysis to determine if permissive abstention [] of a bankruptcy civil proceeding is appropriate." *In re Dune Energy, Inc.*, 575 B.R. 716, 731 (citations omitted). The non-exclusive group of factors commonly examined by bankruptcy courts include:

> (1) the effect or lack thereof on the efficient administration of the estate if the court remands or abstains;
>
> (2) extent to which state law issues predominate over bankruptcy issues;
>
> (3) difficult or unsettled nature of applicable law;
>
> (4) presence of related proceeding commenced in state court or other non-bankruptcy proceeding;
>
> (5) jurisdictional basis, if any, other than 28 U.S.C. § 1334;
>
> (6) degree of relatedness or remoteness to main bankruptcy case;
>
> (7) the substance, rather than the form, of an asserted core proceeding;
>
> (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgment to be entered in state court with enforcement left to the bankruptcy court;
>
> (9) the burden of the court's docket;

(10) the likelihood that the commencement of the proceeding in bankruptcy court involves forum shopping by one of the parties;

(11) the existence of a right to a jury trial;

(12) the presence in the proceeding of non-debtors parties;

(13) comity; and

(14) the possibility of prejudice to other parties in the action.

*Id.* (internal citations omitted).  Were the Court to apply the permissive abstention factors under the premise the California Plaintiffs had a right to assert those claims, and that the Motions to Enforce were merely within the Court's related-to post-confirmation jurisdiction, the outcome might be different.  The foregoing analysis reveals, however, that the California Plaintiffs lack standing for each of the claims asserted in the Complaint, and that the Motions to Enforce are not just related-to, but core.  From this correct perspective, it becomes clear permissive abstention is unwarranted.

While there is no Estate left to administer post-Effective Date, an *ad hoc* determination of whether claims belonged to the Estate is crucial to enable the Liquidation Trustee to pursue those claims and maximize value distributed to creditors.  State law issues do not predominate over the Motions to Enforce because the court is primarily conducting a standing analyses.  While the standing issues turn on underlying state or federal non-bankruptcy law, *In re Seven Seas*, 522 F.3d at 584, those state law issues are primarily implicated to determine whether the claims in the Complaint are direct or derivative liability claims.  And the applicable laws governing ownership and standing of the claims in the Complaint are well settled in Fifth Circuit and Delaware jurisprudence.  *Whalen*, 954 F.2d at 1091; *Tooley*, 845 A.2d 1039; *see also Holmes*, 503 U.S. at 267–68.  The California Plaintiffs are correct the Court's procedural posture is limited and should not opine on whether

any valid defenses may exist at this time. They are wrong in the assumption that underlying state law issues regarding direct or derivative liability eclipse the Court's primary determination of whether the Liquidation Trust is the current owner of any relevant claims that may exist, or whether the California Plaintiffs generally lack standing to assert their claims. Those determinations are required to interpret the Plan (including the Gatekeeping Provision) and enforcing the Confirmation Order. The Court need not conduct a trial-within-a-trail to adjudicate the Motions to Enforce. It need only rule on issues necessary to interpret the asset-transfer provisions and the Gatekeeping Provision and to enforce the Confirmation Order.

The Motions to Enforce are core proceedings in substance and form and have direct implications on this bankruptcy proceeding because implementation of the Plan requires enabling the Liquidation Trust to pursue claims within its sole discretion, for the benefit of creditors equally. Enabling the California Plaintiffs to end-run the claims distribution process by pursuing claims belonging to the Liquidation Trust will prejudice other creditors, given the general policy against double recoveries on account of a singular harm. There are not, or rather should not be, current live disputes for a state court to adjudicate because the California Plaintiffs lack standing to prosecute the claims they filed. While those claims might involve complicated breach of fiduciary duty and RICO law, the Motions to Enforce are based on clear cut bankruptcy law and Fifth Circuit precedent. Given the foregoing, permissive abstention on the Motions to Enforce is unwarranted.

**CONCLUSION[132]**

For the foregoing reasons, the Court hereby **GRANTS** the Motions to Enforce. [133]

Counsel for all Parties are directed to meet and confer regarding a proposed form of order consistent with this Opinion and submit the same within 14 days.

Signed: June 21, 2026

Alfredo R Pérez
United States Bankruptcy Judge

---

[132] This Memorandum Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

[133] The Court is still considering the Liquidation Trustee's and M3 Movants' requests for sanctions.  The Court requests that the Liquidation Trustee and the M3 Movants file declarations within 14 days detailing the costs incurred in connection with these Motions to Enforce.